FILED 24 JUN 20 15:04USDC-ORM

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**MEDFORD DIVISION**

| | |
|---|---|
| **In re the Matter of J.P. and E.P.:** | **Civil Action No. 1:24-cv-00648-AA** |
| ARNAUD PARIS, | |
| **Petitioner,** | **PETITIONER'S RESPONSE TO RESPONDENT REPLY TO INITIAL PETITION** |
| **and** | |
| HEIDI MARIE BROWN, | *Oral Argument and Evidentiary Hearing Requested Expeditiously under the Hague Convention Provisions with Remote Appearance of Petitioner living in France* |
| **Respondent.** | |

Petitioner, Father, would like to respond to Respondent Reply filed on May 28th 2024, in the above matter in which Respondent is asking to dismiss this Hague Action. Respondent main argument to ask for dismissal of this Hague Action is that Petitioner would be a "fugitive criminal". In the following response, Petitioner will be explaining and supporting with clear evidence that:

1)    Petitioner isn't a criminal; he has no criminal charges for child abduction.

2)    Petitioner isn't a fugitive; he has no fugitive charges against him.

**PETITIONER'S RESPONSE Page 1 of 126**
Case No. 1:24-cv-00648-AA

3)    The Fugitive Disentitlement Doctrine doesn't and shouldn't apply here as will be explained in a clear comparison between the Petitioner's situation and the situation of the Father in the Sasson case law which is the main case law used in Respondent argumentation for this doctrine to justify the dismissal of this Hague Case altogether before hearing it on the merit.

4)    Petitioner has desperately been trying to participate in the Oregon proceedings and he's been denied the right to do so repeatedly.

5)    Petitioner is still participating in proceedings in Oregon when judges allow him to participate remotely since he lives in Paris.

6)    This Honorable Court has all the reasons to proceed with this Hague Action as it is a factual case of illegal child abduction from their habitual residence in France.

7)    Mother has committed a clear criminal abduction in violation of two French judgments on French soil and is therefore truly herself what she is accusing Father of being in bad faith.

8)    Mother shows a pattern of manipulating the French and Oregon courts. She particularly started the proceedings in Oregon in bad faith back in October 2022 as part of a custody forum shopping strategy to avoid the French judicial system that had clear exclusive extended jurisdiction over Eva and Juliette.

9)    Mother has obtained a custody judgment in Oregon as a retroactive 'punishment' against Father that is purposefully keeping Father from currently seeing his children in Oregon.

**PETITIONER'S RESPONSE Page 2 of 126**
Case No. 1:24-cv-00648-AA

10) It is in the best interest of the children to return to France as it is the only place where they can have both of their parents in their lives since Mother has no restrictions for being in France.

11) The legal international complexity that this family has gone through for more almost two years could soon come to an end in France where it was started first through the French Appeal. The French proceedings should have been the only proceedings regarding these children since they had been living in France for many years just a couple of months before this custodial battle started. Children should be in France pending the French appeal and Father is hoping for this Hague Action to order a prompt return of the children to France awaiting that the conflict of jurisdiction be resolved once and for all in the interest of the children.

Petitioner will also be proving in this response that Respondent is being disingenuous to this Honorable Court and is making this "Fugitive Disentitlement Doctrine" argument in bad faith to avoid this Hague Action from proceeding as it would unveil and confirm her criminal action of abducting the children from France.

Petitioner will also explain to this Honorable Court that it is in the best interest of the children that this Hague Action proceeds promptly as they have been under parental alienation from their mother for more than two months now and their French school year needs to be saved within the next few months so that they can be with their friends next year in CM2 in their Paris schools.

1

2

3    I would like to alert the court that as Petitioner Pro Per living in France, I've been

4    asking for now more than two months for the help of the US State Department to find a

5    Pro Bono Hague counsel in this Hague Abduction Action, which is a provision of the

6    Hague Convention since I can't afford a Hague Counsel in the United States; especially

7    after almost two year of endless litigation in the US brough upon me by Respondent who

8    started a competing custodial action in Oregon while there was already one started in

9    France she was fully aware of. Therefore, this will also be my declaration in this matter,

10    and I will speak for myself throughout this entire response to this Honorable Court.

11    **In this response I will try to demonstrate that my actions were not those of a**

12    **fugitive but rather those of an individual caught in a complex international legal**

13    **situation while trying to comply with multiple legal systems and preserving the**

14    **superior interest of my children.**

15    I will start this response by correcting the omissions and misrepresentations that

16    Mother, Respondent, presented to this Honorable Court in their first section entitled:

17    **"Introduction: RELEVANT FACTS AND TIMELINE"**

18

19

20    But for sake of clarity considering the length of this document I would like first to present

21    the following Index Table to this Honorable Court:

22

23

24

25

**PETITIONER'S RESPONSE Page 4 of 126**
Case No. 1:24-cv-00648-AA

1

2

## INDEX TABLE:

3

1.    Relevant and corrected facts and timeline from Petitioner.......................................................8

2.    Father, Petitioner is not a fugitive criminal per French and US Authorities. ........................15

3.    Contempt case in which Judge ORR issued a warrant against Father for his "failure to appear" was made while the court knew Father was living in France with children under French Judgment............................................................................................................................................19

4.    Father never tried to disrespect or escape the Oregon Judicial system, he's tried every possible remedy including in Judge Orr's court when he was allowed to speak like at the beginning of the hearing of December 21st, 2023: ......................................................................21

5.    The Fugitive Disentitlement Doctrine doesn't apply. Petitioner, Father, is not in the same situation as the Father in the Sasson case. ......................................................................................23

6.    The proceedings in the US were started in bad faith by Mother who manipulated the Jackson County Court by committing perjury as she didn't disclose there were custodial proceedings already started in France. ..........................................................................................40

7.    Mother acknowledged in her French pleadings that by doing an abduction of the children from France she would lose all that she gained in the Jackson County court, that includes custody of the children and the attorney fees granted by Judge Orr...........................................................43

8.    The following "SHEPARD" case law from the Oregon Court of Appeals should have cleared the matter in the Jackson County Court – France had extended home state....................44

9.    The General Judgment of Default requires Father to register and enforce this judgment in France before he can exercise any parenting time. But it is simply impossible per French laws. 46

10.    The other conditions of the General Judgment obtained without due process are equally "non-conventional" and close to impossible to meet for Father. ...................................................49

11.    Wrongful accusations by Judge Orr in open court about Father being a criminal. ...........50

12.    Traumatic impact on Petitioner, Father, to have been denied due process and the right to defend himself while actively trying to participate and often being forced to watch passively his civil rights being violated. ...............................................................................................................57

13.    Bench Warrant in Jackson County for failure to appear while living in France. ..............62

14.    Mother's proper legal remedy should have been a Hague Action in France if she thought Father had wrongfully removed the children from Oregon in July 2023......................................65

15.    Mediation taking place in France just a few days before the abduction of the children by Mother early April 2024...................................................................................................................69

16.    Mother's manipulations of the Oregon and French courts. ..............................................73

    a.    Mother's fraud onto Father and the French Judicial System in Paris with the July 19th Agreement made in bad faith in order to bring the children to Oregon. ...................................73

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

b.    Mother's Perjury in her Status Quo and Dissolution petition to the court by not disclaiming that she was aware of a custodial action already started in France. ......................74

c.    Mother provided false testimony about get her new French lawyer just before the French custody hearing – Clemence Brassens Testimony. ....................................................................76

d.    Falsification of a Jackson Court Document presented to the French police and to the French judge before asking a Jackson County Judge to sign the document a day later (when Father took back the children to France)...................................................................................81

e.    Mother manipulated the Jackson County Court to make Judge Orr believe that the French judicial system wouldn't allow her to participate remotely and that she couldn't present testimonies from American witnesses in the French custody case. ..........................................84

f.    Mother was disingenuous to the Oregon Court of Appeals about mediations not taking place in France to reject the transcription extension request from Father. ...............................86

g.    Mother testified in open court in front of Judge Orr that Father was raping women without evidence and without Father being allowed to defend himself but with him being forced to watch without being able to object even....................................................................89

h.    Misleading the French Appeal Court of Paris about her intentions to comply with French orders during the April 3rd 2024 hearing in front of the Presiding Judge. .................................91

i.    Mother manipulated the Paris Appeal Court on April 3rd 2024 pretending she was willing to participate into mediations in France while she was preparing the abduction of the children. 92

j.    Mother, Respondent, has been instrumentalizing the Jackson County court to try to avoid this Hague Action (abusive stalking order request): ...................................................................93

k.    Manipulation of the California Court about the residence of the children since July 2023. 96

l.    Judge Orr himself asked Miss BROWN during the Jackson County proceedings after Father and the children were back in France: "You're not going to make a kidnapping Miss Brown"? and she answers "No"...................................................................................................99

m.    Mother is calling Father a "criminal fugitive" while Mother is the one who just committed a criminal abduction of the children from France..................................................102

n.    Why is Mother concealing information on how she left Europe in her response to this Honorable Court while Father fully explained his return to France?.......................................104

17.    What is the best interest of the children in this matter? ...................................................105

a)    Mother just committed an abduction in France of her own children ruining their French school year and impacting their orthodontist treatment, she is a fugitive criminal who doesn't have the interest of her own children in mind........................................................................105

b)    Eva and Juliette had lived almost 4 years total in France and had started the French school system since they were 2-year-old. They were back in France for almost a full year to a life in Paris that was without a doubt their "habitual residence" since 2019 as concluded the Oregon District Court....................................................................................................................112

**PETITIONER'S RESPONSE Page 6 of 126**
Case No. 1:24-cv-00648-AA

1

18.    Response to Mother's Argument: Article 1(b) of the Hague Convention........................116

19.    CONCLUSION ............................................................................................................118

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## 1. Relevant and corrected facts and timeline from Petitioner.

- **July 29, 2022**: Mother and children go to Ashland, Oregon, with Father's consent (obtained fraudulently) for a temporary school year for the children during 2022-2023 before returning to Paris. (See attached Exhibit 00)

- **October 3, 2022**: After having discovered Mother's plan to file after 6 months and obtaining home state jurisdiction in Oregon, Father files for Custody, Parenting Time, and Child Support in the French Family Court of Paris.

- **October 7, 2022**: Mother files a Petition for Custody, Parenting Time, and Child Support, and for Dissolution of Domestic Partnership, in Jackson County Court.

- **October 11, 2022**: Temporary Protective Order of Restraint (TPOR) is issued in the Jackson County case prohibiting children's removal until a custodial determination is made.

- **October 20, 2022**: Father files Hague Convention Petition in the District Court of Oregon, Medford Division, seeking return of the children to France where he lives.

- **December 5, 2022**: District Court Judge Michael McShane acknowledges that the children's habitual residence was France but allows the children to stay in Oregon for the remaining school year.

- **December 7, 2022**: District Court Judge Michael McShane dismisses Father's Hague Convention Petition.

**2023**

- **January 6, 2023**: Father files objections to the temporary restraint order in Oregon as it was obtained in bad faith per Mother based on perjury.

- **January 6, 2023**: Father appeals Judge McShane's dismissal of his Hague Petition.

- **January 30, 2023**: Father dismisses his appeal of the Hague judgment as requested by the French judge in Paris so that the French custodial action can proceed.

- **March 31, 2023**: French court hearing on jurisdiction and on the merit determining that the children's habitual residence should be with their father in France and that the children will return to resume the 2023-2024 school year in their schools in Paris.

- **April 18, 2023**: Father's counsel files motion to stay proceedings based on Judge Orr having to confer with the French court; motion ignored by Judge Orr.

- **April 21, 2023**: French court grants Father full custody and rules that the children will be residence in Paris under the custody Father and Mother will have visitation rights during school vacations and the children will return to France to resume the 2023-2024 school year in their schools in Paris.

- **May 9, 2023**: Father registers the French judgment in Oregon, making it as good as a custodial determination from Oregon the day it is registered per UCCJEA statutes.

- **May 30, 2023**: Father submits a Petition to the Oregon Supreme Court to vacate the TPOR as it will become in clear conflict with the French Judgment provisions.

- **June 23, 2023**: The Oregon Supreme Court refuses to intervene in the case (moot) as the Status Quo order has been dissolved by the French custodial determination.

- **July 11, 2023**: The Oregon Supreme Court denies Father's Petition to vacate the TPOR as moot since by operation of law the Status Quo is already dissolved.

- **July 12, 2023**: Jackson County Circuit Court holds hearings on Father's request to register the French judgment and dismiss the Oregon case.

- **July 22, 2023**: Father, with guidance from the French consulate, travels with the children to France believing he was in compliance with the Oregon Statutes and with the approval from the US border patrols fully aware of the entire case,

- **August 2, 2023**: Father files a complaint with the Oregon Judicial Fitness Commission against Judge Orr for judicial bias and misconduct.

- **August 3, 2023**: Father files motion requesting remote participation in Oregon hearings; motion denied by Judge Orr. Father's counsel is also forbidden to represent him against the Oregon Appeal Court recent opinion on the matter.

- **August 3, 2023**: Father files motion to object to the temporary restraint order, ignored by Judge Orr and for Mistrial in the custody proceedings, ignored.

- **August 4, 2023**: Father files motion detailing Mother's misrepresentations and fraudulent actions, ignored by Judge Orr.

- **August 17, 2023**: Father files motion to disqualify Judge Orr based on bias and lack of impartiality; motion ignored by Judge Orr.

- **August 18, 2023**: Judge David J. Orr declines to confirm the registration of the French judgment in Oregon, ignoring the evidence and testimonies provided by Father.

- **August 24, 2023**: French court issues a second judgment prohibiting the children from leaving France due to the high risk of abduction by the mother.

- **August 25, 2023**: Father files for an emergency hearing in Oregon to prevent the children's removal from France.

- **September 8, 2023**: Father files motion to dismiss the Jackson County case based on the registration of the Second French judgment in Oregon court; ignored by Judge Orr.

- **September 16, 2023**: Father files motion to stay the case based on new French custody determination; ignored by Judge Orr.

- **September 18, 2023**: Father files motion to suspend Oregon proceedings until jurisdictional issues are resolved; ignored by Judge Orr.

- **October 3, 2023**: Father files another motion to the Oregon Supreme Court to intervene due to ongoing judicial misconduct from Judge Orr and irreparable prejudice.

- **October 3, 2023**: Father petitions the Oregon Supreme Court again to intervene due to ongoing judicial misconduct from Judge Orr.

- **October 18, 2023**: Father files fifth motion to dismiss the Jackson County case based on the California registration of the French Judgements in California that Mother hasn't objected to, making this registration of French judgments final; ignored by Judge Orr.

1

2

3

- **October 24, 2023**: Father files third motion for mistrial and motion to stay the case till a new judge is appointed by the Oregon Supreme Court; ignored by Judge Orr.

4

5

- **November 6, 2023**: Father files motion in Oregon requesting dismissal of the case due to improper jurisdiction and procedural violations; ignored by Judge Orr.

6

7

- **November 6, 2023**: Father files objections to Petitioner's motion to strike third motion to dismiss for lack of subject matter jurisdiction; ignored by Judge Orr.

8

9

- **November 9, 2023**: Father files a motion to continue hearings in the Jackson County proceedings for 60 days to find proper representation; motion ignored by Judge Orr.

10

11

- **November 10, 2023**: Father files a motion to consider and set a hearing for the 15 previously ignored motions filed in the case; motion ignored by Judge Orr.

12

13

- **November 13, 2023**: Father files a motion for disqualification of Judge Orr for lack of impartiality and denial of due process; motion ignored by Judge Orr.

14

- **November 14, 2023**: Father files motion to dismiss the case based on conduct; ignored by Judge Orr.

15

16

- **November 21, 2023**: Father files a motion for protective order regarding discovery; motion ignored by Judge Orr.

17

18

- **November 21, 2023**: Father files a second motion for protective order regarding discovery; ignored by Judge Orr.

19

20

- **December 14, 2023**: Father files motion for being allowed to appear and participate remotely in the Jackson County hearings; ignored by Judge Orr.

21

22

- **December 18, 2023**: Father files a motion to stay the case based on the previous motion to disqualify Judge Orr and a civil complaint in Oregon Federal District Court; motion ignored by Judge Orr.

23

24

- **December 21, 2023**: Father requests postponement of Oregon hearing to secure legal representation against FBI extradition threat by Mother; request denied by Judge Orr.

25

**PETITIONER'S RESPONSE Page 11 of 126**
Case No. 1:24-cv-00648-AA

- **December 26, 2023**: Father files a motion to set aside the order for attorney fees and summary judgment, requesting a continuance for 90 days to find proper representation; motion ignored by Judge Orr.

**2024**

- **January 3, 2024**: Father files motion for disqualification of Judge Orr in contempt case; ignored by Judge Orr.

- **January 6, 2024**: Judge Orr issues a warrant for Father's arrest due to his absence at a hearing, ignoring his requests for remote participation.

- **January 27, 2024**: Father appeals Judge Orr's ruling that invalidated the French custody judgment.

- **February 13, 2024**: Father files motion challenging Judge Orr's jurisdiction over the case.

- **February 22, 2024**: Father files a motion for hearing to object to Petitioner's motions for sanctions; ignored by Judge Orr.

- **February 22, 2024**: Father files motion for remote appearance at hearing to show cause; ignored by Judge Orr.

- **February 22, 2024**: Father files motion for reconsideration of motion for disqualification of Judge Orr for lack of impartiality and denial of due process; ignored by Judge Orr.

- **February 22, 2024**: Father files motion for continuance pending reconsideration of disqualification of Judge Orr; ignored by Judge Orr.

- **February 22, 2024**: Father files motion for continuance and disqualification in contempt case; ignored by Judge Orr.

- **February 22, 2024**: Father files motion for remote appearance in contempt case; ignored by Judge Orr.

- **February 29, 2024**: Father files motion for remote appearance at hearing to show cause; ignored by Judge Orr.

- **February 29, 2024**: Father files motion for continuance pending disqualification of Judge Orr; ignored by Judge Orr.

- **February 29, 2024**: Father files motion for remote appearance at hearings; ignored by Judge Orr.

- **March 4, 2024**: Father files another request to postpone March 7 hearing due to lack of representation; request denied by Judge Orr.

- **April 10, 2024:** Mother abducts the children from France with help of their grandmother and they all return to the United States in violation of two French judgements on French.

- **April 16, 2024**: Father files a Hague Convention petition against Mother.

- **April 22, 2024**: Father files an emergency motion to set aside the limited judgment from December 28, 2023, and requests an emergency hearing on kidnapping of the children from France ; ignored by Judge Orr.

- **April 24, 2024**: General Judgment regarding Dissolution of Domestic Partnership is entered, incorporating the limited judgment regarding custody without due process.

- **May 22, 2024**: Father files a motion to have another judge hear the disqualification of Judge Bloom in the Jackson County custody case. Denied by Judge Bloom.

- **May 23, 2024**: Father files a motion and declaration for remote appearance at the May 28 hearing. It's not granted until Father informs the court he is going to be represented by a local Oregon lawyer in the Jackson County custody case.

- **May 25, 2024**: Father petitions the US Supreme Court due to ongoing judicial harassment and denial of due process in the Oregon courts.

- **May 26, 2024**: Father approaches attorney Christopher J. Eggert to represent him in a motion to disqualify Judge Benjamin Bloom.

- **May 28, 2024**: Attorney Eggert argues the motion to disqualify Judge Benjamin Bloom; the motion is denied without any proper legal ground and in total contradiction to the spirit of the Oregon statutes. (See attached Exbibit 36)

1

2
- **May 31, 2024**: Attorney Christopher J. Eggert writes a letter detailing concerns about Judge Bloom's handling of the case and the fairness of the proceedings.

3

4
- **June 4, 2024**: Father files motion challenging the dissolution judgment and seeks further legal recourse.

5

6
It is to be noted that compared to the Relevant facts and timeline provided by Respondent the following items were misrepresented or missing:

7

8

9

10
a)    Mother indicated she had filed in Oregon at the same time as Father on October 7th, she misrepresented the fact that Father was first to file to the French Family Court of Paris on October 3rd then 4th and it was accepted by the court on October 6th. Father was first to file and France, first to serve and was first to judgment.

11

12

13

14

15
b)    Mother omitted all the attempts Father did at participating in the Oregon proceedings remotely from France and all the attempts Father did in Oregon to obtain remedy and injunctive relief against the gross denial of due process he was taking place in the Oregon courts with immediate irreparable prejudice, including the issuance of a warrant for his arrest for failure to appear that couldn't be remedied in an appeal.

16

17

18

19
c)    Mother also omitted all the attempts she made at having Father prosecuted with criminal charges and that all these requests to the Medford DA and the US Attorney's Office were denied. This is showing already that Mother is doing a misrepresentation to the court trying to portray Father in her initial timeline as a fugitive criminal in bad faith.

20

21
To give a better visual understanding of the timeline that is relevant to this Hague Action I prepared the following visual:

22

23

24

25

**PETITIONER'S RESPONSE Page 14 of 126**
Case No. 1:24-cv-00648-AA

1
2



## CHRONOLOGY ABDUCTION FROM FRANCE

Abduction of Eva and Juliette on April 8th, 2024 by their Mother, Heidi Brown, in France in complete violation of two French judgments in full force and effect on French soil and while the girls were on the arlert system at all european borders since the second French Judgment said the girls couldn't leave France. Mother didn't have any US order registered in France when she abducted children. Mother should have filed for a Hague Action in France last summer if she thought children were abducted.

**April 21st, 2023**
French Judgment granting custody of the children to Father in Paris with visitation rights for Mother every school vacation (Mother only asked to the French judge for custody in Oregon, not in Paris).

**July 21st, 2023**
Father obtains confirmation from the Oregon lawyers and from the French Consulate that the Oregon Status Quo has no validity anymore and that the French Judgment properly registered in Oregon superseedes the Oregon Status Quo order.

**July 25th, 2023**
Mother and her counsel lie to the French authorities presenting a falsified document from the Jackson County court that they asked afterwards to be signed to Judge Bloom who denied their request.

**September 15th, 2023**
Mother asks the FBI to have abduction charges pressed against Father, the US AO denies because of the French judgment. BUT Mother doesn't start Hague Action in France.

**ABDUCTION** From France on April 8

**May, 9th 2023**
Registration of the French Judgment in Oregon on May 9th served to Mother on May 10th and she objects to it on May 31st, but this remains the only custodial determination existing in Oregon or anywhere in the world about Eva and Juliette Paris.

**July 23rd, 2023**
Eva and Juliette return to France with approval of French and US authorities that deemed that the Status Quo order from Oregon was not valid anymore by operation of law (the French judgment having voided it). French consul present.

**July 29th, 2023**
Mother ask the Medford DA to press charges for child abduction, the DA refuses because of the French judgment. Mother asks the French Police to press charges, also denied.

**December 28th, 2023**
Mother asks Judge Orr to make an order to the FBI for an arrest of Father and children in France and their extradition to the US. Judge Orr denies because he says he doesn't have jurisdiction over the children in France.

See attached **Exhibit 01**, Chronology of the Abduction of Eva and Juliette Paris from France to Oregon during the week of April 8th 2024 at the current stage of the French Police criminal investigation and prosecution against Mother.

The following section will focus on presenting clear evidence that Father never had any charges pressed against him for having supposedly 'abducted' the children as Mother has been claiming it disingenuously to this Honorable Court and to both the French and the US Authorities.

