1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

```
ARNAUD PARIS,                    )
                                 )
           Petitioner,           )   Case No. 1:22-cv-01593-MC
                                 )
           v.                    )
                                 )   December 7, 2022, 2:00 PM
HEIDI MARIE BROWN,               )
                                 )
           Respondent.           )
_____  )
```

COURT TRIAL

EXCERPT OF TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL J. MCSHANE

UNITED STATES DISTRICT COURT JUDGE

EXHIBIT 2
Page 1 of 55

2

1                              APPEARANCES

2    FOR THE PETITIONER:
                              DAVID B. STARKS
3                             McKinley Irvin PLLC
                              1501 4th Avenue
4                             Suite 1750
                              Seattle, WA 98101
5

6    FOR THE RESPONDENT:
                              KATELYN D. SKINNER
7                             Buckley Law PC
                              5300 Meadows Road
8                             Suite 200
                              Lake Oswego, OR 97035-8617
9

10

11

12

13

14

15   COURT REPORTER:     Kendra A. Steppler, RPR, CRR
                         United States District Courthouse
16                       District of Oregon
                         405 E. 8th Avenue, Room 2100
17                       Eugene, OR 97401

18

19                              *   *   *

20

21

22

23

24

25

EXHIBIT 2
Page 2 of 55

1       THE COURT:  All right, folks.  Thanks for your

2  patience.  Let's go back on the record, and we'll hear any

3  closing arguments the parties wish to make, starting with the

4  Petitioner.

5       MR. STARKS:  Thank you, Your Honor.  Are we -- did

6  that mean we're set?

7       THE COURT:  Yes.

8       MR. STARKS:  Okay.  Thank you.

9    And I would want to start with just pointing out that

10  what's on the ELMO, Your Honor, is what I sort of understand --

11  understood -- was the theoretical thing that the Court's surely

12  working its way through.  Article III is the article about

13  wrongful removal and retention.

14    The Ninth Circuit in the Mozes case, which is M-O-Z-E-S,

15  has told us here sort of the questions you're going to ask

16  yourself when you're thinking about a wrongful removal as a

17  judicial officer, I mean, as the lawyer, when I'm analyzing my

18  case.  So that will be there just if you've got questions or

19  thoughts about any of those particular questions as I go.

20    And now I'll start.  So, as a lawyer, you know, I like

21  logic puzzles.  I think many of us do.  That's why we go into

22  the law.  It's interest of figuring out the spaghetti and how

23  to unwind the noodles.  And so, as a result, I have a tendency

24  to see them sometimes where they are really not.  And so I find

25  it important for me, in many of my cases, and certainly in this

EXHIBIT 2
Page 3 of 55

1  case, as well, to take that big step back and ask myself

2  whether I've really got a puzzle or not.

3       And I think how I would do that, in this case, is take

4  that first big step back and ask, "Why do we have the Hague

5  Convention at all?"  And, you know, I've answered that case --

6  I've answered that question how the Ninth Circuit answers it in

7  Mozes.  And, you know, every circuit answers it about the same

8  way.  But I have always liked the Third Circuit sort of

9  cut-to-the-chase talk about why we have the Convention.

10      And I'm thinking specifically the Karkkainen case.  It's

11 K-A-R-K-K-A-I-N-E-N.  It's 445 F.3d 280, Third Circuit, 2006.

12 In the Karkkainen case, the court said, "The Convention was

13 designed to deter parents from engaging in international forum

14 shopping in custody cases."  That's what the Convention is for.

15      I think that's a nice, really, straight to the point, why

16 do we have the Convention, and why are we sitting here today?

17 Because we all know what happened in this case.  This does not

18 become a logic puzzle case when we ask ourselves, through the

19 framework of why we have a Convention, why are we here?

20      The Respondent specifically, and with intentional

21 forethought, engaged in international forum shopping for the

22 custody case she planned no later than July 19th -- as we can

23 see from Exhibit 23, which was admitted into evidence -- the

24 case she planned to bring in Oregon when the time was right for

25 her to do so under the UCCJEA.  That was the plan.  And if the

EXHIBIT 2
Page 4 of 55

1   Convention is to stop that, then she's violated the Convention.

2   There's a wrongful removal of the children as a result.

3       So the Court asked about wrongful removal, but I do -- and

4   I'll talk about that.  But I do want to say that let's remember

5   there's actually two prongs to analyze, not just one.  A

6   wrongful removal of children occurs when a parent takes

7   children to another country without authorization of the other

8   parent before leaving.

9       A wrongful retention is when a parent does not return with

10  those children to the country of habitual residence after some

11  agreed period of time.  And we have both of those things to

12  think about in this case, Your Honor, not just wrongful

13  removal.

14      So, as I prefaced my remarks with, it's important, I

15  think, to understand that Exhibit 23 demonstrates a wrongful

16  removal.  If Mr. Paris did not intend to follow the July

17  agreement, all that means is he had intended for the children's

18  habitual residence to remain in France.  He intended a status

19  quo decision when it came to the July agreement, if you were to

20  believe that he never had any interest in following it.

21      That's not a custody forum shopping decision.  That's a

22  status quo decision.  The girls remain in their habitual

23  residence.  They remain in their schools.  They remain with

24  their friends and family with whom they've grown attached over

25  the three years that they've been in France.

EXHIBIT 2
Page 5 of 55

1    And these are, of course -- you know, they're very young.

2  I mean, from their perspective, I imagine, other than this

3  short period of time they've been in Oregon, they really only

4  remember France.  This was during, you know, ages four, five,

5  six, and seven.  Right?  I mean, this is a very formative time

6  for children.  These are little French kids.

7    So we don't have a forum shopping issue going on if we are

8  just to believe that Mr. Paris was never interested in

9  following the agreement.

10    I would also say that I think it's a little tough on him

11 to say that I don't think that he ever planned to follow the

12 agreement.  You know, we heard his testimony, and we all

13 understand that he's ill.  And the way I think of those few

14 weeks that he remained behind in Paris in early August, is that

15 the force majeure of this situation for him became apparent to

16 him.  He needed to be in France for medical care.

17    It was during that window between July 29, when his family

18 had left for Oregon, and August 19, when he joins his family in

19 Oregon -- it's during that period of time that he's talking

20 with his dad and having his dad raise alarm about this plan

21 that he's been cooking up to somehow have insurance in Oregon

22 and have it all work out.

23    It's during this time that he gets the Exhibit 25 that

24 confirms he has insurance that will last for no less than five

25 years to try to deal with the illness that he has.

EXHIBIT 2
Page 6 of 55

1     It's during that time -- that August 19 -- or, I'm

2   sorry -- that July 29 to August 19 that he gets the notice of

3   Exhibit 26 that if he were to live outside France, that could

4   jeopardize his insurance.

5     And the idea at trial -- I mean, I'm an American

6   citizen -- the idea at trial is not to bash the U.S. medical

7   system, but to point out the obvious.  Mr. Paris is at no risk

8   of going broke in France with the medical care that he needs.

9   He's not going to have -- he's going to have the full attention

10  of whatever medical team he needs and whatever medical services

11  he needs.  There's not going to be an insurance company that

12  decides that for him, and it's not going to be the power of his

13  pocketbook that decides that for him.

14    He's not going to be bankrupt at the end of his illness in

15  France.  And nobody here can promise that to Mr. Paris in

16  Oregon.  We simply can't.  We know how ObamaCare's been beat

17  around.  Forget Regence Blue Shield and all the rest.  You

18  know, the preexisting -- we all know the preexisting

19  conditions, which were -- tried to be attacked shortly after

20  the legislation was entered.

21    There are no guarantees in the United States about what

22  sort of medical care he's really going to have in Oregon.  And

23  so I think it's pretty tough to -- I think it can be a little

24  tough -- to just sort of paint the same brush for both why he

25  might have -- between August -- between July 29 and

EXHIBIT 2
Page 7 of 55

1  August 19 -- gotten some significant cold feet about this July

2  agreement, and what was going on, on the other side, which, on

3  July 19, had already planned, by January 2022-2023, to be

4  filing for custody in Oregon.

5      And these are two very -- the spirit between those two

6  differences of, "I don't want to follow the agreement," and "I

7  don't want to follow the agreement," are very, very different.

8  And only one of them violates the Convention.  Only one of them

9  is international forum shopping by a family for purposes of a

10  custody decision.  And that's not what Mr. Paris was doing.

