# UCLA

## UCLA Journal of Gender and Law

**Title**
You Can and You Should: How Judges Can Apply the Hague Abduction
Convention to Protect Victims of Domestic Violence

**Permalink**
https://escholarship.org/uc/item/0kp5s7s0

**Journal**
UCLA Journal of Gender and Law, 28(1)

**Author**
Weiner, Merle

**Publication Date**
2021

**DOI**
10.5070/L328155744

**Copyright Information**
Copyright 2021 by the author(s). All rights reserved unless otherwise
indicated. Contact the author(s) for any necessary permissions. Learn
more at https://escholarship.org/terms

eScholarship.org                          Powered by the California Digital Library
                                                          University of California

# YOU CAN AND YOU SHOULD:
## How Judges Can Apply the Hague Abduction Convention to Protect Victims of Domestic Violence

### Merle H. Weiner

#### ABOUT THE AUTHOR

Philip H. Knight Professor of Law, University of Oregon. This article is dedicated to Ray Calamaro, an attorney at Hogan Lovells who worked with this author to try to change the International Child Abduction Remedies Act in ways that would have benefited survivors. I also thank the following individuals for their helpful comments on an earlier draft of this article: Jeffrey Brand (formerly Brand-Ballard), Pam Brown, Jeff Edleson, Taryn Lindhorst, Tom Lininger, Joan Meier, Lynn Hecht Schafran, and Maria Jose Vallejo. A special thanks to Brian Ogolsky for inviting me to present part of this work at the National Council on Family Relations' annual meeting. I appreciated the comments from my co-panelists and the commentator, Robin Wilson. As always, I could not have completed this article without the help of my research assistants; thank you Rowan Bond, Zack Johnson, Kaitlyn Lindaman, Mackenzie Lang, Madeline Monien, and Ben Molloy. Finally, I want to thank Gabriella Kamran at the *UCLA Women's Law Journal* for her excellent editing.

#### TABLE OF CONTENTS

INTRODUCTION ...................................................................................... 224

I.   JUDGES OFTEN FEEL CONFLICTED WHEN ADJUDICATING A
     HAGUE CONVENTION CASE INVOLVING DOMESTIC VIOLENCE ... 231
     A.  *Domestic Violence Is Not Expressly Relevant*
         *to the Hague Convention* ..................................................... 233
     B.  *Return of a Child Can Harm the Child,*
         *the Taking Parent, and Other Survivors* ............................ 236
     C.  *It's Up to Judges to Reach Just Results in These Cases* ... 243

II.  ARTICLE 13(B) IS MORE HELPFUL THAN JUDGES MAY THINK. 250

© 2021 Merle H. Weiner. All rights reserved.

RE: Respondent's Answer and Counterclaims

EXHIBIT 4
Page 2 of 111

A. *The Child Need Not Be the Target of the Violence* .......... 251
B. *All Types of Domestic Violence Are Relevant* ................. 257
   1. A Danger of Physical Harm Can Exist Even
      Without a History of Severe and Frequent
      Physical Violence ............................................. 263
   2. All Forms of Domestic Violence Can Cause
      Harm to the Taking Parent and Child .......................... 267
C. *The Domestic Violence Need Not Recur in the Future* ... 270
D. *An Intolerable Situation Differs From Physical*
   *or Psychological Harm* ......................................... 272
E. *The Harm Caused By Separating the Child From*
   *the Taking Parent Is Relevant* ................................. 278
F. *Protective Measures Are Generally Unhelpful* ............... 282
   1. Protective Measures Do Not Eliminate the Risk
      of Exposure to Harm ......................................... 282
   2. Protective Measures Need Not Necessarily Be
      Canvassed ................................................... 290
   3. Experts Can Help, But Not By Assessing
      the Effectiveness of Protective Measures .................. 296
G. *Survivors are Usually Truthful Despite Credibility*
   *Concerns* ....................................................... 301
H. *Clear and Convincing Evidence Only Needs to Exist*
   *for the Ultimate Issue, Not for Predicate Facts* ............. 312
I. *Only a Grave Risk of Exposure, Not a Grave Risk*
   *of Harm or a Grave Harm, Is Required* ......................... 316
III. JUDGES SHOULD OFTEN GRANT THE ARTICLE 13(B)
     DEFENSE EVEN WHEN THE LAW REQUIRES OTHERWISE ........... 321
     A. *The Justification for Deviation* ............................ 323
     B. *The Method of Deviating* ................................... 330
CONCLUSION ............................................................. 332

## INTRODUCTION

This Article is written for trial judges who adjudicate cases pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention),[1] although appellate judges, lawyers, and scholars may also find it of interest. Trial judges are my target audience because they are the best defense against the potential injustice that the Hague Convention creates for domestic violence victims who flee transnationally with their children for safety, then face their batterers' petitions for the children's return.

1.    Hague Convention of 25 October 1980 on the Civil Aspects of International Child Abduction, *opened for signature* Oct. 25, 1980, T.I.A.S. 11670, 1343 U.N.T.S. 89 (entered into force Dec. 1, 1983).

The trial judge decides whether a child is returned to the place from which the domestic violence victim fled or whether a child is allowed to remain in the United States pursuant to an exception to the Hague Convention's remedy of return.

While the Hague Convention permits the trial judge to refuse to return a child when the taking parent is a domestic violence victim, and while more people than ever before recognize the appropriateness of nonreturn in this context,[2] the law limits the nonreturn option. In fact, many judges complain that the law is too confining; they lament having to return the child but feel as though the law gives them no choice.[3] Legislators have refused to make the judges' job any easier.[4] While judges now have helpful authority in some appellate decisions and the Hague Conference on Private International Law's new *Guide to Good Practice on Article 13(b)*,[5] these sources are uneven and still insufficient. In light of this reality, this Article aims to provide trial judges, as well as their law clerks, the tools and encouragement to promote justice and safety in these cases, even when the legal doctrine may be problematic.

Alleviating judicial discomfort is not my sole purpose, however. Judge Alex Kozinski once wrote, "A troubled [judicial] conscience is certainly not pleasant, but the real-life, brutal consequences of an unjust judicial decision are suffered by others."[6] My chief objective is to change outcomes for domestic violence victims and their children who might otherwise lose. Trial judges too often return children even when the result is detrimental to children and unjust, and even when the law affords them the ability to do otherwise. In 2010, the Department of State admitted that "many" judges in the United States hearing these cases are "disinclined" to rule that domestic violence perpetrated against a parent is sufficient for an exception to the remedy of return and instead issue return orders.[7] The State Depart-

---

2. *In re* M.V.U., 2020 IL App (1st) 191762, ¶ 40 ("Since the adoption of the Hague Convention, there has been a shift toward recognizing domestic violence as posing a grave risk toward the child.").

3. *See infra* text accompanying notes 33–35.

4. *See infra* text accompanying notes 84–86.

5. HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, 1980 CHILD ABDUCTION CONVENTION GUIDE TO GOOD PRACTICE, PART VI-ARTICLE 13(1)(b)(2020) [hereinafter GUIDE TO GOOD PRACTICE], *available at* https://www.hcch.net/en/publications-and-studies/details4/?pid=6740 [https://perma.cc/Y9Y3-276B].

6. Alex Kozinski, *The Real Issues of Judicial Ethics*, 32 HOFSTRA L. REV. 1095, 1102 (2004).

7. HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, U.S. RESPONSE TO PRELIMINARY DOC. NO. 1, QUESTIONNAIRE CONCERNING THE PRACTICAL OPERATION OF THE HAGUE CONVENTION OF 25 OCTOBER 1980 ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION AND THE HAGUE CONVENTION OF 19

ment acknowledged that these cases raise "significant issues related to the safety of the child and the accompanying parent."[8]

A recent sample of appellate cases indicates that the State Department's conclusion is still valid. I analyzed all Hague Convention decisions issued by the U.S. Courts of Appeals from July 2017 through January 2018, a time period I call "T2."[9] The sample paralleled a set of cases from July 2000 through January 2001 that I analyzed for an earlier article,[10] a period I call "T1." A comparison of the cases decided in T1 and T2 reveals that the percentage of Hague Convention appellate cases involving allegations of domestic violence has remained the same: 78 percent.[11] However, domestic

---

OCTOBER 1996 ON JURISDICTION, APPLICABLE LAW, RECOGNITION, ENFORCEMENT AND CO-OPERATION IN RESPECT OF PARENTAL RESPONSIBILITY AND MEASURES FOR THE PROTECTION OF CHILDREN § 5.1 (Nov. 2010), *available at* http://www.hcch.net/index_en.php?act=publications.details&pid=5291&dtid=33 [https://perma.cc/2BT8-V976] (follow "United States" hyperlink).

8. HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, U.S. RESPONSE TO PRELIMINARY DOC. NO. 2, QUESTIONNAIRE ON THE DESIRABILITY AND FEASIBILITY OF A PROTOCOL TO THE HAGUE CONVENTION OF 25 OCTOBER 1980 ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION, § 5.1 (Dec. 2010) [hereinafter U.S. RESPONSE TO PRELIMINARY DOC. No. 2], *available at* http://www.hcch.net/index_en.php?act=publications.details&pid=5290&dtid=33 [https://perma.cc/8RGB-6F69] (follow "United States" hyperlink).

9. The absolute number of appeals was eleven. The number was derived by searching LEXIS for "international w/3 child w/3 abduction." Timeline filters were then used to include only cases from "July 1, 2017 to Feb. 1, 2018." The cases were restricted to federal appellate courts by using the court filter. *See also* note 15 (explaining two cases were excluded from the analysis).

10. Merle H. Weiner, *Navigating the Road Between Uniformity and Progress: The Need for Purposive Analysis of the Hague Convention on the Civil Aspects of International Child Abduction*, 33 COLUM. HUM. RTS. L. REV. 275, 276–78 (2002).

11. The domestic violence allegations were evident in some T2 appellate opinions. *See, e.g.*, Soto v. Contreras, 880 F.3d 706 (5th Cir. 2018); Orellana v. Cartagena, No. 17-6520, 2018 U.S. App. LEXIS 1161, at *2 (6th Cir. Jan. 17, 2018); Davies v. Davies, 717 F. App'x 43 (2d Cir. 2017); Taglieri v. Monasky, 876 F.3d 868, 871–72 (6th Cir. 2017). In other cases, the allegations were evident in the trial court's or magistrate's opinion. *See, e.g.*, Rath v. Marcoski, 2016 U.S. Dist. LEXIS 167685 (M.D. Fla. Oct. 3, 2016); Cunningham v. Cunningham, 237 F. Supp. 3d 1246, 1279 (M.D. Fla. 2017). In still other cases, the allegations only emerged from the pleadings, and I sometimes made a judgment call when classifying the case as involving allegations of "domestic violence." *Compare* Respondent's Answer to Amended Verified Complaint and Petition for Return of Children § 16, Ahmed v. Ahmed, No. 3:16-CV-142, 2016 WL 4691599 (E.D. Tenn. Sept. 7, 2016), *aff'd*, 867 F.3d 682 (6th Cir. 2017) ("Father's ongoing emotional and verbal abuse was a factor in the deterioration of their marriage . . . .") (included in cases involving allegations of abuse) *with* Verified Answers and Defenses to Petition for Return of Child ¶ 32, Blackledge v. Blackledge, Civil Action No. 2:16–10004, (W.D. Penn. filed Aug. 1, 2016) ("Communication became difficult

violence victims had far less success in T2 than T1. In T2, abductors who alleged they were domestic violence victims were successful at trial only 29 percent of the time.[12] In contrast, the success rate at trial for alleged domestic violence victims in T1 was 43 percent.[13] In

between the parties as Petitioner/Plaintiff was calling Defendant/Respondent names.") (not included in cases involving allegations of abuse) *and* Cartes v. Phillips, 240 F. Supp. 3d 669 (S.D. Tex. 2017) ("[T]he marriage was 'in distress' almost from its inception. Discord and conflict marked the parties' entire relationship — escalating and plummeting from time-to-time, with discussions of divorce mentioned throughout.") (not included in cases alleging abuse because no article 13(b) defense raised). In only one of the cases was the father the abductor and the mother the alleged domestic violence perpetrator. *See Cunningham*, 237 F. Supp. 3d, *supra*.

Admittedly, the high percentage of appellate cases with domestic violence allegations tells us nothing about the actual percentage of Hague Convention cases that involve domestic violence. Domestic violence victims may be over-represented in the sample of appellate cases because they may appeal more often than other litigants, especially if they are concerned about the safety of their children. In fact, there were thirty Hague Convention trial court decisions issued during T2, but only four cases involved allegations of domestic violence, and only two involved the classic fact pattern of mothers who claimed to be fleeing with their children to avoid domestic violence. *See* Ischiu v. Garcia, 274 F. Supp. 3d 339 (D. Md. 2017) (mother respondent prevailed); Orellana v. Cartagena, No. 3:16-CV-444-CCS, 2017 WL 5586374 (E.D. Tenn. 2017) (father petitioner prevailed). The other two were cases in which the merits were not adjudicated, but rather a temporary restraining order (TRO) was sought pending the adjudication. *See* Arjouan v. Cabré, No. 17-CV-782, 2017 WL 5891760 (D. N.M. Nov. 28, 2017) (mother abductor); Muwakil-Zakuri v. Zakuri, 2017 U.S. Dist. LEXIS 205373 (D. Conn. Dec. 11, 2017) (father abductor). The thirty trial court decisions were derived using the following search in the federal court database on Westlaw: "international w/3 child w/3 abduction & DA(aft 06/2017) & DA(bef 02/2018) & PR(district)." Ten cases were discarded as duplicates or not involving petitions under the Hague Convention.

12. This statistic is in line with Nigel Lowe's finding that a judicial return order was made in 65 percent of court decisions worldwide. Nigel Lowe & Victoria Stephens, A Statistical Analysis of Applications Made in 2015 Under the Hague Convention of 25 October 1980 on the Civil Aspects of International Child Abduction Part I–Global Report, 3 (Hague Conference on Private International Law, Feb. 2018), https://assets.hcch.net/docs/d0b285f1-5f59-41a6-ad83-8b5cf7a784ce.pdf [https://perma.cc/FJ66-Q9BH].

13. Diorinou v. Mezitis, 237 F.3d 133, 136, 144 (2d Cir. 2001) (mother, who alleged domestic violence, won initially, and prevailed on appeal); Kanth v. Kanth, 232 F.3d 901 (10th Cir. 2000) (mother, who alleged domestic violence, won initially and prevailed on appeal) [*see also* Kanth v. Kanth, No. 20010718-CA, 2002 WL 31770985, at *4 (Ct. App. Utah Dec. 12, 2002)]; Blondin v. Dubois, 238 F.3d 153, 156 (2d Cir. 2001) (mother, who alleged domestic violence, won initially and prevailed on remand); *In re* Tsarbopoulos, 243 F.3d 550, No. CV-00–00083-AAM, 2000 WL 1721800, at *2 (9th Cir. 2000) (unpublished table decision) (mother, who alleged domestic violence, lost initially, but prevailed on appeal and won on remand); Whallon v. Lynn, 230 F.3d 450, 452 (1st Cir. 2000) (mother, who alleged domestic violence, lost initially and lost on appeal); Croll

addition, alleged domestic violence victims in T2 had much less success on appeal; in fact, they *always* lost on appeal, as did all other appellants in the sample. In contrast, of the four victims who alleged domestic violence in T1 and lost at trial, three prevailed on appeal.[14] Overall, domestic violence survivors were successful in 86 percent of the cases in T1, but only 29 percent of the cases in T2.

While the T2 cases are a small sample, they reveal that respondents who allege domestic violence in defense of a Hague Convention petition for the child's return are losing more often than they did approximately twenty years ago despite some improvements in the law. The cases reveal new obstacles to domestic violence survivors' success in defending against a Hague Convention petition for return, including trial judges' misunderstandings about domestic violence, doubts about survivors' credibility, and unwarranted faith in protective measures. The T2 cases also indicate that it is essential for trial judges to get the result right because appellate courts are unlikely to reverse.

Part I of this Article starts by acknowledging that these cases can be difficult for judges and describing why the black letter law leads to unjust outcomes. It suggests that the definition of "wrongful removal or retention," coupled with a limited "grave risk" defense in article 13(b), causes judges to order children's return to their state of habitual residence even when, all things considered, that is the wrong outcome. It substantiates the injustice of return by discussing what happens to survivors and children after the children are returned, pursuant to court order. Part I also discusses the failure of Congress and the Hague Conference to eliminate this injustice through legislative changes, but notes the Hague Conference's development of a new soft-law instrument that may improve outcomes in these cases: the *Guide to Good Practice on Article 13(b)* (*Guide to Good Practice*) and its sanctioned *National Domestic and Family Violence Bench Book of Australia* (*Australian Bench Book*).

Part II then discusses how a judge can reach a just outcome by applying existing law. It focuses on the Hague Convention's "grave risk" defense in article 13(b) as it is the most common defense raised by domestic violence victims.[15] Article 13(b) allows a judge

---

v. Croll, 229 F.3d 133 (2d Cir. 2000) (mother, who alleged domestic violence, lost initially, but prevailed on appeal) [*see also* Croll v. Croll, 66 F. Supp. 2d 554, 561–62 (S.D. NY 1999)]; Walsh v. Walsh, 221 F.3d 204, 209 (1st Cir. 2000) (mother, who alleged domestic violence, lost at first instance, but won on appeal with directions that the petition be dismissed on remand).

14.  *Walsh*, 221 F.3d at 209.

15.  *See* JEFFREY L. EDLESON & TARYN LINDHORST, MULTIPLE PERSPECTIVES ON BATTERED MOTHERS AND THEIR CHILDREN FLEEING TO THE UNITED STATES FOR

EXHIBIT 4
Page 7 of 111

to deny the child's return if "there is a grave risk" that the child's
return "would expose the child to physical or psychological harm or
otherwise put the child in an intolerable situation."[16] This defense
provides judges considerable discretion to make factual and norma-
tive determinations. Yet, case law suggests judges face obstacles that
inhibit their application of the article 13(b) defense. Part II shares
information, arguments, and insights, including from the *Guide to
Good Practice* and the *Australian Bench Book,* that can help judges
eliminate those obstacles.[17]

    Finally, Part III acknowledges that judges may sometimes
find the law too limiting even after the tools in Part II are used. For
example, a judge may feel compelled to return the child because the
domestic violence is not serious enough, or the country of the child's
habitual residence, to which the child will be returned, appears able
to protect the mother and child upon return. Part III argues that
a judge should not return children in many of these cases, either.
Building on the work of Jeffrey Brand-Ballard,[18] I argue that judg-
es should deviate from the law because return in these cases is a
suboptimal outcome and often unjust. I then recommend that the
deviation be accomplished subversively.[19] This recommendation is
not as radical as it may sound. Paul Butler argues that this practice "is
far more common than is openly acknowledged."[20] He suggests judg-

---

SAFETY: A STUDY OF HAGUE CONVENTION CASES 281, tbl.10.4 (2010) (reporting
that grave risk defense was raised in 81 percent of the cases involving domestic
violence and successful 26 percent of the time); LOWE & STEPHENS, *supra* note
12, at 15–16 (finding from worldwide data that when a court refuses to return
a child, the two most common reasons are that the child was not habitually
resident in the requesting state, and/or that the article 13(b)(1) defense exists).
In the T2 sample, two issues predominated on appeal: the article 13(b) defense
and the child's "habitual residence." Nine of the eleven T2 cases contained
one or both of these issues. I excluded two cases from my analysis because
courts resolved them on unusual grounds. *See* Marks v. Hochhauser, 876 F.3d
416 (2017) (holding that the treaty did not apply when the mother's retention
of the children occurred prior to the treaty's entry into force between Thailand
and the United States); Silverman v. Silverman, 703 F. App'x 596 (2017) (re-
jecting attempt to remove case to federal court with erroneous claim that the
Hague Convention was implicated).

   16.  Hague Convention, *supra* note 1, at art. 13(b).

   17.  Part II serves as a checklist that can decrease judicial mistakes. *See
generally* Chris Guthrie, Jeffrey J. Rachlinski & Andrew J. Wistrich, *Blinking on
the Bench: How Judges Decide Cases,* 93 CORNELL L. REV. 1, 40–41 (2007).

   18.  JEFFREY BRAND-BALLARD, LIMITS OF LEGALITY: THE ETHICS OF LAW-
LESS JUDGING (Oxford Univ. Press, 2010).

   19.  *See* Paul Butler, *When Judges Lie (and When They Should),* 91 MINN.
L. REV. 1785, 1802–05 (2007).

   20.  *Id.* at 1785.

EXHIBIT 4
Page 8 of 111

es can and do engage in "ethical subversion:"[21] they "us[e] their power responsibly and effectively"[22] by being "outcome-determinative and crafty"[23] and by writing a decision that will survive appellate review.[24] Butler suggests that trial judges, who are often factfinders, can do this best.[25]

This Article has two strands: one pragmatic and one theoretical. This Article is pragmatic because it is meant to function like an amicus brief. Most trial judges in the United States never hear more than one or two Hague Convention cases and may not know much of the information about the Hague Convention or domestic violence that this Article shares.[26] The information about domestic violence is meant to promote better outcomes because "[p]reconceptions matter" to factfinding[27] and many judges, like the general public, have misconceptions about domestic violence.[28] Judges will find that much of the information will be useful for adjudicating actual cases, as it will qualify as adjudicative facts beyond reasonable dispute of which a court can take judicial notice,[29] including *sua sponte*,[30] or will qualify

21. *Id.* at 1819.

22. *Id.* at 1811.

23. *Id.* at 1818.

24. *Id.* at 1809.

25. *Id.* at 1818.

26. Merle H. Weiner, *Shrinking the Bench: Should United States Federal Courts Have Exclusive or Any Jurisdiction to Adjudicate Icara Cases?*, 9 J. COMP. L. 192, 214–15 (2014).

27. RICHARD A. POSNER, HOW JUDGES THINK 68 & n.15 (2008); *id.* at 69 (a judge's precepts are "shaped by [his] experience, temperament, ideology, or other personal, nonlegalist factors[,]" and sometimes it is "rational and . . . inevitable" that he relies on them "as a tiebreaker" in determining witness credibility).

28. *See generally* Molly Dragiewicz, *Gender Bias in the Courts: Implications for Battered Mothers and Their Children*, in DOMESTIC VIOLENCE, ABUSE, AND CHILD CUSTODY: LEGAL STRATEGIES AND POLICY ISSUES § 5-1 (Mo Therese Hannah & Barry Goldstein eds., 2010); Laurie S. Kohn, *Barriers to Reliable Credibility Assessments: Domestic Violence Victim-Witnesses*, 11 AM. U. J. GENDER SOC. POL'Y & L. 733 (2002) (discussing misconceptions about domestic violence and its impact on civil and criminal cases); Debra Pogrund Stark & Jessica M. Choplin, *Seeing the Wrecking Ball in Motion: Ex Parte Protection Orders and the Realities of Domestic Violence*, 32 WIS. J.L. GENDER & SOC'Y 13, 26–28 (2017) (discussing misconceptions about domestic violence and its impact on cases involving civil protection orders).

29. *See* FED. R. EVID. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

30. *See id.* at 201(c) ("The court: (1) may take judicial notice on its own; or (2) must take judicial notice if a party requests it and the court is supplied with the necessary information.").

as "legislative facts" also amenable to judicial notice.[31] At a minimum, the information in Part II suggests questions that judges should ask in Hague Convention cases to reach just outcomes.

At the same time, this Article is meant to advance the conversation about justice and judging. Judge Kozinski has bluntly stated that judges have the "power and authority to undermine unjust laws."[32] When and how judges should exercise this power is the topic of scholarly discourse. By engaging with that discourse, this strand reveals three important points: (1) judges have a moral reason to deviate from the law in these types of Hague Convention cases; (2) judges have a countervailing moral reason to adhere to the law, as deviation could broaden the article 13(b) defense and potentially undermine the deterrent effect of the Hague Convention; and (3) the moral reason to adhere to the law is weak in light of the structural features of the Hague Convention that make harm from deviation unlikely.

## I.   JUDGES OFTEN FEEL CONFLICTED WHEN ADJUDICATING A HAGUE CONVENTION CASE INVOLVING DOMESTIC VIOLENCE

Some judges express unease when they adjudicate a Hague Convention petition if the respondent is a domestic violence victim. These judges either criticize the law[33] or condemn the domestic

---

31. *See* Robinson v. Liberty Mutual Ins. Co., 958 F.3d 1137, 1142 (11th Cir. 2020).

32. Kozinski, *supra* note 6, at 1102.

33. *See, e.g.*, Garcia v. Duarte Reynosa, No. 2:19-cv-01928-RAJ, 2020 WL 777247, at *4 (W.D. Wash. Feb. 18, 2020) ("This case is a difficult one. The Court does not take Respondent's testimony regarding Petitioner's abuse lightly. She describes incidents of brutality that, if true, are deeply disturbing. Unfortunately, . . . [t]he Court's hands are tied—the children must be returned to Guatemala."); Taglieri v. Monasky, No. 1:15 CV 947, 2016 WL 10951269, at *13 (N.D. Ohio Sept. 14, 2016) ("While the court is deeply troubled by, and in no way discounts the seriousness of the physical abuse Monasky suffered—regardless of the frequency, severity, or duration—the Sixth Circuit has instructed that the grave risk exception is 'to be interpreted narrowly.'") (expressing regret that she was "[c]onstrained by the requirements of the law"); Pliego v. Hayes, 86 F. Supp. 3d 678, 703 (W.D. Ky. 2015) ("Much has been written regarding the difficulty victims of domestic abuse face in litigating ICARA cases. Compounding this is the inherent difficulty of attempting [to] prov[e] rape and domestic abuse allegations in court. Unfortunately, this leaves the Court in the uncomfortable position of both understanding why there is little proof of these allegations, and still requiring more under the law."). *Cf.* Souratgar v. Fair, 818 F.3d 72, 83 & n.1 (2d Cir. 2016) (Lohier, Cir. J., concurring) ("ICARA and the Convention have been criticized (rightly, in my view) for their complete *failure* to consider intimate partner violence as a mitigating or equitable factor in the removal of children from their countries of habitual residence. . . . Congress can and, I

violence despite concluding that the law makes it irrelevant to the case's outcome.[34]  In 2017, Baroness Brenda Hale of Richmond, former President of the Supreme Court of the United Kingdom, captured well her own discomfort as a trial judge in these cases. She confessed, "Many years ago, when I was in the Family Division, it often felt as if my role was to oppress women, and specifically, mothers—always for a good reason, of course, but that was how it felt."  She explained that "above all," this feeling was caused by "child abduction cases, usually involving British women who had married or partnered with foreigners and [had] come back to their home country and their families with their children when the going got rough."[35]

This discomfort is understandable because the doctrinal structure of the Hague Convention makes it difficult for judges to resolve a case in the domestic violence victim's favor, even if the domestic violence victim removed her child from the state of the child's habitual residence for reasons of safety.  Because judging involves a "dialogue between the heart and head,"[36] as Justice Bren-

---

think, should act to amend ICARA to favor respondents who are victims of intimate partner violence and who flee in part because of that violence."); Khan v. Fatima, 680 F.3d 781, 796 (7th Cir. 2012) (Hamilton, Cir. J., dissenting) ("Like some of the advocates and scholars cited by the majority, we might think that the Convention and the Congress should have made it easier to prove the defense.").

34.  *See, e.g.,* Ajami v. Solano, No. 3:19-cv-00161, 2020 WL 996813, at *17 (M.D. Tenn. Feb. 28, 2020) (calling the domestic violence "alarming and very regrettable," but insufficient for purpose of establishing article 13(b) defense); Valles Rubio v. Veintimilla Castro, No. 19-CV-2524(KAM)(ST), 2019 WL 5189011, at *24, *31 (E.D.N.Y. Oct. 15, 2019) (noting that the violence was "disturbing" and "very concerning," but insufficient to establish article 13(b) defense); Saada v. Golan, No. 18-CV-5292(AMD)(LB), 2019 WL 1317868, at *1, *20 (E.D.N.Y Mar. 22, 2019) (noting the case was "heart-wrenching" and she did "not come to [the] conclusion lightly," but denying the article 13(b) defense); Neumann v. Neumann, 197 F. Supp. 3d 977, 983 (E.D. Mich. 2016), *aff'd in part, vacated and remanded on other grounds,* 684 F. App'x 471 (2017) (stating the abuse is "certainly distressing," but not sufficient to support article 13(b) defense); Rivas v. Segovia, No. 2:10-CV-02098, 2010 U.S. Dist. LEXIS 138607, at *14 (W.D. Ark. Dec. 28, 2010) (stating "the Court does not take lightly any allegation of domestic violence" but the incident was insufficient to support article 13(b) defense).

35.  Brenda Hale, *Taking Flight—Domestic Violence and Child Abduction,* 70 Current Legal Probs. 3, 3 (2017).

36.  William J. Brennan, Jr., *Reason, Passion, and "The Progress of the Law",* 10 Cardozo L. Rev. 3, 12–13 (1988) (discussing the constitutional notion of "due process"). *See also* Honorable Marian Blank Horn, *A Trial Judge's Perspective—Promoting Justice and Fairness While Protecting Privilege,* 26 Fordham Urb. L.J. 1429, 1436 (1999) (noting judges generally want to adjudicate "in ways which are consistent with [their] moral and ethical obligations"); Posner,

EXHIBIT 4
Page 11 of 111

nan once noted, these cases can feel unjust if the judge concludes that the child must be returned.

## A.  *Domestic Violence Is Not Expressly Relevant to the Hague Convention*

To understand why the tension between the law and justice for victims of domestic violence exists, briefly consider the facts of a fictional, but paradigmatic, Hague Convention case:

> John is from country X and Mary is from country Y. John and Mary met in country Y when John was a graduate student. They dated, married, and decided to move to country X, where they had a child. John became physically and psychologically abusive to Mary during her pregnancy, and this behavior intensified after the child's birth. The abuse included criminal acts like physical and sexual assault, but also included calling Mary names, controlling her finances, and not allowing her to attend church. The child is now three and has been exposed to John's violence. Mary has been the child's primary caregiver for the child's entire life. Mary has thought about leaving John, but she fears his violent retaliation. She also lacks the resources to make it on her own in country X, as all of Mary's family and social support is in country Y. After John commits another act of sexual assault, Mary and the child return to her parents' home in country Y without John's permission. John is aware of Mary's whereabouts and petitions the court in country Y pursuant to the Hague Convention. He seeks the prompt return of the child to country X. Mary tells the judge that she is terrified of John and cannot imagine returning to country X. Mary wants to litigate custody in country Y, where she feels safe. She is willing to provide John supervised visitation in the interim in country Y, until a family law court can weigh all the evidence and make a custody decision.

What should the judge do?  Absent any law, most judges would likely say the optimal result would be to deny John's petition for the child's return. Domestic violence is immoral and a crime, and John's actions caused Mary's flight. It is commendable for Mary to have removed herself and the child from an abusive situation.[37] It is in the

*supra* note 27, at 238–39, 251 (noting "[pragmatists] want very much to think that their exercise of [] power is 'just,'" and this requires attention to consequences broadly defined, including "to the parties" and the "system[,]" and the latter is the more important); Justice Stephen Breyer, *America's Courts Can't Ignore the World*, ATLANTIC (Oct. 2018), https://www.theatlantic.com/magazine/archive/2018/10/stephen-breyer-supreme-court-world/568360 [https://perma.cc/J5HW-4MQV] ("Law . . . embodies an ancient and universal human need, expressed in the biblical words 'Justice, justice shall you pursue.'").

  37. In fact, flight from domestic violence is a defense under the

child's best interest to stay with Mary, the primary caregiver, and to be in a place where Mary is safe, especially until a court determines custody. Returning the child to country X would elevate John's interests above Mary's and the child's.

Yet, a judge adjudicating John's Hague Convention petition must return the child unless Mary can establish that the reason for her flight is relevant to one of the Hague Convention's defenses. While John will have to make out the prima facie case, including that Mary's removal or retention of the child was "wrongful,"[38] wrongful has a technical meaning that does not include consideration of whether an abduction was morally justified. As Justice Lowell Goddard of the New Zealand Court of Appeals recently explained, "[I]t is not the court's role to judge the morality of the abductor's actions."[39] If a judge were simply empowered to determine whether the removal was justified, many respondents who are domestic violence victims would win their cases easily. As Justice Goddard noted, quoting Baro-ness Hale in the English case of *Re D*: "Sometimes, particularly when the abductor is fleeing from violence, abuse or oppression in the home country, they will not [have been morally wicked.]"[40]

The law instead focuses the judge's attention on the article 13(b) defense. This defense states that a judge need not return a child if "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."[41] The defense is concerned with the reason the abductor left,[42] so domestic violence is relevant, but perpetrators of domestic violence have a significant legal advantage when the taking parent raises this defense because the court must

---

International Parental Kidnapping Crime Act of 1993, 18 U.S.C § 1204(c)(2) (1994). In addition, women are often criticized and penalized for their supposed failure to protect their children from domestic violence.

38. Hague Convention, *supra* note 1, at art. 3, 12.

39. LRR v. COL [2020] NZCA 209 at [91] (N.Z.).

40. *Id.* at [91] (citing *In re* D (Abduction: Rights of Custody), [2006] UKHL 51, [2007] 1 AC 619, [56] (appeal taken from Eng.)).

41. Hague Convention, *supra* note 1, at art. 13(b).

42. *See* Elisa Pérez-Vera, *Explanatory Report, reprinted in* Hague Conference on Private International Law, III Actes et documents de la Quatorzième Session October 426, 432 ¶ 25 (1980) [hereinafter Pérez-Vera, *Explanatory Report*] [https://perma.cc/WU8R-QS36] ("[I]t has to be admitted that the removal of the child can sometimes be justified by objective reasons which have to do either with its person, or with the environment with which it is most closely connected. Therefore the Convention recognizes the need for certain exceptions to the general obligations assumed by States to secure the prompt return of children who have been unlawfully removed or retained.").

focus only on the *future*, the *child*, and a *grave* risk, which is even greater than a serious risk.[43]

Moreover, appellate judges have developed a number of rules that restrict article 13(b)'s breadth, thereby making a successful defense even more challenging. For example, before making a determination as to the child's return, some case law requires judges to consider ways to minimize the risk to the child, including through services available in the state of the child's habitual residence and undertakings (i.e., promises) from the abuser.[44] Other case law separates domestic violence into degrees, for example by looking at whether the violence is frequent and severe, and excludes from the defense entire categories of domestic violence deemed minor.[45] To make matters more difficult for the taking parent, the defense must be proven by clear and convincing evidence,[46] and the expedited nature of the proceedings can truncate the available evidence.[47]

The doctrinal structure—whereby removals are wrongful even though they are arguably morally justified, and return is mandated even though the petitioner is morally blameworthy and return poses a risk of harm to the mother and the child (perhaps even a serious risk)—explains some judges' considerable discomfort adjudicating these cases. That discomfort should not exist because the drafters of the Convention never intended judges to return the children of parents fleeing from domestic violence, as some high-profile judges have acknowledged.[48]

---

43. *See* HAGUE INTERNATIONAL CHILD ABDUCTION CONVENTION: TEXT AND LEGAL ANALYSIS, 51 Fed. Reg. 10494, 10510 (Mar. 26, 1986) [hereinafter TEXT AND LEGAL ANALYSIS] ("The person opposing the child's return must show that the risk to the child is grave, not merely serious."); Danaipour v. McLarey, 286 F.3d 1, 14 (1st Cir. 2002).

44. *See infra* text accompanying notes 145, 339–340.

45. *See, e.g.*, Laguna v. Avila, No. 07-CV-5136, 2008 WL 1986253, at *8 (E.D.N.Y. May 7, 2008).

46. International Child Abduction Remedies Act (ICARA) § 4, 22 U.S.C. § 9003(e)(2)(A) (2019).

47. STANDING SENATE COMMITTEE ON HUMAN RIGHTS, ALERT: CHALLENGES AND INTERNATIONAL MECHANISMS TO ADDRESS CROSS-BORDER CHILD ABDUCTION 14 (2015) (Canada), https://sencanada.ca/content/sen/Committee/412/ridr/rep/rep13jul15-e.pdf [https://perma.cc/6SWH-5GLM] (noting article 13(b) "poses the greatest interpretive challenge to judges" because "it can be difficult to ascertain the truth of allegations of domestic abuse" during what "is supposed to be a quick process").

48. *See* Jopie Witzand, *Dutch-Australian 'Hague Case' Reveals Flaws in International Treatment of Domestic Violence*, SBS DUTCH (Mar. 21, 2019), https://www.sbs.com.au/language/english/dutch-australian-hague-case-reveals-flaws-in-international-treatment-of-domestic-violence [https://perma.cc/4Z-BV-K3R3] (quoting Diana Bryant, Chief Justice of the Family Court in Australia). *See also* Simcox v. Simcox, 511 F.3d 594, 609 (6th Cir. 2007) (opinion by

B.    *Return of a Child Can Harm the Child, the Taking Parent, and
      Other Survivors*

While some judges are troubled when the law requires them
to return a child after a parent has fled domestic violence, not all
judges are bothered. Judge Richard Posner notes that some judges
are simply hard-hearted,[49] but a more pleasant explanation is that
they instead find solace in several external facts. First, the Hague
Convention adjudication does not decide custody of a child,[50] and
a judge in the state of the child's habitual residence can address
any domestic violence when adjudicating custody after the child is
returned. Second, a member of the International Hague Network
of Judges (IHNJ),[51] or a foreign judge or central authority contact-
ed via the IHNJ,[52] may have assured the judge that the country to

---

Chief Judge Danny Boggs) (citing Merle H. Weiner, *Navigating the Road Be-
tween Uniformity and Progress: The Need for Purposive Analysis of the Hague
Convention on the Civil Aspects of International Child Abduction*, 33 Colum.
Hum. Rts. L. Rev. 275, 278–79 (2001)) ("the Convention . . . . was never in-
tended to be used as a vehicle to return children to abusive situations"); *In re* D
(Abduction: Rights of Custody) [2006] UKHL 51, [52], [2007] 1 AC 619 (appeal
taken from Eng.) (opinion by Baroness Hale) ("No-one intended that an in-
strument designed to secure the protection of children from the harmful effects
of international child abduction should itself be turned into an instrument of
harm."). *See also* Merle H. Weiner, *International Child Abduction and the Es-
cape from Domestic Violence*, 69 Fordham L. Rev. 593, 602 (2000).