## 2. Father, Petitioner is not a fugitive criminal per French and US Authorities.

When Father challenged the validity of the TPOR once the French custodial determination had been issued in the Paris court and registered in Oregon, it was explained to Father by his Oregon counsels that per the Oregon Statutes the TPOR had been clearly superseded by the French custodial determination that had been properly registered in Oregon on May 9th, served to Mother on May 10th, and had therefore become a custodial

determination in full force and effect on the day of its registration as good as any other custodial determination from the state of Oregon (per ORS 109.787(2)).

-See attached **Exhibit 03**, letter from Oregon Counsel Tom Bittner to the French consulate in San Francisco on July 17th, 2023.

> *"But there is nothing in Oregon law that says that an objection to a registration that is already effective is suspending the effectiveness of such French judgement."*

-See attached **Exhibit 04**, letter from Oregon Counsel Bradley Lechman Su to the French consulate in San Francisco on July 20, 2023.

> *"Attached to this letter is the Official Register showing that Judgment (originally the French judgment), was registered under 23DR08269 and thus it became an Oregon Judgment on the day it was registered, May 9, 2023."*

-See attached **Exhibit 05**, letter from Oregon Counsel Bradley Lechman Su to the French consulate in San Francisco on July 21, 2023.

> *"The question is what effect the filing of an objection has on the status of the filed judgment? It has no effect on the judgment until the court hears the objection, and then, and only then, will the court decide whether the objection has any merit. In the meantime, the judgment is an official, registered judgment entitled to full recognition and enforcement."*

All my interactions with the French Consulate the week before our return to France in July 2023 were based on what I had been explained from my Oregon lawyers and that they confirmed in writing in these emails between July 17th and July 21st explaining to me that the Oregon Statutes clearly indicated that the Status Quo had been invalidated by operation of law through the registration of the French Judgment in Oregon.

I also asked for confirmation from the French Consulate who agreed with this analysis after they consulted with their "legal attaché" at the French Embassy in Washington, otherwise they wouldn't have delivered the travel documents for Eva and Juliette to return to France as indicated in their email:

Dear Sir,

As you know, we made our decision to issue the passes for your daughters not without having first checked its merits, in particular with our central administration. Witness our many exchanges that we have had since you informed us of the removal of your daughters by their mother.

In support of your request, you presented yourself with a court decision confirming that you exercise parental authority over your two daughters and determining their habitual residence with you, in France. This decision is also registered in Oregon. From then on, nothing stood in the way of the issue of French titles for your daughters.

In addition, the American authorities, the only ones competent to decide on entry and exit on their territory, have decided to let you board for France after having reconsidered their initial refusal on the basis of the ban on leaving the territory requested by the mother of your daughters. I have no doubt that these authorities made their decision to dismiss the reporting of the children by their mothers after a thorough analysis of their situation.

For our part, I can assure you that our decision to issue passes was made knowingly, in the best interests of your daughters as stated by the French judge.

Sincerely,


*Olivier-Antoine REYNES*
**Gérant**
*Acting Consul General*

Therefore, in the mind of Petitioner, it was made clear that the TPOR by operation of law had been superseded, voided and invalidated by the registration of the French judgment in Oregon (on top of having been obtained based on perjury in the first place). The Jackson County Court had a issued a Status Quo order based on Mother's perjury and Father had been explained that this order was dissolved by operation of law and Father had obtained the confirmation from the French and US authorities at the SFO Airport that he was authorized to return to France with the children since that TPOR had no validity anymore and Mother herself had agreed and committed to the relocation of the children to France at the end of the 2022-2023 Oregon school year that ended on June 16th.

-See attached **Exhibit 02**, the July 19th Agreement between Father and Mother confirming return of the children in France after the 2022-2023 school year in Oregon as Judge McShane confirmed it in the Hague Proceedings of December 2022 in Eugene:
//
//

-See attached **Exhibit 05**, email from the French Consulate explaining that the US Border Patrol confirmed that Father was allowed to return to France with the children while they were fully aware of the TPOR and the Oregon proceedings and ***"after a thorough analysis of the situation."***

```
17        Obviously, if Ms. Brown chooses to keep the children in
18   Oregon, she will be in violation of the French agreement.  The
19   Oregon courts may want to, and I think they should, enforce the
20   agreement you entered into.  I think you should be stuck with
21   it, even if you change your mind.
```

Petitioner wasn't charged neither by the Medford DA nor by the US Attorney's Office for any abduction charges when he left the US with his children to return to France despite Miss BROWN asking repeatedly for such charges to be pressed against Father.

In evidence provided to the French court in her appeal in France, Mother released herself the proof that both the FBI and the US Attorney Office recognized the French judgment and denied Mother's request to press criminal charges against Father for having taken the children to France under the French judgment even if there was the Oregon Status Quo order.

-See attached **Exhibit 07**, translation of the email from the FBI agent Tamara Simmons confirming that both the FBI and the US Attorney Office denied Mother's request to press criminal charges against Father for child abduction. (Evidence originally provided in French by Mother's French Attorney, Sandrine Farrugia, as Exhibit 87 in the French proceedings).

**Subject: [EXTERNAL EMAIL] – Confirmation**
Tapara Simmons <TSIMMMONS3@fbi.gov>          Tue, Sep 26, 2023 at 8:11 AM
To: Heidi Paris <hindimparis@gmail.com>

Heidi,

The FBI has now closed its investigation into this case. The decision to close the case in no way diminishes the important contribution that you made to the investigation. Your help and cooperation were greatly appreciated. The investigation was closed because the United States Attorney's Office (USAO) declined to prosecute. For more information, please contact the USAO.

If you have additional questions, please contact us by email.

Respectfully yours,                          [Stamp:]
TaPara Simmons Jr.                           Sandrine FARRUGIA
Special agent                                Attorney of the court
Portland Division                            Exhibit 87
VCAC/VIC

-----Original message-----
From: Heidi Paris <hindimparis@gmail.com>
Sent: Saturday, September 16, 2023 at 2:47 pm
To: Tapara Simmons Jr. (PD) (FBI) <TSIMMMONS3@fbi.gov>
Subject: [EXTERNAL EMAIL] – Confirmation

Hello Mr. Simmons,

Could you send me an email confirming that the FBI will not be filing child abduction charges against Mr. Paris?

Thank you,

Heidi

3. **Contempt case in which Judge ORR issued a warrant against Father for his "failure to appear" was made while the court knew Father was living in France with children under French Judgment.**

This court also had no jurisdiction over me and the children since we were living in France where I had returned with the children with the approval of French and US Authorities and I didn't agree to service by email, the Hague Convention about service doesn't allow for this type of service in France, which makes service of this contempt case invalid. Therefore, the warrant for my arrest and the entire contempt case should be dismissed or at the very least the warrant for my arrest should be set aside as this warrant was part of a remedial case and the relief thought by Petitioner has already happened. Children are with Mother

**PETITIONER'S RESPONSE Page 19 of 126**
Case No. 1:24-cv-00648-AA

in Oregon. I am currently still trying to challenge that contempt case and the warrant for my arrest that was issued while I was living 6000 miles away and was following a French judgment ordering me to care for my children in Paris where they were supposed to reside and go to school per that French judgment.

Judge Orr not only denied me the right to participate while all I was just trying to do the best for our children, ensuring that they could start their French school year as I had been instructed to do by the French judgment. Here is an excerpt of the November hearing in front of Judge Orr:

> *THE COURT:*
> *When you are in flagrant violation of that order, you are not going to come back in to court and continue to litigate about where these kids should be or where they shouldn't be or what's going to happen with these children, absolutely not. The court is not -- this is basically -- you're asking --*
> *MR. PARIS:*
> *So it was a sanction?*
> *THE COURT:*
> *Be quiet right now. This is as though you are asking the Court to negotiate with hostage-takers. This is what this looks like. You are now holding these children criminally. It doesn't matter to me whether you were charged criminally or not. You have violated a criminal statute --*

**Four important things to alert this Honorable Court about:**

1)    Judge Orr, who had been stripped from all his criminal cases by the Jackson County Presiding Judge Mejia in 2021 as a sanction for being unfit to rule criminally, is now saying that he doesn't care that both the Medford DA and the US General Attorney concluded that I was not to be charged criminally for having brought back the children to France under the approval of both the French and US authorities in full knowledge of the Oregon proceedings including his Status Quo order that they deemed to not be valid anymore.

2)    Judge Orr is saying he has more authority to decide what is 'criminal' offense than the Medford DA and the US General Attorney Office.

3)    A family judge who is fully aware that the children have resumed their school year in France and are properly following on French soil what a French judgment had ordered Father and the children to do, which is to ensure that the children start their school year in Paris, thinks it is a good thing to order that the children be brought back to the US in the middle of the school year?

4)    And that family judge wants to unroot the children from having been back in the Parisian environment and school system they had started since they were 2-year-old in Paris instead of letting them continue being in school in France and instead of simply allowing Father to participate in the Oregon proceedings remotely as it had previously been possible to do when he was in the US?

-See attached **Exhibit 08**, letter and motion from Medford DA, Beth Eckert, asking for disqualification of Judge Orr from all criminal cases due to his lack of impartiality.

> *"I have never filed an affidavit on a judge in my 33 years in the District Attorney's Office. Unfortunately, I do not believe that crime victims, law enforcement officers, my attorneys or even the accused can receive a fair hearing or impartial trial before Judge Orr."*
>
> *Beth Eckert, Medford DA, July 26th, 2021*

**4. Father never tried to disrespect or escape the Oregon Judicial system, he's tried every possible remedy including in Judge Orr's court when he was allowed to speak like at the beginning of the hearing of December 21st, 2023:**

One of the best pieces of evidence I can bring to this Honorable Court about my respect to the Oregon judicial system is this excerpt from the Jackson County proceedings from December 21st 2023:

//

//

**PETITIONER'S RESPONSE Page 21 of 126**
Case No. 1:24-cv-00648-AA

**THE COURT (JUDGE ORR)**

*But your position is that it was ok for you to do that because this court didn't have jurisdiction to make the orders that it made in the first place. And so therefore, the court's orders, as you see it, were not valid and you, you committed no wrong by removing the Children from Oregon. So if that is the case, what I, what I don't understand is why you are, why are you concerned about continuing this litigation here in this case in Oregon?*

**MR. PARIS**

*First, I'm continuing out of respect. I know it sounds incredible from your perspective because you, you, you, you believe that I've been genuinely and maliciously have been leaving thinking "Great. I don't care. I'm just gonna take the Children and I'm running away. I'm gonna run away." That's really not. That wasn't my, my, my, my thinking, truly, I, I asked a lot of questions to understand of course, what was the validity of what Miss Brown had been doing from the beginning. And, and again, I am sorry to say that, but like me, your honor has been manipulated from the beginning and, and, and you've been lied to from the beginning. So, of course, my first opinion, after I was advised, by lawyers, is that something obtained on perjury has no validity.*

*And, and if I was able to prove you that you've been lied to, you probably would think the same. But we're not at that point yet. I know that you don't want to let me explain that yet, but with proof in your courtroom. So I'm going to move to the second reason, which was that I was also explained by, by, by a lawyer that the Oregon Statutes, they clearly, and I've, I've read it myself and I, and I, and I was genuinely convinced myself that the Oregon statute said clearly that the, the, the, the status quo has no validity anymore once there is a custodial determination which there was in France and which was registered in the US. And when, when I left with the Children, that objection from mother against that French judgment hadn't been heard yet. And, and I was explained clearly and, and, and I was, that was confirmed by Washington that was confirmed by the border patrol that was confirmed by the consulate that did refer to the State Department.*

As will be shown later in this document I, Father, tried my best to participate in the Oregon proceedings and I've been seeking remedy to the violation of my civil rights in this matter as well as filing for an appeal in which I'm confident the Oregon Judicial will ensure proper justice is taking place even in a "diversity" case involving French nationals and the French judicial system.

## 5. The Fugitive Disentitlement Doctrine doesn't apply. Petitioner, Father, is not in the same situation as the Father in the Sasson case.

By arguing that my petition should be dismissed under the Fugitive Disentitlement Doctrine, Mother is distorting the facts of the case to excuse her own criminal conduct when she kidnapped the children from France and concealed their whereabouts in Oregon.

Mother relies primarily on a case from the Supreme Court of Virginia, *Sasson* v. *Shenhar* (2008) 276 Va. 611. There are many facts that distinguish this case from *Sasson*, but the primary difference concerns compliance with court orders.

In *Sasson*, father wrongfully removed the children from Virginia to Spain and refused to comply with an order to return them to Virginia. That is, at the time of the proceedings, father remained in noncompliance and the children were in Spain which interfered with the mother's fundamental interest as a parent in the custody of her children.

In my case, while it was due to Mother's abudcting the children, the children are now in Oregon. Compliance with Judge Orr's order that the children be returned to Oregon is moot. **I am not a "fugitive" from that order, as was the case in *Sasson*, and compliance is a non-issue.** The children are in Oregon and thus there is no present

interference with Mother's fundamental parental rights. Quite the opposite, in fact, due to Mother's unlawful conduct in abducting the children from France in violation of two French custody judgements on French soil, my parental rights are compromised.

I'm not engaging in illegal behavior like Mother. What Mother should have done was file a Hague action in France seeking their return upon our return if she deemed I took them to France wrongfully. But instead Mother decided to engage in self-help instead regardless of the consequences. Unlike Mother, I'm engaging the legal process, subjecting myselft to Oregon jurisdiction, and I'm seeking rightful orders under the law that the children be returned to their habitual residence pending the outcome of the jurisdictional issue between Oregon and France and to finally determine which forum has issued the controlling custody order over the children.

## CHRONOLOGY ABDUCTION FROM FRANCE

Abduction of Eva and Juliette on April 8th, 2024 by their Mother, Heidi Brown, in France in complete violation of two French judgments in full force and effect on French soil and while the girls were on the arlert system at all european borders since the second French Judgment said the girls couldn't leave France. Mother didn't have any US order registered in France when she abducted children. Mother should have filed for a Hague Action in France last summer if she thought children were abducted.



**April 21st, 2023**
French Judgment granting custody of the children to Father in Paris with visitation rights for Mother every school vacation (Mother only asked to the French judge for custody in Oregon, not in Paris).

**July 21st, 2023**
Father obtains confimation from the Oregon lawyers and from the French Consulate that the Oregon Status Quo has no validity anymore and that the French Judgment properly registered in Oregon superseedes the Oregon Status Quo order.

**July 25th, 2023**
Mother and her counsel lie to the French authorities presenting a falsified document from the Jackson County court that they asked afterwards to be signed to Judge Bloom who denied their request.

**September 15th, 2023**
Mother asks the FBI to have abduction charges pressed against Father, the US AO denies because of the French judgment. BUT Mother doesn't start Hague Action in France.

**ABDUCTION**
From France on April 8

**May, 9th 2023**
Registration of the French Judgment in Oregon on May 9th served to Mother on May 10th and she objects to it on May 31st, but this remains the only custodial determination existing in Oregon or anywhere in the world about Eva and Juliette Paris.

**July 23rd, 2023**
Eva and Juliette return to France with approval of French and US authorities that deemed that the Status Quo order from Oregon was not valid anymore by operation of law (the French judgment having voided it), French consul present.

**July 29th, 2023**
Mother ask the Medford DA to press charges for child abduction, the DA refuses because of the French judgment. Mother asks the French Police to press charges, also denied.

**December 28th, 2023**
Mother asks Judge Orr to make an order to the FBI for an arrest of Father and children in France and their extradition to the US. Judge Orr denies because he says he doesn't have jurisdiction over the children in France.

-See attached **Exhibit 01**, Chronology of the Abduction of Eva and Juliette Paris from France to Oregon during the week of April 8th 2024 at the current stage of the French Police criminal investigation and criminal prosecution against Mother.

Mother claims that my petition for return should be dismissed under the Fugitive Disentitlement Doctrine must fail because she has failed to meet her burden of proof that there is a sufficient nexus between the alleged fugitive status and any impairment of her parental rights. Under the law, without such a nexus application of the doctrine in matters involving fundamental parental rights is deemed too harsh.

In *Sasson* v. *Shenhar* (2008) 276 Va. 611, the court applied a three-part test to determine whether the Fugitive Disentitlement Doctrine should be applied:

> In order to employ the doctrine, the following elements are required: (1) the appellant must be a fugitive, (2) there must be a nexus between the current appeal and the appellant's status as a fugitive, and (3) dismissal must be necessary to effectuate the policy concerns underlying the doctrine. See, e.g., *Walsh* v. *Walsh*, 221 F.3d 204, 215 (1st Cir. 2000); *Magluta* v. *Samples*, 162 F.3d 662, 664 (11th Cir. 1998); *Atkinson* v. *Taylor*, 277 F. Supp. 2d 382, 385 (D. Del. 2003). Moreover, when deciding to apply the doctrine, courts must exercise "restraint," and its use must "be a reasonable response to the problems and needs that provoke it." *Degen* v. *United States*, 517 U.S. 820, 823-24 (1996).

> *Sasson* v. *Shenhar*, *Id.* at 623.

//

In this case, Mother's claim must fail because she cannot meet the second requirement of the test. In *Sasson*, the father refused to comply with orders from the Virginia Circuit Court and wrongfully removed them to Spain and refused to return them to Virginia. Due to his noncompliance, the children remained in Spain thus impairing the mother's custodial rights under the Virginia orders (no Spanish custody orders were at issue).

Regardless of the fact that in this case there was no wrongful removal and that a jurisdictional dispute exists, the children are presently in Oregon and Mother's rights are therefore unimpaired. With no showing of impairment, application of the doctrine is improper. The *Sasson* court held:

> As the Court of Appeals noted, in *Walsh*, for example, the United States Court of Appeals for the First Circuit declined to apply the Fugitive Disentitlement Doctrine in a Hague Convention case where there was no impairment of the other party's parental rights by the appellant's fugitive status and, thus, there was an insufficient nexus to satisfy the second part of the test for applying the doctrine. *Moscona*, 50 Va. App. at 255, 649 S.E.2d at 199 (quoting *Walsh*, 221 F.3d at 216). In this case, by wrongfully taking Ilan to Spain, Sasson has clearly interfered with Shenhar's parental rights.

*Sasson v. Shenhar*, *Id.* at 627

The Fugitive Disentitlement Doctrine was applied in *Pesin* v. *Rodriguez* (2001) 211 F.3d 1250, but in that case, as in *Sasson*, there was a clear impairment of parental rights by the father who was asserting application of the doctrine against the mother. In *Pesin*, the

District Court granted the father's petition for the return of the parties' children to Venezuela. The mother refused to comply with the orders, she was found in contempt and a bench warrant was issued for her arrest. The father's parental rights were clearly impaired by mother's **conduct in defiance of the very orders from the District Court that she was appealing**.

The children are currently in Oregon and unlike *Sasson* and *Pesin*, Heidi's parental rights are presently unimpaired. On this fact alone Heidi's request for dismissal must be denied.

Similarly in *Walsh* v. *Walsh* (2000) 221 F.3d 204, the lack of a nexus between the father's fugitive status and the mother's parental rights, the doctrine was not applied. The opinion in *Walsh* is particularly instructive in the application of the doctrine to matters under the Hague Convention:

> In *Walsh*, the father was a fugitive from justice when, in 1994, he absconded to Ireland from Massachusetts to avoid criminal prosecution in a separate proceeding related to breaking and entering the home of a neighbor and threatening to kill him. The mother, who was pregnant at the time, followed the father to Ireland a couple months later with their two-year-old child. The opinion details extensive domestic violence committed against the mother, their child, and other family members while in Ireland. Mother ultimately fled and returned to the United States with the children in 1997. Father filed a petition for the return of the children to Ireland, which was granted with undertakings by the district court.

The *Walsh* court denied the application of the Fugitive Disentitlement Doctrine

because the mother could not meet her burden of proof on the second requirement for application of the doctrine. She unsuccessfully argued that but for the father's absconding to Ireland, she would not have followed him and there would have been no occasion to apply the treaty and file a petition for return. This was an insufficient nexus between fugitive status and her parental rights:

That, though, may be too slim a read to support so weighty a doctrine.

*Walsh* v. *Walsh*, *Id.* at 216.

The *Walsh* court further reasoned that the enforceability of judgments against parties in a foreign jurisdiction is always a consideration in matters under the Hague Convention and is insufficient to meet the third requirement for application of the doctrine:

*There are questions of enforceability of any potential judgment against John, as return orders under the Convention are often imposed with conditions, as was true here. But all cases under the Convention raise similar problems since, by definition, one of the parties lives in a foreign jurisdiction. Neither was the petition brought to harass Jacqueline. The practical considerations, on these facts, are not strong enough alone to warrant application of the doctrine.*

*Ibid.*

Implicit in this analysis by the *Walsh* court is that there are always going to be enforcement issues in inter-jurisdictional custody disputes which alone are insufficient for the application of the doctrine without a finding of a sufficient nexus between the fugitive status and the impairment of parental rights. In this case there is an unresolved issue of

which custody orders are the controlling orders between France and Oregon. **But that is largely irrelevant in this proceeding because the Hague Convention contemplates that the children be in their place of habitual residence pending the outcome of the jurisdictional dispute** — in Oregon, a finding of habitual residence is not a jurisdictional determination so if this Honorable Court concludes that the children have been wrongfully removed from France and that it was their habitual residence to order their return it won't constitute a custodial determination neither for France nor for Oregon. Mother's abducting the children, however, is the very conduct the Hague Convention was implemented to prevent and remedy — as discussed below.

Mother's remedy for the return of the children is not to kidnap them by illegally crossing borders and absconding with them to the US, **which an application of the doctrine in this proceeding would explicitly condone**, but to seek return orders from a French court which Mother could have done either by starting a Hague action in France when she claimed I abducted the children or through her appeal in France currently happening.

Perhaps of greatest applicability to this case, the *Walsh* court determined [emphasis added]:

"*More importantly, applying the fugitive disentitlement doctrine would impose too severe a sanction in a case involving parental rights. Parenthood is one of the greatest joys and privileges of life, and, under the Constitution, parents have a fundamental interest in their relationships with their children. See generally Troxel v. Granville, 120 S.Ct. 2054, 2060 (2000) (plurality opinion) ("The liberty interest . . . of parents in the care, custody, and*

*control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this Court."). To bar a parent who has lost a child from even arguing that the child was wrongfully removed to another country is too harsh. It is too harsh particularly in the absence of any showing that the fugitive status has impaired the rights of the other parent."*

*Ibid.*

Mother has not and cannot show that her parental rights are impaired, she has the children in Oregon, so no finding of a nexus between this proceeding and fugitive status is possible. Mother's recitation of the procedural facts of the case is suspect. She lied to the Oregon court when she commenced proceedings there by stating, under oath, that there was no other pending custody proceeding — she was aware of the French custody preceding that predates the proceedings in Oregon as was said in open court in the Hague proceedings of December 2022. More recently, Mother also lied to the French court when she told the judge, in open court, that of course she would follow and comply with the French orders and Judgements, just a few days before abducting the children on French soil in violation of those two French judgments.