11      And I'd also point out, you know, one of the things that I

12  didn't talk about in Exhibit 83.  And Exhibit 83 is that

13  WhatsApp where Mr. Paris is talking about the fact that, "Hey,

14  I found this on your computer.  Your explanation is making no

15  sense.  Was this your lawyer or was this you?  If it was really

16  just your lawyer and not how you felt, you would have fired her

17  right away to say these evil things about me.  And the fact

18  that you're just waiting for me -- you're even going to use the

19  fact that I'm sick and in France against me, as being an absent

20  father, when you filed for custody in January."

21      Part of that -- he also says -- and I'll use the clean

22  language.  He says, at one point, "It's my effing life."  And

23  you know what he means by that.  Right?  What he means by that

24  is, "You're telling me you would lie to me just to have a

25  custody case in Oregon instead of France and maybe kill me?"

EXHIBIT 2
Page 8 of 55

1    Right?  "You would really do that?"

2        And so you can understand really the place he found

3    himself in as we're getting ourselves ramped up to these

4    children leaving and him figuring out really what's going on

5    with his health and what needs to happen next.

6        I still think that it's important also to understand that

7    the medical condition remains a big issue in this case.  He

8    still has that medical condition.  And a couple of things are

9    important.  Both how I've described it, which I think anybody

10   who gets bad medical news is going to need some time to process

11   that.  And, you know, he hadn't processed it on July 19 like he

12   processed it by August 20.  Right?  He simply had not.  And I

13   don't think that that's wrong.  I don't think we need to be

14   upset with him for taking some time to figure that out.

15       I would also point out that during the time that he

16   sorting this out as we run up to the July 19 agreement, you do

17   have to consider the psychological manipulation that he was

18   going through.  You've seen the videos in Exhibits 47 and 48.

19   And they were devastating to him.  Right?

20           THE COURT:  I agree.  But, I mean, up until the 13th,

21   the whole family was leaving for Ashland, and all of a sudden

22   he's gone with the passports, puts a hold on a tickets, and

23   everything that seemed to be in place disappears, and Ms. Brown

24   is in a hotel room with two kids.

25           MR. STARKS:  I'm not sure that's exactly the case,

EXHIBIT 2
Page 9 of 55

Your Honor.  I understand what the Court is telling me.  Here's
my -- here's what I believe I heard and what I think was going
on.

I think these parties were having problems back in April
and May and were in therapy.  And I think that they were
discussing, in therapy, all kinds of things and hoping it was
going to get better.  And I think one person thought, "I want
to move to Ashland, Oregon," and the other person thought, "I
want to try to keep my family together."

And so we have all this sort of marching along with one
person, perhaps somewhat naively, saying, "I want to keep my
family together," while another person would like to move to
Ashland.

Then you have the fact that in May and into June,
Mr. Paris learns that he's ill.  And it becomes clearer and
clearer that he's ill enough that the idea of moving to Oregon
is becoming more and more an idea that's -- I know we don't
talk about this in the federal court for purposes of your
decisions -- but for how he's thinking about things, it's
becoming more and more not in the best interest of the
children.  I mean, that's why he goes out and gets that
pediatrician's note that he does.  Right?  It's because he --
you know, he senses and he knows that the kids need to be
around him.

And I would also point out -- let's see if I can find it

EXHIBIT 2
Page 10 of 55

1    in my notes here quickly.  Otherwise, I'll come back to it.

2    You know, there's an email that the Respondent sends to

3    Mr. Paris, while he's in France in that July 29 to August 19

4    period, where she's talking about the difficulties that the

5    children are having, and thinking about how sick he might be,

6    and how he's not there.

7        So all these things are going on.  And I certainly

8    understand the Court's -- what the Court was saying to me

9    when -- "Hey, I mean, yeah, those videos are pretty terrible.

10   But nobody looks exactly great on July 13, Mr. Starks," is what

11   I'm hearing you say.  I don't disagree.

12       But you have to remember, I mean, who the pressure is on.

13   Right?  I mean, the pressure isn't on Ms. Brown.  Ms. Brown

14   doesn't have any physical maladies.  Ms. Brown has a job in

15   France.  We can find another apartment.  If these parties were

16   in a better state in their relationship, we wouldn't be here.

17   Right?  Because all it would have taken is them having a really

18   good conversation about how, "Look, I'm -- this is really tough

19   for me.  This is not going to work.  You just leaving, us not

20   having any sort of agreement in place, me trying to have

21   mediations with you" -- right?

22       You've got these two exhibits where Mr. Paris is saying,

23   "Hey, I mean, I'm not okay with this.  We need to talk about --

24   I feel like you're leaving.  We need to talk about the fact

25   that if you're leaving, and you're really not coming back, and

EXHIBIT 2
Page 11 of 55

1  this isn't going to be a family anymore, I want a mediation to

2  try to figure out what our international parenting plan's going

3  to look like."  Right?

4      So I don't think that -- I think it was well done

5  testimony.  I don't think it was exactly what was going on.  I

6  think Ms. Brown was very well aware that Mr. Paris had real,

7  real concerns about this move.  And she was just hoping she

8  could -- it would get pulled off, and whatever the problems

9  would be would get sorted out in Oregon.  That's how I feel

10  about it, Your Honor.

11      So there's the wrongful removal.  Right?  We've got

12  Exhibit 23.  We know what that means.  We also have Exhibit 49

13  and 50.  These are the petition for the divorce and the

14  custody.  These are the letter with the proposed temporary

15  order and the proposed parenting plan.  And that's -- we have

16  the fruit of the Exhibit 23 plan.  Right?  It's no longer just,

17  "This is what I might do when I get to Oregon," as Ms. Brown

18  testified.  It is, "Here's what I've done."

19      Now, she's hone -- she's filed sooner than she wanted to.

20  Right?  She wanted to wait until January to know that she got

21  six months in Oregon.  She went ahead and rolled the dice, did

22  it with three months, and argued not home state but significant

23  connections.  Right?  But you have the fruit of the decision

24  on -- that's set forth in Exhibit 23 of what she was going to

25  do.  So we have the removal.  We see it from Exhibit 23.  We

EXHIBIT 2
Page 12 of 55

1    see the fruit of that removal from Exhibits 49 and 50.

2        And let's just be clear -- right -- there would have never

3    been nine suitcases, there would have never been a lifted

4    travel ban, these children would have never been in Oregon on

5    July 29th for even a summer vacation if the Respondent had not

6    lied, pretended she wished to remain a couple to entice

7    Mr. Paris to follow the children and her to Oregon.

8        If she hadn't done -- if truly she had not done what she

9    did, which was enter into a July agreement she never intended

10   to follow, we would not be here, these children would be in

11   France, and these parties, if they couldn't make it work as a

12   couple, would have a French custody order about how to handle

13   their French children.

14       I also do want to talk about the agreement in a practical

15   way. And, again, I don't want to suggest the Court is here to

16   think about the best interest of the children. But I'm a

17   divorce lawyer, so I can't help but talk about this stuff a

18   little bit.

19       This was a family law agreement. Right? In a family law

20   agreement, if facts change such that an agreement between the

21   parties becomes detrimental to the children, no court enforces

22   that agreement. Right? As a practical matter, if the Court

23   were to determine that an agreement between parties had now

24   turned into something that would be detrimental for the

25   children, that agreement's gone. And I believe that that's the

EXHIBIT 2
Page 13 of 55

1  case.

2      And I'm not suggesting Mr. Paris is a lawyer or a Court is

3  allowed to make those decisions, necessarily.  But, as a

4  practical matter, what we have is a parent who's ill, who needs

5  to have medical care in Paris, and his kids should be there.

6  His kids should be around while he's going through this medical

7  care.

8      And this is where it was going to take me some time to

9  find it.  The exhibit that I was talking about was Exhibit 27.

10  That's the email from the Respondent where she's describing to

11  him the issues that the children are having with his absence in

12  that July 29 to August 19 time frame.  So, as a practical

13  matter, they shouldn't have a dead dad and they shouldn't have

14  an absent dad.  Both of those things are not in their best

15  interest.

16      So, to me, as a practical matter, the agreement has always

17  been kind of a bigger thing than it ever needed to be over this

18  case.  Because, again, if these parties had been working well,

19  that's not -- you would both walk away from that agreement.

20  "Oh, my God, you mean you're so ill that you've gotten this

21  five years of care in France now.  Oh, my gosh, the kids are

22  communicating to me how scared they are about this."  I mean,

23  there would be no conversation.  Everybody would be back in

24  France.  Right?

25      So, as a practical matter, it's just not in the best

EXHIBIT 2
Page 14 of 55

1  interest of the children in that agreement.  It's just not.