49.    Posner, *supra* note 27, at 119 ("[A]s doctors tend to be callous about
sick people, judges tend to be callous about pathetic litigants because they have
seen so many of them."); *id.* ("[M]ost judges are (surprisingly to nonjudges)
unmoved by the equities of the individual case . . . .").

50.    Hague Convention, *supra* note 1.

51.    *See generally* Phillippe Lortie & Frédéric Breger, *The 20th Anniversa-
ry of the International Hague Network of Judges (IHNJ)*, 23 Judges' Newsl. on
Int'l Child Prot., Winter 2018–Spring 2019, https://assets.hcch.net/docs/dff2c-
b7c-ed66-4408-a892-2af15c664d58.pdf [https://perma.cc/TD38-ST3Q]; Hague
Conference on Private International Law, Direct Judicial Communication:
Emerging Guidance Regarding the Development of the International
Hague Network of Judges and General Principles for Judicial Commu-
nications, Including Commonly Accepted Safeguards for Direct Judicial
Communications in Specific Cases, Within the Context of the International
Hague Network of Judges 7 (2013) [hereinafter Direct Judicial Communica-
tion], https://www.hcch.net/en/publications-and-studies/details4/?pid=6024&d-
tid=3 [https://perma.cc/628C-4RFC] (describing role of Hague Network Judge
as including "direct judicial communications with regard to specific cases, the
objective of such communications being to address any lack of information that
the competent judge has about the situation and legal implications in the State
of the habitual residence of the child").

52.    Direct Judicial Communication, *supra* note 51, at 11 ("The Hague
Network Judge may provide, or facilitate the provision of, responses to fo-
cused enquiries from foreign judges concerning legislation and Conventions on

which the child will be returned has laws to protect domestic violence victims and their children.[53]  In fact, the decisions of some judges adjudicating Hague Convention petitions specifically mention these facts.[54]  A judge might also harbor misconceptions about domestic violence,[55] such as the myth that separation ends the violence[56] or that the petitioner will honor promises to comply with court orders.[57]  A judge may further assume that the foreign court adjudicating custody will not penalize the taking parent for fleeing and will act in the child's best interest in awarding custody.

Judges who believe the outcome will ultimately be just and that the taking parent and child will be safe are typically uninformed and unjustifiably optimistic.  There is no comprehensive data detailing the outcomes in cases involving domestic violence after children are returned.[58]  Nor do judges who return children

---

international child protection and their operation in his / her jurisdiction.").

53.  *See* PERMANENT BUREAU, HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, DOMESTIC AND FAMILY VIOLENCE AND THE ARTICLE 13 "GRAVE RISK" EXCEPTION IN THE OPERATION OF THE HAGUE CONVENTION OF 25 OCTOBER 1980 ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION: A REFLECTION PAPER 30 (Preliminary Doc. No. 9 May 2011) [hereafter REFLECTION PAPER], https://assets.hcch.net/docs/ce5327cd-aa2c-4341-b94e-6be57062d1c6.pdf [https://perma.cc/X99T-YJW2] (speaking of "comfort" judge received from communication with foreign judge).

54.  *See, e.g.,* Monasky v. Taglieri, 140 S. Ct. 719, 729 (2020) ("Domestic violence should be an issue fully explored in the custody adjudication upon the child's return."); Saada v. Golan, No. 1:18-CV-5292, 2020 WL 2128867, at *1, *3–*4 (E.D.N.Y. May 5, 2020) (describing IHNJ-facilitated communication with the Italian Central Authority, the Italian Ministry of Justice, and Italian courts and concluding "the Italian legal system is capable of handling domestic violence cases involving children" and that "the Italian court will protect B.A.S.").

55.  Nicole E. Negowetti, *Judicial Decisionmaking, Empathy, and the Limits of Perception*, 47 AKRON L. REV. 693, 694 (2014) ("Decisions based on what we believe to be careful, neutral, and logical reasoning, may actually be guided by unexamined and often unseen frameworks of thinking . . . of which we are unaware.").

56.  *See, e.g.,* Souratgar v. Fair, No. 12 Civ. 7797, 2012 WL 6700214, at *11 (S.D.N.Y. Dec. 26, 2012), *aff'd* 720 F.3d 96 (2d Cir. 2013) ("The Court finds that petitioner engaged in abusive conduct toward the respondent. . . . However, there is no credible evidence that petitioner and respondent will ever cohabit again.").

57.  Sierra v. Sierra, 2001 CarswellOnt 1869, ¶ 57–58 (Can.) (WL) (ordering the father "not to molest, annoy, harass or disturb" the mother or children pending their return to Florida and "assuming that the child and spousal support orders made in the Florida Court are being honoured").

58.  Marilyn Freeman & Nicola Taylor, *Domestic Violence and Child Participation: Contemporary Challenges for the 1980 Hague Child Abduction Convention*, 42 J. SOC. WELFARE & FAM. L. 154, 159–60 (2020) ("The paucity of data about what happens for a child after the Convention case has concluded was said to hamper Central Authorities and judges, who would also find education

despite a history of domestic violence receive feedback about what actually happens after the children depart.[59] The lack of feedback perpetuates the myth for those adjudicating Hague Convention cases that return will not cause anyone harm.

The reality, however, is that things frequently end poorly for the domestic violence survivor and the child after the child is returned. Media outlets, including the internet, produce a sample of anecdotal (and admittedly unconfirmed) hardship stories.[60] Sometimes the mother and/or child are killed.[61] Sometimes the

---

and information to assist them in developing the requisite skills and practices of paramount importance.") (reporting on conclusions from a meeting in June 2017 of fifty-seven "specialist abduction researchers, judges, legal practitioners, policy makers and NGO staff" from nineteen jurisdictions).

59. REFLECTION PAPER, *supra* note 53, at 28 (examining ninety-two cases from various jurisdictions noting, "there . . . were very few comments regarding intentions to follow-up upon the return of the child and accompanying parent").

60. *See, e.g.*, Gina Masterton, *Fleeing Family Violence to Another Country and Taking Your Child Is Not 'Abduction', but That's How the Law Sees It,* CONVERSATION (Jan. 20, 2019, 1:55 PM), https://theconversation.com/fleeing-family-violence-to-another-country-and-taking-your-child-is-not-abduction-but-thats-how-the-law-sees-it-109664 [https://perma.cc/E4F2-HY9W] (discussing cases of Fiona and Rita); Becka Kellaway, Comment to *Protect Victims Under the Hague Convention,* CHANGE.ORG (Aug. 2, 2019), https://www.change.org/p/in-memory-of-cassandra-hasanovic-protect-victims-under-the-hague-convention/c [https://perma.cc/G4EC-B6AT] (reporting that the judge adjudicating the mother's Hague case did not believe her testimony that courts in the child's habitual residence would not protect her as they had been unsuccessful in addressing petitioner's alleged escalating violence for four years, and further describing that upon return, "[w]e were homeless for 10 months, we were/are in terrible poverty and had to still pay for barristers and appear in court to fight to keep custody. We need protection"); Jennifer Cragg, Comment to *Protect Victims Under the Hague Convention,* CHANGE.ORG (Aug. 3, 2019), https://www.change.org/p/in-memory-of-cassandra-hasanovic-protect-victims-under-the-hague-convention/c [https://perma.cc/G4EC-B6AT] (reporting that her friend "has been forced to return to an abusive and controlling husband in Ireland who has the advantage of wealth on his side," that the Irish courts have not helped her, and concluding that "[t]he mother seems to have no power or rights in such situations and has to acquiesce to whatever the father and courts in the habitual residence demand. I can't believe this can still happen in Europe in 2019").

61. *See, e.g.*, Natalie Evans, *Mum Stabbed to Death in Front of Children by Husband Warned: "I Know He's Going to Kill Me",* DAILY MIRROR (Feb. 17, 2014, 5:42 PM), http:www.mirror.co.uk/news/uk-news/Cassandra-hasanovic-inquest-mum-stabbed-3155912 [https://perma.cc/Q3KC-N2N3] (discussing case of Cassandra Hasanovic); *Family Mourns Montreal Boy's Death in Texas,* CBC NEWS (Dec. 15, 2010, 11:59 AM), https://www.cbc.ca/news/canada/montreal/family-mourns-montreal-boy-s-death-in-texas-1.878443 [https://perma.cc/M99J-MX9E] (discussing case of Danyela and Deyen Perisic).

---

abuse resumes with acts short of murder.[62] Sometimes the child becomes a direct victim of abuse.[63] Sometimes the taking parent is punished by the government of the child's habitual residence for being "an abductor," i.e., she is criminally prosecuted,[64] she loses custody in a judicial proceeding,[65] and/or her child is placed in fos-

---

62. *See* Katie Pashley, Comment to *Protect Victims Under the Hague Convention*, CHANGE.ORG (Mar. 2019), https://www.change.org/p/in-memory-of-cassandra-hasanovic-protect-victims-under-the-hague-convention/c [https://perma.cc/2URE-QZX7] ("I am a stuck parent who is suffering at the hands of the family courts in Singapore. . . . I had no choice but to voluntarily return under the Hague and face abuse from my nex [sic] everyday. The impact this has on the children and my whole family is not important it seems.").

63. *See* Juju Chang & Angela Ellis, *Exclusive: International Custody Battle Rages into 10th Year*, ABC NEWS (Apr. 26, 2010, 3:43 PM), https://abcnews.go.com/GMA/exclusive-argentine-american-custody-battle-rages-10th-year/story?id=10481955 [https://perma.cc/36P2-S7N6] (noting mother and child made such allegations after the court returned the children to Argentina, but also noting that father denied committing any such abuse).

64. *See Angelina Maalue Avalon: 'That's Why I Abducted My Children To Brazil,'* POWER KVINDERNE, https://powerkvinderne.dk/liste/833-angelina-derfor-bortforte-jeg-mine-born?fbclid=IwAR0nSogTTgRIO5UY4Pa6rEDI89D-kDT-wZxI5MoEmC8DPnxMxrCDIcIQsJtk [https://perma.cc/UZ8B-JDR7] (reporting that mother who alleged domestic violence and abuse of her two children was sentenced to eighteen months by Danish courts for taking her children to Brazil). *Cf.* Martin Robinson, *British Mother Who Admitted Abducting Her Two Children and Taking Them to ALASKA Without Permission Is Jailed for Three-and-a-Half Years*, DAILY MAIL (Sept. 10, 2018, 6:48 AM), https://www.dailymail.co.uk/news/article-6150895/British-mother-ADMITS-abducting-two-children-taking-Alaska.html [https://perma.cc/97CF-TKFD] (reporting that Indea Ford was sentenced to 3.5 years in prison by a U.K. court after pleading guilty to taking her children from the U.K. to the United States). Ford claimed that she took her children to the United States because her former spouse was abusing her and the children, including threatening to kill her, and the U.K. was not protecting them. *See* Robert Woolsey, *For This Expat Mom, Raising Healthy Girls Means Going to Prison*, KCAW.ORG (Mar. 8, 2018), https://www.kcaw.org/2018/03/08/expat-mom-raising-healthy-girls-means-going-prison [https://perma.cc/EJ4L-2F8C]. She believed her ex-husband brought criminal charges instead of a Hague petition to punish her. *Id.*

65. *See, e.g.*, Ellen A., Comment to *Save the Children from the Negative Consequences That the Hague Abduction Convention Creates for Them*, CARE2 PETITIONS (July 8, 2013), https://www.thepetitionsite.com/692/647/766/save-children-from-the-negative-consequences-that-the-hague-abduction-convention-creates-for-them [https://perma.cc/9627-ZZKE] ("Today, July 8th 2013 I just lost my four year old son to an abusive ex-husband. I couldn't afford an attorney and my ex-husband had like 8 people defending him. My case was hopeless. . . . The Hague Convention is nothing but poison for women who want to protect their children. I am hopeless and I feel like I lost everything."). *See also* EDLESON & LINDHORST, *supra* note 15, at 180 (describing case of Tamara); Monasky v. Taglieri, 140 S. Ct. 719, 724–25 (2020) (noting that after the child's removal, the Italian court terminated the mother's parental rights in an

EXHIBIT 4
Page 18 of 111

ter care.[65] In such cases, the taking parent may not even be awarded visitation.[67] And, even if awarded visitation, she sometimes has no practical way to exercise it because the visitation must occur in the state of the child's habitual residence where she no longer resides,[68] it raises risks for herself and the children,[69] or the father refuses her

ex parte proceeding, and that the child was returned to the father in Italy after the Hague petition was granted). As of January 26, 2021, the Italian courts have not assumed jurisdiction to decide whether Monasky's parental rights should be restored, let alone who should have custody. Email from Joan Meier to Merle Weiner (Jan. 26, 2021) (on file with author). *See also* Am. Bar Ass'n Comm'n on Domestic Violence, 10 Myths About Custody and Domestic Violence and How to Counter Them 2 (2006), *available at* http://leadershipcouncil.org/docs/ABA_custody_myths.pdf [https://perma.cc/AE2W-37PF] (noting it is a myth that abusive fathers lose custody to fit mothers).

66. *See, e.g.*, Kristina Becker, Comment to *Face of the Crisis: Ursula*, Facebook (Dec. 4, 2019), https://www.facebook.com/TheWomensCoalition/posts/2526405690967075 [https://perma.cc/ETT5-M85A] (explaining that "I took my daughter abroad to save us from the violence, the abuse and the threats," that the child was placed in foster care upon return, that she lost sole custody, that she has "not heard or seen [her] daughter" in more than a year, and concluding, "Hell could not be worse than this, I swear").

67. *Cf.* The Women's Coalition, *Laney USA*, Facebook (Aug. 1, 2017), https://www.facebook.com/events/315558372234493/?post_id=33220834 0569496&view=permalink [https://perma.cc/8X3W-YM8F] (alleging her child was the victim of physical, mental and sexual abuse, that the family courts were not protecting the child, that the mother had full custody of the child when she was caught trying to go to Canada, and that she has not been able to see her child in approximately five years).

68. *See, e.g.*, Amy Oliver, *How CAN They Say I Abducted My Own Daughter? Heartbreak of British Mothers Forced to Send Their Children Abroad . . . to Foreign Fathers Exploiting International Child Abduction Laws in Custody Battles*, Daily Mail (Oct. 4, 2015, 7:41 PM), https://www.dailymail.co.uk/femail/article-3259069/How-say-abducted-daughter-Heartbreak-British-mothers-forced-send-children-abroad-foreign-fathers-exploiting-international-child-abduction-laws-custody-battles.html?fbclid=IwAR37rAUxeodawA-F0URBFvBBFj6Z0-KNqi1L_JuFDdYzYUrRW3LLnch_C0Rs [https://perma.cc/E9QW-XRC8] (describing the story of Anita Duncan, who lost a Hague Convention case in the United States, and now "can see [her children] three times a year but only in [the alleged abuser's] state," and reporting, "'I've lost everything' . . . I've lost my home, my belongings and my children. I have nothing more than a huge debt. I don't look at photos of them often — it's too painful'"); A. Gera, *BBC World Interview, 12 Oct. 2017*, YouTube (Oct. 15, 2017), https://www.youtube.com/watch?v=5OaSHxpSdAY [https://perma.cc/74DG-CRE3].

69. *See Episode 30: #SurvivorStories Series with Anita Gera and the Misuse of the Hague Convention to Harm Children*, En(gender)ed Podcast (Nov. 15, 2018), https://engendered.us/episode-30-survivorstories-series-with-anita-gera-on-how-the-hague-convention-can-be-used-to-harm [https://perma.cc/6ZLW-6XYN].

access and she lacks the resources to enforce the order.[70] In this way, the custody proceedings can become another tool of the abuser.[71] Further, the domestic violence victim frequently struggles to find housing, legal assistance, and/or other types of support.[72]

Empirical work corroborates the harsh outcomes that are reflected anecdotally in media accounts and women's self-reports. Professors Jeffrey Edleson and Taryn Lindhorst's study of cases litigated in the United States found that upon return children were often physically abused, while women were revictimized, criminally prosecuted for abduction, and subjected to economic hardship.[73] Similarly, Marilyn Freeman's study in England found that upon the return of the child, most taking parents "continued to suffer the issues which had caused them to abduct, without the support from their families that they had temporarily found in the abducted-to State," causing them stress-related health issues.[74] Return to the child's habitual residence caused them to feel "'vulnerable and alone', . . . 'totally isolated and impoverished', and 'terrified and distraught.'"[75]

Apart from the potential hardship and despair following the return of children to their state of habitual residence in cases with domestic violence, judges should be aware of the indirect effects of their decision to return a domestic violence victim's child. Specifically, returning a child may cause other domestic violence survivors to stay in abusive situations rather than flee with their children. A nonprofit organization that works with U.S. survivors abroad reported

---

70. *Id. See also* The Women's Coalition, *Face of the Crisis: Ursula*, FACEBOOK (Dec. 4, 2019), https://www.facebook.com/TheWomensCoalition/posts/2526405690967075 [https://perma.cc/K66Y-5JF9] (explaining the aftermath of a Hague Convention proceeding in which mother, who allegedly suffered "a long and on-going history of domestic violence" and was the primary caregiver, must now travel to children's habitual residence to see them, but cannot because father "has made it very clear he will not allow me to see them. . . . He is concerned only with hurting and punishing me. This Hague Court ruling does not in any way serve the best interests of my children").

71. *See generally* Barbara J. Hart, Jennifer White & Lisa Matukaitis, *Child Custody*, *in* THE IMPACT OF DOMESTIC VIOLENCE ON YOUR LEGAL PRACTICE: A LAWYER'S HANDBOOK 234 *(Margaret B. Drew et al., eds.,* 2d ed. *2004)* ("[C]ustody litigation often becomes a tool for batterers to maintain or extend their control and authority over the abused parent after separation."). *See also infra* note 167.

72. *See* Kellaway, *supra* note 60; EDLESON & LINDHORST, *supra* note 15, at 185–87, 309.

73. EDLESON & LINDHORST, *supra* note 15, at 160–61, 179–87.

74. *See* MARILYN FREEMAN, REUNITE INTERNATIONAL, INTERNATIONAL CHILD ABDUCTION: THE EFFECTS 27–28 (2006), *available at* http://takeroot.org/ee/pdf_files/library/freeman_2006.pdf [https://perma.cc/F2X8-JUGR].

75. *Id.* at 27.

this deterrent effect,[76] and women's online testimonials corroborate it.[77] The low number of respondents alleging domestic violence at the trial court level during T2 also suggests a deterrent effect.[78] Simply, victims are inclined to stay put when they see judges rejecting the article 13(b) defense and returning children pursuant to the Hague Convention.[79] While the Hague Convention is meant to deter abduction and its attendant harms,[80] this general deterrent effect can harm those who need to escape domestic violence.

---

76. Karen Lewis, *Human Rights*, FAWCO (Feb. 13, 2017), https://www.fawco.org/global-issues/human-rights/ending-violence-against-women-a-children/2967-the-hague-convention-returning-children-to-their-abusers [https://perma.cc/98ZV-2MMM] (noting "many victims are deterred from attempting to escape to safety by the Hague petition").

77. *See, e.g.*, Plodalot, Comment to *Don't Let It Happen to You: What Every Mother Should Know Before Emigrating*, AMAZON (Apr. 20, 2014), https://www.amazon.com/Dont-Let-Happen-You-Emigrating-ebook/dp/B00FV80PTM [https://perma.cc/V8Q3-5JRV] ("How many of us are 'stuck' in a foreign country trying to do the best we can for our kids. Only time will tell if we did the right thing by staying. I often feel that my child has a shell of the mother I could be if I was in a safe, stable environment surrounded by friends and family."). *See also* Ka Man Mak, *Part 3 – Family Crisis and Insights and Advice*, GUIDANCE (Mar. 8, 2020), https://oslodesk.com/part-3-family-crisis-insights-and-advice [https://perma.cc/7JAP-MF2X] (discussing parents living in domestic violence shelters long term); Carole Hallet Mobbs, *Nobody Tells You This About Moving Overseas with Your Kids*, EXPATCHILD (May 18, 2015), https://expatchild.com/nobody-tells-you-this-about-moving-overseas-with-your-kids [https://perma.cc/AB2H-BDTU] (discussing parents living in hardship because they cannot access support systems in the other country); ANNA WORWOOD & LUCY CUMMIN, PENNINGTONS MANCIES, INTERNATIONAL FAMILY LAW REPORT: CAN WE GO OR MUST WE STAY? THE INTERNATIONAL CHILD RELOCATION RANKINGS 5 (2016), *available at* https://www.penningtonslaw.com/media/1121277/international-relocation-of-children-law-report.pdf [https://perma.cc/65VJ-37YV] (discussing how obtaining permission to relocate can take years and how some countries routinely deny permission).

78. *See supra* note 11.

79. Personal stories, academic studies, and petitions on the Web warn domestic violence victims of the futility of abduction and the unjustness of the Hague Convention. *See, e.g.*, *supra* notes 60–70 (personal stories); *Mothers and Children Seeking Safety in the U.S.: A Study of International Child Abduction Cases Involving Domestic Violence*, NAT'L INST. OF JUSTICE: RESEARCH FOR THE REAL WORLD (Oct. 12, 2010), https://www.nij.gov/multimedia/presenter/presenter-edleson/Pages/presenter-edleson-transcript.aspx [https://perma.cc/P6CU-5FS9] (video transcript); SUDHA SHETTY & JEFFREY L. EDLESON, SEEKING SAFETY ACROSS BORDERS: BATTERED WOMEN'S EXPERIENCES WITH THE HAGUE CONVENTION IN AMERICAN COURTS (PowerPoint presentation), *available at* http://www.courts.ca.gov/documents/BTB_23_4O_1.pdf [https://perma.cc/3FQ5-968N]; *Protect Victims Under the Hague Convention*, CHANGE.ORG, https://www.change.org/p/in-memory-of-cassandra-hasanovic-protect-victims-under-the-hague-convention [https://perma.cc/CZ3E-GZE7] (petition).

80. *See* Friedrich v. Friedrich, 78 F.3d 1060, 1064 (6th Cir. 1996) ("[T]he

C.  *It's Up to Judges to Reach Just Results in These Cases*

Judges who decide Hague Convention cases occasionally call for changes to the law so it may better align with justice. For example, in speaking about the Hague Convention, Justice Breyer told interest groups "to monitor court decisions with care and, in light of those decisions, stand ready to modify treaties when that seems necessary."[81] Judges on the U.S. Courts of Appeals have called on Congress to reform the treaty's implementing legislation as it applies to domestic violence victims,[82] and other judges have noted the rumor of reform efforts.[83]

Lawmakers, however, have not made it easier for judges to refuse the child's return in cases with domestic violence. Perhaps this is unsurprising, as scholars note lawmakers are generally reluctant to heed judges' requests.[84] Lawmakers' disinterest in reform was evident from 2013 to 2015 when a group of academics and lawyers, of which this author was a part, tried to persuade Congress to improve the International Child Abduction Remedies Act (ICARA) for domestic violence victims. The last iteration of the draft legislation, called the ICARA Improvement for Victims of Domestic Violence Act of 2015, was designed "to eliminate the current unintended consequences in the implementation of the Hague Convention that result in harm to children and parents by ensuring that U.S. judges appropriately apply the exceptions to the return of an abducted child and that battered parents have access to adequate legal counsel."[85]

---

Hague Convention is generally intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.").

81.  Breyer, *supra* note 36.

82.  *See* Souratgar v. Fair, 818 F.3d 72, 83 (2d Cir. 2016) (Lohier, Cir. J., concurring); Khan v. Fatima, 680 F.3d 781, 796 (7th Cir. 2012) (Hamilton, Cir. J., dissenting).

83.  Neumann v. Neumann, 684 F. App'x 471, 490–91 (6th Cir. 2017) (Daughtrey, J., concurring in part and dissenting in part) (noting "a movement to amend the Hague Convention" to address abductors who are fleeing from domestic violence); Gallegos v. Garcia Soto, No. 1:20-CV-92-RP, 2020 WL 2086554, at *4 n.1 (W.D. Tex. Apr. 30, 2020) (same).

84.  Butler, *supra* note 19, at 1806 ("When judges, after applying law they think is unjust, register some kind of protest, there is little evidence that legislators care.").

85.  THE ICARA IMPROVEMENT FOR VICTIMS OF DOMESTIC VIOLENCE ACT OF 2015 (on file with author) [hereinafter ICARA IMPROVEMENT ACT]. Among other things, the bill would have changed the burden of proof for the article 13(b) and article 20 defenses to "a preponderance of the evidence." It would have specified that "grave risk" includes harm to a child from a reasonable likelihood of future exposure to domestic violence or child abuse, *id.* § 4(b), and that an "intolerable situation" exists if the respondent would face a reasonable

Despite the considerable work that went into the bill, it was never introduced.[86]

The futility of the reform effort is particularly disheartening when contrasted with Japan's passage of implementing legislation that addressed the topic of domestic violence after it acceded to the treaty in 2014,[87] and U.S. congressional activity on the topic of inter-

---

likelihood of domestic violence from the petitioner upon the child's return. *Id.* The law would have provided guidance to courts on factors that suggest the existence of domestic violence, including a course of conduct taken to exercise power and control over the individual, such as using behaviors that intimidate, humiliate, isolate, frighten, or coerce. *Id.* § 4(b). The law would have made clear that a court must not return a child if the article 13(b) or article 20 defense applies. *Id.* § 5(c).

The bill had some other provisions that were meant to level the playing field for the petitioner and respondent. The law would have allowed a court to award attorney fees to a successful litigant, petitioner or respondent. *Id.* § 6. A protective parent who had a good faith belief that removing the child was necessary for the parent's or child's safety could not be ordered to pay the other parent's attorney's fees. *Id.* The law would have required an applicant completing the Central Authority's application for assistance to list all arrests or convictions for domestic violence or child abuse and attach any related police reports or court records. *Id.* § 7. In addition, the Act would have required that all judges who adjudicate Hague cases, liaison judges, and staff of the Office of Children's Issues receive training on domestic violence with a curriculum approved by the federal Violence Against Women Office. *Id.* § 9. Finally, an interagency group was to meet once every three years to consider how U.S. policies and practices could better meet the safety needs of abused parents and children involved in Hague proceedings. *Id.* § 8.

86. It had a sponsor, Representative Ileana Ros-Lehtinen, but Representative Chris Smith never cosponsored it. His participation was thought a necessary prerequisite for the bill's passage because legislators consider him an expert on child abduction. Smith sits on the House Foreign Affairs Committee and is the Chairman of the Subcommittee on Africa, Global Health, and Global Human Rights and International Organizations. He initiates many hearings on child abduction and is the architect of ICAPRA. *See infra* note 88. He aggressively advocates for left-behind parents, primarily fathers. Other members of Congress were generally uninterested in the bill, possibly because fathers left behind in the United States by a fleeing partner are vocal proponents of the Hague Convention in order to get more children returned to the United States. *See, e.g.*, *International Child Abduction: Broken Laws and Bereaved Lives: Hearing Before the Subcomm. on Africa, Global Health and Human Rights of the H. Comm. on Foreign Affairs*, 112th Cong. 112–72 (2011) (including testimony of five left-behind parents, four of whom were fathers); *see also* Yuette Lusk, *International Child Abduction – Patrick Braden – Part 1*, DAILYMOTION, https://www.dailymotion.com/video/x3618d2   [https://perma.cc/8VZ3-3VXQ] (describing his lobbying activities).

87. Japan's law explicitly states that a court, in considering the article 13(b) defense, is to examine, inter alia, "(ii) Whether or not there is a risk that the respondent would be subject to violence, etc. by the petitioner in such a manner as to cause psychological harm to the child if the respondent and the

---

RE: Respondent's Answer and Counterclaims

EXHIBIT 4
Page 23 of 111

national child abduction generally. For example, in 2014, Congress enacted the Sean and David Goldman International Child Abduction Prevention and Return Act (ICAPRA) to facilitate the retrieval of more children who were abducted abroad.[88] Congress also adopted resolutions on the topic of international child abduction, both before and after the described reform effort.[89] None of the resolutions ever mentioned the injustice and harm that results when judges return children pursuant to the Hague Convention and their taking parents are victims of domestic violence.[90] Instead, witnesses before

child entered into the state of habitual residence; (iii) Whether or not there are circumstances that make it difficult for the petitioner or the respondent to provide care for the child in the state of habitual residence." Professor Barbara Stark noted that the provision is not limited to physical violence or threats of physical harm, and consequently, "may well be the most lenient standard for Article 13(b) proceedings in the world." Barbara Stark, *Foreign Fathers, Japanese Mothers, and the Hague Abduction Convention: Spirited Away*, 41 N.C. J. INT'L L. & COM. REGUL. 761, 787 (2016) (citing Act for Implementation of the Convention on the Civil Aspects of International Child Abduction, Law No. 48 of 2013, ch.3, § 1, art. 28 (Japan)). *See* Yoko Konno, *A Haven for International Child Abduction: Will the Hague Convention Shape Japanese Family Law?*, 46 CAL. W. INT'L L.J. 39 (2015) (criticizing the breadth of the provision). Other nations have also had relevant legal reform. *Cf.* Merle H. Weiner, *Intolerable Situations and Counsel for Children: Following Switzerland's Example in Hague Abduction Cases*, 58 AM. U. L. REV. 335 (2008) (describing reform in Switzerland).

88.  *The Sean and David Goldman Intl Child Abduction Prevention and Return Act*, U.S. CONGRESSMAN CHRIS SMITH, https://chrissmith.house.gov/lawsandresolutions/the-sean-and-david-goldman-intl-child-abduction-prevention-and-return-act.htm [https://perma.cc/EHY9-VAUA]. *See generally* Sean and David Goldman International Child Abduction Prevention and Return Act of 2014, 22 U.S.C. §§ 9111–41 (2014). Among other things, ICAPRA requires all extraterritorial missions to designate at least one senior official to assist left-behind parents who are trying to obtain the return of, or access to, their children. *See id.* § 9112. The Act also requires the Secretary of State to report noncompliant countries to Congress. *See id.* § 9111(b)(5). The Act never mentions domestic violence.

89.  *See, e.g.*, S. Res. 543, 112th Cong. (2012) (condemning international abduction of children and stating that the United States should pursue the return of all children abducted by a parent from the United States); S. Res. 431, 115th Cong. (2018) (proposing April 2018 as International Parental Child Abduction Month in order to "raise awareness of, and opposition to, international parental child abduction"); S. Res. 23, 116th Cong. (2019); S. Res. 487, 116th Cong. (2020) (proposing April as Countering International Parental Child Abduction Month in order to "educat[e] the public about the negative emotional, psychological, and physical consequences to children and parents victimized by international parental child abduction"). *See also* H.R. Res. 841, 116th Cong. (2020) (supporting recognition of International Parental Child Abduction Month to raise awareness of, and opposition to, international parental child abduction) (introduced and referred to the House Comm. on Oversight and Reform).

90.  *See supra* note 89.

Congress asserted that domestic violence allegations are manufactured by taking parents.[91]

The State Department has also avoided addressing the needs of domestic violence survivors by recommending changes either to the U.S. implementing legislation[92] or to the Hague Convention itself.[93] However, since 2011, the State Department has supported the development of a *Guide to Good Practice* to address domestic violence in the context of article 13(b).[94]

In March 2020, the Hague Conference did promulgate the *Guide to Good Practice*, after ten years in the making,[95] opting for this soft-law

---

91. *See No Abducted Child Left Behind: An Update on the Goldman Act: Hearing Before the Subcomm. on Africa, Global Health and Human Rights of the H. Comm. on Foreign Affairs*, 112th Cong. 5–6 (2011) (written testimony of James Cook II), *available at* https://docs.house.gov/meetings/FA/FA16/20180411/108117/HHRG-115-FA16-Wstate-CookJ-20180411.pdf [https://perma.cc/F5FP-UKL2] (describing domestic violence services complex as having a financial incentive to funnel women to them and have them file claims with police as part of it). *Cf. The Goldman Act at Five Years: Hearing before the Tom Lantos Human Rights Commission*, 116th Cong. 66 (2019) (written testimony of Ravindra Parmar), *available at* https://humanrightscommission.house.gov/events/hearings/jamika-test [https://perma.cc/UWF2-7SAB] (implying that mother was deceptive and not a "victim of domestic abuse" because "she never reported this [to the police] in the U.S.").

92. Over the years, employees at the State Department have expressed to this author their fears that ICARA might become vulnerable to unattractive initiatives once opened for amendment.

93. U.S. RESPONSE TO PRELIMINARY DOC. NO. 2, *supra* note 8, ¶ 5.1 (rejecting the idea that the Hague Conference should promulgate an international protocol to fix the Hague Convention by expressly addressing the topic of domestic violence).

94. *Id.* The State Department's position was a notable improvement over past actions with regard to domestic violence and the Hague Convention. *See* Merle H. Weiner, *Half-Truths, Mistakes, and Embarrassments: The United States Goes to the Fifth Meeting of the Special Commission to Review the Operation of the Hague Convention on the Civil Aspects of International Child Abduction*, 1 UTAH L. REV. 221, 286–93 (2008). Yet, the State Department's sympathy for domestic violence victims only goes so far. For example, it labels Peru as a country showing a pattern of noncompliance with the Convention in part because Peru's Central Authority, which is housed in the Ministry of Women and Vulnerable Populations, will not help institute a case if the abductor alleges she fled for reasons of domestic violence. *See* DEP'T OF STATE, ACTION REPORT ON INTERNATIONAL CHILD ABDUCTION 25 (2019). *See generally* GUIDE TO GOOD PRACTICE, *supra* note 5, at 63 n.132 (explaining that "Art. 27 of the Convention, which gives very limited discretion to the Central Authority not to accept an application for return, should not be interpreted therefore as allowing the Central Authority to refuse to accept an application for return on the basis of an allegation of grave risk").

95. The process began in 2010, when the Permanent Bureau added questions about domestic violence to a questionnaire that was sent out to State Parties. The answers were incorporated into an important *Reflection Paper*

approach instead of a protocol to the Hague Convention addressing the topic of domestic violence.[96] In several ways, as discussed in Part II, this *Guide to Good Practice* should help judges grant the article 13(b) defense, but the *Guide to Good Practice* is not a panacea. Although the *Guide to Good Practice* recognizes the importance of article 13(b)

---

that the Permanent Bureau authored for the 2011 Special Commission meeting. Among other things, the paper acknowledged the following: that domestic violence includes coercive control even in the absence of frequent and severe violence, REFLECTION PAPER, *supra* note 53, at 7; that children can suffer harm from exposure to domestic violence, *id.* at 9; that judges were applying article 13(b) inconsistently, *id.* at 16–27; and that public international law instruments addressed the topic of domestic violence and the Hague Permanent Bureau needed to consider States' obligations. *Id.* at 31–32. The *Reflection Paper* also recommended that State Parties create a *Guide to Good Practice* to bring harmony to this area; to this end, it suggested that a working group including interdisciplinary experts in domestic violence craft the document. *Id.* at 37–38. At the 2011 Special Commission meeting, State Parties agreed to the *Guide's* development. *See* HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, CONCLUSIONS & RECOMMENDATIONS (PART II) ADOPTED BY THE SPECIAL COMMISSION, Nos. 81 and 82 at 1–2 (Jan. 2012) [hereinafter CONCLUSIONS & RECOMMENDATIONS (PART II)]. The Council on General Affairs and Policy of the Hague Conference established the working group in 2012. *See also* HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, CONCLUSIONS AND RECOMMENDATIONS ADOPTED BY THE COUNCIL, Nos. 5 and 6, at 1 (Apr. 2012). A draft of the *Guide to Good Practice* was considered, but not approved, at the Seventh Meeting of the Special Commission in 2017. *See also* HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, [DRAFT] GUIDE TO GOOD PRACTICE ON ARTICLE 13(1)(B) OF THE HAGUE CONVENTION OF 25 OCT. 1980 ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION (Oct. 2017) [hereinafter [DRAFT] GUIDE]. State Parties suggested "much more work" was necessary. *Draft Guide to Good Practice on Article 13(1)(b) of the 1980 Convention*, 21 JUDGES' NEWSL., Winter–Spring 2018, at 17, https://assets.hcch.net/docs/58c8ddc4-c1db-4d2b-979e-f0bdeff5673a.pdf   [https://perma.cc/RY42-UJVX]. They wanted the *Guide to Good Practice* to be "shorter, more concise, and substantially reduced." *Id.* The Special Commission asked the working group "to continue its work" and to make it a "priority." HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, CONCLUSIONS AND RECOMMENDATIONS ADOPTED BY THE SPECIAL COMMISSION ¶ 54 (Oct. 2017). The Council on General Affairs and Policy approved the recommendation. *See* HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, CONCLUSIONS AND RECOMMENDATIONS ADOPTED BY THE SPECIAL COMMISSION ¶ 19 (Mar. 2018). State Parties considered a revised draft *Guide* in 2019 and submitted more comments. *See* HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, CONCLUSIONS & RECOMMENDATIONS ADOPTED BY COUNSEL ¶ 24 (Mar. 2019). After some last-minute changes, a finalized draft was circulated. The absence of any further objection by State Parties meant the *Guide to Good Practice* was approved. *Id.* It was posted on the Permanent Bureau's Web site in March 2020. *Id.*

    96. CONCLUSIONS AND RECOMMENDATIONS (PART II), *supra* note 95 (rejecting a potential protocol to address domestic violence, but instead encouraging development of the *Guide to Good Practice* on article 13(b)).