Based on her representation, I allowed her to see the children and she immediately violated the French orders by abducting them and unlawfully removing them from France. Criminal proceedings against her are pending. It is worth noting that Mother's fugitive status in France is in violation of a custody order that has impaired my parental rights — **Mother is attempting to turn the tables or distract this Court by accusing me of**

**conduct she has engaged in.**

By contrast, I did not abduct the children when we returned to France. As I've stated, the properly registered French order was in full force and effect under Oregon law at the time we returned to France. To make sure I did not violate any orders I consulted with two separate attorneys in Oregon on this issue and they each independently confirmed the French order had superseded the Status Quo order. I consulted with the French consulate that came to the same conclusion and decided to issue travel documents for Eva and Juliette for them to be able to return to France. They also went over the entire case with the border patrol in California as well prior to our departure to ensure our return was proper under the law. The border patrol consulted with their legal office in Washington to confirm we could lawfully return to France. After that return to France with the children, Mother attempted to have me prosecuted for abduction but that was unsuccessful because under Oregon law and the registered French order, I had lawfully returned to France with the children. Mother's claim that I abducted them in violation of Oregon orders when we left is without merit and has no factual or legal support.

While Judge Orr may disagree, despite it not being a discretionary issue, none of his orders are the basis for any prosecution against me for abduction.

At the hearing in front of Judge Orr on November 14, 2023, Judge Orr did not acknowledge that under Oregon law, the registration of the French order superseded the earlier temporary orders he had issued while the Oregon Supreme Court herself considered that my request to vacate his order was moot, which implied that there was no need to

vacate an order that had already been dissolved by operation of law .

-See attached **Exhibit 09**, decision from the Supreme Court, that Respondent was referring to in her *Response*, saying that the request was "Moot".

Despite my efforts to speak and present evidence at the hearing, Judge Orr repeatedly told me to be quiet thus denying me the opportunity to be heard. When I attempted to object, he told me my objections would not be heard. This is shown in the transcript as cited by Mother in her papers. Judge Orr stated I violated a criminal statute and that it was a felony when I returned to France with the children. Judge Orr did not address the timing issues and the registration of the French order or address which order was in effect at the time of our departure— unless a custody order was violated, there is no actionable claim under the criminal authorities cited by Judge Orr. No U.S. enforcement agency agrees with him and despite Mother's efforts, no agency prosecuted that claim. To the extent Mother asserts that I am a fugitive based on violating an Oregon custody order, that is a false representation. The bench warrant that issued was due to my not personally appearing in Judge Orr's courtroom on an order to show cause why I should not be held in contempt — despite the fact that I was in France, he refused to let me appear remotely while he had previously allowed me to appear remotely in the proceedings. The order directing that I return the children to Oregon was after the fact and cannot be the basis for a claim of abduction because we were already in France under a lawful French order with a departure approved by US authorities in full knowledge of Judge Orr's order.

What Judge Orr was doing was trying to retroactively change the nature of the orders

to make my return to France an abduction. Only if it was an abduction could he then order my return or the return of the children. Judge Orr is trying to say that I have wrongfully removed the children from Oregon but that is for a Hague Judge in France to make that determination, not for him. And it was for Mother to start this Hague action in France. Judge Orr couldn't retroactively try to create the "result of a Hague Action". I am not improperly in France, but **Mother improperly removed the children from France**.

Regardless of Judge Orr's conduct and regardless of his orders or findings, even assuming he was completely correct in his understanding of Oregon custody and criminal law, the fact remains that I have never been criminally prosecuted for violating a custody order and Mother cannot show that her parental rights are in any way currently impaired, which **she must do to meet her burden of proof for the application of the Fugitive Disentitlement Doctrine.** More recent US Case Law comes to confirm that this Doctrine shouldn't be applied to this matter:

In *United States* v. *Bescond* (2d Cir. 2021) 24 F.4th 759, Ms. Bescond, a French banker, was charged with knowingly transmitting false commodities reports in violation of the Commodities Exchange Act from her office in France. Through counsel, she moved to dismiss the indictment, but the district court refused to reach the merits of her motion under the Fugitive Disentitlement Doctrine. The US Court of Appeals reversed the district court's decision on the ground that, *inter alia*, Ms. Bescond was not a fugitive. Under the *Bescond* court's analysis, I too am not a fugitive:

1
2
3
4
5
6
7
8
9

There are two types of fugitivity at common law: (1) traditional fugitives and (2) constructive-flight fugitives. Both require conduct that occurred in the United States. A traditional fugitive is "[a] person who, having committed a crime, flees from [the] jurisdiction of [the] court where [a] crime was committed or departs from his usual place of abode and conceals himself within the district." *Finkelstein*, 111 F.3d at 281 (alterations in original) (quoting BLACK' S LAW DICTIONARY (5th ed. 1979))

*Id.* at 771.

10
11
12
13

I am not a traditional fugitive because I engaged in no conduct in Oregon or elsewhere in the United States that violated any orders. I was not found to have violated orders nor was I found in contempt in any U.S. proceeding at the time I returned to France with the children. A constructive-flight fugitive is:

14
15
16
17
18
19

[A] person "who allegedly committed crimes while in the United States but who w[as] outside the country—for whatever reason—when [she] learned that [her] arrest[ ] w[as] sought and who then refused to return to the United States in order to avoid prosecution."

*Id.* at 772.

20
21
22
23
24

I engaged in no other conduct that violated any orders while I was in the U.S. The registration of the French order superseded the temporary orders issued by Judge Orr — two Oregon attorneys agreed with this view, the border patrol in California and their attorneys in Washington agreed, and the Oregon Supreme Court agreed when they

25

determined my petition for Writ of Mandamus to vacate Judge Orr's temporary order was

moot, which is only true if that order was no longer in force and effect.

-See attached **Exhibit 09**, decision from the Supreme Court, that Respondent was referring

to in her *Response*, saying that the request was "Moot".

The *Bescond* court further noted:

> *"Nor is she refusing to return to the United States to avoid prosecution; she*
> *simply remains at home, as her home country permits her to do. So she does*
> *not qualify as a constructive-flight fugitive."*
>
> *Ibid.*

Judge Orr's order that I appear personally in his courtroom, even though I was in France

at the time he made that order, therefore cannot be the basis to apply the Fugitive

Disentitlement Doctrine. **Under that order, the alleged conduct occurred while I was**

**in France, not in Oregon, and like Ms. Bescond, I remain in France as my country**

**permits me to do.**

Further, citing *Antonio-Martinez* v. *I.N.S.*, 317 F.3d 1089, 1092 (9th Cir. 2003), the

*Bescond* court noted:

> *The paradigmatic object of the doctrine is the convicted criminal who flees*
> *while his appeal is pending.*
>
> *Ms. Bescond's presence in France was not covert or suspect and was not "a*
> *hideout, sanctuary, or escape from the reach of the law" (Bescond at 773).*
> *There was no flight from justice. Likewise, I am not hiding out or evading the*

> *reach of the law and am actively participating in those proceedings. The*
>
> *Bescond court reasoned (Ibid):*

But if the doctrine were to be expanded to reach someone such as Bescond, who stays at home abroad, without concealment or evasion, Congress, not the courts, should weigh the competing issues and values and determine whether such an expansion is warranted. As observed in *Degen*:

> *"Courts invested with the judicial power of the United States have certain inherent*
>
> *authority to protect their proceedings and judgments in the course of discharging*
>
> *their traditional responsibilities," including disentitling fugitive defendants, but*
>
> *"[t]he extent of these powers must be delimited with care, for there is a danger of*
>
> *overreaching when one branch of the Government, without benefit of cooperation*
>
> *or correction from the others, undertakes to define its own authority." 517 U.S. at*
>
> *823[...].*

**Disentitlement**

Citing *Empire Blue Cross* v. *Finkelstein* (2d Cir. 1997) 111 F.3d 278, the *Bescond* court stated four principles served by disentitlement:

> Disentitlement serves four purposes: "1) assuring the enforceability of any
>
> decision that may be rendered against the fugitive; 2) imposing a penalty for
>
> flouting the judicial process; 3) discouraging flights from justice and promoting
>
> the efficient operation of the courts; and 4) avoiding prejudice to the other side

caused by the defendant's escape." *Finkelstein*, 111 F.3d at 280. Courts exercise

their discretion to apply the doctrine "[b]earing these objectives in mind."

*Bescond* at 773-74.

**Enforceability**.

My return to France was not obtain any unfair advantage nor did I seek to "game

the system." I was merely trying to do what the French order was asking me to do which

was to prepare the French school year my children were to attend in Paris, I was not hiding

out nor "running away with the children". Unlike Mother, my whereabouts were known.

Unlike Mother, at no time did I conceal my location or the children's location. I have no

residence in Oregon and my employment is in France. The only reason I would ever have

to go to Oregon is to see the children in the event the pending jurisdictional dispute is not

resolved in favor of France — the jurisdictional dispute is beyond the scope of this

proceeding which is to ensure the children remain in their habitual residence pending the

outcome of the jurisdictional dispute. Disentitlement is too harsh under these circumstances

and given the fundamental parental rights at issue.

**Flouting the Judicial Process**.

The nature of my conduct was to return home, to the children's place of habitual

residence, consistent with the custody orders in effect in Oregon at the time being the

French judgment. Unlike Mother, I did not lie to the court. Unlike Mother, I did not abduct

the children and illegally cross international borders with them. Unlike Mother, I am

actively participating in proceedings in the U.S. and France. I should be permitted to do so

from France pending the outcome of the jurisdictional dispute, and the children should be able to remain in their habitual residence pending that dispute. Disentitlement is inappropriate under these circumstances as well, because it eliminates a parent's ability to assert their children's best interests in pending proceedings to be in their habitual residence.

**Discouraging Flights from Justice**.

If Mother's request to apply the doctrine is successful, it would apply to any parent in any Hague proceeding in which there are conflicting orders between two forums. This would be a denial of due process that would tilt the field heavily in favor of every parent who, by hook or by crook, has the children in the U.S. It would promote illegal conduct and the kidnapping of children to the U.S. The U.S. would be a haven for abducting parents. As stated above, my return to France was in no way a flight from justice.

**Avoiding Prejudice**.

The inquiry here is to determine what prejudice results from the flight from the jurisdiction. As pointed out herein, the prejudice would have been the denial of parental rights. However, the children are in Oregon so Mother cannot show any such prejudice. Even if the children were still in France, it is questionable whether such prejudice would warrant application of the doctrine in view of the countervailing prejudice to me and the denial of my parental rights. Not applying the doctrine does not mean our respective parental rights will not be considered.

Even if I were a fugitive as required by the doctrine, the circumstances do not warrant disentitlement and the request should be denied.

**PETITIONER'S RESPONSE Page 38 of 126**
Case No. 1:24-cv-00648-AA

To summarize this legal analysis between the Sasson case and the current case in front of this Honorable Court I prepared the following comparison table thought it is difficult to fit all the specific legal arguments and case law citations that have been explained above.

| Criteria | Sasson Case | Paris/Brown Case |
|---|---|---|
| Jurisdiction | Virginia | Oregon and France |
| Primary Allegation | Father wrongfully removed children from Virginia to Spain | Allegation of wrongful removal of children to France by Mother, no criminal charges, and no Hague action started, followed by wrongful removal of the children by Mother from France to Oregon per Article 3 of the Hague Convention. |
| Court Orders | Father failed to comply with Virginia court orders to return children | Children are currently in Oregon; compliance with Oregon court orders is not in question currently |
| Compliance with Court Orders | Father remained in noncompliance, children stayed in Spain | Compliance with Oregon orders moot; children are in Oregon currently |
| Parental Rights Impairment | Mother's fundamental parental rights were impaired as children remained in Spain | Heidi's parental rights are not currently impaired; however, Father's parental rights are compromised per two French judgments |
| Legal Actions Taken | Father did not engage with the legal process; fled jurisdiction | Father engaged with the legal process, he respected both Oregon and French courts and used or actionned every legal remedy. |
| Legal Compliance | Father engaged in illegal behavior by refusing to comply with orders | No illegal behavior; followed legal processes communicated with authorities and sought rightful orders |
| Hague Convention Involvement | Not applicable | You advocate for handling through Hague Convention; Heidi did not pursue a Hague action in France. |
| Nature of Removal | Wrongful removal to a foreign country | Mother's removal involved alleged kidnapping from France to Oregon with criminal prosecution |
| Fundamental Issue | Noncompliance with court orders and impairment of parental rights | Father's efforts to comply with both Oregon and French legal systems; Father focuses on children's welfare |
| Misrepresentation from Father | Father is lying extensively to the courts and to Mother | Father is honest and transparent with Mother regarding all the current legal actions pending both in France and in Oregon and about the life of children. |

| Following Judgement even at the Risk of Abduction | Father doesn't hesitate to engage in self-help regardless of the consequences | Follows the judgments even when it is clear that Mother is going to take advantage of it to commit an abduction: French judgment allowed for visitation time during school vacation without supervision |
|---|---|---|

In summary, what transpires from this analysis is that Mother, not Father, seems to be closer to what the Father was doing in the Sasson case, especially as Mother, didn't hesitate to engage in self-help regardless of the consequences especially when she uprooted them in the middle of their school year from France to take them on a fugitive escape of Europe trying to avoid border controls and leaving behind their belongings in a hotel including their stuffed animals and their orthodontist apparel. And completely severing the children from their French culture and family and friends for now more than two months. But Mother's actions seem to also show a pattern of manipulation towards the judicial systems both in France and in Oregon based on a large number of misrepresentations as will be explained next.

## 6. The proceedings in the US were started in bad faith by Mother who manipulated the Jackson County Court by committing perjury as she didn't disclose there were custodial proceedings already started in France.

The Status Quo order and the Custody Petition in this case were obtained based on perjury from Miss Brown. See page 5 of the attached transcript from the Hague Federal proceedings from last December 2022 in Eugene, Oregon:

*"Now, why did she file Exhibit 49, the custody case in Oregon? Not because that was part of her preplan, because, in fact, the six months obviously hadn't expired at that point. She did that because Dad had filed in France, on October 3rd, a French custody case. And Ms. Brown was concerned that, again, it was another reneging of a contract, and that Mr. Paris was going to use the October 3rd French custody filing to again yank the kids back."*

-See attached **Exhibit 10**, excerpt from the Hague Federal proceedings in front of Honorable Judge McShane from last December 2022 in Eugene, Oregon.

In this transcript, Miss Brown's lawyer says clearly that Miss Brown knew about the French custody case Father had filed on October 3rd, 2022 and Miss Brown filed her custody case in Oregon in response to it on October 7th, 2022 including the motion for Status Quo order. Yet in her declaration to obtain the Status Quo order, Miss Brown declared under perjury that she didn't know of any other custody proceedings about the children:

*"I do not know of any proceeding that could affect this proceeding, including any proceedings for enforcement or relating to domestic violence, protective orders, termination of parental rights, or adoptions."*

-See attached **Exhibit 11**, Status Quo motion from Miss Brown specifically the points 16 and 17 on page 5.

This entire case was started based on perjury from Miss Brown which is a state and federal felony to the court and yet Judge Orr ignored deliberately all of this evidence when

**PETITIONER'S RESPONSE Page 41 of 126**
Case No. 1:24-cv-00648-AA

it was presented to him. This proof and evidence of perjury had been presented to Judge ORR in a motion filed in April 2023 untitled "Motion to dismiss for Fraud and Lies" and in a second Motion filed with the court on November 16th 2023 untitled **MOTION TO DISMISS FOR DENIAL OF JURISDICTION FOR REASON OF CONDUCT** (ORS 109.764) that Judge ORR has refused to consider.

-See attached **Exhibit 12**, MOTION TO DISMISS FOR DENIAL OF JURISDICTION FOR REASON OF CONDUCT that was filed in the Jackson County Court on November 16th 2023.

Therefore, Judge ORR conducted a clear denial of due process against Father, Petitioner. Had Judge ORR considered the motions regarding the validity of this Status Quo order that were properly in front of him he would have clearly seen that Mother lied and committed perjury to obtain her Status Quo order in the first place which invalidates it entirely Ab Initio with no prospective effects. A Status Quo order issued Ex-Parte must be done rigorously otherwise it's false. If this Status Quo order was obtained on a false basis and on perjury from Mother, then the Status Quo order is void or voidable.

Per the previous elements provided in this case Judge ORR knew very well this Status Quo order was based on falsehood, it should have been voided and set aside by Judge ORR when Father was asking repeatedly to have a hearing on the merit of this Status Quo order in May and June 2023 as Judge ORR had clearly been made aware of the damages and prejudice that were caused by this invalid and unlawful Status Quo order. Considering the immense immediate prejudice to Father, Judge ORR should have immediately remediated to this prejudice by vacating the Status Quo order when Father

alerted on its invalidity, with no prospective effects. The Jackson County court didn't have jurisdiction and the statement from Mother was based on perjury which rendered this Status Quo order also void Ab Initio. It was also void and voidable if the Jackson County court wouldn't have considered this Status Quo order to be void Ab Initio.

Since the Status Quo had been obtained through perjury it had no validity and Judge ORR couldn't use it to try to impose a contempt case upon Father based on that invalid order that Father would have supposedly violated. The fact that Judge ORR was trying to force his jurisdiction over Father and the French Judicial system based on that illegal and invalid (dissolved by operation of law) Status Quo order to bring back the children to Oregon instead of Mother filing for a Hague Action in France is a clear proof that there was a total lack of respect for the French Judicial system, and it confirms the lack of impartiality from Judge Orr through this clear denial of due process against Father in this matter.

**7. Mother acknowledged in her French pleadings that by doing an abduction of the children from France she would lose all that she gained in the Jackson County court, that includes custody of the children and the attorney fees granted by Judge Orr.**

In the pleadings that Miss BROWN's French lawyer filed on April 3rd to the French court and that she argued in front of the Presiding Judge of the Paris Appeal Court when she was asking that the French Judgment of August 25th 2023 (the one keeping Mother from taking the children outside of the US when she comes for her visitation time) be set aside pending the appeal of that Judgment in Paris Mother is admitting herself in there that if she was to violate that French Judgment and take the children to the US illegally her Oregon Judgment would be overturned.

1
2
3

-See attached **Exhibit 13**, excerpt from the pleadings that Miss BROWN's French lawyer filed on April 3rd to the French court and that she argued in front of the Presiding Judge of the Paris Appeal Court when she was asking that the French Judgment of August 25th 2023

4
5

Attached is a rough google translation but on page 32 and 33 you can read:

6
7
8
9

*"Monsieur PARIS a également été condamné à payer à Madame BROWN la somme de 225.000 dollars au titre des frais d'avocat engagés aux USA, dont il ne s'est pas acquitté, si Madame BROWN devait «kidnapper» les enfants tel qu'il le prétend, elle renoncerait à obtenir une telle somme."*

10
11

Which translates in English:

12
13
14

*"Mr. PARIS was also ordered to pay Ms. BROWN the sum of $225,000 for legal fees incurred in the USA, which he did not pay. If Mrs. BROWN were to "kidnap" the children as he claims, she would give up obtaining such an amount."*

15
16
17
18
19
20

This is a clear acknowledgement and admittance from Mother, Miss BROWN, herself that if she were to violate that French judgment on French soil and abduct the children from France to the US then her Oregon judgment would to be reversed since she would become an 'abducting parent' **and no court in the US would confirm a judgment granting custody to an abducting criminal parent**.

21
22
23

**8. The following "SHEPARD" case law from the Oregon Court of Appeals should have cleared the matter in the Jackson County Court – France had extended home state.**

24
25

https://caselaw.findlaw.com/court/or-court-of-appeals/1085351.html

This case law is a very strong argument for me to show that the Oregon Court of Appeals confirmed in 2005 that a temporary stay of a Mexican parent with her child in Ashland (of all cities) for a year of studies, doesn't constitute a loss of the home state jurisdiction for Mexico over the child per *ORS 109.704(7)*.

See the attached case comparison analysis that Tom Bittner my ex-lawyer did using SHEPARD v. BARCENAS in his "motion to dismiss" on pages 11 to 14, showing that France should equally be considered to have retained exclusive extended jurisdiction over our children in Oregon even when Mother filed for custody when they had only been in Oregon for 2 months early october 2022. The following excerpts are particularly relevant:

*"See Shepherd v. Lopez-Barcenas, 200 Or App 692 (2005) (holding that the mother and child's absence from the home state for one year while mother obtained a master's degree was a "temporary absence" within the meaning of ORS 109.704(7).)"*

*CITING SHEPARD: "Their absence from Mexico was only temporary, and the time spent in Ashland is therefore considered to be time in Mexico for the purpose of determining the home state. ORS 109.704(7)."*

*"As in Shephard, the Father and the children are present in Ashland on a temporary basis for the purpose of attending school for the 2022-2023 school year. The July Agreement expressly provides that the parties never mutually intended for the children to stay in Ashland on a permanent, ongoing basis beyond the end of the 2022- 2023 school year. Even if Father had remained in Ashland with Mother and the children, the absence from France would still be a "temporary absence," just as in Shephard. Mother's secret intention to remain in Ashland with the children does not defeat the temporary nature of the children's stay here."*

-See attached **Exhibit 14**, RESPONDENT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION (ORCP 21 A(1)(a)) that was filed in the Jackson County Court on April 18th 2023 by Father's former counsel Tom Bittner.

The July 19th agreement and the French court's findings clearly demonstrate that the move to Oregon was temporary, with a definitive plan to return to France. The filing in the Paris court on October 4th, 2022, when the children had been in Oregon for only two months, further supports that France retains extended home state jurisdiction under the UCCJEA. This situation aligns with the Shepard case, where a temporary absence did not alter the home state jurisdiction, thus maintaining France's legal jurisdiction over the custody matter. The court have should denied the Petitioner's claim for custody in Oregon, France had exclusive continued jurisdiction over the children and still has to this day.

**9. The General Judgment of Default requires Father to register and enforce this judgment in France before he can exercise any parenting time. But it is simply impossible per French laws.**

**It is not in the interest of children not to have a Father in Oregon while they can have a Mother and a Father in France per the French judgment (and Father offers mediations so that children can spend all their school vacation in Oregon).**

As explained in **Exhibit 15**, attached and incorporated herein by reference, the Court of Cassation (French Supreme Court) requires three conditions be met in order to be registered and enforced, despite any agreement by parties for such registration. Cornelissen Cass. Civ February 20th, 2007 n°05-14082. The conditions are as follows:

1. The foreign Court has jurisdiction under French law;
2. The foreign judgment complies with French procedural and substantive public policies; and
3. The foreign judgment was rendered without fraudulent forum shopping.

-See attached **Exhibit 15**, Declaration from Terrence Richoux, Father's French attorney and French expert in International Law, explaining the conditions for a Foreign Judgment

**PETITIONER'S RESPONSE Page 46 of 126**
Case No. 1:24-cv-00648-AA

to be registered in France per French law.

The first condition is not met given France has not declined to exercise jurisdiction and the second condition is not met as Father's deprivation of his right to defend himself through counsel is contrary to the recognized right of defense in France. **Father consequently cannot register the Oregon General Judgment of Default in France such that this judgment deprives his right to parenting time without good cause.**

Father is also likely to prevail on appeal in Oregon due to the trial court denying Father's right to due process by prohibiting Father's attorney from participating in the August 3, 2023, hearing. ORS 9.320 provides that "[a]ny action, suit, or proceeding may be prosecuted or defended by a party in person, or by attorney, * * * unless otherwise specifically provided by law."  In re Kharma, 332 Or App 489 (2024), the husband filed a response to the wife's petition for dissolution, but did not appear personally at trial. The trial court prohibited the husband's attorney from participating due to the husband's failure to appear and indicated to the wife she only needed to put on a prima facie case. A general judgment favorable to the wife was entered, stating that the husband "did not appear", that his counsel "appeared", and that the wife presented a prima facie case "because [husband] failed to appear at the time and place set for trial." This Court held that the trial court committed grave error by mistakenly believing the husband was required to appear in person and prohibiting participation of his lawyer. The trial court's actions resulted in a fundamentally unfair trial, and was reversed and remanded for a new trial.