2  And so I don't think that it ever really needed to be followed.

3  I just don't.  Especially when we know, ultimately, what

4  happened with Mr. Paris' need for medical care.  So wrongful

5  retention, because I think that there is that in this case as

6  well.

7       So, again, not to make it sound like we don't all

8  understand.  But wrongful removal -- you shouldn't have taken

9  them.  Wrongful retention -- you should have brought them back,

10 and you didn't.  Right?  I mean -- and both of those are

11 wrongful under Article III, and both of those things are things

12 that you can circle and say, "As a result, wrongful; you've got

13 to send these kids back to France."

14      So I believe you have a couple of dates to choose from in

15 thinking about wrongful retention.  You've got August 20.  On

16 August 20, the Respondent convinces Mr. Paris to turn over the

17 children's French passports to her.  Then she refuses, as she

18 testified on cross-examination, his multiple requests to return

19 those passports, leading him, as the Court knows, to file

20 police reports that are found in Exhibits 32 and 33 regarding

21 the state of affairs at the family home in Oregon.

22      If you -- and I know -- I'll get to (indiscernible) at the

23 end.  You said it didn't matter too much.

24           THE COURT REPORTER:  Sorry.  "I'll get to" what?

25           MR. STARKS:  I'll get to habitual residence at the

EXHIBIT 2
Page 15 of 55

end.  I'm trying to watch here.  So I -- I'll get to habitual

residence at the end, because I know I should talk a little bit

about it.  But, I'm with you, I don't know how France couldn't

be the habitual residence.

If France is the children's habitual residence, Mr. Paris

could not have wrongfully removed the children from Oregon with

their passports.  The only thing that could happen is that,

without the passports, the Respondent could be sure that she

could accomplish a wrongful retention.  That's the only thing

that could be accomplished by her maintaining the passports.

If France is their habitual residence, his removal of the

children back to France would not have been in violation of the

Hague Convention.  She could have filed something in French

family court alleging that they had this July 19 agreement, and

he was breaching it, and the children should be brought back.

But it's not a Hague Convention case.  France is the children's

habitual residence.

All it is, when you take those passports, is a wrongful

retention.  That's all you're doing.  You're making sure the

children, who are habitual residents in another country, cannot

be taken back to that country.  It's not a logic puzzle.

Right?  It is.  I'm describing gravity.  It is what it is.  So

that's the first date.

I would also have you keep in mind that Mr. Paris never

got those passports back.  Right?  Those passports now sit --

EXHIBIT 2
Page 16 of 55

1   because you entered an order saying that all passports needed

2   to be turned over to the Medford clerk.  Those passports --

3   those French passports sit in the Clerk's Office in the federal

4   court building in Medford, Oregon.  And so those passports have

5   been wrongfully retained as long as the children have been

6   wrongfully retained in this state.

7        The second date would be October 7.  And I've described

8   Exhibits 49 and 50, which are the petition for divorce, and the

9   letter, and the temporary order, and the parenting plan, and

10  all that sort of stuff.  I've described those as sort of the

11  fruit of the wrongful removal.  Right?  How do we know it was a

12  wrongful removal?  Well, we've got Exhibit 23 and then we've

13  got the filing of a divorce.

14       But I would also point out that under Roche v. Hartz --

15  which is R-O-C-H-E -- Hartz, H-A-R-T-Z -- which is a district

16  court case out of Ohio.  It's 783 F. Supp. 2d 995.  It's a 2011

17  case.  Under that case, the court was looking for dates to

18  figure out, okay, when did the wrongful retention start.  And,

19  in that case, the court said the retention started the date

20  that the petition for divorce was filed.  Because, at that

21  point, you had notice that the parent was never coming back

22  with those kids to the habitual residence that you were

23  asserting had been their habitual residence.

24            THE COURT:  Help me out.  I'm looking for the

25  exhibit.  What day was the petition filed?

EXHIBIT 2
Page 17 of 55

1          MR. STARKS:  October 7, Your Honor.  The exhibit is

2    Exhibit 49.

3          THE COURT:  In your earlier argument that wrongful

4    retention is the date of withholding of the passports, that

5    date would be...

6          MR. STARKS:  Oh, I'm sorry.  That date would be

7    August 20.  That would be the date that he turned over the

8    passport, and all requests after that date were denied by the

9    Respondent for their return.

10          THE COURT:  Okay.

11          MR. STARKS:  So those are the two dates.  You've got

12   those two dates, I believe, to circle as potential wrongful

13   retention dates.  But, again, I don't think wrong -- I

14   certainly understand all the evidence this Court has had to

15   take and all the things this Court has to think about.  But,

16   for me, it's just really not a big logic puzzle for removal.

17       These children would not be here if there had been no July

18   agreement.  That July agreement was fraudulently entered into

19   by the Respondent with no intent of ever following it.  That

20   was a wrongful removal.

21       Now, what we would pivot to -- right -- if I've

22   established that we've got a wrongful removal, you'd pivot to

23   the defenses that the Respondent has raised.  And she's raised

24   two Article 12 defenses.  I guess, here I would point out -- I

25   think the Court knows, but just to point out -- my burden as

EXHIBIT 2
Page 18 of 55

the Petitioner was on the wrongful retention part -- right --
to establish habitual residence.

If I've done that -- if you decide I've made a prima facie
case with the testimony I was able to put on and the great
argument I'm giving you now -- if you were to decide that, the
burden then shifts to them on any defenses they wish to raise.
And because -- and they raise two Article 12 defenses, consent
and acquiescence.  In other words, that Mr. Paris has either
consented to the children being here or acquiesced to their
presence to be here.  Right?

And that now is their burden.  It's not my burden to say,
"No, we didn't."  It's their burden, again, by preponderance of
the evidence, to convince you that more probably than not he
has consented or acquiesced.

I would also point out a couple of things when you're
thinking about these defenses.  The concept of these defenses
is that they are narrowly drawn to effectuate the purposes of
the Hague Convention.  And, you know, just about every case
that talks about this talks about it.  But I will tell -- you
know, I'm looking, again, at a Third Circuit case.  It's
Tsia-Yi Yang, T-S-I-A-Y-A; Yang, Y-A-N-G.  That's Third
Circuit.  It's 499 F.3d 259, a 2007 case.

You know, the idea is that these are narrowly drawn,
because the purposes of the Hague Convention are what?  To send
children home; right?  So we're not supposed to get overly

EXHIBIT 2
Page 19 of 55

legalistic and technical.  We're not supposed to be looking for

reasons to find these defenses.  They're to be narrowly drawn

and you're to be convinced.  Right?  And so -- and I would also

point out that even where a defense applies, you, nonetheless,

have the discretion to return the children anyway.

And that's both that case and many other cases -- and

Hague Convention Article 18.  Hague Convention Article 18 says,

"The provisions of this chapter do not limit the power of a

judicial or administrative authority to order the return of the

children at any time."  So you have this sort of catch-all in

the Convention.  Maybe some things were interesting.  Maybe

they raised a defense that you thought was a good defense.

If you still think the children's home is France, and they

should go to France, then you still have the authority to do

so.  These are to be narrowly drawn.  And even if you find that

the defense is well taken, you have the discretion to order

their return anyway.

So here's the things I would have you -- the Court -- I

would ask the Court to try to keep in mind when thinking about

consent and acquiescence.  First, I think consent is out the

door.  Just like Exhibit 23 shows that there was a wrongful

removal, Exhibit 23 shows there was no consent to the removal.

Right?  The consent that was obtained was fraudulently obtained

with a lie and would not have been obtained -- the consent to

remove the children to Oregon would not have been obtained in

EXHIBIT 2
Page 20 of 55

1  the absence of that lie.

2      So then the question becomes acquiescence.  And I have a

3  specific case in my materials that I provided to you in my

4  trial brief.  It was a district court case out of Texas.  It's

5  page 7 of the trial brief if the Court ever wants to take a

6  look at that particular case.  And, in it, that father did some

7  of the things that this father has done who's before you.

8      Mr. Paris never consented to the children's enrollment in

9  school in Oregon, just like the father in the trial brief case

10  never consented to the children's enrollment in Texas.  And

11  that was one of the ways the Court found there had been no

12  consent or acquiescence.  He hadn't agreed to it.  He hadn't

13  agreed for the children to be there to attend school there.

14      You have not only that he affirmatively wasn't involved in

15  the enrollment process of the children, but you also have

16  Exhibit 51, which is his email with the principal -- or with

17  the school personnel of some kind -- letting them know that he

18  did not consent to the children attending school in Oregon.