EXHIBIT 4
Page 26 of 111

to the structure of the Hague Convention,[97] it reiterates that the article 13(b) defense "must be applied restrictively,"[98] and that the defense is for "exceptional circumstances."[99]  The *Guide* also addresses none of the most challenging obstacles to a successful article 13(b) defense, including the high burden of proof in the United States, gender bias in accessing credibility, and the pervasive misarticulation of the article 13(b) defense itself.  Nor does the *Guide* even recommend that judges adjudicating a Hague petition receive training on domestic violence. The *Guide* selectively cites case law, excluding many helpful authorities.  And, as this Article elaborates below, the *Guide to Good Practice* contains some confusing language[100] and an unfortunate commitment to the relevance of protective measures.[101]

One of the most significant and advantageous parts of the *Guide to Good Practice*, however, is its specific endorsement of the *Australian Bench Book*.[102]  The *Guide to Good Practice* authorizes the use of this resource so that judges can "acquire and enhance knowledge and understanding of the interpretation and application of Article 13(1)(b)."[103]  The *Australian Bench Book* goes into detail about the dynamics of domestic violence and addresses myths and misconceptions.[104]  It is essential reading for U.S. judges because the U.S. government provides no domestic violence training to judges hearing these cases,[105] although it trains judges generally on

97.  Guide to Good Practice, *supra* note 5, ¶ 27.

98.  *Id.* ¶ 25.

99.  *Id.* ¶ 28.

100.  *See infra* text accompanying note 120.

101.  Merle H. Weiner, *The Article 13(b) Guide to Good Practice*, 25 Domestic Violence Rep. 7, 21 (2019).

102.  Guide to Good Practice, *supra* note 5, ¶ 106 (citing National Domestic and Family Violence Bench Book of Australia, *infra* note 104).

103.  *Id.* ¶ 99.

104.  *See, e.g.*, Austl. Gov't Att'y Gen. Dep't, National Domestic and Family Violence Bench Book §§ 3.1, 4.1 (Heather Douglas et al. 2020) [hereinafter Austl. Bench Book], *available at* https://dfvbenchbook.aija.org.au/contents [https://perma.cc/HCD6-LRH3; https://perma.cc/2GUJ-4QW8; https://perma.cc/Q8J9-E6PU].

105.  Domestic violence was not a topic explicitly mentioned in the description of training contained in the annual report of the Federal Judicial Center. *See* Fed. Jud. Ctr., Annual Report 2017, at 5–9 (2017).  Email correspondence with the Center confirmed that there is virtually no material available on domestic violence. Email from Dana Chipman to Merle H. Weiner (Sept. 25, 2018) (on file with author) ("We don't have a lot of focus on domestic violence programs at the federal judicial level.").  The email mentioned that the Federal Judicial Center's manual on child abduction addresses domestic violence and, in fact, it does.  *See* Hon. James D. Garbolino, The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges 114–16 (2d ed. 2015).  However, that guide only discusses several cases

EXHIBIT 4
Page 27 of 111

the Hague Convention,[106] and it acknowledges the need for train-
ing on domestic violence: "[T]raining for judges and mediators on
domestic violence [in Hague cases] is essential [and] many judg-
es could benefit from additional training on the issue of domestic
violence."[107] While many states provide training to state judges on
the topic of domestic violence,[108] federal judges hear most Hague
Convention cases.[109]  In fact, federal appellate courts occasional-

involving domestic violence and does not contain the sort of information that
should be used for training judges on the topic, including dispelling myths and
explaining the effect of trauma on witness testimony and credibility.

106. *See* U.S. Response to Questionnaire Concerning the Practical
Operation of the 1980 Convention ¶ 4.1 (2017) ("[T]he USCA has a robust ju-
dicial training program that reaches out whenever a judge is assigned to a Con-
vention case to provide basic information about the Convention and contact in-
formation for our office and our Hague Network Judges."), *available at* https://
assets.hcch.net/docs/61a1521b-9ec4-4fda-b543-33a39266f0c5.pdf     [https://per-
ma.cc/4H8U-EGS2]; *see also id.* ¶ 4.2 ("The USCA has information specifically
for judges and lawyers available on its website that details the requirements of
the Convention."); *see generally id.* ¶ 13.1.

107. U.S. Response To Preliminary Doc. No. 2, *supra* note 8, § 5.1.

108. Nat'l Council of Juv. & Fam. Ct. Judges, Res. Ctr. on Domestic
Violence: Child Prot. and Custody, Mandatory Domestic Violence Train-
ing for Judges (2014), https://www.rcdvcpc.org/resources/resource-library/
resource/mandatory-dv-training-for-judges.html   [https://perma.cc/W2D8-TU-
VQ] (noting about half the states mandate such training and others make it
available). Training was often prompted by recommendations from the Nation-
al Council on Juvenile and Family Court Judges, the preeminent professional
organization for state family law judges. *See, e.g.*, Nat'l Council of Juv. & Fam.
Ct. Judges, Family Violence: A Model State Code § 510(3)-(4) (1994) [herein-
after Model Code on Family Violence] (identifying mandatory training topics
for judges handling any case involving domestic or family violence, including
the following: "(a) The nature, extent, and causes of domestic and family vio-
lence; (b) Practices designed to promote safety of the victim and other family
and household members, including safety plans; (c) Resources available for vic-
tims and perpetrators of domestic or family violence; (d) Sensitivity to gender
bias and cultural, racial, and sexual issues; and (e) The lethality of domestic
and family violence."). *Cf.* The Impact of Domestic Violence on Children:
A Report to the President of the American Bar Association 5 (Aug. 1994)
("It is critical that all personnel involved in domestic relations, juvenile court,
family law, and criminal cases (e.g., lawyers, including . . . judges . . . ) receive
training about domestic violence and how it affects children."); Rita Smith &
Pamela Coukos, *Fairness and Accuracy in Evaluations of Domestic Violence and
Child Abuse in Custody Determinations*, 36 Judges' J. 38, 54 (1997) ("Judicial
education programs on these issues can make a difference.").

109. *See* Weiner, *supra* note 26, at 199 (conveying that in a survey of Hague
Convention cases being decided in four states from 2005 to 2013, only two out
of nineteen cases were filed in state court). In T2, there were eleven appellate
cases in federal court, but only one appellate decision addressing the Hague
Convention from all of the state courts combined. In contrast, during T1, there
were five published appellate decisions in state court. *See* Weiner, *supra* note

EXHIBIT 4
Page 28 of 111

ly chide federal trial judges who have decided Hague Convention cases for their lack of understanding about domestic violence. For example, an appellate judge noted one trial court's "thoroughly superficial analysis" and stated, "the only obvious certainty here is the district court's apparent lack of familiarity with the nature and significance of both alcoholism and domestic violence and their harmful effect on children."[110] While the *Australian Bench Book* is not a substitute for in-depth training, it is a very helpful, authoritative, and authorized resource.

## II. ARTICLE 13(B) IS MORE HELPFUL THAN JUDGES MAY THINK

Case law reveals that the most prominent obstacles to granting the article 13(b) defense include the following: (1) a requirement that the child has been directly abused; (2) a requirement of severe and frequent physical violence; (3) a requirement that the violence is likely to recur in the future; (4) disregard of the harm a child experiences when separated from the taking parent; (5) disregard of the "intolerable situation" language in article 13(b) as a separate category of the defense; (6) faith in protective measures; (7) a reluctance to find the taking parent credible; (8) the clear and convincing evidence burden of proof; and (9) a misarticulation of the article 13(b) legal test that ignores "a grave risk of exposure to" harm. Batterers' attorneys emphasize all of these obstacles, but none of them should prevail. This Part discusses these obstacles seriatim.

### A. *The Child Need Not Be the Target of the Violence*

Judges who evaluate article 13(b) in the context of domestic violence often attribute significance to the fact that the child was never directly abused.[111] In fact, the U.S. Supreme Court recently

---

10, at 277 n.5.

110. Neumann v. Neumann, 684 F. App'x 471, 490 (6th Cir. 2017) (Martha Craig Daughtrey, J., concurring in part and dissenting in part); Van De Sande v. Van De Sande, 431 F.3d 567, 570 (7th Cir. 2005) (calling the trial judge's decision "irresponsible" and noting that "[t]he judge inexplicably gave no weight to Davy's threat to kill the children" in light of petitioner's "propensity for violence, and the grotesque disregard for the children's welfare that he displayed by beating his wife severely and repeatedly in their presence and hurling obscene epithets at her also in their presence"). *See also In re* Application of Adan, 544 F.3d 542 (3d Cir. 2008). Anecdotal reports, as well as news reports, suggest that the Third Circuit was disgusted with the trial court's ruling in light of the evidence at trial. *See* Bob Braun, *Court Spares Girl, 8, From Deportation*, NEW-ARK STAR LEDGER (Sept. 23, 2008), https://www.nj.com/njv_bob_braun/2008/09/court_spares_girl_8_from_depor.html [https://perma.cc/3EJU-V5P2].

111. *See, e.g.*, Ajami v. Solano, No. 3:19-cv-00161, 2020 WL 996813, at *15

mentioned this fact in the last of the four Hague Convention cases it has heard.[112] While the Court signaled in its first Hague Convention case that the article 13(b) defense could be appropriate if the facts of a case showed domestic violence,[113] its last case included problematic dictum suggesting that domestic violence is not necessarily relevant unless the child is also directly abused.[114]

Several judges deciding T2 cases, i.e., federal appellate cases decided from July 2017 through January 2018, mentioned this supposed requirement. For example, in *Orellana v. Cartagena*, the appellate court noted the following: "[T]he magistrate judge concluded that [the respondent] failed to clearly establish that the nature and frequency of the abuse created a grave risk to her daughter's return. The judge reasonably concluded that [the respondent's] allegations at most showed isolated incidents of abuse directed at her, not the child."[115] In *Ahmed v. Ahmed*, the appellate court did

---

(M.D. Tenn. Feb. 28, 2020) ("As discussed above, the Court finds that Respondent has established only one incident of physical abuse by Petitioner towards Respondent in 2013. And the Court finds that this sole incident is insufficient to demonstrate that returning EAST and PGST to Venezuela would expose them to a grave risk of harm. As an initial matter, Respondent did not establish that Petitioner ever threatened or abused *the Children.");* Garcia v. Duarte Reynosa, No. 2:19-cv-01928-RAJ, 2020 WL 777247, at *4 (W.D. Wash. Feb. 18, 2020); da Silva v. de Aredes, 953 F.3d 67, 73 (1st Cir. 2020).

112. All of the cases involved a backdrop of domestic violence. In *Abbott v. Abbott*, the abductor mother alleged that the father was abusive. *See* Brief of the Domestic Violence Legal Empowerment & Appeals Project (DV Leap), et al., As Amici Curiae in Support of Respondent at *10–11, Abbott v. Abbott, 560 U.S. 1 (2010) (No. 08–645). In *Chafin v. Chafin*, the abductor mother was alleged to be violent. Chafin v. Chafin, 568 U.S. 165, 170 (2013). In *Lozano v. Montoya Alvarez*, the abductor mother alleged that the father was abusive. Lozano v. Montoya Alvarez, 572 U.S. 1, 6–7 (2014). In *Monasky v. Taglieri*, the mother alleged the father was abusive. Monasky v. Taglieri, 140 S. Ct. 719, 724 (2020).

113. *See Abbott*, 560 U.S. at 22 ("If, for example, Ms. Abbott could demonstrate that returning to Chile would put her own safety at grave risk, the court could consider whether this is sufficient to show that the child too would suffer 'psychological harm' or be placed 'in an intolerable situation.'").

114. *Monasky*, 140 S. Ct. at 729 ("Article 13(b) allows a court to refrain from ordering a child's return to her habitual residence if 'there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.' Monasky raised below an Article 13(b) defense to Taglieri's return petition. In response, the District Court credited Monasky's 'deeply troubl[ing]' allegations of her exposure to Taglieri's physical abuse. But the District Court found 'no evidence' that Taglieri ever abused A.M.T. or otherwise disregarded her well-being.") (alteration in original) (citations omitted).

115. Orellana v. Cartagena, No. 17-6520, 2018 U.S. App. LEXIS 1161, at *2 (6th Cir. Jan. 17, 2018).

not address article 13(b), but the trial court had rejected the article 13(b) defense, stating, "While Mother has alleged that Father was physically, emotionally, and verbally abusive to her . . . , there are no allegations or evidence that he was abusive in any way to the children or that there is a threat of harm to the children in the U.K."[116]

Despite what these cases suggest, abuse against the child, either historically or in the future, is not required to establish the article 13(b) exception. In fact, several other T2 cases recognized that it is a misreading of article 13(b) to limit the defense to direct abuse of the child. In *Davies v. Davies*, the Second Circuit said, "Evidence of prior spousal abuse, though not directed at the child, can support the grave risk of harm defense, as could a showing of the child's exposure to such abuse."[117] Similarly, in *Soto v. Contreras*,[118] the Fifth Circuit suggested that abuse to the mother could make out the defense: "[The mother] does not show the court 'labored under' the mistaken 'assumption that threats against a parent can never create a grave risk of harm to his or her children.'"[119]

The *Guide to Good Practice* also takes the position that direct abuse of the child is not required, although this resource contains some inartful language that suggests otherwise unless the language is read in context.[120] The *Guide to Good Practice* explains why abuse

---

116. Ahmed v. Ahmed, No. 3:16-CV-142, 2016 WL 4691599, at *5 n.9 (E.D. Tenn. Sept. 7, 2016).

117. Davies v. Davies, 717 F. App'x 43, 48 (2d Cir. 2017).

118. Soto v. Contreras, 880 F.3d 706 (5th Cir. 2018).

119. *Id.* at 713. *See also* Taglieri v. Monasky, 876 F.3d 868, 878 (6th Cir. 2017) (noting that the father had not been physically violent towards the child, but "[t]his is not to say that a child who is not herself subjected to physical abuse is never in grave risk of psychological harm or of being placed in an 'intolerable situation'").

120. The *Guide to Good Practice* has an inartful sentence, inserted at the eleventh hour, that, at first glance, suggests that the absence of physical abuse to the child is relevant. GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 58 ("Evidence of the existence of a situation of domestic violence, in and of itself, is therefore not sufficient to establish the existence of a grave risk to the child."). The sentence is accompanied by footnote 73, which increases the chance of a misreading. That footnote cites the Second Circuit case of *Souratgar v. Fair* and its language suggesting that violence against the child is needed. When read in context, it is clear that paragraph 58 is referring to the fact that violence must have a potential effect on the child to trigger the exception, not that the violence must also be against the child. *See* Merle H. Weiner, *Hague Convention Article 13(b) Guide to Good Practice: Addendum to Weiner's Commentary*, DOMESTIC VIOLENCE REP., 93–94 (2020). *See also* Rhona Schuz & Merle Weiner, *A Small Change that Matters: The Article 13(1)(b) Guide to Good Practice*, INT'L FAM L. 87 (2020). The full case of *Souratgar* and other parts of the *Guide* make clear that that violence against the child is not required. Weiner, *supra*, at 93–94; Schuz & Weiner, *supra*, at 90 (footnotes omitted).

against the child is not required for an article 13(b) defense. First, and put simply, domestic violence against the taking parent can harm the child even if the child is not the direct victim of abuse.[121] The *Guide to Good Practice* acknowledges,[122] buttressed by overwhelming social science,[123] that children who are exposed to domestic violence can "suffer increased physical and psychological illnesses that undermine their health, social and emotional development, and interpersonal behaviors."[124] A congressional resolution details these same types of

---

121. GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 57.

122. *Id.*

123. *See, e.g.*, Peter G. Jaffe, Claire V. Crooks & Samantha E. Poisson, *Common Misconceptions in Addressing Domestic Violence in Child Custody Disputes*, 54 JUV. & FAM. CT. J., 57, 60–61 (2003) (citations omitted) ("Research on children's exposure to domestic violence has consistently identified a range of negative outcomes for these children. . . . Children who are exposed to domestic violence may show comparable levels of emotional and behavioral problems to children who were the direct victims of physical or sexual abuse. . . . In addition to emotional and behavioral problems, difficulties experienced by child witnesses can encompass a variety of trauma symptoms, including nightmares, flashbacks, hypervigilance, depression, and regression to earlier stages of development. . . . Other identified difficulties include compromised social and academic development. . . . The effect of domestic violence cuts across all ages and stages of children's development. The impact of violent environments on very young children suggests that permanent negative changes in the child's brain and neural development can occur, such as altering the development of the central nervous system, predisposing the individual to more impulsive, reactive, and violent behavior. . . . Furthermore, the adverse effects of exposure to violence are not restricted to young children. In adolescence, exposure to domestic violence is associated with drug and alcohol abuse, truancy, violent dating relationships, and involvement in the juvenile justice system. . . . Exposure to domestic violence in childhood is also associated with significant problems in adult social adjustment."); Sarah E. Evans, Corrie Davies & David DiLillo, *Exposure to Domestic Violence: A Meta-Analysis of Child and Adolescent Outcomes*, 13 AGGRESSION & VIOLENT BEHAV. 131, 136 (2008) ("Results of this meta-analysis support the hypothesis of an association between childhood exposure to domestic violence and internalizing, externalizing, and trauma symptoms in children"); Tuppett M. Yates, Michele F. Dodds, L. Alan Sroufe & Byron Egeland, *Exposure to Partner Violence and Child Behavior Problems: A Prospective Study Controlling for Child Physical Abuse and Neglect, Child Cognitive Ability, Socioeconomic Status, and Life Stress*, 15 DEV. & PSYCHOPATHOLOGY 199 (2003); SHERRY HAMBY ET AL., U.S. DEP'T OF JUST., OFFICE OF JUV. JUST. AND DELINQUENCY PREVENTION, CHILDREN'S EXPOSURE TO INTIMATE PARTNER VIOLENCE AND OTHER FAMILY VIOLENCE 2 (2011) ("Exposure to IPV is distressing to children and is associated with a host of mental health symptoms both in childhood and in later life. The best documented mental health effects include symptoms of posttraumatic stress, depression, and anxiety."); MODEL CODE ON FAMILY VIOLENCE, *supra* note 108, § 301 cmt (stating "children are acutely vulnerable to the trauma of domestic or family violence").

124. Lynn Hecht Schafran, *Evaluating the Evaluators: Problems with "Outside Neutrals,"* 42 JUDGES' J. 10, 13 (2003). *See also* Lynn Hecht Schafran, *Domestic Violence, Developing Brains, and the Lifespan: New Knowledge from*

harms,[125] specifically noting that "children are emotionally trauma-
tized by witnessing physical abuse of a parent" and may experience
"actual and potential emotional . . . harm [and] the negative effects of
exposure to an inappropriate role model."[126] Importantly, and con-
trary to what some trial judges have assumed,[127] "exposure" is not
limited to witnessing the abuse, but may include hearing the fighting,
seeing injuries, or being told about the abuse after the fact.[128] It also
includes being aware of "abusive behaviors that stop[] short of phys-
ical violence."[129]

Second, as the *Guide to Good Practice* recognizes, domestic
violence puts children in physical danger. They can be incidental-
ly caught between the abuser and the victim.[130] In addition, some

---

*Neuroscience*, 53 Judges' J. 32 (2014); Ostevoll v. Ostevoll, No. C-1-99-961, 2000
WL 1611123, at *16 (S.D. Ohio Aug. 16, 2000).

125. H.R. Con. Res. 172, 101st Cong. (1990) (recommending that states
should have a "statutory presumption that it is detrimental to the child to be
placed in the custody of the abusive parent").

126. *Id.*

127. *See* Gil-Leyva v. Leslie, 780 F. App'x 580, 590–91 (10th Cir. 2019) (af-
firming a finding that no grave risk existed where the father slapped and shoved
the mother several times, once choked her with his hands, and threw things, but
was never physical toward the children aside from a small number of spankings,
and never abused the mother in front of the children except for occasionally
slapping her with force on her buttocks); Hart v. Anderson, 425 F. Supp. 3d 545,
570–71 (D. Md. 2019) (finding no grave risk of harm because abuse did not
occur in front of the children).

128. Nat'l Council of Juv. & Fam. Ct. Judges, Navigating Custody &
Visitation Evaluations in Cases with Domestic Violence: A Judge's Guide
9–10 (2006) ("We are using the term 'exposure' to signal that children are af-
fected not only when they are present at the violent incident, but also when
they hear it, see it, or see or feel the aftermath—such as a parent injured or
in distress, furniture knocked over, things broken, blood on the wall or floor.
They are affected, too, when they are forced to live in an atmosphere of threat
and fear created by violence. And they are affected, too, when they are forced
to live in an atmosphere of threat and fear created by violence. And they are
affected by a parent's use of abusive behaviors that stop short of physical vio-
lence, whether those behaviors are directed primarily toward a partner, or char-
acterize the abusive parent's relationships with partner and children alike.");
Schafran, *Domestic Violence, Developing Brains, and the Lifespan, supra* note
124, at 33; Hamby et al., *supra* note 123, at 3 (noting ten different types of ex-
posure including "seeing and hearing violent acts, seeing injuries resulting from
the violence, and being told about the violence," and noting children "can also
become aware of violence after it occurs, for example).

129. Nat'l Council of Juv. & Fam. Ct. Judges, *supra* note 128, at 8–9. *See
also infra* Part II.B.2.

130. Guide to Good Practice, *supra* note 5, at 38 n.71 (citing Gomez v.
Fuenmayor, 812 F.3d 1005 (11th Cir. 2016)). *See Gomez*, 812 F.3d at 1010 (cit-
ing district court's finding that the "acts of violence, although not specifically di-
rected at the child, placed her in a perilous position with a high risk of danger");

abusers who never abused their children before will start as a way to punish their victims for ending the relationship.[131]   Courts adjudicating Hague Convention cases have taken notice of the frequent co-occurrence of domestic violence and child abuse.[132]

---

Ischiu v. Garcia, 274 F. Supp. 3d 339, 354 (D. Md. 2017) (crediting "the physical risk that W.M.L.G. would be caught up in potential violence directed at his mother"); Baran v. Beaty, 526 F.3d 1340 (11th Cir. 2008). *See generally* BARBARA J. HART, CHILDREN OF DOMESTIC VIOLENCE: RISKS AND REMEDIES 2 (1992) ("Older children are frequently assaulted when they intervene to defend or protect their mothers.").

131. *See* H.R. Con. Res. 72, 115th Cong. (2018) ("Whereas research confirms that a child's risk of abuse increases after a perpetrator of domestic violence separates from a domestic partner, even when the perpetrator has not previously abused the child . . . ."). *See generally* HART, *supra* note 130, at 2 (noting that because domestic violence "is instrumental, directed at subjugating, controlling and isolating . . . ," the batterer can "turn to abuse and subjugation of the children as a tactic of . . . control" of the mother even when a victim of domestic violence finally acquires independence from her abuser) (citing social science); MEG CRAGER, REVIEW OF A SAMPLE OF DOMESTIC VIOLENCE PROTECTION ORDERS IN KING COUNTY SUPERIOR COURT FROM APRIL 2013: AN ISSUE PAPER 11 (2015) ("When the parties separate, batterers often escalate their use of children as a way to maintain coercive control over their former spouse or partner through visitation, as well as through frequent court actions, including requests to modify parenting plans."). Courts adjudicating Hague Convention petitions sometimes fail to recognize that a perpetrator can start abusing a child after the child's return even if the perpetrator has never abused the child previously. *See, e.g.*, Hart v. Anderson, 425 F. Supp. 3d 545, 571 (D. Md. 2019) (rejecting defense based on risk of co-occurrence of child abuse when there was no prior history of abuse towards the children); Souratgar v. Fair, 720 F.3d 96, 106 (2d Cir. 2013) (finding no grave risk of harm to the parties' child, despite the respondent's claim that the petitioner was "likely to turn on" the child, because there was no history of child abuse and evidence instead indicated a "loving father-son relationship").

132. Walsh v. Walsh, 221 F.3d 204, 220 (1st Cir. 2000) ("[C]redible social science literature establishes that serial spousal abusers are also likely to be child abusers.") (citing Jeffrey L. Edleson, *The Overlap Between Child Maltreatment and Woman Battering*, 5 VIOLENCE AGAINST WOMEN 134 (1999)); *In re* Matter of NIR, 797 F. App'x 23, 27 (2d Cir. 2019) (summary order); *In re* Application of Adan, 437 F.3d 381, 396 n.6 (3d Cir. 2006); Miltiadous v. Tetervak, 686 F. Supp. 2d 544, 554 n.12 (E.D. Pa. 2010); Tsarbopoulos v. Tsarbopoulos, 176 F. Supp. 2d 1045, 1058 (E.D. Wash. 2001). *See also* Sherry Hamby et al., *The Overlap of Witnessing Partner Violence With Child Maltreatment and Other Victimizations in a Nationally Representative Survey of Youth*, 34 CHILD ABUSE & NEGLECT 734 (2010); Anne E. Appel & George W. Holden, *The Co-Occurrence of Spouse and Physical Child Abuse: A Review and Appraisal*, 12 J. FAM. PSYCH. 578 (1998); JOHN J. WILSON, OFF. OF JUV. JUST. AND DELINQUENCY PREVENTION, U.S. DEP'T. OF JUST., SAFE FROM THE START: TAKING ACTION ON CHILDREN EXPOSED TO VIOLENCE xiii (2000) ("There is an overlap of 30 to 60 percent between violence against children and violence against women in the same families.").

Third, as the *Guide to Good Practice* recognizes, domestic violence perpetrated against the taking parent can render her a less competent parent, thereby placing the child at grave risk of exposure to harm.[133] The domestic violence victim's fear of violence, in and of itself, can have this effect and be grounds for granting the defense.[134] This effect can also result from the exhaustion that accompanies everyday vigilance and the need to protect oneself through legal action. The Hague-endorsed *Australian Bench Book* states, "For some victims their engagement with law enforcement agencies and the courts may exacerbate or prolong the trauma they have experienced as a result of the domestic and family violence."[135] The reduction in the parent's ability to care effectively for the child creates a risk to the child of physical and psychological harm as well as an "intolerable situation," as discussed below.[136]

Given the above, a trial judge should attribute no significance to the fact that the petitioner has never physically abused the child. A judge's reliance on such an irrelevant finding should be reversible error. The trial judge can and should recognize that prior abuse of

---

133. GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 57.

134. Alistair W. MacDonald, *Article 13 Exceptions – Return and Best Interests of the Child in the Jurisdiction of England and Wales*, 23 JUDGES NEWSL., Winter–Spring 2019, at 17, 18 (mentioning that "anxieties of a respondent mother about a return with the child which are not based upon objective risk to her but are nevertheless of such intensity as to be likely, in the event of a return, to destabilise her parenting of the child . . . can found the defence under Article 13(1)(b)") (citing Re E (Children)(Abduction: Custody Appeal) [2011] UKSC 27, [2012] 1 AC 144 and Re S (A Child), [2012] UKSC 10); *Ischiu*, 274 F. Supp. 3d at 354 ("Between the potential psychological harm to W.M.L.G. that would derive from Gomez Garcia's legitimate fear for her safety if they were to return to Guatemala, and the physical risk that W.M.L.G. would be caught up in potential violence directed at his mother, the Court finds that returning W.M.L.G. to Guatemala would create a grave risk of harm to the child and place him in an intolerable situation.").

135. AUSTL. BENCH BOOK, *supra* note 104, § 5 (mentioning how, inter alia, "absence of legal representation," "lack of interpreter services," and "repeatedly return[ing] to court for motions, adjournments and hearings may contribute to a victim's revictimisation or secondary abuse through the court system"). *See also id.* § 10.1.8 (mentioning study that showed "the debilitating effects of violence may make them unavailable or unable to meet their children's needs; and frequent belittling, undermining, insulting, and physical harm by the violent partner in front of the children may affect the children's respect for their mother's authority or her ability to assert her authority" and noting "[i]f mental illness or substance are also relevant, a parent's cognition, moods, perception, self-awareness and self-esteem may be adversely affected, resulting in possible further impacts on a parent's capacity to perform basic tasks, maintain daily routines, respond to children's physical, material, and emotional needs, and provide consistent and positive parenting").

136. *See infra* text accompanying notes 217–266.

the taking parent is itself a form of child abuse and creates further risks for the child.[137]

### B.    *All Types of Domestic Violence Are Relevant*

When adjudicating the article 13(b) defense, trial judges must determine when domestic violence is serious enough to trigger concerns about the child's return. The *Guide to Good Practice* suggests that trial courts should look at "the nature, frequency and intensity of the violence, as well as the circumstances in which it is likely to be exhibited."[138] Occasionally, appellate courts craft a rule that automatically qualifies an act as sufficiently serious, such as a credible threat of death.[139] More often, however, there is not such a bright-line rule. Rather, courts adopt vague tests that tend to discount the seriousness of the violence, such as holding that "sporadic,"[140] "isolated,"[141] or "not severe"[142] violence is insufficient to establish an article

---

137. Daniel G. Saunders, *Child Custody and Visitation Decisions in Domestic Violence Cases: Legal Trends, Risk Factors, and Safety Concerns,* NAT'L ONLINE RES. CTR. ON VIOLENCE AGAINST WOMEN (2007) (calling exposure a "severe form of child abuse").

138. GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 58.

139. *See, e.g.,* Noergaard v. Noergaard, 244 Cal. App. 4th 76, 88 (Cal. Ct. App. 2015) ("As father's briefing acknowledges, a credible death threat 'automatically constitute[s] a grave risk of harm' prohibiting the child's return."); Simcox v. Simcox, 511 F.3d 594, 607–08 (6th Cir. 2007) (mentioning "sexual abuse, other similarly grave physical or psychological abuse, death threats, [and] serious neglect").

140. *See, e.g.,* Souratgar v. Lee, 720 F.3d 96, 104 (2d Cir. 2013); Davies v. Davies, 717 F. App'x 43, 49 (2d Cir. 2017) (affirming grant of article 13(b) defense but emphasizing that the case did not involve "sporadic or isolated incidents" but "*overwhelming evidence* of Mr. Davies's extreme violence and uncontrollable anger, as well as his psychological abuse of Ms. Davies *over many years*, much of which was witnessed by K.D., and the fact that Mr. Davies frequently screamed and yelled at K.D. for no legitimate reason") (emphasis in original).

141. *See supra* note 140 (both cases). *See* Gil-Leyva v. Leslie, 780 F. App'x 580, 591 (10th Cir. 2019) (discounting evidence that petitioner "slapped" and "shoved" respondent and once "choked her with his hands," causing her to break a blood vessel in her eye and bruise on her neck because "isolated incidents of abuse generally demonstrate a risk of harm only to the spouse," not the child); Avendano v. Smith, 806 F. Supp. 2d 1149 (D.N.M. 2011) (calling the father's rape and abuse of the mother isolated incidents and not aimed at the children); Aly v. Aden, No. 12-1960 (JRT/FLN), 2013 WL 593420, at *17 (D. Minn. Feb. 14, 2013) (calling physical abuse on "at least four occasions—in the fall of 2010, on February 27, 2011, in July 2011, and on April 25, 2012," "isolated instances of abuse"); Monasky v. Taglieri, 876 F.3d 868, 878–79 (6th Cir. 2017) (affirming rejection of article 13(b) defense despite the fact that father's behavior was "appalling," because, inter alia, "the frequency . . . and severity of the physical violence is unclear").

142. *See, e.g.,* Valles Rubio v. Veintimilla Castro, No. 19-CV-2524 (KAM) (ST), 2019 WL 5189011, at *24 (E.D.N.Y. Oct. 15, 2019) (crediting "most of the

13(b) defense. These tests are problematic for many reasons, as discussed below, but they are also bad policy because they encourage survivors to stay in abusive relationships until the violence is egregious enough to qualify for the defense.[143]

Unfortunately, appellate courts' efforts to predetermine categories of relevant abuse increase the probability that trial courts will make deadly mistakes. For example, in *Simcox*,[144] the Sixth Circuit

---

child's and Respondent's testimony as to the frequency and extent of petitioner's alleged physical and verbal abuse," but then concluding the "pervasiveness and severity" did not rise "to the level of abuse and harm found to be sufficient to deny return"). In *Aly v. Aden*, the court found that the petitioner had been violent on at least four occasions, although the petitioner had alleged seven, including: 1) slapping the respondent in the face several times and damaging her laptop and cell phone; 2) assaulting her, causing a trip to the emergency room which revealed six small bruises on her wrist, two swollen and painful fingers, and two small bruises on her upper arm; 3) hitting the respondent in the head several times; 4) slapping her in the face. In addition, the respondent alleged the petitioner said he would kill her for taking away his daughter. The respondent also alleged control issues, including his control over her finances, hacking her online accounts, and viewing her as a woman of little value. The expert in the case said that the petitioner "was likely to commit physical and psychological abuse in the future." Nevertheless, the court found that the physical abuse did "not rise to the level of severity required" because "Aly's abuse was not characterized by prolonged violent outbursts." *Aly*, 2013 WL 593420, at *17.

143. *See In re* M.V.U., 2020 IL App (1st) 191762,¶ 49 (affirming trial judge's decision that article 13(b) defense was established, and rejecting that the domestic violence had to have "occurred over an extended period of time and involve vicious circumstances" because "we cannot say that a spouse must endure years of violent abuse for this exception to be established").

144. Simcox v. Simcox, 511 F.3d 594, 607–08 (6th Cir. 2007) ("Hague Convention cases dealing with abusive situations can be placed into three broad categories. First, there are cases in which the abuse is relatively minor. In such cases it is unlikely that the risk of harm caused by return of the child will rise to the level of a '*grave* risk' or otherwise place the child in an '*intolerable* situation' under Article 13b. In these cases, undertakings designed to protect the child are largely irrelevant; since the Article 13b threshold has not been met, the court has no discretion to refuse to order return, with or without undertakings. Second, at the other end of the spectrum, there are cases in which the risk of harm is clearly grave, such as where there is credible evidence of sexual abuse, other similarly grave physical or psychological abuse, death threats, or serious neglect. In these cases, undertakings will likely be insufficient to ameliorate the risk of harm, given the difficulty of enforcement and the likelihood that a serially abusive petitioner will not be deterred by a foreign court's orders. Consequently, unless 'the rendering court [can] satisfy itself that the children will in fact, and not just in legal theory, be protected if returned to their abuser's custody,' the court should refuse to grant the petition. Third, there are those cases that fall somewhere in the middle, where the abuse is substantially more than minor, but is less obviously intolerable. Whether, in these cases, the return of the child would subject it to a 'grave risk' of harm or otherwise place it in an 'intolerable situation' is a fact-intensive inquiry that depends on

identified three types of violence—minor, serious, and cases in the middle. For cases in the middle category, trial courts have to give "careful consideration of several factors, including the nature and frequency of the abuse, the likelihood of its recurrence, and whether there are any enforceable undertakings that would sufficiently ameliorate the risk of harm to the child caused by its return."[145] The implication is that a trial court need not give careful consideration to minor violence, although the *Simcox* court never stated that expressly. In fact, the Sixth Circuit offered its categorization not as a litmus test for which violence could trigger the article 13(b) defense, but rather to help trial judges assess whether protective measures might mitigate the risks sufficiently so that a child could be returned. The Sixth Circuit heightened the risk that trial courts would dismiss the relevance of domestic violence altogether without any further analysis because it categorized the abuse in *Simcox* as falling into the middle category even though it was, in fact, very severe.[146]

---

careful consideration of several factors, including the nature and frequency of the abuse, the likelihood of its recurrence, and whether there are any enforceable undertakings that would sufficiently ameliorate the risk of harm to the child caused by its return. Even in this middle category, undertakings should be adopted only where the court satisfies itself that the parties are likely to obey them. Thus, undertakings would be particularly inappropriate, for example, in cases where the petitioner has a history of ignoring court orders. Where a grave risk of harm has been established, ordering return with feckless undertakings is worse than not ordering it at all.") (citations omitted) (emphasis in original).

    145. *Id.*

    146. Although there were disputes about the abuse, the appellate court stated,

> Mr. Simcox was both verbally and physically violent with his wife and children. For example, the oldest child testified that he would call Mrs. Simcox a "f—-ing bitch [and] a c—-" in the presence of the children, and that "[h]e would maybe grab her jaw and put his finger on her neck, pulling hair." She also stated that her father once while driving banged her mother's head against the passenger window of the vehicle in which they were traveling, and that she often had to intervene by placing herself between them. The other children (with the exception of the youngest, who did not testify) expressed fear of their father and recounted frequent episodes of belt-whipping, spanking, hitting, yelling and screaming, and of pulling their hair and ears. They also witnessed their father strike their mother on numerous occasions. For example, C. Simcox, testifying *in camera,* recalled an incident in which her father "held [her mother] by the neck against the wall. [Her older sister] tried to stop him but he hit her." Mr. Simcox himself acknowledges that he would "physically discipline" his children, but downplays the seriousness of this "discipline."

*Id.* at 598–99. The violence was "not isolated or sporadic incidents," and "all but the youngest were suffering from some level of post-traumatic stress disorder."

EXHIBIT 4
Page 38 of 111

In fact, trial courts have applied the *Simcox* schema to evaluate the sufficiency of domestic violence for the article 13(b) defense and have arrived at some startling conclusions.[147] For example, a trial court in the Sixth Circuit acknowledged that the respondent's allegations of physical and psychological abuse, including that the petitioner "dragg[ed] Respondent through the house by her hair resulting in three bruises[,]" and "t[old] Respondent that she can hang herself" were "alarming and very regrettable."[148] Nonetheless, the court held that the behavior fell into "the first category of cases of relatively minor abuse" as defined by the Sixth Circuit in *Simcox* because "the nature of this alleged conduct is less serious than abuse categorized by the Sixth Circuit as [the middle category]."[149]

Instead of using the *Simcox* categorization, judges should analyze the violence following the recommendations contained in the resource recommended by the *Guide to Good Practice*, i.e., the *Australian Bench Book*.[150] It recognizes that batterers can be dangerous even if the violence has not been frequent and severe.[151] It also recognizes that children can be harmed from domestic violence that is not physical violence.[152]

As an initial matter, the *Australian Bench Book* explains that domestic violence is a "pattern of behavior involving a perpetrator's exercise of control over the victim."[153] It warns trial judges not to focus exclusively on discrete incidents of physical violence.[154] Rather, physically violent acts must be understood as part of a

---

*Id.* at 608.