Based on ORS 9.320, Kharma, and the notion of fundamental fairness, the trial court's refusal to allow participation of Father's attorney in the evidentiary hearing resulted in a fundamentally unfair proceeding. There is no legal basis to prohibit a party appearing by and through their attorney at a hearing or other legal proceeding and it is a common practice.

The mediation efforts that Father conducted in France over the last year to offer shared parenting time to Mother emphasize the fact that to the contrary in Oregon there is no possible balance of both parents being equally involved in the children's life. Consequently as long as the Oregon Judgment remains in place, France is the only place where the children can have both parents properly involved in their lives.

-See attached **Exhibit 16**, official mediation offer sent to Mother's French Counsel on October 30, 2023 by Father's French Counsel Terrence Richoux.

-See attached **Exhibit 17,** email from the French mediator in Paris to the President of the Paris Appeal court informing her that Petitioner had left France with the children right in the middle of the French mediations without any warning while she had agreed and committed to these mediations.

On page 28 of Mother's judgment one of conditions required for me to be able to see my children in Oregon is that: *"The final Oregon Custody and Parenting Time judgment is registered and enforced in France as well as all other states and counties where Father registered the French custody judgment and any other counties, states, or countries where Father has commenced court proceedings related to Custody and Parenting Time."*

By French law a French judge can't register the Oregon Judgment in France as is explained in the attached declaration from my French counsel who is also specialized in the matter of registering US judgments in France.

Mother's judgment could not be registered in France because it violates all the conditions for a judgment to be registered in France and as a result this Oregon judgment is keeping me from seeing my children in Oregon. This is unconstitutional even per the Oregon

constitution, this judgment is extremely prejudicial and creates irreparable harm onto the relationship of the children with their father.

**10. The other conditions of the General Judgment obtained without due process are equally "non-conventional" and close to impossible to meet for Father.**

The other conditions of the Oregon Judgment obtained by Mother from Judge Orr without due process also constitute a violation of Father's most fundamental rights:

| CONDITION | DETAIL OF WHAT FATHER MUST DO | POSSIBLE TO MEET? | FATHER'S BASIC RIGHTS VIOLATED? |
|---|---|---|---|
| Registration and Enforcement of Oregon Judgment in France | The final Oregon Custody and Parenting Time judgment must be registered and enforced in France, as well as in all other states and counties where you registered the French custody judgment. Also, there should be no other duplicative or frivolous custody proceedings initiated by you in France, Oregon, or any other jurisdiction. | IMPOSSIBLE LEGALLY, FRENCH LAW SIMPLY DOESN'T ALLOW A JUDGMENT MADE WITHOUT A PARTY ALLOWED TOP DEFEND OR TO BE REPRESENTED BY HIS LAWYER | YES, SINCE THIS CONDITION IS IMPOSSIBLE TO MEET THEN THIS JUDGMENT SIMPLY VIOLATES THE FUNDAMENTAL RIGHT OF FATHER TO BE ABLE TO SEE HIS CHILDREN |
| Permanent Residence of Father in Oregon | Father must establish a permanent place of residence in Ashland, OREGON that can adequately and safely accommodate the children, including a separate bedroom for them in a safe environment. | NO, FATHER HAS MEDICAL COVERAGE FOR A LIFELONG CONDITION IN FRANCE AND HE WOULD LOSE IT IF HE ESTABLISHES HIS RESIDENCE IN THE USA, PLUS A HOME IN ASHLAND IS MINIMUM $3000 PER MONTH | YES, FOR FATHER TO MEET THIS CONDITION HE WOULD HAVE TO MOVE TO ASHLAND AND ESTABLISH A RESIDENCE THERE, CONSIDERING THE COST OF LIVING HE WOULD HAVE TO GIVE UP LIVING IN FRANCE, THIS IS VIOLATING FATHER'S FUNDAMENTAL RIGHT TO LIVE WHERE HE WANTS |
| Bond Posting of $150,000 by Father | Father must post a bond of $150,000, payable to the mother, in the event he takes the children out of Oregon in violation of the parenting plan. | NO, FATHER DOESN'T HAVE ANY FINANCIAL RESOURCE LEFT BECAUSE OF ONGOING LITIGATION IN OREGON IMPOSED BY MOTHER IN BAD FAITH FOR OVER 2 YEARS IN PARALLEL TO FRENCH ONE STARTED FIRST | YES, THIS VIOLATES THE FUNDAMENTAL RIGHT OF FATHER TO BE ABLE TO SEE HIS CHILDREN |
| Access to Activities and Events of the Children Forbidden | Father is not allowed to attend the children's school activities and athletic events. | YES, THOUGH UNCONSTITUTIONAL | YES, THIS VIOLATES THE FUNDAMENTAL RIGHT OF FATHER TO BE ABLE TO SEE HIS CHILDREN AND BE INVOLVED IN THEIR LIFE |
| Communication of Father with the Children beween 3m and 5am in France | Father may call the children on the telephone two times per week. The call shall last no more than 15 minutes and shall take place between 6 PM and 8 PM. | IMPOSSIBLE, FATHER LIVES IN FRANCE AND THIS TIME IS BETWEEN 3 AM AND 5 AM, HOW CAN FATHER SLEEP AND WORK IF HE HAS TO BE UP EVERY NIGHT WAITING FOR A POSSIBLE PHONE CALL OF HIS CHILDREN? | YES, THIS VIOLATES THE FUNDAMENTAL RIGHT OF FATHER TO BE ABLE TO COMMUNICATE WITH HIS CHILDREN SINCE HE LIVES IN FRANCE AND CAN'T MOVE TO ASHLAND |
| Notification Requirement of Father's New Partner | If Father has a new female partner, he must inform the Mother in writing at least 30 days prior to any intended introduction of this new partner to the children. This notification must include the partner's full name, birth date, and current address. | CONSIDERING THE HISTORY OF MOTHER HARASSING FATHER BOTH JUDICIALLY AND IN HIS WORK THIS COULD LEAD TO MOTHER PREVENTING FATHER FROM HAVING ANY PERSONAL RELATIONSHIP ANYMORE | YES, THIS VIOLATES THE FUNDAMENTAL RIGHT OF FATHER TO HAVE A PARTNER IN HIS LIFE |
| Psychological Evaluation of Father's New Partner | The new partner must undergo a psychological evaluation by a licensed psychologist in Jackson County, Oregon, to determine that she poses no risk to the children. This evaluation must be confirmed by the court before the partner can be introduced to or spend time with the children. | IT SEEMS UNLIKELY A NEW PARTNER WOULD WANT TO BE ENTERING INTO A RELATIONSHIP WITH FATHER IF THEY HAVE TO BE PSYCHOLOGY EVALUATED | YES, THIS VIOLATES THE FUNDAMENTAL RIGHT OF FATHER TO HAVE A PARTNER IN HIS LIFE |
| Court Approval of Father's New Partner contact with the Children | All contact between the new partner and the children must be approved by the court. The court may impose additional conditions or restrictions on the contact as it deems appropriate to ensure the children's safety and well-being. | IT SEEMS UNLIKELY A NEW PARTNER WOULD WANT TO BE ENTERING INTO A RELATIONSHIP WITH FATHER IF THEY HAVE TO BE INVOLVED WITH A US COURT | YES, THIS VIOLATES THE FUNDAMENTAL RIGHT OF FATHER TO HAVE A PARTNER IN HIS LIFE |
| No Overnight Stays of Father's Partner | Father isn't permitted to have a member of the opposite sex, who is not related to Father by blood or marriage, stay overnight during Father's parenting time with the children. | IT SEEMS UNLIKELY A NEW PARTNER WOULD WANT TO BE ENTERING INTO A SERIOUS RELATIONSHIP WITH FATHER IF THEY HAVE TO BE MARRIED TO EVEN GET TO KNOW HIS CHILDREN | YES, THIS VIOLATE THE FUNDAMENTAL RIGHT OF THE PARTNER TO NOT WANT TO BE MARRIED, THIS ALSO VIOLATES THE FUNDAMENTAL RIGHT OF FATHER TO HAVE A PARTNER IN HIS LIFE |

-See attached **Exhibit 20**, table summarize the "non-conventional" conditions and requirements of the Oregon Judgment for Father to be able to see his children.

But more importantly this means that these conditions will keep the children from seeing their father if they remain in Oregon. It is in the interest of the children to be returned to France under the Hague Convention where the French judgment is allowing for both

1
2    parents to be present in their lives.

It's in the children's interest to go back quickly to having a normal life in France with both
3    their mother and their father involved in their lives which is what I've been offering
4    endlessly to their mother through mediation in France over the last 9 months. I offered
5    Mother some shared parenting time in France and for the kids to spend all their vacations
6    in Oregon which already amounts for a third of the year alone.
7    -See attached **Exhibit 16**, official mediation offer sent to Mother's French Counsel on
     October 30, 2023 by Father's French Counsel Terrence Richoux.
8
9    From Mother's behavior since the abduction in France two months ago, it seems she wants
10   to permanently cut the children from having a real connection to their Father. Mother has
11   severed entirely the link between Father and the girls no allowing a single video call since
12   she abducted them, and it is only possible because Judge Orr's Judgment is allowing that
     in contravention of the basic parenting rights of any father, including the ones protected by
13   the US and the Oregon constitution.
14   -See attached **Exhibit 82**, email from mother saying she is cutting all communication
15   between Father and the children.
16
17   **11. Wrongful accusations by Judge Orr in open court about Father being a
         criminal.**
18
19   Judge ORR showed clear proof of bias and lack of impartiality towards Father during the
20   Jackson County proceedings, going as far as mocking the French and their Judicial System
21   in open courts.
22   -See attached **Exhibit 22**, motion for Mistrial filed on August 2nd, 2023 by Father's former
     lawyer, Tom Bittner in case 22DR17285 showing that Father wasn't given a fair trial in
23   the Jackson County court and that Judge ORR had been making improper and insulting
     jokes against the French and the French judicial system in open court.
24
25

July 13, 2023

```
                                                              2
 1                  EXCERPT OF PROCEEDINGS
 2                     July 13, 2023
 3                          * * *
 4               MR. MURDOCH:  But that it be made
 5     clear to him what he would be facing.
 6               THE COURT:  But how do I do -- I don't
 7     know -- is there -- what -- what are the penalties
 8     in France for perjury?  Maybe it's lashing.  Maybe
 9     they put you in --
10               MR. MURDOCH:  Yeah.  Maybe you can't
11     drink wine for a month.
12               THE COURT:  Right.
```

-See attached **Exhibit 23,** email from Father's former lawyer, Tom Bittner from August 3rd, 2023, showing that Father was denied due process by Judge ORR who simply forbade him from participating in his proceedings and also forbade Father's counsel to from representing him resulting in the Mother's custody judgment without due process.

As mentioned previously, Judge ORR is also subject of a recent complaint by the Medford DA, Beth Eckert, for judicial misconduct and lack of impartiality in his proceedings.

-See attached **Exhibit 08,** letter and motion from Medford DA, Beth Eckert, asking for disqualification of Judge ORR from all criminal cases due to his lack of impartiality.

*"I have never filed an affidavit on a judge in my 33 years in the District Attorney's Office. Unfortunately, I do not believe that crime victims, law enforcement officers, my attorneys or even the accused can receive a fair hearing or impartial trial before Judge Orr." Beth Eckert, Medford DA, in a press release from July 26th, 2021*

And further down in her Motion for Disqualification Beth Eckert says:

*"COMES NOW, the State, by and through Beth Heckert, District Attorney for Jackson County, and based upon the Affidavit herein and moves the Court for an*

**PETITIONER'S RESPONSE Page 51 of 126**
Case No. 1:24-cv-00648-AA

*Order Disqualifying Judge David Orr to hear the Jackson County District Attorney appearances for the reason the State believes it cannot obtain a fair and impartial trial or hearing before such Judge."*

As a result, Judge ORR was stripped in 2021 from handling any criminal and juvenile cases by the Jackson County Presiding Judge at the time, Judge Lorenzo A. Mejia.

-See attached **Exhibit 08**, Order by Judge Lorenzo A. Mejia stripping Judge ORR from handling any criminal and juvenile cases in 2021.

But Judge Bloom, the current Presiding Judge of Jackson County, recently re-instated Judge Orr in a way that was the subject of a judicial complaint by the Medford DA Beth Eckert for judicial misconduct and possible collusion between Judge Bloom and Judge Orr for political gain.

-See attached **Exhibit 24**, article from the Rogue Valley Times from April 27th, 2024 explaining that the Medford DA believes Judge Orr and Judge Bloom have been in collusion together to commit "judicial misconduct".

It is to be noted that the timing of this local judicial and political scandal is surprising since Judge Orr recused himself from our custody matter just after he was informed of the abduction of Eva and Juliette from France and Judge Orr was also aware of the abduction when the Final Judgment granting full custody to their Mother was entered on April 24th since I had filed a Motion for Emergency Hearing regarding the abduction on April 22nd (and Judge Orr recused himself also on April 24th).

-See attached **Exhibit 25**, Motion for Emergency Hearing about Abduction filed by Father Pro Per on April 22nd 2024 in Jackson County.

**OREGON JUDICIAL DEPARTMENT - Online Records Search**

04/15/2024 Return - Mail ⌄

Comment
Notice Ready for Trial - 1/3/24

04/18/2024 Notice - Withdrawal of Attorney

04/23/2024 Motion - Set Aside ⌄

Comment
Limited JGM from 12.28.2023 and Emergency Hearing on Kidnapping

04/24/2024 Trial - Court ⌄

Judicial Officer
Orr, David J.

Hearing Time
9:00 AM

Cancel Reason
Judgment

04/24/2024 Digitized Judgment Document ⌄

Judicial Officer
Orr, David J.

04/24/2024 Notice - Judgment Entry

04/24/2024 Closed

-See attached **Exhibit 26**, online case history showing that Judge Orr was aware of the abduction in France when he entered the Final Judgment granting custody of the children to Mother.

**PETITIONER'S RESPONSE Page 53 of 126**
Case No. 1:24-cv-00648-AA



IN THE CIRCUIT COURT OF THE STATE OF OREGON FOR JACKSON COUNTY

Heidi Marie Brown,

              Petitioner,

    v.

Arnaud Paris,

              Respondent.

Case No.  22DR17285

**ORDER CASE ASSIGNMENT**

This matter having come before the Court on 04/24/2024 on its own motion, hereby Orders that this case and any associated cases be assigned to another Civil Family Judge.  All future hearings shall be heard by the assigned Judge.

SO ORDERED

Dated: 4·24·2024

HONORABLE DAVID J. ORR
CIRCUIT COURT JUDGE

(Verified Correct Copy of Original 4/24/2024.)

-See attached **Exhibit 27**, Order by Judge Orr recusing himself from the custody case and any other associated cases.

It is also to be noted that Judge Bloom himself took over the custody matter regarding our children and refused to disqualify himself while I filed for his disqualification on May 15th 2024 based on the possible collusion between Judge Bloom and Judge Orr that was reported in the Rogue Valley Article.

-See attached **Exhibit 24**, article from the Rogue Valley Times from April 27th, 2024 explaining that the Medford DA believes Judge Orr and Judge Bloom have been in collusion together to commit "judicial misconduct".

**PETITIONER'S RESPONSE Page 54 of 126**
Case No. 1:24-cv-00648-AA

**OREGON JUDICIAL DEPARTMENT - Online Records Search**

05/13/2024 Letter ⌄

Comment
A183410 re: Corrected Amended Notice of Appeal

05/14/2024 Order - Recusal ⌄

Judicial Officer
Barnack, Timothy

05/15/2024 Motion - Disqualify Judge

05/16/2024 Order - Denial ⌄

Judicial Officer
Bloom, Benjamin M

05/28/2024 Hearing - Motion ⌄

Judicial Officer
Bloom, Benjamin M

Hearing Time
9:00 AM

Comment
RSP's Motion to Disqualify

-See attached **Exhibit 29**, online case history showing that Judge Bloom took over the custody case and refused to disqualify himself while Judge Bloom had no legal basis to deny my request was timely and he had ruled on no motion in the case previously.

-See attached **Exhibit 30**, motion for Disqualification of Judge Bloom filed by Father Pro Per on May 15th in case 22DR17285.

In light of all these elements about Judge Orr's lack of impartiality and lack of due process in his proceedings it seems questionable to consider the "criminal accusation" that Judge Orr made against Petitioner in open court when he says on the hearing of November 14th:

**PETITIONER'S RESPONSE Page 55 of 126**
Case No. 1:24-cv-00648-AA

THE COURT:

*Be quiet right now. This is as though you are asking the Court to negotiate.*

*with hostage-takers. This is what this looks like. You are now holding these children*

*criminally. It doesn't matter to me whether you were charged criminally or not. You*

*have violated a criminal statute –*

MR. PARIS:

*Sir, I am in France…*

THE COURT:

*Be quiet, sir.*

MR. PARIS:

*I'm in France, Your Honor…*

THE COURT:

*Be quiet, sir. You have violated a criminal statute, and it's a felony. You're*

*holding these children contrary to the court's order, and you want to continue to*

*litigate?*

This Honorable Court should know that I wasn't trying to be disrespectful in any way saying "I'm in France" twice, it wasn't a provocation at all, I was just trying to speak but unable finish my sentence every time to say that:

> *"I'm in France, your Honor, **because a French judgment had ordered me to***
> ***ensure that our children would be starting school properly in Paris."***

And that I had to comply with that French judgment and that French order the same way I had been complying with the Oregon judicial system throughout the 2022-2023 school year until that Status Quo order became superseded by the French judgement. And even then, I waited till the end of the school year in Ashland and even weeks after that trying to resolve the proceedings in person in Oregon while my residence was in France.

So, when time came to ensure that the children would be having sufficient time to prepare for returning to school in France, I was left with no choice but to follow what the

French Judgment had ordered me to do since I was the only custodial parent for our children per this French Judgment. I had all the responsibility on my shoulders, and I was told by lawyers and the French and US authorities that I was cleared to leave per the Oregon Statutes and I had also clearly indicated to the authorities that I would continue participating in the Oregon proceedings remotely the same way I had been allowed to do many times previously by Judge Orr.

Consequently, my actions were not those of a fugitive but rather those of **an individual, a Father, caught in a complex international legal situation while trying to comply with multiple legal systems and trying to do what's best for the children.**

Such accusations from Judge Orr of being a "hostage taker" that Mother has been using in her May 28 *Response* to this Honorable Court as proof of me being a "criminal fugitive" is questionable in this context. Especially as I, Father, wasn't charged neither by the Medford DA nor by the US Attorney's Office for any abduction charges when I left the US with our children to return to France per the French Judgement.

-See attached **Exhibit 07,** translation of the email from the FBI agent Tamara Simmons confirming that both the FBI and the US Attorney Office denied Mother's request to press criminal charges against Father for child abduction. (Evidence originally provided in French by Mother's French Attorney, Sandrine Farrugia, as Exhibit 87 in the French proceedings).

## 12. Traumatic impact on Petitioner, Father, to have been denied due process and the right to defend himself while actively trying to participate and often being forced to watch passively his civil rights being violated.

Father would like to point out how traumatic of an experience it has been to be treated in such a way by Judge Orr in the Jackson County court.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

The court tried to even make Father look like an "aggressor" by purporting the wrongful accusations of Mother that he was "harassing" the court while Father has only and always been communicating with the court staff respectfully and just to be allowed to participate. What Judge Orr said about me "harassing" his staff was yet again a misrepresentation since all I was doing was asking by email why I wasn't given a hearing when I had properly filed a motion to the court and each of my motion were being ignored and never being heard by the court.

To prove that I've always been respectful here is the type of emails I had been sending when Judge Orr mentioned that I had been warned by the Jackson County court to stop sending emails. This sounds like another attempt at indirectly asking me to stop trying to participate in the Oregon proceedings. Which now seems to have been a clear strategy to claim in this Hague Action that I was trying to evade the judicial while these very same emails of me asking over and over to the Jackson County court why I was not allowed to participate prove exactly the opposite:

> *"I have the upmost faith in your integrity Miss Allen, so I look forward to your response and your explanation for not answering my previous emails regarding these motions since I am a defendant Pro Per entitled to proper response from this court regarding the status of my motions to dismiss this entire case for lack of subject matter jurisdiction and the required hearing date to address them in priority before setting any trial date.*
>
> *I'm looking forward to your response with the clear position of Judge Orr on whether my **FIFTH MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION DUE TO UNCHALLEGED REGISTRATION OF FRENCH JUDGEMENT IN STATE OF CALIFORNIA** will be intentionally ignored by this court so that this court can move forward with trial, denying me once again due process and proving judicial bias towards Mother from this court.*

*Regards,*

*Arnaud Paris"*

**-See attached Exhibit 61**, email sent to Judge Orr's court assistant, Miss Allen, on October 25th 2023 asking when motions that I had been filing since August could be heard, and why all my emails about obtaining a hearing dates for the different motions I had been filing asking for dismissal of that case had been ignored by Judge Orr.

I would like to also point out that the Jackson County court not only tried to keep me "silent" in my written communication with the court to deter me from filing more motions that would have established my willingness and eagerness to participate in the Jackson County proceedings, but the court also forced me at times to watch my rights being violated in the most atrocious ways during those hearings.

Particularly, on the hearing of December 21st 2023 in the Jackson County proceedings, Mother testified that Father was **degrading women sexually to the point of raping them**, and Mother testified under oath of such slanderous unfounded accusations without any possible way for Father to make any objections on the record to such atrocious lies. See the following excerpt from the hearing of December 21st 2023 in the Jackson County proceedings in which Father was not allowed to participate but only to listen without the right to make any objection nor to cross examinate, nor to bring any witnesses, evidence or testimony to counter anything that was said in these hearing:

> ***THE COURT***
>
> *Can you explain or if, you know, when, when he talked about, you know, hurting*
>
> *women, in, in, in a sexual way, was this something like occurring against their will*

*or that this other person or the other woman was a willing participant, but also for*

*some kind of sexual reasons.*

**MISS BROWN**

*My understanding is that it started out as something they were consenting for and*

*then when things got more intense, they, it was against their will at different*

*points.*

**THE COURT**

*So you're concerned that something like that could happen within the, the*

*apartment or the dwelling while the Children are there.*

**MISS BROWN**

*Yeah. Yeah.*

Such an horrific accusation made by Mother in open court during her testimony against

Father without any basis nor proof constitutes clear slander and is it consistent with the

parttern of misrepresentations and manipulations Mother conducted in all the courts, both

French and American as I will explain in a later section of this document.

I think this should never happen in a courtroom to have a defendant willing and

wanting to participate being slandered and tarnished in such a horrendous way. This

traumatic event will remain engraved in my mind for a long time and I hope that justice

will be given to me about that specific experience by the Oregon judicial system and that

my complaint against Judge Orr won't be once again ignored the same way it was when I

filed to the Judicial Fitness Committee about the improper jokes he made in open court

about French people and the French judicial system.