19  That's Exhibit 51.

20      And Exhibit 52 -- you have his email where he's attempting

21  to confirm whether the Respondent has ever let the principal

22  know that the children were just going to be there for a year.

23  And the principal says, "That's never been communicated to me.

24  No."

25      So you have a clear chain from him of, "I'm not agreeing

EXHIBIT 2
Page 21 of 55

1   to this."  Right?  "Here's my email to the school.  Here's my

2   email to the principal.  I wasn't involved in enrolling the

3   children in school."  And of course he did not sign the house

4   lease.  So he did not consent to there being a house for the

5   children to be living in, in Oregon.  And I think that's a big

6   deal and wasn't -- and maybe hasn't been talked a lot -- talked

7   enough about.  He did not agree to sign a lease for these

8   children to be in Oregon for a year.

9       And so he didn't agree that they could attend school, and

10  he didn't agree they could live there in any document that was

11  put in front of him that would make him agree.

12      Now, there are things that happened.  Right?  If I was

13  opposing counsel, I'd argue about the fact that he was in

14  California, loaded up a truck, and brought it across state

15  lines with all the stuff.  I'd also try to argue the nine

16  suitcases, but I'd remind you that the nine suitcases don't

17  exist without Exhibit 23.

18      But I'd try to argue all the stuff he did when he got to

19  Oregon.  Right?  I'd argue about, you know, what about the nice

20  WhatsApp messages where he says, "Let's be a family," and all

21  the rest of this?  And, you know, I know what Mr. Paris

22  testified to -- that he felt he was -- that was the only way to

23  see his children.  You know, there's -- other than his

24  testimony -- there's certainly no WhatsApps that say, "You

25  can't see the kids."

EXHIBIT 2
Page 22 of 55

1    I will say, there are messages, though.  Right?  You've

2    got messages where, you know, he's being treated like a child.

3    Right?  He's being told, "Oh, well, you know, maybe you can

4    start staying with the parents again when you apologize for

5    your behavior.  This can be a good teaching moment for the

6    children to see you treated as a child having to apologize

7    before you can stay someplace."

8    This was not -- here's what I would tell Your Honor.  I

9    think this is very clear, regardless of whose testimony -- or

10   whether either one of them had testimony you wholly believed at

11   any time -- there was a true power imbalance here.  Right?

12   There's one person who's, you know, born and raised in France.

13   And their motivation, whether they're accomplishing it with the

14   greatest deal of aplomb every time, is to try to keep their

15   family together.

16   So it's not crazy to imagine a world where, when you have

17   this differential in power, and you have someone who's really

18   trying to keep a family together, and who is ill, and who wants

19   to be able to see their children, and is really doing their

20   best to try to figure out a way to stay on the person who's got

21   the power in the relationship right now -- stay on their good

22   side -- and talk them into coming back to France as a family.

23   Right?

24   It's easy to imagine taking steps that a clever attorney

25   might call, "Hey, you were just acquiescing to this removal or

EXHIBIT 2
Page 23 of 55

1    this retention." But the facts would suggest -- are really the

2    product of what it's like to be in a messy relationship. You

3    know, many of us -- thankfully, most of us haven't in been in a

4    situation that was so messy they needed to be in front of a

5    federal court judge.

6       But we've all been in messy relationships where, at every

7    moment, we weren't necessarily at our best, and where, every

8    moment, we might have taken steps that we thought were the best

9    way to keep the peace. And if someone was to ask us later, in

10   a deposition or a trial, whether that meant we agreed or

11   acquiesced, we'd have to say, "Wait, wait, wait. That's not

12   what I meant or what I was trying to do."

13      So that would be what I would really try to drive home

14   with the idea of acquiescence, Your Honor. This is a true

15   power differential. He doesn't have the children's passports.

16   They are being kept from him. He sees the children when she

17   lets him see the children. Right? I mean, he's not on the

18   lease of the house. He's not going to come and go.

19      He testified that the keys to the car -- he didn't -- he

20   wasn't given the keys to the car. So he came and went as

21   people pleased, not necessarily how he pleased, in trying to

22   keep the peace in that situation, in trying all along to figure

23   out a way to say, "Hey, can we just get back to France?" You

24   know, that makes, to me, at least 51 percent sense as a way of

25   thinking about whether there's truly acquiescence in this case

EXHIBIT 2
Page 24 of 55

1    or not.

2        So, in result, you said you didn't want or need a lot of

3    habitual residence argument.  I agree.  I mean, I don't know

4    how these children couldn't have been habitual residents of

5    France at the time of their removal.  These are children who --

6    we have one child who, the testimony is unrebutted, was signed

7    up for a four-year program.  So not only does that show that

8    she was habituated before -- that she had been there for three

9    years -- but that another three years was anticipated that the

10   family would be there just for the musical program that she was

11   engaged in.

12        And this family was looking for apartments.  And that was

13   Exhibit 75, Your Honor, that you were thinking about earlier

14   today in your questions for Ms. Brown.  Exhibit 75 is the text

15   messages and WhatsApp messages of the French apartments that

16   the parties had looked at.  I think some of them -- some of

17   those are as early as February, and some of them are as late as

18   in between that July 19 and August 20 window.  Right?  So -- or

19   July 29th -- so July 29-August 19 window, when the children

20   have left on July 29 with Ms. Brown, but Mr. Paris remains in

21   France.  That exhibit also shows him sending her apartments for

22   France during that window.  Right?

23        So I think it's, to me, very clear that these parties and

24   the children were habitual residents of France.  And so, you

25   know, what's that mean?  And, as I said, Your Honor, I think

EXHIBIT 2
Page 25 of 55

1    Holder says it best when it says, you know, "Are you sending

2    the children home if you send them back to France?"  Because

3    your job is to send them home.

4        And the logic puzzles can be interesting.  You know, as a

5    lawyer, as I said, you know, I have a weakness for them.  You

6    know, if the restaurant serves mushroom soup on Wednesday and

7    lentil soup on Thursday and all that good sort of stuff.  But,

8    at the end of the day, you know, most Hague Convention cases

9    can get boiled down to some pretty specific issues that carry

10   the day.  And I feel very strongly that the specific issues

11   that I've identified for you in this argument really carry the

12   day.

13       These children need to be sent back home to their friends,

14   to the home that they've lived in, to the schools that they've

15   attended.  These are French children, and they should be

16   returned.  Thank you.

17           THE COURT:  All right.  Thank you.

18       For Respondent?

19           MS. SKINNER:  Thank you, Your Honor.

20       The Convention and the enforcing U.S. law -- the ICARA --

21   indicate that the international abduction or wrongful retention

22   of children is harmful to their well-being.  And I agree with

23   Mr. Starks' contention that this is not, although, a

24   best-interest case.  And the Court must determine whether or

25   not a wrongful removal or retention takes place.

EXHIBIT 2
Page 26 of 55

1    So the first step is determining whether or not a wrongful
2  removal occurred.  The Court heard credible testimony from
3  Ms. Brown about the months and days leading up to the
4  children's removal from France.  The Court heard testimony that
5  the parties had discussed over the years, since their move to
6  France in 2019 until their ultimate departure in 2022, that
7  that was an ongoing discussion about the parties.
8    I think there's some pretty clear evidence that the
9  parties left California in 2019 with an intention to be in
10  France for a limited duration while they were developing their
11  California property.  And that that got delayed mostly because
12  of COVID and because of the pandemic that was going on.  When
13  the discussion finally came back on the table again, after the
14  40th birthday that Ms. Brown celebrated, tickets were
15  purchased.  Those were one-way tickets from France to the U.S.,
16  and it was specifically scheduled for a date that would work
17  for the children's schooling and their activities for
18  July 13th.
19    So the parties, at that time, agreed to have the return
20  move to Oregon.  At that point, Mr. Paris took the lead on --
21  what was important to him in the move was to have an au pair on
22  the ground in Oregon to ensure that the girls were maintaining
23  their connection with France while in Oregon.  And so on May
24  19th of 2022, the parties signed the au pair application.  They
25  then interviewed the au pair, both by video and in person.  She

EXHIBIT 2
Page 27 of 55

1  was going to start in August of 2022, and the contract notes a

2  12-month commitment.

3      The parties continue on their steps towards their move to

4  Oregon by sending a letter and email to their French landlord

5  indicating that they were going to move to the U.S. and settle

6  in.  The parties unenrolled the girls from both of their

7  schools for the upcoming school year, while reserving their

8  daughter's space in the musical program.  That was to be put on

9  pause for a year.