147. *See, e.g.*, Gil-Leyva v. Leslie, 780 F. App'x 580, 597 (10th Cir. 2019) (Briscoe, J., concurring and dissenting in part); Maurizio R. v. L.C., 201 Cal. App. 4th 616, 635 (Cal. Ct. App. 2011); Ross v. Worley, No. 1:13–cv–60–WSD, 2013 WL 12309782 (N.D. Ga. Feb. 19, 2013).

148. Ajami v. Solano, No. 3:19-cv-00161, 2020 WL 996813, at *17 (M.D. Tenn. Feb. 28, 2020).

149. *Id.*

150. GUIDE TO GOOD PRACTICE, *supra* note 5, ¶¶ 99, 106 (citing AUSTL. BENCH BOOK, *supra* note 104).

151. AUSTL. BENCH BOOK, *supra* note 104, § 4.1, § 4.2 (citing, inter alia, work by Evan Stark), § 4.3 (rejecting typologies for assessment of risk).

152. *Id.* § 4.4.3 (mentioning, inter alia, the batterer's efforts to undermine or destroy the relationship between mother and child and how this can "impair their physical, emotional and mental health and wellbeing"); GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 57 (mentioning how potential harm can significantly impair the ability of the taking parent to care for the child).

153. AUSTL. BENCH BOOK, *supra* note 104, § 3.1, § 5 ("In order to properly respond to domestic and family violence judicial officers will often need information presented to them, not just about individual incidents of violence, but also about the history and pattern of violence in the relationship.").

154. *Id.* § 3.1.

broader abusive pattern, including economic abuse, emotional abuse, reproductive abuse, cultural and spiritual abuse, harassing and monitoring, property damage, or animal abuse, among others.[155] In fact, the *Guide to Good Practice* itself recognizes that there are "a range of abusive behaviours," among them "physical, emotional, psychological, sexual and financial abuse."[156] It also cites authority where the trial court found the father's "persistent attitude of continuing to harass the mother" as relevant to the likelihood of "further incidents of violence between them."[157]

This advice is important because most physical abuse is "relatively minor, involving pushing, grabbing, holding, slapping, hair pulling, and the like."[158] However, even "minor" abuse can cause its victims to experience "devastating fear and dependence elicited by frequent abuse over an extended period."[159] In addition, physical violence need not be frequent if the victim fears future violence: "Sometimes, one or more episodes of severe violence early in a relationship instills enough fear of future violence in a woman to keep her under psychological control, whether or not subsequent acts of physical violence occur."[160] The American Psychological Association emphasizes: "The acts do not necessarily have to be frequent or continuing; in specific instances, a single act or threat of abuse may be enough to establish unreasonable dominance and control over the victim."[161]

---

155. *Id. See* Davies v. Davies, 717 F. App'x 43, 48–49 (2d Cir. 2017) (finding grave risk defense when there was psychological abuse of mother and uncontrolled anger in the presence of the child and the abuse was "primarily psychological in nature"); Sabogal v. Velarde, 106 F. Supp. 3d 689, 705–06 (D. Md. 2015) (finding grave risk defense when there was "little or no physical abuse," but "significant and unusual" verbal abuse of mother and children, including threats to kill).

156. GUIDE TO GOOD PRACTICE, *supra* note 5, at 9.

157. *Id.* at 39 n.76 (citing State Central Authority, Secretary to the Department of Human Services v. Mander, 17 September 2003, Family Court of Australia (Austl.) [INCADAT Reference: HC/E/AU 574], at ¶¶ 113–14).

158. Evan Stark, *Reframing Child Custody Decisions in the Context of Coercive Control*, *in* DOMESTIC VIOLENCE, ABUSE, AND CHILD CUSTODY: LEGAL STRATEGIES AND POLICY ISSUES § 11–1, 11–8 (Mo T. Hannah & Barry Goldstein eds., 2010) (explaining "[o]f the 11,000 substantiated abuse cases reported to the military in 2001, for example, 57 percent involved no injury at all, another 36 percent prompted one visit to outpatient care, and only 7 percent could be classified as "severe").

159. *Id.*

160. AMERICAN PSYCH. ASS'N, VIOLENCE AND THE FAMILY: REPORT OF THE AMERICAN PSYCHOLOGICAL ASSOCIATION PRESIDENTIAL TASK FORCE ON VIOLENCE AND THE FAMILY 34 (1996).

161. *Id.* at 11.

Instead of scrutinizing the frequency and severity of physical violence, trial judges should look for evidence of coercive control.[162] Coercive control can exist without severe, frequent, or recent physical violence.[163] Even Michael Johnson, a professor of sociology who is well known for his violence typologies, said the following:

> It is important not to make the mistake of assuming that this pattern of general control can be indexed simply by high rates of violence. Although the average frequency of violence among cases of patriarchal terrorism may be high, there may well be cases in which the perpetrator does not need to use violence often in order to terrorize his partner.[164]

Joan Meier, who persuasively criticized Johnson's typologies, noted: "Contrary to [the intimate terrorism] label's implications, coercively controlling relationships are often *not* highly violent. In fact, in upper socioeconomic status relationships, the violence is usually suppressed but control is often extreme."[165]

---

162. *See* Weiner, *supra* note 87, at 357 n.97. *See, e.g.*, Haw. Rev. Stat. § 586 –1 (2020) (defining domestic abuse to include coercive control and defining coercive control as "a pattern of threatening, humiliating, or intimidating actions, which may include assaults, or other abuse that is used to harm, punish, or frighten an individual," and includes "(1) Isolating the individual from friends and family; (2) Controlling how much money is accessible to the individual and how it is spent; (3) Monitoring the individual's activities, communications, and movements; (4) Name-calling, degradation, and demeaning the individual frequently; (5) Threatening to harm or kill the individual or a child or relative of the individual; (6) Threatening to publish information or make reports to the police or the authorities; (7) Damaging property or household goods; and (8) Forcing the individual to take part in criminal activity or child abuse").

163. Evan Stark, *Rethinking Custody Evaluation in Cases Involving Domestic Violence*, 6 J. Child Custody 287, 293–94 (2009). *See* Hernandez v. Ashcroft, 345 F.3d 824, 837 (9th Cir. 2003) (noting that "although a relationship may appear to be predominantly tranquil and punctuated only infrequently by episodes of violence, 'abusive behavior does not occur as a series of discrete events' but rather pervades the entire relationship[,]" and that "[t]he effects of psychological abuse, coercive behavior, and the ensuing dynamics of power and control" can cause the battered woman to experience "'fear, vigilance, or [the] perception that she has few options . . . even when the abusive partner appears to be peaceful and calm'") (citing Mary Ann Dutton, *Understanding Women's Responses to Domestic Violence: A Redefinition of Battered Woman Syndrome*, 21 Hofstra L. Rev. 1191 (1993)).

164. Michael P. Johnson, *Patriarchal Terrorism and Common Couple Violence: Two Forms of Violence Against Women*, 57 J. Marriage & Fam. 283, 287 (1995). *See also* Michael Johnson & J.M. Leone, *The Differential Effects of Intimate Terrorism and Situation Couple Violence: Findings From the National Violence Against Women Survey*, 3 J. Fam. Issues 322, 333 (2005).

165. Joan Meier, *Johnson's Differentiation Theory: Is it Really Empirically Supported?*, 12 J. Child Custody 4, 19 (2015) (emphasis in original); *id.* at 7 ("In an important caveat, Johnson also states that severity and frequency do

EXHIBIT 4
Page 41 of 111

Actually, even the filing of the Hague Convention petition itself may be an example of contemporaneous coercive control in the relationship. The *Australian Bench Book* notes: "[A] parent may use their joint parenting role or related judicial options as a means of exercising ongoing control over their former partner."[166] While it may seem odd to call the Hague Convention petition an act of abuse when the petition is a lawful legal remedy, abusers use legal acts all the time to control their partners, e.g., repeatedly telling a survivor she is worthless, driving by a target's house, or controlling all of the money in a jointly-titled bank account. Because it is well recognized that abusers use the court system to try to control or punish their victims, often by litigating over custody,[167] the trial judge can and should consider whether the Hague Convention petition is itself evidence of an ongoing attempt to control the respondent in the context of the couple's overall relationship.

### 1.    A Danger of Physical Harm Can Exist Even Without a History of Severe and Frequent Physical Violence

The amount of control exercised by the petitioner is relevant in determining the petitioner's potential to inflict physical injury. This is because the batterer can be dangerous to the taking parent's and child's physical safety even without a history of severe and frequent physical violence. As the *Australian Bench Book* notes,

> Some victims . . . may never experience any form of actual or threatened physical violence and yet may still be at risk of death; in some reported cases, the homicide is the first incident. In these cases, there may be other important signifiers of risk evident in the perpetrator's behaviour, such as: physical violence outside the intimate relationship; misuse of alcohol or drugs; intense jealousy towards the victim; or exercising a high level of prolonged control over the victim's daily activities and life.[168]

---

not exclusively *define* each type, although the types do differ 'on average.'") (emphasis in original).

166. AUSTL. BENCH BOOK, *supra* note 104, § 4.1. *See also* Jaffe, *supra* note 123, at 59–60 (noting "threats to obtain custody are often used by abusers as weapons against the abuse victims to enhance power and control post-separation" and that abusive men referred to a parenting group "commonly identified" "the use of custody proceedings [as a strategy] to control or harass former partners").

167. *See generally* Susan L. Miller & Nicole L. Smolter, *"Paper Abuse": When All Else Fails, Batterers Use Procedural Stalking*, 17 VIOLENCE AGAINST WOMEN 637 (May 2011); David Ward, *In Her Words: Recognizing and Preventing Abusive Litigation Against Domestic Violence Survivors*, 14 SEATTLE J. FOR SOC. JUST. 429, 434–35 (2016).

168. AUSTL. BENCH BOOK, *supra* note 104, § 4.2.

In fact, focusing solely on the severity and frequency of the physical violence can obfuscate the danger the perpetrator poses to the taking parent and child upon the child's return. Tellingly, the well-known Danger Assessment, developed by Professor Jacquelyn Campbell of the John Hopkins School of Nursing, contains twenty questions to assess the perpetrator's danger and only one of the questions asks about the frequency and severity of the violence.[169] Even that one question asks about it in relative terms: "Has the physical violence increased in severity or frequency over the past year?" Better predictors of dangerousness are the factors associated with coercive control.[170]

A judge assessing whether a child will face a "grave risk" of exposure to harm should be aware of all the markers of dangerousness. The *Australian Bench Book* identifies some of the risk factors, including but not limited to the following: domestic violence within the past year; use or threatened use of a firearm, knife, choking, strangling, or a death threat; a pregnant victim; misuse of alcohol or drugs by the perpetrator; stalking; controlling, jealous, or obsessive behaviors towards the victim; threats of suicide by the perpetrator; and children fathered by someone other than the perpetrator.[171] Judges can and should use risk assessment tools like Campbell's Danger Assessment,[172] although they should be aware that danger predictions can sometimes underestimate the potential for future harm.[173]

---

169. Jacquelyn C. Campbell, Daniel W. Webster & Nancy Glass, *The Danger Assessment, Validation of a Lethality Risk Assessment Instrument for Intimate Partner Femicide*, 24 J. INTERPERSONAL VIOLENCE 653, 655 (2009). The tool has been validated. *Id.* at 667–68.

170. Stark, *supra* note 158, § 11–14 ("Several large-scale, well-designed studies have shown that control factors predict fatality and the psychological, physical, and psychosocial outcomes heretofore attributed to DV far better than do levels or frequency of physical assault and may elicit these outcomes even in the absence of physical assault or long after physical assault has ended.").

171. AUSTL. BENCH BOOK, *supra* note 104, § 4.2.

172. *See supra* text accompanying notes 169–170. *See generally* Leon Samuels, *The Danger Zone: Domestic Violence Risk Assessment Tools*, THE ADVOCATE 29 (Aug. 2018). *See also* AM. JUDGES' FOUND., DOMESTIC VIOLENCE AND THE COURT HOUSE: UNDERSTANDING THE PROBLEM, KNOWING THE VICTIM 4 (2012), *available at* http://aja.ncsc.dni.us/domviol/page4.html [https://perma.cc/HQV4-XDWT].

173. *See* Editorial, *A Tragic End. Our View: In Custody Disputes, Protect Children First*, BALTIMORE SUN (Apr. 3, 2008) (describing murder of three children by father following judge's misjudgment as to father's dangerousness; law required mother to show "clear and convincing" evidence of abuse or harm to the children, and two mental health professionals testified that father was not dangerous).

The best indicator of continuing danger is the simple fact that that the petitioner has abused the taking parent in the past.[174]

It is worth emphasizing that a domestic violence victim's separation from her abuser heightens her danger.[175] Judges adjudicating the article 13(b) defense sometimes have the common misconception that separation reduces the risk of domestic violence.[176] On the contrary, as the *Australian Bench Book* notes, "it is common for perpetrators to continue or escalate the violence after separation in an attempt to gain or reassert control over the victim, or to punish the victim for leaving the relationship."[177] The *Australian Bench Book*

---

174. *In re* E.B., 184 Cal. App. 4th 568, 576 (Cal. Ct. App. 2010) (noting "'Studies demonstrate that once violence occurs in a relationship, the use of force will reoccur in 63% of those relationships . . . Even if a batterer moves on to another relationship, he will continue to use physical force as a means of controlling his new partner.' [Citation.]"); Van de Sande v. Van de Sande, 431 F.3d 567, 570 (7th Cir. 2005). *See also* text accompanying note 205.

175. *See generally* HART, *supra* note 130, at 4 ("[H]alf of the homicides of female spouses and partners were committed by men after separation or divorce." (citing George W. Bernard et al., *Till Death Do Us Part: A Study of Spouse Murder*, 10 BULL. AM. ACAD. PSYCH. & L., 271–80 (1982)).

176. *See* Souratgar v. Fair, No. 12 Civ. 7797, 2012 WL 670021, at *11 (S.D.N.Y. Dec. 26, 2012), *aff'd* 720 F.3d 96 (2d Cir. 2013). *Cf.* Aly v. Aden, 2013 WL 593420, at *17 n.17 (D. Minn. Feb. 14, 2013) ("Finally, the Court rejects as a basis for its decision Dr. Edelson's reliance on 'estrangement' as a factor contributing to a finding of grave risk, as nearly every Convention case, by its very nature, involves some estrangement of the parents."). *See also* AUSTL. BENCH BOOK, *supra* note 104, § 4.1 (noting as a myth and misunderstanding the idea that "[t]he domestic and family violence will stop when the victim and perpetrator separate"). *See generally* Mike Brigner, *Why Do Judges Do That?, in* DOMESTIC VIOLENCE, ABUSE, AND CHILD CUSTODY: LEGAL STRATEGIES AND POLICY ISSUES § 13–1, 13–10 (Mo T. Hannah & Barry Goldstein eds., 2010) ("Judges sincerely but wrongly believe that DV will end when a couple becomes legally divorced or separated. This misconception is as dangerous as it is widespread.").

177. AUSTL. BENCH BOOK, *supra* note 104, § 4.2. *Cf.* Ann E. Freedman, *Fact-Finding in Civil Domestic Violence Cases: Secondary Traumatic Stress and the Need for Compassionate Witnesses*, 11 AM. U. J. GENDER SOC. POL'Y & L. 567, 584 (2003) (footnote omitted) (noting "widespread agreement that the abusive behavior of a substantial proportion of batterers will escalate in seriousness and frequency over time, particularly in response to efforts by the victim to change or end an intimate relationship with the abuser"). *See also* Jaffe, *supra* note 123, at 59 ("Researchers who have tried to identify risk markers associated with recidivism, dangerousness, and lethal violence in domestic relationships have consistently identified the process of separation as a critical period. These researchers have noted that domestic violence is more about one person's attempt to control and dominate his partner, rather than about isolated acts of abuse. Thus during separation, when a perpetrator's perceived grasp on his intimate partner is weakening, he may be most dangerous and extreme in his attempts to regain control. Attempts to leave a violent partner, with children, is one of the most significant factors associated with severe domestic violence and

reports that "the violent response may be severe, life threatening or lethal" when the batterer experiences "an intense sense of loss of control."[178] Predictably, the batterer may experience an intense sense that he has lost control if the courts in the state of habitual residence award custody to the mother.[179] The National Council on Juvenile and Family Law judges recognizes that the "elevated risk" towards the child and battered parent after separation "often continues after legal interventions."[180]

Another important risk factor is the perpetrator's response to the allegations of domestic violence. Many judges mention that when a perpetrator denies or minimizes the violence, he is less trustworthy and more likely to be dangerous.[181] Judges should always consider this common response when assessing not only the

---

death.").

178. AUSTL. BENCH BOOK, *supra* note 104, § 4.2.

179. *Acosta v. Acosta*, 725 F.3d 868 (8th Cir. 2013) ("Ricardo's testimony and voice messages indicate that he wants the children returned to his care. A Peruvian court's order to the contrary likely could cause Ricardo to become violent and harm the children."). *Cf.* Rodriguez v. Rodriguez, 33 F. Supp. 2d 456, 462 (D. Md. 1999) (noting that "the risk to his wife and children has increased exponentially as a result of these proceedings").

180. MODEL CODE ON FAMILY VIOLENCE, *supra* note 108, § 405 cmt. *See also id.* § 301 cmt. The MODEL STATE CODE ON DOMESTIC AND FAMILY VIOLENCE was crafted with "expert assistance of an advisory committee composed of leaders in the domestic violence field including judges, prosecutors, defense attorneys, matrimonial lawyers, battered women's advocates, medical and health care professionals, law enforcement personnel, legislators, educators and others." *Id.* at v.

181. *See, e.g., Rodriguez*, 33 F. Supp. 2d at 461 ("Petitioner's deportment in the courtroom and his complete denial of any culpability in this matter leaves little doubt that he would make no effort to alter the destructive manner in which he interacts with his family."); REFLECTION PAPER, *supra* note 53, at 18 (noting that the court in S.E.H. v. H.E.H., 21 December 1998, (Norway), placed "significant weight on the fact that the father 'appeared unwilling to admit his behaviour towards his family or to appreciate the difficulties for the children'"). *Cf. In re* Amber, No. B287403, 2019 WL 1123000 (Cal. Ct. App. Mar. 12, 2019) ("The court rejected father's blanket denial that he ever committed physical violence against mother. Indeed, the court implicitly found that father's refusal to acknowledge his propensity for physical violence made it more likely such behavior would recur.~past violence in a relationship is a good predictor of similar behavior in the future. . . . Furthermore, 'denial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision.' . . . see *In re* Gabriel K. (2012) 203 Cal. App. 4th 188, 197 ["One cannot correct a problem one fails to acknowledge"]; *In re* Giovanni F., 184 Cal. App. 4th at p. 594, 601 (2010) [parent's denial of domestic violence increases risk]; *In re* J.N. (2010) 181 Cal. App. 4th 1010, 1025–26 (2010) [in assessing risk, court should consider "parent's current understanding of and attitude toward the past conduct that endangered a child"]").

EXHIBIT 4
Page 45 of 111

petitioner's credibility but also the petitioner's dangerousness if the children are returned.

The bottom line is that judges who require the respondent to face a risk of serious physical violence in the future, in order to establish the defense, must not simply look at the type, frequency, and severity of past abuse. Trial judges should embrace a more comprehensive approach for predicting dangerousness, as implied in the *Australian Bench Book* and already implemented by some appellate courts.[182]

### 2. All Forms of Domestic Violence Can Cause Harm to the Taking Parent and Child

Further, coercive control also has great importance for the application of the article 13(b) defense for other reasons. Specifically, coercive control can continue and even intensify after separation, targeted at either the parent, the child, or both.[183] This behavior can harm children, as described below, whether it is targeted at their caregivers or themselves, and even if the taking parent is not the victim of future physical violence.[184] Judges should consider whether the taking parent or the child, or both, will be the target of the petitioner's coercive control if the child is returned and whether this behavior satisfies the requirements of article 13(b).

First, coercive control of a parent can cause a child psychological harm.[185] In fact, coercive control between parents can be as traumatic to a child as child abuse.[186] This is true even if the child's

---

182. *See, e.g., Acosta*, 725 F.3d at 876 (noting a variety of risk factors, including a history of abuse, escalation of abuse over time, threats to kill, threats of suicide, and the respondent's attempt to leave the relationship).

183. Emma Katz, Anna Nikupeteri, Merja Laitinen, *When Coercive Control Continues to Harm Children: Post-Separation Fathering, Stalking and Domestic Violence*, 29 CHILD ABUSE REV. 310, 312 (2020) (citing research).

184. *Id.* at 311.

185. Aly v. Aden, No. 12-1960 (JRT/FLN), 2013 WL 593420, at *18. (D. Minn. Feb. 14, 2013).

186. *See* Testimony of Dr. Peter Favaro, Grano v. Martin, 442 F. Supp. 3d 510, 532 (S.D.N.Y. 2020) ("Dr. Favaro noted that a child who witnesses coercive control or lives in a coercively controlling environment receives the same type of emotional trauma as a child who is directly abused. In fact, even in utero, a child's brain may develop differently if his mother is the victim of coercive control."). *See also* Emma Katz, *Beyond the Physical Incident Model: How Children Living with Domestic Violence are Harmed By and Resist Regimes of Coercive Control*, 25 CHILD ABUSE REVIEW 46, 52 (2016) (conducting qualitative study of fifteen mothers and children and noting that "children had experienced the same negative impacts (e.g. internalising and externalising behaviours, mental health difficulties)" from coercive control without frequent violence "as those who had lived with frequent and sometimes severe physical violence"); *id.* at 56 ("Shifting from the physical incident model to the concept

parent, the direct victim, does not experience frequent and severe physical harm.[187] A study by Jane Callaghan found that the coercive relational dynamics were the "most troubling and distressing for children."[188] Callaghan refused to call children "indirect victims" when a parent experiences coercive control because the children are affected "just as much as adult victims are."[189] Psychologist Evan Stark—noting that the vast majority of relationships with a history of physical or sexual assault also involve "acts to intimidate, humiliate, exploit, isolate, and control a partner"—concluded that "nonviolent forms of coercion and control are at least as harmful as violence."[190] He reported that the consequences of coercive control for children include "depression, suicidality, aggression, delinquency, anxiety, development delay, substance abuse, and inappropriate behavior at school."[191] He explained that standard psychological tests often miss the long-term effects of such exposure.[192]

Second, coercive control of the child can harm the child by making the "children's lives frightening, constrained and unpredictable."[193] Behavior targeted at the child can include hitting walls, threatening pets, threatening people whom the parent does not like, and excessively punishing children to maintain strict control over their lives.[194] Such frightening behavior can "severely harm [children's] emotional/psychological, social and physical wellbeing, and their educational achievement."[195] Fathers who are coercively controlling sometimes combine their frightening behavior with

---

of coercive control . . . . may also help to dispel the myths that . . . . unless children have witnessed physical violence between their parents, then they have not been impacted by domestic violence.").

187. *See generally* Jane E.M. Callaghan et al., *Beyond "Witnessing": Children's Experiences of Coercive Control in Domestic Violence and Abuse*, 33 J. INTERPERSONAL VIOLENCE 1551 (2018).

188. *Id.* at 1571 (finding "children are fully aware of coercive control in their family [and] are affected by controlling dynamics within the family").

189. *Id.*

190. Stark, *supra* note 158, § 11–11. There is now recognition that coercive control can exist without any physical violence and it can be just as harmful for victims' mental health. *See, e.g.*, Kimberly A. Crossman et al., *"He Could Scare Me Without Laying a Hand on Me": Mothers' Experiences of Nonviolent Coercive Control During Marriage and After Separation*, 22 VIOLENCE AGAINST WOMEN 454, 456–57 (2016).

191. Stark, *supra* note 158, § 11–20.

192. *Id.* § 11–19. *See also id.* (noting "many of the harms attributed to physical violence alone are actually elicited by exposure to a combination of abusive tactics among which assault (because it is often low level) may not be the most important").

193. Katz et al., *supra* note 183, at 317.

194. *Id.* at 317–18.

195. *Id.* at 322.

"[p]erformances of 'admirable' fathering," allowing the father to hide the controlling behavior from others and manipulate the child, similar to how batterers combine abusive behavior against their adult victims with protestations of love.[196] A study that explored the ways in which abusers exercise coercive control over their children post-separation found that children living with their nonviolent parent sometimes experienced an "ever-present" father post-separation.[197] These children were scared that their father might appear at any time "to harass, manipulate, upset, kidnap and/or attack them or their mothers," and exhibited "anxiety, panic attacks, bed-wetting and nightmares."[198] Some children experienced this fear even though the last incident of violence was years ago.[199]

Third, a broader understanding of domestic violence—one that focuses on control as well as physical violence—is relevant to assessing whether return will be an "intolerable situation" for the child.[200] A child may experience the petitioner's coercive control directed at him or her as an intolerable situation. In addition, the child may experience the petitioner's coercive control directed at the mother as an intolerable situation, especially if it diminishes her ability to provide adequate caregiving. After all, coercive control can be "profoundly damaging" to its target even without frequent and severe violence.[201] In fact, "women report that psychological abuse is by far the greatest source of their distress, regardless of the frequency or severity of the physical harm they've experienced."[202] Such behavior can have profound implications for the parent's ability to care for the child upon return. This unfortunate result is often the perpetrator's purpose: a common control tactic is to undermine a victim's ability to parent.[203]

---

196. *Id.* at 318–19.

197. *Id.* at 317.

198. *Id.* at 319.

199. *Id.* at 319–20.

200. *See infra* text accompanying notes 217–266.

201. Joan S. Meier, *Domestic Violence, Child Custody and Child Protection: Understanding Judicial Resistance and Imagining the Solutions*, 11 Am. U. J. Gender Soc. Pol'y & L. 657, 685 (2003). *See also* Melena Ryzik and Katie Benner, *What Defines Domestic Violence? Survivors Say It's More than Assault*, N.Y. Times (Jan. 22, 2021).

202. Deborah Epstein & Lisa A. Goodman, *Discounting Women: Doubting Domestic Violence Survivors' Credibility and Dismissing Their Experiences*, 167 U. Pa. L. Rev. 399, 417–18 (2019) (footnotes omitted) (discussing ways in which a batterer can increase his control over her life, including "by sabotaging her efforts to find or keep a job," by "refusing to allow her to sleep the night before a job interview," and "harassing her at work").

203. Stark, *supra* note 158, § 11–20.

In sum, the judge should consider all the evidence of domestic violence, broadly understood, and assess the danger of future harm to the taking parent and child from the totality of circumstances.

### C.    *The Domestic Violence Need Not Recur in the Future*

Because article 13(b) is future-oriented, trial judges often want to know if the alleged domestic violence will continue.[204] To the extent that this fact is a prerequisite to a successful article 13(b) defense (and I argue in this Part that it is not), judges should presume that the violence will continue. The mere fact of past violence is itself evidence that future violence is likely.[205] The National Council of Juvenile and Family Court judges reports: "The risks of recidivism and harm are high in the context of domestic and family violence."[206] In fact, physical abuse can resume even when it last occurred in the distant past.[207]

Judges can use common sense to reach the conclusion that "[P]ast violent behavior in a relationship is 'the best predictor of future violence.'"[208] In fact, the Federal Rules of Evidence recognize that perpetrators of gender-based violence are likely to commit the crime again. Rules 413 and 415 explicitly depart from the ordinary presumption against propensity evidence to permit the introduction of prior sexual assaults in criminal and civil cases pertaining to sexual assault.[209] The departure was prompted by the inherent evidentia-

---

204. *See, e.g.*, Ajami v. Solano, No. 3:19-cv-00161, 2020 WL 9996813, at *17 (M.D. Tenn. Feb. 28, 2020).

205. *See In re* T.G.R.-M., 404 S.W.3d 7, 14 (Tex. Ct. App. 2013) ("Another factor that may contribute to an environment that endangers a child's well-being is a parent's abusive or violent criminal conduct. . . . Evidence that a parent previously has engaged in abusive conduct allows an inference that the parent's violent behavior will continue in the future."); *In re* S.M., 389 S.W.3d 483, 492 (Tex. Ct. App. 2012) ("Evidence that a person has engaged in abusive conduct in the past permits an inference that the person will continue violent behavior in the future."). *See supra* note 174.

206. MODEL CODE ON FAMILY VIOLENCE, *supra* note 108, § 306 cmt.

207. AMERICAN PSYCH. ASS'N, *supra* note 160, at 34 (explaining that while abuse tends to escalate in frequency and severity over time, the violence can stop for a while if others become aware of it and the violence can resume "after a period during which no violence occurs").

208. *In re E.B.*, 184 Cal. App. 4th 568, 576 (Cal. Ct. App. 2010).

209. The prohibition in Federal Rule of Evidence 404 on the introduction of propensity evidence applies to a trial before a jury. The judge is the factfinder in a Hague Convention proceeding, making the proceeding a "miscellaneous proceeding" for purposes of the evidence rules. *See* FED. R. EVID. 1101(d)(3). In addition, propensity evidence is only prohibited by Rule 404(b) when it is used "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." The inquiry here is not backward looking, i.e., whether the person acted in accordance with the

ry difficulties of proving sexual offenses because these acts typically occur in private.[210] Some states extend such rules to domestic violence generally.[211] While it is possible that the petitioner has changed and will be peaceable in the future, it is not probable. The National Council on Juvenile and Family Courts reports, "Most perpetrators who stop violent, coercive, or threatening conduct do so after long-term intervention services."[212]

Although a trial court should assume the violence will recur, the violence need not recur for the article 13(b) defense to be successful. For example, some children can experience post-traumatic stress disorder (PTSD) from returning to the place of the abuse even if the abuse does not resume.[213] Courts adjudicating Hague cases have recognized this fact and used it to grant the defense,[214] citing expert testimony that PTSD can, inter alia, cause a child to "feel like it is happening again."[215] In addition, as previously discussed in Part II.B.2, coercive control of the taking parent or the child independent of physical violence can also create psychological harm for the child and expose the child to an intolerable situation. The next Part elaborates on the usefulness of the intolerable situation language, noting that judges have underutilized this language despite the common-sense interpretation of what should be considered an "intolerable situation" under article 13(b).

character, but forward looking, i.e., whether the person will act in accordance with the character. Fed. R. Evid. 404(b)(1). In fact, Fed. R. Evid. 405(b) allows the introduction of specific acts of character when character is in issue. Since propensity for violence is an issue, a party can in fact prove it.

210. Frank v. County of Hudson, 924 F. Supp. 620, 627 (D. N.J. 1996) (discussing history of provision).

211. *See, e.g.*, Cal. Evid. Code § 1109 (West 2020); *see* Alaska R. Evid. 404(b)(4); Colo. Rev. Stat. Ann. § 18–6–801.5 (West 2020); 725 Ill. Comp. Stat. Ann. 5/115–7.4 (West 2020); Mich. Comp. Laws Ann. § 768.27b (West 2020); Minn. Stat. Ann. § 634.20 (West 2020).

212. Model Code on Family Violence, *supra* note 108, § 221 cmt.

213. *See* Blondin v. Dubois, 238 F.3d 153, 160 (2d Cir. 2001) (citing testimony of Albert J. Solnit).

214. *See, e.g.*, Elyashiv v. Elyashiv, 353 F. Supp. 2d 394, 400, 409 (E.D.N.Y. 2005); Rodriguez v. Rodriguez, 33 F. Supp. 2d 456, 461 (D. Md. 1999) ("Returning the children to Venezuela, even if it did not result in the children's physical abuse at the hands of their father, would result in psychological trauma because of the children's fear of physical harm, a fear well grounded in their experience.").

215. *Elyashiv*, 353 F. Supp. 2d at 400.

EXHIBIT 4
Page 50 of 111

D.   *An Intolerable Situation Differs From Physical or*
     *Psychological Harm*

Article 13(b) allows a judge to deny the return of a child if return would create "a grave risk" of exposure to "physical or psychological harm or otherwise place the child in an intolerable situation."[216] I explained in a 2008 article that (1) the "intolerable situation" language in article 13(b) is a different concept than "psychological or physical harm;" (2) U.S. courts have largely ignored the "intolerable situation" language; and (3) the "intolerable situation" language deserves more attention.[217] After all, the drafters of the Hague Convention added the "intolerable situation" language, at least in part, to address the situation of domestic violence that might not expose the child to physical or psychological harm.[218]

An intolerable situation is a flexible concept. The *Guide to Good Practice* explains that an intolerable situation is "a situation that an individual child should not be expected to tolerate."[219] No child should be expected to tolerate the abuse of his or her taking parent, regardless of the harm it causes the child.[220] Similarly, no child should be expected to tolerate a situation in which the taking parent suffers considerable hardship in the child's state of habitual residence because of that parent's past victimization, regardless of the harm it causes the child, when a better option for the taking parent is available.

U.S. courts have increasingly acknowledged the independent character of the "intolerable situation" language.[221] Most notably, in *Pliego v. Hayes*, the Sixth Circuit held that an intolerable situation

216. Hague Convention, *supra* note 1, at art. 13(b).

217. Weiner, *supra* note 87. *But see Rodriguez*, 33 F. Supp. 2d at 462 (saying the domestic violence created an intolerable situation).

218. Fourteenth Session of the Hague Conference on Private International Law (1980), *Actes et documents de la Quatorzième session*, Tome III, *Enlèvement d'enfants*, *Child Abduction* 302 ("Mr. Jones (United Kingdom) . . . . [I]t was necessary to add the words 'or otherwise place the child in an intolerable situation' since there were many situations not covered by the concept of 'physical and psychological harm'. For example, where one spouse was subject to threats and violence at the hands of the other and forced to flee the matrimonial home, it could be argued that the child suffered no physical or psychological harm, although it was clearly exposed to an intolerable situation.").

219. GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 34.

220. *See* Pollastro v. Pollastro [1999] 43 O.R. (3d) 497 (C.A.) (noting "as a matter of common sense that returning a child to a violent environment places that child in an *inherently* intolerable situation, as well as exposing him or her to a serious risk of psychological and physical harm").

221. Ajami v. Solano, No. 3:19-cv-00161, 2020 WL 9996813, at *15 (M.D. Tenn. Feb. 28, 2020) (citing Pliego v. Hayes, 843 F.3d 226, 233 (6th Cir. 2016)).

can exist if the courts in the state of the child's habitual residence are practically or legally unable to adjudicate custody.[222]

U.S. judges should continue to expand their application of the intolerable situation defense, particularly when the taking parent is a domestic violence victim. After all, the *Guide to Good Practice* makes clear that the "intolerable situation" language creates a separate defense from article 13(b)'s language about "physical or psychological harm,"[223] and endorses its use specifically in the context of domestic violence when return of the child would cause an "extreme deterioration of [the taking parent's] psychological health."[224]

In addition, judges in other countries utilize the "intolerable situation" portion of the article 13(b) defense in cases with a history of domestic violence, recognizing that the child is negatively affected by the taking parent's inability to cope in the state of the child's habitual residence. For example, in *Re S*, the U.K. Supreme Court held that judges must consider not only the history of domestic violence but also the litany of related facts that will contribute to the taking parent's potential hardship.[225] In that case, the issue was not only that the father had "behaved very badly towards" the mother.[226] The mother also anticipated struggling greatly upon her return with the child because the father had descended into alcohol and drug abuse, he had contemplated suicide, she would likely need to enforce a protection order, she would be financially insecure, and the parties would be forced to have ongoing contact to coordinate visitation and to attend court proceedings for the child's relocation.[227] These facts lent credence to the mother's subjective belief about the difficulty of her life if the child were returned.[228] Consequently, the court found that her "merely subjective perception of risks could, as a matter of logic, found the defense."[229] The court concluded: "If the [High court] concludes that, on return, the mother will suffer such anxieties that their effect on her mental health

---

222. *Pliego*, 843 F.3d at 232–33.

223. GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 30.

224. *Id.* at 47 n.105. *See also* Hale, *supra* note 35, at 7 ("Nowadays, we also understand that domestic violence directed towards a parent can be seriously harmful to the children who witness it or who depend upon the psychological health and strength of their primary carer for their health and well-being.").

225. *See* Re S (A Child) [2012] UKSC 10, [2012] 2 AC 257, ¶ 30.

226. *Id.*

227. *Id.*

228. *Id.* ¶¶ 30–31, 35 ("As we have explained, the Court of Appeal failed to appreciate that the mother's fears about the father's likely conduct rested on much more than disputed allegations.").

229. *Id.* ¶¶ 31–32.

will create a situation that is intolerable for the child, then the child should not be returned."[230]

Similarly, in the recent case of *LRR v. COL*, the Court of Appeal of New Zealand found that the article 13(b) defense was established when a mother with a history of mental illness and substance abuse—likely "caused or exacerbated" by the father's domestic violence against her[231]—would encounter a bleak and stressful life if she and the child returned to Australia, and this stress would impede her care of the child.[232] The family court had granted the article 13(b) defense,[233] but not because of possible physical or psychological harm to the child as court orders could address the safety concerns related to domestic violence.[234] Rather, the family court found that returning the child would create a grave risk of exposure to an intolerable situation.[235] Return would compromise the mother's ability to parent the child because of her fear for her safety,[236] her psychological issues,[237] and some "uncertainty" about her entitlement to benefits, including legal aid to pursue a relocation

---

230. *Id.* ¶ 34.

231. LRR v. COL [2020] NZCA 209 at [5].

232. *Id.* at [138–40].

233. *Id.* at [31–32]. The mother emphasized the physical and psychological abuse against her, the psychological violence against the child, and the physical and psychological violence against a child from a previous relationship.

234. *Id.* at [48–50]. The court was unable to resolve the contested issues of fact about direct physical or psychological abuse of the child or another child from a previous relationship on the basis of affidavit evidence, without cross-examination.

235. *Id.* at [54–55].