1

2    Here are a few more excerpts from the Jackson County hearings in which Judge Orr made

3    a gross denial of due process in my regards. On December 21st 2023 Judge Orr said to me:

4

5        **THE COURT**

6        *So let me explain Mr Paris. I was willing to hear everything that you had to say with*

7        *regards to the attorney fees and with regards to my order to you a month ago to*

         *return the Children. But here we're going back to the merits of the case which as*

8        *I've explained to you, I'm not taking evidence from you or considering any kind of*

9        *argument that you're putting forward, your participation today. I'm allowing simply*

10       *as you can be here to observe the proceedings. So we're setting that up for you with*

11       *webex so that you can, you can observe all this so that you know what's going on,*

12       *but you're not participating. So please do not interfere further at this point.*

13       Excerpt from the FTR Transcript of December 21st 2023.

14

15   During the November 11th 2023 hearing, Father was even more harshly treated by Judge:

16

         **THE COURT**

17       *Now you have them overseas and you want to litigate this case. So understand this,*

18       *all your motions that you filed subsequent to to, to removing the Children, and*

19       *removing as a kind word, the more accurate word is abducting. All the motions that*

20       *you filed are not going to be considered;*

21

22   The court that went forward without letting any of the motions filed by Father considered

     for months on.

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## 13. Bench Warrant in Jackson County for failure to appear while living in France.

The bench warrant for failure to appear that Mother is using against Father to argue the **"fugitive disentitlement doctrine"** was issued by Judge Orr who had been making offensive jokes against the French people and the French judicial system in open court in the custody case. So, when Judge Orr was assigned to the related contempt case Father couldn't possibly believe that Judge Orr would be impartial against him, which is why Father asked for his disqualification.

-See attached **Exhibit 31**, Motion for Disqualification of Judge Orr filed by Father Pro Per on January 3rd 2024 in the contempt case 23CN05721.

But that request was denied by Judge Bloom without any kind of explanation. Father asked for a reconsideration of the disqualification asking for a legal justification for denying Father's request while it satisfied all the statutory requirements to be granted.

-See attached **Exhibit 32**, Motion for Reconsideration of Disqualification of Judge Orr filed by Father Pro Per on February 22nd 2024 in the contempt case 23CN05721.

Judge Bloom denied once again that Motion to Father without any kind of explanation and Judge Orr was able to proceed with the contempt case against Father in which he asked him to present himself in front of the court on March 7th 2024 in the middle of the school year while Judge Orr knew very well that Father was living in France and was the only custodial parent in charge of the children in Paris per the French Judgment. Father asked to be allowed to appear remotely at the Show Cause Hearing of March 7th in the contempt case since he was living more than 6000 miles away but Judge Orr denied Father's requests repeatedly.

-See attached **Exhibit 33**, Motion for Remote Appearance filed by Father Pro Per on February 22nd 2024 in the contempt case 23CN05721.

-See attached **Exhibit 34**, Motion for Remote Appearance filed by Father Pro Per on February 29th 2024 in the contempt case 23CN05721.

Father also filed for a Motion for Continuance since he was being threatened of an extradition request through the FBI that he had no idea how to fight legally and that no criminal lawyer in Oregon seemed to be familiar with, let alone defend Father against especially in front of Judge Orr. This motion was denied as well leaving Father without representation in Oregon.

-See attached **Exhibit 35**, MOTION FOR CONTINUANCE FOR ALLOWING RESPONDENT TO FIND NEW COUNSEL SPECIALIZED IN INTERNATIONAL FBI ARREST AND EXTRADITION ORDERS filed by Father Pro Per on February 29th 2024 in the contempt case 23CN05721.

More excerpts will be provided to this Honorable Court if needed to show that Father was wrongfully denied the right to participate remotely on the March 7th hearing as this seemed highly unusual to force someone who lives 6000 miles away to come in person to a hearing while a proper judgment was in place in France first requiring Father to be with children after bringing them back to France to prepare their school year per the French Judgment of April 21st 2023.

The Warrant for Father's arrest issued on March 7th 2024 for "Failure to Appear" was not the result of Father trying to escape the Oregon judicial system, it was the result of Father having tried repeatedly to participate in the Oregon judicial system while he lives in France 6000 miles away having to take care of his children per the French judgment and he was being denied all his motions for remote appearance. Father is to this date still trying to obtain a hearing on this "abusive" warrant for his failure to appear and Judge Bloom, who took over the case disregarding Father's motion for his disqualification, is continuously ignoring Father's motions while he already denied without any proper legal justification to disqualify himself in the Jackson County custody case (22DR17285).

-See attached **Exhibit 36**, Letter from Christopher J Eggert, who represented Father in a limited capacity during the May 28th disqualification hearing of Judge Bloom.

In this letter Christopher Eggert who was in the courtroom in front of Judge Bloom says:

> *"I am left with the distinct impression that for some reason Judge Bloom has an interest in keeping Mr. Paris and Ms. Brown's case on his docket under his control. Whether this is for proper or improper reasons I cannot say. But based on all of the above history and factors, I am concerned that some form of investigation by appropriate authorities is warranted to attempt to determine whether the rights of Mr. Paris and his children are being upheld by the Oregon courts."*
>
> *Christopher Eggert*

Father filed other motions to challenge the warrant for his arrest since Judge Bloom was recently assigned to this contempt case as well, Father equally asked for his disqualification in this third case and it was denied without even granting me a hearing while the "Oral Argument Requested" was clearly specified on the Motion.

-See attached **Exhibit 37**, MOTION FOR SPECIAL APPEARANCE WITHOUT WAIVING OBJECTION TO SERVICE AND JURISDICTION TO ASK FOR DISQUALIFICATION OF JUDGE BLOOM filed by Father Pro Per on June 6th 2024 in the contempt case 23CN05721.

Father also filed a motion to dismiss the contempt case since Mother abducted the children the relief that Mother was seeking in this contempt remedial case has happened: children are in Oregon with their mother.

-See attached **Exhibit 38**, MOTION FOR SPECIAL APPEARANCE WITHOUT WAIVING OBJECTION TO SERVICE AND JURISDICTION TO ASK FOR DISMISSAL OF THIS ENTIRE CONTEMPT CASE OR TO SET ASIDE WARRANT FOR RESPONDENT'S ARREST AS RELIEF THAT PETITIONER WAS SEEKING HAS HAPPENED – CHILDREN ARE WITH MOTHER IN OREGON filed by Father Pro Per on June 6th 2024 in the contempt case 23CN05721.

As pointed out by several Oregon lawyers the warrant issued against Father is highly unusual and action is being taken to question the reasons for denying remote appearance.

### 14. Mother's proper legal remedy should have been a Hague Action in France if she thought Father had wrongfully removed the children from Oregon in July 2023.

The remedy Mother asked to the Jackson County Court was meant to retroactively and artificially grant the Jackson County court jurisdiction over the children against Father and the French judgment by denying Father the right to participate and defend himself, to the point of issuing a warrant for Father's arrest several months after he returned to France.

This is an unusual course of action to ask for a local court to interfere with the jurisdiction of France over Father and the children while they were living in France and attending their French school per the French Judgment that Father had an obligation to comply with on French soil. Asking the Jackson County court to try to contravene with the French decisions directly on French soil was an "unusual" legal approach. Especially considering that there was a perfectly well-suited legal action that could have been activated immediately in France by Mother when Father returned with the children per the French Judgment: a **Hague Action**.

Starting a Hague Action in France when Father returned with the children was the only logical legal remedy to a situation of alleged 'abduction' that both Mother and Judge Orr were claiming Father did in July 2023.

To emphasize this point, Father prepared the following flow chart comparing these two paths of action and their consequences onto the children, the parents and the judicial systems.



It is also to be noted that in France the appeal process does give an opportunity to the parties to present new evidence and make a De Novo trial. Every single point and argument that Mother has made in the Jackson County court when Father was not allowed to participate or defend himself could and should have been made in front of the appeal court of France. If Mother claims she didn't get a chance to present sufficient evidence during the March 31st hearing in France that denied her custody of the children in Oregon she could present all this new evidence in the French appeal and have the French decision reversed.

Why did Mother prefer to use strategy of pushing the jurisdiction of the Jackson County court over France with the help of Judge Orr rather than using the proper return mechanism of a Hague Action in France or through her appeals to the French judgment in France?

I would like to point out that the Jackson County court was largely influenced in its "criminal" analysis by what Mother's Counsel, Taylor MURDOCH, was literally dictating

Judge ORR to write these specific wording in its judgment so that Mother could then bring forward this "fugitive doctrine".

> **THE COURT**
> *Mr. Murdoch, the, the language you propose is somewhat stilted. So, so what you would have me say there is father departed. So I have changed the word absconded to departed. But then you would have me say father departed to France with the minor Children. And then you said criminally, comma, in this court's view?*
> **MR. MURDOCH**
> *In this court's view, criminally. Coma.*
> **THE COURT**
> *All right, I'll, I'll try putting that in.*

Excerpt from the FTR Transcript of December 21st 2023.

This is as if Mother and Counsel knew that they needed to have that specific wording in place in the Judgment from Judge Orr so that later on they could bring up such a defense in order to defeat this Hague Action. This Honorable Court will note that this request made by Mother's counsel to Judge Orr took place more than 4 months before Mother abducted the children from France knowing very well that this would result in a Hague Action on my part as it is in front of this Honorable Court right now.

The only possible explanation to choosing this course of action is that Mother and her Oregon counsels knew back in August-September of 2023 that this strategy would involve as a final chapter the abduction of the children from French soil in contravention of the two French judgments and that this "fugitive disentitlement doctrine" argument would be their only possible response to the Hague Action would necessarily bring upon Mother in Oregon.

It appears Mother and her counsels wanted to circumvent the French judicial system onto French soil through the involvement of the State Department and the FBI as a result of this abusive and bad faith court's orders made in the clear intent to harass Father and disrupt the children French education.

Mid-summer 2023 Father and the children had to be back in France to prepare their return to the French school year as Father was instructed and ordered to do by the French judgment of April 21st 2023. It was Father's responsibility to ensure so.

It was in the best interest of the children to ensure that they could start their French school year properly in Paris and nothing was keeping the Jackson County proceedings to continue with Father participating remotely. That's what would have been the most logical course of action with a party living 6000 miles away. But instead, the Jackson County court decided to:

1)    Forbid Father to participate or to be represented in these proceedings.

2)    Forbid Father's Oregon lawyer to represent him in these proceedings.

3)    Order Father to uproot the children in the middle of their French school year.

4)    Order Father to come to the other side of the planet to present himself in front of the court to explain why the children where in French school while it knew that it was what the French judgement had ordered Father to do in the superior interest of the children.

5)    Issue a warrant for the arrest of Father because he failed to appear.

All this could have been prevented if Mother had followed the logical course of action of starting a Hague action in France as soon as the children were taken to France on July 23rd since per the Hague Convention the French court would have been required to handle this matter expeditiously (4-6 weeks in France) which means that the matter could have been resolved much faster than what the Jackson County proceedings took to try to bring

back the children to Oregon while it didn't have any jurisdiction to do so and it contravened to the UCCJEA Statutes through this entire process.

### 15. Mediation taking place in France just a few days before the abduction of the children by Mother early April 2024.

It is to be noted that just before this kidnapping Father had offered to participate in a mediation in France that Mother attended on the first meeting and used the second meeting to mislead Father to lower his guard. Father is still willing to continue this mediation process with Mother in France if Mother is willing to return the children to France immediately and Father is still willing to offer Mother to get shared custody in France and to allow children to travel to the US every French vacation.

For all these reasons it is crucial that the children don't become any further victims of this situation and that they be returned immediately by Mother to France in order to salvage their French school year and that the French custody proceedings that had been filed first and were first to judgment be properly concluded in France through Mother's appeal that is supposed to take place within a few months and in which Mother will be given a chance to argue that the first French decision should be revised to grant her custody of the children in the US or to relinquish jurisdiction to the Oregon courts.

-See attached Exhibit 17, email from the French mediator in Paris to the President of the Paris Appeal court informing her that Petitioner had left France with the children right in the middle of the French mediations without any warning while she had agreed and committed to these mediations in Paris.

But before that Father had tried since last fall to have mediation take place between him and Mother. on January 3rd 2024, Mother, Miss BROWN, was asking Father, Mr. PARIS, to send to her French lawyer, Miss FARRUGIA, the mediation proposal that had been sent previously to Miss BROWN's French criminal lawyer.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

The content of that proposal (translated from French to English) is attached herein as **Exhibit 16**.

The first line of that proposal is unequivocal:

> *« Monsieur PARIS s'engage à donner la garde partagée des filles à Madame BROWN si cette dernière vient s'installer en France.»*

Which translated to English says:

> *"Mr. PARIS is willing to give shared custody to Miss BROWN if she agrees to move to France."*

**-See attached Exhibit 16**, official mediation offer sent to Mother's French Counsel on October 30, 2023 by Father's French Counsel Terrence Richoux.

Then discussions between French lawyers continued the following week by email and a phone meeting was organized between Miss BROWN's French civil lawyer, Miss FARRUGIA, and Mr. PARIS' French civil lawyer, Mr. RICHOUX on January 15th 2024.

**-See attached Exhibit 55,** English translation of an excerpt of Father's Whatsapp discussion with his French counsel Mr. RICHOUX from January 15th regarding a phone meeting between the French lawyers that took place on that same day.

It is to be noted that later on Father also offered to Mother to have equal parenting time even if she didn't want to move back to Paris. Indeed, Father offered to Mother that she could have all of the children French school vacation to take the children to be with their American family in Oregon which amounts already for 4 month of parenting time, so a third of the year. And then Father told Mother that to have another two months of parenting time during the year to really have equal parenting time between them he was willing to let her have his apartment in Paris 2 months a year to be near the children school without having to find lodging if her work would allow her to work remotely for about two months during the year. Which is already the case since her company is located in Pennsylvania

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

and she lives and works remotely in Ashland so several thousands miles away from her company. It didn't seem unrealistic to consider that working for a couple of months from Paris would be something difficult to negotiate with her company in that context.



**-See attached Exhibit 59,** Whatsapp discussion between Father and Mother on March 11th 2024 confirming the offer made to Mother by Father to have equal parenting time throughout the year with all the French school vacation to be spent with their American family in Oregon (which amounts to 4 months a year) and Mother could have another two months of parenting time in Paris without having to worry about finding lodging near the children's schools in Paris since Father offered to let her use his apartment and he would go and live with his family near Paris during that time.

It is to be noted that Mother on the contrary made a different kind of offer to Father earlier in the school year in which she offered Father to separate the children for the rest of their childhood having one each live with one parent and switching every year.

| TLM | 09/12/2023 | 1.20 | $380.00 | $456.00 | Professional Fee | latest Arnaud Paris motion and send to client |
|     |            |      |         |         |                  | Emails with client and phone conference with Sandrine regarding strategy; email client trial dates; emails regarding trial scheduling |
| TLM | 09/13/2023 | 1.20 | $380.00 | $456.00 | Professional Fee | Draft lengthy summary email to client; email client; phone call and messages with client regarding dividing children as settlement |

**-See attached Exhibit 60,** page 11 of Mother's "*Petitioner's 2nd Statement of Attorney Fees*" filed on January 11th 2024 with the Jackson County court detailing Mother's lawyer invoice showing that on September 13th 2023 her counsels were preparing an email to Father's counsel regarding "Dividing children as settlement".

NOTE: This offer from Mother having been made through an "unofficial" communication between French counsels, Father is not allowed to produce that communication that his French counsel received as evidence but this excerpt from Mother's "Attorney fees statement" clearly confirms Mother made such an offer.

Furthermore, Mother didn't deny having made this offer to Father of separating the girls during the hearing of December 21st 2023 as can be seen in the following FTR excerpt from that hearing:

> **THE COURT**
> *How long has it been since the children have seen their mother?*
> **MR. PARIS**
> *She came in October until I, I believe the first of November. So it's been, it's been about a month and a half and she's gonna be there in 10 days. For a week. It's, it's terrible, kids, kids should be with both parents and you know, this is the situation.*

*One of the parents was going to, to, we can't split the Children in two. We can't. I mean, I know Miss Brown asked for that. She, she made your proposal of separating the Children and having one each on each side of the planet and switching every year. All, all the lawyers were like, "what, what the hell! like no judge in the world is going to agree to that. This is insane." **This is how desperate she is. She's willing to separate sisters for the rest of their childhood.***"

FTR excerpt from that hearing of December 21st 2023.

### 16. Mother's manipulations of the Oregon and French courts.

a. **Mother's fraud onto Father and the French Judicial System in Paris with the July 19th Agreement made in bad faith in order to bring the children to Oregon.**

This is probably the biggest and most shocking of all of Mother's manipulations. Miss BROWN made a fraudulent agreement on July 19th 2022 in France to convince Mr. Paris to agree to a temporary school year in Oregon making him believe that there was still hope for their relationship if he agreed to this and that she didn't want a separation. While on the email Father found early September 2022, it is clear that not only did Mother want a separation at the time she made the July 19th agreement but she also wanted to evade the French judge and the French judicial system regarding custody of their children who had been living in France for the last 3 years before that agreement in order to bring that custody case to the Jackson County court once it would have acquired home state jurisdiction after 6 months over France.

**See attached Exhibit 02:** French July 19th Agreement between Miss BROWN and Mr. PARIS French lawyers.

**See attached Exhibit 00:** Email dated July 20th showing that Miss Brown had no intent in respecting the July 19th agreement and she had a plan to make a separation down the line in Oregon so that she could bring the matter in front of a local custody court that would be

more favorable to her and would allow her to keep the children in Oregon and avoid a separation in France.

This was also very clear to the Federal Judge McShane who saw clearly in the fraudulent and deceitful plan of Miss Brown clearly during the Hague Trial (see attached Exhibit 41):

> *"THE COURT: It does certainly suggest within the body of Exhibit 41 that Ms. Brown's intent of entering into the July 9 agreement was simply to perpetuate a fraud on both the French courts and Mr. Paris. So I do think it falls, generally, under the -- what we call the crime fraud exception."*

Then further down the same page in Exhibit 41 he says:

> *"THE COURT: But there's lots of other evidence that prior to filing the Hague Convention Act case, that it was clear that -- at least on the evidence I have before me so far -- there's a lot of clarity that Ms. Brown did not intend to return with the children to France."*

And then in Exhibit 42 he adds:

> *"THE COURT: If there is extrinsic evidence, it would be the fact that Ms. Brown entered into a parenting agreement in France and then made it very clear in communications with her lawyer she has no intent on following that agreement."*

**See attached exhibit 41:** Except01 from the Oregon Federal Hague trial in December 2022 where judge McShane made a finding of the fraudulent intent from Miss Brown.

**See attached exhibit 42:** Except02 from Oregon Federal Hague trial in December 2022 where judge McShane made a finding of the fraudulent intent from Miss Brown.

### b. Mother's Perjury in her Status Quo and Dissolution petition to the court by not disclaiming that she was aware of a custodial action already started in France.

It is indeed very important to inform this Honorable Court that Mother's disingenuous actions in the Jackson County court started as early as when she filed her custody action back in October 7th 2022 and when she asked also for a Status Quo order for the children.

Indeed, in her initial petitions Mother didn't mention that there were already custodial proceedings that she was fully aware of in France.

During the previous Federal Hague Action proceedings in Oregon that took place in December 2022 in Eugene, Mother's counsel confirmed that she knew of the French proceedings. Here's an excerpt from the Oregon Hague trial from December 2022 in Eugene, on page 5 the section highlighted in yellow confirms that Mother knew of the French custodial action having been filed first in Paris:

> *"Now, why did she file Exhibit 49, the custody case in Oregon? Not because that was part of her preplan, because, in fact, the six months obviously hadn't expired at that point. She did that because Dad had filed in France, on October 3rd, a French custody case. And Ms. Brown was concerned that, again, it was another reneging of a contract, and that Mr. Paris was going to use the October 3rd French custody filing to again yank the kids back."*

-See attached **Exhibit 10**, excerpt from the Hague Federal proceedings in front of Honorable Judge McShane from last December 2022 in Eugene, Oregon.

In this transcript, Miss Brown's lawyer says clearly that Miss Brown knew about the French custody case Father had been filed already on October 3rd, 2022 (the filing was missing a document on October 3rd and was redone on the 4th) **and Miss Brown filed her custody case in Oregon in response to it on October 7th, 2022 including the ex-parte motion for Status Quo order**. Yet in her declaration to obtain the Status Quo order, Miss Brown declared under perjury that she didn't know of any other custody proceedings about the children:

*"I do not know of any proceeding that could affect this proceeding, including any proceedings for enforcement or relating to domestic violence, protective orders, termination of parental rights, or adoptions."*

-See attached **Exhibit 11,** Status Quo motion from Miss Brown specifically the points 16 and 17 on page 5.

### c. Mother provided false testimony about get her new French lawyer just before the French custody hearing – Clemence Brassens Testimony.

Mother committed perjury in the Jackson County court regarding the hiring of a new French attorney just a few days before the March 31st hearing in Paris about the custody of her children. Mother falsely testified in front of Judge Orr about her legal representation and the timeline related to her hiring a French attorney for a crucial custody hearing in Paris on March 31, 2023:

Mother claimed that she had hired a new French attorney, Clemence Brassens, just days before the March 31st hearing. This statement was intended to justify her lack of preparedness for the hearing and the subsequent unfavorable ruling regarding the custody of her children. According to the declaration by Clemence Brassens and testimony from the July 12, 2023 transcript, Mother's claim was untrue. Brassens was not retained just days before the hearing but had been in contact regarding the case since February 2023.

> 6. At the March 31, 2023 hearing, I was surprised that the judge decided to examine both jurisdiction and custody. My focus has been centered on jurisdictional arguments, as that was my understanding of the purpose of the hearing. I believed it was likely that the judge would agree to postpone the hearing and make a decision on custody at a later date not only because that is common, but also because I had only been on the case for five days at the time of the hearing, and that is typically sufficient reason to postpone a hearing.

-See attached **Exhibit 44**, Declaration from Clemence Brassens, Mother's French attorney who represented her at the March 31st hearing in Paris on the custody matter about our children.

Miss Brassens stated in her declaration that she had been acting as legal counsel for Miss Brown since March 27, 2023, specifically for the French case numbered RG 22/38495. She appeared on behalf of Miss Brown at the March 31, 2023 hearing in Paris and pleaded the case on both jurisdiction of the French court and on the merit of the custody of the children for Miss Brown though in her declaration she indicated that she only pleaded on the French judge's lack of jurisdiction and not on the merit.

Noémie Huchet Tran, who was contacted by Miss Brown's former US attorney, Ryan Carty, testified in open court under oath that Miss Brassens initially reached out to her on February 13th 2023 to discuss acting as an expert witness in Mother's Oregon case. This contradicts Miss Brown's claim that Brassens was a new attorney brought in last minute just before the March 31st Paris hearing on the custody of the children:

> MR. BITTNER:
> *Ok alright, so that now that lawyer apparently at some point resigned from the case. Is that correct. Sorry now I got confused I though that Clemence Brassens represented Miss Brown at the March hearing, correct?*
>
> MISS HUCHET TRAN:
> *Yeah, that's what the decision says, Clemence Brassens represented Miss Brown.*
>
> MR. BITTNER:
> *Well it is your testimony that Clemence Brassens, that she contacted you in February of the past year to be an expert witness for Miss Brown.*
>
> MISS HUCHET TRAN:
> *Yeah let me check that... yes it was the 13 of february 2023, and then I was just in contact with Ryan the next day.*
>
> MR. BITTNER:
> *Ok. And you are positive that it was Clemence Brassens in February.*

**PETITIONER'S RESPONSE Page 77 of 126**
Case No. 1:24-cv-00648-AA

*MISS HUCHET TRAN:*
*Well. Yes but she didn't seem to know the case cause she told me that... well basically she said she didn't have the whole file yet. It was very brief, I don't know if she was officially retained or not in the case. She just told me I have a new case, could you intervene as an expert witness.*

-See attached **Exhibit 45**, Transcript from the July 12, 2023 hearing during which Miss Huchet Tran testified in the Jackson County Court for Mother.