10      And not only did Ms. Brown involve herself with the

11  removal of the children from the French school system, but

12  Mr. Paris was an equal participant in that.  And we can see

13  that in Exhibits 211 and 213, where Mr. Paris is asking for not

14  only a copy of the radiation certificate -- the unenrollment

15  forms -- but he's also asking for a certificate showing that

16  his daughter had, in fact, passed that grade and could move on

17  to the next grade.

18      The parties sold their furniture from their big apartment

19  and took multiple steps.  They gathered numerous suitcases from

20  different sources, from the grandparents, from others.  They

21  bought luggage.  They worked out the schedule again for when

22  they would move.  And Ms. Brown took multiple steps in order to

23  ensure that she'd have a job when she got to the U.S.

24      She interviewed with multiple companies, and while she was

25  interviewing, Mr. Paris would watch the kids.  And, ultimately,

EXHIBIT 2
Page 28 of 55

1   she decided that the best employment move for her was to see if

2   her France employer could transfer her to their U.S.-based

3   position, which is exactly what happened.  So that all fell

4   into line.

5       They said "goodbye" to their family and friends.  They

6   purged items from their larger apartment, because it would not

7   fit in the small 200-to-300 square foot apartment that they

8   stayed at for a brief period of time.  And they forwarded their

9   mail to Mr. Paris' father so that the refund from their large

10  Paris apartment could be mailed to him and not be lost.  And so

11  when they did go back to France to visit, their mail would be

12  kept for them.

13      Mr. Paris was an equal and willing participant in all of

14  those steps until the unfortunate date of July 13th, when he

15  blocked the parties' removal from France.  Thereafter, an

16  agreement was put in place that allowed the parties to reengage

17  with that agreement.  And July 29th was chosen as the date that

18  everybody would -- well, at least Ms. Brown and the girls --

19  would go to Oregon, and Mr. Paris would follow thereafter.

20      And so --

21          THE COURT:  But you would agree, I mean, he's allowed

22  to change his mind about the permanent removal from the United

23  States --

24          MS. SKINNER:  I will get there, Your Honor.

25          THE COURT:  -- or to the United States.

EXHIBIT 2
Page 29 of 55

1          MS. SKINNER:  And I have a couple of cases that I

2   would like to point out to you at that time.  I appreciate that

3   question, Your Honor.  Thank you.

4          THE COURT:  Okay.

5          MS. SKINNER:  And so the next question is whether

6   there was a wrongful retention.  And that deals, again, with

7   whether or not the children remaining in Oregon thereafter was

8   at any point wrongful.

9     And I'd like to point out, for that specific question, an

10  answer.  And that's in the form of a couple of appellate court

11  cases that I've printed off, and I'd like for the Court to take

12  very careful consideration of.  Because they do answer for us

13  this question of what happens when someone retracts or rescinds

14  their agreement?  Where does that leave us?  And so if I may

15  approach with a copy of a couple of cases.  And I'll hand the

16  same two to Mr. Starks.

17          THE COURT:  So do these cases deal with retracting

18  while in the habitual residence, or once you get to the new

19  country?

20          MS. SKINNER:  Both, Your Honor.  And so I'll start

21  off with describing the situation in Gonzalez and Caballero

22  (sic).  In that case, the petitioner, a U.S.-based parent,

23  allowed the respondent, who was a Panama-based parent who had

24  the -- who was the primary parent -- who had the child at the

25  time, to take the child to the U.S., but promptly after the

EXHIBIT 2
Page 30 of 55

child left, claimed that the visit was to be for no more than

two weeks, and then contacted law enforcement.

The Ninth Circuit held that her revocation of prior

consent was too late.  The court found that the petitioner's

claim that she only authorized a temporary removal was

inconsistent with the facts, and determined that the

respondent's testimony was more credible and consistent.

Now, she contends that the -- the petitioner contends that

the post-departure conduct shows that she rescinded or revoked

her consent to the removal and retention; however, the district

court found that post-departure -- excuse me -- that once the

district court found that there was the prior consent given --

they called it "ex ante consent" -- the court's inquiry was

complete.  Because if someone shows ex post nonacquiescence --

so dispute after the fact -- that could not revive your return

remedy under the Convention.

The second case that I wanted to point out for the Court

also follows along, very similarly, with the facts of this

case -- Cascio v. Pace.  And, in that case, the petitioner

argues that his agreement for the children to go to the other

jurisdiction was given under duress, and that his subsequent

conduct shows that he never actually consented to the

retention.

In that case, the court had some troubles with the

credibility of that witness.  And the court ultimately found

EXHIBIT 2
Page 31 of 55

1    that the consent exception applies when a petitioning parent

2    either expressly or through his conduct agrees to removal or

3    retention before it takes place.  Again, in that case, the

4    petitioner argued that, well, he was under duress when he did

5    so.  And the court ultimately found that the petitioner's

6    post-retention behavior was consistent with an individual who

7    had changed his mind after consenting and then rushed to

8    correct what he thereafter had decided to be an error.

9        The court finds, in short then, that the petitioner

10   expressly consented to the retention before it occurred, and

11   that his later change of heart is irrelevant, as the Hague

12   Convention does not provide a mechanism for the revocation of

13   consent once given.

14       And the reasoning behind that is pretty clear.  It's

15   because we don't want to have the kids going back and forth,

16   just like in this case, where the children's residence in

17   France was abandoned.  They do not have a home to go to in

18   France.

19       If they were to be returned today, they'd go to a

20   200-square-foot apartment where they'd be sleeping on a

21   pull-out couch.  And that's not the result that this Court

22   should reach.  And so I'd ask the Court to take careful

23   consideration of both Cascio and Caballero.

24       And, importantly, in the Cascio case, where the court has

25   some concerns about the credibility of the petitioning parent

EXHIBIT 2
Page 32 of 55

1 and his claim that he was under duress, I'd like the Court to

2 look at the petitioner in this case.

3      Now, there is numerous documents into evidence that, when

4 compared with petitioner's statements, cast doubt on his

5 credibility.  For example, Exhibit 248, the email he wrote to

6 the Topanga neighbors in 2019 about going to France for the

7 school year.  He says, for a very kind of confusing explanation

8 up on the stand, about, "No, I didn't really mean that."

9           THE COURT:  Right.

10           MS. SKINNER:  "That was something that Ms. Brown" --

11 so -- so he said that was a lie that he said.

12      And then, when we look at Exhibit 206, the au pair

13 application, petitioner claims, very confusingly, either he

14 didn't know or he didn't read or he didn't believe that, in

15 fact, the au pair was a year-long commitment.

16      And then we look to 207 and 214, the email to the French

17 landlord indicating that they're moving back to the U.S.

18 Again, that's a lie, although I can't -- I couldn't quite

19 pinpoint as to why that would be a lie and why that would be

20 something that Respondent would be pressuring him to say.

21      Number 60 -- Exhibit 67, correspondence where Petitioner

22 tells Respondent he's made peace with his decision to stay in

23 Ashland.  He's team Heidi.  Again, that was a lie, he says.  It

24 was just to appease Ms. Brown.  He says he was pressured.  But,

25 in fact, the evidence shows that it's Mr. Paris who puts

EXHIBIT 2
Page 33 of 55

1  pressure on people.  His own testimony -- he used that

2  phrase -- he put pressure on his ex-wife.

3     We saw in evidence, in Exhibit 255, he put pressure on

4  Ms. Brown's MatchTune employer, threatening them if they didn't

5  testify in his favor, they were going to have problems with

6  their reputation.

7     And then, finally, we heard he put pressure on Ms. Brown

8  when he demanded the children's beds just this last Sunday, not

9  so that he could use them while he was here with them in

10  Oregon, but so that he could put them in storage and so that

11  she couldn't use them, because he purchased them.  Otherwise,

12  he was going to call the police on her.  So, in fact, it's

13  Mr. Paris who's putting pressure on other individuals.

14     And, again, the -- Exhibit 227 and the email from the

15  children's French school director indicating that she had

16  prepared the unenrollment forms -- that was done by both

17  parents' request.  She provided the documents.  But, again,

18  Mr. Paris is claiming that's not really how it happened, or

19  that's a lie.

20     Further, Exhibit 253, an email from the director of E█'s

21  school, again, describing the situation where the child had --

22  was -- she used the word "expelled" -- but we know she was

23  unenrolled from school.  And the director had discussed that

24  with both parents.  But, again, Mr. Paris says not true or

25  that's not really what happened.