236. The Court of Appeals found the mother "fears for her safety in Tasmania," and that "[t]his fear is well grounded in fact." *Id.* at [135]. In Australia, the father had been physically and psychologically abusive. *Id.* at [11-12]. When the father was arrested for violating a restraining order, *id.* at [24], the mother entered a women's shelter because she was fearful for her safety if the father was released. *Id.* at [25]. The mother fled with the child to New Zealand shortly after the father was released on bail. *Id.* at [27]. The father, who denied all allegations of violence, filed a Hague Convention petition in family court. *Id.* at [33].

237. The Court of Appeal explained that the mother's frail mental health created a "very high" risk that she would relapse, both in terms of her mental health and substance abuse. *Id.* at [138]. A relapse would significantly impair her parenting capacity. *Id.* at [7]. An expert explained that the mother's condition, including her depression and stress, "can have a negative impact on parenting and healthy child development." *Id.* at [139]. The fact that the parents would be living apart did not address these risks. *Id.* at [140].

petition.[238] In light of the mother's vulnerability, she would not be able "to cope and provide appropriate care" for the child.[239]

The Court of Appeal of New Zealand affirmed, disagreeing with the intermediate High Court's conclusion that no intolerable situation would exist because the child could live with the father.[240] Even if the child could be cared for by the father or paternal grand-parents,[241] the child could experience the loss of his mother "because she [could be] rendered incapable of caring for him by mental ill-ness and/or substance abuse."[242] The mother's inability to function as an effective parent would be intolerable for the child as she "has been his primary [caregiver] throughout his life."[243] The court con-cluded, "This young child cannot be expected to tolerate the loss of effective parental care from his mother."[244] Even if the Australian court allowed the mother to retain custody, she might not be able to relocate with the child back to New Zealand and might instead be in Australia "for a substantial period," contributing to the risk of becoming overwhelmed and ineffective.[245] While it was possible that none of it would occur, the court said the article 13(b) defense did not require the mother to prove this worst-case scenario to a cer-tainty.[246] Rather, it was sufficient that "there is a very significant risk that these concerns will materialize, and they will have a very serious adverse effect" on the child.[247]

While *Re S* and *LRR v. COL* are very significant authori-ty, judges should not assume that an intolerable situation can only exist if the taking parent's situation rises to the level of the dire cir-cumstances evident in those cases. No child should be expected to

---

238. *Id.* at [51, 53] (citing [COL] v. [LRR] [2018] NZFC 4040 [Family Court judgment] at [113-15]).

239. *Id.* at [54] (citing [COL] v. [LRR] [2018] NZFC 4040 at [117-20]).

240. *Id.* at [60]. While the court acknowledged that the mother might not be able to tolerate the situation and care for the child, it concluded, "[t]he pri-mary risks are to her, not [the child]." *Id.* at [63] (citing COL v. LRR [2018] NZHC 2902 [High Court judgment] at [35] (N.Z.)).

241. *Id.* at [143].

242. *Id.* at [7]. Moreover, if the mother lost her status as primary caregiver in court, she might have no contact with her child because she would not be entitled to government benefits, *id.* at [144], and her significant risk of suicide would increase further. *Id.* at [138, 144]. Although the court recognized the risk that the mother might be totally eliminated from the child's life, it instead based its decision on the mother's potential inability to be a "functioning and effective parent." *Id.* at [144].

243. *Id.* at [143].

244. *Id.* at [142].

245. *Id.* at [134].

246. *Id.* at [144].

247. *Id.* at [141].

tolerate the further abuse of his or her parent, period. As such, the case of *Al-Hadad v. Al Harash* is a significant decision.[248] In this 2020 case, the Ontario Court of Justice granted the article 13(h) defense on the basis that there would be an "intolerable situation" if the child were returned to Germany, even though there was not evidence that the mother would be debilitated.[249]

Specifically, in *Al-Hadad*, none of the father's violent incidents were "severe," but the "cumulative pattern" was severe and significant.[250] The violence had been escalating, the father denied and minimized it,[251] there were many markers of coercive control,[252] and the court recognized that this was a "very concerning form of family violence."[253] The mother alleged her life with the father had been a "living hell" punctuated by verbal, physical, and sexual abuse.[254] The incident precipitating the child's removal involved the father punishing the mother for hanging up the phone on him.[255] The mother alleged that "[h]e shoved her to the ground and began kicking her. When she ran to another room, he kept hitting her and said 'I am the only one who gets a say in this house.'"[256]

The trial court noted that the mother would be safer in Canada than in Germany, the state of the child's habitual residence.[257] Although Germany "has all of the institutional and legislative protections found in Canada,"[258] the family lived within a Syrian community in Germany.[259] The Syrian culture and the mother's fear of authority inhibited her from calling the police or contacting local children's aid authorities about the violence.[260] It was an environment that magnified the father's control, unlike in Canada.[261]

The trial court granted the article 13(b) defense despite the fact that there was no evidence that the violence had or would cause the

248. Al-Hadad v. Al Harash (2020) ONCJ 269 (Can.).

249. *Id.* ¶ 74.

250. *Id.* ¶ 55.

251. *Id.* ¶¶ 55–56.

252. *Id.* ¶ 61. It chronicled the facts, including his control of the mother's movement, his control over finances, his anger "if he perceives the mother is not being readily obedient," and the verbal, physical and sexual abuse. *Id.* ¶¶ 25, 28, 61.

253. *Id.* ¶ 62.

254. *Id.* ¶¶ 28, 29.

255. *Id.* ¶¶ 29–30.

256. *Id.* ¶ 29. The father admitted the pushing but denied the hitting. *Id.* ¶ 31.

257. *Id.* ¶ 69.

258. *Id.* ¶ 68.

259. *Id.* ¶ 69.

260. *Id.* ¶¶ 69, 34.

261. *Id.* ¶ 69.

mother's psychological deterioration or undermine her ability to parent her child. Rather, it noted that the "[o]n going abusive conduct by the father towards the mother and the child is more than likely and would place the child in an intolerable situation."[262] That is, the likelihood of future abusive conduct was itself an intolerable situation.

*Al-Hadad v. Al Harash* is an outlier but is consistent with the fact that the drafters of the Hague Convention added the "intolerable situation" language, at least in part, to address the situation of domestic violence.[263] The drafting history does not limit the defense to instances when the mother's psychological situation would deteriorate so much that she could not care for the child.[264] Rather, the defense is broad enough to encompass a situation in which the petitioner is more likely to abuse the respondent if the child is returned than if the child remains in the abducted-to state.

At a minimum, trial judges in the United States should follow the lead of foreign courts and recognize that when there has been domestic violence, the taking parent's life upon return can negatively affect her, and derivatively, the child.[265] At least one trial judge in the United States subscribes to this reading of article 13(b). In *In re Tsarbopoulos*, the federal judge acknowledged that domestic violence and harsh circumstances upon return—or alternatively, the child's separation from the mother and siblings after a history of abuse if the mother did not return with the child—would be an intolerable situation.[266]

The intolerable situation provision gives judges more flexibility when applying the article 13(b) defense. It permits a judge to

---

262. *Id.* ¶ 74.

263. *See supra* note 218.

264. *See* Weiner, *supra* note 87, at 342–43.

265. *See* Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 377 (8th Cir. 1995) (noting U.S. courts "should give considerable weight to these well-reasoned opinions of other Convention signatories").

266. Tsarbopoulos v. Tsarbopoulos, 176 F. Supp. 2d 1045, 1061 (E.D. Wash. 2001) ("As for Jason, not only is he bonded with his two siblings, his mother has been his primary care giver for virtually all of his four years. Separating him or Hari or Joanna from each other or from their mother would be an intolerable situation. Kristi Tsarbopoulos has no resources which would enable her to live in Greece; she lacks language skills, would be quite likely unemployable, has no place to live and there is no evidence that there are government benefit programs which would supply financial or other support for her as a spouse who has been subject to spousal abuse. Additionally, Dr. Tsarbopoulos has provided no financial support to Kristi Tsarbopoulos or the children since they left Greece which added to their dependence on her family and their integration into that home and community. Finally, there was no evidence of undertakings, offers of support in Greece, or other services available to ensure the safety of the children if they were returned to Greece.").

EXHIBIT 4
Page 56 of 111

consider the potential for future domestic violence, but also a wide range of lingering repercussions from past domestic violence that can affect the child upon return. It, as well as the psychological harm portion of article 13(b), can also be used to refuse return of the child when the child will be separated from the taking parent after a history of abuse. The next Part explains that article 13(b) provides a defense in this situation, as recognized by the trial judge in *In re Tsarbopoulos*.

E.    *The Harm Caused By Separating the Child From the Taking Parent Is Relevant*

While most taking parents who are domestic violence victims will return with the child to the state of the child's habitual residence if the court grants the batterer's petition, not all will. This is especially true if the taking parent has other children who will remain with her in the requested state, or if she is driven primarily by concerns about her own safety. This fact pattern raises the question of whether the separation of the taking parent and child, because of the child's return and the taking parent's refusal to return, can itself establish the article 13(b) defense.

Courts have repeatedly held that the article 13(b) defense cannot rest on any harm to the child attributable to the child's separation from the abducting parent,[267] as the abductor should not be allowed to benefit from the abduction.[268] Some trial courts mistakenly apply this logic to the separation of a child from a taking parent who has fled for reasons of domestic violence.[269]

The cases in which the taking parent has fled from domestic violence differ significantly from other abduction cases. Children who have been exposed to domestic violence are particularly reliant upon their protective parent for healing, and they need continuity

---

267. *See, e.g.*, *In re* Koc, 181 F. Supp. 2d 136, 155 (E.D.N.Y. 2001).

268. *See* Friedrich v. Friedrich, 78 F.3d 1060, 1068 (6th Cir. 1996) ("A removing parent must not be allowed to abduct a child and then—when brought to court—complain that the child has grown used to the surroundings to which they were abducted. Under the logic of the Convention, it is the *abduction* that causes the pangs of subsequent return. The disruption of the usual sense of attachment that arises during most long stays in a single place with a single parent should not be a 'grave' risk of harm for the purposes of the Convention.").

269. *See, e.g.*, Saada v. Golan, No. 1:18-CV-5292, 2020 WL 2128867, at *2-3 (E.D.N.Y. May 5, 2020); Diagne v. Demartino, No. 18-11793, 2018 WL 6064965, at *3 (E.D. Mich. Nov. 20, 2018); Maurizio R. v. L.C., 201 Cal. App. 4th 616, 642 (Cal. Ct. App. 2011). *But see* Blondin v. Dubois, 78 F. Supp. 2d 283, 295–96 (S.D.N.Y. 2000), *aff'd*, 238 F.3d 153 (2d Cir. 2001) (acknowledging that stability can be relevant to the article 13(b) inquiry when domestic violence existed); *Tsarbopoulos*, 176 F. Supp. 2d at 1061.

with their safe caregiver for their recovery.[270] Judges have acknowledged the harm from separation for these children in numerous contexts. For example, the National Council of Juvenile and Family Court Judges recommends that state welfare administrators and juvenile court judges keep children in their non-offending parent's custody whenever possible to ensure "stability and permanency for children."[271]

A landmark case by a federal trial court, *Nicholson v. Williams*, contains a considerable amount of expert testimony that speaks to the harm children experience when separated from their abused parents.[272] The case challenged New York City's policy of removing children from their abused mothers as a way to protect the children. Witnesses testified that the practice is traumatic,[273] and, in both a literal and legal sense, intolerable for the child. One witness testified that the separation from the non-abusive parent is the child's "worst nightmare" and "tantamount to pouring salt on an open wound."[274] The federal court granted the petitioners a preliminary injunction, finding New York City's practices violated parents' and children's fundamental liberty interests and "harm children much more than they protect against harm."[275]

In light of this science, judges should regard the child's separation from a taking parent as evidence of a grave risk of exposure to psychological harm or an intolerable situation if the child has previously been exposed to abuse. The harm caused by separating a child from a taking parent who has experienced domestic violence is

---

270. Heather C. Forkey, *Children Exposed to Abuse and Neglect: The Effects of Trauma on the Body and Brain*, 30 J. Am. Acad. Matrimonial L. 307, 322 (2018) ("For children, the pathways to resilience are rooted in the give and take of safe, stable, and nurturing relationships that are continuous over time.").

271. Susan Schechter & Jeffrey L. Edleson, Effective Intervention in Domestic Violence and Child Maltreatment Cases: Guidelines for Policy and Practice, Recommendations from the National Council of Juvenile and Family Court Judges 19 (1999), *available at* https://www.ojp.gov/pdffiles1/Digitization/180603NCJRS.pdf [https://perma.cc/T55N-QAR7].

272. Nicholson v. Williams, 203 F. Supp. 2d 153 (E.D.N.Y. 2002).

273. *Id.* at 199 (citing multiple experts who explained "disruption of that bond [with the primary caregiver] can be even more traumatic than situations where there is no domestic violence"); *id.* (noting testimony of Dr. David Pelcovitz who said "children exposed to domestic violence are at a significantly above-normal risk of suffering separation anxiety disorder if separated from their mother" and that "taking a child whose greatest fear is separation from his or her mother and in the name of 'protecting' that child [by] forcing on them, what is in effect, their worst nightmare, . . . is tantamount to pouring salt on an open wound").

274. *Id.*

275. *Id.* at 253.

EXHIBIT 4
Page 58 of 111

not equivalent to the harm caused by separating a child from a taking parent who was not abused. Trial judges should not assume that they can protect the child from such widely recognized harm, at least not without expert testimony.[276] Rather, trial judges should carefully consider the potential harm to children from separation in cases with domestic violence, as the trial judge did in *In re Tsarbopolous*.[277]

Even if there is general appellate case law to the contrary, trial judges can and should consider the harm from separation when the taking parent is a domestic violence victim. The U.S. Supreme Court recently implied that attorneys representing domestic violence victims should challenge the assumption that the harm caused by the separation of the child from the taking parent is irrelevant to the article 13(b) defense.[278] Moreover, the *Guide to Good Practice* recognizes that separation can be relevant to the article 13(b) defense in this context. While the *Guide to Good Practice* reiterates the position that parents who abduct should not be permitted to rely on their child's harms from separation to support the article 13(b) defense,[279] it simultaneously acknowledges that separation can sometimes rise to the level of a grave risk.[280] The *Guide to Good Practice* thereby provides an important inroad on the position that the harm from separation is always irrelevant to article 13(b).

However, the *Guide to Good Practice* also suggests that judges should explore means to reduce obstacles to the parent's return rather than grant the article 13(b) exception,[281] and it condemns a taking parent's unequivocal refusal to return.[282] Its reliance on protective measures is unfortunate, as Part II.F. discusses, and its condemnation

---

276. Maurizio R. v. L.C., 201 Cal. App. 4th 616, 642 (Cal. Ct. App. 2011) ("[W]e look to the courts and agencies like DCFS to provide the child with the counseling, support, and environment to ensure that potential psychological harms are averted.").

277. *See supra* text accompanying note 266. *See also* Jacquety v. Baptista, No. 19-CV-9642, 2021 WL 1885263, at *37, *41 (S.D.N.Y. May 11, 2021) (granting article 13(b) defense and recognizing that separation of child from primary caregiver could exacerbate child's PTSD).

278. *See* Monasky v. Taglieri, 140 S. Ct. 719, 729 (2020) ("That court also followed Circuit precedent disallowing consideration of psychological harm A.M.T. might experience due to separation from her mother. Monasky does not challenge those dispositions in this Court.").

279. GUIDE TO GOOD PRACTICE, *supra* note 5, at ¶ 72.

280. *Id.* ¶ 64 ("The primary focus of the grave risk analysis in these instances is the effect on the child of a possible separation in the event of an order for return or of being left without care, and whether the effect meets the high threshold of the grave risk exception . . . .").

281. *Id.* ¶¶ 64–65. It also suggests returning the child to someone else in the habitual residence until a court there can make a custody decision.

282. *Id.* ¶ 72.

EXHIBIT 4
Page 59 of 111

of the survivor is entirely unwarranted, especially in this context. The taking parent has a right to stay in a place where she feels safe. Moreover, the policy reasons that led courts to disregard the harm from separation simply do not apply here: the emotional connection between the respondent and the child is not established by the abduction, as the taking parent is often the primary caregiver before flight,[283] and it was the petitioner's bad acts that caused the flight. The taking parent and the child should not be punished by disregarding the harm to the child from separation when the taking parent reasonably elects to live in a safer location. Rather, the court should consider the impact of separation on the child because that harm satisfies the article 13(b) defense.[284]

Fortunately, even the *Guide to Good Practice* recognizes that it is not always appropriate to expect the taking parent to return. It encourages judges to consider whether the taking parent's return would cause "an extreme deterioration" in the taking parent's health.[285] It specifically cites two domestic violence cases in which the courts found the article 13(b) defense established. In one case, the court found that the mother might commit suicide if she returned with the child[286] and, in the other case, the court found that the mother's PTSD might be triggered if compelled to return.[287] In both cases, the children would have been deprived of their mother's care; either the children would have returned without their mother or their mother would have returned but the psychological strain would have killed or debilitated her. As the U.K. Supreme Court stated in *Re S*, one of the cases cited in the *Guide to Good Practice*, "If the court concludes that, on return, the mother will suffer such anxieties that their effect on her mental health will create a situation that is intolerable for the child, then the child should not be returned."[288]

To be clear, while the *Guide to Good Practice* contains a limited acknowledgement that the taking parent cannot always be expected to return and that separation from the taking parent can establish the article 13(b) defense, article 13(b) itself is not as limited as the *Guide* suggests: it does not require that a child face a grave risk of exposure

---

283. LOWE & STEPHENS, *supra* note 12, at ¶ 11.

284. RHONA SCHUZ, THE HAGUE CHILD ABDUCTION CONVENTION: A CRITICAL ANALYSIS 302 (2013) ("[I]gnoring harm caused to the child by separation from the abducting primary [caregiver] is inconsistent with the objective of protecting the child.").

285. *See, e.g.*, GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 70.

286. *See, e.g., id.* at 47 n.105 (citing Director-General, Department of Families v. R.S.P. [2003] FamCA 623 (Austrl.)).

287. *See, e.g., id.* (citing Re S. (A Child) (Abduction: Rights of Custody) [2012] UKSC 10, [2012] 2 AC 257 (appeal taken from Eng.)).

288. Re S. (A Child) (Abduction: Rights of Custody) [2012] UKSC ¶ 34.

to harm both from return with and without the taking parent. It only requires that the facts—as they are—establish the requisite level of potential harm. Consequently, a trial court can and should grant the article 13(b) defense when a domestic violence fact pattern exists, the taking parent refuses to return to the child's habitual residence because it is less safe, and the child's return without the parent would cause the child a grave risk of exposure to physical or psychological harm or otherwise place the child in an intolerable situation. The time is right for trial judges to credit the harm to children from separation from an abused parent.

As mentioned, the *Guide to Good Practice* puts faith in protective measures when assessing whether the taking parent should return with the child. The next Part specifically addresses protective measures, which some courts also use as a basis for determining whether the article 13(b) defense is made out at all, even when the taking parent is planning to return.

### F.    *Protective Measures Are Generally Unhelpful*

Trial judges face pressure to consider protective measures before granting the article 13(b) defense. This pressure comes from the *Guide to Good Practice* as well as some appellate case law. However, this requirement is ill-advised because protective measures are generally ineffective, although it is very hard for a victim of domestic violence to demonstrate this fact in court. This Part first suggests some general reasons why protective measures may not work in a particular case. It then notes that trial judges may not need to consider protective measures because precedent in their jurisdiction may disapprove of the inquiry. It concludes by cautioning trial courts about the limits of expert testimony with respect to the availability and efficacy of protective measures.

#### 1.    Protective Measures Do Not Eliminate the Risk of Exposure to Harm

In 2007, an Australian judge adjudicating a Hague Convention petition against Cassandra Hasanovic, a victim of domestic violence,[289] found:

> The Court should not and would not on the facts of this case presume the authorities in the United Kingdom [the state of the child's habitual residence] would not protect the mother and children if the children returned with the mother to the United Kingdom. In this case, the mother knows that she can be protected because the father was removed from the home

---

289. Department of Community Services v. Hadzic (2007) FamCA 1703 (Austl.).

> by police and charged with serious criminal charges in May of this year. That enabled the mother to escape to Australia. . . . There are a number of actions the mother could take to protect herself and the children from the violence of the father. Those actions would be invoked by her making applications to courts and authorities in the United Kingdom to assist in her protection and the protection of the children.[290]

The judge then had the father agree in writing to certain conditions to assure Hasanovic's safety until a U.K. court was seized of the matter, including the following: not coming within 250 meters of Hasanovic or the children; not contacting Hasanovic in any way; vacating the home so that Hasanovic and children could live there; and not seeking any court order that would prevent the children from living with Hasanovic.[291]

Hasanovic and her children then returned to England. Hasanovic secured a nonmolestation order,[292] the U.K. court awarded her custody,[293] the police gave her a panic alarm, and the police responded to several violent confrontations between the couple.[294] However, the police refused to give Hasanovic a police escort when she feared for her life and decided to move into a women's shelter.[295] When Hasanovic, her mother, and her two children got in the car to leave for the shelter, the father dragged Hasanovic out of the car and stabbed her to death.[296] An investigation into her killing found that the police failed "to arrest [the abusive spouse] for breaching bail conditions that prevented him from having contact with his wife."[297]

The tragic case of Cassandra Hasanovic illustrates the point that trial judges' predictions about the efficacy of protective measures can be wrong. A New Zealand court called it an "obvious point that no legal system can provide an assurance of protection against

---

290. *Id.* ¶ 6.

291. *Id.* ¶ 9.

292. *Man 'Killed Wife After Losing Custody Battle,'* Metro UK (Apr. 15, 2009, 1:16 PM), https://metro.co.uk/2009/04/15/man-killed-wife-after-losing-custody-battle-30492 [https://perma.cc/6DM4-TJD3].

293. *Id.*

294. Paola Totaro, *Young Mother Fled to Sydney to Save Her Life*, Sydney Morning Herald (May 2, 2009, 12:00 AM), https://www.smh.com.au/world/young-mother-fled-to-sydney-to-save-her-life-20090501-aq5z.html [https://perma.cc/96S6-ZPAP].

295. Sandra Laville, *Woman's Murder Could Have Been Prevented, Says Jury*, Guardian (Feb. 26, 2014), https://www.theguardian.com/society/2014/feb/26/cassandra-hasanovic-murder-domestic-violence [https://perma.cc/5MN2-KY3T].

296. *Id.*

297. *Id.*

EXHIBIT 4
Page 62 of 111

family violence if the perpetrator is not willing to comply with court orders."[298] Numerous family court judges have miscalculated an abusive parent's willingness and ability to be law-abiding,[299] and the same is true for judges deciding Hague cases specifically. Research by Edleson and Lindhorst found that seven of twelve women who were domestic violence survivors and whose children were returned pursuant to the Hague Convention continued to experience physical harm in the state of the child's habitual residence; some of the children were also subject to physical abuse upon return.[300] These abusive acts were often illegal; sometimes undertakings specifically proscribed them.[301] Nonetheless, these acts occurred and some batterers even went to great lengths to find their victims, such as the batterer who successfully tracked down the mother at a domestic violence shelter.[302] Judges bear partial responsibility for the harm inflicted on parents and children when they send children back because it is always foreseeable that protective measures, including the criminal law, will be potentially insufficient to protect victims.[303] In fact, judicial assurances that the taking parent and child will be safe upon return can cause the parent and child further harm in the form of institutional betrayal when the batterer reoffends.[304]

If a trial judge must consider the available protective measures (and a trial court need not always do so, as Part II.F.2 argues), what should a trial judge look for when evaluating their adequacy? The *Guide to Good Practice* notes that the state of the child's

---

298. LRR v. COL [2020] NZCA 209 at [128].

299. *See* H.R. Con. Res. 72, 115th Cong. (2018) (noting "researchers have documented a minimum of 653 children murdered in the United States since 2008 by a parent involved in a divorce, separation, custody, visitation, or child support proceeding, often after access was provided by family courts over the objections of a protective parent"); Editorial, *supra* note 173.

300. EDLESON & LINDHORST, *supra* note 15, at 180–81.

301. *See, e.g., id.* at 163–64 tbl.6.2, 179–81.

302. *Id.* at 182–83.

303. *See* MARILYN FREEMAN, REUNITE, THE OUTCOMES FOR CHILDREN RETURNED FOLLOWING AN ABDUCTION, at 31 (2003), http://takeroot.org/ee/pdf_files/library/freeman_2003.pdf [https://perma.cc/M68K-CEY4]. *See also* EDLESON & LINDHORST, *supra* note 15, at 256 (quoting attorney who said, "These undertakings — that are given — are flouted all the time.").

304. *See generally* Carly Parnitzke Smith & Jennifer J. Freyd, *Institutional Betrayal*, 69 AM. PSYCH. 575, 578 (2014) ("Institutional betrayal occurs when an institution causes harm to an individual who trusts or depends upon that institution."); Carly P. Smith et al., *The Psychology of Judicial Betrayal*, 19 ROGER WILLIAMS UNIV. L. REV. 451, 455 (2014) (describing the effects of such betrayal, including "poorer physical health, anxiety, depression, dissociation, borderline personality disorder characteristics, shame, hallucinations, self-harm, and revictimization," and PTSD).

habitual residence must be capable of actually protecting the taking parent and child.[305] That necessitates two levels of inquiry: (1) whether there are protective measures available in the habitual residence and (2) whether they will be effective.

First, as to the availability of protective measures, a judge will often receive information from a foreign law expert on that topic. Apart from an expert hired by the petitioner to testify to this issue, the source of the information is typically a representative from the central authority or a foreign judge responding to the trial judge's inquiry about protective measures. The European Union, in connection with Brussells IIa, highlighted the need for this inside information:[306]

> It will generally be difficult for the judge to assess the factual circumstances in the Member State of origin. The assistance of the central authorities of the Member State of origin will be vital to assess whether or not protective measures have been taken in that country and whether they will adequately secure the protection of the child upon his or her return.[307]

A judge should be skeptical of the information received, despite the temptation to accept it at face value because of norms of collegiality and because the treaty is "based on mutual trust between States."[308] Foreign judges and representatives from a central authority are biased—not in a partisan way, but rather with regard to the tendency to overstate the efficacy of their legal system.[309] A government official's admission that his or her country has inadequate laws, processes, and protections for domestic violence would be embarrassing and tantamount to conceding that

---

305. GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 59. *See also* LRR v. COL [2020] NZCA 209 at [113] (noting the habitual residence must be able to protect the child from the relevant harm "in practice").

306. *See* Council Regulation (EC), No. 2201/2003 (Nov. 27, 2003) Concerning Jurisdiction and the Recognition and Enforcement of Judgments in Matrimonial Matters and the Matters of Parental Responsibility, repealing Regulation (EC), No. 1347/2000, 2003 O.J. (L338) 1 [hereafter Brussels IIa Regulation], at art. 11(4) ("A court cannot refuse to return a child on the basis of Article 13b of the 1980 Hague Convention if it is established that adequate arrangements have been made to secure the protection of the child after his or her return."). Moreover, Article 11 § 8 provides that the state of habitual residence can override a decision refusing to order a child's return, pursuant to article 13(b) of the Hague Convention, and the requested state has to enforce it.

307. *See* DIRECTORATE-GENERAL FOR JUSTICE AND CONSUMERS, PRACTICE GUIDE FOR THE APPLICATION OF THE BRUSSELS IIA REGULATION 54 (2016).

308. *See, e.g.*, GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 69.

309. Part of these observations were shared previously by this author with the U.S. State Department. *See* Letter from Merle H. Weiner to Mr. Michael Coffee (Sept. 2, 2017) (on file with author).

the country violates public international law.[310]  In addition, such an admission would reduce the number of children returned to the jurisdiction, contrary to politicians' interests.  Politicians care greatly about the return rate.  For example, Congress considers the return rate of children to the United States as a criterion in assessing the competency of the State Department's Office of Children's Issues, the United States' central authority under the Hague Convention.[311]

Moreover, a respondent rebutting evidence about the availability of protective measures in the state of a child's habitual residence faces a difficult task.  While a respondent might be able to "adduce evidence regarding the condition of the legal and social service systems in a country she has fled," doing so "creates difficult problems of proof."[312]  General information about the inadequacies of law enforcement, protective orders, or shelter in the state of the child's habitual residence is probative, but often discounted for lack of specificity.[313]

A judge should not be so demanding of a respondent's evidence, however.[314]  After all, the judge's own sources of information

310. [DRAFT] GUIDE, *supra* note 95, at Annex III ¶¶ 30–35.

311. It is therefore no surprise that in its 2018 *Report to Congress*, the State Department included a section labelled "Domestic Violence Resources Available in IPCA cases" and cited the Violence Against Women Act as evidence of "the U.S. government's continued commitment to helping victims of violence." U.S. DEP'T OF STATE, ANNUAL REPORT ON INTERNATIONAL CHILD ABDUCTION 6 (2018), https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/for-providers/legal-reports-and-data.html (choose "For additional reports, click here"; then choose "2018" under "Annual Reports on IPCA 2020–2015") [https://perma.cc/Z5CB-BVFT]. It very generally describes potential services for survivors in the United States. It also provides the phone number of the National Domestic Violence Hotline. Its 2019 report repeated much of this information. *See* U.S. DEP'T OF STATE, ANNUAL REPORT ON INTERNATIONAL CHILD ABDUCTION 7 (2019), https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/for-providers/legal-reports-and-data.html (choose "For additional reports, click here"; then choose "2019" under "Annual Reports on IPCA 2020–2015") [https://perma.cc/N7DC-T853] [hereinafter 2019 ANNUAL REPORT].

312. *See* Baran v. Beaty, 526 F.3d 1340, 1348. (11th Cir. 2008).

313. *See, e.g.,* Saada v. Golan, No. 18-CV-5292(AMD)(LB), 2019 WL 1317868, at *13 (E.D.N.Y. Mar. 22, 2019) ("Although Dr. Biaggioni credibly testified about certain shortcomings in the Italian legal system, she spoke in broad terms, citing anecdotal evidence, but few specifics.").

314. The trial judge has broad discretion in determining relevance for purposes of admissibility. CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, 1 FEDERAL EVIDENCE § 4:3 (4th ed. May 2020 update) (discussing rule 401). It also has broad discretion in deciding what weight the evidence receives. *See, e.g.,* JOHN BOURDEAU ET AL., 55A FLA. JUR. 2D TRIAL § 341 (Mar. 2021 update) ("In a nonjury trial, the credibility of witnesses and the weight of their testimony are

EXHIBIT 4
Page 65 of 111

may speak in generalities. Moreover, the respondent typically cannot probe the accuracy of any specific information from the foreign judge or central authority representative because they are not considered fact witnesses subject to cross-examination.[315] Consequently, the judge should recognize the impediments to accurate factfinding when assessing the availability and adequacy of protective measures. Relatedly, the judge should take judicial notice of this fact: "There is a difference between the law on the books and the law as it is actually applied, and nowhere is the difference as great as in domestic relations."[316]

Second, a trial judge must consider whether available measures will be effective in a particular case. Sometimes protective measures are simply irrelevant because the child's emotional condition will make return harmful or intolerable regardless of whether violence recurs.[317] Similarly, the taking parent's life may be so difficult upon return regardless of protective measures that the child's situation will be intolerable.[318] In other cases, however, the inquiry focuses on whether the batterer will comply with the law. Numerous courts in the United States have found protective measures inadequate for this reason.[319]

---

questions for the determination of the trial judge, whose function it is to draw all reasonable deductions from the evidence, within its sound discretion as fact finder.").

315. There is some question about the propriety of a trial judge soliciting and considering information from a foreign judge or central authority. Judges have broad latitude to consider a range of information when deciding "issues of foreign law" under Federal Rule of Evidence 44.1, including information that is not admissible under the Federal Rules of Evidence or submitted by a party. However, the reference to "foreign law" in Rule 44.1 may not encompass empirical questions about the effectiveness of those laws and the legal system more broadly. Similarly, the Hague Convention allows a court to "take notice directly of the law of, and of judicial . . . decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable." *See* Hague Convention, *supra* note 1, at art. 14. However, the language suggests courts can take notice of positive law, but not empirical questions about effectiveness.

316. Van de Sande v. Van de Sande, 431 F.3d 567, 570–71 (7th Cir. 2005).

317. *See, e.g.*, Miltiadous v. Tetervak, 686 F. Supp. 2d 544, 557 (E.D. Pa. 2010); Reyes Olguin v. Cruz Santana, No. 03-CV-6299, 2005 WL 67094, at *11–12 (E.D.N.Y. Jan. 13, 2005); Blondin v. Dubois, 238 F.3d 153, 168 (2d Cir. 2001); *In re* D.T.J., 956 F. Supp. 2d 523, 547 (S.D.N.Y. 2013).

318. *See supra* Part II.D.

319. *See, e.g.*, Ischiu v. Garcia, 274 F. Supp. 3d 339, 354–55 (D. Md. 2017); Walsh v. Walsh, 221 F.3d 204, 220–21 (1st Cir. 2000); Simcox v. Simcox, No. 07CV96, 2008 WL 2924094, at *4 (N.D. Ohio July 24, 2008); Davies v. Davies, 717 F. App'x 43, 49 (2d Cir. 2017). This is also true abroad. *See* REFLECTION

The *Guide to Good Practice* identifies one red flag with regard to effectiveness: if a petitioner has "repeatedly violated protection orders," then protective measures may not be adequate.[320] Inexplicably, this language gives the benefit of the doubt to the contemnor. Of course, *any* disregard of a court order is a red flag, even if it occurred once before—as is any other disregard of the law. Law violations portend a failure to comply with protective measures in the future. In this vein, the past violence itself demonstrates the petitioner's disregard of criminal law, as well as the petitioner's propensity to be abusive in the future.[321] Similarly, a petitioner's denial that he perpetrated the violence may constitute perjury.[322]

As part of assessing the petitioner's likely compliance, the judge should also consider other facts that are relevant to the likely effectiveness of protective measures. These include any factors that predict dangerousness, including coercive control.[323] They also include the petitioner's propensity to engage in activities that correspond with the violence, such as drinking or drug use.[324] Judges can and should take judicial notice of the fact that a high percentage of

---

PAPER, *supra* note 53, at 25 (citing foreign cases and noting "a number of judges found that, given the severity of the abuse alleged (which they had found to be credible), possible undertakings, conditions and protective facilities, even if they were offered or existed, would be insufficient to protect the returning child and / or accompanying parent").

320. GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 44. *See also* LRR v. COL [2020] NZCA 209 at [114] (noting a court cannot assume court orders will be effective in the future if a parent has breached them in the past).

321. *See supra* text accompanying notes 205–212.

322. *Davies*, 717 F. App'x at 49 (upholding the district court's finding that there were no ameliorative measures to protect the child because the father's deceit, manipulation, unwillingness to accept responsibility, and escalating threats indicated he was unlikely to respect a stay-away order); Sabogal v. Velarde, 106 F. Supp. 3d 689, 706 (D. Md. 2015) (refusing to conclude that father's abusive conduct was in the past because, inter alia, father's "testimony was internally inconsistent and defiant at times, such as when he denied past psychiatric treatment, and he did not present a uniform picture of someone who has acknowledged and corrected past misbehavior"); Elyashiv v. Elyashiv, 353 F. Supp. 2d 394, 398 (E.D.N.Y. 2005) ("Mr. Elyashiv's wholesale denial of any abuse of his wife is simply not credible, and clouds his entire testimony.").

323. *See supra* notes 168–180.

324. *See Sabogal*, 106 F. Supp. 3d at 706–07.

batterers violate restraining orders[325] as well as undertakings,[326] and that batterers, more frequently than other criminals, retaliate against their victims for sharing the details of violence with the justice system.[327] A judge can notice the difficulty a respondent would have enforcing a protective measure because she would need to obtain legal representation.[328] Finally, a judge can observe that enforcement occurs only after the protective measures have failed and harm has already been inflicted.

Because the petitioner's veracity is such an important factor in determining the viability of protective measures,[329] courts should never short circuit the inquiry into the allegations of domestic violence underlying the article 13(b) defense. The *Guide to Good Practice* allows for such a shortcut,[330] and some courts take this route—i.e., they assume that the risk to the child is a grave one and only explore the adequacy of protective measures.[331] However, this approach deprives a judge of information about the petitioner's response to the allegations. That response is relevant to the petitioner's likely future compliance with the law. This truncated approach also leaves the judge guessing if protective measures can fully address the dynamics in the particular family.[332]

---

325. *See* TK LOGAN ET AL., THE KENTUCKY CIVIL PROTECTIVE ORDER STUDY: A RURAL AND URBAN MULTIPLE PERSPECTIVE STUDY OF PROTECTIVE ORDER VIOLATION CONSEQUENCES, RESPONSES, AND COSTS 116 (2009), https://www.ncjrs.gov/pdffiles1/nij/grants/228350.pdf [https://perma.cc/JZ5S-7B2C] (finding approximately half of restraining orders were violated); Christopher T. Benitez et al., *Do Protection Orders Protect?*, 38 J. AM. ACAD. PSYCHIATRY & L. 376, 384 (2010) ("[A]vailable research supports the conclusion that there is a substantial chance that a protection order will be violated . . . .").

326. *See, e.g.*, FREEMAN, *supra* note 74, 39–40; FREEMAN, *supra* note 303, at 31 ("Undertakings were broken in 66.6% (8) cases out of the 12 cases in which they were given."); EDLESON & LINDHORST, *supra* note 15, at 169 ("In all four cases where undertakings were agreed to by the parties in the U.S. courts, none of these agreements were carried out in the other country by the left-behind parent.").

327. *Cf.* MODEL CODE ON FAMILY VIOLENCE, *supra* note 108, § 208 cmt.

328. *See* Jaffe, *supra* note 123, at 63–64 (noting "limited access to legal representation may be a factor for abused women remaining or returning to abusive relationships in as many as half of the cases").

329. *See supra* note 322.

330. GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 45.

331. Return Order ¶ 53, H v. K [2017] EWHC (Fam) 1141 (Eng.). *But see* Simcox v. Simcox, 511 F.3d 594, 608 (6th Cir. 2007) (noting a judge only has the legal authority to impose protective measures once a grave risk is found to exist).

332. SCHUZ, *supra* note 284, at 290 (suggesting that the court has a duty to ensure the protective measures actually eliminate the risk to the child).

EXHIBIT 4
Page 68 of 111

In the end, judges need to heed the lesson of Cassandra Hasanovic's death. Because no judge is clairvoyant, judges must recognize the inherent risks in assessing the batterer's future behavior. Judges should not rely on protective measures to defeat an otherwise established article 13(b) defense because the petitioner's compliance with the law cannot be assured. As the next Part suggests, some judges will be able to avoid the impossible task of determining the adequacy of protective measures because precedent recognizes that the Hague Convention does not require it.

### 2.    Protective Measures Need Not Necessarily Be Canvassed

Courts are divided on whether a trial court should consider protective measures at all. Baroness Hale reports that the vast majority of countries that are party to the Hague Convention do not consider protective measures in assessing the merit of the article 13(b) defense.[333] In addition, many appellate courts in the United States do not require trial courts to consider protective measures. The Eleventh Circuit noted,

> Relying on the plain language of Article 13(b), many courts hold when a respondent proves returning a child would expose him to a grave risk of physical or psychological harm, the reviewing court has discretion to deny the petition for return outright [without consideration of protective measures]. That position is consistent with the Convention's official commentary and with directives from the United States State Department.[334]

While some countries tout the practice of considering protective measures, including the notable example of the U.K., these

---

333. Baroness Hale states: "[O]ne of my tasks on the working group [is] to preserve this approach as acceptable good practice because *it is not what most other countries do*." Hale, *supra* note 35, at 12 (emphasis added). She concedes, "[judges] may well have to take the effectiveness of protective measures largely on trust," and speculates that "[w]hether our extensive reliance on protective measures is one reason why our return rate is so much higher than many other countries' is hard to say." *Id.* at 13. The *Guide* admits, "[T]he Guide is not intended to describe the legal position in all Contracting Parties and, of necessity, contains only limited references to national jurisprudence and comparative law." GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 8.

334. Baran v. Beaty, 526 F.3d 1340, 1347–48 (11th Cir. 2008). *See also* Danaipour v. McLarey, 386 F.3d 289, 303–04 (1st Cir. 2004); Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 377 (8th Cir. 1995) (finding the defense was not established, but rejecting that article 13(1)(b) applies only if the Mexican government and courts cannot protect the child); Acosta v. Acosta, 725 F.3d 868, 877 (8th Cir. 2013) (noting "[o]nce a district court concludes that returning a child to his or her country of habitual residence would expose the child to a grave risk of harm, it has the discretion to refuse to do so"); Wigley v. Hares, 82 So. 3d 932 (Fla. Dist. Ct. App. 2011).

EXHIBIT 4
Page 69 of 111

countries' reasons for examining protective measures have no applicability in the United States. First, courts in the U.K. are constrained in their factfinding about the violence. They typically decide Hague Convention cases on the basis of affidavits, without oral evidence and cross-examination.[335] As a result, resolving conflicting evidence can be particularly difficult. A superficial way around holding an oral hearing to determine the merits of the underlying allegations is to ask whether there are protective measures that would protect the child from the grave risk, assuming a grave risk exists.[336] Second, the U.K. has historically been bound by the law of the European Union,[337] which governs the adjudication of child abduction cases involving two European Union countries. The Brussels IIa Regulation requires the consideration of protective measures.[338] In the United States, these same forces do not exist: a hearing is typically held to determine the underlying facts in a Hague Convention petition, and the Brussels IIa Regulation is not the law.

Nonetheless, some appellate courts have required consideration of protective measures,[339] often repeating the precept that the United States can trust its treaty partners to protect people threatened with harm.[340] However, as the European Court of Human

---

335. *See* Re E [2011] UKSC 27, [32] (appeal taken from Eng.).

336. LRR v. COL [2020] NZCA 209 at [108–12].

337. For the position in the U.K. after Brexit and the final accord, see LEXIS LEGAL NEWS, COMMENT—EU-UK TRADE AND COOPERATION AGREEMENT IMPACT ON FAMILY LAW (Dec. 29, 2020), https://www.lexisnexis.co.uk/legal/news/impact-of-the-eu-uk-trade-cooperation-agreement-on-family-law [https://perma.cc/9N7P-F7HW].

338. Brussels IIa Regulation, *supra* note 306, at art. 11(4) ("A court cannot refuse to return a child on the basis of Article 13b of the 1980 Hague Convention if it is established that adequate arrangements have been made to secure the protection of the child after his or her return."). Brussels IIa also allows a court in the state of the child's habitual residence to make an order of return that prevails over the order of another court from an EU state that grants the article 13(b) defense. See *id.* at art. 11(8). Experts call this override system "ineffective" and suggest it should be "scrapped." *See, e.g.,* PAUL BEAUMONT, PRIVATE INTERNATIONAL LAW CONCERNING CHILDREN IN THE UK AFTER BREXIT: COMPARING HAGUE TREATY LAW WITH EU REGULATIONS, CPIL WORKING PAPER No. 2017, p. 3.

339. *See, e.g.,* Blondin v. Dubois, 189 F.3d 240, 249 (2d Cir. 1999); Blondin v. Dubois, 238 F.3d 153, 163 (2d Cir. 2001). *See also* Gaudin v. Remis, 415 F.3d 1028 (9th Cir. 2005); *In re* Application of Adan, 437 F.3d 381, 395 (3d Cir. 2006).

340. *See, e.g.,* Saada v. Golan, 930 F.3d 533, 539–40 (2d Cir. 2019) ("'[T]he exercise of comity that is at the heart of the Convention' requires us 'to place our trust in th[ose] court[s] . . . to issue whatever orders may be necessary to safeguard children who come before [them].'"); *Blondin,* 189 F.3d at 248–49 ("In the exercise of comity that is at the heart of the Convention (an international agreement, we recall, that is an integral part of the "supreme Law of the

Rights has recognized, "trust" should not be a reason to negate the article 13(b) defense when violence to the child is at issue.[341] "Trust" is not an enumerated exception to the article 13(b) defense. Moreover, this chimera is simply beside the point: perpetrators of domestic violence are independent actors who can render protection measures illusory despite any trust that exists between treaty partners. This fact has caused several appellate courts to suggest that whatever the merit of protective measures otherwise, they are simply inappropriate in cases with domestic violence.[342] Finally, to the extent that trust is an important consideration, it operates in both directions. That is, the state of the child's habitual residence should trust the state adjudicating the Hague Convention petition to apply the article 13(b) defense as written.

Moreover, the minority's approach of allowing protective measures to negate the article 13(b) defense is not an approach mentioned in the Hague Convention or its *travaux préparatoires*. Judge Posner explained that a focus on protective measures is, in fact, inconsistent with the text of the Hague Convention:

> [T]o define the issue not as whether there is a grave risk of harm, but as whether the lawful custodian's country has good laws or

Land," U.S. Const., art. VI), we are required to place our trust in the court of the home country to issue whatever orders may be necessary to safeguard children who come before it."); Friedrich v. Friedrich, 78 F.3d 1060, 1068 (6th Cir. 1996) ("[C]ourts in the abducted-from country are as ready and able as we are to protect children. . . . When we trust the court system in the abducted-from country, the vast majority of claims of harm—those that do not rise to the level of gravity required by the Convention—evaporate."). *See also* Miller v. Miller, 240 F.3d 392, 402 (4th Cir. 2001) (same).

341. *See* Case of O.C.I. and Others v. Romania, App. No. 49450/17, ¶ 45 (May 19, 2019), https://hudoc.echr.coe.int/eng#{%22itemid%22:[%22001-193069%22]} [https://perma.cc/8AJR-YFLF] ("[T]he existence of mutual trust between child-protection authorities does not mean that the State to which children have been wrongfully removed is obliged to send them back to an environment where they will incur a grave risk of domestic violence solely because the authorities in the State in which the child had its habitual residence are capable of dealing with cases of domestic child abuse. Nothing in the Hague Convention or in the Brussels II bis Regulation allows the Court to reach a different conclusion.") (finding a violation of the European Convention on Human Rights when Romanian courts refused to grant the article 13(b) defense when there were credible allegations of corporal punishment).

342. Simcox v. Simcox, 511 F.3d 594, 608 (6th Cir. 2007) (expressing doubt about the appropriateness of undertakings in many domestic violence cases); Van De Sande v. Van De Sande, 431 F.3d 567, 569, 572 (7th Cir. 2005) (noting if the court "is presented with unequivocal evidence that return would cause the child a 'grave risk' of physical or psychological harm, . . . then it would seem less appropriate for the court to enter extensive undertakings than to deny the return request").

even as whether it both has and zealously enforces such laws, disregards the language of the Convention and its implementing statute; for they say nothing about the laws in the petitioning parent's country. The omission to mention them does not seem to have been an accident—the kind of slip in draftsmanship that courts sometimes correct in the exercise of their interpretive authority. If handing over custody of a child to an abusive parent creates a grave risk of harm to the child, in the sense that the parent may with some nonnegligible probability injure the child, the child should not be handed over, however severely the law of the parent's country might punish such behavior.[343]

Proponents of protective measures claim that the inquiry is consistent with the text of the Hague Convention because judges have discretion under article 13(b) to return a child even when the defense is established.[344] Yet the drafters intended for this discretion to be exercised sparingly,[345] not as a matter of course as advocates of protective measures propose. In fact, courts historically treated this discretion as having marginal significance. Professors Paul Beaumont and Peter McEleavy, private international law experts and authors of the first scholarly book about the Hague Convention, stated: "[I]n relation to Article 13(1)(b) the discretion has been relegated to a position of nominal importance and in many instances has been ignored entirely."[346] They explain why: "The assumption must be that, given the rigorous test imposed in interpreting what constitutes a grave risk, a positive result will indicate such an overwhelming possibility of serious harm that a judge would find it very difficult, if not impossible, to make a return order."[347]

---

343. *Van De Sande*, 431 F.3d at 571. *See also* Khan v. Fatima, 680 F.3d 781, 788 (7th Cir. 2012) ("The Convention says nothing about the adequacy of the laws of the country to which the return of the child is sought—and for good reason, for even perfectly adequate laws do not ensure a child's safety."). *See also* Noergaard v. Noergaard, 244 Cal. App. 4th 76, 88 (Cal. Ct. App. 2015) (same); Danaipour v. McLarey, 286 F.3d 1, 21 (1st Cir. 2002) (discussing undertakings); Baran v. Beaty, 526 F.3d 1340, 1349 (11th Cir. 2008) (same).

344. Hague Convention, *supra* note 1, at art. 13 ("Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that . . . .").

345. Schuz, *supra* note 284, at 300 ("[I]t would not have occurred to the drafters that courts would be prepared to return children in cases where this would jeopardise their safety.").

346. Paul R. Beaumont & Peter E. McEleavy, The Hague Convention On International Child Abduction 155 (1999).

347. *Id. See also* Re S. (A Child) (Abduction: Rights of Custody) [2012] UKSC 10, [5], [2012] 2 AC 257 (appeal taken from Eng.) ("[I]t is impossible to conceive of circumstances in which . . . it would be a legitimate exercise of the discretion nevertheless to order the child's return."); *In re* D (Abduction:

The same sentiment cautions against a judge using his or her discretion to return a child because of protective measures. The assessment of the effectiveness of protective measures is so fraught with uncertainties that reliance on protective measures undermines the hierarchy of values expressed in the Hague Convention and should be considered antithetical to it. The reason for article 13(b)'s existence is that the Hague Convention places a "higher premium on children's safety than on their return."[348] A court that relies on protective measures subordinates the safety of a parent and child to a vague sentiment of international trust.

It is also poor policy to rely on protective measures. Adjudicating the availability and effectiveness of protective measures requires courts to delve deep into issues that are more appropriate for a court adjudicating custody. Courts must also resolve new legal issues related to protective measures, thereby delaying proceedings. For example, who bears the burden of proof regarding the efficacy of protective measures?[349] Is foster care a protective measure?[350] How likely must it be that protective measures will restrain this petitioner and protect this child? The required intensiveness of the inquiry has led the U.S. State Department to suggest that reliance on ameliorative measures is inappropriate "because to do otherwise could embroil the court in the merits of the underlying custody issues" and "would tend to dilute the force of the [grave risk] exception."[351]

---

Rights of Custody) [2006] UKHL 51, [55], [2007] 1 AC 619 (appeal taken from Eng.).

348. *See Baran*, 526 F.3d at 1348. *See also* Simcox v. Simcox, 511 F.3d 594, 604 (6th Cir. 2007).

349. The answer is unclear even in those jurisdictions that require an examination of protective measures. Saada v. Golan, No. 1:18-CV-5292, 2020 WL 2128867, at *2 (E.D.N.Y. May 5, 2020). *Compare, e.g., Simcox*, 511 F.3d at 611 (suggesting petitioner bears the burden of proof) *and* Danaipour v. McLarey, 286 F.3d 1, 21 (1st Cir. 2002) (same) *with In re* Application of Adan, 437 F.3d 381, 395 (3rd Cir. 2006) (suggesting respondent bears the burden). The *Guide to Good Practice* does not provide an answer. There is some language that suggests the burden may be on the respondent. *See* GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 41–42, ¶ 51. The final version omitted a footnote from an earlier draft that discussed the unfairness of putting the burden on the respondent. *See* [DRAFT] GUIDE, *supra* note 95, at 36 n.155 (citing two articles by author that emphasized it is hard to prove a negative, i.e., that the batterer will not comply with the law and that the state of habitual residence will not protect children).

350. Something is terribly wrong with the Convention if children end up in foster care when they have loving caregivers who, in fact, have already protected them by removing them from the grave risks that existed in the state of habitual residence. *See* Weiner, *supra* note 87, at 349–50 (arguing that foster care is an intolerable situation for the child).

351. Petition for Writ of Certiorari at *6–7, Golan v. Saada, (No. 20-1034), 2021 WL 1240917 (U.S. 2021) (citing Letter from Catherine W. Brown, Assistant

For all the aforementioned reasons, the *Guide to Good Practice's* emphasis on protective measures is a disappointment.[352] Fortunately, trial courts need not follow the *Guide to Good Practice's* approach to protective measures. The *Guide to Good Practice* explicitly says in bold lettering that it is "*not intended* to direct the interpretation of Article 13(1)(b) in individual cases."[353] It continues, "nothing in this Guide may be construed to be binding upon Contracting Parties to the 1980 Convention . . . and their judicial or other authorities."[354] In fact, there are currently six different Guides to Good Practice for the Hague Abduction Convention,[355] and as of July 2020, only five opinions in the United States refer to one of them.[356] Even the U.S. State Department dislikes the position taken in the *Guide*. The State Department's comments to the Permanent Bureau about protective measures said:

> The United States is concerned that it is not clear in all parts of the Guide that protective measures or "undertakings" are not to be imposed as a matter of regular course and are not required by the Convention . . . . We are concerned about an overemphasis on the value of protective measures . . . [W]e are concerned that a judge might order a return based on that judge's discretion, where an Article 13(b) defense has been established, in reliance on the general availability in a country of a particular type of protective measure, rather than on the particular accessibility of a protective measure for a particular child or parent.[357]

Legal Adviser for Consular Affairs, United States Dep't of State, to Michael Nicholls, Lord Chancellor's Dep't, Child Abduction Unit, United Kingdom (Aug. 10, 1995)).

352. *See* GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 41, and at 33.

353. *Id.* ¶ 7.

354. *Id.* ¶ 8

355. *See Child Abduction Section*, HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW, https://www.hcch.net/en/instruments/conventions/specialised-sections/child-abduction [https://perma.cc/3VMJ-87J2].

356. Westlaw search on July 30, 2020 for "Hague w/s Abduction and Guide w/s Good." *See* Abbott v. Abbott, 560 U.S. 1, 18 (2010); Chafin v. Chafin, 568 U.S. 165 (2013) (Ginsburg, J., Scalia, J., and Breyer, J., concurring); Madrigal v. Tellez, 848 F.3d 669, 674 n.3 (5th Cir. 2017); Chafin v. Chafin, 742 F.3d 934, 936 n.4 (11th Cir. 2013); Gil-Leyva v. Leslie, 780 F. App'x 580, 598 (Brisco, C.J., concurring in part). That is not to say that these guides are unimportant. The Supreme Court has cited a guide in *Abbott* to support its position that ne exeat clauses establish rights of custody, *Abbott*, 560 U.S. at 18, and the concurrence in *Chafin* cited a guide to emphasize the need for expedition. *See Chafin*, 568 U.S. 165 (Ginsburg, J., Scalia, J., and Breyer, J., concurring). Moreover, trial courts may refer to them without ever citing them in their decisions.

357. GENERAL COMMENTS OF THE UNITED STATES OF AMERICA ON THE 13(B) GUIDE TO GOOD PRACTICE 2–3 (2019) (on file with author). The State Department was also concerned "that requiring extensive undertakings as a

As discussed above, there are plenty of reasons to doubt the efficacy of protective measures in all cases, and consequently, to reject this part of the *Guide to Good Practice*. If, however, a judge must assess their adequacy, it is essential that a judge recognize the inherent limitations of such an exercise, as discussed next.

### 3.    Experts Can Help, But Not By Assessing the Effectiveness of Protective Measures

Expert testimony has become fairly ubiquitous in Hague Convention proceedings. A study by the Permanent Bureau of ninety-two cases involving domestic violence found that thirty-nine featured expert testimony.[358] Richard Min and Alberto Yohananoff recently argued that forensic mental health experts have become "integral" to these proceedings because the respondent seeks to establish "the presence of domestic violence and its impact on children's development and overall well-being," while the abuser seeks to establish the availability of "protective measures that could reduce any risk of harm to children."[359]

The *Guide to Good Practice* recognizes a role for experts in Hague Convention cases but suggests ways to reduce their number and limit their testimony.[360] This is sound advice because trial judges will usually find expert testimony useful only to establish the presence of domestic violence and its effect on the parent and child, and not to determine the effectiveness of protective measures.[361] Expert testimony is helpful when experts have examined the parties and can

---

pre-condition for return of a child allows an abducting parent to benefit from his or her wrongdoing, and this is even more true if the Article 13(b) exception has not been properly established." *Id.* It also asked that this language be added to the *Guide to Good Practice*: "Protective measures or 'undertakings' are not to be imposed as a matter of course and should be of a time-limited nature that ends when the country of habitual residence is able to determine what, if any, protections are appropriate for the family." *Id.* at 5. *See also* Danaipour v. McLarey, 286 F.3d 1, 25 (1st Cir. 2002) (citing U.S. State Department position on undertakings that "[i]f the requested . . . court is presented with unequivocal evidence that return would cause the child a 'grave risk' of physical or psychological harm, . . . then it would seem less appropriate for the court to enter extensive undertakings than to deny the return request. The development of extensive undertakings in such a context could embroil the court in the merits of the underlying custody issues and would tend to dilute the force of the Article 13(1)(b) exception.").

358. Reflection Paper, *supra* note 53, at 24.

359. Richard Min and Alberto Yohananoff, *The Hague Convention and Its Grave Exceptions: An Overview*, N.Y.L.J. 4 (Apr. 13, 2020).

360. Guide to Good Practice, *supra* note 5, ¶ 90.

361. See Fed. R. Evid. 702(a) (requiring that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue").

EXHIBIT 4
Page 75 of 111

diagnose PTSD or psychosis,[362] although a judge should not draw an adverse inference from the absence of such testimony.[363] It can also help educate a judge about domestic violence if the judge has not had training.[364] However, expert testimony can have the adverse effect of fostering factfinding mistakes about whether a taking parent and child will be safe upon return. An expert can make an inherently uncertain exercise seem more certain than it is. Moreover, when there are experts on both sides, trial judges may resolve the conflict about the effectiveness of protective measures with tools that are poor proxies for assessing the underlying truth about whether protective measures will work, such as by comparing the testimonies' detail or the expert witnesses' potential biases.

The case of *Saada v. Golan* illustrates the varying helpfulness of expert testimony as well as the distraction caused by needing to resolve the conflict between experts. In that case, the judge's resolution of the conflict between the experts ultimately lead the judge astray from a common-sense assessment about the availability and efficacy of protective measures. Over the course of the nine-day bench trial, the petitioner called four experts and the respondent called three.[365] Four of the expert witnesses—two for each side—addressed domestic violence and its effects on children.[366] Four of the experts addressed the availability and effectiveness of protective measures.[367] The trial judge found extensive domestic violence and potential harm to the child, but also found "that there are measures that can be taken to ameliorate the risk"[368] and therefore ordered the child's return to Italy.[369]

---

362. *See, e.g., In re* D.T.J., 956 F. Supp. 2d 523, 547 (S.D.N.Y. 2013); Elyashiv v. Elyashiv, 353 F. Supp. 2d 394, 400 (E.D.N.Y. 2005); Ischiu v. Gomez Garcia, 274 F. Supp. 3d 339, 354 (D. Md. 2017).

363. *See In re* M.V.U., 2020 IL App (1st) 191762, ¶ 50 (noting that requiring expert testimony would undermine the defense). In addition, the National Council of Juvenile and Family Court Judges (NCJFCJ) noted "psychological testing is not appropriate in domestic violence situations" because it may "misdiagnose the non-abusive parent's normal response to the abuse or violence as demonstrating mental illness, effectively shifting the focus away from the assaultive and coercive behaviors of the abusive parent." NAT'L COUNCIL OF JUV. AND FAM. CT. JUDGES, *supra* note 128, at 20.

364. *See* Kohn, *supra* note 28, at 742–43; Mohacsi v. Rippa, 346 F. Supp. 3d 295, 303, 321–22 (E.D.N.Y. 2018).

365. Saada v. Golan, No. 18-CV-5292(AMD)(LB), 2019 WL 1317868, at *1 (E.D.N.Y. Mar. 22, 2019). Min and Yohananoff, authors of the aforementioned article, participated in the case. *See* text accompanying note 359, *supra*.

366. *Saada*, 2019 WL 1317868, at *11.

367. *Id.* at *12–*13.

368. *Id.* at *1.

369. *Id.* at *20.

The experts ostensibly helped the judge understand that children are harmed from exposure to domestic violence, and that was because all of the experts agreed that a risk of harm existed.[370] The experts disagreed about whether there were measures that could protect the child given the history of domestic violence.[371] The trial judge could have, and should have, relied on common sense to reject the adequacy of the protective measures, but instead the judge got caught up in selecting between the experts.

An expert for the petitioner pointed to the availability of protective measures in Italy, the state of the child's habitual residence, including orders of protection, supervised visitation, and psychologists and psychiatrists in custody proceedings.[372] An expert for the respondent spoke to the countervailing problems facing domestic violence victims in Italy, including how Italian courts "often award custody to abusive fathers, sometimes at the expense of children's safety or without sufficient protections surrounding visitation," and noted that Italian courts and prosecutors have been criticized by multiple international bodies for "systemic failures" to protect victims of domestic violence.[373] The judge chose to believe that the Italian legal system was able to handle domestic violence cases involving children because the expert for the respondent, while credible, "spoke in broad terms, citing anecdotal evidence, but few specifics."[374] However, both experts spoke in broad terms, and neither were able to predict what a court would actually do in this particular case once the child was returned.[375]

On the more important question of whether the protective measures would be effective, the judge similarly credited the petitioner's mental health expert, Dr. Yohananoff, because the respondent's expert, Dr. Brandt, "appeared to accept everything [the respondent] said at face value, without consulting any independent sources."[376]

---

370. *Id.* at *12. ("The experts also agreed that exposure to Mr. Saada's undisputed violence toward Ms. Golan—including verbal, emotional, psychological, and physical abuse—posed a significant risk of harm to B.A.S.").

371. *Id.* ("Dr. Brandt took the position that there were no measures that could protect B.A.S given Mr. Saada's history of violence not to B.A.S., but to Ms. Golan. . . . Dr. Yohananoff, on the other hand, thought that any risk would be mitigated if Mr. Saada's visits with B.A.S. were supervised, and if Mr. Saada got parental coaching and psychoeducational training.").

372. Another expert for the petitioner testified about a specialized hospital for domestic violence victims in Milan that provides medical care, and psychological and social counseling for victims. *Id.* at *14.

373. *Id.* at *13.

374. *Id.* at *14.

375. *Id.* at *13.

376. *Id.* at *12.

EXHIBIT 4
Page 77 of 111

Because Dr. Brandt attributed problems in the mother's testimony to childhood trauma instead of intentional misrepresentation, the trial judge thought she was "more of an advocate[.]"[377]   In contrast, the judge found that Dr. Yohananoff "did not hesitate to point out areas of concern" about the petitioner.[378]

The trial judge's characterization of Dr. Brandt as an advocate appears unfounded considering another district court judge found her credentials "impeccable,"[379] but, more importantly, it distracted from the evidence before the judge that the petitioner posed a serious risk of harm to the mother and child that exceeded the mitigating capacity of protective measures.   For example, Dr. Yohananoff, the only expert who examined the petitioner,[380] found unnamed "areas of concern[.]"[381]   Moreover, the record contained numerous red flags suggesting a real risk to the mother and child regardless of any protective measures,[382] including the following: the petitioner's lack of impulse control;[383] a failure to appreciate the severity, consequences, and wrongfulness of his behavior;[384] lies about the violence;[385] blaming the victim;[386] being unrestrained even in the presence of others, including the child, family, friends, and police officers;[387] a pattern of giving empty promises about changing his ways and going to counseling;[388] and, the fact that he has "to date not demonstrated a capacity to change his behavior."[389]   One commentator, aghast at the trial court's decision, noted: "When a domestic violence victim responds 'yes' to danger assessment questions about strangulation, attacks

377. *Id.* at *13. The judge also noted, "Dr. Yohananoff . . . provided the clearest and most objective evaluation of the parties' relationship, and the potential risks to [the child]. As part of his evaluation, he not only interviewed Mr. Saada, he consulted collateral sources and made use of psychological testing." *Id.* at *12. In contrast, "Dr. Brandt relied only on her interviews of Ms. Golan and her observations of B.A.S., and on Ms. Golan's account of her experience." *Id.*

378. *Id.* at *12.

379. Elyashiv v. Elyashiv, 353 F. Supp. 2d 394, 397 (E.D.N.Y. 2005).

380. The principal expert witnesses on each side interviewed their client and watched their client's interaction with the child. *Saada*, 2019 WL 1317868, at *12.

381. *Id.*

382. The undertakings included funding for housing so the petitioner would not know where the respondent was living and a mutual stay-away agreement until the Italian courts addressed the issue. *Id.* at *19.

383. *Id.* at *4, *12.

384. *Id.* at *1, *18.

385. *Id.* at *8, *10.

386. *Id.* at *8, *18.

387. *Id.* at *4, *7–8 & n.11.

388. *Id.* at *3, *7, *13.

389. *Id.* at *18.

during pregnancy and overt threats to kill, and provides extensive testimony about forced sex, these are the reddest of red flags for escalating violence and femicide."[390] Instead of recognizing these red flags, the judge reiterated a basic misconception about domestic violence: "Ms. Golan and Mr. Saada will no longer be living together, and eliminating the element of proximity will reduce the occasions for violence."[391]

Given the evidence in the record, the trial judge in *Saada* could have concluded there was no guarantee that protective measures would be effective. Dr. Yohananoff testified that undertakings would reduce the risk that the child would be subjected to harm upon his return to Italy,[392] but he never said undertakings or other protective measures would eliminate the risk. All the experts in the case agreed that any re-exposure to violence could harm the child.[393] In light of this testimony in *Saada*, the reduction of risk provided by protective measures should have been inadequate to defeat the article 13(b) defense.[394] Instead, the trial judge in *Saada* allowed her preference

---

390. Lynn Hecht Schafran, Saada v. Golan: *Ignoring the Red Flags of Domestic Violence Danger and What Is Required to Protect a Child From "Grave Risk"*, 25 DOMESTIC VIOLENCE RPT. 15 (2019).

391. *Saada*, 2019 WL 1317868, at *19.

392. *Id.* at *12.

393. *Id.* at *11–12.

394. The Second Circuit remanded after Golan appealed, telling the district to consider whether there were alternatives to unenforceable undertakings, i.e., "ameliorative measures that are either enforceable by the District Court or, if not directly enforceable, are supported by other sufficient guarantees of performance." Saada v. Golan, 930 F.3d 533, 540–41 (2d Cir. 2019). Regrettably, the Second Circuit did not focus on the petitioner's characteristics and the nature of the underlying violence, both of which raised consequential questions about the adequacy of any protective measures. I have criticized the courts in the Second Circuit before and have suggested that a trial court can often assess the inadequacy of protective measures without an expert so long as the judge is aware of markers of dangerousness. *See* Weiner, *supra* note 10, at 351. Unfortunately, on remand, the trial judge felt "confident" that the Italian courts would "ensure B.A.S.'s safety and well-being." Saada v. Golan, No. 1:18-CV-5292, 2020 WL 2128867, at *1 (E.D.N.Y. May 5, 2020). The Italian court was already involved, had imposed a protection order, had required supervised visitation, and told the petitioner that failure to go to treatment could harm him in the custody proceedings. *Id.* at *4. The trial court found, "[t]his order provides a sufficient guarantee that the petitioner will undergo appropriate treatment, and that B.A.S. will be safe in Italy." *Id.* The trial court dismissed concerns about whether the petitioner would comply with the Italian court orders, noting that the petitioner had complied in the past with investigations prompted by the respondent's call to the police, had complied with the district court's orders in the current matter, and would suffer "significant consequences" in Italy if he didn't comply with its court orders. *Id.* Time will tell if these examples are more probative of Dr. Saada's trustworthiness than all the other contrary evidence in

---

for one expert to serve as a proxy for the truth of the matter—i.e., whether the petitioner would comply with the law in the future.

Had the trial judge instead granted the defense, the judge would have been using common sense. Common sense is an important and permissible factor for a factfinder to consider,[395] including in a Hague Convention case. Lawyer Barry Goldstein observed that judges sometimes ignore common sense when considering which of two versions of the facts related to alleged domestic violence is more realistic.[396] For example, Goldstein has witnessed a judge acknowledging that domestic violence is a pattern of behavior, but nevertheless concluding that "the father abused the mother only once or twice and then, for some unknown reason, stopped on his own."[397] While the judge's conclusion is possible, common sense dictates that it is highly improbable that the abuser stopped on his own.[398] Similarly, common sense dictates that there is a high likelihood protective measures will fail.

Of course, common sense will not help a judge if the judge harbors misconceptions about the underlying facts. That can occur when the trial judge believes the parents' separation will stop the violence. It can also occur, as the next Part discusses, when a judge assumes certain facts are indicia of veracity when they are not.

### G.  *Survivors are Usually Truthful Despite Credibility Concerns*

Determining the facts about domestic violence is often challenging for a factfinder. Cases with domestic violence allegations "are not necessarily clear-cut," and "a high proportion" of proceedings "are murky, ambiguous, and difficult—cases that any decisionmaker, no matter how wise or experienced, would find challenging to

---

the record. At the time of writing, Golan had petitioned the Supreme Court to hear the case.

395. Ronald J. Allen & Alex Stein, *Evidence, Probability, and the Burden of Proof*, 55 ARIZ. L. REV. 557, 577 (2013); POSNER, *supra* note 27, at 207 (explaining that when a judge decides which outcome is the most sensible, the judge is considering not only the statutes and precedents, but "common sense, policy preferences, and often much else"). *See, e.g.*, Vermont Civil Jury Instruction Committee, Plain English Jury Instructions: General Jury Instructions, D. Inferences from the Evidence, at http://www.vtbar.org/UserFiles/Files/WebPages/Attorney%20Resources/juryinstructions/civiljuryinstructions/generaljury.htm [https://perma.cc/KAX3-GVHT] ("In considering the evidence, you are not limited to what the witnesses said. You may draw reasonable conclusions based on the testimony and exhibits based on common sense and experience.").

396. Barry Goldstein, *Recognizing and Overcoming Abusers' Legal Tactics, in* DOMESTIC VIOLENCE, ABUSE, AND CHILD CUSTODY: LEGAL STRATEGIES AND POLICY ISSUES § 18–1, 18–4 (Mo T. Hannah & Barry Goldstein eds., 2010).

397. *Id.*

398. *Id.*

resolve."[399]  A trial court noted that these contests can feel like a "he said/she said hearing," and it is difficult "to say categorically one side is telling the truth and one side is not telling the truth."[400]

Judges adjudicating Hague Convention petitions sometimes resolve these disputes by drawing erroneous conclusions. Contrary to some judges' reasoning, conflicting testimony in and of itself—whether from the respondent herself or from other witnesses—does not mean that the respondent has failed to meet her burden of proof.[401] The court must decide who is telling the truth by making a credibility assessment. This step is required by due process,[402] not to mention Federal Rule of Civil Procedure 52(a).[403]

When making a credibility assessment, judges sometimes refuse to credit the respondent's testimony regarding the violence because of inconsistencies. For example, in the T2 case of *Orellana v. Cartagena*,[404] the respondent alleged that the petitioner physically abused her "on a few occasions and that he yelled at her in front of the daughter."[405]  In denying a stay of the return order pending appeal, the appellate court noted that the magistrate judge found "internal inconsistencies in [the mother's] testimony and inconsistencies among her testimony, immigration interview, and police report she had filed in Honduras." Therefore, the appellate court concluded that "credibility was an issue in this case."[406]

Some judges also refuse to credit a survivor's testimony when the survivor lacks certain corroborating evidence, such as a police

---

399. Freedman, *supra* note 177, at 580.

400. Khan v. Fatima, 680 F.3d 781, 786 (7th Cir. 2012). This can be attributable, in part, to the reality that facts are not always either true or false, but can occupy a middle ground. Kevin M. Clermont, *Trial by Traditional Probability, Relative Plausibility, or Belief Function?*, 66 Case W. Res. L. Rev. 353, 360–62 (2015). This can be caused by matters of degree, incomplete information, or conflicting evidence. *Id.* at 361.

401. Monroy v. de Mendoza, No. 3:19-cv-1656-B, 2019 WL 7630631, at *12 (N.D. Tex. Sept. 20, 2019); Soto v. Contreras, 880 F.3d 706 (5th Cir. 2018).

402. Noergaard v. Noergaard, 244 Cal. App. 4th 76, 86 (Cal. Ct. App. 2015) (ruling that the trial court's failure to resolve the authenticity of email containing father's alleged death threats was a violation of due process).

403. Fed. R. Civ. Proc. 52(a)(1). *See generally Khan*, 680 F.3d at 785–86 ("[T]here is no rule exempting the judge from the duty of finding the facts in cases in which the plaintiff has a higher burden of proof than the usual civil burden of the preponderance of the evidence.").

404. Orellana v. Cartagena, No. 17-6520, 2018 U.S. App. LEXIS 1161, at *2 (6th Cir. Jan. 17, 2018).

405. *Id.* The mother was requesting a stay of the trial court's return order pending resolution of her appeal. An applicant for a stay must have, inter alia, a strong showing that she is likely to succeed on the merits of the appeal. *Id.* at *1.

406. *Id.* at *3.

EXHIBIT 4
Page 81 of 111

report. In *Rath v. Marcoski*,[407] the respondent alleged "Petitioner assaulted her physically on multiple occasions," including by kicking her in the stomach when she was pregnant and pushing her face into the floor at her grandfather's house.[408] These allegations were "echoed" by the respondent's mother and grandfather.[409] Yet the court noted that the testimony was "conflicting" and that there was "little other evidence" to support the allegations.[410] The record contained a medical record and a photograph, but the parties disputed that the evidence was probative.[411] The court further found it compelling that "there was never any report filed with any law enforcement agency."[412] Following these observations, the court ruled for the petitioner on the article 13(b) defense.[413]

*Orellena* and *Rath* are not aberrations as respondents are plagued by adverse credibility determinations when they try to invoke the article 13(b) defense both in the United States[414] and abroad.[415] This reality aligns with the extensive credibility discounting survivors of domestic violence and sexual assault experience in court generally.[416] Task forces throughout the United States have documented the bias that women face in court when they raise such allegations.[417]

---

407. Rath v. Marcoski, 2016 U.S. Dist. LEXIS 167685 (M.D. Fla. Oct. 3, 2016).

408. *Id.* at *67.

409. The case suggests it was "petitioner's mother and grandfather," but a close reading suggests it was, in fact, respondent's mother and grandfather. *Id.* at *68.

410. *Id.*

411. *Id.*

412. *Id.* at *69.

413. *Id.*

414. *See, e.g.*, Soto v. Contreras, 880 F.3d 706 (5th Cir. 2018); Mauvais v. Herisse, 772 F.3d 6 (1st Cir. 2014); Norinder v. Fuentes, 657 F.3d 526, 535 (7th Cir. 2011).

415. REFLECTION PAPER, *supra* note 53, at 23 ("Credibility issues of the relevant parent or other witness (especially when a family member) were often important and commented upon in case law.").

416. *See generally* Epstein & Goodman, *supra* note 202, at 418; Dragiewicz, *supra* note 28, at 5–8. *Cf.* U.S. DEP'T OF JUSTICE, IDENTIFYING AND PREVENTING GENDER BIAS IN LAW ENFORCEMENT RESPONSE TO SEXUAL ASSAULT AND DO-MESTIC VIOLENCE 7 (2016), https://www.justice.gov/opa/file/799366/download [https://perma.cc/V49J-XMUE] ("Explicit and implicit biases, including stereotypes about gender roles, sexual assault, and domestic violence, are embedded in our culture and can affect people in all different professions.").