Miss Brown's statements regarding the hiring of Clemence Brassens as her attorney just before the March 31st custody hearing in Paris were false. These statements contradicted the evidence provided by both Clemence Brassens and Noémie Huchet Tran, proving that Miss Brown had committed perjury in her testimony to the Jackson County court.

But Miss Brown's misrepresentation through her French attorney doesn't stop there because in her Mother argued to the Jackson County court that Miss BRASSENS she didn't plead on the merit of the case and that she only pleaded on the lack of jurisdiction of the French judge. To prove that she points out to page 12 of Miss BRASSENS' declaration (Exhibit 44):

**PETITIONER'S RESPONSE Page 78 of 126**
Case No. 1:24-cv-00648-AA

# PAR CES MOTIFS

*IN LIMINE LITIS*

Il est demandé au Juge aux affaires familiales de PARIS de :

- SE DECLARER INCOMPETENT pour connaître du présent litige au profit du Tribunal compétent de l'Etat de l'OREGON à savoir le Tribunal de Circuit de l'Etat de l'OREGON ;

- A titre subsidiaire, si le Juge aux Affaires familiales de PARIS se déclarait compétent, et considérait qu'il existait une situation de litispendance, DIRE RECEVABLE ET BIEN FONDEE l'exception de litispendance, et SE DESSAISIR au profit du Tribunal de Circuit de l'Etat de l'OREGON au regard de l'antériorité de sa saisine ;

- A titre extrêmement subsidiaire, si le Juge aux affaires familiales de PARIS se déclarait compétent et considérait avoir été saisi en premier, RENVOYER l'affaire afin que les parties puissent se mettre en état sur le fond du dossier.

This page shows the final page of the "Conclusions" (pleadings) that Miss BRASSENS presented and pleaded to the French judge on March 31st 2023 which seem to show that she only pleaded on the lack of jurisdiction of the French judge.

Except this last page is not the real last page of Miss BRASSENS "Conclusions" (pleadings) that Miss BRASSENS presented and pleaded to the French judge. She actually had the obligation to provide them to Father's French lawyer Terrence RICHOUX as well as to the French court on March 31st 2023. And the real "Concusions" from Miss BRASSENS show clearly that MR. RIRCHOUX added as an exhibit of his declaration to the Jackson County court show that Miss BRASSENS did plead on the Merit of the custody for Mother, see page 15 of Terrence Richoux's declaration in which the last page of Miss Brassens conclusion was translated to English. This translation shows that Miss BRASSENS was desinginuous in her declaration or worse that she falsified the last section of her "Conclusions" not conceal that she did plead on the merit of the custody of the children for Mother in Oregon:

# FOR THESE REASONS

*IN LIMINE LITIS*

It is requested that the Judge of the Family Court of PARIS:

- DECLARE ITSELF INCOMPETENT to hear the present dispute in favor of the competent Court of the State of OREGON, namely the Circuit Court of the State of OREGON;

- Alternatively, if the Judge of the Family Court of PARIS declares competence and considers that there is a situation of lis pendens, DECLARE THE OBJECTION OF LIS PENDENS ADMISSIBLE AND WELL-FOUNDED, and REFER THE CASE to the Circuit Court of the State of OREGON due to the prior filing in that jurisdiction;

- In an extremely alternative manner, if the Family Court of PARIS declares itself competent and considers that it has been seized first, REMAND the case so that the parties can come to an agreement on the merits of the case.

## ON THE MERITS

- ORDER Mr. PARIS to pay a sum of €3,000 under Article 700 of the Code of Civil Procedure.
- ORDER the referral of the case for substantive examination
- Alternatively:
  SET the children's habitual residence at the mother's residence in the United States; failing this, ORDER the maintenance of the alternating weekly residence as practiced by the parties since October 2022 in the United States; ORDER the sharing of expenses concerning the children.

-See attached **Exhibit 46**, Declaration Terrence RICHOUX about the hearing of March 31st 2023 in Paris during which Miss BRASSENS, Mother's French lawyer, **did plead on the merit and asked for custody of the children in Oregon with Mother**.

1

2   In his declaration MR. RICHOUX, Father's lawyer, who was present at the March 31st

3   2023 hearing in Paris during which the custody matter was heard on the merit by the French

4   judge as expected (since this matter had already been continued for almost 3 months

5   specifically so that counsels could prepare to plead on the merit) confirms under oath as a

6   witness that Miss BRASSENS did plead on the merit about the custody of the children for

7   Miss BROWN.

8

9   This shows that there was a second misrepresentation made by Mother and her French

10  lawyer, Miss BRASSENS, to the Jackson County court using disingenuous or falsified

11  conclusions to claim Mother didn't plead on the merit of the custody of our children during

12  the March 31st hearing in Paris and that they didn't ask for Mother to have custody in

13  Oregon. **This evidence shows clearly that they did ask for custody of the children in**

14  **Oregon and pleaded for that on the merit in front of the French judge in Paris on**
    **March 31st 2023.**

15  There is nothing more to say here, **Mother's was once again being disingenuous to the**

16  **Jackson County court, and this shows a clear pattern of misrepresentation and**

17  **perjury to the Oregon judicial system on her part**.

18

19        d. **Falsification of a Jackson Court Document presented to the French police and to the**
          **French judge before asking a Jackson County Judge to sign the document a day**

20        **later (when Father took back the children to France).**

21

22  On July 24th 2023, Mother's counsel Taylor MURDOCH asked for an emergency phone

23  conference with Jackson County to ask the judge (Judge Bloom) to sign a document that

24  had already been presented to the French police and the French Judge about a "claim of

25

abduction" of the children by the Father while the return had been approved by the French and the US authorities.

During this emergency phone conference Taylor MURDOCH, Mother's counsel, asked the Jackson County court to sign a document that was incriminating Father for having done an 'alleged abduction' that MR. MURDOCH had prepared himself the day before and that had already been presented to the French authorities by Mother's French counsel as coming from the Jackson County court:

> **MR. PARIS**
> *Thank you your honor, I want to bring to the attention of the court that I have not taken these Children without an approval from the US government that was vetted by the border patrol. And it was also approved by the French consulate that referred to US authorities in making that decision to let the Children travel with me. The second point that I need to make is that Mr. Murdoch actually transmitted the letter that you're looking at already to the French police and to the French Judge. Claiming that this was already a letter from the court.*

> **MR. MURDOCH**
> *Your honor, I object to this, first of all, that's a representation, that's completely false representation. Secondly,*

> **MR. PARIS**
> *I am a witness, Mr Murdoch! I was there when the police officer showed me your letter 12 hours ago and I was told that a judge in Oregon had written that letter and it was asked to me why I would have violated an order from a judge. And all the arguments that are in that letter were presented to me by Miss Brown's lawyer in the email that was provided to the police. So how do we explain that a French judge and the French police are already considering that as evidence in a case, which to me sounds like misrepresentation from Mr Murdoch and almost forgery at the expense of the Jackson County Court?*

> **THE COURT**
> *Thank you Mr. Paris. So I'm I'm gonna say if, the Status Quo is in effect and there are ways remedying that situation and the appropriate thing for the court to do is not to respond by letter, thereby inserting itself in these proceedings. But that the parties do that based upon the order of the court issues with that.*

**MR. MURDOCH**
*Well, if I may respond to Mr Bittner's argument too. So what we're, what we're looking for*

**THE COURT**
*You know Mr. Murdoch, I think it's really important that you let me speak.*

**MR. MURDOCH**
*Thank you your honor.*

**THE COURT**
*So I, I don't want to insert myself in there.*

**See attached Exhibit 47**, Excerpt of the emergency hearing of July 24th 2023 with the Jackson County Court.

It is to be noted that when Mother's attorney asked for an emergency phone conference because the children had been 'allegedly abducted' from Oregon to France by Father, that conference was granted to Mother and organized within a few of hours by the Jackon County court.

But when Father asked on April 22nd 2024 for a similar emergency phone conference with the court because Mother had abducted criminally the children from France to the US while violating two French judgments on French soil that conference request was ignored for many days by Jackson County court and eventually was even denied by Judge Bloom.

1

2
Re: URGENT: KIDNAPPING EVA JULIETTE PARIS - EMERGENCY HEARING 22DR17285  EXHIBIT 48

3
**Subject:** Re: URGENT: KIDNAPPING EVA JULIETTE PARIS – EMERGENCY HEARING 22DR17285
**From:** Arnaud Paris <aparis@sysmicfilms.com>

4
**Date:** 23/04/2024, 21:16
**To:** "Tricia M. Allen" <Tricia.M.Allen@ojd.state.or.us>

5
**CC:** Heidi Paris <heidimparis@gmail.com>, David.J.Orr@ojd.state.or.us

6
Miss Allen, my motion and request for emergency hearing was delivered to the court this morning at 11.37am.

7
Here is the proof of delivery by Fedex:

https://www.fedex.com/fedextrack/?trknbr=816152048820

8

9
Please advise on when we could set the phone conference with Judge Orr on that urgent kidnapping matter of the children from France in the middle of the school year by Miss Brown.

Regards,

10
Arnaud Paris

11
On 22/04/2024 21:53, Arnaud Paris wrote:

12
Hello Miss Allen,

I'd like to set an emergency hearing with Judge Orr as Miss Brown just abducted the kids

13
from France and violated two French judgments on French soil in full force and effect putting the kids through a traumatic illegal escape from France to the US and she is now hiding in Oregon without any direct communication with the children so we have no

14
information about what's going on.

I've sent this emergency motion today also requiring this emergency hearing, see attached.

15

16
As you will see in this Motion, Miss Brown just lied to a French judge in Paris she was in front of a few days before doing the abduction of the children, saying that she would never violate the French judgment as it would make her lose what she obtained from Judge Orr in the Jackson Court. And she just kidnapped the kids....

17

18
**-See attached Exhibit 48,** Email sent to the Miss Allen, Judge Orr's court scheduling assistant on April 23rd to ask for an emergency hearing with Judge Orr regarding the abduction of the children

19
from France by Mother. This email was never answered or replied by the Jackson County court.

20
**-See attached Exhibit 25,** Motion for Emergency Hearing about Abduction filed by Father Pro Per on April 22nd 2024 in Jackson County.

21

22

23
    e. **Mother manipulated the Jackson County Court to make Judge Orr believe that the French judicial system wouldn't allow her to participate remotely and that she**

24
    **couldn't present testimonies from American witnesses in the French custody case.**

25

**PETITIONER'S RESPONSE Page 84 of 126**
Case No. 1:24-cv-00648-AA

Mother testified disingenuously during the Jackson County hearing of August 3rd and 4th 2023 (when Father wasn't allowed to participate or to be defended by his counsel) as she made many misrepresentations about the French court system. In particular, Mother told the Jackson County court that she French court system didn't allow remote participation and that she didn't have the possibility to bring to the court testimonies and evidence remotely or through written testimonies.

-See attached **Exhibit 49**, Transcript from the August 3rd, 2023 hearing during which Mother, Miss BROWN, testified desinginuously under oath about the French Court proceeding and made misrepresentation about the French Court System.

> *MR. MURDOCH:*
>
> *Were you present at that hearing in March in any capacity? Were you listening on the phone or were you doing anything --*
>
> *MISS BROWN:*
>
> *They don't have any capacity for -- **or any option for a remote hearing.***
>
> *(...)*
>
> *MR. MURDOCH:*
>
> *And was there any opportunity for you to present evidence, such as testimony from witnesses or testimony from family members who are here present in the courtroom?*
>
> *MISS BROWN:*
>
> *No.*

Mother is doing a misrepresentation to the Jackson County court about the French court system not allowing for remote participation since it is even written in the French Civil Code that remote participation is possible during French hearing (**Article L111-12** of the French Civil Code). The French Court Systeme does offer the possibily of remote participation, see the following quote from the L111-12 French Code Article:

*"Without prejudice to the specific provisions of the Public Health Code, the Code of Criminal Procedure, and the Code on the Entry and Residence of Foreigners and the Right of Asylum, hearings before judicial jurisdictions may, by decision of the presiding judge, ex officio or at the request of a party, and with the consent of all parties, take place in several hearing rooms linked directly by an audiovisual means of telecommunication guaranteeing the confidentiality of the transmission. One or more of these hearing rooms may be located outside the jurisdiction of the court hearing the case."*

-**See attached Exhibit 50**, certified English translation of the French Civil Code **Article L111-12** allowing remote participation in French Court hearings for civil matters.

Mother is doing another misrepresentation when she says that she can't bring testimonies remotely to the court since she has the possibility of providing written testimonies on the French Court Official Testimony Form ("**Formulaire 11527*03**").

-**See attached Exhibit 51**, French Court Official Testimony Form **11527*03** that allow for a witness to make a testimony in writing and to be accepted as evidence in French proceedings.

**NOTE**: Several testimonies in this Hague Action are being provided by Father on these forms and they have been translated by an official certified translator and show that these testimonies are made under oath and are the equivalent of a sworn declaration in the US court system.

   **f.  Mother was disingenuous to the Oregon Court of Appeals about mediations not taking place in France to reject the transcription extension request from Father.**

Respondent, Miss Brown, has been lying to both the French and the American judicial systems since the beginning of this custody matter in October 2022 to be able to obtain custody forum shopping in Oregon. This disingenuous behavior from Mother has

continued in front of Oregon Court of Appeals as can be seen in the objection filed by Respondent on January 18th 2024 in the matter A182305. Mother and her counsel were indicating in their objection to Father's request for transcript time extension that:

> "Respondent does not believe there is any possibility of this case settling. (...) She is also unaware of any dialog between the parties or the attorneys for the parties, including the parties' French lawyers."

-See attached **Exhibit 52**, Objections from Mother's Oregon Appeal Counsel, George Kelly.

And yet on January 3rd 2024, Respondent, Miss BROWN, was asking Appellant, Mr. PARIS, to send to her French lawyer, Miss FARRUGIA, the mediation proposal that had been sent previously to Miss BROWN's French criminal lawyer, Miss DURAND-POINCLOUX by Mr. PARIS' French Civil Lawyer, Mr. RICHOUX.

-See attached **Exhibit 53**, proof of Whatsapp communication in which Miss BROWN writes:

> "Separately, what proposal did you send over? Did you send it to Farrugia? She is my lawyer of record."

To which Mr. PARIS responds:

> "Yes, Richoux sent a proposal to Farrugia almost 2 months ago."

Then in the same discussion a few lines below Miss BROWN answers:

> "She never received it. Could you have him resend it?"

It's clear from this exchange that there had been mediation proposal exchanged between the parties through their French lawyer and that Miss BROWN enquired on January 3rd about the latest proposal made by Mr. PARIS and she even asked for it to be resent to her French lawyer.

The content of that proposal (translated from French to English) is attached herein as **Exhibit 16**.

The first line of that proposal is unequivocal:

> « Monsieur PARIS s'engage à donner la garde partagée des filles à Madame BROWN si cette dernière vient s'installer en France.»

Which translated to English says:

> *"Mr. PARIS is willing to give shared custody to Miss BROWN if she agrees to move to France."*

Then discussions between French lawyers continued the following week by email and a phone meeting was organized between Miss BROWN's French civil lawyer, Miss FARRUGIA, and Mr. PARIS' French civil lawyer, Mr. RICHOUX on January 15th 2024.

Mr. PARIS is providing herein as **Exhibit 55** an excerpt of his Whatsapp discussion with Mr. RICHOUX from January 15th regarding this phone meeting between the French lawyer that took place on that same day, so 3 days before that objection was filed by Miss BROWN's appeal US lawyer, Mr. KELLY to this Honorable Court. In this whatsapp excerpt, Mr. PARIS says:

> *"Hello Counsel, what time will you be speaking to FARRUGIA? I sent you a little summary of the important points, but what you told said in our last discussion was really good, you should write them down to not forget any of them and have a logical outline for when you will be discussing with FARRUGIA."*

Then Mr. RICHOUX answers:

> *"I offered to talk at 2pm. I'm waiting for her answer. Ok I got it."*

Then in a later message dated from 2.33pm Mr. RICHOUX writes to Mr. PARIS:

> *"I'm on the phone with FARRUGIA."*

Therefore, per this discussion it is undeniable that Miss BROWN's French lawyer talked to Mr. PARIS' lawyer on January 15th and this discussion was reported to have lasted more than an hour by Mr. RICHOUX and a follow up call is to happen most likely this week.

How can Miss Brown and her appeal counsel Mr. KELLY come filing a motion to the Oregon Court of Appeals under perjury that there has been no discussion between French lawyers? This is once again Miss BROWN with the help of her Oregon counsel being disingenuous to the US court system, like she has been doing through her entire proceedings in Oregon, to manipulate and obtain what she wants disregarding the fact that she was committing yet another perjury to the Honorable Oregon Court of Appeals.

**g. Mother testified in open court in front of Judge Orr that Father was raping women without evidence and without Father being allowed to defend himself but with him being forced to watch without being able to object even.**

Mother has a continued history of having tried to create that negative image of Father in the Oregon court, particularly when Father was denied due process and wasn't allowed to participate in the Jackson County proceedings after the August 3rd hearing during which Father was summarily sanctioned. Particularly, on the hearing of December 21st 2023 in the Jackson County proceedings, Mother testified that Father was enjoying **degrading women sexually to the point of raping them**, and Mother testified under oath of such slanderous unfounded accusations without any possible way for Father to make any objections on the record to such atrocious lies. See the following excerpt from the hearing of December 21st 2023 in the Jackson County proceedings in which Father was not allowed to participate but only to listen without the right to make any objection nor to cross examinate, nor to bring any witnesses, evidence or testimony to counter anything that was said in these hearing:

> *THE COURT*
>
> *Can you explain or if, you know, when, when he talked about, you know, hurting women, in, in, in a sexual way, was this something like occurring against their will or that this other person or the other woman was a willing participant, but also for some kind of sexual reasons.*
>
> *MISS BROWN*

*My understanding is that it started out as something they were consenting for and then when things got more intense, they, it was against their will at different points.*

**THE COURT**

*So you're concerned that something like that could happen within the, the apartment or the dwelling while the Children are there.*

**MISS BROWN**

*Yeah. Yeah.*

Such an horrific accusation made by Mother in open court during her testimony against Father without any basis nor proof constitutes clear slander and is it consistent with all the bad faith actions that Mother has been doing in the Jackson County's proceedings, starting with her very initial petition for custody in which she lied about not knowing of any competing custodial action in France.

It is to be noted here that Mother never brought up such atrocious accusations against Father in any of the other proceedings that took place neither France or in the US when Father was allowed to participate, object and defend himself. Only when Father was being litterally "silenced" by the court and without lawyer did she make these unfounded accusations that are almost senseless especially as the first sensible thing to do when she would have supposedly found that out would have been to report me to the authorities.

h. **Misleading the French Appeal Court of Paris about her intentions to comply with French orders during the April 3rd 2024 hearing in front of the Presiding Judge.**

During the hearing of April 3rd in front of the Appeal Court of Paris Miss Brown's French lawyer presented the following arguments to the court in her pleadings with Miss Brown present in front of the Presiding Judge of the Paris Appeal Court:

"    - *Regarding the absence of flight risk for Ms. BROWN*

*(...)*

*Mr. PARIS therefore cannot legitimately claim that there is a risk of the mother absconding with the children.*

*(...)*

*But as we have indicated extensively, Mr. PARIS refuses to issue French passports or even any identity papers for the children, maintaining that the mother would only use them to flee.*

*(...)*

*The alleged flight is only a figment of Mr. PARIS' imagination, which is why he mentions a safety protocol.*

*(...)*

*But the hearing will not take place until October 2024, and Ms. Brown has never wished to commit any offence.*

*In addition, Ms. Brown's job requires her to travel and she has no intention of committing the offence of unlawful child removal,*
*(...)*
*Mr. PARIS has also been ordered to pay Ms. BROWN 225,000 dollars in legal fees incurred in the USA, which he has not paid; if Ms. BROWN were to "kidnap" the children as he claims, she would forego obtaining such a sum.*
"

-**See attached Exhibit 56,** excerpts from April 3rd 2024 pleadings from Miss Brown's French lawyer presented in presence of Miss BROWN herself on April 3rd in front of the

Presiding Judge of the Appeal Court of Paris (so just 5 days before Miss BROWN committed the abduction of Eva and Juliette from France).

    **i.  Mother manipulated the Paris Appeal Court on April 3rd 2024 pretending she was willing to participate into mediations in France while she was preparing the abduction of the children.**

It is to be noted that just before this kidnapping Father had offered to participate in a mediation in France that Mother attended on the first meeting and used the second meeting to mislead Father to lower his guard. Father is still willing to continue this mediation process with Mother in France if Mother is willing to return the children to France of her own will.

**Subject:** Mediation Paris April 4-5
**From:** Arnaud Paris <aparis@sysmicfilms.com> **Date:**
03/18/2024, 6:18 p.m. **To:**
Heidi Paris <heidimparis@gmail.com>

Heidi, since you will be in Paris the week of April 1st and you will not have the girls during the day I think it would be a good opportunity to try to mediate in the presence of our lawyers here in Paris in order to find a quick solution to this conflict in the interest of our children. I therefore asked several mediators here in Paris to offer us one or more meetings.

Good to you,
Arnaud

**-See attached Exhibit 57,** English translation of email sent by Father to Mother on March 18th offering to have mediations when Mother will be in Paris on the week of April 1st 2024.

Then at the hearing of April 3rd 2024 in the Paris Court of Appeal the French Judge asked if Father and Mother would be willing to engage in a mediation process to try to resolve

**PETITIONER'S RESPONSE Page 92 of 126**
Case No. 1:24-cv-00648-AA

these ongoing legal battles in the best interest of the children. Mother accepted in front of the Judge.

**-See attached Exhibit 58**, clerk's notes from the April 3rd hearing in front of the Appeal Court of Paris showing that the judge asked us to try a mediation process and that both parties agreed.

**-See attached Exhibit 17**, email from the French mediator in Paris to the President of the Paris Appeal court informing her that Mother had left France with the children right in the middle of the French mediations without any warning while she had agreed and committed to participating in these mediations in France.

The last email from the French mediators is unequivocal, Mother was desinginuous to them but also to the Judge from the Paris Court of Appeal on April 3rd when she agreed to participate in those French mediations just a few days before abducting the children from France while she was assuring that French judge that she would never violate the French Judgments. The duplicity of Mother seems to have no limit and she doesn't hesitate to lie to every judge she's in front of, French or American.

### j. Mother, Respondent, has been instrumentalizing the Jackson County court to try to avoid this Hague Action (abusive stalking order request):

Mother, Respondent, filed for a protective order in bad faith almost as soon as she returned with the children to Oregon to try to avoid service from Father in the Hague action and she naturally had to lie once again to the Jackson County Court when she filed her ex parte Petition for protective order since she didn't disclose that she just had abducted the children

from France in complete violation of two French judgments in the middle of their French school year and she didn't disclose either that Father, Petitioner, was asking for the immediate return of the children to France under this Hague Action filed in Oregon Federal Court on April 16th 2024.