EXHIBIT 2
Page 34 of 55

1    And so I think the Court needs to review the evidence
2    that's been admitted and test that against the testimony of the
3    Petitioner to determine -- to make a credibility determination.
4    Now, we talked about wrongful removal and wrongful
5    retention.  There's also the issue of whether or not, when that
6    occurred, what was the habitual residence of the children.  Of
7    course, the Court looks to the totality of the circumstances.
8    And the most important question is when are we placing a date
9    on determining where their habitual residence was?
10   If the date was today or the date was four months ago,
11   that's going to be a decision for the Court to make if a
12   wrongful removal or retention took place.  We need to determine
13   when and what the children's habitual residence was at that
14   point.
15   Now, the Monasky decision, of course, indicates that --
16   that's the -- we look at the totality of the circumstances.
17   Well, here there was clearly --
18        THE COURT:  Slow down just a little bit for the court
19   reporter.
20        MS. SKINNER:  Thank you.
21   Here there was clearly a move to Oregon, gave up the
22   France apartment, sold all furniture in France, brought up
23   items from storage in California to Oregon, enrolled kids in
24   school in Oregon, secured a year-long Oregon au pair.
25   So what is habitual residence?  Do the children have

EXHIBIT 2
Page 35 of 55

1  habitual residence in France after they had departed and said,

2  "Au revoir, we're leaving that behind for the year"?

3          THE COURT:  Can we start with wrongful removal?

4  Because I'm still not hearing you talk about --

5          MS. SKINNER:  The -- our argument --

6          THE COURT:  -- the underlying agreement by which the

7  children left for the United States.  And, I agree, there are

8  some credibility issues with some of the explanations that

9  don't make a lot of sense by Mr. Paris.  But, I'll be honest,

10 I'm not sure if the explanation that your client gave about

11 Exhibit 23 is particularly credible.

12    I know she kept saying, "It's made out of context," but

13 I've yet to see what other context there is, especially in

14 light of the fact that, on October 7th, she filed a petition

15 totally revoking any interest in the July 19th agreement.

16         MS. SKINNER:  Thank you, Your Honor.  And I'll

17 address both points.

18    As to the intent of Ms. Brown at the time she entered into

19 the July agreement, I think she testified credibly that she

20 negotiated that agreement for hours and hours.  There was

21 discussions back and fork about health insurance and all of the

22 conditions that were placed.  She had already started to do the

23 work to put those things --

24         THE COURT:  Right.

25         MS. SKINNER:  -- in motion.

EXHIBIT 2
Page 36 of 55

1      And if she had had a plan to not follow through with the

2  July agreement, then why would she get her French visa renewed

3  in September of 2022, or take the steps to get it renewed?

4           THE COURT:  But what she told me is that she wanted

5  to leave her options open, which tells me that she believed she

6  had the unilateral ability to simply keep the children in the

7  United States.  And she certainly has -- is attempting to do

8  that by the October 7th filing.

9           MS. SKINNER:  And I'll address the October 7th filing

10  in just a moment.  With the testimony about keeping options

11  open, I think we need to look at that in light of the

12  flip-flopping that Mr. Paris had done at that point.  And I

13  think her credible testimony was -- in discussions with her

14  lawyer -- it was, "What do I do if he reneges on this again?

15  What can I do?  What -- could a plan be put into place if that

16  happens?  I need something with security."

17      And what we don't have in evidence is any evidence that

18  shows that she took -- and I'll get to the October 7th custody

19  pleading in just a moment -- so that aside -- she took no steps

20  to renege on the July agreement.  And, in fact, the opposite is

21  true.  She took all of the steps to keep that agreement upheld

22  and in place.

23      There's no evidence to show that there was an appointment

24  scheduled with an Oregon lawyer for July 29th, plus six months,

25  so that she could go in there and get the petition filed.

EXHIBIT 2
Page 37 of 55

1    There was no petition for custody that was drafted up and ready

2    to go, so that on six months and a day, that that could be

3    done.  Because she didn't take any steps to breach the

4    agreement.

5        Now, why did she file Exhibit 49, the custody case in

6    Oregon?  Not because that was part of her preplan, because, in

7    fact, the six months hadn't expired at that point.  She did

8    that because dad had filed in France, on October 3rd, a French

9    custody case.  And Ms. Brown was concerned that, again, it was

10   another reneging of a contract, and that Mr. Paris was going to

11   use the October 3rd French custody filing to, again, yank the

12   kids back.

13       And so the October 7th, 2022, filing had nothing to do

14   with, "I'm trying to now get UCCJEA jurisdiction."  It had

15   everything to do with simply getting a status quo in place so

16   that the terms of the July agreement would be able to continue

17   in force.  Because, with the status quo, the kids are here for

18   the time being, in line with that one-year agreement.

19       Now, Mr. Paris' counsel had much to say about Mr. Paris'

20   illness.  But I haven't heard any testimony or receive -- I

21   didn't receive one piece of evidence brought into this court

22   about a single condition, symptom, or any impact that it had on

23   Mr. Paris' daily living, except that he takes some B-12

24   vitamins and goes and sees a doctor occasionally.

25       But, more importantly, the information about his disease

EXHIBIT 2
Page 38 of 55

1    was known to him at the time of the July agreement, which was

2    why all of those conditions were built into the July agreement,

3    which was why Ms. Brown went to all of the lengths that she did

4    to ensure that Mr. Paris' medical condition would be adequately

5    met in the U.S.

6        Mr. Paris indicates in his closing argument, again, that

7    this is not a best-interest determination in the court today.

8    We know that the state court level will determine what's in the

9    kids' best interest.  He brought up a reference to Exhibit 27,

10   wherein Ms. Brown was indicating to Mr. Paris that the kids

11   were concerned for their dad.  They were afraid he was going to

12   die.  And that's because that's what he told them.  He was

13   manipulating them and said, "Your dad is going to die."

14       And so he's bringing his kids into the case.  And we have

15   evidence of that from just earlier this morning where Mr. Paris

16   is messaging with Ms. Brown, just recently, saying, you know,

17   "Basically, I'm telling the kids that we're moving to Paris at

18   the end of this court case, so you better get your act in

19   gear."  And so we have evidence that he's been bringing the

20   kids into these inappropriate communications.

21       Now, Mr. Paris argues, and his counsel argues in closing

22   argument, that he didn't consent to enrollment in Oregon

23   school.  But he sure consented to unenrollment in French school

24   well before even the July agreement.  That was something that

25   they then remained unenrolled in the French system until much,

EXHIBIT 2
Page 39 of 55

1  much later, when he attempted to reenroll the children there.

2      Now, he's indicating that he is not, quote, "on the lease

3  to the Oregon property."  But he's an authorized resident of

4  that lease.  He has the rights to -- and that's how that was

5  set up.

6      He also agreed to put one of their children's four-year

7  musical program on hold for a year.  That was done.  And so

8  steps were taken to ensure that the parties' move, for one

9  year, was put into motion.  And the one-year pause on the

10  program, of course, was also agreed to by Ms. Brown.  She

11  didn't say that the children need to be removed from school

12  altogether and taken out of that program.  She went along and

13  agreed, equally, with the proposal that the children's

14  schooling in France would be put on hold, and that that program

15  would be reserved for them.

16      Now, there's one other case that I'd like to bring to the

17  Court's attention if this Court finds that the facts fit this

18  situation.  And that's the idea of whether or not Mr. Paris is

19  bringing this action prematurely, having to do with the

20  question about anticipatory breach.  And that is the Toren v.

21  Toren case, cited also in my briefing, 191 F.3d 23 --

22          THE COURT:  Right.

23          MS. SKINNER:  -- which talks about a father who was

24  petitioning to a claim that the mother had made an intent to

25  retain the children past their agreement.  But that date had

EXHIBIT 2
Page 40 of 55

1  not been reached yet.  And the court held there that father's

2  argument was based on mother's future intent, and that the

3  father was seeking a judicial remedy for an anticipatory

4  violation of the Hague Convention.  But the Hague Convention

5  only provides a cause of action to petitioners who can

6  establish actual retention.  And so that was merely

7  anticipatory retention.

8      We've got the same facts here if the Court finds that

9  Ms. -- even if the Court does find that Ms. Brown has made an

10  anticipatory retention, which we argue she hasn't.  No steps

11  were taken.  The October 7th Oregon custody petition was for a

12  separate reason, again, to protect and preserve the July

13  agreement to keep the children here.