417. *See, e.g.*, MARYLAND SPECIAL JOINT COMMITTEE, GENDER BIAS IN THE COURTS (1989), https://www.ncjrs.gov/pdffiles1/Digitization/118392NCJRS.pdf [https://perma.cc/F7KB-662W] ("[T]he Committee learned that the attitudes and lack of understanding of many judges and court employees about the nature of domestic violence are the most pervasive and difficult problems facing victims of domestic violence."). *See* COURTWATCH MONTGOMERY, CIRCUIT

Courts "consistently [hold] mothers to higher standards of proof than fathers"[418] due to implicit gender bias and misconceptions about domestic violence.[419]

While the *Guide to Good Practice* itself says nothing about this important and uncomfortable topic, earlier versions of the *Guide to Good Practice* did,[420] and the *Australian Bench Book* has some useful information, as discussed below. This topic is important because judges evaluate the evidence through their own "experience about how the world works,"[421] assessing the "relative plausibility" of each story.[422] Unless a judge recognizes that his or her own understanding may be influenced by misconceptions and biases, a judge is less likely to get the answer right. Once a judge recognizes his or her implicit biases, the judge should be better able to assess credibility and adjudicate the contested facts.[423]

---

COURT PROTECTIVE ORDER PRACTICES IN DOMESTIC VIOLENCE CASES: IN THE BEST INTERESTS OF THE CHILD? (May 2014), http://archive.mnadv.org/_mnadvWeb/wp-content/uploads/2014/06/CWM-CC-Children-rept-5.28.14-exec-summ.pdf [https://perma.cc/GY7Q-F8TZ]. *Cf. The Effects of Gender in the Federal Courts: The Final Report of the Ninth Circuit Gender Bias Task Force*, 67 SO. CALIF. L. REV. 727, 949–50 (1994).

418. Meier, *supra* note 201, at 687.

419. Freedman, *supra* note 177, at 580 (noting these cases are hard to resolve, in part, because of inadequate "fact-finding resources" and "the biases and reactivity of factfinders").

420. *See* [DRAFT] GUIDE, *supra* note 95, at 75 (explaining that there are psycho-social effects from violence that can affect "credibility or believability of their testimony and the existence or non-existence of evidence"); *id.* at 13 ¶ 20 ("[D]elays in or non-reporting of domestic violence incidents to the police could be caused by lack of receptivity of relevant police officials, intimidation, lack of autonomy, 'learned helplessness' due to abuse, or cultures of secrecy around domestic violence.").

421. Allen & Stein, *supra* note 395, at 576 (noting factfinders "do not consider the probability of various elements of a story being true, but look instead to it holistically"). *See also* Maggie Wittlin, *Hindsight Evidence*, 116 COLUM. L. REV. 1323 (2016).

422. Allen & Stein, *supra* note 395, at 567. Factfinders employ a system of "inference to the best explanation." *Id.* at 574.

423. *See* DP v. Commonwealth Central Authority [2001] HCA 39 at [7] ("The nature of the issue, and the context in which it arises, may be significant in considering the sufficiency of evidence."); LRR v. COL [2020] NZCA 209 at [108] ("[T]he evidence that is provided by the parties should be evaluated having regard to the timeframes involved, and the ability of each party to offer evidence on the issue" (citing DP v. Commonwealth Central Authority, *supra*)). *See* Vermont Civil Jury Instruction Committee, *supra* note 395, at F (instructing jurors that in assessing credibility they may consider, inter alia: "did the witness have an interest in the outcome of the case?," "how did the witness behave while testifying?," "did the witness seem candid?," "did the witness seem to have a bias?," "does the other believable evidence in the case fits [sic] with the witness's testimony, or is it inconsistent with it?," and "whether an omission or

Fortunately, judges typically want to confront their implicit biases,[424] although most think they have none.[425] It is promising that mere attentiveness to the potential for implicit bias and misconceptions about domestic violence can increase the fairness of a proceeding. Acknowledging the problem is the first step to combatting its effects, especially in "complex settings where individuals have to make intricate judgments," such as judicial fact-finding.[426] Decision-makers who think about implicit bias can question their own objectivity, try harder to be fair,[427] and employ practices that reduce the chance of bias, including "effortful, deliberative processing" instead of "snap judgments."[428]

Combatting the problem of implicit bias requires judges first to identify the ways that they may be unfairly discounting a respondent's credibility. Four sources of implicit bias are evident in domestic violence cases. First, a domestic violence victim's affect may cause a judge to disbelieve her. Domestic violence victims often "appear

---

a mistake is innocent or minor, or whether it is something more serious that affects the rest of their testimony").

424. Judicial training on implicit bias is now quite popular. *See, e.g., Helping Courts Address Implicit Bias: Resources for Education*, NAT'L CTR. FOR STATE CTS., https://www.ncsc.org/ibeducation [https://perma.cc/WTD4-TD85] (last visited July 12, 2020) (providing resources); Natalie Carrillo, *Teaching Implicit Bias to Court Employees: Lessons from the Field*, NAT'L ASS'N OF STATE JUD. EDUCATORS (Feb. 3, 2016), https://nasje.org/teaching-implicit-bias-to-court-employees-lessons-from-the-field [https://perma.cc/8MUT-RKZM]; Matthew Estes & Nancy Smith, *#IAmFruitvale#: An Approach to Teaching Court Staff About Racism, Prejudice and Implicit Bias*, NAT'L ASS'N OF STATE JUD. EDUCATORS (Nov. 12, 2015), https://nasje.org/iamfruitvale-an-approach-to-teaching-court-staff-about-racism-prejudice-and-implicit-bias [https://perma.cc/9K-BV-LQS8].

425. Jerry Kang et al., *Implicit Bias in the Courtroom*, 59 UCLA L. REV. 1124, 1172–73 (2012).

426. Cynthia Lee, *Awareness as a First Step Toward Overcoming Implicit Bias, in* ENHANCING JUSTICE: REDUCING BIAS 289, 295–96 (Sarah Redfield et al. eds., 2017). *But see id.* at 295–97 (noting that telling people not to rely on stereotypes can be counterproductive especially for quick decisions; therefore, people must have a desire to overcome implicit bias and tools to do so).

427. Kang, *supra* note 425, at 1172, 1174.

428. *Id.* at 1177. Federal judges and European judges are required to give specific reasons. FED. R. CIV. PROC. 52(a)(1); Vladimir Ushakov v. Russia, App. No. 15122/17, ¶ 83 (Sept. 18, 2019), http://hudoc.echr.coe.int/spa?i=001-193878 [https://perma.cc/2HMB-VF4F] (discussing procedural obligation imposed by Article 8 to give "specific reasons in the light of the circumstances of the case" and noting that judges must engage in reasoning that is not automatic or stereotyped when adjudicating article 13(b)). *See also In re* Application of Adan, 437 F.3d 381, 398 n.8 (3rd Cir. 2008) (remanding for written, detailed findings of fact).

unappealing, disorganized or emotionally unstable."[429]  However, these behaviors should not be surprising or undercut the respondent's credibility because the respondent may be suffering the effects of the trauma, the stress of the high-stakes proceedings, and/or fear from encountering her abuser in the courtroom.[430]  Similarly, if the judge views the domestic violence episodically and ignores evidence of coercive control, the judge may fail to understand why victims are so afraid or traumatized. This may "[lend] credibility to a perpetrator's insistence that [the respondent is] exaggerating, lying, crazy, or trying to 'alienate' their children."[431]  In contrast, the batterer may simply appear more reliable because batterers are "skillfully dishonest."[432]  The *Australian Bench Book* identifies ways that perpetrators can make themselves appear credible, such as by emphasizing flaws in the survivor's character or minimizing the abuse.[433]

Second, judges often discount the respondent's story because of internal inconsistencies.[434]  However, internal inconsistency is common with the retelling of traumatic experiences and by itself says nothing about veracity.[435]  Judges also discredit a domestic violence victim's testimony when her actions seem inconsistent with her

---

429. NAT'L COUNCIL OF JUV. & FAM. CT. JUDGES, *supra* note 128, at 8.

430. Epstein & Goodman, *supra* note 202, at 406–12 (explaining how trauma can cause inconsistencies). *See* Jaffe, *supra* note 123, at 62; Nancy S. Erickson, *Use of the MMPI-2 in Child Custody Evaluations Involving Battered Women: What Does Psychological Research Tell Us?* 39 FAM. L. Q. 87, 104 (2005).

431. Stark, *supra* note 158, § 11–8, 11–9.

432. Meier, *supra* note 201, at 690 (citing LUNDY BANCROFT & JAY G. SILVERMAN, THE BATTERER AS PARENT: ADDRESSING THE IMPACT OF DOMESTIC VIOLENCE ON FAMILY DYNAMICS 124 (2002)); Freedman, *supra* note 177, at 581 (describing techniques of batterers, including "projecting a non-abusive image" and "making false or exaggerated defensive accusations against the other parent").

433. AUSTL. BENCH BOOK, *supra* note 104, § 5 (citing LINDA C. NEILSON, DOMESTIC VIOLENCE ELECTRONIC BENCH BOOK (2017) (ebook)). *Cf.* CRAGER, *supra* note 131, at 9 ("[A] common tactic of batterers is to minimize and deny the violence, divert attention away from their own acts of violence and to focus the attention on alleged flaws in the survivor/petitioner's character.").

434. Orellana v. Cartagena, No. 17-6520, 2018 U.S. App. LEXIS 1161, at *3 (6th Cir. Jan. 17, 2018); Rath v. Marcoski, 2016 U.S. Dist. LEXIS 167685 (M.D. Fla. Oct. 3, 2016).

435. *See* Jim Hopper, *Sexual Assault and Neuroscience: Alarmist Claims vs. Facts*, PSYCH. TODAY (Jan. 22, 2018), https://www.psychologytoday.com/us/blog/sexual-assault-and-the-brain/201801/sexual-assault-and-neuroscience-alarmist-claims-vs-facts [https://perma.cc/K4D3-MTEK] (citing research) ("Remembering always involves reconstruction and is never totally complete or perfectly accurate. Such gaps and inconsistencies are simply how memory works—*especially* for highly stressful and traumatic experiences, . . . where the differential encoding and storage of central versus peripheral details is the greatest. Such gaps and inconsistencies are never, on their own, proof of *anyone's* credibility . . . .").

EXHIBIT 4
Page 85 of 111

claims of abuse, such as staying in a relationship with her batterer or allowing him to watch their children unattended.[436] Yet, these actions are also not probative of veracity once one has a thorough understanding of the dynamics of the abusive relationship and the options available to the victim.

Third, judges discount victims' testimonies if there is no corroborating evidence. Specifically, judges in Hague Convention cases have discounted a survivor's testimony if she did not go to the doctor, call the police, or tell someone else about the violence.[437] The demand for corroboration reflects an inherent distrust of a woman's testimony, captured in an Italian judge's comments to the Hague Permanent Bureau: "What I find more frustrating is when I have the feeling that the mother is telling the truth and actually suffered violence (or risk of violence) but I have no evidence of it to support my decision."[438]

Yet, corroboration of abuse often does not exist. Violence tends to occur in private and, most of the time, there are no witnesses.[439] Further, domestic violence victims often do not call the police for many reasons, including fear of retaliation by the abuser. Psychologist Peter Jaffe explained that "domestic violence is notoriously difficult to substantiate," and there is usually "insufficient corroborating evidence," in part because "the majority of abuse victims do not contact the police."[440] Similarly, medical reports are typically nonexistent or unhelpful. They can be unhelpful because domestic

---

436. Epstein & Goodman, *supra* note 202, at 418. Epstein and Goodman have explained that there is an "experiential gap," i.e., an "epistemic asymmetry," between the judge and the survivor that makes it hard for the judge to understand why these things occur. *Id.* at 413, 418. *See also* Susan A. Bandes, *Moral Imagination in Judging*, 51 WASHBURN L.J. 1, 13 (2011) ("Judges, like other humans, are situated in a tradition and a culture replete with expectations about how the world ought to work. They make assumptions about how domestic violence victims or rape victims . . . ought to act.").

437. *See, e.g.*, Mendoza v. Esquivel, No. 2:16-cv-0001, 2016 WL 1436289, at *11 (S.D. Ohio Apr. 12, 2016) ("And the facts that Respondent never filed a police report, received medical care, sought social services, or took other action to document the alleged abuse weighs against a finding that any abuse exceeded the 'relatively minor' category set forth in *Simcox*."); Ajami v. Solano, No. 3:19-cv-00161, 2020 WL 9996813, at *9 (M.D. Tenn. Feb. 28, 2020); *Rath*, 2016 U.S. Dist. LEXIS 167685.

438. Onyoja Momoh, *The Interpretation and Application of Article 13(1) b) of the Hague Child Abduction Convention in Cases Involving Domestic Violence: Revisiting X v Latvia and the Principle of "Effective Examination"*, 15 J. PRIV. INT'L L. 626, 645–46 (Dec. 16, 2019) (citing ITALY: JUDGES' QUESTIONNAIRE: Q3.2.4).

439. Mildred Daley Pagelow, *Justice for Victims of Spouse Abuse in Divorce and Child Custody Cases*, 8(1) VIOLENCE & VICTIMS 69, 70–71 (1993).

440. *See* Jaffe, *supra* note 123, at 62.

violence victims "frequently lie to medical providers, either because their abusers are with them when they are seeking treatment, or because of shame and embarrassment at their situations."[441] Documentation may not exist even when a victim calls the police or visits the doctor if domestic violence is sometimes "tolerated or ignored" in the country where it occurred.[442] In addition, even if there is corroborating evidence, the respondent may have no ability to obtain it from abroad because of the expedited nature of Hague Convention proceedings, among other things.[443]

Fourth, some judges have a "discriminatory disbelief of the storyteller herself, independent of the story she tells."[444] This would include "cultural tropes about women's motives to lie."[445] For example, Professor Deborah Tuerkheimer explained that courts are generally disinclined to believe survivors when they allege sexual assault,[446] even though the rate of fabrication is very low.[447] Some judges think domestic violence allegations are opportunistic even though evidence suggests domestic violence perpetrators are much more likely to lie than victims.[448] Moreover, the Hague Convention proceeding may be the first time the survivor has told someone about the violence because it is the first time the benefits of doing so have

---

441. Lois Schwaeber, *Recognizing Domestic Violence: How to Know It When You See It and How to Provide Appropriate Representation, in* DOMESTIC VIOLENCE, ABUSE, AND CHILD CUSTODY: LEGAL STRATEGIES AND POLICY ISSUES § 2–11 (Mo T. Hannah & Barry Goldstein eds., 2010).

442. Carolyn A. Kubitschek, *Failure of the Hague Abduction Convention to Address Domestic Violence and Its Consequences*, 9 J. COMP. L. 111, 125 (2014).

443. *See* Hague Convention, *supra* note 1, at art. 11.

444. Epstein & Goodman, *supra* note 202, at 420.

445. *Id.* at 425.

446. *See* Deborah Tuerkheimer, *Incredible Women: Sexual Violence and the Credibility Discount*, 166 U. PA. L. REV. 1, 56 (2017) (noting "credibility discounting" on issues of "plausibility" and "trustworthiness"); Anoosha Rouhanian, *A Call for Change: The Detrimental Impacts of* Crawford v. Washington *on Domestic Violence and Rape Prosecutions*, 37 B.C. J.L. & SOC. JUST. 1, 36–38 (2017) (discussing disbelief of rape victims in criminal justice system).

447. Kaarin Long, Caroline Palmer & Sara G. Thome, *A Distinction Without a Difference: Why the Minnesota Supreme Court Should Overrule Its Precedent Precluding the Admission of Helpful Expert Testimony in Adult Victim Sexual Assault Cases*, 31 HAMLINE J. PUB. L. & POL'Y 569, 589–90 (2010) (discussing rape allegations).

448. AUSTL. BENCH BOOK, *supra* note 104, § 4.1 (noting it is a myth that "[w]omen often make false or exaggerated claims of domestic and family violence to obtain a tactical advantage in parenting proceedings" and explaining "that false denials of true allegations are more common"); *id.* ("Domestic and family violence is often minimised by perpetrators attempting to shift the blame to the victim and others.").

outweighed the potential harm. That is not mendacity, but rather rational behavior.

Apart from implicit bias, a judge may experience reactivity that can both contribute to credibility discounting and have other harmful repercussions for respondents. Reactivity is "an automatic, anxiety-driven response" that often results in psychological reactions that try to lessen the discomfort.[449] Professor Ann Freedman explains that there is a strong tendency for a judge hearing evidence of domestic violence to act as a reactive bystander.[450] That is, the judge will subconsciously try to avoid vicariously experiencing the respondent's trauma because that produces unwelcome feelings of "fear, anger, grief and despair."[451] The judge will substitute other feelings such as "boredom, impatience, frustration, irritation, a vague sense of discomfort, blame, judgment, or loss of energy."[452] Predictably, "to abandon the burden of vicarious trauma [a judge may] turn against women who have been victimized."[453] Reactivity can also lead a judge to avoid addressing the violence in detail.[454] The judge's "feelings of anger, disgust, or resentment" can exacerbate implicit bias.[455]

The trial judge's comments on remand in *Saada v. Golan* provide an example of a judge who may have been experiencing reactivity.[456] By the end of the case, the trial judge was blaming the mother for electing to go back to Italy with the child. The judge thought it was the mother's presence in Italy that caused the risk that she would be abused, and while her safety was important, "it is B.A.S.'s safety and well-being that is paramount—not the respondent's."[457] The

---

449. Freedman, *supra* note 177, at 576 & n.24 (citing HARRIET GOLDHOR LERNER, THE DANCE OF INTIMACY: A WOMAN'S GUIDE TO COURAGEOUS ACTS OF CHANGE IN KEY RELATIONSHIPS 36 (1989)).

450. *Id.* at 582–83.

451. *Id.* at 610.

452. *Id.*

453. *Id.* at 632.

454. *Id.* at 583. This is evident in some Hague Convention cases. *See, e.g.*, Khan v. Fatima, 680 F.3d 781, 786–88 (7th Cir. 2012) ("Very little of the wife's testimony was so much as mentioned by the judge, even though the wife had testified that she'd been beaten with a pillow . . . , knocked down by him in front of ZFK, hit in the chest by a heavy wallet that he had hurled at her, choked by him twice . . . when she was pregnant with her second child, threatened . . . with having her eyeballs yanked out, and dragged bodily from the backyard into a room in the house. . . . The essential point is that the evidentiary hearing was inadequate."); Noergaard v. Noergaard, 244 Cal. App. 4th 76, 94 (Cal. Ct. App. 2015) (chastising trial judge for excluding most evidence).

455. Kang, *supra* note 425, at 1177.

456. *See supra* text accompanying notes 391, 394.

457. Saada v. Golan, No. 1:18-CV-5292, 2020 WL 2128867, at *2 (E.D.N.Y.

judge then concluded, "There is no evidence in the record that the petitioner was abusive to B.A.S. or that B.A.S. would be unsafe with the petitioner. In fact, the respondent frequently left B.A.S. with the petitioner when she lived in Italy . . . . Accordingly, B.A.S.'s return to Italy is not necessarily contingent on the respondent also living there."[458] The judge's visceral rejection of the domestic violence victim's claims—evident in the judge's victim-blaming, minimization of the mother's importance to the child, misconceptions about domestic violence, and discounting of potential harm to the child despite protective measures—illustrates what appears to be judicial reactivity.

To avoid reactivity, Freedman suggests that judges should engage in "compassionate witnessing."[459] These are techniques that help decision-makers "remain present to the painful truths" of victims' experiences with domestic violence.[460] Among other techniques, judges should simply be aware that secondary traumatic stress makes one reactive,[461] and then use their emotions to stay intellectually present,[462] including by consciously letting go of the "strategies for coping with distress" such as impatience or frustration.[463]

Finally, to combat credibility discounting from implicit bias and reactivity, a trial court should start with a readiness to credit the taking parent as an expert on her own experiences and then ask questions to gain a deeper understanding. Judge Marjory D. Fields of the Family Court of the State of New York, Bronx County, gave this advice to other judges adjudicating issues of domestic violence: "The judge's initial step is to accept that the woman may have been subjected to prolonged physical and psychological abuse. Her story may seem fantastic, but it is likely to be entirely true. She is an expert concerning her husband's behavior patterns . . . ."[464] She then encouraged

---

May 5, 2020) (stating "'[A] respondent should not be rewarded for declining to ameliorate the risk' to her child . . . and harm that is 'a consequence of choices made by [the] respondent' should not affect the Court's repatriation decision.") (alterations in original) (citation omitted).

458. *Id.* at *2 n.4.

459. Freedman, *supra* note 177, at 609.

460. *Id.* at 614. The nine techniques include: "conscious engagement, adopting a moral stance as a witness, reckoning with secondary traumatic stress, integrating reason and emotion, maintaining appropriate boundaries, and exploring one's personal connections to what one encounters as a witness." *Id.* at 622.

461. *Id.* at 612, 618.

462. *Id.* at 619.

463. *Id.* at 619–20. This may require confronting one's own experiences with violence. *Id.* at 620. Freedman explains that this approach is consistent with judge's professional obligations. *See id.* at 618.

464. Marjory D. Fields, *Practical Ideas for Judges in Domestic Violence Cases,* JUDGES' J. 32, 32–33 (1996).

EXHIBIT 4
Page 89 of 111

judges to ask questions even when the parties are represented.[465] The judge can resolve any doubts about the respondent's credibility by encouraging the respondent to provide more information.

There are other good reasons to believe and inquire. First, as Judge Fields suggests, the trial judge should obtain more detail because "[p]ainting a picture of the complainant and defendant, so that the appellate court sees what the trial judge observed, is essential in family violence cases."[466] Second, the child should not be disadvantaged by having to rely only on the respondent as the child's advocate.[467] After all, the child rarely has an attorney.[468] Third, the failure to believe and inquire undermines survivors' faith in the legal system and causes its own harm. A survey of ten Australian survivors who lost their Hague Convention cases found, "All their voices were not heard and their domestic violence experiences not believed by the courts. They felt they were treated like criminals."[469] When a judge discounts a woman's experience of violence, the judge "closely replicates the dynamics of abuse [the victim] endures at home. Perpetrators of intimate partner violence . . . often discredit both the plausibility of a survivor's story and her trustworthiness as a truth teller."[470]

Unless the factfinder believes the domestic violence victim, the article 13(b) defense will be of no help to her. However, even if the trial judge believes her, the respondent will likely be denying or minimizing some of the violence and its effects. As the next Part suggests, a trial judge can and should use a preponderance of the evidence standard to resolve the conflict as well as determine other historical facts.

---

465. *Id.* at 33–34 ("When cases proceed to trial, judges may use their expansive role permitted in nonjury trials. The judge may ask questions to obtain information not elicited by counsel, or call witnesses in civil proceedings.").

466. *Id.*

467. *See* LRR v. COL [2020] NZCA 209 at [106] (recognizing that "it will often be unsatisfactory to determine issues that arise . . . by reference to the burden of proof, or one party's failure to adduce evidence in a timely way . . . . This is not a context in which a court can properly proceed on the basis that a party who fails to provide relevant evidence to support their case must bear the consequences of that failure. That approach would risk compromising the interests of the child because of deficiencies in the way in which one or other parent has conducted the litigation.").

468. *See generally* Weiner, *supra* note 87 (arguing children should have their own attorneys in Hague Convention cases).

469. Masterton, *supra* note 60.

470. Epstein & Goodman, *supra* note 202, at 446.

EXHIBIT 4
Page 90 of 111

H.    *Clear and Convincing Evidence Only Needs to Exist for the Ultimate Issue, Not for Predicate Facts*

Judges in the United States who may otherwise be inclined to rule for the respondent are sometimes hampered by the burden of proof attending the article 13(b) defense. U.S. law requires that a respondent prove the article 13(b) defense by clear and convincing evidence.[471] The burden of proof has a psychological effect on the factfinder: it serves as an "anchoring heuristic" that "lowers the willingness of the factfinder to determine that the burdened party has prevailed."[472]

Congress should change the burden of proof for the defense from a clear and convincing standard to a preponderance standard. The Hague Convention itself does not specify the burden of proof, and the Explanatory Report merely says that the burden should be placed on the abducting parent, without specifying its nature.[473] The *Guide to Good Practice* similarly takes no position on the burden of proof other than to say the burden is on the respondent.[474] Most countries do not use such a high burden.[475]

While the burden of proof is not something trial judges can alter when it is set out in statute, trial judges can use the preponderance of the evidence standard for finding predicate facts related to the article 13(b) defense, such as whether or not the domestic violence occurred. Unfortunately, some U.S. judges use the clear and convincing standard to determine predicate facts,[476] although nothing requires that they do so. The better approach, and one followed by many judges, is to use the heightened burden of proof only for the ultimate legal issue of whether there is a grave risk of exposure and to use a preponderance of the evidence standard for the predicate

---

471. *See* International Child Abduction Remedies Act (ICARA) § 4, 22 U.S.C. § 9003(e) (2)(A) (2019). Clear and convincing evidence means that the factfinder is clearly convinced. Clermont, *supra* note 400, at 376.

472. Clermont, *supra* note 400, at 371. *See also* John Leubsdorf, *The Surprising History of the Preponderance Standard of Civil Proof*, 67 FLA. L. REV. 1569, 1579 (2015) (juries typically require the plaintiff's evidence to be "considerably more likely to be correct than the defendant's").

473. *See* Pérez-Vera, *Explanatory Report, supra* note 42, ¶ 114.

474. GUIDE TO GOOD PRACTICE, *supra* note 5, ¶¶ 50–51.

475. [DRAFT] GUIDE, *supra* note 95, at 43 n.194 ("The standard of proof applied by Contracting States may differ. E.G. many Contracting States apply a general civil standard of proof 'preponderance of evidence' or 'balance of probabilities'; a few States require the exception to be proved by a higher standard, e.g., 'by clear and convincing evidence.'").

476. Ajami v. Solano, No. 3:19-cv-00161, 2020 WL 9996813, at *14 (M.D. Tenn. Feb. 28, 2020); Matas-Vidal v. Libbey-Aguilera, No. 2:13CV422 DAK., 2013 WL 3995300, at *9 n.47 (D. Utah Aug. 5, 2013).

RE: Respondent's Answer and Counterclaims

EXHIBIT 4
Page 91 of 111

facts.[477]  A bifurcated approach to the burden of proof is consistent with what courts sometimes do in other types of proceedings with heightened burdens for the ultimate issue, such as termination of parental rights proceedings and criminal proceedings.[478]

The bifurcated approach for the article 13(b) defense is highly preferable to requiring that the respondent prove predicate facts by clear and convincing evidence.  The latter approach makes the defense much more difficult to establish.[479]  For example, if a court requires the respondent to prove by clear and convincing evidence on a seriatim basis that the domestic violence occurred, that the child will be exposed to it, and that domestic violence causes children psychological or physical harm or places them in an intolerable situation, then the respondent has to surmount the "clear and convincing" hurdle three times, not just once.[480]

Applying the proper burden of proof to predicate facts is very important because factfinding for the article 13(b) defense is prone to error due to the evidentiary challenges discussed in Part II.G.  In the Hague Convention case *Khan v. Fatima*, the Seventh Circuit observed: "The process of factfinding in such a situation is inexact and the findings that result are doubtless often mistaken."[481]  Moreover, federal judges find family law matters outside their wheelhouse.  Justice Breyer said the following about deciding Hague Convention cases: "[O]ur lack of expertise means a high possibility of error."[482]  While the burden of proof does not affect the absolute number of errors in factfinding, it does determine which party bears the impact of those mistakes.[483]

The purpose of a burden of proof is to allocate the risk of error.[484]  Use of the clear and convincing evidence standard for determining

---

477. *See, e.g.*, Yaman v. Yaman, 730 F.3d 1, 11 (1st Cir. 2013); Souratgar v. Lee, 720 F.3d 96, 103 (2d Cir. 2013); Danaipour v. McLarey, 183 F. Supp. 2d 311, 315 (D. Mass. 2002), *rev'd on other grounds*, 286 F.3d 1, 13 (1st Cir. 2002); Didur v. Viger, No. 05-2188-JWL-DJW, 2005 WL 8160585, at *9 (D. Kan. Aug. 12, 2005).

478. *See, e.g.*, Care and Protection of Laura, 610 N.E.2d 934, 937 (Mass. 1993); Doe v. Sex Offender Registry Board, 120 N.E.3d 1263, 1270–71 (Mass. App. Ct. 2019).

479. *Cf.* Clermont, *supra* note 400, at 359 (speaking about elements of a claim).

480. *Cf.* Leubsdorf, *supra* note 472, at 1579 (employing analysis in context of preponderance of the evidence).

481. Khan v. Fatima, 680 F.3d 781, 785 (7th Cir. 2012).

482. Breyer, *supra* note 36.

483. Richard A. Posner, *An Economic Approach to the Law of Evidence*, 51 STAN. L. REV. 1477, 1507 (1999) ("Burden of persuasion has less to do with the number of errors than with the distribution of errors between sides.").

484. Allen & Stein, *supra* note 395, at 590–91. *See* Leubsdorf, *supra* note

predicate facts means the mistakes will fall on the shoulders of the respondent. These mistakes are rarely corrected on appeal, in part because the burden of proof and risk of error is placed on the losing party— again the respondent.[485] In contrast, the typical burden of proof for civil cases—a preponderance of the evidence[486]—creates a "roughly equal allocation of the risk of error between litigants."[487] That burden of proof reflects a "fundamental" principle that "the parties should ordinarily receive equal treatment and bear equal risk."[488] Courts typically "presume that this standard is applicable in civil actions between private litigants unless particularly important individual interests or rights are at stake."[489]

The petitioner's interest in accurate factfinding in a Hague Convention case is no weightier than the respondent's, especially considering the subject matter of the article 13(b) defense. If anything, the respondent's interest in protecting the child from a grave risk of exposure to physical or psychological harm or an intolerable situation is weightier than the petitioner's interest in the location of a custody proceeding. After all, the Hague Convention prioritizes children's safety over children's return by virtue of including the article 13(b) defense.[490]

The benefit of the preponderance standard for factfinding in this context is revealed by considering closely the "comparative cost of errors."[491] There are two types of errors in connection with article 13(b): false positives and false negatives. A false positive is when a

---

472, at 1580.

485. Clermont, *supra* note 400, at 376 (noting that for the review of judge-found facts, "the reviewer must think there was a serious error"). *See, e.g.,* Ortiz v. Martínez, 789 F.3d 722, 729 (7th Cir. 2015) (noting determinations of credibility are factual findings subject to review only for clear error); Davies v. Davies, 717 F. App'x 43, 46 (2d Cir. 2017) (noting appellate court gives "particularly strong deference where the district court premises its findings on credibility determinations"); da Silva v. de Aredes, 953 F.3d 67, 72 (1st Cir. 2020) (reviewing trial court's article 13(b) determination for clear error because that "accords with the goals of the Convention," including expeditious return).

486. Ronald J. Allen, *How Presumptions Should Be Allocated: Burdens of Proof, Uncertainty and Ambiguity in Modern Legal Discourse,* 17 HARV. J.L. & PUB. POL'Y 627, 633 (1994) (calling preponderance of the evidence "nearly universal").

487. Grogan v. Garner, 498 U.S. 279, 286 (1991).

488. Clermont, *supra* note 400, at 375.

489. *Grogan,* 498 U.S. at 286.

490. Pérez-Vera, *Explanatory Report, supra* note 42, ¶ 29 ("Thus, the interest of the child in not being removed from its habitual residence without sufficient guarantees of its stability in the new environment, gives way before the primary interest of any person in not being exposed to physical or psychological danger or being placed in an intolerable situation.").

491. Leubsdorf, *supra* note 472, at 1581.

court grants the article 13(b) defense when there is not a grave risk of exposure to psychological or physical harm or an intolerable situation. A false negative is when a court denies the article 13(b) defense and returns a child when there is a grave risk.[492] A preponderance of the evidence standard says that the two errors are roughly equivalent, but creates a slight tendency to cause false negatives.[493] A clear and convincing evidence standard magnifies the tendency to make false-negative errors and suggests a false positive is much worse than a false negative.

Yet judges should prefer a false positive to a false negative when adjudicating the article 13(b) defense. Kenneth Klein used pregnancy tests as a helpful example of why false positives are sometimes preferable to false-negative results. False negatives in the pregnancy test context present a public health concern because people may act as if they are not pregnant, when in fact they are. Consequently, "a pregnancy test is intentionally biased to produce more false positives than false negatives."[494] Similarly, a false negative in the Hague context represents a poor policy choice because courts act as if the child will not face a grave risk of exposure to harm when the child will, in fact, be endangered by the return. In addition, while a false positive error can be readily addressed in the subsequent custody proceeding, a false negative error may result in a tragedy, rendering the custody proceeding irrelevant. The appropriateness of favoring a false positive error is evident by the universal use of a preponderance of the evidence standard for civil protective order proceedings involving domestic violence. Maryland, the last state to change to a preponderance of the evidence standard for civil protective orders, did so because "the standard of evidence for protective orders was 'clear and convincing evidence,' and many judges cited the lack of clear and convincing evidence when denying orders."[495]

Judges should not enhance the possibility of false-negative errors in light of all the other factors that already contribute to their likelihood in these cases, including implicit bias and misconceptions about domestic violence. Trial judges can and should use the preponderance of the evidence standard when they determine the predicate facts.

---

492. Kenneth S. Klein, *Truth and Legitimacy (in Courts)*, 48 Loy. U. Chi. L.J. 1, 32-33 (2016).

493. Leubsdorf, *supra* note 472, at 1595 (It "tell[s] the tier of fact that if the evidence leaves the trier in equilibrium, the party bearing that burden must lose.").

494. Klein, *supra* note 492, at 33.

495. CourtWatch Montgomery, *supra* note 417.

Just as an unnecessarily high burden of proof compounds all the previous obstacles, so too does an unnecessarily restrictive interpretation of the article 13(b) defense. The next Part addresses this final issue, i.e., the actual legal test embodied within article 13(b).

I.    *Only a Grave Risk of Exposure, Not a Grave Risk of Harm or a Grave Harm, Is Required*

Judges often misstate the legal test embodied in article 13(b), which states that the judge is not bound to order the return of the child if "there is a *grave risk* that his or her return would *expose* the child to physical or psychological harm or otherwise place the child in an intolerable situation."[496] There are several common misarticulations of the legal test, including the following: (1) courts require a "grave risk of harm," even though the defense only requires a grave risk of "exposure" to physical or psychological harm or an intolerable situation;[497] or (2) courts require the potential outcome to be a

496. Hague Convention, *supra* note 1, at art. 13(b) (emphasis added).

497. See Taglieri v. Monasky, 876 F.3d 868, 879 (6th Cir. 2017) ("[B]ut we must acknowledge that the facts before us, while demonstrating that [the father] engaged in appalling and justly censurable activity, do not 'show that the risk to the child is grave, not merely serious' . . . As a result, [the mother] has failed to meet her burden to show by clear and convincing evidence *that a grave risk of harm to [the child] exists* or that there is a grave risk that [the child] would be placed in an intolerable situation.") (emphasis added); Soto v. Contreras, 880 F.3d 706, 712 (5th Cir. 2018) (affirming the trial court's articulation of the legal standard, that "Lemus had to 'prove[ ] by clear and convincing evidence that . . . [Ontiveros] seriously abused or neglected [A.O.L.], or that there is otherwise *a grave risk of harm* to [him] if [he] returns to Mexico for a custody determination'") (emphasis added); Ermini v. Vittori, 758 F.3d 153, 164 (2d Cir. 2014) ("Spousal violence, in certain circumstances, can also establish a grave risk of harm to the child, particularly when it occurs in the presence of the child."); Walsh v. Walsh, 221 F.3d 204 (1st Cir. 2000) ("The risk must be 'grave,' and when determining whether a grave risk of harm exists, courts must be attentive to the purposes of the Convention."); Gomez v. Fuenmayor, 812 F.3d 1005, 1010 (11th Cir. 2016) ("The sole issue we face is whether Salvi proved by clear and convincing evidence that M.N. would face a grave risk of harm were she returned to Venezuela."); Acosta v. Acosta, 725 F.3d 868, 876 (8th Cir. 2013) ("The proper focus under Article 13b is whether returning the children to Peru would expose them to a grave risk of harm."). *Cf. Acosta*, 725 F.3d at 875 (noting "The proper focus under Article 13b is whether returning the children to Peru would expose them to a grave risk of harm."); Kim v. Ferdinand, 287 F. Supp. 3d 607, ¶ 61 (E.D. La. 2018) ("[T]he return would expose the child to 'grave risk' of harm."). *But see* DP v. Commonwealth Central Authority [2001] HCA 39 at [42] ("[T]he risk that is relevant is not limited to harm that will actually occur, it extends to a risk that the return would *expose* the child to harm.") (emphasis in original); *id.* ¶ 61 ("The difference between a grave risk of *exposure* to harm and a grave risk of harm may be important.") (emphasis added).

"grave harm" when "grave" only modifies risk, not harm.[498] These types of errors compound all of the obstacles to a successful article 13(b) defense mentioned previously.

It is easy to get the words in article 13(b) mixed up—even the State Department has done so[499]—but the locution matters. To see the difference in meaning, consider an analogy to the coronavirus. A child who lives in a place where the infection rate is low but would be returned to a place where the infection rate is high would face a "grave risk of exposure . . . to . . . harm" even if the child is statistically unlikely to become severely sick given his or her age.[500] A "grave risk of exposure to . . . harm or an intolerable situation" merely requires a very high probability of encountering something that can cause physical or psychological harm, which would exist in the COVID example. The result can be different, however, if the test requires "a grave risk of harm" or "a risk of grave harm." A "grave risk of harm" entails a very high probability of actual harm, and that is unlikely given the child's age. A "risk of grave harm" necessitates some probability of a grave harm, such as severe injury or death, which is theoretically unlikely, albeit unlikely. These variations in phraseology produce differences in the required certitude of the harm and the required seriousness of the harm. Either mistake creates a much more stringent standard than the defense actually embodies. Article 13(b) was not meant to require certainty of outcome or very severe physical or psychological harm.

---

498. *See, e.g.*, Baran v. Beaty, 526 F.3d 1340, 1347-48 (11th Cir. 2008) (reasoning "return need not be ordered when the risk of grave harm exists"); Friedrich v. Friedrich, 78 F.3d 1060, 1068 (6th Cir. 1996) (noting "[t]he exception for grave harm to the child").