And what Mother was arguing to the Jackson County courtt to be 'harassment' or stalking was simply Father, Petitioner, trying to serve Mother, Respondent, with this Hague Action with 'diligent efforts' as Honorable Judge Aiken specifically ordered Father to do on April 19th 2024.

-**See attached Exhibit 64**, petition from Mother for Protective Order filed in the Jackson County Court on May 2nd, 2024.

-**See attached Exhibit 65**, order from Honorable Judge Aiken asking Father to make "diligent efforts" to continue trying to find and serve Mother with the Hague Action for child abduction 1:24-CV-00648-AA.

What is even more concerning is that Mother was trying to use this Honorable Court to avoid being served the Oregon Hague Action as she was desperately hiding in the US after she abducted the children from France. She knew that she could possibly delay this Hague Action by asking for this stalking preventive order as Father had filed a motion to let Honorable Judge Aiken know that Mother was hiding and avoiding service.

-**See attached Exhibit 69**, email sent to Mother on April 17th 2024 by Father to inform her know of the Federal Hague Action 1:24-CV-00648-AA started in Oregon.

**PETITIONER'S RESPONSE Page 94 of 126**
Case No. 1:24-cv-00648-AA

So Mother was trying to manipulate once again the Jackson County court pretending that Father was harassing her 'remotely' from the other side of the planet while in truth he was simply following a Federal Court order issued by Honorable Judge Aiken on April 19th urging him to continue trying to serve Mother with "diligent efforts". This strategy to avoid service on the part of Mother has been confirmed by the service company hired by Father to serve her.

-**See attached Exhibit 67**, Affidavit from the service company ACP Investigations in Medford.

So based on the clear bad faith of Mother who introduced this order to delay and avoid the Hague Action for the Return of the Children to France, Father obtained from the Jackson County cout the dismissal of Mother's protective order request which made absolutely no sense since Father lives in Paris more than 6000 miles away from Mother and he had no intention to come to Oregon to abduct the children since he started a perfectly legal action to have the children returned promptly to France by Honorable Judge Aiken and he followed Honorable Judge Aiken's order every step of the way.

-**See attached Exhibit 66**, order from Honorable Judge Aiken granting Father alternative service to Mother by email considering she was avoiding service to delay this Hague Action for child abduction.

-**See attached Exhibit 68**, Order from Judge Bloom dismissing the request for protective staking order from Mother.

**PETITIONER'S RESPONSE Page 95 of 126**
Case No. 1:24-cv-00648-AA

1

2
This stalking case was just another example of Mother's pattern of being desinginous to

3
every court in every state and every country about this matter with Father. And the next

4
example in a California court is just going to confirm this.

5

6
    **k. Manipulation of the California Court about the residence of the children since July**

7
       **2023.**

8
On June 3rd 2024, Mother started a registration action in California to the Superior Court

9
of Los Angeles of the Oregon Judgement granting her custody of the children. In her filing

10
to the Los Angeles court Mother indicated that the children had been living with her in

11
Ashland, Oregon at the 2256 Abbott Avenue address since May 2023 while the children

12
were in France since July 2023 and were in school the entire 2023-2024 school year until

13
their Mother abducted them to Oregon during week of April 8th 2024.

14

15

16

17

18

19

20

21

22

23

24

25

1

2

FL-105/GC-120

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| PARTY WITHOUT ATTORNEY<br>HEIDI MARIE BROWN<br>385 STRAWBERRY LANE<br>ASHLAND, OR 97520<br>TELEPHONE NO.: 541-944-2066    FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):* HEIDIMPARIS@GMAIL.COM<br>ATTORNEY FOR *(Name):* | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse

*(This section applies only to family law cases.)*
PETITIONER: HEIDI MARIE BROWN
RESPONDENT: ARNAUD PARIS
OTHER PARTY:

| *(This section applies only to guardianship cases.)*<br>GUARDIANSHIP OF *(Name):*                    Minor | CASE NUMBER: |
|---|---|

**DECLARATION UNDER UNIFORM CHILD CUSTODY
JURISDICTION AND ENFORCEMENT ACT (UCCJEA)**

1. I **am a party** to this proceeding to determine custody of a child.
2. [✓] My present address and the present address of each child residing with me is confidential under Family Code section 3429 as I have indicated in item 3.
3. There are *(specify number):* **2** minor children who are subject to this proceeding, as follows:
   *(Insert the information requested below. The residence information must be given for the last FIVE years.)*

| a. Child's name<br>EVA LILIE PARIS | Place of birth<br>ASHLAND, OR | Date of birth<br>01/15/2015 | Sex<br>F |
|---|---|---|---|
| Period of residence | Address<br>ASHLAND, OR<br>[✓] Confidential | Person child lived with *(name and complete current address)*<br>Heidi M. Brown, 2256 ABBOTT AVE,<br>[✓] Confidential    Ashland, OR 97520 | Relationship |
| MAY 2023 to present | Child's residence *(City, State)* | | MOTHER |
| | | Person child lived with *(name and complete current address)*<br>Heidi M. Brown, 665 Leonard Street,<br>Ashland, OR 97520 | |
| Oct 2022 to Apr 2023 Ashland, OR | Child's residence *(City, State)* | | MOTHER |
| | | Person child lived with *(name and complete current address)*<br>Heidi Brown & Arnaud Paris<br>665 Leonard St., Ashland, OR 97520 | |
| July 2022 to Oct 2022 Ashland, OR | Child's residence *(City, State)* | | Mother & Fath |
| | | Person child lived with *(name and complete current address)*<br>Heidi Brown & Arnaud Paris<br>4 rue Malher, 75004 Paris, France | |
| Aug 2015 to July 2022 Paris, France | Child's residence *(City, State)* | | Mother & Fath |

| b. Child's name<br>JULIETTE MANON PARIS | Place of birth<br>ASHLAND, OR | Date of birth<br>01/15/2015 | Sex<br>F |
|---|---|---|---|
| Period of residence<br>[✓] Residence information is the same as given above for child a.<br>*(If NOT the same, provide the information below.)* | Address | Person child lived with *(name and complete current address)* | Relationship |
| to present | [ ] Confidential | [ ] Confidential | |
| | Child's residence *(City, State)* | Person child lived with *(name and complete current address)* | |
| to | | | |
| | Child's residence *(City, State)* | Person child lived with *(name and complete current address)* | |
| to | | | |
| | Child's residence *(City, State)* | Person child lived with *(name and complete current address)* | |
| to | | | |

c. [ ] Additional residence information for a child listed in item a or b is continued on attachment 3c.
d. [ ] Additional children are listed on form *FL-105(A)/GC-120(A)*. *(Provide all requested information for additional children.)*

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>FL-105/GC-120 [Rev. January 1, 2009] | DECLARATION UNDER UNIFORM CHILD CUSTODY<br>JURISDICTION AND ENFORCEMENT ACT (UCCJEA) | Family Code, § 3400 et seq.;<br>Probate Code, §§ 1510(f), 1512<br>www.courtinfo.ca.gov |
|---|---|---|

**-See attached Exhibit 70**, first three pages of the Declaration under UCCJEA from Miss BROWN attempting registration of the Oregon Judgement with the Los Angeles Superior Court of California on June 3rd 2024 in which she commits perjury about the residence of the children.

Mother just a few days ago committed yet another perjury to a US court by doing this misrepresentation of the residence of the children who had been living in France with Father since July 23rd 2024 per the French Judgment of April 21st 2023.

As confirms Eva's Paris school Principal Mr. Luc RICHARD:

> *"I, the undersigned, Luc Richard, principal of the École Renard, do hereby*
>
> *certify that Eva Paris attended the CM1-grade class here at our school from*
>
> *September until the April vacation."*

**-See attached Exhibit 73**, letter from Eva's Paris school principal about the sudden and disruptive abduction conducted by Mother during the Spring vacation in France in contravention of the French Judgements.

As confirms Juliette's Paris school Principal Mr. Thierry HATTU:

> *"I, the undersigned, Thierry HATOU, principal of the school, do hereby certify that*
> *Juliette PARIS had indeed been diligently attending the CM1-grade class here at*
> *the École des Hospitalières since September 4 and that her studies were going well*
> *despite some comprehension difficulties in mathematics.*
>
> *Juliette seemed to be thriving in her class with her classmates that she'd reunited*
> *with, most of whom she had known since she started kindergarten (2017).*
>
> *At the request of Ms. Brown, we met with her just before the spring vacation to*
> *update her on Juliette's progress in school. Our meeting went well, with discussion*
> *of progress targets for the rest of the school year and no indication that Juliette*
> *would not finish her year in the class.*
>
> *It is shocking and very surprising that the commitments made at the time by Ms.*
> *Brown were, in the end, totally bogus and did not correspond to the end-of-year*
> *timetable discussed.*

*Juliette was very involved in our annual projects (choir show, commemoration - Olympiads) and her absence is regrettable for the whole class.*

*All of Juliette's schoolwork and class projects were cancelled by this departure during the year.*

*The students were sad and confused. The teacher's attempts to explain the situation were made quite difficult given the circumstances underlying her sudden departure."*

-**See attached Exhibit 74**, letter from Juliette's Paris school principal about the sudden and disruptive abduction conducted by Mother during the Spring vacation in France in contravention of the French Judgements.

Yet again in this California registration filing of her Oregon Judgment Mother is trying to manipulate another court by being desinginuous about where the children lived over the last 12 months.

l. **Judge Orr himself asked Miss BROWN during the Jackson County proceedings after Father and the children were back in France: "You're not going to make a kidnapping Miss Brown"? and she answers "No".**

During the hearing of August 3rd and 4th 2023 in Jackson County when Father and his counsel were forbidden to participate in the proceedings Mother was asked by the Court if she was planning a "kidnapping of the children" and she answered "No". This is very enlightening to see that Mother was willing to lie bluntly to the court as it is now undeniable that Mother would eventually not hesitate to violate two French Judgments in full force and effects on French soil to conduct such kidnapping of the children in France with a plan that would have required many months of preparation and several accomplices to properly

be executed. When she was testifying in the Jackson County court on August 4th, 2023 Mother said under oath:

> MR. MURDOCH
> *Now, if you could, let's see, actually go down to the the second the, next paragraph begin with FYI.*
>
> MISS BROWN
> *FYI madame Brown is on her way to try to bring the Children back to the USA. It is absolutely necessary that the diplomatic services get in touch with the State Department and the FBI to indicate that Mrs Brown is probably preparing to kidnap the Children in Paris given her background.*
>
> MR. MURDOCH
> *Are you preparing to kidnap the Children from France?*
>
> MISS BROWN
> *No.*

Excerpt from FTR from August 4th, 2023 in cases 22DR17285/23DR08269.

**Mother's pattern of being disingenuous to the Jackson County court and any court anywhere in the world can be summarized in the following table of all of Mother's manipulations of the judicial systems:**

| Manipulation/Misrepresentation | Judge/Court | Impact on Legal Proceedings |
|---|---|---|
| Filing a protective stalking order in bad faith to delay Hague Action | Bloom, Aiken, USA | Delayed service of Hague Action, affecting timely resolution |
| Testifying that Father degraded women sexually to the point of raping them | Orr, USA | Painted Father as a danger, influencing court's perception; Accused Father without evidence, contradicting earlier statements |
| Initial custody petition claiming no knowledge of competing custodial action in France | Orr, USA | Misled the court about jurisdictional conflicts; Claimed no knowledge of French custodial action but was involved in it |
| Intention to return to France with children as per July 2022 agreement | McShane, USA | Fraudulently obtained agreement to leave France, misleading court; Agreed to return children to France but later refused |
| Refusal to return children's passports despite French judgment | nan | Violation of court order, complicating legal enforcement; Kept children's passports despite court order to return them |
| Mother's claim in Oregon court of being unaware of any French custodial action | Orr, USA | Obstructed the Hague Convention proceedings; Denied knowledge but had prior involvement |
| Providing false testimony about when she hired her new lawyer | Orr, USA | Manipulated court proceedings and delayed justice; Hired new lawyer earlier than claimed |
| Claiming that Father was a fugitive criminal | Aiken, USA | Attempted to discredit Father's legal standing; Accused Father of being a fugitive, which was disproved by official communications |
| Fabricating a story about her departure route from Europe | Aiken, USA | Created confusion about legal process and jurisdiction; Fabricated travel route story conflicting with evidence |
| Obtaining Status Quo order in bad faith | Orr, USA | Misled court to gain favorable interim orders |
| Committing child abduction while claiming Father's danger to children | Bloom, USA | Manipulated court's perception to delay children's return; Committed child abduction while falsely claiming Father's danger |
| Misleading the French court about her intentions to comply with agreements | Presiding Judge, Paris Appeal Court, Paris France | Violated trust and agreements, prolonging legal battles; Misled court about intentions to comply with agreements, then reneged |
| Service of the IST référé for the August 24th, 2023 Hearing | Presiding Judge, Paris Appeal Court, Paris France | Attempted to invalidate the August 24th hearing proceedings; Claimed improper service despite documented proof of proper service |
| Desinginuous Testimony about | Orr, USA | Misled the court regarding the legal processes in France, affecting court decisions; Provided false information through Brassens' testimony, contradicting documented facts |
| Participation in Mediation | Presiding Judge, Paris Appeal Court, Paris France | Misled court about willingness to mediate, delaying resolution; Claimed willingness to mediate but failed to attend scheduled sessions |
| Misrepresentation about Children's Residence and Schooling | Los Angeles Court, California | Misled the French court regarding the children's habitual residence; Claimed children lived and schooled in France while they were in Ashland, Oregon |
| Misrepresentation about Acceptance of French Judgment | Presiding Judge, Paris Appeal Court, Paris France | Attempted to nullify concerns about potential child abduction; Actions indicated a disregard for the French court's orders despite claiming compliance |
| Misrepresentation about the French court not letting her participate remotely and present testimonies and evidence from Oregon | Orr, USA | Misled the court regarding her cooperative stance; Claimed willingness to cooperate but demonstrated contrary actions |
| Misrepresentation about Children's Residence Since July 2023 | Orr, USA | Misled the California court regarding the children's residence, affecting custody and jurisdictional decisions; Claimed children resided in Oregon, while they were actually in Paris until the abduction in April 2024 |
| Misrepresentation to Arnaud and French Judge about the July 19th agreement | French Judge, Paris, France | Avoided to start a custodial action in France in July 2022; Mother was able to take the children to Oregon for temporary school year while her real plan was to make a separation after 6 months and gaining home state jurisdiction over the children against France. |
| Misrepresentation about the letter from Jackson Court to the French police and to the French Judge | French police and judge, France | Bring criminal prosecution against Father in France. |

That table shows that Mother's manipulation of the courts is a clear pattern, and this has

no reason to stop with this Hague Action so I would like to caution this Honorable Court

in that regards as this next section will show that Mother is often accusing Father wrongfully and in bad faith of the very same actions she doesn't hesitate to take herself.

### m. Mother is calling Father a "criminal fugitive" while Mother is the one who just committed a criminal abduction of the children from France.

Mother was fully aware of the French Judgments valid in France when she abducted the children on French soil last month and she knows that the Hague Convention's Article 3 is very clear:

> *"The removal or the retention of a child is to be considered wrongful where –*
> *a)  it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and b)  at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention."*

Mother removed children from France, where the children had been spending their entire school year in Paris living there with Father, their custodial parent per the "law of that state", being France, since Father had full custody of the children in Paris per the French Judgment of April 21st, 2023. And there was even a second French Judgment issued on August 25th, 2023 forbidding Mother to take the children outside of France during her visitation time. That was the "law of the state" that Mother was fully aware of when she abducted the children from France last month and this clearly constitutes a wrongful removal from the children's habitual residence.

-**See attached Exhibit 71**, notice of criminal charges against Mother, Heidi BROWN, by the Paris Prosecutor Margaux PEGIS, for international child abduction with request for filing as civil party to Father, Arnaud PARIS.

Mother is fully aware that if a Hague Action is to take place, these two conditions to return the children to France are clearly met and she wants to delay this return of the children to France at all cost. She's also probably conducting intense parental alienation onto the children since she's kept them from having unsupervised communication with me, she's refused to do any video call preventing them from seeing their cat that they told me they're missing so deeply. And recently she's decided to simply cut all communication. Mother's goal here is clearly to alienate the children against Father to ensure that they would be against a decision from this Honorable Court to return to France. Here is the last message that Mother sent to Father about communication to the children:

> *"As I mentioned over the phone, I am going to pause communications for a couple weeks."*

-**See attached Exhibit 81**, email sent by Father to Mother after a brief conversation on the phone with Eva and Juliette on May 27th during which Mother hanged up the call.

-**See attached Exhibit 82,** email sent by Mother to Father after a brief conversation on the phone with Eva and Juliette on June 8th during which Mother hanged up the call.

The stalking protective order entered in bad faith in the Jackson County Court on May 2nd 2024 shows that Mother was not only trying to delay these Hague Federal proceedings in Oregon be she was also trying to set the narrative to portray Father as some kind of dangerous character that it wouldn't be in the interest of the children to be sent back to live with in Paris. And this explains also why Mother filed for that Stalking Protective Order before entering the logical Hague Federal Proceedings for the return of the children to France. Mother wants to set the stage for this Honorable Court to believe that Father is some kind of clear and immediate danger not just to Mother but also to the Children. This abusive request was obvious to the Jackson County court and Mother's request was dismissed.

-**See attached Exhibit 68**, Order from Judge Bloom dismissing the request for protective staking order from Mother against Father since Father lives 6000 miles away.

Respondent, Mother, is now trying to use that "fugitive doctrine" equally in bad faith since she is herself an international fugitive from having committed a criminal child abduction while Petitioner hasn't, he has no criminal charges for child abduction.

### n.  Why is Mother concealing information on how she left Europe in her response to this Honorable Court while Father fully explained his return to France?

The French Police has no trace of a legal crossing of the European borders so Respondent must explain if she left Europe 'legally' or if she used a smuggling route why she did it and why she put the children through such a dangerous "escape from Europe" and why she did it criminally. The French and European Police from legal border crossings have no record or evidence that Mother and children legally crossed the border and the "Frontex" European control system would automatically have made a record of their passport check, especially for children.

The Paris Prosecutor, Margaux PEGIS, in charge of the criminal charges against Mother for child abduction noted that the route Mother and the children took to reach the United States avoiding European borders and passport controls went through Spain and Morocco after they left the Hotel in Perpignan in the South of France near the Spanish border.

-See attached **Exhibit 71**, notice of criminal charges against Mother, Heidi BROWN, by the Paris Prosecutor Margaux PEGIS, for international child abduction with request for filing as civil party to Father, Arnaud PARIS.

It is to be noted that Mother staged her escape at the hotel leaving behind the children's luggage to make it look like they were still at the Perpignan Holiday Inn Hotel the entire

week that Mother had reserved while her fugitive illegal escape of Europe with the children started on the Monday April 8th according to the video surveillance footage of the hotel:

> "Ms. BROWN had made a reservation from April 5 to 13, 2024. Thursday April 14th [sic] [recte 11th], she called to inform us that she had returned to the USA and was therefore cancelling the end of the week. So she asked us to ship her luggage back to the USA. At the request of the police, I looked at the hotel's surveillance camera footage and saw Ms. BROWN, her mother, and two daughters leaving the hotel on the morning of April 8. Two hours later, Ms. BROWN returned alone to get her own suitcase, but left the children's suitcases, stuffed animals, the girls' clothes, and an Apple watch. The police asked me not to send the suitcases back to the USA as the items were important in the child abduction investigation. The belongings were recovered by Mr. PARIS with police authorization. Dental retainers were also found in the suitcase. From the surveillance videos, I was able to identify the car they left in. But when Ms. BROWN returned to pick up her suitcase, the car was not the same."

**-See attached Exhibit 76,** written testimony under oath from David FOUET, owner of the Perpignan Holiday Inn Hotel about the fugitive escape from Mother, Heidi BROWN, who had made a reservation for the entire week at his hotel for her, her mother and the children.

This testimony shows the level of preparation that Mother went through for this abduction of the children and to ensure that she wouldn't be caught in her fugitive escape from Europe by letting the hotel staff believe that they were still using their room for several days after they had started their escape.

**17. What is the best interest of the children in this matter?**

    **a) Mother just committed an abduction in France of her own children ruining their French school year and impacting their orthodontist treatment, she is a fugitive criminal who doesn't have the interest of her own children in mind.**

When Mother conducted the abduction during the Spring school vacation in France, she didn't have the best interest of the children in mind since she was willing to sacrifice their French school year and abruptly uproot them from their Parisian life without notice and without Eva and Juliette being able to say goodbye to their family or their friends. They couldn't even say goodbye to their Father, with whom they were expecting to be reunited a few days later on April 13th to then celebrate his birthday with him on April 14th.

Mother also left behind in her escape the girls' luggage at the Perpignan hotel to create a diversion and ensure that she would have time to escape Europe with the children and her mother before the abduction would be discovered by Father and the French authorities. In the luggage found in at the hotel, beside the girls cloth and their favorite stuffed animals, Mother didn't hesitate to also leave behind their orthodontist apparel that was important for the long term treatment they had started with the French orthodontist following them in Paris and for which she had given her approval. Mother shows here again that she doesn't even have the medical interest of her own daughters in mind.

**-See attached Exhibit 76,** written testimony under oath from David FOUET, owner of the Perpignan Holiday Inn Hotel about the fugitive escape from Mother, Heidi BROWN, who had made a reservation for the entire week at his hotel for their week of spring vacation in France.

**-See attached Exhibit 77,** email from assistant of the Orthodontist Dr. Chpindel who confirmed the orthodontist treatment that Mother had agreed to for Eva and Juliette on February 12th, 2024. This treatment was a one to two year treatment.

It is important for this Honorable Court to know that since last January the children were worried about their Mother attempting to abduct them to the US. Indeed their Mother had taken them to the US embassy during her visitation week of the Christmas break to have new US passport made for them. She then indicated to them during the winter break early february that she was going to "save them from France".

Since then, Eva and Juliette became extremely worried that their Mother would conduct an abduction and they had nightmares about it for weeks since February. They even had recurring nightmares that they shared with their Father and the AuPair.

-**See attached Exhibit 83**, testimony from Keira Sumner, the current AuPair of the family in Paris, made under oath on April 24th 2024, in which she describes the state of mind of the girls before their Mother came to see them for the Spring vacation during which Mother conducted the abduction. Miss SUMNER mentions in this testimony the nightmares that the girls had shared with her about their Mother abducting them to Oregon.

-**See attached Exhibit 75**, excerpt from Eva's diary in which she describes one of the nightmares she was having since her Mother started to talk about bringing them back to Oregon during the last winter break in February.

Sending Eva and Juliette through a traumatic fugitive escape and possibly putting them in harm's way trying to cross the border illegally using some unsafe passage while they were specifically scared of such a scenario of forced return to Oregon must have been extremely disruptive for the children. It is currently unknown what level of trauma Eva and Juliette went through and their Mother is refusing to let them speak freely about what happened during the abduction with Father, most likely because Mother is worried about details of her criminal escape coming out and being shared with the authorities.

The French President Emmanuel Macron and the First Lady themselves have taken this matter quite seriously and have been informed of the situation and the President asked the Ministry of Justice and the Ministry of Foreign Affairs to follow the matter carefully.