14      And so this -- and then I also want to touch, just

15  briefly, on habitual residence.  Because I think that --

16  depending on if the Court finds there was a wrongful removal or

17  retention, that does not begin and end our discussion about

18  habitual residency being in France.  Because if the Court

19  finds, for example, that there was a wrongful removal or

20  retention, and if the Court sets the date of October 7th, for

21  example, I think there's still a pretty strong argument that on

22  October 7th, the facts under a Monasky analysis show that

23  Oregon was, in fact, the children's habitual residence at that

24  time.  Because France had been abandoned.  And the evidence

25  shows that the children pretty quickly assimilated into their

EXHIBIT 2
Page 41 of 55

1    surroundings here in Oregon.

2        And so, in closing, Your Honor, we argue that there was no

3    wrongful removal or retention.  If there was, we argue the

4    defense of consent.  And if the Court finds that the defense of

5    consent is satisfied, that's the end of the discussion.

6    There's no more habitual residence argument.  Thank you, Your

7    Honor.

8            THE COURT:  Okay.

9        Reply?

10           MR. STARKS:  Just briefly.  Thank you, Your Honor.

11       In looking at the two cases, I gave them as steady an eye

12   as I could in a short period of time.  I had -- I will say on

13   Caballero, the court says at the end, at page 795, "We cannot

14   say that its factual finding of consent was clearly erroneous,"

15   which is not exactly screaming from the mountaintops that the

16   only decision could have been that there is a finding of

17   consent.

18       And in the Cascio -- I'm maybe pronouncing that right --

19   maybe not -- C-A-S-C-I-O -- in the Cascio case, which is the

20   Northern District of Illinois trial court case -- or, yeah,

21   the -- it merely makes a note at, well, page 866, I believe,

22   that the court was finding, in short, that he had expressly

23   consented to the retention before it occurred.

24       And I would really go back to Exhibit 23 and say that I

25   don't believe the Court can make that same finding here.  This

EXHIBIT 2
Page 42 of 55

1  consent was based on a lie.  And it's simply not the case that

2  it was the sort of consent I think any court is looking for.

3  Thank you, Your Honor.

4            THE COURT:  Okay.

5       All right.  Let's take a quick break and give me a chance

6  to get my thoughts together.

7            MS. SKINNER:  Your Honor, I apologize if this is

8  tardy.  I had prepared, as a demonstrative aid for my closing,

9  our proposed timeline.

10            THE COURT:  Okay.

11            MS. SKINNER:  And I'd like to present that to Your

12 Honor.  And I've got a copy.

13            MR. STARKS:  Thank you.

14       And I apologize, Your Honor.  She had actually sent me a

15 nice proposed timeline with mine and hers.  And I -- it was

16 this morning.  And I've been so full of this case, I didn't

17 check my emails until we were waiting for you on the bench.  So

18 if you do need something, let me know, and we can still provide

19 that to you.

20            THE COURT:  Okay.

21       All right.  We'll be in recess for 15 minutes.

22            MR. STARKS:  Thank you, Your Honor.

23

24            (A break was taken from 3:04 PM to 3:26 PM.)

25

EXHIBIT 2
Page 43 of 55

1              THE COURT:  Okay.  We'll go back on the record.

2         All right.  So, as a preliminary matter, both Ms. Brown

3    and Mr. Paris, my decision today is not about who's the better

4    parent, who has behaved badly.  I think both Mr. Paris and

5    Ms. Brown -- you're good parents.  You obviously love your two

6    girls.

7         And I think, for the most part, you've shielded them from

8    their parents' conflicts -- not all of them.  I think both of

9    you understand the importance of having each of you in the

10   lives of your children -- and also the grandparents.  I really

11   did appreciate the fact that there was obviously joy in

12   Mr. Paris' father having some time with -- in Ashland -- with

13   the granddaughters.  And that tells me you care enough that

14   you're not going to hold your children hostage.  So I just

15   thought I'd throw that out.

16        It's also apparent there's no shortage of hurt between the

17   two of you.  It's not surprising to see both sides capable of

18   some manipulation, some crimination, some snooping, some

19   dishonesty.  It would be hard to find a breakup of a real

20   relationship that didn't encompass some of that stuff.  I mean,

21   I see it in every relationship that I know of that is

22   meaningful that falls apart.  But I do sincerely hope both of

23   you can move past a lot of those issues and focus on the

24   children.

25        So in terms of habitual residence, I'm finding that

EXHIBIT 2
Page 44 of 55

Mr. Paris is a dual citizen in both France and the United
States.  He has a residence in France and at various times has
been a resident of the United States.  Ms. Brown is a United
States citizen.  The twins were born on January 15th, 2015, in
Ashland, Oregon.  They stayed there for a very short, short
period before moving to Topanga, California.

In 2017, at the age of two, while living in California,
the twins became French citizens.  Between 2017 and 2019, the
family visited France, I believe, three times, for a total of
about ten months.  During that time, they did attend a French
preschool.  And they would have been age two to four during
these visits.

In August 2019, the family moved to Paris.  I mean,
there's some dispute as to whether the move was intended to be
temporary.  I think it was.  I think, at the very least, at the
time of the move, the parties intended to have the children
attend preschool in France for at least a year.  They told
family and friends they intended to be gone for a year.

They had plans to develop property in California.  They
kept their household goods and stored them in California.  They
rented a furnished apartment in Paris rather than purchasing a
home or furnishings.  But, all that said, is it happens with
the best of intentions.  The family remained in France well
over a year.  Certainly, I think the pandemic may have
contributed to this, as well as other factors.

EXHIBIT 2
Page 45 of 55

1    The girls were obviously doing well in school and enjoyed

2    it there.  There seemed no pressing reason to return to the

3    United States after one year.  So one year turned into three

4    years, and during those three years, Paris became the girls'

5    home, meaning it was their habitual residence.  The children

6    were French citizens.  They spoke fluent French.  They attended

7    French schools that had, you know, year-long programs at these

8    academies for music and dance.

9        The girls were involved in sports.  They went on school

10   and family excursions, regularly, throughout France.  They had

11   school-age friends and attended certainly visits with friends

12   and birthday parties, those type of things.  They had extended

13   family and social support in France, including a godfather.

14       So I'm finding the children were fully assimilated to

15   France and an intensive fact inquiry points to the only

16   conclusion that when the children left France for Oregon in

17   July this year, France was their habitual residence.  And that

18   analysis is under Monasky v. Taglieri, which stands for the

19   proposition that the intent of the parties, while important, is

20   not so much as important as, you know, where was the children's

21   home at the time of removal.

22       So the much more difficult issue, in this case, is whether

23   the removal of the children to Oregon was wrongful or whether

24   there was a wrongful retention.  The question here is whether

25   Ms. Brown -- whether Ms. Brown unilaterally decided to remove

EXHIBIT 2
Page 46 of 55

the children to the United States without the consent of

Mr. Paris.

So here the Court finds that in early 2022, it is apparent

that Ms. Brown is no longer happy living in France.  I wouldn't

say she was having a mid-life crisis, but, by her own

testimony, she had turned 40.  She hadn't intended on staying

in Paris as long as they had.  She certainly did not have a job

that she seemed very passionate about.  She wanted to be closer

to her family.  And the relationship with Mr. Paris was -- it's

hard for me to know what it was at times, to be honest, but it

was less than perfect.  There were definitely some difficulties

in the relationship.  And it's clear that Ms. Brown wanted to

go back home.

Also, early in 2022, Ms. Brown did convince Mr. Paris that

the family should return to the United States, specifically,

that they return to Ashland, Oregon, where she has family.  I'm

a little unclear whether they have property there or not.  But

I don't know if that's -- that means much to me right now.

And this is where, you know, really the difficulties start

to play in.  Because, Mr. Paris, your intent and what you want

seem to change dramatically.  It seemed like everybody was on

board in early 2022 that the family was going to move to the

United States.  One-way tickets are purchased April 25th, 2022,

for a flight to depart on July 13th, 2022.  I believe everybody

was leaving on that flight.

EXHIBIT 2
Page 47 of 55

1    Everything the family did up until the July 13th departure

2    appears to be in anticipation of a permanent move to the United

3    States.  The girls are unenrolled from the French schools by

4    the parents.  The lease to the apartment is broken, and the

5    landlord was told, "We are moving to the United States."

6    And, again, these are one of the explanations, Mr. Paris,

7    that you give, that you didn't really mean that.  You've said

8    that about a number of explanations you've given to various

9    people.  And, at some point, it starts ringing a little hollow.