499. 2019 ANNUAL REPORT, *supra* note 311 (describing article 13(b) as requiring a "grave risk of harm").

500. *Cf.* Guerra v. Rodas, No. CIV-20-96-SLP, 2020 WL 2858534, at *7 (W.D. Okla. June 2, 2020) (staying order to return child until it is safe to travel in light of COVID-19); Gallegos v. Garcia Soto, No. 1:20-CV-92-RP, 2020 WL 2086554, at *8 (W.D. Tex. Apr. 30, 2020) (same).

318        *UCLA WOMEN'S LAW JOURNAL*        Vol. 28.223

In fact, in terms of certitude, when read carefully, article 13(b) requires nothing of the sort.[501] Rather it requires that children face a *grave risk of a risk of harm*—not a grave risk of harm. That is because "expose" means to "subject to *risk* from a harmful action or condition."[502] Therefore, a risk of exposure to physical or psychological harm is plainly a risk of a risk of harm or, to put it another way, a risk of danger. This interpretation is supported by language in the Hague Convention's *Explanatory Report*, which states that the purpose of the Hague Convention must "give[] way before the primary interest of any person in not being exposed to physical or psychological *danger* or being placed in an intolerable situation."[503] Danger is not the harm itself, but rather a risk of harm. A contrary interpretation renders the word "expose" mere surplusage.[504]

Courts that require the child to face a grave, or even serious, harm ignore that "grave" only modifies the word risk. Sometimes courts sneak in the requirement of a grave harm by saying that a "grave risk" necessitates assessing the seriousness of the potential harm too. For example, the Eighth Circuit said: "The gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes."[505] This judicial gloss is inconsistent with the wording of article 13(b). Article 13(b) expressly sets forth what kind of harm is sufficient: "physical or psychological harm" or an "intolerable situation." It does not say "grave harm" or even "serious physical or psychological harm." Moreover, the U.S. State Department did not further define "harm" in its report to the Senate at the time of ratification.[506] The drafters consciously chose the phrase "grave risk" to mean that the risk is more than substantial,[507] but the phraseology is agnostic as to the severity of the harm

---

501. *LRR v. COL* [2020] NZCA 209 at [90] (noting "certainty is not required; what is required is that the court is satisfied that there is a risk which warrants the qualitative description 'grave'") (citations omitted).

502. *Expose*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/expose [https://perma.cc/Y2ZJ-HDXH] (last visited Apr. 22, 2021) (emphasis added).

503. Pérez-Vera, *Explanatory Report*, *supra* note 42, ¶ 29 (emphasis added). The Explanatory Report is relevant to the Hague Convention's interpretation. *See* Vienna Convention on the Law of Treaties, art. 32, May 23, 1969, 1155 U.N.T.S. 331.

504. ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 178 (2012) (arguing it "should be regarded as the exception rather than the rule" that a word in a statute would have "no meaning").

505. Acosta v. Acosta, 725 F.3d 868, 875 (8th Cir. 2013). *See also LRR v. COL* [2020] NZCA 209 at [88]; Re E [2011] UKSC 27, [2012] AC 133 [33] (appeal taken from Eng.).

506. TEXT AND LEGAL ANALYSIS, *supra* note 43, at 10510.

507. Fourteenth Session of the Hague Conference on Private International

because, as described further below, harm has a particular meaning that suggests any physical or psychological harm is unacceptable.

Some courts have asserted that physical or psychological harm to the child must be serious because of the language that follows "physical or psychological harm" in article 13(b): "or otherwise place the child in an intolerable situation."[508] Yet, if the drafters had intended such an interpretation, they surely would have made that clear by qualifying the harm with an adjective like "serious" or "intolerable." Instead, the drafters chose the connecting term "otherwise," suggesting that they thought any physical or psychological harm is already intolerable.[509] If only "intolerable" physical or psychological harm could establish the defense, then only exposure to torture would suffice.[510] That is a preposterous interpretation and contrary to the drafters' actual orientation. Looking at the legislative history, Professor Rhona Schuz explains, "it would not have occurred to the drafters that courts would be prepared to return children in cases where this would jeopardise their safety."[511]

Proponents of a "grave harm" requirement have expressed concern that "harm" is too broad of a concept, and could include the "rough and tumble, discomfort and distress" from "growing up."[512] Yet the word harm has a narrow definition that would exclude such an application.[513] The Oxford English Dictionary defines harm as

Law, *supra* note 218, at 362. Sometimes courts impose an even higher requirement, unfortunately. *See, e.g.*, Vujicevic v. Vujicevic, No. C13-0204RSL, 2013 WL 2627132, at *3 n.2 (W.D. Wash. June 11, 2013) (although the mother would be in "grave danger of physical harm if she were to return to Croatia and attempt to work cooperatively with" the father, and even though the father "plainly showed that he is willing to strike not only his wife, but his children," and even though the father's "yelling and criticizing" of the child "put [the child] at risk of certain psychological problems," "the mere possibility of harm does not establish an Article 13(b) defense").

508. *See Re E* [2011] UKSC 27 at [34]; DP v. Commonwealth Central Authority [2001] HCA 39 at [8].

509. *See* Letter to Mr. Michael Coffee from Merle H. Weiner 12 (Sept. 2, 2017) (on file with author).

510. Occasionally courts have accepted, or ventured toward, such a preposterous position. *See, e.g.*, Thomson v. Thomson, [1994] 3 S.C.R. 551, para. 82 (Can.) (rejecting that separation from primary caregiver met this test); *Re E* [2011] UKSC 27 at [34] (stating that the phrase physical or psychological harm "gain[s] colour from" the intolerable situation language).

511. SCHUZ, *supra* note 284, at 300.

512. *Re E* [2011] UKSC 27 at [34] (citing this example to show the potential expansiveness of article 13(b) without considering the magnitude of harm).

513. "Discomfort and distress from growing up" is not even as harmful as outcomes categorically excluded as constituting sufficient harm. *See* TEXT AND LEGAL ANALYSIS, *supra* note 43, at 10510 ("A review of deliberations on the Convention reveals that 'intolerable situation' was not intended to encompass

"[e]vil (physical or otherwise) as done to or suffered by some person or thing; hurt, injury, damage, mischief."[514] "Discomfort and distress from growing up" is not harm. In contrast, "physical abuse" is harm and it is per se sufficient for the defense, regardless of the degree of abuse.[515] Since "exposure" to domestic violence is also a harm, the defense would exist if there were a grave risk that the child would face a danger of such exposure.[516] Similarly, since PTSD is also a harm, a grave risk that the child might be exposed to something that would trigger a relapse should qualify for the defense. There is no need to determine how bad the harm would be as children should not suffer "evil."

Some will argue that my literal reading of article 13(b) is inconsistent with the idea that 13(b) should be "narrowly" or "restrictively" construed.[517] However, the Permanent Bureau has noted that there is no indication of what "restrictively" means in the Explanatory Report.[518] In fact, judges around the globe have noted that article 13(b) should be accurately construed, not narrowly construed. The New Zealand Court of Appeals usefully explained: "[T]he exceptions to the obligation to return are by their very nature restricted in scope. They do not need any extra interpretation or gloss . . . . It adds nothing but confusion to say that the [article 13(b)] exception should be 'narrowly construed.'"[519]

---

514. *Harm*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/view/Entry/84259?rskey=fZMonK&result=1&isAdvanced=false#eid [https://perma.cc/KG9D-LMSZ] (last visited Apr. 22, 2021).

515. *See Re E* [2011] UKSC 27 at [34].

516. *Id.*; Van De Sande v. Van De Sande, 431 F.3d 567, 571 (7th Cir. 2005) ("If handing over custody of a child to an abusive parent creates a grave risk of harm to the child, in the sense that the parent may with some nonnegligible probability injure the child, the child should not be handed over . . . ."); Blondin v. Dubois, 238 F.3d 153, 162 (2d Cir. 2001) (identifying a spectrum for the "grave risk of harm" that excludes "situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences" but includes "situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation").

517. *See, e.g.*, Danaipour v. McLarey, 286 F.3d 1, 13–14 (1st Cir. 2002) ("The Convention establishes a strong presumption favoring return of a wrongfully removed child. Exceptions to the general rule of expedient return, including Article 13(b), are to be construed narrowly.") (citations omitted).

518. REFLECTION PAPER, *supra* note 53, at 12.

519. *LRR v. COL* [2020] NZCA 209 at [81, 87] (noting that extends to the "interpretative, fact finding and evaluative exercises involved"). *See also Re E* [2011] UKSC 27 at [31]; Re S (A Child) [2012] UKSC 10, [2012] 2 AC 257 at [6]; DP v. Commonwealth Central Authority [2001] HCA 39 at [9], [44]. Moreover,

Instead, respecting the actual language in article 13(b) honors the purpose of the defense.[520] The drafters were concerned about children experiencing "physical or psychological danger or being placed in an intolerable situation."[521] The Hague Convention was designed to protect children's "true interests."[522] A statement in the *travaux préparatoires* from Mr. Jones, a U.K. delegate to the drafting sessions, indicates that exposure to domestic violence was considered a sufficient harm to trigger the defense.[523]

In sum, the Hague Convention permits a court to deny return if there is a more than serious risk that the child would face a danger of physical or psychological harm or an intolerable situation due to domestic abuse.

## III. Judges Should Often Grant the Article 13(b) Defense Even When the Law Requires Otherwise

Thus far, this Article has offered legal guidance and tools to encourage trial courts to rule in a domestic violence victim's favor when adjudicating the article 13(b) defense. Part II argued that this result is usually possible through judges' exercise of legally authorized discretion, such as in the following ways: (1) understanding that domestic violence is relevant even if the child is not a direct victim of abuse; (2) acknowledging that perpetrators can be dangerous even when the physical violence is not frequent and severe; (3) recognizing that domestic violence short of physical attacks is harmful to direct victims and their children when there is coercive control; (4) appreciating that domestic violence need not always recur for harm to materialize, but that it probably will recur; (5) using the "intolerable situation" language in article 13(b) when appropriate; (6) considering the harm to the child from separation from the protective parent; (7) acknowledging that protective measures are often a chimera; (8)

---

as Rhona Schuz has argued, it is wrong to worry that an approach addressing the prevalence of domestic violence will undermine the Hague Convention because such a view will "undermine the struggle against domestic violence" and it is wrong to think "combatting international abduction should take precedence over that of combatting domestic violence." Schuz, *supra* note 284, at 314.

520. Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000) ("The risk must be 'grave,' and when determining whether a grave risk of harm exists, courts must be attentive to the purposes of the Convention.").

521. Pérez-Vera, *Explanatory Report*, *supra* note 42, ¶ 29; Baran v. Beaty, 526 F.3d 1340, 1348 (11th Cir. 2008) ("[T]he text of the Convention and the commentaries on it place a higher premium on children's safety than on their return.").

522. Pérez-Vera, *Explanatory Report*, *supra* note 42, ¶ 24.

523. *See supra* note 218.

finding a survivor's testimony credible even when not corroborated or consistent; (9) using a preponderance of the evidence standard to find predicate facts; and (10) applying the article 13(b) standard as written, without unwarranted gloss.

Despite these tips and tools, a judge may still believe that the law in the jurisdiction requires the child's return. For example, appellate courts might have set a precedent that requires domestic violence to be severe and frequent to satisfy the article 13(b) defense,[524] or requires reliance on protective measures.[525] While trial judges may still be able to rule for the respondent by massaging the facts, distinguishing precedent, and engaging their moral imagination,[526] the trial judge may feel boxed in by the law even though it dictates a result that he or she believes is unjust.

This Part argues that a judge who encounters such a situation should still grant the article 13(b) defense, assuming there is no other legally authorized way to rule in the respondent's favor.[527] Building upon Jeffrey Brand-Ballard's excellent book, *Limits of Legality: The Ethics of Lawless Judging*,[528] I argue that judges in this situation are morally authorized to disregard the law. Brand-Ballard draws on common morality and practical philosophy to argue that "judges sometimes have the moral right, and moral reasons, to disregard clear legal mandates, and not only when the law is extremely unjust."[529]

---

524. *See, e.g.*, text accompanying notes 140–142, *supra.*

525. *See, e.g.*, text accompanying note 339, *supra.*

526. Bandes, *supra* note 436, at 24 (defining "moral imagination" as "the ability to understand one's own limitations, the limitations of perspective, the range of values at stake, and the possibilities for change inherent in the situation" in order to move away from "arid formalism and closed systems" and pay more attention to "justice").

527. There may be other ways to rule in the domestic violence victim's favor that this Article does not discuss, such as finding that returning the child would violate "higher level rules, constitutional provisions, or (arguably) sufficiently important legal principles." BRAND-BALLARD, *supra* note 18, at 45. *See generally* Merle H. Weiner, *Using Article 20*, 38 FAM. L. Q. 583 (2004); Merle H. Weiner, *Strengthening Article 20*, 38 U.S.F. L. REV. 701 (2004). *See also Sustainable Development Goals: Ending Violence Against Women and Girls*, UNITED NATIONS, https://www.un.org/sustainabledevelopment/ending-violence-against-women-and-girls [https://perma.cc/Y5FT-RLPK] (last visited, Oct. 27, 2018) ("Violence against women and girls is one of the most widespread, persistent and devastating human rights violations in our world today."). In addition, domestic violence can be very relevant to issues such as the child's habitual residence as well as the other defenses. A discussion of these issues is beyond the scope of this Article.

528. BRAND-BALLARD, *supra* note 18.

529. *Id.* at 13. *See also* Zev J. Eigen, David S. Sherwyn & Nicholas F. Menillo, *When Rules Are Made to Be Broken*, 109 NW. U. L. REV. 109, 110–11 (2014) ("There are no formal or moral guidelines for judges to follow when applying

A.    *The Justification for Deviation*

Brand-Ballard argues that judges are ethically permitted to deviate from the law in a "suboptimal-result case"—that is, a case in which the law favors a party, but the party has no moral right to prevail.[530] These are cases where "the law . . . requires the judge to reach a result that she would have an all-things-considered reason to avoid if the law permitted her to do so."[531] It is a suboptimal result when a judge has to return a child to the state of the child's habitual residence because the article 13(b) defense is unavailable, even though the taking parent fled domestic violence.[532]

Judges' moral reasons to deviate from the law stem from the fact that judges are autonomous moral agents who exercise state-authorized power.[533] Judges, like all humans, have a moral duty of nonmaleficence: "the duty not to use physical force against other human beings without justification."[534] In addition, judges, like others, have a "widely-recognized" Samaritan duty that gives them the right to help others or not to harm them.[535] While the law authorizes the judge to abrogate these moral duties by virtue of the judge's position,[536] individuals "ordinarily need moral justification, not just legal authorization," to violate them.[537] Stated another way, just because the law might require a judge to rule in a certain way does not erase the moral reasons not to do so.[538]

A judge who grants the Hague Convention's remedy of return to a domestic violence perpetrator is violating the aforementioned moral duties. The judge is exercising force, or at least the threat of force, against a respondent who is a domestic violence victim by virtue of the order's coercive effect and the emotional distress it will

rules perceived to lead to unjust results."). I extract from Brand-Ballard's 314 pages those parts that best support my own argument, but encourage people to read the entire book to see his full logic. I do not defend his book or even the parts I extracted, although I obviously have found the book compelling. I will, however, raise some questions about his argument as I apply it to the Hague Convention context.

530. BRAND-BALLARD, *supra* note 18, at 10, 16, 170.

531. *Id.* at 90. *See also id.* at 96–97.

532. *Id.* at 303 ("All unjust results are suboptimal, but not all suboptimal results are unjust.").

533. *Id.* at 30 ("Judges are in the force business."); *id.* at 175 ("[J]udges threaten and/or use force with virtually every ruling.").

534. *Id.* at 23.

535. *Id.* at 24.

536. *Id.* at 32.

537. *Id.* at 30.

538. *Id.* at 309.

inflict on the respondent.[539] Granting a petition for a child's return in this context is unjust because the batterer has no moral right to win. The batterer has violated the moral duty to refrain from harming others. The abduction, potentially also a violation of this moral duty, falls within an exception to the duty—the ability to use reasonable force for the purpose of defending oneself or others from culpable aggressors.[540] The domestic violence victim's action also falls within her Samaritan duty in that she is protecting her child from exposure to domestic violence.

On balance, ordering a child's return violates a judge's moral duty to avoid causing harm much more than does denying a Hague Convention petition. The child's return will likely subject the domestic violence victim and the child to severe hardship,[541] as well as a risk of further abuse.[542] The domestic violence victim who does not return with her child suffers the loss of her child, and the child suffers the loss of his or her protective parent. The loss may be temporary, but it may end up being much longer than anticipated, and any loss causes pain and potential harm. In contrast, a batterer who loses a Hague Convention proceeding is only inconvenienced by having to litigate custody in the state to which the taking parent fled.[543] In addition, the judge's decision to order the child's return will deter other domestic violence victims from leaving abusive situations with their children.[544] The net harm gives the judge moral permission to rule for the respondent-victim.

Admittedly, there are prudential reasons for a judge to adhere to the law, but they are too weak in the context of the Hague

---

539. *Id.* at 23.

540. *Id.* at 24. The abduction is per se reasonable when the state is unable or unwilling to defend the citizens against violence. *Id.* at 27.

541. *See supra* text accompanying notes 60–75.

542. *See supra* Part II.B.1–2.

543. The judge's moral authority to deviate from an unjust law does not depend upon the domestic violence victim's moral authority to violate an unjust law, as some theorists contend. Brand-Ballard differentiates the two situations: while an unjust law might violate the individual's rights, "it does not require them to perform immoral positive actions or to violate anyone else's rights. So they have no countervailing moral reason to undermine the putative *pro tanto* moral duty to obey the law." BRAND-BALLARD, *supra* note 18, at 170. The factual scenario of domestic violence discussed in this Article, however, reveals an atypical unjust law that actually gives the abductor a moral reason to disregard the law too, assuming the law prohibits the abduction because the recognized defenses are so narrow. The domestic violence victim has a positive moral obligation to protect her child from harm. The Hague Convention requires her to take no action, or less effective or timely action than the abduction. Second, some say it is not immoral to violate an unjust law. *Id.* at 37, 39 (citing scholars).

544. *See supra* text accompanying notes 76–80.

Convention to obviate the moral case for deviation. Consider, for example, the importance of separation of powers. Brand-Ballard suggests, inter alia, that a judge's deviation from the law does not violate the separation of powers doctrine because lawmaking power is supposed to be shared between branches of government.[545] In fact, there is a strong expectation of shared lawmaking in Hague Convention cases, as the *Guide to Good Practice* suggests. More importantly, lawmaking in the United States is necessarily a shared power in Hague Convention cases. Neither Congress nor the Executive Branch can easily correct the injustice done to domestic violence victims by the Hague Convention. Congress's lawmaking is constrained by the United States' treaty obligations, as well as the strong sentiment among politically active left-behind fathers that abduction is always wrong.[546] The Executive Branch is constrained by the reality that treaty amendment is near impossible; State Parties to the Hague Convention have already rejected the prospect of a protocol to address the topic of domestic violence.[547] The other branches' inability to provide a solution necessitates that judges deviate in suboptimal-result cases. Moreover, separation of powers is not a trump card when the law violates fundamental human rights,[548] which arguably occurs when domestic violence victims and their children are separated or forced to encounter danger pursuant to the Hague Convention and its implementing legislation.[549]

Brand-Ballard does identify one moral reason why judges might adhere to the law in suboptimal-result cases: there may be

---

545. BRAND-BALLARD, *supra* note 18, at 141 ("Deviating in a single case usurps relatively little lawmaking authority."); *id.* at 141 (arguing that a judge who deviates isn't making law, but is simply not applying the law). Even if this and other prudential concerns deserve consideration, they must be balanced against the injustice in a particular case. *Id.* at Chapter 8.

546. *See supra* text accompanying notes 85–86.

547. Weiner, *supra* note 10, at 292 n.54 (citing Eck v. United Arab Airlines, 360 F.2d 804, 812 n.18 (2d Cir. 1966) (noting that "language of [a treaty] is less likely to be modified in the light of changing conditions than is the language passed by a legislative body that convenes regularly"). In terms of the Hague Abduction Convention, the proposal for a protocol did not advance. *See supra* note 96. *See also* Natalia Camba Martin & Gustavo Ferrera Ribeiro, *The "Grave Risk Exception," Efficiency and the Hague Convention on Child Abduction: A Law and Economics Approach*, 24 R. OPIN. JUR., FORTALEZA 177, 195, 197 (2019) (positing that "specification costs [i.e., "the costs associated with drafting, negotiating, assembling, deliberating, and discussing"] of a new binding international treaty were considered so high by the State-Parties—or at least to some of them—that even the discussions on a possible new treaty" was not worth it).

548. Butler, *supra* note 19, at 1824.

549. *See supra* note 527.

systemic effects from deviation that would cause harm.[550] In particular, other judges might mimic the act of deviation but deviate in cases with optimal results.[551] This act of deviation would cause the same moral wrong as when a judge adheres to the law in a suboptimal-result case.[552] Moreover, if judges were deviating frequently, then further deviation might cause "mimetic failure." Mimetic failure exists when the deviation in optimal-result cases exceeds the deviation in suboptimal-result cases.[553] If the frequency of deviation rises to the point that it causes an irreversible cascade of mimetic failure, it could "destroy[] the rule of law indefinitely."[554] This is a variant of the slippery slope argument.[555] In the context of the Hague Convention, this could mean the collapse of the treaty's regime.

While the likelihood of judicial mimicry is an empirical question for which no data exists,[556] the Hague Conference has established mechanisms that make it more likely that judges would actually be aware of deviant decisions. These mechanisms include the INCADAT case law database, questionnaires that ask State Parties to report on notable judicial decisions, the International Network of Hague Judges, specialized Hague Convention benches and bars in some countries, and a judicial newsletter disseminated by the Permanent Bureau.

Yet, the Hague Convention regime also has features that make mimetic failure extremely unlikely. The argument about mimetic failure assumes "that judges cannot distinguish the optimal from the suboptimal-result case."[557] But the risk of deviation in optimal-result cases seems low in the Hague Convention context because State Parties from the beginning have been attentive to the possibility of an interpretation of article 13(b) that is too expansive,[558] and have fostered a fairly firm consensus about cases that are inappropriate

---

550. Brand-Ballard, *supra* note 18, at 188.

551. *Id.* at 181.

552. *Id.* at 187.

553. Brand-Ballard, *supra* note 18, at 310.

554. *Id.* at 236. Such a result requires a "high-level of deviant density." *Id.* at 198.

555. *See id.* at 200 (explaining how this "moral-moral prisoner's dilemma" argument differs from the traditional "slippery slope" argument).

556. *Id.* at 182, 186–87, 213.

557. *Id.* at 198, 207.

558. Text and Legal Analysis, *supra* note 43, at 10509 ("In drafting Articles 13 and 20, the representatives of countries participating in negotiations on the Convention were aware that any exceptions had to be drawn very narrowly, lest their application undermine the express purposes of the Convention—to effect the prompt return of abducted children.").

for the article 13(b) defense.[559]  For example, it is very clear that the defense is inappropriate for cases in which "money is in short supply, or where educational or other opportunities are more limited than in the requested State."[560]  It is also irrelevant when the respondent makes only general assertions about differences in the relative level of safety between the two countries, due to political or economic forces.[561]  Moreover, the mechanisms mentioned above, which might enhance the visibility of deviant decisions to other judges, should also help judges differentiate between suboptimal and optimal-result cases.  In addition to those mechanisms already mentioned in the previous paragraph, there are the Explanatory Report, periodic Special Commission meetings with Conclusions and Recommendations, and the *Guide to Good Practice*.  Further, the Permanent Bureau coordinates the implementation of the Hague Convention[562] and could rally the Hague Network of International Judges, State Parties at a Special Commission meeting, and some prominent judges to provide counsel on the correct interpretation of article 13(b) if too many judges started granting the article 13(b) defense in optimal-result cases.[563]

While the risk of an unwarranted expansion of the article 13(b) defense seems very low if judges deviate in domestic violence cases, a judge who perceived a higher risk would still have a moral basis to deviate from the law.  Brand-Ballard gives four reasons why this is true.  First, "unintended effects provide weaker reasons than

---

559. BRAND-BALLARD, *supra* note 18, at 231.

560. *See, e.g.,* TEXT AND LEGAL ANALYSIS, *supra* note 43, at 10510.  *See also* GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 60 ("The court is not to embark on a comparison between the living conditions that each parent [or each State] may offer.").

561. GUIDE TO GOOD PRACTICE, *supra* note 5, ¶ 61 ("Assertions of a serious security, political or economic situation in the State of habitual residence are therefore generally not sufficient to trigger the grave risk exception.").

562. BRAND-BALLARD, *supra* note 18, at 217, 235 (speaking of the difficulty of coordinated judicial action to monitor deviation density).

563. The power of these forces was obvious after the European Court of Human Rights decided the *Nuerlinger* case. Neulinger and Shuruk v. Switzerland, 54 Eur. Ct. H.R. 31, ¶ 138 (2010) (holding that a child's best interests must be assessed in every Hague Convention case). Hague Convention purists managed to get the European Court on Human Rights to pull back on its holding. X v. Latvia, Eur. Ct. H.R., 356, ¶¶ 106–08 (2013) (holding Hague exceptions are the way a national court can consider the child's best interest, but the exceptions must be "genuinely . . . taken into account" and "effectively examined" and the court must "make a ruling giving specific reasons," ensure adequate safeguards are provided in that country, and put in place protection measures). For a discussion of the politics involved in getting the European Court to retreat from its holding in *Neulinger, see generally* Peter McEleavy, *The European Court of Human Rights and the Hague Child Abduction Convention: Prioritising Return or Reflection?*, 62 NETH. INT'L L. REV. 365 (2015).

intended effects."[564] Judges who would deviate in suboptimal-result cases would have no intention of encouraging other judges to deviate in optimal-result cases, although they may foresee this result.[565] While a judge adjudicating a Hague Convention petition who intentionally adheres in a suboptimal-outcome case involving domestic violence may also not intend any harmful effects, that judge has a much greater chance of causing harm to the taking parent and child and, in some instances, that result is substantially certain.

Second, "[h]arm caused as a side effect or aspect of action provides weaker [moral] reasons than harm caused as a means to an end."[566] Mimetic failure, whether generally or for the Hague Convention specifically, would be a side effect of the judge deviating in a suboptimal-result case.[567] In contrast, the judge who denies the article 13(b) defense in a case with domestic violence uses the taking parent and the child as a means to an end. The child is returned to the habitual residence, even though that is a very bad outcome for them, in order to deter abduction generally.

Third, "[r]emote effects provide weaker reasons than local effects."[568] The effects of deviation, namely the weakening of the Hague Convention, is "spatiotemporally remote."[569] After all, many things can happen in the interim that may interrupt the realization of this more remote consequence, including more education on what constitutes an optimal-result case. In contrast, the harm from returning the child is immediate.

Fourth, a judge is not responsible for the acts of an autonomous posterior judge who deviates in an optimal-result case. The judge has not in any way coerced or commanded the posterior judge to make a suboptimal decision.[570] Brand-Ballard argues that "[e]ffects mediated by subsequent voluntary interventions provide weaker reasons than unmediated effects."[571]

Although a judge has moral reasons to deviate even acknowledging the prospect of mimetic failure, Brand-Ballard ultimately concludes that the morality of the judicial decision to adhere will turn on the likelihood of mimetic failure. "[S]ince the judge has *pro*

---

564. BRAND-BALLARD, *supra* note 18, at 204.

565. *Id.*

566. *Id.* at 204. *See, e.g.*, LRR v. COL [2020] NZCA 209 at [100] ("The interests of the child in not being exposed to that risk [of an intolerable situation] cannot be outweighed by the goal of deterring future would-be abductors.").

567. BRAND-BALLARD, *supra* note 18, at 204–05.

568. *Id.*

569. *Id.* at 203.

570. *Id.* at 203–04.

571. *Id.* at 204.

*tanto* moral reasons to adhere," i.e., to avoid inflicting imperceptible systemic effects, or to avoid "expos[ing] others to *unjustifiable* risks of harm—even miniscule risks,"[572] the morality of the decision will depend upon the risk of undermining, here, the Hague Convention.[573] If a ruling for a domestic violence victim has no perceptible systemic effects and the child's return creates a serious or non-negligible risk of harm to the parent or child, then the judge who deviates is not acting immorally or irrationally in terms of consequences.[574]

Hence, Brand-Ballard's analysis demonstrates that judges can and should grant the article 13(b) defense when raised by domestic violence victims, even if the strict requirements of the law dictate otherwise. Judges need not adhere in suboptimal-result cases because there is a miniscule risk that the Hague Convention will actually suffer harm.[575] Further, while judges may be concerned about their reputation and their judicial oath, "reputational risk" is not something that can outweigh "a moral reason against using force,"[576] nor does a judicial oath to uphold the law provide a moral reason to apply the law when the result is unjust.[577] Even "[a] promise to perform an otherwise immoral act does not give the promisor a reason to perform it."[578]

In sum, judges should do all they can to reach a just result within the bounds of the law. Most of the time, it is possible to do so. However, if a judge cannot arrive at a just result within the bounds of the law, the judge can and should deviate from the law. This outcome is especially warranted because the Hague Convention will not be negatively affected by his or her decision.

---

572. *Id.* at 224.

573. *Id.* at 227–28.

574. *Id.* at 221, 223–24.

575. *See id.* at 223 (calling the risk of triggering mimetic failure from a deviant decision miniscule in "realistic, stable legal systems"). Brand-Ballard does not come right out and blame judges who adhere in suboptimal-result cases, but only argues that "they are morally permitted" to deviate. *Id.* at 286. Yet, he thinks they are arguably blameworthy if they refuse to deviate but think the system will not suffer from their decision to deviate. *Id.* at 269.

576. *Id.* at 269. Brand-Ballard's example here is helpful: "A teenager has an all-things-considered moral reason not to vandalize windows, even if his friends will ostracize him for refusing." *Id.*

577. He first questions, however, whether a judge promises to resolve cases according to the law when the law produces "results that are unjust, bad, immoral, inequitable, or wrong." BRAND-BALLARD, *supra* note 18, at 145.

578. *Id.* at 142. *See also id.* at 147 ("Promises make morally optional actions morally obligatory. They do not make morally impermissible actions morally permissible, much less obligatory."); *id.* at 146 (noting "[a]n oath cannot override or attenuate one's natural duty of nonmaleficence").

### B. *The Method of Deviating*

Assuming a judge decides to deviate in a suboptimal-result case, how should the judge do it? Brand-Ballard recommends that judges should deviate surreptitiously in suboptimal-result cases.[579] Brand-Ballard suggests that judges should engage in fallacious legal reasoning, as the trial judge's decision will never become a precedent.[580] Paul Butler, in *When Judges Lie (and When They Should)*, suggests that judges should "pretend" that their decisions comport with the law.[581] The judge should be "outcome-determinative and crafty,"[582] and "make[] findings of fact to insulate her decision, to the extent that she can, from appellate review."[583] Judge Richard Posner admonishes trial judges never to falsify facts, or consciously twist the facts to minimize the chance of being reversed,[584] but rather to partake in "a fuller engagement with the facts of the case, a greater willingness to knead rules into standards, and a looser interpretation of rules that were created without reference to the situation presented[.]"[585] All of these recommendations are worth heeding.

There are moral reasons to deviate surreptitiously, including the risk that the judge would "be replaced by someone who would instead reach a suboptimal result."[586] Perhaps a more salient concern is that candor may "exacerbate[] mimetic failure, . . . encouraging subpar judges to deviate in optimal-result cases."[587] Consequently,

---

579. *Id.* at 286.

580. *Id.* at 283–85 (discussing how appellate courts can ensure these decisions are weak precedent, such as with an unpublished opinion).

581. Butler, *supra* note 19, at 1792. Butler, too, suggests that "subversive" judging occurs when the judge "believes that the outcome is unsupported by law," but the "correct legal response conflicts with the correct moral response." *Id.* However, he focuses on outcomes that are extremely unjust. *Id.* at 1786.

582. *Id.* at 1817–18.

583. *Id.* at 1792 ("[S]ubversive judges are double agents. Everyone thinks they work for law, but their true boss is justice.").

584. POSNER, *supra* note 27, at 69.

585. *Id.* at 240.

586. BRAND-BALLARD, *supra* note 18, at 27.

587. *Id.* Brand-Ballard recognizes that "judges have a *pro tanto* moral duty to be candid about the law in their public statements" *Id.* (citing, inter alia, Deborah Hellman, *The Importance of Appearing Principled*, 37 ARIZ. L. REV. 1108 (1995)). However, if judges were totally transparent about the rules that influenced their decision to deviate in a particular case, such as the notion of "selective optimization" and "tokenism" that Brand-Ballard promotes, the public might be upset because the rules do not rely on "case-type-specific" factors. *Id.* at 279. Yet Brand-Ballard reminds the reader that anyone with an understanding of what a judge is actually doing when the judge follows his recommendations would understand that the judge is minimizing unfairness in the aggregate. *Id.* at 280.

"[a] judge who deviates has a . . . moral reason to write an opinion that causes minimal failure."[588]  Surreptitious deviation is also preferable because it is more likely to spare the prevailing party the expense and angst of an appeal and subsequent reversal.

My proposal in Part III will undoubtedly sound radical to some people, but scholars report that judges deviate all the time.[589]  In fact, empirical evidence reveals that judges are more apt to deviate when Congress and the Executive Branch are unlikely to fix problematic law.  In *When Rules are Meant to be Broken*,[590] authors Zev Eigen, David Sherwyn, and Nicholas Menillo found that judges were much more likely to deviate in the context of applying the law of sexual harassment when they thought neither the legislature nor an appellate court would fix the unjust rule if the judge called attention to it.[591]  The judges' assessment of the justness of the rule involved attention to the policy, or consequences, as well as "the frequency of cases and the relative harm to litigants and society."[592]  This study suggests that U.S. judges in Hague cases may be particularly willing to deviate, absent a strong moral reason to adhere, because neither Congress nor the Executive Branch is likely to change the law.[593]  In fact, some judges may have already reached just results by deviating surreptitiously.

Judge Posner observes that judges typically delude themselves into thinking that the law permits what they are doing when they deviate. He claims judges never really say, "This is an awful rule but it is the law, so I have a dilemma—can I get around it?"[594]  Rather, they believe their actions are permitted:

---

588. *Id.* at 272.

589. *Id.* at 130 ("Despite the virtual consensus that judges have strong reasons to adhere, few deny that judges do, in fact, deviate from the law, sometimes knowingly."); Posner, *supra* note 27, at 2 ("They tend to parrot an official line about the judicial process (how rule-bound it is), and often to believe it, though it does not describe their actual practices."); Butler, *supra* note 19, at 1785 (claiming "judicial 'subversion' or lying . . . is far more common than is openly acknowledged"); *id.* at 1821 (noting "subversive judges are all around us").

590. Eigen, Sherwyn & Menillo, *supra* note 529, at 109.

591. *Id.* at 113. These were cases that dealt not with the most extreme injustice, such as "whether to execute an innocent person," but rather "whether to impose a financial penalty on a party that can bear it." *Id.*

592. *Id.* at 170 ("All else equal, rules are more likely to be applied [assuming that is the goal], even when application will have harmful results, when the target population of the rule's application is small, and the probability of the harm is relatively low."); *id.* at 167–68 (judges "will consider the frequency of cases and the relative harm to litigants and society caused by strict application of the rules").

593. *See* text accompanying notes 84–86, *supra.*

594. Posner, *supra* note 27, at 213.

> When a judge does bend a rule to avoid an awful result, he
> does not feel that he is engaging in civil disobedience; he
> thinks the rule does not *really* compel the awful result. He will
> have rejected, probably unconsciously . . . the crabbed view
> of "law" that would if adopted make much of what American
> judges do be classified as lawless.[595]

It would be very advantageous if judges did have a false con-
sciousness about what they are doing when they deviate, as Judge
Posner suggests. Brand-Ballard's system of deviation requires a
certain psychological wherewithal.[596] He says that whether a judge
will deviate in a suboptimal-result case depends on the judge's
"self-confidence, humility, intelligence, initiative, and willingness
to risk one's reputation for the sake of others."[597] That describes
an exceptional person. Yet, if Judge Posner is correct and judges
engage in deviation "unconsciously," then even the average judge
may be able to rule for the respondent who is a domestic violence
victim in a Hague Convention case.[598]

## Conclusion

Judges judge. Judges need not shrink away from doing the
task for which they were appointed or elected. Attorneys repre-
senting batterers will raise all of the obstacles to the article 13(b)
defense identified in this Article and argue that judges must find for
the batterer. Judges need not yield their power to these attorneys.
Judge come to the job with their own morality, compassion, and
ingenuity. The arguments of the batterer's attorney are refuted by
this Article, which relies on social science, the new *Guide to Good
Practice*, its sanctioned *Australian Bench Book*, case law, and com-
mon sense. Contrary to what the batterer's attorney might suggest,
the law of the Hague Convention does not tie the judge's hands.
The trial judge can and should grant the article 13(b) defense.

---

595. *Id.* at 213–14.

596. Brand-Ballard, *supra* note 18, at 286 (mentioning the work in-
volved in deciding when to deviate, living with the realization that the opinion
may "misrepresent his actual reasoning," and recognizing that any deviation
may be limited to token cases).

597. *Id.*

598. Brand-Ballard believes that his work does not conflict with Posner's
because, as Brand-Ballard describes it, Posner is talking about cases in which
"judges have legal authority to choose or modify rules." *Id.* at 305. Brand-Bal-
lard based his assessment on Posner's work that predates *How Judges Think*.
Email from Jeffrey Brand to Merle H. Weiner (Sept. 28, 2020) (on file with
author). However, *How Judges Think* is about both trial judges and appellate
judges, and the former are likely to be legally constrained.