-**See attached Exhibit 80**, English translation of the letter from the office of the **French president, Emmanuel MACRON,** asking the minister of foreign affairs, Stéphane SÉJOURNÉ, and the minister of justice, Éric DUPOND-MORETTI, to take over this matter as both the French President and the First Lady show great concern about Eva and Juliette's abduction by Mother.

Mother has also severed the link entirely with the rest of the French family and their French friends, here is what Eva and Juliette French Grandfather is writing in an email to Mother on June 2nd:

> *"Hello Heidi, we haven't seen our granddaughters for two months; Impossible to reach you by WhatsApp. We would like to be able to chat on video with Eva and Juliette, we miss talking to them and seeing them. That would suit us Saturday or Sunday morning (for you).*
>
> *Katy and Jean"*

**-See attached Exhibit 74**, English translation of the French Grandfather email sent to Mother on June 7th indicating that the French grandparents haven't been allowed to communicate with their grandchildren once since Mother abducted them from France.

Here is an excerpt from the testimony that David BENAMOU made on June 17th 2024 describing the relationship of his daughter Anna who's been Juliette's best friend since they were 2-year -old when the both joined the first year of Pre-Kindergarden at the local school in Paris in 2017. He describes the life that Eva and Juliette were having in Paris before the abduction, and he also describes in this the traumatic impact that this abduction has had onto the entire school and the girls' friends in Paris:

> *"With this letter, I would like to affirm the strong friendship between my daughter Anna and her friends Juliette and Eva. Their close friendship developed as early as Petite Section at the Hospitalière school in 2017, and has grown stronger over time. In particular, Anna's bond with Juliette is particularly strong, making Juliette her best friend.*
>
> *Following Eva and Juliette's return home to Paris after a year without news from the United States, I had the pleasure of observing the girls' great joy at reuniting during the month of August 2023. We spent part of the vacation at my home in the Drôme. It was a very warm reunion after such a long and worrying absence for my daughter Anna, who was afraid of losing her girlfriends forever.*

*Indeed, the situation of the girls being so far apart had made me worry about how the children's reunion would go. Our children's friendship soon reassured me that the distance had not had the impact I had feared.*

*In September 2023, the start of the new school year at École Hospitalière, where Juliette and Anna are in the same class, also went smoothly.*

*As a local neighbor, I often had the opportunity to observe Eva and Juliette outside school. They resumed their many Parisian activities without difficulty. They've reconnected with their close circle and found their bearings and friends again.*

*Every morning, Anna and I accompany Juliette to school. During this intimate moment, the girls talk about their personal lives, and I've noticed that they're much closer than they were a year ago.*

*School life is punctuated by school parties, where Eva (who attends a different school) is always present alongside her sister, prolonging the bond with all of their friends from kindergarten. These are simple moments where their happiness is a joy to behold. The girls feel at home here.*

*Also, this school on a human scale is ideal for preparing in the best conditions for the always complex transition to 6th grade. As our daughters will be going to collège Charlemagne [middle school] together in a year's time, they are preparing together (by visiting the campus, for example) to tackle this turning point as serenely as possible.*

*Despite these happy moments, I remained sensitive to the balance of the Paris children.*

*I was surprised by the prolonged absence of Heidi, their mother. Eva and Juliette are part of my daughter Anna's circle of close friends. To cast doubt on this fact is at best bad faith, at worst a lie.*

*Their sudden departure for the USA has left us in a state of confusion and dismay.*

*We haven't heard from them since, and my daughter regularly asks for news of her friends who are no longer there. She feels very sad. I think my initial concern about Heidi's desire to be far away has become a reality."*

**-See attached Exhibit 78**, testimony from David BENAMOU, father of Anna who is Juliette's best friend.

Mother is also on a criminal escape from Europe that could lead to serious international criminal charges that would greatly affect her job as was explained by her French counsel on April 3rd in front of the Judge of the Court of Appel. Now that she will have an international criminal status this will impact her capacity to earn an income and to support the children. On April 3rd 2024 while Mother was in front of the Presiding Judge of the Paris Court of Appeal her counsel said:

*"In addition, Ms. Brown's job requires her to travel and she has no intention of committing the offence of unlawful child removal,"*

**-See attached Exhibit 56**, excerpts from April 3rd 2024 pleadings from Miss Brown's French lawyer presented in presence of Miss BROWN herself on April 3rd in front of the Presiding Judge of the Appeal Court of Paris (so just 5 days before Miss BROWN committed the abduction of Eva and Juliette from France).

**-See attached Exhibit 71**, notice of criminal charges against Mother, Heidi BROWN, by the Paris Prosecutor Margaux PEGIS, for international child abduction with request for filing as civil party to Father, Arnaud PARIS.

In the interest of both parties and the children, Eva and Juliette should be ordered to return to France by this Honorable Court so that Mother be given a chance to willingly comply with the result of this Hague Action so that the French authorities take into account this willingness and do not move forward with an international warrant for Mother's arrest and so that the French mediations that had been started before the abduction can resume in Paris.

-See attached **Exhibit 79**, testimony from Keira Sumner, the AuPair who visited Father and the daughers in Ashland early June 2023 before becoming their AuPair in Paris from November 2023 till the abduction in April 2024 and who confirmed that children knew that the school year in Oregon was only temporary and that they were eager to come back to France.

-See attached **Exhibit 17,** email from the French mediator in Paris to the President of the Paris Appeal court informing her that Petitioner had left France with the children right in the middle of the French mediations without any warning while she had agreed and committed to these mediations.

The following testimony from Juliette's school principal in Paris only confirms that it would be in the interest of the children:

> *"Juliette seemed to be thriving in her class with her classmates that she'd reunited with, most of whom she had known since she started kindergarten (2017).*

> *At the request of Ms. Brown, we met with her just before the spring vacation to update her on Juliette's progress in school. Our meeting went well, with discussion of progress targets for the rest of the school year and no indication that Juliette would not finish her year in the class.*

> *It is shocking and very surprising that the commitments made at the time by Ms. Brown were, in the end, totally bogus and did not correspond to the end-of-year timetable discussed.*

> *Juliette was very involved in our annual projects (choir show, commemoration - Olympiads) and her absence is regrettable for the whole class.*

> *All of Juliette's schoolwork and class projects were cancelled by this departure during the year.*

> *The students were sad and confused. The teacher's attempts to explain the situation were made quite difficult given the circumstances underlying her sudden departure."*

**-See attached Exhibit 74**, letter from Juliette's Paris school principal about the sudden and disruptive abduction conducted by Mother during the Spring vacation in France in contravention of the French Judgements.

**b) Eva and Juliette had lived almost 4 years total in France and had started the French school system since they were 2-year-old. They were back in France for almost a full year to a life in Paris that was without a doubt their "habitual residence" since 2019 as concluded the Oregon District Court.**

The federal district court in Oregon ruled on Father's first Hague Petition on December 7, 2022. The court found that Paris, France was the children's habitual residence. The court described the children's connection to their home and community in France:

> *"The children were French citizens. They spoke fluent French. The attended French schools that had, you know, year-long programs at these academies for music and dance."*
>
> *"The girls were involved in sports. They went to school and family excursions, regularly, throughout France. They had school-age friends and attended certainly visits with friends and birthday parties, those type of things. They had extended family and social supports in France, including a godfather."*
>
> *"So I'm finding that the children were fully assimilated to France and an intensive fact inquiry points to the only conclusion that when the children left France for Oregon in July of [2022], France was their habitual residence."*

This is the life Eva and Juliette had gone back to for almost a year when their Mother conducted an abduction in the middle of the French school year specifically meant to disturb and harm their stability in this return to their habitual residence and to sever the link entirely to their Father.

The school year that took place in Ashland in 2022-2023 was a temporary school year per the July 19th, 2022 (see attached Exhibit 02) an agreement made between Mother and Father that the children were fully aware of. During the 2022-2023 school year in Ashland the children were expecting and counting on returning to France at the end of the school year to come back to their French schools and their long time French friends that they had known for several since they were 2-year-old as they've been following the entire French school system since the "Petite Section". Because of its temporary nature the 2022-2023 school year in Ashland this can't constitute a change of habitual residence. Therefore, France and their life in Paris never stopped to be their habitual residence since summer of 2019.

**-See attached Exhibit 79**, testimony from Keira Sumner, the AuPair who visited Father and the daughers in Ashland early June 2023 before becoming their AuPair in Paris from November 2023 till the abduction in April 2024 and who confirmed that children knew that the school year in Oregon was only temporary and that they were eager to come back to France.

The following case law from the Oregon Court of Appeals that affirmed a decision from the Jackson County Court in that regards (of all counties in Oregon) is confirming that analysis that the temporary absence from France conferred extended home state to France. Even though the UCCJEA "home state" analysis is different from a Hague Action "habitual residence" analysis it brings an interesting angle to this specific situation since it helps answer both the question of the jurisdiction of the Jackson County court over the children and it helps reinforce the fact that France never stopped being the habitual residence of the children because in the mind of the children they were going to be back in France after this temporary school year in Ashland.

The facts in *Shepherd v. Lopez-Barcenas* are strikingly similar to the facts of this case. In *Shephard*, mother and father lived in Mexico, where their child was born. In September

1999, mother and the child moved to Ashland, Oregon so that mother could complete a one-year master's degree program at Southern Oregon University. When mother left, the parties agreed that she would return to Mexico when she finished her degree. One month after mother and the child moved to Ashland, mother told father that she wanted to end their relationship, but that she and the child would be returning to Mexico when she completed her program (albeit to a different location than the family home). In January 2000, father moved to Oregon and filed here to establish parentage, custody and parenting time. In December 2000, the Jackson County Circuit Court entered a judgment for custody and parenting time. Months later, mother moved to vacate the custody and parenting time judgment, arguing that the trial court lacked jurisdiction under the UCCJEA. *Id.* at 694-95. The Court of Appeals agreed with mother, holding that:

> *"[A]t the time father commenced the filiation proceeding, N's home state was Mexico. The parties had lived in Mexico since N's birth in 1998. Mother and N had lived in Oregon for only three months at the time that father filed his petition, and mother intended to return with N to Mexico.* ***Their absence from Mexico was only temporary, and the time spent in Ashland is therefore considered to be time in Mexico for the purpose of determining the home state. ORS 109.704(7).*** *Accordingly, mother and N are considered to have lived in Mexico for the six-month period before the commencement of the proceeding, and Mexico was N's home state. For that reason, Oregon courts lacked jurisdiction to make an initial custody determination for N. The circuit court correctly vacated the custody and parenting-time provisions of the December 2000 judgment."*

Id. at 696.

In the Shepard case, Father argued that even if mother intended to return to Mexico, he intended to remain permanently in Oregon. Thus, according to father, the child had no home state, so Oregon could assert jurisdiction because the child had a significant

connection to Oregon. The Court dismissed that argument. It reasoned that, regardless of father's intention, mother was still only temporarily absent from Mexico. *"Under ORS 109.704(7), 'any temporary absence of any of the mentioned persons' (emphasis added) is considered to be part of the period during which [the child] lived in Mexico for the purpose of determining the home state." Id. at 697 (emphasis added in original.)*

As the mother in the *Shephard case*, Father and the children were present in Ashland on a temporary basis for the purpose of attending school for the 2022-2023 school year. The July Agreement between Father and Mother expressly provides that the parties never mutually intended for the children to stay in Ashland on a permanent, ongoing basis beyond the end of the 2022- 2023 school year. Even if Father had remained in Ashland with Mother and the children, the absence from France would still be a "temporary absence," just as in *Shephard*. Mother's secret intention to remain in Ashland with the children does not defeat the temporary nature of the children's stay here.

So, to summarize the children were in France for 10 months between 2017 and 2018. Then they moved permanently and staid continuously in France for 3 years between summer 2019 through summer 2022. Then they went to do a school temporary year in Oregon before returning to France summer of 2023 in preparation for returning to their French schools in Paris. And they were back in France for almost 9 months when mother abducted them from France in April 2024.

There is no doubt at this point that France has been their habitual residence since summer of 2019 and having even started to be in the French educational program since 2017, having attended every year of the elementary French school since they were 2-year-old.

In light of this *Shepard* case, it is clear that the facts of this case support a finding that the children's departure from their home state in France to Oregon was only temporary. When the children came to Oregon, France had been their home continuously for the prior three

years; they had been in Oregon less than three months when Mother filed this action. The July Agreement provided that the children would return to France on August 23, 2022 if certain conditions were not met. Even if those conditions were met, the children were to remain in Oregon only until the end of the current school year, when they would return to France and start their 2023-2024 school year in Paris per the French judgment of April 21st 2023 and would be under the custody of Father with Mother having visitation rights during the school vacations.

## 18. Response to Mother's Argument: Article 1(b) of the Hague Convention

Finally, before concluding, Father, Petitioner would like to address one specific argument made by Mother's counsels in their response from May 28th. On page 8 they say:

> *"It would only be proper in the instant matter for this Court to apply the fugitive disentitlement doctrine and dismiss Father's Petition in its entirety. Pursuant to Article 1(b) of the Hague Convention, the objects of the Convention include ensuring "that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States."*

This argument needs some clarification in the perspective of the Hague Convention as a treaty between nations is intended to have the right of the contracting state in which the Hague Action is started, in this instance the US, respect the rights of the other contracting State, in this instance France.

This is an important clarification to make otherwise what Mother's counsel is implying here in this argument is that if the Hague Action is started in the US then I shouldn't be given a right to a Hague action because the custodial determination from France is conflicting with custodial determination to "respect" in the US?

That wouldn't be making any sense, the Hague action is signed between different nations. This self-centered analyis from Mother's counsels is confusing to not say misleading. But I am confident that this Honorable Court won't be influenced by that type of circular argumentation.

I would like also to bring to the attention of this Honorable Court that the Hague Convention in its Article 17 says:

> *The sole fact that a decision relating to custody has been given in or is entitled to recognition in the requested State shall not be a ground for refusing to return a child under this Convention, but the judicial or administrative authorities of the requested State may take account of the reasons for that decision in applying this Convention.*

Mother's counsel is trying to create a diversion from the real question brought in front of this Honorable Court. The purpose of a Hague Action isn't to examine which custodial determination between France and the US should be the controlling order over our children. In other words, the Oregon judgment shouldn't influence this court's decision about ordering the return of the children to France: *"shall not be a ground for refusing to return a child"*

The matter of which custodial determination should be the controlling order is to be resolved in the proper court of each country to assess their own jurisdiction. Since the appeal in France will be coming first it is likely that this matter will be resolved by the French Court of Appeals. But in the meantime the children should be awaiting this resolution in their "habitual residence", especially if they have been taken to Oregon wrongfully per the law of the state they were taken from, in this instance France.

I want to make sure that Mother's counsels are not trying to segway this Hague Action into a matter of jurisdictional competing analysis between France and the US. The matter presented to this Honorable Court is very simple per the Hague Convention it only encompasses the two following questions:

1) Were the children taken wrongfully from France in the eye of the law of France.

2) Were the children taken away from their "habitual residence" in France.

I have confidence that these two questions can be answered expeditiously in front of this Honorable Court as there is sufficient and plenty of evidence here in France that can be presented remotely; and it is in the interest of our children to have this Hague Action take place rapidly as Mother stipulated in her other response to my motion about direct communication with the children.

## 19. CONCLUSION

As a conclusion, Father would like to insist that Mother's argument that this Hague Action shouldn't take place baring me my legal right based on the "fugitive doctrine" is not valid because:

-Father isn't a fugitive.

-Father isn't a criminal.

-Father is not escaping the warrant, Father has been and is actually strongly contesting that warrant and the contempt case as well as the true motivation of Judge Orr and Juge Bloom in this matter.

-Father has been also the victim of a bad faith abusive staking protective order request on the part of Mother that was dismissed as the pattern of manipulation of all the courts by Mother is now becoming obvious including in Jackson County.

-The warrant against Father was issued by a judge who wasn't allowed to hear criminal matters.

-The warrant was issued onto someone who didn't leave in the US and was willing to participate remotely and has been participating remotely extensively in all the Oregon proceedings.

-The warrant was issued because Father wasn't allowed to participate remotely.

-Father has tried to participate in all the Oregon proceedings and has respected all the judicial systems no matter how complex this international matter has been to navigate over almost 2 years.

-Father is doing the right thing asking for return of children under Hague Action, this is the proper remedy that Mother should have been seeking in France instead of doing an abduction.

**AS A RESULT OF THE ABDUCTION IN FRANCE:**

-Mother is now truly a fugitive.

-Mother is now truly a criminal as she violated the exit ban while she was swearing to the President of the Appeal court that I was paranoiac about her being about to do so.

-Children have been removed illegally.

-Children were taken in middle of school year with extremely dramatic consequences on their well being, education, their relationship to their Father, their health and their mental stabililty.

-Children are undergoing strong parental alienation against Father that needs to stop immediately.

-Proper communication with the children needs to be re-established not just with Father but also with their French friends and family.

-It is a fact that in the current situation Children can only see both parents in France.

-Father has offered and still offers to continue mediations in Paris

**Mother is attempting to turn the tables or distract this Court by accusing me of conduct she has engaged in.**

Furthermore, the legal analyis done by Father in this response of the Sasson case in particular show that the **fugitive disentitlement doctrine** doesn't apply in this instance.

US courts can and should decline to apply the **fugitive disentitlement doctrine**, particularly when:

1) There is no direct connection between the individual's fugitive status regarding the mandate for failure to appear and this Hague action. I have a mandate because I didn't come in front of Judge Orr in a civil matter and while I live in France, the case law cited specifically insist that foreigner should be allowed to participate remotely including in a criminal action.

2) The application of the doctrine would be unduly harsh or inequitable. Eva and Juliette would lose their Father for many more months to come possibly years until the Oregon Judgment is dealt with in appeal as it is impossible to meet the requirements of this judgement per French law. Making them the real victims of the story.

3) The individual's ability to defend their legal rights in civil matters is at stake, especially when the fugitive status arises from unrelated issues. Here I have left the US with approval from the authorities and I should now be considered a criminal

and a fugitive while all I was doing was to try to comply with the French order to have my kids start their school year properly in Paris which was the law of Oregon at the time.

I'm not in a fugitive status, I've done nothing but trying to participate and defend myself in the Oregon and American judicial system while there was already a custodial matter started and adjudicated first in France regarding Eva and Juliette that their Mother has appealed to. This entire custodial matter should have been dealt with in France where Mother could have easily prevailed.

This very Hague Action is yet another proof of that, I'm not preparing an abduction plan of the children like their Mother devised for many months after I returned to France with Eva and Juliette per the only custodial determination made about our children that existed at the time and that ordered me to ensure that they could start their school year in Paris properly.

In this Hague Action I'm simply asking for my rights to be respected by the Oregon courts once again as I have been actively and voicefully been doing in the Oregon judicial system since I started to see that I was not getting due process in the Jackson County court.

And if Mother felt that her parental rights had been violated when I returned to France with our children per the French order that is the same thing that Mother should have done in France by starting a Hague Action if she felt I had wrongfully taken the children to France at the time.

Courts are mindful of ensuring that the doctrine is applied fairly and only when it directly serves the interests of justice, avoiding situations where its application might lead to further injustices.

What Mother is asking in her response is exactly that, Eva and Juliette haven't been able to see their Father for more than two months now and denying me this Hague Action could damage and sever their relationship to their dad as Mother is hoping for. Worse they've been severed from their entire relationship to their French family including their French grandparents and their Aunt they were very close to. By also changing their last name this is an entire part of their identity that their Mother is simply trying to erase.

Courts have also recognized that the doctrine should not be applied rigidly in situations where legal proceedings are initiated in bad faith or to harass:

Courts may decline to apply the fugitive disentitlement doctrine if it is demonstrated that the legal actions taken by the opposing party were initiated with malicious intent, to harass, or without a genuine legal basis. Here considering the level of misrepresentation, manipulation and disinginousness of Mother towards both the French and the Oregon courts it can only be concluded that the legal action she initated in Oregon were made in bad faith like the recent stalking order she asked for that was denied by the Jackson County court.

If a parent can prove that the legal proceedings were brought forth primarily to harass them, rather than to resolve legitimate legal disputes, the court may consider this an exception to the doctrine. This is also the case in this instance as Mother has kept on pushing the Jackson County proceedings while the French courts had already adjudicated this matter. If Mother truly felt that the first French Judgment was based on lies that's what her French appeal is for but trying to "punish" Father for having obtained and followed the first French judgment by obtaining a competing custodial determination from the Jackson County court in total contravention of the UCCJEA is nothing less than judicial harassment against Father.

**1**

**2** In summary, while the fugitive disentitlement doctrine is a powerful tool to prevent abuse

**3** of the judicial system by fugitives, its application is not absolute. The case law on this

**4** doctrine shows that courts have to consider its application with caution and exceptions,

**5** especially in cases involving bad faith or harassment, to ensure a fair and just legal process.

**6** The "fugitive disentitlement doctrine" can't be claimed retroactivity by Judge Orr as a

**7** support to the denial of due process that took place in the Jackson County court, and more

**8** importantly it cannot be used punitively especially when the defendant is a foreigner living

**9** 6000 miles away who was and still is willing to engage with the legal process from abroad.

**10** In this instance Mother has the children with her in Oregon so factually nothing prevents

**11** this case Hague case from moving forward as it would be extremely inappropriate to forbid

**12** a Father from having a Hague Action regarding the abduction of the children taken away

**13** from him in the middle of the school year from France where he was the custodial parent

**14** and not giving him at least the only remedy he has at his disposal to resolve this situation,

**15** knowing that if he doesn't prevail the Oregon judgment in place will have dramatic and

**16** irreperable consequences on the relationship to his daughters.

**17** Father's actions were not those of a fugitive but rather those of an individual caught in a

**18** complex international legal situation while trying to comply with multiple legal systems.

**19** If the court doesn't give way to this Hague action the children will be deprived and severed

**20** from their Father to the point that Mother could permanently implement a strategy of long

**21** term parental alienation with damage impossible to reverse for years to come.

**22**
**23** As the Walsh case says:

**24** *"More importantly, applying the fugitive disentitlement doctrine would impose too severe*

**25** *a sanction in a case involving parental rights. Parenthood is one of the greatest joys and*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*privileges of life, and, under the Constitution, parents have a fundamental interest in their relationships with their children.*

I respectfully request this Honorable Court to take into consideration the best interest of Eva and Juliette by giving them a chance to have a Father and a Mother in their lives.

DATED this 20th day of June, 2024, in Paris, France

13 rue Ferdinand Duval

## VERIFICATION

I, Arnaud Paris, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

SIGNED AND DATED this 20th day of June, 2024, in Paris, France.

Arnaud Paris

# CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **PETITIONER'S RESPONSE TO RESPONDENT REPLY TO INITIAL PETITION** on the following party:

Katelyn Skinner at kds@buckley-law.com
Katrina Seipel at kas@buckley-law.com
Attorneys for Respondent

By the following method or methods:

_____    **ailing** full, true, and correct copies thereof in sealed, first class postage

_____

shown above, which is the last known email address for the respondent's attorneys on the date set forth below.

_____

_____

DATED this 20th day of June, 2024, in Paris, France.

By:_____
ARNAUD PARIS, Petitioner

ARNAUD PARIS
13 rue Ferdinand Duval
75004, PARIS, FRANCE
Telephone: +33688283641
Email: aparis@sysmicfilms.com