10   I think you broke the lease specifically because everything

11   points to the fact you were, in fact, moving to the United

12   States.  All of the girls' belongings were packed --

13   everything, for the most part -- and any unnecessary items were

14   disposed of.

15   On July 13th, however, Mr. Paris leaves his family and

16   files paperwork -- I'm not sure exactly the specifics of all of

17   this type of paperwork and whether it was with the police

18   department or some other authority -- that effectively puts a

19   hold on Ms. Brown's ability to leave France with the children.

20   Mr. Paris is holding the passports of the entire family at this

21   time.

22   Ms. Brown is left with the two girls, no passports, no

23   home to go to.  She moves the children into a hotel, and

24   they're living out of their bags.  Mr. Paris has apparently

25   changed his mind about moving to Oregon.  But he's also put

EXHIBIT 2
Page 48 of 55

1    Ms. Brown in a remarkably difficult position.

2        It's a little unclear to me whether Ms. Brown was keeping

3    the children from Mr. Paris at this time.  It's clear that the

4    children and Ms. Brown are upset about not being able to go to

5    Oregon.  I think, even on -- in the limited aspect -- that a

6    number of events, that I can only think were positive and

7    uplifting to the children, such as summer camps, that they

8    would have begun immediately, were now out of the question.

9    Visiting the grandparents seemed out of the question.

10       I do think Ms. Brown's attempt at impacting Mr. Paris

11   through a very emotional video was -- she described "a bad

12   parenting moment."  But it was a bad parenting moment.  And it

13   was a bad parenting moment primarily because of the actions of

14   Mr. Paris at this time.

15       Now, I realize people get to change their mind in the

16   middle of all this, and Mr. Paris certainly had a right to

17   change his mind.  But it does then put into play this rushed

18   attempt to put together a remarkably unusual agreement, the

19   July 19th agreement, which allows the girls to fly to the

20   United States for the summer vacation period.  It allows the

21   girls to remain in the United States for the 2022-2023 school

22   year, as long as certain conditions are met.

23       And, you know, those conditions generally are that, by a

24   certain date, there be a -- I think by August 22nd -- there be

25   a lease to a four-bedroom home that also includes a home

EXHIBIT 2
Page 49 of 55

1  office, that there will be an au pair that will be contracted

2  with for the school year, that there will be health insurance

3  purchased for Mr. Paris by August 22nd in the United States.

4  If he's not eligible, I think, for the Oregon Health Plan, the

5  agreement is Ms. Brown and Mr. Paris would purchase that

6  insurance.  And there's some requirement that there be a

7  doctor's appointment I believe with a gastroenterologist.

8       The agreement was negotiated in France with a mediator and

9  filed in a French -- I'm assuming a French court -- I'm not

10  quite sure how France works -- on July 19th, 2022.  Ms. Brown

11  and the children fly to Oregon on July 29th, 2022.  At some

12  point, Mr. Paris joins them.

13       And, again, this is where we get into behavior that's hard

14  to understand exactly what Mr. Paris' intentions are.  During

15  this period, he joins the family.  He lives, at times, in, it

16  appears to be the family home.  He assists the family in

17  getting set up in the Ashland home.  He appears to consent to

18  the family being in Ashland in various texts.  He denies that

19  he meant what he said in those texts.

20       He collects the household belongings in California and

21  brings them up to Ashland.  He assists in bringing on the

22  au pair.  He assists in unenrolling the girls from the French

23  school.  He certainly assisted in getting out of the lease in

24  France.  On the other hand, he refuses consent to the lease of

25  the home in Ashland, although he agrees he's listed as an

EXHIBIT 2
Page 50 of 55

1   occupant.  And he did not sign any enrollment documents of the

2   children in the Oregon school.

3       So based on this activity, it's very difficult to

4   understand what Mr. Paris wants or where he wants the family to

5   be.  He is also having to deal with a medical condition that

6   might legitimately raise concerns as to whether living in

7   France is in his better interest.

8       I will say, I agree with the Respondent in this area; that

9   it is unclear to the Court the seriousness of the condition.

10  The record is silent with regard to any medical opinion.  I've

11  heard some testimony about having to take B-12.  I've heard

12  some testimony that there may -- this particular disease may

13  have aspects of cancer.  But I certainly have not seen anything

14  more than Mr. Paris' description of his medical condition.

15      During this time, Ms. Brown is holding the children's

16  passports to prevent Mr. Paris from returning to France with

17  the kids, because, I think, in her own words, she was unable to

18  assess, from day to day, what he was going to do.

19      Ms. Brown does complete all of the conditions required by

20  the July 19th agreement to keep the children in Oregon for the

21  school year.  Mr. Paris refused to accept the insurance policy,

22  that was purchased on his behalf, by revoking it on

23  August 21st, allegedly due to his medical situation.  Again,

24  I'm not sure if I'm willing to find this completely credible,

25  because, one, there is no medical record before me; two,

EXHIBIT 2
Page 51 of 55

Mr. Paris' explanation for his responses in other parts of the
trial have been less than credible.

On September 3rd, Mr. Paris does search Ms. Brown's
computer and finds emails between attorneys indicating that
Ms. Brown's strategy is to not return the children to France
for the 2023-2024 school year.  That obviously has caused him a
lot of concern -- and the Court as well.

But here's what I think as to the July 19th agreement:  I
think both sides entered the July 19th agreement with some
doubts to how committed they were to it, in part, because it is
completely unclear as to whether the relationship between
Mr. Paris and Ms. Brown could maintain itself.  I don't think
either side knew whether they could make it work as a couple or
as a family unit, and, in part, because Mr. Paris has created
an untenable situation in which the children had no home, no
passports, and no future options for where they would be
staying.

Mr. Paris believed he needed to do very little to
effectuate the insurance requirements of the agreement.  This
does seem incredible to me, because, given his medical issues
that needed to be addressed, I would have thought he would have
been more proactive about finding medical care and finding
insurance in the United States -- or working out a way to
address his medical needs in France.  He ultimately would not
accept the insurance purchased, despite that condition being

EXHIBIT 2
Page 52 of 55

53

met almost unilaterally by Ms. Brown.

I agree that Ms. Brown seems to have wanted to leave her options open.  Both sides seem to think that it is possible to unilaterally change their mind under the French agreement, which, for better or worse, they both bound themselves to.

So I'm finding that there has been no wrongful removal.  I base this, in part, in the language found in Flores Castro v. Hernandez Renteria, 971 F.3d 882, a Ninth Circuit case from 2020.  Judge Smith holds that removal is not wrongful if there's consent to leave the country.  It only becomes wrongful when children are retained without consent.

I don't believe consent, in this case, can be so easily revoked, and that it results in the children then being treated like a ping-pong ball.  At this point, the agreement and the activities of the parties suggest that Mr. Paris has consented to the family living in Oregon for the 2022-2023 school year.

Obviously, if Ms. Brown chooses to keep the children in Oregon, she will be in violation of the French agreement.  The Oregon courts may want to, and I think they should, enforce the agreement you entered into.  I think you should be stuck with it, even if you change your mind.

There may be other reasons why the Oregon courts would find otherwise.  I do believe that if that comes -- if it comes to that, there's clear evidence before the Court today that the children are certainly creating a habitual residence in the

EXHIBIT 2
Page 53 of 55

1  United States without any great impediment.

2      So I am going to deny the petition.  I am going to find

3  that there has been no wrongful removal.  This was a difficult

4  case.  I apologize to both of you for how difficult it is, to

5  both sets of family.  I don't see anybody as a great winner

6  here when both of you worked very hard for these children and

7  for both of you.

8      Is there anything further we need to discuss?

9          MR. STARKS:  Thank you for your time and attention,

10 Your Honor.

11         MS. SKINNER:  Nothing from Respondent.  Thank you,

12 Your Honor.

13         THE COURT:  All right.  Thank you, both.

14

15         (The proceedings adjourned at 3:45 PM.)

16

17

18

19

20

21

22

23

24

25

EXHIBIT 2
Page 54 of 55

1                    C E R T I F I C A T E

2

3              Arnaud Paris v. Heidi Marie Brown

4                      1:22-cv-01593-MC

5                     Court Trial Excerpt

6                     December 7, 2022

7

8        I certify, by signing below, that the foregoing is a true

9    and correct transcript of the record, taken by stenographic

10   means, of the proceedings in the above-entitled cause.   A

11   transcript without an original signature, conformed signature,

12   or digitally signed signature is not certified.

13

14   /s/Kendra A. Steppler, RPR, CRR
     Official Court Reporter        Signature Date: 12/13/2022
15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 2
Page 55 of 55