1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**MEDFORD DIVISION**

| | |
|---|---|
| **In re the Matter of J.P. and E.P.:** | **Civil Action No. 1:24-cv-00648-AA** |
| ARNAUD PARIS, | |
| **Petitioner,** | **EMERGENCY MOTION FOR PROVISIONAL REMEDIES (INTERIM CONTACT) AND LIMITED STAY OF STATE DECISIONS (22 U.S.C. § 9004)** |
| **and** | |
| HEIDI MARIE BROWN, | |
| **Respondent.** | *EXPEDITED UNDER ARTICLE 11 OF THE 1980 HAGUE CONVENTION* |

## I. INTRODUCTION

Petitioner respectfully requests that the Court enter **narrowly tailored provisional remedies** under 22 U.S.C. § 9004(a) to immediately restore and preserve meaningful parent–child contact during the pendency of these Hague proceedings. The record reflects severe parental alienation concerns identified by qualified experts, and a detailed interim framework is necessary to protect the children's well-being and prevent further deterioration of the father–child relationship while the Court resolves the return petition.

1
2    Petitioner also respectfully submits that interim relief is especially appropriate here because
3    Petitioner has a **strong likelihood of success on the merits**, based on the November 27,
4    2025 French Return Order confirming that, under French law, the children were
5    removed/retained wrongfully since April 2024 within the meaning of **Article 3** of the
6    Hague Convention and ordering their immediate return to France.
7

8
9    Accordingly, Petitioner requests that the Court order an enforceable interim contact
10   framework that includes **immediate video contact** and **meaningful in-person contact in**
11   **the United States**, structured to support proper reunification and to reduce the alienating
12   influences by Mother and her community described in the expert evidence. In light of the
13   severe and community-reinforced alienation dynamics identified by both experts Dr.
14   Marshack and Dr. Guerra, Petitioner further requests that these interim in-person measures
15   occur in a **neutral, culturally appropriate environment** in **San Francisco**, where Mother
16   has family support and where the children can maintain stability through a **French-**
17   **American educational setting** and access to a **French-speaking psychologist**
18   experienced in child trauma and parental alienation—while maintaining appropriate
19   contact between the parents and the children pending the Court's return determination
20

21
22
23   **II. PROCEDURAL POSTURE, THREATS AND URGENCY**

24   The Ninth Circuit has **reversed the dismissal and remanded** this Hague petition for
25   urgent adjudication on the merits under 6 weeks per Article 11 of the Hague Convention.
     *Paris v. Brown*, No. 24-4950 (9th Cir. Oct. 3, 2025).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Time is not neutral here. The children have been suffering for the last 21 months escalating harm from prolonged parent-child separation and coercive gatekeeping as well as severe parental alienation against Father. Petitioner submits an unrebutted child-alienation international expert affidavit by Dr. Guerra describing an ongoing "pattern of parental alienation" and the urgency of immediate contact to mitigate immediately compounding psychological harm. (See attached **Exhibit 01**)

**Meet-and-Confer:** Pursuant to D. Or. LR 7-1(a), Petitioner attempted in good faith on December 30, 2025 to confer with Respondent's counsel to stipulate to immediate interim contact (in-person and video) and avoid motion practice. Counsel refused and instead **<u>threatened further legal action</u>** if Petitioner sought these provisional contact remedies, leaving no practical alternative to this emergency motion.

The children are ten years old. They have been isolated from their father for nearly two years. The expert report of **Dr. Jorge Guerra González,** (See attached **Exhibit 01**) **an international expert in parental alienation and speaker for the HCCH,** establishes that this isolation of the Paris children is causing "dramatic parental alienation" and "irreparable psychological damage."

Consistent with that request, Dr. Kathy J. Marshack, Ph.D. (licensed psychologist in Oregon and Washington) had already recommended an immediate, therapeutically supported interim framework to mitigate the psychological risks of prolonged separation

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

and strong parental alienation through temporary relocation of the children to San Francisco as a neutral setting, continued schooling in a French-American environment, and prompt access to a French-speaking psychologist experienced in child trauma and parental alienation, together with structured visitation and family-therapy/reunification support to preserve the children's relationship with both parents while the return question is resolved. (See attached **Exhibit 12**)

## III. FACTUAL BASIS FOR LIMITED URGENT PROVISIONAL REMEDIES

A. **Contact has been functionally severed.** Prior "call windows" from the Oregon judgment were unworkable (e.g., requiring calls in the middle of the night in France), and Mother has repeatedly failed to facilitate meaningful contact even when Petitioner proposed reasonable video schedules in the interest of the children. Video call is the only viable option to prevent Mother from influencing the children during the phone calls.

B. **Mother has threatened to pursue "harassment" actions** when Petitioner had attempted to call to reach the children, and Mother previously pursued a stalking protective order in Oregon based on Petitioner's attempts to call via WhatsApp to speak with the children after the abduction. These threats have made any spontaneous or flexible contact practically impossible for Petitioner without a proper Hague court order framework with precise times for the video calls and proper calling environment without supervision.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

C. **Mother has used collateral processes to chill contact.** The record includes examples of protective-order tactics triggered by minimal communications, reinforcing why contact must be governed by a **clear, court-ordered protocol** with neutral logistics in a neutral environment respecting the right under the Hague Convention for the left behind parent to preserve the bond with the children as their primary caretaker in France before the abduction (per the French Judgments).

D. **State "Failure to Appear" warrants now obstruct Hague relief and participation.** The outstanding warrant—issued in the orbit of state custody/contempt litigation—prevents Petitioner from safely entering the US to have interim contact and reunification with the children, effectively weaponizing state coercion to frustrate federal treaty enforcement and rights of maintaining proper contact with the left behind parent during the Hague proceedings.

E. **Expert evidence establishes irreparable harm and the need for immediate reunification contact.** Dr. Jorge Guerra González explains that prompt, protected parent-child contact is urgently needed to prevent further entrenchment of alienation-related harm to the children.

F. **Systemic Obstruction of Contact & The "Christmas Refusal" (Exhibits 03–08)** Mother, Respondent claims to support contact, but her actions prove otherwise.

1. **The "3:00 AM" Schedule:** As detailed in **Exhibit 05**, Mother has insisted on the

"Oregon judgement" calls between "6:00–8:00 p.m. Oregon time," fully aware this is **3:00–5:00 a.m.** for the Father in France. She has ignored over 30 requests to adjust this to a time compatible with the children's routine and French time (See attached **Exhibits 03 and 04).**

2. **The Christmas Blockade:** Most recently, Mother refused to allow the children to video call their Father or their French grandparents for Christmas 2025, despite explicit pleas from the family to allow the girls to receive well-wishes and discuss gifts (See attached **Exhibit 07**, Grandparents' email, and **Exhibit 08**, Father's email).

3. **Blocking Extended Family:** Respondent has blocked all contact with the paternal grandparents and the French family for over 21 months, isolating the children from their entire French culture, family, heritage and roots (See attached **Exhibit 06**).

## IV. LEGAL AUTHORITY

**A. This Court has express statutory power to order "provisional remedies," including interim contact/visitation, during a pending Hague case.**

ICARA provides an explicit provisional-remedies provision for contact with children: "In furtherance of the objectives of article 7(b) and other provisions of the Convention, and subject to the provisions of subsection (b) of this section, any court exercising jurisdiction of an action brought under section 9003(b) of this title may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child

involved or to prevent the child's further removal or concealment before the final disposition of the petition." 22 U.S.C. § 9004(a).

Very recently, in *Aubert v. Poast*,W.D. Wis. Apr. 9, 2025, a US federal court reaffirmed that interim visitation is a proper provisional remedy during Hague proceedings :

*The court may order temporary visitation under 22 U.S.C. § 9004 as a provisional remedy "to protect the well-being of the child." See also Ly v. Heu, 296 F. Supp. 2d 1009, 1011 (D. Minn. 2003).* See Page 6 of attached **Exhibit 02**.

This Honorable Court should follow this clear requirement in US Hague caselaw and grant structured reunifications rights and immediate video contact with the children to stop the ongoing irreparable harm of alienation conducted by Mother with the support of the local circuit court in clear violation of Article 16 of the Hague Convention. (See **Exhibit 01**).

Likewise, in Ly v. Heu, the court held it "has authority to grant interlocutory visitation to Petitioner as a provisional remedy" under ICARA's provisional-remedies section. Ly v. Heu, 296 F. Supp. 2d 1009, 1011 (D. Minn. 2003):

*"Section 11604 of ICARA provides courts broad authority to issue appropriate orders "to protect the well-being of the child involved" in Hague Convention proceedings. 42 U.S.C. § 11604(a). Such authority exists only while the court is exercising jurisdiction over an action properly brought under section 11603(b) of the Act." See id.*

1
2
3
4
5
6
7
8
9

*"This court, recognizing the possibility that it might be compelled to return Sandie to France, believed it necessary to her well-being that she have some limited contact with petitioner. Evidence before the court suggested that Sandie had little memory of petitioner or her previous life in France. Therefore, pursuant to section 11604(a) of ICARA, the court fashioned orders to facilitate Sandie's reintroduction to her father and to ameliorate what could have been a significant shock to Sandie had petitioner prevailed on the merits." id.*

10
11
12
13
14

That is exactly what Petitioner seeks here: **temporary urgent, non-merits measures** that protect well-being and restore and preserve the child-parent relationship with the left behind parent who has been severed from the children for more than 21 months while the Hague return petition is adjudicated.

15
16
17
18
19
20
21
22
23

ICARA also expressly contemplates "arrangements for organizing or securing the effective exercise of rights of access." 22 U.S.C. § 9003(b). The Second Circuit has held that this provision permits a civil action seeking access arrangements. Ozaltin v. Ozaltin, 708 F.3d 355, 370–72 (2d Cir. 2013). Even courts that decline to enter final access orders recognize § 9004 authority to order interim contact as a provisional remedy while a return petition is pending.

24
25

Congress also expressly found that wrongful removals/retentions "**[are] harmful to [children's] well-being**," reinforcing that interim safeguards are central—not ancillary—to ICARA's design. 22 U.S.C. ch. 97 findings.

**B. Interim-contact orders are routine in Hague practice internationally (persuasive authority; supports reasonableness and feasibility).**

Courts in other Contracting States routinely order **structured interim video contact** pending Hague adjudication—for example:

High Court of Justice (England & Wales, March 16, 2020) ordering "**twice-weekly video contact**" as an interim arrangement in *AX v CY, HC/E/UKe 1462 Case No: FD20P00010.*

Also R v G, High Court of Justice (Family Division England & Wales , Judgment dated 22 March 2022, para. 7 (describing directions made on November 5, 2021):

*"In paragraph 20 of the 5 November 2021 order, **provision was made for the father and X to have video contact on Tuesday, Thursday and Saturday**."*

Neutral Incadat Citation Number: 2022 EWHC 655 (Fam), Case No: FD21P00779

These confirm that what Petitioner requests is a standard, treaty-consistent tool to prevent the very harm the Hague framework is meant to preserve the children from severe parental alienation which has been ongoing for the last 21 months in violation of the Hague Convention.

**C. Article 16 forbids state-merits custody adjudication while the return petition is pending—and state coercive enforcement cannot be used to obstruct treaty interim contact requirements.**

Article 16 of the Hague Convention provides: "*After receiving notice of a wrongful removal or retention of a child in the sense of Article 3, the judicial or administrative authorities of the Contracting State to which the child has been removed or in which it has been retained shall not decide on the merits of rights of custody until it has been determined that the child is not to be returned under this Convention.*"

Father filed an "*Emergency Motion for Setting Aside Limited Judgment and Emergency Hearing on Kidnapping*" on April 22, 2024 in the Jackson County court, two days before the Final Oregon Judgment was entered by Judge Orr who was made aware of that Emergency Motion. In that motion, Father notified the court that Mother had just "*abducted the children from France… in complete violation of two French judgments*" and was "*keeping them hidden in Oregon,*" and requested to be heard in emergency about this clandestine abduction in order to stay or set aside the Oregon proceedings due to the Hague.

The trial court ignored that request and entered the General Judgment of Default on April 24, 2024—only two days after Father filed the Emergency Motion notifying the court of the children's illegal abduction from France.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**By entering a final custody determination after being put on notice of a wrongful removal, <u>the trial court knowingly violated the mandatory stay requirements of the Hague Convention Article 16</u>**. The local circuit court judge was fully aware of this requirement since he had previously received a letter from the US State Department informing him of that Article 16 requirement under ICARA and the Hague Convention.

As the court held in Yang v. Tsui, 416 F.3d 199, 201 (3d Cir. 2005), "*Article 16 provides that 'until it has been determined that the child is not to be returned under the Convention,' the state to which the child has been removed 'shall not decide on the merits of rights of custody.'*". Furthermore, "*any state court custody litigation [must] be stayed pending the outcome of the Hague Convention litigation.*" Id. at 203.

ICARA/Hague require **<u>federal courts to be able to neutralize conflicting state orders that contravene the treaty</u>**. The Ninth Circuit has recognized:

The Ninth Circuit emphasizes that the Convention's purpose is "*to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court.*" Holder v. Holder, 305 F.3d 854, 865 (9th Cir. 2002) (quoting Mozes v. Mozes, 239 F.3d 1067, 1073 n.10 (9th Cir. 2001) (quoting Friedrich v. Friedrich, 983 F.2d 1396, 1400 (6th Cir. 1993))).

The relief requested here is narrower than vacatur: a **temporary, tailored stay of specific state orders and enforcement actions** (including the outstanding FTA warrants) only to the extent necessary to enable Petitioner to have proper contact with the children under this Court's provisional interim-contact order under 22 U.S.C. § 9004(a), ICARA and the Hague Convention framework, so that meaningful parent-child contact can be promptly re-established, preserved and maintained during the pendency of these Hague proceedings.

## V. ARGUMENT

**A. Provisional contact is necessary to protect the children's well-being and preserve the status quo ante relationship during remand proceedings per Article 16.**

The Court is now actively adjudicating the Hague petition on the merit. The children's well-being is at stake now as it has been for the last 21 months, not after trial. § 9004 exists to prevent precisely the type of accumulating harm described in the expert affidavit of Dr. Guerra and Dr. Marshack (See attached **Exhibits 01 and 12**).

**B. A detailed, enforceable contact protocol is required to prevent interference and prevent fabricated "harassment" claims by Mother.**

Because Mother has previously used collateral accusations and gatekeeping tactics, the Court should not issue vague "reasonable contact" language. Along with a full reunification process with relocation of the children in San Francisco pending the Hague proceedings; the interim video contact order must specify: **(i) times, (ii) method, (iii) privacy, (iv)**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**logistics, (v) documentation channel, and (vi) a neutral exchange mechanism for Mother's visiation rights**.

ICARA authorizes provisional measures "in furtherance of the objectives of article 7(b)" of the Convention, including measures needed to make interim contact orders meaningful. 22 U.S.C. § 9004(a). A tailored stay of the Oregon state court decisions—limited to the extent necessary to allow Petitioner's interim contact and proper reunification with the children—prevents state coercion from frustrating further the ongoing federal treaty required enforcement under ICARA and the Hague Convention.

State FTA warrants that functionally prevents Petitioner from exercising interim contact rights and reunification with the children would defeat § 9004's purpose and impede the 9th Circuit Court ordere remand and violate the entire spirit and letter of the 1980 Hague Convention.

This Honorable Court should enter **a tailored order staying nationwide enforcement of the Oregon orders for the duration of the Hague proceedings and allowing the court-ordered interim contact and reunification process with children to properly take place under the Hague Convention and ICARA.**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**VI. Petitioner Has a Strong Likelihood of Success on the Merits (Wrongful Removal Under Article 3 Confirmed by recent French Return Order making clear findings)**

Petitioner has a strong likelihood of prevailing on the merits of the Hague petition. The Judicial Court of Paris issued a Return Order on **November 27, 2025** that contains an express finding that the children's removal/retention by Mother was **wrongful under Article 3** of the Hague Convention and orders their return to France.

Specifically, the French court **"*FINDS that the removal of the children is wrongful under Article 3 of the Hague Convention of 25 October 1980*"** and **"*ORDERS Ms. Heidi BROWN to return*"** the children to French territory. (See attached **Exhibit 09**, Certified Translation of the Judicial Court of Paris, Return Order, Nov. 27, 2025, at p. 8).

The Return Order further states that Ms. Brown's departure with the children from France in April 2024, "*in violation of the French court decisions and Mr. PARIS' custody rights, constitutes an international child abduction under Article 3 of the Hague Convention.*"(**Exhibit 09 at p. 7**).

While this Court independently determines the Hague issues under ICARA, the French court's findings provide compelling guidance as to what **French law required at the time of removal.**

This merits finding by the court of the children's habitual residence strongly supports Petitioner's Hague claim and reinforces why immediate provisional measures are necessary to protect the children's well-being and preserve the father–child relationship through proper reunificiation while this Court resolves the Hague return petition.

The French Return Order also expressly encouraged the parties to pursue international mediation, and Petitioner attempted to do so. The court-appointed mediator confirmed that a mediation information meeting was held on **December 4, 2025** "*in the presence of Mr. PARIS who accepted to enter mediation,*" but the mediator remained "***without news from Ms. Brown despite my emails***", and therefore closed the file after the court-imposed deadline expired. (See attached **Exhibit 10,** Google Translation from Email from Maître Audrey SONNENBERG, International Mediator, Dec. 8, 2025).

In the mediator's words:

***'Unfortunately, I remain without any news from Ms. BROWN despite my emails.'* (Id.)**

Mother's non-responsiveness to the international mediator's outreach confirms that voluntary cooperation is not presently functioning and supports the necessity of a **court-ordered, time-specific interim contact schedule** and related safeguards to prevent further erosion of the children's relationship with their father during these Hague proceedings.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## VII. PROPOSED INTERIM CONTACT PLAN

Petitioner requests that the Court enter a **temporary, structured contact framework** under 22 U.S.C. § 9004(a) and reunification process with relocation to San Francisco to protect the children's well-being while the Hague return question is pending, tailored to the severe parental-alienation concerns identified in the expert evidence (**Exhibits 01-12**).

Specifically, Petitioner requests an interim Hague contact order providing:

1. **A clear, enforceable interim contact schedule in the United States** (with specific days and times) to restore meaningful Father–child contact immediately and to prevent interference or "harassment" allegations by Mother based on Father's attempts to communicate with the children.

2. **A safe pathway for the children to reunite with their French family in San Francisco** during these Hague proceedings (including in-person contact for Father and appropriate contact for French relatives), **without any risk of Father being arrested**, by temporarily staying the enforcement of the outstanding FTA warrants **only to the limited extent necessary** to allow Father's physical presence for interim contact measures and reunification process pending Hague proceedings.

3. **Immediate initiation of a reunification process** supported by a **French–American psychologist (fluent in both French and English)** with experience in high-conflict separations and parental alienation, to begin repairing the father-child relationship and mitigating the harm caused by the 21 month prolonged separation

and alienation dynamics from Mother described by the experts (**Exhibits 01-12**).

4. **Continued, appropriate contact between Mother and the children in San Francisco** (where Mother has family) during the pendency of the Hague proceedings, structured so that the children's relationship with both parents is protected while the Court resolves the return Hague petition on the merit.

Petitioner does not request a merits custody determination through this interim contact order. Petitioner requests only provisional interim contact measures necessary to protect the children's well-being and preserve meaningful family relationships pending the Court's final disposition per the Hague Convention.

To prevent further alienation, Petitioner requests the following specific video call schedule:

**1. Remote Video Contact Schedule (French-Time Compatible)** Respondent shall make the children immediately available for unsupervised video calls pending reunification process on:

- **Wednesdays:** 10:00 a.m. (Oregon) / 7:00 p.m. (France)
- **Saturdays:** 10:00 a.m. (Oregon) / 7:00 p.m. (France)
- **Sundays:** 9:00 a.m. (Oregon) / 6:00 p.m. (France)

**2. Safeguards & Non-Interference**

- **Privacy:** Mother and her family are strictly prohibited from monitoring, interrupting, or "coaching" the children during and before calls.

- **Grandparent Access:** During the Saturday call, the children shall have at least 20 minutes of dedicated video time with their paternal grandparents.
- **Device Reliability:** Respondent must ensure the children have a charged device and a stable internet connection for every scheduled video call.

### 3. In-Person Visitation & Passport Surrender

- **Passports:** Mother shall immediately surrender the children's passports to the Clerk of Court to avoid Mother's flight to escape these Hague proceedings per ICARA.
- **Visitation:** Upon the staying of the state warrants, Petitioner shall be granted unsupervised daytime custody rights in San Francisco along with the reunification process supervised by a French-American expert. Mother will also have supervised visitation right with the children in San Francisco pending the Hague proceedings.

## VIII. CONCLUSION

For the reasons set forth above, Petitioner respectfully requests that the Court grant narrowly tailored **provisional remedies** under 22 U.S.C. § 9004(a) to protect the children's well-being and restore and preserve meaningful family relationships with their Father who was their primary caregiver before the addutcion in April 2024 while this Hague petition is adjudicated on remand.

Petitioner has a strong likelihood of success on the merits. The Judicial Court of Paris has confirmed, under French law, that the children's removal/retention occurred in violation of

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Petitioner's custody rights and constitutes a wrongful removal within the meaning of Article 3 of the Hague Convention. (**Ex.10,** Judicial Court of Paris, Return Order, Nov. 27, 2025, at pp. 7–8).

The record also supports immediate, specific interim relief. Dr. Jorge Guerra González explains that the prolonged separation has created an urgent risk of escalating psychological harm and that prompt, structured contact and reunification is necessary to mitigate entrenched alienation dynamics. Dr. Kathy Marshack similarly identifies severe parental alienation concerns and emphasizes that delay increases the risk of permanent estrangement especially if the children remain in Ashland.  In these circumstances, a vague directive for "reasonable contact" is not sufficient; the Court's interim order must include relocation in San Francisco with visitation rights and be **time-specific and immediately enforceable** to ensure the children maintain a meaningful connection with their left-behind parent, who was their primary caregiver prior to removal and be properly reunited with him.

Accordingly, Petitioner respectfully requests (1) immediate entry of a detailed immediate interim video-contact schedule at workable France–Oregon times with basic non-interference protections, (2) a safe rapid pathway for in-person contact in San Francisco and Oregon during the pendency of this case, and (3) prompt initiation of a reunification-oriented process with a neutral, culturally competent French American reunification professional in San Francisco.

## AFFIDAVIT OF ARNAUD PARIS IN SUPPORT OF MOTION

## FOR PROVISIONAL INTERIM CONTACT

I, **Arnaud Paris**, declare under 28 U.S.C. § 1746:

1. I am the Petitioner, proceeding pro se. I make this declaration in support of my motion under **28 U.S.C. §§ 144 and 455**. I declare under penalty of perjury that the foregoing is true and correct.

2. Since approximately April 2024, my contact with the children has been functionally severed. I have repeatedly attempted to establish a simple, consistent video-call schedule that is workable for the children's routines and also workable in France.

3. Over many months, I sent repeated written requests proposing reasonable alternative schedules at workable France–Oregon times. True and correct copies of representative communications are attached as Exhibits 03, 04 and 05.

4. In the days immediately preceding Christmas 2025, I requested that Respondent allow a brief video call so the children could receive holiday greetings from me and from their paternal grandparents in France. I made these requests in writing and proposed multiple reasonable time options. See attached Exhibit 08.

5. The paternal grandparents emailed requesting a short Christmas video call and expressing their desire to wish the children a Merry Christmas and discuss gifts. A true and correct copy is attached as Exhibit 07.

6. Respondent refused to allow the children to video call me or their paternal grandparents for Christmas 2025, or otherwise failed to facilitate any Christmas video call despite these explicit requests.

7. This Christmas refusal is consistent with the broader pattern I have experienced: extended gaps in contact, refusal to implement a workable schedule, and isolation of the children from my side of the family.

8. This affidavit is submitted in support of my Motion for

9. This affidavit is made in good faith and not for the purpose of delay.


DATED this 31st day of December, 2025, in Paris, France

Submitted by:
Arnaud PARIS, Pro Per

13 rue Ferdinand Duval
75004 Paris, FRANCE
+33.6.88.28.36.41

# CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **EMERGENCY MOTION FOR PROVISIONAL REMEDIES (INTERIM CONTACT) AND LIMITED STAY OF STATE DECISIONS** on the following party:

<div align="center">
Katelyn Skinner at kds@buckley-law.com<br>
Katrina Seipel at kas@buckley-law.com<br>
Attorneys for Respondent
</div>

By the following method or methods:

_____ by **mailing** full, true, and correct copies thereof in sealed, first class postage prepaid envelopes, addressed to the attorneys(s) as shown above, the last known office address of the attorney(s), and deposited with the United States Postal Service at Portland, Oregon on the date set forth below.

 X    by **emailing** full, true, and correct copies thereof to the attorney(s) at the email address shown above, which is the last known email address for the attorney(s) office, on the date set forth below by Oregon process server.

_____ by **faxing** full, true, and correct copies thereof to the attorney(s) at the fax number(s) shown above, which is the last known fax number for the attorney(s) office, on the date set forth below.   The receiving fax machines were operating at the time of service and the transmission was properly completed.

_____ by selecting the individual(s) listed above as a service contact when preparing this electronic filing submission, thus causing the individual(s) to be served by means of the **court's electronic filing system**.

DATED this 31st day of December 2025, in Paris, France.

By:_____
ARNAUD PARIS, Petitioner

ARNAUD PARIS
13 rue Ferdinand Duval
75004, PARIS, FRANCE
Telephone: +33688283641
Email: aparis@sysmicfilms.com

EXHIBIT 01

**Declaration of Dr. Jorge Guerra González**

I, Jorge Guerra González, under penalty of perjury, declare:

1.  My name is Jorge Guerra, I'm an expert in research, teaching, and practice at the intersection of law and psychology, with international experience in family law and child protection. My work focuses on the importance of family bonds and the severe consequences of their severance, combining theoretical knowledge with practical expertise as a court expert, mediator, and educator. The result of my research has been presented to many universities and institutions at the Assemblée National Française (Paris, March 2023), the The Hague Conventions' Commission (Washington, March 2025) and the World Congress on Family Law and Children's Rights (University of Cambridge, July 2025).  My CV is attached to this affidavit.

2.  On August 8th 2025, I was asked to review the family situation of Eva and Juliette Paris following their abduction from France in April 2024. In preparing my report, I reviewed and analyzed more than ninety documents, recordings, and other materials concerning the welfare of Eva and Juliette Paris since 2022 and the pattern of parental alienation following their abduction from France in April 2024. These included phone calls soon after the abduction and several in the following months; email exchanges in which the mother refused proper communication and ignored all requests for the French family to visit the children in Oregon. I also examined witness statements describing how the abduction was conducted in the middle of the French school year, evidence showing that the children were used as leverage in the mother's legal pressure supported by Oregon judges, and documentation demonstrating that proper contact was refused for more than twenty months.

1

EXHIBIT 01 - Page 1 of 11

I also reviewed videos from 2022 showing the mother's psychologically coercive behavior toward the children during the parent's separation.

3. In addition, I reviewed the father's repeated but unsuccessful mediation efforts to de-escalate the conflict in the children's interest since 2023, transcripts of Oregon hearings where the father was pressured by local judges to transfer jurisdiction to Oregon as a condition to see his children which were also relayed to the children themselves by the mother, and testimonies from local witnesses describing a "witch-hunt" climate within the community in Oregon since the abduction reinforcing the children's alienation from their father and their French identity. Here are the main conclusions of my expert report regarding the children:

4. **Separation from Father and Home Environment:** Since the abduction, the Paris children have been **forcibly separated** from Mr. Paris, who was their primary caregiver and custodial parent. Prior to the abduction, the girls enjoyed daily contact and a strong, secure emotional bond with their father. That bond was abruptly severed when the mother unilaterally removed them from their home, school, friends, and extended family in France. The children's entire familiar environment and support network were suddenly taken away. They have had only minimal and sporadic contact with Mr. Paris since (largely due to the mother's obstruction), and **no physical contact at all** for over a year. Including with the rest of the French family, particularly the French grandparents that the mother has even refused could come to visit the children in Oregon. This period of now twenty months of separation constitutes an extremely long time in the life of young children, a critical period in which they have been deprived of paternal love, stability, and guidance.

2

EXHIBIT 01 - Page 2 of 11

5. **Current Situation of the Children:** Eva and Juliette are currently believed to be living with their mother in Oregon, USA. Under all these circumstances they are **isolated from the father, their bond to him being intentionally severed** as much as the link to their French family, culture, and language. There are indications that the mother has been actively frustrating any contact with Mr. Paris and has been engaging in behavior that alienates the children from him. According to reports the Applicant has received, the mother has **"instrumentalized"** the children and disparaged the father in front of them. Such conduct, if confirmed, is a classic pattern in parental alienation scenarios – it **poisons the children's minds** against the loved and loving parent and deepens the emotional rift. The girls have already endured the trauma of a **parental abduction** event; since then, they have been exposed to ongoing **loyalty conflicts and stress**. There is grave concern that the longer this abnormal situation persists, the more it will damage the children's mental health and development. Indeed, my expert psychological report finds that the Paris children are **at immediate risk of severe psychological harm absent urgent intervention**.

6. **Cumulative Effect:** Together, the mother's alienating conduct and the court's restrictive measures create a dual barrier to the children's relationship with their father. This combination is particularly damaging because it denies the children both spontaneous affection and institutional protection of their bond. Clinically, this accelerates the risk of irreversible alienation and long-term psychological harm.

7. This compounding effect has been explicitly acknowledged in Oregon hearings, where the presiding judge suggested that the father could only see his children if he abandoned French judgments and Hague rights. Such statements demonstrate to the children that their relationship with their father is conditional and negotiable,

EXHIBIT 01 - Page 3 of 11

rather than fundamental and protected — a message that deepens the psychological injury of alienation and involves directly the Oregon judiciary in what constitutes serious child abuse.

8. **Psychological Impact of Unjustified Parental Bond Severance:** The circumstances of this case represent what I, Dr. Jorge Guerra González, as court expert psychologist, identify as a radical version of an **"Intended but Unjustified Severance of Parental Bonds (IUSPB)"**. IUSPB describes a situation where a child's relationship with a parent is deliberately obstructed without a valid reason – in other words, the parent–child bond is intentionally broken apart despite the parent being loving and fit. Crucially, IUSPB is recognized in mental health literature as a **form of psychological child abuse** (indirectly acknowledged by DSM-5 and ICD-11 diagnostic frameworks). The rationale is simple: a stable, continuous bond with a primary caregiver is essential for a child's healthy emotional development, and **unjustified disruption of that bond is profoundly traumatic**. In this case, Eva and Juliette's secure attachment to their father has been suddenly disrupted by the abduction, amounting to a textbook example of IUSPB.

9. **T**he girls are **currently exposed – and will continue to be exposed unless an urgent intervention is issued – to serious harm to their health and well-being** as a result of the ongoing separation. The report's key findings can be summarized as follows:

10. **Multi-dimensional Psychological Harm:** Children who are unjustifiably separated from a parent exhibit elevated rates of **emotional and psychological distress**, including depression, generalized anxiety, and even post-traumatic stress symptoms. Many suffer from chronic nightmares and intense feelings of guilt or self-

4

EXHIBIT 01 - Page 4 of 11

blame, internalizing the trauma of the separation. Clinical observations also note **low self-esteem**, difficulty regulating anger, and identity confusion in such children. In extreme cases, **suicidal ideation** has been reported among children who feel they have effectively "lost" a parent. It is difficult to overstate the severity of this emotional pain: the severance of a secure attachment bond fundamentally undermines the child's basic sense of safety and love.

11. **Developmental and Cognitive Disruption:** Unjustified parental separation often leads to significant **developmental setbacks**. Alienated children frequently experience concentration and attention problems, declining academic performance or **school failure**, and various behavioral difficulties. Some children become **withdrawn, depressed, or overly perfectionistic** as they internalize the stress, while others may externalize their distress through aggression, defiance, or other conduct issues. In Eva and Juliette's case – at ages when personality and social skills are rapidly developing – the lack of a father's guidance and the strain of their predicament risk impairing their ability to learn and thrive.

12. **Social and Attachment Impairments:** Research indicates that children subjected to IUSPB often develop **trust issues and social difficulties**. Because a fundamental trust (the parent-child relationship) was betrayed or severed, these children struggle to form **healthy peer friendships or later romantic relationships**. They may also have an impaired capacity to establish secure attachments in adulthood, fearing abandonment or conflict in relationships. In the short term, Eva and Juliette's sudden displacement to a new country – coupled with being told (implicitly or explicitly) that their father is not part of their life – is likely causing confusion and insecurity in their social world. They have effectively lost not just a parent but also

EXHIBIT 01 - Page 5 of 11

grandparents, cousins, and friends in France, which can lead to loneliness and difficulty trusting others.

13. **Physical and Psychosomatic Symptoms:** The trauma of forced separation can manifest in **physical health issues** as well. Children in such situations often report sleep disturbances (insomnia or nightmares), changes in appetite or eating disorders, and other stress-related symptoms. Chronic high stress can weaken the immune system and lead to headaches, stomach aches, or other psychosomatic complaints in children. It is known that **toxic stress** in childhood – such as the stress of parental loss – can even impact brain development and physical growth. Thus far, Mr. Paris has extremely limited information on his daughters' health, but he is deeply concerned that their well-being is deteriorating in these subtle but serious ways.

14. **Long-Term Trauma and Irreversible Consequences:** Perhaps most alarmingly, the harm from IUSPB is **not transient; it can cast a shadow over the child's entire life**. Longitudinal studies and interviews with adults who were alienated as children show enduring negative impacts. These individuals often carry **persistent low self-esteem and chronic depression** into adulthood. They experience higher rates of **substance abuse**, difficulty maintaining relationships (often leading to divorce or estrangement), and even tend to have lower educational and professional attainment. Some suffer an **intergenerational effect**, wherein the unresolved trauma of losing a parent without cause contributes to them later becoming estranged from their *own* children. In sum, unjustified attachment disruption is "**not a transient difficulty but a lifelong risk factor**" for a host of adverse outcomes. If

6

EXHIBIT 01 - Page 6 of 11

Eva and Juliette are not promptly reunited with their father and provided a normal, loving environment, they may similarly carry psychological scars well into the future.

15. Based on the undisputed facts – the **abrupt and prolonged severance** of contact with their loving father, the length of the ongoing alienation (now beyond one year), the prior trauma of the abduction itself, and signs that the mother may be **actively undermining** the children's relationship with their father – the prognosis for the girls is *"highly concerning."* The report concludes that **Eva and Juliette face an immediate and long-term risk of severe psychological harm** if the severance of the bond with their father continues. The current circumstances have placed the children on a trajectory of **"emotional trauma, developmental disruption, and social difficulties,"** and urgent corrective action is required to halt and reverse this harm. Importantly, the harm to the children is **ongoing and compounding over time**: every additional day of forced separation and alienation further entrenches the trauma and makes reunification more difficult. This is the **very definition of irreparable harm** – once a child's formative years pass in trauma and once a parent–child bond is destroyed, no later remedy can fully undo that damage.

16. The passage of such time is gravely harmful to the children: each additional month entrenches in their minds **the idea that the mother's wrongful act is normal and permanent, eroding their bond with their father and French family.** This underscores the need for **immediate intervention of the Oregon District Court to prevent the devastating consequences of the Oregon Judgement that supports Mother's escalating IUSPB**. Without a set aside of the Oregon judgment, Mother can further impose psychological harm onto the children during the Hague proceedings to erode the strong bond they had with their Father and further

7

EXHIBIT 01 - Page 7 of 11

condition them into refusing a return to France. **Only this Court** can break the stalemate and exponential growing harm by compelling heightened action and focus on the children's situation as a human-rights emergency and order interim in person contact measures with Father pending the end of the Hague proceedings.

17. The urgency in this case is not merely procedural but human and profound. As detailed above, Eva and Juliette's **childhood is slipping away** in an environment of emotional turmoil and confusion. The harm to the children's mental health and to the girls' development is happening now, daily. Psychological research emphasizes that **delays in intervention exacerbate harm** – a truth painfully relevant here. The longer they are kept from their father, the greater the risk that their relationship with him will be permanently destroyed.

18. **Conclusion:** In my professional opinion, the children's ongoing separation from their father results not only from the mother's alienating conduct but also from judicial measures that have institutionalized this separation. The April 2024 Oregon judgment granted full control to a parent who had just committed a clandestine abduction in the middle of the children's school year — an act later confirmed by the French Court of Appeal as "clandestine" and "selfish." Every subsequent judicial refusal to stay or set aside the April 2024 Oregon judgment in light of the escalation of the parental alienation supported by the Oregon courts has deepened that very same alienation. This dual dynamic places Eva and Juliette at immediate risk of profound and irreversible psychological harm. Each additional week without regular contact intensifies the alienation and makes reunification more difficult. For this reason, urgent corrective action is required: only the set aside of the operative Oregon judgment along with interim contact measures with Father pending the

EXHIBIT 01 - Page 8 of 11

Hague proceedings will help restore consistent contact and can safeguard the children's emotional development and protect their fundamental right to maintain a secure bond with both parents, which both Father and the French courts have always demonstrated they wanted to maintain in the interest of the children.

I hereby declare under penalty of perjury under the laws of the State of Oregon that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on December 13th of 2025 at Hamburg, Germany.

_____

Dr. Jorge Guerra González

9

EXHIBIT 01 - Page 9 of 11

**Dr. Jorge Guerra-González, Ph.D.**
Psychologist, Researcher, Legal Expert and Family Policy Advocate
Berlin, Germany — www.jorgeguerra.de

**About Dr. Jorge Guerra-González**

I am a psychologist, judicial expert and researcher dedicated to improving family systems, with a special focus on child protection, parental alienation, and the socio-psychological dimensions of justice. My work bridges the worlds of clinical psychology, social policy, and human rights advocacy.

For more than two decades, I have been committed to reforming how institutions respond to family crises—working with interdisciplinary teams of judges, social workers, and mental health professionals to rethink how families are supported in moments of conflict or vulnerability.

I am also an international lecturer and consultant on family systems, psychological trauma, and ethical reform in child welfare. My professional mission is rooted in the belief that sustainable social systems must protect not only the child's safety but also their emotional integrity and their fundamental right to family life.

**Education**

**Ph.D. in Psychology** — Humboldt University of Berlin
**M.A. in Psychology** — University of Bremen
**B.A. in Social Psychology** — University of Heidelberg

**Professional Experience**

**Founder & Director — Family System ReDesign Initiative (Berlin, Germany)**
*2015–Present*
Leads interdisciplinary research and policy dialogue to modernize Europe's approach to family and child protection systems. Organizes symposiums and produces studies bridging psychology, social work, and law.

**Lecturer and Researcher — Humboldt University of Berlin**
*2010–2019*
Taught courses on developmental psychology, trauma, and ethics in family systems. Supervised postgraduate research on high-conflict family dynamics and children's well-being after separation.

**Psychologist and Forensic Consultant**
*2005–Present*
Provides expert evaluations in family court proceedings in Germany and abroad, focusing on attachment disruption, parental alienation, and the impact of institutional behavior on children's mental health.

EXHIBIT 01 - Page 10 of 11

**Advisor — European Network on Parental Alienation and Family Law Reform**
*2020–Present*
Collaborates with policymakers and NGOs to promote evidence-based reforms in European family law and child protection protocols.

**Research and Advocacy Focus**
- Family system dysfunction and institutional trauma
- Parental alienation and child psychological resilience
- Ethical standards in child protection and custody evaluations
- Integration of neuroscience and attachment theory in social policy
- Cross-national cooperation in family law reform

**Selected Presentations & Conferences**
- **World Congress on Family Law & Children's Rights** (2025) — "Rethinking Family Support Systems"
- **European Conference on Child Welfare Ethics** (2024) — "Institutional Responsibility in Family Trauma"
- **Psychological Society of Germany Annual Meeting** (2023) — "Parental Alienation as Systemic Failure"
- **UNESCO Expert Forum on Family Policy** (2022) — "The Future of Child-Centered Systems in Europe"

**Publications & Media Contributions**
- Numerous scientific and policy articles on family dynamics, ethics, and systemic reform (see www.jorgeguerra.de/publications).
- Frequent commentator on European radio and television on child protection reform and family justice ethics.
- Contributor to *Psychologie Heute*, *Der Standard*, and *Le Monde Diplomatique*.

**Languages**

German — English — Spanish — French

**Professional Philosophy**

"My work is guided by a simple conviction: every child deserves a system that listens to them — and every family deserves a system that heals, not punishes."

EXHIBIT 01 - Page 11 of 11

EXHIBIT 02

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

YVES AUBERT,

                              Petitioner,

     v.                                         OPINION and ORDER

LAURIE LEE POAST,                       24-cv-926-jdp

                            Respondent.

---

Petitioner Yves Aubert petitions under the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act (ICARA) for the return of his two minor children to Norway. The children, whom the court will refer to as LPA and APA, are eleven and six years old respectively. The children's mother, respondent Laurie Lee Poast, brought them from Norway to Wisconsin in May 2024 for a family visit and now refuses to return them to Norway.

Two motions are before the court. First, Poast moves to dismiss the complaint, contending that Aubert lacks custody of the younger child, APA, and thus cannot seek her return through a Hague petition. Second, Aubert moves for supervised visitation with the children during the pendency of these proceedings. The motion to dismiss will be denied because Poast has not established that Aubert lacks custody rights over APA. The motion for supervised visitation will be granted because the court concludes that visitation is in the children's best interest.


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

EXHIBIT 02 - Page 1 of 10

ANALYSIS

## A. Poast's motion to dismiss

Poast contends that Aubert cannot seek APA's return under the Hague Convention because he lacks custody rights over APA. Although Poast's arguments apply only to APA, Poast moves to dismiss the petition in its entirety on the basis that LPA and APA should not be separated. The court will deny Poast's motion to dismiss the petition for APA, so it need not consider the issue of separating the children.

Poast moves to dismiss for both lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). But Poast's challenge to Aubert's custody rights does not raise jurisdictional issues. A federal court's subject matter jurisdiction is limited by Article III and any other applicable statutory requirements. *Tereshchenko v. Karimi*, 102 F.4th 111 (2d Cir. 2024). Aubert has Article III standing: Poast's removal of his children from Norway is a concrete and redressable injury. *See Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992)). The court also has statutory authority to hear this case: ICARA confers on federal district courts original jurisdiction of all actions arising under the Hague Convention. 22 U.S.C. § 9003(a). Poast's contention that Aubert lacks custody rights is a challenge to the merits of Aubert's petition, not to jurisdiction. *See Tereschchenko*, 102 F.4th at 126 (concluding that the issue whether father consented to children's removal was not jurisdictional). The court will analyze the motion under Rule 12(b)(6), not Rule 12(b)(1). Under Rule 12(b)(6), the question is whether, drawing all reasonable inferences in favor of the petitioner, the petition states a plausible claim for relief

2

EXHIBIT 02 - Page 2 of 10

under the Hague Convention. *See Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997).

Poast's motion concerns the custody element of a Hague Convention petition. To establish a prima facie case for return, the petitioner must show "wrongful removal" of a child, meaning removal in breach of a right of custody held by the petitioner in the country of habitual residence. Hague Convention Art. III(a). The Convention defines "rights of custody" to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Id.* Art. V(a). Rights of custody are distinct from rights of access, which do not allow a parent to petition for a child's return. *Abbott v. Abbott*, 560 U.S. 1, 9 (2010). Visitation is a right of access, so a parent with only visitation rights may not petition for a child's return. *Id.*

The parties agree that the relevant law for determining Aubert's parental rights is Norway's Children Act. *Act Relating to Children and Parents (Children Act)*, *available at* https://www.regjeringen.no/en/dokumenter/the-children-act/id448389/. Under the Children Act, parents may have sole or joint "parental responsibility," which gives them the right to make decisions for the child. *Id.* § 33. A parent who lacks parental responsibility may still have access rights under the Children Act. *Id.* §§ 42–46. Parents with access rights also have rights to be informed, to express an opinion, and to request mediation on issues that affect their access rights, including the child's relocation. *Id.*

Aubert admits in the petition that he does not have parental responsibility for APA. Dkt. 1, ¶ 6. Aubert did have visitation rights with APA at the time of her removal. The parties were involved in an active custody case when the children were removed; as part of that case, they had reached a temporary agreement allowing Aubert to visit the children. *Id.* ¶¶ 52–53.

3

EXHIBIT 02 - Page 3 of 10

Poast contends that Aubert's petition fails as a matter of law because Aubert's parental rights to APA were limited to visitation, which is an access right and not a right of custody. Poast argues that section 40 of the Children Act is dispositive. The first paragraph of section 40 says that "[i]f one of the parents has sole parental responsibility, the other parent may not object to the child relocating abroad."

In response, Aubert contends that the Children Act gives him a *ne exeat* right to APA even though he lacks parental responsibility over her. A *ne exeat* right— the right to prevent the child's removal abroad—is a custody right under the Convention. *Abbott*, 560 U.S. at 11. Aubert identifies four sections of the Children Act as the source of his *ne exeat* right:

- Section 40, ¶ 3: "If the parents disagree as to who shall have parental responsibility, or on international relocation or custody, the child must not relocate abroad until the matter has been decided."

- Section 42a: "If one of the parents intends to relocate within Norway or abroad, and access has been determined by agreement or decision, the parent who intends to move shall notify the other parent no later than three months prior to relocation. If the parents disagree regarding relocation, the parent who intends to relocate with the child must request mediation pursuant to section 51." Dkt. 1-1, at 13.

- Section 46: "Any person who has right of access to the child shall, as far as possible, be allowed to express an opinion before the parent who has parental responsibility takes decisions that will make it impossible or considerably more difficult to exercise right of access to the child."

- Section 51, ¶ 4: "Parents who disagree regarding the child's relocation must attend mediation."

Aubert argues that the temporary agreement giving him visitation rights to APA gave him "access . . . determined by agreement or decision," meaning that Poast was required to inform him of APA's impending relocation and give him a chance to mediate. He says that Poast failed to comply with the notification requirement, which prevented him from exercising his right to mediate under section 42a and to express an opinion on the relocation under section 46.

4

EXHIBIT 02 - Page 4 of 10

In her reply brief, Poast argues that Aubert had no right to notification under section 42a because the parties' visitation agreement was temporary: the agreement prescribed only three visits between February and May 2024, with additional visitation to be determined at the next court proceeding on May 31, 2024. But Poast's argument is contradicted by the plain language of section 42a, which states that a party with "access . . . determined by agreement or decision" has a right to notification before the child is relocated. Poast cites no authority to support her argument that a temporary agreement is not an "agreement" under section 42a.

But that doesn't resolve the issue. The key question is whether the Children Act, which gives Aubert the right to be notified, to request mediation, and to "express an opinion" before APA is relocated, but which also states that Aubert may not "object" to APA's relocation abroad, gives Aubert a *ne exeat* right to prevent APA's removal from Norway. Whether the Children Act gives Aubert a *ne exeat* right is a question requiring interpretation of foreign law. The court resolves issues of foreign law in a Hague Convention case like any other question of law, but the court may consider "any relevant material or source, including testimony" in resolving the issue. *Garcia v. Pinelo*, 808 F.3d 1158, 1163 (7th Cir. 2015) (quoting Federal Rule of Civil Procedure 44.1).

Neither side has adequately briefed the key question in this case. Both Aubert and Poast have simply pointed to the sections of the Children Act that benefit them, without explaining how those sections interact with each other or what rights they confer on Aubert to prevent APA's removal. Because neither side fully addressed the relevant issue in their briefs, the court declines to rule now on Aubert's custody rights. The court will deny the motion to dismiss. In their pretrial submissions, the parties should explain more fully whether the Children Act does or does not allow Aubert to prevent APA's removal from the country, in light of all the relevant

5

EXHIBIT 02 - Page 5 of 10

sections identified above. In addition to their affidavits of foreign law, the parties should cite case law or other sources of Norwegian legal authority that would help the court decide this issue.

**B. Aubert's motion for supervised visitation**

Aubert moves for supervised visitation with the children during the pendency of these proceedings. Specifically, he asks for video visits with the children while he remains in Norway, and for in-person visits once he arrives in Wisconsin for the evidentiary hearing. The relevant legal standard is not in dispute. The court may order temporary visitation under 22 U.S.C. § 9004 as a provisional remedy "to protect the well-being of the child." *See also Ly v. Heu*, 296 F. Supp. 2d 1009, 1011 (D. Minn. 2003) (visitation allowed as a provisional remedy under § 9004); *Castang v. Kim*, No. 1:22-cv-05136, 2023 WL 2401914 (N.D. Ga. Jan. 27, 2023) (same). The court looks to state law in determining whether to order provisional remedies. In this case, the relevant law is Wisconsin's custody and placement statute, Wis. Stat. § 767.41. The statute directs courts to consider "all facts relevant to the best interests of the child" in determining placement, including the wishes of the parents and children, the relationship the children have with both parents, and any history of interspousal battery or domestic abuse. *Id.* § 767.41(5)(am).

Aubert says that visitation would be in the children's best interest because it would facilitate the children's reintroduction to their father and make the transition easier if the court orders the children's return to Norway. Aubert retained a clinical psychologist to assist with facilitating video visits and also offered to pay reasonable fees for Poast to select a local therapist to facilitate video and in-person visits. Aubert asserts that facilitation by a trained

6

EXHIBIT 02 - Page 6 of 10

therapist will help alleviate any mental or emotional challenges the children may experience during visits.

In response, Poast asserts that Aubert was abusive toward her and the children and that the children don't want to see him. As evidence, Poast provides therapy records for both children. In February 2024, the older child, LPA, told a psychologist in Norway that she had witnessed Aubert physically abuse Poast. Specifically, LPA said that she saw Aubert choke Poast after Poast got angry with LPA for smearing glitter on the couch. Dkt. 41-1, at 2–3. Another time, LPA said she was in the bath, heard "shouting and a loud thump," and came out of the bath to see Poast on the floor crying. *Id.* LPA also described one instance in which Aubert physically hurt her, saying that he pinched her in the side while helping her with her math homework. *Id.* at 3. When asked how she would respond if someone like a judge decided she should see her father, LPA said that she doesn't want to see him and "just wants to run away." *Id.* As for APA, therapy records from February 2025 note that APA "[h]as experienced trauma and abuse from father" and "[h]as witnessed domestic violence," although the records do not describe any specific instances of abuse.

On reply, Aubert denies the allegations of domestic abuse. To support his version of events, he provides Child Protective Services (CPS) records from 2020 and 2023, police records from 2023, and a psychologist's observations of supervised visits between Aubert and the children in 2024. The 2020 CPS records provide another version of the choking incident that LPA allegedly witnessed. Officials at LPA's school reported the family to CPS after LPA told an adult at school that "daddy will strangle mommy if she gets mad at me." Dkt. 45-5, at 4. When CPS officials interviewed LPA, she said that her dad had recently choked her mom after her mom got angry at LPA for smearing glitter on the couch. But unlike in 2024, LPA denied

7

EXHIBIT 02 - Page 7 of 10

witnessing the choking in 2020. The CPS official wrote: "Ask her if she saw it. She says no, but mum told her." *Id.*

The 2023 CPS investigation was initiated after Poast reported Aubert for domestic violence. Dkt. 45-1 and Dkt. 45-2. CPS staff interviewed Poast, Aubert, and LPA, and obtained information from doctors, the police, and the children's school. Poast described Aubert as "dangerous," "violent," and "controlling" and said that she cut off contact with him to protect the children. Dkt. 45-1, at 6. Aubert "acknowledge[d] that on one occasion he . . . pinched [LPA] after she punched his nose but clearly state[d] that he has otherwise not been violent with the children." *Id.* Aubert said that there had "been some incidents" with Poast, but the CPS records did not describe these in detail. LPA described Aubert as a "threat" and "controlling," but also said that she loved him and trusted him. *Id.* at 5–6. CPS officials concluded that there was no evidence that Aubert was dangerous to the children. *Id.* at 8. They also concluded that Poast was "not shielding the children appropriately" from her own conflicts with Aubert, noting that some of the negative views LPA expressed about Aubert may have been influenced by what LPA had heard Poast say about him. *Id.* CPS officials said that "it is important that [LPA] gets to validate the positive feelings she has towards her father, and that she herself should be able to express this to him through contact." *Id.* at 8–9.

The police investigation was initiated in April 2023 after Poast reported Aubert for domestic violence. Dkt. 45-3 and Dkt. 45-4. The case was dismissed in April 2024 for insufficient evidence. Dkt. 45-3. In a memorandum, the prosecutor's office explained that there was little evidence to support the allegations beyond Poast's statements, which was not enough to meet the high evidentiary standard for criminal liability. Dkt. 45-4.

8

EXHIBIT 02 - Page 8 of 10

The psychologist's observations of the supervised visits between Aubert and the children in 2024 were generally positive. Dkt. 45-7. The psychologist observed positive communication between Aubert and the children during both visits. He noted that APA was "cheerful, trusting and approachable" with Aubert at all times, and that LPA was more reserved in the presence of Poast but that she appeared to relax once Poast left. *Id.*

The court concludes that it is in the children's best interest for Aubert to have visitation during the pendency of this case. Aubert had visitation rights when the children were removed from Norway, so an order granting visitation would reestablish the pre-removal status quo. The psychologist's observations from the pre-removal visits suggest that the children enjoyed and benefited from visiting with Aubert. Dkt. 45-7. It also appears that the children may have developed negative feelings toward Aubert in part because of how Poast has spoken about him. Visitation will allow the children to reconnect with Aubert and develop their own independent views of him. *See* Wis. Stat. § 767.41(5)4 (interference by one parent with the other parent's relationship with the child is a factor in determining placement).

Poast argues that Aubert has engaged in a pattern of domestic abuse, which requires the court to make her and the children's safety the most important factor in determining visitation. Wis. Stat. § 767.41(5)(bm); *see also Valadez v. Valadez,* 2022 WI App 2, ¶¶ 25–26, 400 Wis. 2d 523, 969 N.W.2d 770. Section 5(bm) doesn't apply here because Poast has not established by a preponderance of the evidence that Aubert engaged in a pattern of domestic abuse. *See* Wis. Stat. § 767.41(2)(d).  And in any event, the visitation plan proposed by Aubert adequately protects the children's safety because Aubert agreed to have a trained psychologist supervise both the video and in-person visits.

9

EXHIBIT 02 - Page 9 of 10

Poast argues that in-person visits should be denied because they will interfere with Poast's ability to prepare for the evidentiary hearing. But any disruption will likely be minimal and is outweighed by the benefits to the children of reestablishing contact with their father.

The court will order weekly video visits of up to one hour between now and May 8, 2025, and two in-person visits of up to two hours between May 8 and May 14, 2025. Aubert has agreed to pay for supervision for these visits. The parties should confer regarding the schedule and supervision plan for these visits and submit a joint proposed visitation plan by April 14, 2025. The proposed plan should include visits beginning the week of April 14 unless both parties agree to an alternative plan.

## ORDER

IT IS ORDERED that:

1. Respondent Laurie Poast's motion to dismiss, Dkt. 29, is DENIED.

2. Petitioner Yves Aubert's motion for video and in-person visitation during the pendency of the case, Dkt. 35, is GRANTED.

3. The parties should confer and submit a joint proposed plan for supervised video and in-person visits by April 14, 2025.

Entered April 9, 2025.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge

10

EXHIBIT 02 - Page 10 of 10

EXHIBIT 03

Urgent Video Calls with the Kids – Grandparents Visit – Mediation    EXHIBIT 03

**Subject:** Urgent Video Calls with the Kids – Grandparents Visit – Mediation
**From:** Arnaud Paris <arnaud@skyvr.com>
**Date:** 31/08/2025, 21:17
**To:** Heidi Paris <heidimparis@gmail.com>

Heidi,

We really need to talk.

I am once again reaching out about Eva and Juliette's need to maintain meaningful contact with me and their French family. For more than 16 months now, I have sent you over 20 separate emails proposing a simple, consistent weekly video call schedule, but so far you've ignored all of these requests. I have also asked that the girls be allowed to see their French grandparents in Oregon, who have not been with them since April 2024, and whose absence is deeply felt.

This situation is deeply unhealthy for the girls. Child therapists have emphasized to me that regular, open, and unsupervised communication with both parents is essential for a child's emotional development, especially after a period of separation. By supervising and limiting their calls with me, you are placing them in a position where they cannot express their thoughts and emotions freely, which can lead to long-term psychological effects, including anxiety, confusion, and a sense of divided loyalty. These are clear indicators of emotional manipulation and alienation and the only possible way to re-establish proper communication with our children is by letting me have video calls with them on a regular basis several times a week without any supervision.

Moreover, the absence of unsupervised video calls is depriving the girls of the opportunity to maintain a normal and loving relationship with their father. Blocking this essential form of communication sends them the message that their bond with me is not important or is something to be restricted. This not only undermines their sense of security and identity but also places them in the middle of a conflict that no child should have to navigate.

This is not just harmful but unlawful. The Hague Convention, binding on both France and the United States, requires that parental access be preserved during international abduction proceedings. Your continued refusal to allow video calls or family contact is a violation of this obligation and is inflicting irreparable harm on Eva and Juliette. Child experts have warned me repeatedly that such obstruction leads to long-term psychological damage, and the pattern of your actions is consistent with parental alienation.

If your priority is truly the well-being of Eva and Juliette, it is crucial that you allow them to have regular, unsupervised video calls with me. This is not about legal strategies or personal disagreements—it is about giving our daughters the freedom to maintain a healthy and loving relationship with both parents. Anything less is harmful and unfair to them.

The schedule I have suggested many times remains very simple and compatible with the girls' routine:
* Wednesdays at 2:00 PM PST
* Saturdays at 10:00 AM PST
* Sundays at 10:00 AM PST

Pending the end of the Hague abduction proceedings in the U.S., this is the minimum framework the girls need to keep a natural relationship with me and with their French family.

At the same time, I want to emphasize that I am still open to constructive solutions and to mediation efforts in the interest of the children. As you know, I have already made several mediation proposals and even approached your attorneys in Oregon to try to de-escalate this situation and find a framework we could both agree on. Unfortunately, those efforts have not been pursued from your side, but I remain willing to continue

Urgent Video Calls with the Kids, Grandparents Visit, Mediation

them.

To that end, I suggest we set aside a separate time to talk specifically about mediation and possible settlement options that would protect the girls and end this conflict. I believe that even a short discussion between us could help reduce the tension, clarify what is possible, and show the children that both parents are willing to put their well-being first.

Pending the resolution of the Hague abduction proceedings in the U.S., I again ask you to:
1.    Confirm the weekly video call schedule set out above, starting immediately.
2.    Authorize a visit with their French grandparents in Oregon, so the girls can reconnect with their French family.
3.    Engage in meaningful mediation rather than rejecting or ignoring my settlement efforts, as this is in the best interest of our daughters.

I am approaching this in good faith, because I believe Eva and Juliette deserve to see that their parents can cooperate for their benefit.

Please propose a date and time when we can have a dedicated conversation (by phone or Zoom) to discuss mediation options and possible solutions for ending all legal actions.

Best,

Arnaud

EXHIBIT 03 - PAGE 2 OF 2

01/09/2025, 13:37

EXHIBIT 04

**Subject:** Urgent Video Calls per Hague Convention – Grandparents Visit – Mediation
**From:** Arnaud Paris <arnaud@skyvr.com>
**Date:** 07/10/2025, 18:22
**To:** Heidi Paris <heidimparis@gmail.com>

Heidi,

It has now been more than 18 months since you completely severed the link between me and our daughters. For all that time, you have refused every single one of my requests for a simple weekly video call schedule so that Eva and Juliette could see me regularly at proper French hours. Video calls that wouldn't be supervised nor filtered, but freely, like children should with their father as many specialists including an Oregon child psychologist have stressed out is extremely important.

You have also refused to let my parents — their French grandparents who love them and haven't seen them since April 2024 — come to Oregon even once to visit them despite many request. There is no excuse for this anymore. The girls are growing up in isolation from their French roots, without seeing the faces or hearing the voices of the French people who have loved them all their lives.

And now the Ninth Circuit Court of Appeals has just ruled last Friday on October 3rd that the Hague case resulting from the criminal abduction you conducted in France in April 2024 must be heard on the merits in US Federal Court. The Ninth Circuit Court has recognized that my petition for their return must be heard and that the Oregon judge violated both US and international law in refusing to do so previously. That decision also confirms what I have been repeating for 18 months: during these Hague proceedings, both parents have the duty to preserve contact between the children and the other parent and the Hague Convention provisions must be respected in this matter.

Yet for 18 months you have chosen to do the opposite — to block, isolate, and silence communication between me and the girls. Eva and Juliette have not been able to see me once, neither in person nor in video call, since April 2024. You have even threatened me with harassment actions for trying to call you so I couldn't reach them. You even filed a stalking protective order in Oregon because I tried to call you on whatsapp to talk to the girls! That kind of threat has made any spontaneous contact with our girls impossible, hence my 30+ requests over the last 18 months to establish a weekly video call schedule at set times and proper French hours compatible with the girl's school schedule so that you couldn't possibly accuse me of any kind of harassment. And yet you have ignored or refused all of these requests for a weekly video call schedule over the last 18 months.

Heidi, this has gone far beyond personal conflict. It is now about two little girls who are being illegally deprived of their right to see their father, their French family and their French friends. This is extreme parental and cultural alienation on your part. What you are doing is not only parental alienation—it amounts to a severe form of emotional child abuse recognized by child psychologists worldwide. Depriving children of one parent, cutting them off from their roots and identity, is one of the most damaging forms of psychological harm a child can experience.

Every day that passes like this damages Eva and Juliette irreparably. Every psychologist who has worked on cases like ours says the same thing: when one parent prevents contact like you do, it creates long–term trauma, severe confusion, and irreparable emotional harm with a high risk of suicide for the rest of their lives. **The only way to start repairing this is to restore regular, unsupervised video calls so they can see me and talk with me freely again as normal children without me risking more harassment actions from you.**

EXHIBIT 04 - PAGE 1 OF 2

1 of 2                                                                                          27/11/2025, 17:04

The weekly video call schedule I have proposed for over a year is still the same and completely reasonable and compatible with the girl's school routine:

- Wednesdays at 2:00 PM (PST)
- Saturdays at 10:00 AM (PST)
- Sundays at 10:00 AM (PST)

These are set times that respect their routine. But they must be consistent and free from any supervision or interference from you or your family.

I also ask again that you allow their grandparents to come see them in Oregon before the end of this month. They are getting older, and this prolonged deprivation of contact is unbearable for them — and deeply unfair to the girls as well.

Heidi, the Ninth Circuit has now made it clear: this abduction will be judged on its merits per the Hague Convention and it is already factually established that you have abducted our daughters clandestinely and criminally from France in April 2024.

Eva and Juliette should have been back in France for over a year now per international law. The Convention and common sense both demand that the girls' relationship with me and their French family be urgently restored and preserved. Please, do not let this trauma and parental/cultural alienation you're imposing onto our girls go on any longer. Let's at least give them back the right to have these video calls with their father since they have themselves asked for these video calls with their father for over a year now.

Heidi, I've repeatedly proposed mediation over the last year to find a constructive solution for the girls to protect them from any further legal actions, but those efforts have always been rejected on your part. Still, I remain willing to engage at any time, because mediation is the only path that can bring this conflict to an end without going through this Hague action in the best interest of Eva and Juliette. I am approaching this in good faith, because I believe Eva and Juliette deserve to see that their parents can rise above this conflict and finally do what is right for their well-being.

Best,

Arnaud

EXHIBIT 04 - PAGE 2 OF 2

EXHIBIT 05

**Subject:** Re: Call schedule with the kids... trying again
**From:** Arnaud Paris <aparis@sysmicfilms.com>
**Date:** 27/11/2025, 17:42
**To:** Heidi Brown <heidimparis@gmail.com>

Heidi,

As I have already explained in many emails since last year, the time window in the Oregon judgment (6–8 p.m. Oregon time) corresponds to 3–5 a.m. in Paris, which is neither practical nor realistic for me since I live in France. I have repeatedly asked you over the last 18 months to agree on a proposed fixed communication schedule compatible with French time, and you have not accepted nor proposed any realistic alternative for almost two years now.

Plus given your past threats of "stalking/harassment" actions you did back in April 2024, it is not safe for me to "just call" without a clear written schedule. We need agreed times that work for both time zones.

Nothing in your Oregon judgment (obtained in violation of the Hague Convention) says calls cannot be by video. The girls themselves have said they want to be able to see me on video calls, and given the distance and long separation, video is essential.

It is also clear from their "coached" behavior in previous calls that communication with them must be unsupervised so they can speak freely with me, without any pressure from you or your family. The last few calls with Juliette last spring and last summer during which you made her ask me to abandon the French judgment and to drop the Hague action show clear manipulation of our daughter in your legal strategy. That's appalling coming from a mother and this needs to stop as it is extremely damaging to do that to our children. Video calls with the girls is the only way to ensure that they are not being supervised nor pressured by you or your family.

So I again propose the following video schedule (Oregon time):
- Wednesdays – 2:00 p.m.
- Saturdays – 10:00 a.m.
- Sundays – 10:00 a.m.

These correspond to normal evening hours in Paris and reasonable daytime for the girls compatible with their school and activity routine. I also would like to ask that, at least once a week, the girls be allowed a short video call with their French grandparents, who are desperate to have any contact with them for almost two years now. My parents sent you many emails asking you to have these video calls with their grand kids and to be able to come visit them in Oregon. You've ignored every single one of these email and never responded for almost two years.

I also remind you that I have repeatedly proposed family mediation for almost two years now, and that the French appeal court has just ordered you to participate in the French mediation process. It is in everyone's interest, especially the girls', that we de-escalate this situation through family mediation as ordered by the French judge. Let me know when we could organize a mediation video call together.

Best,

Arnaud

On 25/11/2025 22:30, Heidi Brown wrote:

> Arnaud,

I wanted to check in with you to see if you are planning on calling during the scheduled call times anytime soon?

As mentioned many times before, I would like to set up a regular call schedule with you per the judgment. Could you please let me know what days would work for you in the scheduled call windows?

Specifically, per the judgment, **you** "may call the children on the telephone 2 times per week. The call shall last no more than 15 minutes and shall take place between 6 pm. and 8 pm."

Heidi

EXHIBIT 05 - PAGE 2 OF 2

EXHIBIT 06

**From:** "katy.paris" <katy.paris@laposte.net> **Date:**
22/11/2025, 11:14 **To:** Arnaud
PARIS <aparis@sysmicfilms.com>

Heidi,

it is with great sadness that we note that for over a year and a half you have deprived us of all contact with our granddaughters. This is without valid reason and despite our numerous unanswered requests.

We would like to bring you to your senses, by making you understand that you will not find a solution to your dispute with their father by using your children.
Furthermore, Juliette and Eva bear no responsibility. They shouldn't understand why you're imposing such a privatization on them, unless you're lying to them... about the situation.
Before Christmas, allow them a video call with us so we can see them, talk to them freely and, among other things, ask them what gifts they would like.

It also goes without saying that we miss our granddaughters, that we often think about them, and that we still love them just as much.

In conclusion, try to reflect on these few lines. It's never too late to go back... especially when it concerns the well-being of two little girls in the process of developing, who happen to be YOUR CHILDREN and THEIR FATHER'S, on whom you inflict the same deprivation.

Thank you Heidi for following up on our request.

• Katy and Jean    , their grandparents

Sent from my Galaxy device

EXHIBIT 06 - PAGE 1 OF 2

**From:** "katy.paris" <katy.paris@laposte.net>
**Date:** 22/11/2025, 11:14
**To:** Arnaud PARIS <aparis@sysmicfilms.com>

Heidi
C'est avec beaucoup de peine que nous constatons que depuis plus de 1 an 1/2 tu nous prives de tout contact avec nos petites-filles. Ceci sans motif valable et malgré nos multiples demandes restées  sans réponse.

Nous aimerions te ramener à la raison, en te faisant comprendre que ce n'est pas en te servant de tes enfants,  que tu trouveras une solution à ton litige avec leur père.
De plus Juliette et  Eva  n'ont aucune responsabilité. Elles ne doivent pas comprendre pourquoi tu leur infliges une telle privatisation, sauf à leur mentir... sur la situation.
Avant Noël, permets leurs une visio avec nous afin de les voir, leur parler librement et entre autre, leur demander ce qui leur ferait plaisir comme cadeaux.

Il va aussi sans dire que nos petites-filles nous manquent, que nous pensons souvent à elles, que nous les aimons toujours autant.

En conclusion, essaye de réfléchir à ces quelques lignes. Il n'est jamais trop tard pour revenir en arrière... surtout lorsqu'il s'agit de l'équilibre de deux petites filles en pleine construction, qui se trouve être TES ENFANTS et celles de LEUR PÈRE, sur qui tu excerces la même privation.

Merci Heidi de  donner suite à notre demande.

- Katy et Jean , leurs grands-parents

Envoyé depuis mon appareil Galaxy

EXHIBIT 06 - PAGE 2 OF 2

EXHIBIT 07

**From:** "katy.paris" <katy.paris@laposte.net> **Date:**
12/20/2025, 12:57 **To:** Arnaud
PARIS <aparis@sysmicfilms.com>

Heidi,

since my two previous emails asking you to do a video call with our granddaughters, I have received no response from you.
It goes without saying that, in addition to having the pleasure of seeing them and talking with them, we cannot send any gifts for Christmas without knowing what they would like and also at the risk that they might end up in the trash... We suppose that for their birthdays we will not have any more luck.

This is the second Christmas and birthday that Juliette and Eva have been, by your sole decision, deprived of being able to celebrate these two events as little girls of 10 years old, soon to be 11 years old, would wish.

We no longer know what arguments to use to convince you to finally think about your daughters, who we are sure are suffering. The mere thought of it makes us very unhappy.

Despite all our repeated requests for over a year and a half, we remain hopeful and above all we do not forget our granddaughters.
Can we ask you to kiss them for us?

Sent from my Galaxy device

EXHIBIT 07 - PAGE 1 OF 2

1 of 1                                                                                                          26/12/2025, 12:5

**From:** "katy.paris" <katy.paris@laposte.net>
**Date:** 20/12/2025, 12:57
**To:** Arnaud PARIS <aparis@sysmicfilms.com>

Heidi
Depuis mes deux précédents mails te demandant de faire une  visio avec nos petites-filles, aucune réponse de ta part.
Il est  bien entendu, qu'en plus d'avoir le plaisir de les voir et dediscuter avec elles,  nous ne pouvons envoyer aucun cadeau pour Noël sans savoir ce qu'il leur ferait plaisir et aussi au risque que ceux-ci finissent à la poubelle... Nous supposons que pour leurs anniversaires nous n'auront pas plus de chance.
Cela fait le deuxième Noël et anniversaire que Juliette et Eva sont, par ta seule décision, privées de pouvoir fêter ces deux événements comme le souhaiteraient des petites filles de 10 ans, bientôt 11 ans.
Nous ne savons plus quels arguments utiliser pour te convaincre  de penser enfin à  tes filles qui, nous en sommes sûrs,  sont en souffrance. Le simple faite d'y penser nous rend très malheureux .
Malgré toutes nos demandes répétées depuis plus de 1 ans et demi, nous gardons  espoir et surtout nous n'oublions pas nos petites-filles.
Peut-on te charger de les embrasser pour nous ?

Envoyé depuis mon appareil Galaxy

EXHIBIT 07 - PAGE 2 OF 2

EXHIBIT 08

**Subject:** Video call schedule with the kids for Christmas and after
**From:** Arnaud Paris <arnaud@skyvr.com>
**Date:** 22/12/2025, 01:17
**To:** Heidi Paris <heidimparis@gmail.com>

Heidi,

As Christmas approaches, I am writing again because I am still trying to organize proper video calls with the girls through a workable, consistent schedule compatible with both time zones. As explained in my prior emails you have repeatedly refused to implement a practical video call schedule with the kids for almost two years now despite many attempts on my part...

My parents have also emailed you many times trying to organize video calls with the girls especially for this coming Christmas—both to reconnect and to ask what gifts they would like as presents, and to arrange for you to give them presents locally. Those messages have been ignored like you did for last Christmas and their last birthday.

I am asking you now to confirm, in writing, a proper weekly video-call schedule going forward (at fixed days and times each week that are reasonable in both Oregon and France time), and to start for Christmas this week with a video call this Thursday at 6:00 p.m. Paris time (9:00 a.m. Oregon time) so we can wish Eva and Juliette a Merry Christmas and let them share this moment with their French family.

Please confirm this ASAP so that everyone can get organized to be available at that time since we will be celebrating Christmas earlier in the day in France and people would be staying longer specifically to be able to do this video call with the girls.

Separately, it is critical to establish a proper weekly video-call schedule moving forward in the girls' best interests. For nearly two years now, you have been severing Eva and Juliette's connection not only with me, but also with their French grandparents and their French family. This is not a "detail" or a scheduling inconvenience Heidi—this is their identity, their roots, and their emotional stability.

By continuing to block regular video contact to further alienate them against me and their French family so that they would refuse any Hague return order to France, you are turning the girls into pawns in your Hague legal strategy in a way that puts them at serious risk long-term. Children should never be placed in the middle of litigation or pressured to carry adult conflicts like you're doing, you're fully aware by now that what you're doing is severe child abuse, you've read the reports of several experts confirming so. Preserving their bond with their father and their French family is essential for their well-being and their future.

If your priority is truly the well-being of Eva and Juliette, it is crucial that you allow them to have these regular video calls with me and their French family. This is not about legal strategies or personal disagreements Heidi—it is about giving our daughters the freedom to maintain a healthy and loving relationship with both parents and both cultures. Anything less is harmful and unfair to them.

Arnaud

EXHIBIT 09

FRENCH REPUBLIC
In the name of the French people



EXCERPT
from the records of the Court Registry

# JUDICIAL

# COURT OF

# PARIS

**ENFORCEABLE COPY**

**GR No.  25/35482 – Portalis No. 352J-W-B7J-DAASP**

Mr. Arnaud PARIS

EXHIBIT 09 - Page 1 of 21

American Translators Association
ata
Robin Holding
French into English
Certification #426978
Robin Holding
Certified Translator
Verify at www.atanet.org/verify

**JUDICIAL COURT OF PARIS**

**FAMILY LAW DIVISION**

FCJ Division 1 Room 1

GR No. 25/35482 - Portalis No. 352J-W-B7J-DAASP

RECORD No. /1

# DECISION
## Issued on 27 November 2025

**PLAINTIFF**

**Mr. Arnaud PARIS**
13 RUE FERDINAND DUVAL
75004 PARIS

Appearing in Person

**DEFENDANT**

**Ms. Heidi BROWN**
385 STRAWBERRY LANE
ASHLAND, OREGON 97520
UNITED STATES

Not appearing or represented

**FAMILY COURT JUDGE**

Stéphanie HEBRARD

**CLERK**

Rita KALLAS, during the proceedings
Marianne DEBOUTIERE, during the pronouncement

**HEARING:** in chambers on 27 October 2025;

**DECISION:** delivered by entry into the record, deemed *inter partes*, at first instance and subject to appeal

**2** Enforceable copies sent ***28/11/2025***
to ***The Parties***
Certified copies sent to

The relationship between Mr. Arnaud PARIS and Ms. Heidi BROWN resulted in the birth of two children whose parentage has been legally established in relation to both parents:
- Juliette PARIS, born 15 January 2015 in Ashland (United States)
- Eva PARIS, both 15 January 2015 in Ashland (United States)

<u>In a decision dated 21 April 2023</u>, the Family Court Judge of the Judicial Court of Paris issued, in particular, a decision:

**DECLARING** the French courts to be of competent jurisdiction and French law to be applicable,

**DISMISSING** the *lis alibi pendens* objection raised by Ms. BROWN,

**RULING** that parental authority will be exercised jointly with regard to the minor children,

**REMINDING** the parties that the joint exercise of parental authority implies the duty to make all decisions together, in the best interests of the children, specifically those relating to the children's education, schooling, religion, morals, and safety, and more generally the duty to notify the other parent in a timely manner of any decision or event that may have an impact on the children's life and affect their future,

**RULING** that to this end, the parents must, in particular:
- jointly make all important decisions regarding the children's health, academic guidance, religious education, and change of residence,
- keep each other informed about the children's schedule (academic life, extracurricular activities, medical treatments, etc.)
- communicate, in all circumstances, the address of the children's location and how they may be contacted,
- respect the children's bonds with their other parent,

**REMINDING** the parties that any change of residence by either parent, if it modifies the conditions of parental authority, must be communicated in advance and in a timely manner to the other parent,

**ESTABLISHING** the minor children's habitual residence to be the father's home, from the start of the 2023/2024 school year,

**RULING** that the mother will exercise her visiting and accommodation rights with respect to the minor children, absent a better agreement between the parents:
- during school holidays, the first half of school holidays during even-numbered years, and the second half during odd-numbered years,
- the parents must share the costs of travel and transportation (logistics) between France and United States,

**RULING** that the half of a holiday is counted from the 1st day of the official date of the school holiday, which depends on the school that the children attend,

**ESTABLISHING**, from the start of the 2023/2024 school year, the amount of the mother's contribution to the maintenance and education of the children to be 500 euros per child per month, or 1,000 euros per month, and ORDERING, as necessary, Ms. Brown to pay this amount to Mr. PARIS before the 5th of each month, 12 months per year, subject to cost-of-living adjustment.
**RULING** that the children's special expenses (unreimbursed medical and paramedical expenses, school trips, language immersion programs, driving lessons), decided by mutual agreement, will be shared equally between the parents upon presentation of supporting documents.

**Page 2**

EXHIBIT 09 - Page 3 of 21

**REJECTING** all other claims,

**ORDERING** the provisional enforcement of this decision,

**RULING** that there are no grounds for the application of Article 700 of the French Code of Civil Procedure.

<u>In a decision dated 25 August 2023</u>, the Family Court Judge of the Judicial Court of Paris ordered a ban on leaving French territory without the consent of both parents, stipulating that the visiting and accommodation rights of Ms. Heidi BROWN be exercised solely on French territory, absent a better agreement between the parents, with half of Ms. Heidi BROWN's airfare to be paid by Mr. Arnaud PARIS.

On 11 April 2024, Ms. Heidi BROWN left French territory with the two children, and on 13 April 2025 informed the father that she intended to remain with the children in the United States.

In a decision dated 26 November 2024, the Appeals Court of Paris to which the appeal brought by Ms. Heidi Brown was referred:

**Declared** Mr. Arnaud PARIS' request for exclusive exercise of parental authority to be inadmissible,

**Upheld** the decision issued on 21 April 2023.

**Granted** Ms. Heidi BROWN visiting and accommodation rights with respect to Juliette and Eva, which, absent a better agreement, will be exercised solely on French territory and during half of the school holidays: the first half in even-numbered years and the second half in odd-numbered years, along with compensation for half the cost of the mother's airline tickets.

Mr. Arnaud PARIS initiated return proceedings in the United States on the grounds of the Hague Convention of 25 October 1980, on which no action has been taken.

<u>By petition filed with the court clerk on 8 April 2025</u>, Mr. Arnaud PARIS requested authorization to have Ms. Heidi BROWN summoned at short notice to appear before the Family Court Judge in light of Ms. Heidi BROWN's failure to comply with the court orders establishing the children's residency in France.

Authorized by an order dated 9 April 2025, Mr. Arnaud PARIS had Ms. Heidi BROWN summoned at short notice, at her residence in Ashland, OREGON in the UNITED STATES, to appear at a hearing on 16 June 2025.

He requests that the Court:

*Pursuant to Article 373-2-6 of the Civil Code, pursuant to Article 373-2-8 of the Civil Code, pursuant to Article 834 of the Civil Code, pursuant to Article 1073 of the Civil Code, pursuant to Article 1137 of the Civil Code, pursuant to Article 1141 of the Civil Code,*
*Pursuant to the criminal procedure for the abduction of minors, Case Number 24103000192,*
*Pursuant to Decision No. 17-16.760 of the Civil Court of Cassation, Civil Chamber 1, of 12 October 2017,*
*Pursuant to Decision No. 04-41.012 of the Court of Cassation, Social Chamber, 25 January 2005,*
*Article 23bis of the Statute of the European Union Court of Justice,*
*Article 267 of the Treaty on the Functioning of the European Union*
*Article 3 of the Treaty on the European Union*

**Page 3**

EXHIBIT 09 - Page 4 of 21

*Articles 3, 9, and 10 of the New York Convention of 20 November 1989 on the Rights of the Child (CRC),*
*Articles 6 and 8 of the European Convention on Human Rights (ECHR),*
*Article 14 of the International Covenant on Civil and Political Rights (ICCPR),*
*Articles 24 and 47 of the Charter of Fundamental Rights of the European Union,*
*The case law Plazzi v. Switzerland, (ECHR), 8 February 2022, NO. 44101/18.*
*See the documents entered into the record.*

**DECLARE** Mr. Arnaud PARIS' requests to be admissible and well founded.

And accordingly:

*On the merits*

**ISSUE,** based on the Court's jurisdictional competence as confirmed by the Paris Court of Appeal on 26 November 2024, an order to return the children to France where French judgments have established their residency and custody to be in Paris with their father;

**AND REFER** the matter to the Court of Justice of the European Union as an urgent preliminary ruling procedure (PPU), posing a question such as the following: "In a situation where a child who is a national of a Member State is wrongfully retained in a Third State that does not guarantee access to an equitable procedure under the Hague Convention, do the courts of the Member State of habitual residence have the power, or the obligation under European Union law (Charter of Fundamental Rights Article 3(5) TUE, Brussels Rule II ter), to take concrete steps to order the child's return to the Union, by virtue of their subsidiary jurisdiction?"

**ORDER** Ms. BROWN to pay a civil penalty of 5,000 euros.

**ORDER** Ms. BROWN to pay all costs for the actions undertaken both in the USA and in Europe, which already amount to more than €250,000, in addition to a civil penalty of 5,000 euros (this amount to be revised after the children have been returned).

**ORDER** that the unrecoverable costs and expenses be placed in reserve.

At the hearing of 16 June 2025, Mr. Arnaud PARIS appeared in person and confirmed his request.

Ms. Heidi BROWN did not appear.

The public prosecutor's office issued a written opinion dated 15 June 2025 that was unfavorable to the request, on the grounds that the Family Court Judge did not have the power to order an enforcement measure on the territory of a Third State.

In a decision dated 4 July 2025, the Family Court Judge issued a stay of proceedings in accordance with Article 15 of the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, and Article 686 of the French Code of Civil Procedure, and requested that Mr. Arnaud PARIS produce the return receipt for the registered letter sent to Ms. Heidi BROWN and provide proof of the sending of the summons and of this decision, including the send date by postal service and by email to both Ms. Heidi BROWN and her defense lawyer in the ongoing proceedings in the United States.

**Page 4**

EXHIBIT 09 - Page 5 of 21

At the return hearing on 27 October 2025, Mr. Arnaud PARIS appeared in person. He produced the required documents and requested the benefit of his initial writ of summons.

Ms. Heidi BROWN did not appear and was not represented at the hearing. The decision will be deemed *inter partes*.

## GROUNDS

### On the validity of the referral:

Mr. Arnaud PARIS has performed all of the formalities for service of the writ of summons before our court to the residence of Ms. Heidi BROWN in OREGON in the United States.

It is clear from the certificate provided under Article 6 of the Hague Convention of 1965 on Service, dated 30 April 2025, that the process server confirmed that Ms. Heidi BROWN did in fact live at the address indicated and that no one answered the door despite signs that someone was present in the home, and wrote up a declaration of non-service.

The French process server followed up on his submission to the relevant authorities in the United States by sending a registered letter with return receipt directly to Ms. Heidi BROWN.

At our request, Mr. Arnaud PARIS produced documents proving that:

− Ms. Heidi BROWN picked up the registered letter on 2 May 2025 at her post office in the United States (notification from LA POSTE of international registered mail).
− Ms. Heidi BROWN refused receipt of the second registered letter sent by FedEx on 29 August 2025.
− Ms. Heidi BROWN and her lawyer Mr. Taylor Murdoch did receive, by email on 28 August 2025, the original writ of summons and a copy of the decision issued on 4 July 2025 accompanied by an English translation.
− Her lawyer, Mr. Taylor Murdoch, also received the writ of summons and the decision issued on 4 July 2025, including the date of the return hearing, by FedEx registered letter with a return receipt, the receipt having been signed on 2 September 2025.

Accordingly, it is clear that due diligence was taken to ensure the service of the summons overseas and that both Ms. Heidi BROWN and her lawyer were duly notified.

Our court therefore has valid jurisdiction.

### On the main request:

The purpose of the Hague Convention of 26 October 1980 is to prevent international child abductions in the event of parental separation.

Its first three articles are worded as follows:

*"Article 1*

*The objects of the present Convention are*
*a) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and*
*b) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.*

**Page 5**

EXHIBIT 09 - Page 6 of 21

*Article 2*

*Contracting States shall take all appropriate measures to secure within their territories the implementation of the objects of the Convention. For this purpose they shall use the most expeditious procedures available.*

*Article 3*

*The removal or the retention of a child is to be considered wrongful where -*
*a)   it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and*
*b)   at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.*
*The rights of custody mentioned in sub-paragraph a) above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State."*

By virtue of Article 373-2 of the French Civil Code, the judge of the judicial court delegated to family matters shall settle the matters referred to him or her under this chapter, taking special care to safeguard the interests of minor children.

The judge may take measures to guarantee the continuity and effectiveness of the maintenance of the child's ties with each of his parents.

In particular, he may order a ban on the child leaving French territory without the authorization of both parents. This ban on the child leaving French territory without the authorization of both parents is entered in the wanted persons file by the public prosecutor.

He may even of his own motion, order a penalty payment to ensure that his decision is enforced.

In this case, in a decision dated 21 April 2023, the Family Court Judge of the Judicial Court of Paris, noting that Juliette and Eva, born 15 January 2015 in Ashland (United States), had been living with their parents in France since 2019, were fully integrated at the time of their parents' separation, and had expressed a desire to continue living in France in their familiar environment, established the habitual residence of the two children at the home of their father in France, along with visiting and accommodation rights for the mother to exercise during half of the school holidays.

In a decision dated 25 August 2023, the Family Court Judge of the Judicial Court of Paris, having noted that Ms. Heidi Brown did not intend to comply with the decision of the French judge, ordered a ban on leaving the national territory with the two children and ruled that Ms. Heidi BROWN would exercise her visiting and accommodation rights on French territory.

In a ruling dated 26 November 2024, the Paris Court of Appeal, after reviewing the history of the habitual residence of the parents and the children, the agreement reached by the couple in 2022, and the evidence presented by both parties during the proceedings, confirmed the establishment of the children's residence at the home of their father in France and arranged regular visiting and accommodation rights for the mother.

EXHIBIT 09 - Page 7 of 21

It is clear from these decisions issued *inter partes* that Ms. Heidi BROWN's departure for the United States with the two children in April 2024, in violation of the French court decisions and Mr. Arnaud PARIS' custody rights, constitutes an international child abduction under Article 3 of the Hague Convention of 25 October 1980, to which France and the United States are State Parties, having ratified it in 1982 and 1988, respectively.

Although our present court cannot deliver a return order that is directly enforceable in the United States, it nevertheless has the power, in view of the existence of a wrongful removal under Article 3 of the Convention, to order that the children be returned to France on the basis of Article 373-2-6 of the Civil Code, as a measure for ensuring the continuity and strength of the children's bonds with each of their parents.

In the absence of voluntary compliance by the parent in question, this order may become legally enforceable in the territory of a Third State through the exequatur procedure, which the left-behind parent can bring before the judicial authorities of the State in whose territory the children reside.

Accordingly, on the grounds of the non-compliance with the prior court decisions and the absence of any contact between the children and their father in violation of court decisions and in the best interests of the children, the court must order the return of the children to French territory in order that the court decisions validly reached *inter partes* in France, establishing the custody arrangements for the two children, may be enforced.

In view of a standoff between the parents that is harmful to the children, who have been deprived of any relations with their father since April 2024, and the fact that the parents can in fact reach an agreement and have it recognized by mirror orders in France and the United States, the parties are requested to seek information on mediation from an international mediator whose contact information is provided in the order and to take advantage of this opportunity to reach an amicable solution that takes the needs of each party into account.

**On the request to refer a matter to the European Court of Justice for a preliminary ruling:**

This request will not be granted as it is not relevant to the resolution of this case.

**On the request for a civil penalty:**

By virtue of Article 373-2-6, final paragraph, of the Civil Code, the Family Court Judge may, when a parent deliberately obstructs, seriously or repeatedly, the enforcement of any of the instruments mentioned in points 1 through 5 of part I of Article 373-2-2, order him or her to pay a civil penalty in an amount not to exceed €10,000.

In order not to impede a negotiated solution between the parents, the request for a civil penalty will not be granted.

**On the costs:**

Pursuant to Article 696 of the Civil Procedure Code, Ms. Heidi BROWN shall be ordered to pay the costs of these proceedings.

**Page 7**

EXHIBIT 09 - Page 8 of 21

## ON THESE GROUNDS

The Family Court Judge

Ruling by a judgment deemed *inter partes*, entered into the court registry, after a hearing in chambers.

**FINDS** that the removal of the children is wrongful under Article 3 of the Hague Convention of 25 October 1980 on the Civil Aspects of International Child Abduction.

**ORDERS** Ms. Heidi BROWN to return the two children Juliette PARIS, born 15 January 2015 in Ashland (United States), and Eva PARIS, born 15 January 2015 in Ashland (United States), to French territory.

**DISMISSES** the rest of Mr. Arnaud PARIS's claims.

**REQUESTS** that Mr. Arnaud PARIS consult **Ms. Alice CANET**, a mediator registered on the list of international mediators: canet@alice-canet.eu ; Tel: 0033(0)367102024, for the purpose of initiating an international mediation and finding a negotiated solution in the best interest of the children.

**ORDERS** Ms. Heidi BROWN to pay the costs.


### Signed in Paris on 27 November 2025


**Marianne DEBOUTIERE**          **Stéphanie HEBRARD**

**Clerk**                        **1st Vice President**

[SIGNATURE]                      [SIGNATURE]


**Page 8**

EXHIBIT 09 - Page 9 of 21

GR No. 25/35482 – Portalis No. 352J-W-B7J-DAASP

**COPY**, enforceable in this case

Plaintiff: **Mr. Arnaud PARIS**

v.

Defendant: **Ms. Heidi BROWN**



ACCORDINGLY, THE FRENCH REPBULIC commands and orders:

All bailiffs and marshals, as required, to enforce this decision,

The Attorneys General and District Attorneys of the Judicial Courts to uphold it,

All police commanders and officers to lend their assistance when legally required to do so.

In witness whereof, this document has been signed and delivered by us, the undersigned Director of Court Registry Services at the Registry of the Judicial Court of Paris.

p/Director of Court Registry Services

[STAMP/INITIALS]

9th and last page

EXHIBIT 09 - Page 10 of 21

## VERIFICATION OF TRANSLATION

I, Robin Holding, residing at 948 Fifteenth Street, Suite 4, Santa Monica, California 90403-3134, hereby declare that I am conversant with the French and English languages and that I have prepared the English translation of the attached Return Order, a decision issued by Family Court Judge Stéphanie HEBRARD of the Judicial Court of Paris on 27 November 2025.

December 3, 2025
_____
Date



Robin Holding, CT
French-to-English translator, certified by
the American Translators Association

Verify at www.atanet.org/verify

EXHIBIT 09 - Page 11 of 21

RÉPUBLIQUE FRANÇAISE
Au nom du Peuple Français

EXTRAIT
des minutes du Greffe

# TRIBUNAL

# JUDICIAIRE

# DE

# PARIS

## EXPÉDITION EXÉCUTOIRE

**N° RG 25/35482 - N° Portalis 352J-W-B7J-DAASP**

M. Arnaud PARIS

EXHIBIT 09 - Page 12 of 21

# TRIBUNAL JUDICIAIRE DE PARIS

■

## AFFAIRES FAMILIALES

JAF section 1 cab 1

N° RG 25/35482 - N° Portalis 352J-W-B7J-DAASP

N° MINUTE : 1

## JUGEMENT
### rendu le 27 novembre 2025

### DEMANDEUR

**Monsieur Arnaud PARIS**
13 RUE FERDINAND DUVAL
75004 PARIS

Comparant en personne

### DÉFENDERESSE

**Madame Heidi BROWN**
385 STRAWBERRY LANE
97520 ASHLAND - OREGON
ETATS-UNIS

Non comparante ni représentée

### LE JUGE AUX AFFAIRES FAMILIALES

Stéphanie HEBRARD

### LE GREFFIER

Rita KALLAS, lors des débats
Marianne DEBOUTIERE, lors du prononcé

**DÉBATS** : en chambre du conseil le 27 Octobre 2025 ;

**JUGEMENT** : prononcé par mise à disposition au greffe, réputé contradictoire, en premier ressort et susceptible d'appel.

*(marge gauche, texte manuscrit et vertical)* Copies exécutoires envoyées le 28/11/2025 à Paris — Copies certifiées conformes envoyées le à

Page 1

EXHIBIT 09 - Page 13 of 21

Des relations de Monsieur Arnaud PARIS et Madame Heidi BROWN sont nées deux enfants dont la filiation est légalement établie à l'égard des deux parents :
- Juliette PARIS née le 15 janvier 2015 à Ashland (Etats-Unis),
- Eva PARIS née le 15 janvier 2015 à Ashland (Etats-Unis).

<u>Par jugement en date du 21 avril 2023</u>, le juge aux affaires familiales du tribunal judiciaire de Paris a, entre autres mesures, statué comme suit:

**DECLARE** le juge français compétent et la loi française applicable,

**REJETTE** l'exception de litispendance soulevée par Madame BROWN,

**DIT** que l'autorité parentale sera exercée en commun à l'égard des enfants mineurs,

**RAPPELLE** que l'exercice en commun de l'autorité parentale implique le devoir de prendre ensemble, dans l'intérêt de l'enfant, toute décision relative notamment à son éducation, sa scolarité, sa religion, sa moralité et sa sécurité et plus généralement le devoir d'aviser en temps utile l'autre parent de toute décision ou événement pouvant avoir une répercussion dans la vie de l'enfant et de nature à engager son avenir,

**DIT** qu'à cet effet, les parents devront notamment :
- prendre ensemble les décisions importantes concernant la santé, l'orientation scolaire, l'éducation religieuse et le changement de résidence de l'enfant,
- s'informer réciproquement de l'organisation de la vie de l'enfant (vie scolaire, activités extra-scolaires, traitements médicaux...),
- communiquer en toutes circonstances l'adresse du lieu où se trouve l'enfant et le moyen de le joindre,
- respecter les liens de l'enfant avec son autre parent,

**RAPPELLE** que tout changement de résidence de l'un des parents, dès lors qu'il modifie les modalités d'exercice de l'autorité parentale, doit faire l'objet d'une information préalable et en temps utile de l'autre parent,

**FIXE** la résidence habituelle des enfants mineurs au domicile du père à compter de la rentrée scolaire 2023/2024,

**DIT** que la mère exercera ses droits de visite et d'hébergement à l'égard des enfants mineurs, sauf meilleur accord entre les parents :
- pendant les vacances scolaires, la première moitié des vacances scolaires les années paires et seconde moitié les années impaires,
à charge pour les parents de partager les frais de trajets et la charge des déplacements (logistique) entre la France et les Etats-Unis,

**DIT** que la moitié des vacances est décomptée à partir du 1er jour de la date officielle des vacances de l'académie dont dépend l'établissement scolaire fréquenté par les enfants,

**FIXE** à compter de la rentrée scolaire 2023/2024 le montant de la contribution de la mère pour l'entretien et l'éducation des enfants à la somme de 500 euros par enfant et par mois, soit 1000 euros par mois, et CONDAMNE, en tant que de besoin, Madame BROWN à la payer à Monsieur PARIS, avant le 5 de chaque mois et douze mois sur douze, avec indexation.

**DIT** que les frais exceptionnels des enfants (frais médicaux et paramédicaux non remboursés, voyages scolaires, séjours linguistiques, conduite accompagnée), décidés d'un commun accord, seront partagés par moitié entre les parents sur production de justificatifs,

Page 2

EXHIBIT 09 - Page 14 of 21

**REJETTE** toute autre demande,

**ORDONNE** l'exécution provisoire de la présente décision,

**DIT** n'y avoir lieu à application des dispositions de l'article 700 du code de procédure civile,

<u>Par jugement en date du 25 août 2023</u>, le juge aux affaires familiales du tribunal judiciaire de Paris a ordonné l'interdiction de sortie du territoire national français sans l'accord des deux parents, précisant que le droit de visite et d'hébergement de Madame Heidi BROWN s'exercerait uniquement sur le territoire français, sauf meilleur accord entre les parents, avec prise en charge de la moitié des frais d'avion de Madame Heidi BROWN par Monsieur Arnaud PARIS.

Le 11 avril 2024, Madame Heidi BROWN a quitté le territoire français avec les deux enfants et le 13 avril 2025 a informé le père qu'elle entendait rester avec les enfants aux Etats Unis.

<u>Par arrêt en date du 26 novembre 2024</u>, la Cour d'appel de PARIS saisie de l'appel interjeté par Madame Heidi BROWN a :

**Déclaré** irrecevable la demande de Monsieur Arnaud PARIS d'attribution de l'exercice exclusif de l'autorité parentale .

**Confirmé** le jugement rendu le 21 avril 2023.

**Accordé** à Madame Heidi BROWN un droit de visite et d'hébergement à l'égard de Juliette et d'Eva qui , sauf meilleur accord, s'exercera sur le territoire français et pendant la moitié des vacances scolaires: première moitié les années paires et seconde moitié les années impaires, avec prise en charge de la moitié du coût des billets d'avion de la mère.

Monsieur Arnaud PARIS a engagé une procédure de retour aux Etats-Unis sur le fondement de la Convention de La Haye du 25 octobre 1980, procédure qui n'a pas été suivie d'effets.

<u>Par requête déposée au greffe le 8 avril 2025</u>, Monsieur Arnaud PARIS a sollicité l'autorisation de faire citer Madame Heidi BROWN à bref délai devant le juge aux affaires familiales au constat de l'inexécution par Madame Heidi BROWN des décisions de justice fixant la résidence des enfants en France.

Autorisé par ordonnance en date du 9 avril 2025, Monsieur Arnaud PARIS a fait citer Madame Heidi BROWN à son domicile à Ashland dans l'OREGON aux ETATS UNIS, à bref délai, pour l'audience du 16 juin 2025.

Il sollicite :

*Vu l'article 373-2-6 du code civil, Vu l'article 373-2-8 du code civil, Vu l'article 834 du code civil, Vu l'article 835 du code civil, Vu l'article 1073 du code civil, Vu l'article 1137 du code civil, Vu l'article 1141 du code civil,*
*Vu la procédure d'instruction pénale pour soustraction de mineurs numéro parquet 24103000192,*
*Vu l'arrêt de la Cour de cassation, civile, Chambre civile 1, du 12 octobre 2017, 17-16.760*
*Vu l'arrêt de la Cour de cassation, soc., 25 janvier 2005, n° 04-41.012*
*L'article 23 bis du statut de la Cour de justice de l'Union Européenne*
*L'article 267 du Traité sur le fonctionnement de l'Union Européenne*
*L'article 3 du Traité sur l'Union Européenne*

**Page 3**

EXHIBIT 09 - Page 15 of 21

*Les articles 3, 9 et 10 de la Convention de New York du 20 novembre 1989
relative aux droits de
l'enfant (CIDE).
Les articles 6 et 8 de la Convention européenne des droits de l'homme (CEDH)
L'article 14 du Pacte international relatif droits civils et politiques (PIDCP)
Les articles 24 et 47 de la Charte des droits fondamentaux de l'Union européenne
La jurisprudence Plazzi c. Suisse, CEDH, 8 février 2022, n° 44101 /18 ;
Vu les pièces versées au débat;*

**DECLARER** les demandes de Monsieur Arnaud PARIS recevables et bien
fondées.

En conséquence ;

*A titre principal*

**D'ORDONNER** un ordre de retour des enfants vers la France où leur résidence
et leur garde a été établie à Paris avec leur père par les jugements français, fondé
sur sa compétence juridictionnelle confirmée par la Cour d'appel de Paris le 26
novembre 2024;

**ET DE SAISIR** la Cour de justice de l'Union européenne dans le cadre d'une
procédure préjudicielle d'urgence (PPU), en posant une question telle que la
suivante :"Dans une situation où un enfant ayant la nationalité d'un État membre
est illicitement retenu dans un Etat tiers qui ne garantit pas l'accès à une
procédure équitable dans le cadre de la Convention de La Haye, les juridictions
de l'État membre de résidence habituelle ont-elles la faculté, ou l'obligation au
titre du droit de l'Union européenne (Charte des droits fondamentaux article 3 §5
TUE, règlement Bruxelles llter), de prendre des mesures concrètes pour ordonner
le retour de l' 'enfant dans l'Union, en vertu de leur compétence subsidiaire ".

**CONDAMNER** Madame BROWN à une amende civile de 5 000 euros.

**CONDAMNER** Madame BROWN aux entiers dépens y compris au niveau des
actions entreprises aux USA et en Europe qui s'élèvent déjà à plus de 250 000 €
ainsi qu'à une amende civile de 5 000 euros (dont montant à parfaire après le
retour effectif des enfants).

**RESERVER** les frais irrépétibles et les dépens.

A l'audience du 16 juin 2025, Monsieur Arnaud PARIS s'est présenté en personne
et a confirmé sa demande.

Madame Heidi BROWN n'a pas comparu.

Le ministère public a communiqué un avis écrit daté du 15 juin 2025, défavorable
à la demande au motif de ce que le juge aux affaires familiales n'a pas le pouvoir
d'ordonner une mesure d'exécution forcée sur le territoire d'un Etat tiers.

Par jugement en date du 4 juillet 2025, le juge aux affaires familiales a sursis à
statuer au visa de l'article 15 de la convention de La Haye du 15 novembre 1965
relative à la signification et à la notification à l'étranger des actes judiciaires et
extrajudiciaires en matière civile ou commerciale et de l'article 686 du code de
procédure civile français et a demandé à Monsieur Arnaud PARIS de produire
l'accusé de réception de la lettre recommandée envoyée à Madame Heidi
BROWN et de justifier de l'envoi de l'assignation et de la présente décision
contenant la date de renvoi par voie postale et par messagerie électronique à
Madame Heidi BROWN, ainsi qu'à son avocat constitué dans la procédure en
cours aux Etats-Unis.

**Page 4**

EXHIBIT 09 - Page 16 of 21

A l'audience de renvoi du 27 octobre 2025, Monsieur Arnaud PARIS a comparu en personne. Il a produit les pièces sollicitées et a demandé le bénéfice de son exploit introductif d'instance.

Madame Heidi BROWN n'a pas comparu et ne s'est pas faite représenter à l'audience. La décision sera réputée contradictoire.

## MOTIFS

### Sur la régularité de la saisine :

Monsieur Arnaud PARIS a fait procéder aux formalités de signification de l'assignation devant notre juridiction au domicile de Madame Heidi BROWN dans l'OREGON aux Etats Unis.

Il résulte du certificat prévu à l'article 6 de la Convention de La Haye de 1965 sur les notifications, daté du 30 avril 2025, que l'agent chargé de la signification a constaté que Madame Heidi BROWN habitait bien à l'adresse indiquée, que personne n'a ouvert malgré des signes de présence dans l'habitation et a dressé une attestation de non accomplissement.

Le commissaire de justice français a doublé son envoi aux autorités compétentes aux Etats-Unis de l'envoi d'une lettre recommandée avec accusé de réception directement à Madame Heidi BROWN.

Sur notre demande, Monsieur Arnaud PARIS produit les justificatifs de ce que:
- Madame Heidi BROWN a retiré le recommandé le 2 mai 2025 à son bureau de poste aux Etats unis (notification LA POSTE d'envoi international recommandé)
- Madame Heidi BROWN a refusé la réception du deuxième courrier envoyé en recommandé Fedex le 29 août 2025
- Madame Heidi BROWN a bien reçu, ainsi que son avocat Me Taylor Murdoch, par messagerie électronique le 28 août 2025 l'assignation introductive d'instance et une copie du jugement rendu le 4 juillet 2025 avec une traduction en langue anglaise.
- son avocat Me Taylor Murdoch, a quant à lui bien reçu l'assignation introductive d'instance et le jugement rendu le 4 juillet 2025 contenant la date d'audience de renvoi, par courrier Fedex avec accuse de réception signé le 2 septembre 2025 .

Par conséquent, il convient de constater qu'il est justifié des diligences nécessaires et suffisantes pour la signification de l'assignation à l'étranger et que Madame Heidi BROWN, ainsi que son conseil, en ont bien eu connaissance.

Notre juridiction est par conséquent valablement saisie.

### Sur la demande principale:

La convention de La Haye du 26 octobre 1980 a pour objet de prévenir les enlèvements internationaux d'enfants dans le cadre de séparations des parents.

Ses trois premiers articles sont ainsi libellés:

" *Article premier*

*La présente Convention a pour objet :*
*a) d'assurer le retour immédiat des enfants déplacés ou retenus illicitement dans tout Etat contractant ;*
*b) de faire respecter effectivement dans les autres Etats contractants les droits de garde et de visite existant dans un Etat contractant.*

Page 5

EXHIBIT 09 - Page 17 of 21

*Article 2*

*Les Etats contractants prennent toutes mesures appropriées pour assurer, dans les limites de leur territoire, la réalisation des objectifs de la Convention. A cet effet, ils doivent recourir à leurs procédures d'urgence.*

*Article 3*

*Le déplacement ou le non-retour d'un enfant est considéré comme illicite :*
*a) lorsqu'il a lieu en violation d'un droit de garde, attribué à une personne, une institution ou tout autre organisme, seul ou conjointement, par le droit de l'Etat dans lequel l'enfant avait sa résidence habituelle immédiatement avant son déplacement ou son non-retour ; et*
*b) que ce droit était exercé de façon effective seul ou conjointement, au moment du déplacement ou du non-retour, ou l'eût été si de tels événements n'étaient survenus.*
*Le droit de garde visé en a) peut notamment résulter d'une attribution de plein droit, d'une décision judiciaire ou administrative, ou d'un accord en vigueur selon le droit de cet Etat. "*

En vertu de l'article 373-2-6 du code civil français, le juge du tribunal judiciaire délégué aux affaires familiales règle les questions qui lui sont soumises dans le cadre du présent chapitre en veillant spécialement à la sauvegarde des intérêts des enfants mineurs.

Le juge peut prendre les mesures permettant de garantir la continuité et l'effectivité du maintien des liens de l'enfant avec chacun de ses parents.

Il peut notamment ordonner l'interdiction de sortie de l'enfant du territoire français sans l'autorisation des deux parents. Cette interdiction de sortie du territoire sans l'autorisation des deux parents est inscrite au fichier des personnes recherchées par le procureur de la République.

Il peut, même d'office, ordonner une astreinte pour assurer l'exécution de sa décision.

En l'espèce, par jugement en date des 21 avril 2023, le juge aux affaires familiales du tribunal judiciaire de Paris constatant que Juliette et Eva nées le 15 janvier 2015 à Ashland (Etats-Unis) résidaient avec leurs parents en France depuis 2019, y étaient pleinement intégrées au moment de la séparation de leurs parents et avaient exprimé le désir de rester vivre en France dans leur environnement familier, a fixé la résidence principale des deux enfants chez le père en France avec un droit de visite et d'hébergement pour la mère à exercer pendant la moitié des vacances scolaires.

Par jugement en date du 25 août 2023, le juge aux affaires familiales du tribunal judiciaire de Paris, au constat de ce que Madame Heidi BROWN n'entendait pas se conformer à la décision du juge français, a ordonné une interdiction de sortie du territoire national des deux enfants et dit que Madame Heidi BROWN exercerait son droit de visite et d'hébergement sur le territoire français.

Par arrêt en date du 26 novembre 2024, la Cour d'appel de Paris, après un examen de l'historique de la résidence habituelle des parents et des enfants, de l'accord auquel le couple était parvenu en 2022, et des éléments produits contradictoirement aux débats, a confirmé la fixation de la résidence des enfants au domicile du père en France et a organisé un droit de visite et d'hébergement régulier pour la mère.

**Page 6**

EXHIBIT 09 - Page 18 of 21

Il résulte de ces décisions rendues contradictoirement que le départ de Madame Heidi BROWN aux Etats-Unis avec les deux enfants au mois d'avril 2024 en violation des décisions de justice françaises et du droit de garde de Monsieur Arnaud PARIS réalise un enlèvement international d'enfant au sens de l'article 3 de la Convention de La Haye du 25 octobre 1980 à laquelle la France et les Etats-Unis d'Amérique sont Etats parties pour l'avoir ratifiée respectivement en 1982 et 1988.

Si notre présente juridiction ne peut délivrer un ordre de retour directement exécutable aux Etats Unis, elle a néanmoins le pouvoir, au constat de l'existence d'un déplacement illicite au sens de l'article 3 de la convention, d'ordonner le retour des enfants en France sur le fondement de l'article 373-2-6 du code civil à titre de mesure de nature à garantir la continuité et l'effectivité du maintien des liens des enfants avec chacun des parents.

A défaut d'exécution volontaire par le parent concerné, cet ordre est susceptible de revêtir force exécutoire sur le territoire d'un Etat tiers par la procédure d'exequatur que le parent délaissé peut engager auprès des autorités judiciaires de l'Etat sur le territoire duquel se trouvent les enfants.

Par conséquent, aux motifs du non-respect des précédentes décisions judiciaires et de l'absence de tout contact des enfants avec leur père en contravention avec les décisions de justice et l'intérêt supérieur des enfants d'entretenir librement des relations avec leurs deux parents, il y a lieu d'ordonner le retour des enfants sur le territoire français aux fins de mise à exécution des décisions judiciaires régulièrement et contradictoirement prises en France organisant les modalités de garde des deux enfants.

Au constat d'un bras de fer entre les parents préjudiciable aux enfants qui sont privées de toutes relations avec leur père depuis avril 2024, alors que les parents peuvent parvenir à un accord et le faire homologuer par des décisions miroirs en France et aux Etats-Unis, les parties seront invitées à s'informer sur la médiation auprès d'un médiateur international dont les coordonnées sont indiquées dans le dispositif et à se saisir de cette opportunité afin de parvenir à une solution d'apaisement tenant compte des besoins de chacun.

### Sur la demande de soumettre une question préjudicielle à la Cour de Justice européenne:

Il ne sera pas fait droit à cette demande comme n'étant pas utile à la résolution du présent litige.

### Sur la demande d'amende civile:

En vertu de l'article 373-2-6 dernier alinéa du code civil, le juge aux affaires familiales peut, lorsqu'un parent fait délibérément obstacle de façon grave ou renouvelée à l'exécution de l'un des titres mentionnés aux 1° à 5° du I de l'article 373-2-2, le condamner au paiement d'une amende civile d'un montant qui ne peut excéder 10 000 €.

Afin de ne pas entraver une solution négociée entre les parents, il ne sera pas fait droit à la demande d'amende civile.

### Sur les dépens:

En application de l'article 696 du code de procédure civile, Madame Heidi BROWN sera condamnée aux dépens de la présente procédure.

**Page 7**

EXHIBIT 09 - Page 19 of 21

## PAR CES MOTIFS

Le juge aux affaires familiales

Statuant par jugement réputé contradictoire, mis à disposition au greffe, après débats en chambre du conseil,

**CONSTATE** que le déplacement des enfants est illicite au sens de l'article 3 de la convention de La Haye du 25 octobre 1980 sur les aspects civils de l'enlèvement international d'enfants.

**ORDONNE** à Madame Heidi BROWN de ramener les deux enfants Juliette PARIS née le 15 janvier 2015 à Ashland (Etats-Unis), et Eva PARIS née le 15 janvier 2015 à Ashland (Etats-Unis), sur le territoire français.

**DEBOUTE** Monsieur Arnaud PARIS du surplus de ses demandes;

**INVITE** Monsieur Arnaud PARIS à saisir **madame Alice CANET**, médiatrice inscrite sur le liste des médiateurs internationaux: canet@alice-canet.eu ; tel: 0033(0)367102024, aux fins d'engager une médiation internationale et trouver une solution négociée dans le meilleur intérêt des enfants.

**CONDAMNE** Madame Heidi BROWN aux dépens.

### Fait à Paris, le 27 Novembre 2025

Marianne DEBOUTIERE

Greffier

Stéphanie HEBRARD

1ère vice-présidente

Page 8

EXHIBIT 09 - Page 20 of 21

**EXPÉDITION** exécutoire dans l'affaire :

Demandeur : **M. Arnaud PARIS**

contre

Défenderesse : **Mme Heidi BROWN**

EN CONSÉQUENCE, LA RÉPUBLIQUE FRANÇAISE mande et ordonne :

A tous les huissiers de justice, sur ce requis, de mettre ladite décision à exécution,

Aux Procureurs Généraux et aux Procureurs de la République près les Tribunaux Judiciaire d'y tenir la main,

A tous commandants et officiers de la force publique de prêter main-forte lorsqu'ils en seront légalement requis.

En foi de quoi la présente a été signée et délivrée par nous Directeur des services de greffe judiciaires soussigné au Greffe du Tribunal judiciaire de Paris

p/Le Directeur des services de greffe judiciaires



9ème page et dernière

EXHIBIT 09 - Page 21 of 21

EXHIBIT 10

**Subject:** Case No. 23/16081 / Ms. BROWN / Mr. PARIS / Mediation
**From:** Audrey SONNENBERG <audreysonnenberg@outlook.fr> **Date:**
08/12/2025, 11:20 **To:**
"heidimparis@gmail.com" <heidimparis@gmail.com>, Arnaud Paris
<arnaud@skyvr.com>, Sandrine FARRUGIA <farrugiaavocat@gmail.com>,
"terence.richoux@trx-legal.com" <terence.richoux@trx-legal.com>

Dear Madam, dear Sir, dear Teachers,

I am contacting you again regarding the case referenced above.

I confirm that I organised the information meeting on mediation which was held via zoom on Thursday, December 4, in
the presence of Mr PARIS who agreed to enter into mediation with me.

Unfortunately, I still haven't heard from Mrs. BROWN despite my emails.

The 15-day period granted by the Court of Appeal having now expired, I am therefore closing this case and informing
the Court of Appeal.

However, I remain at the disposal of Mrs. BROWN and Mr. PARIS should they wish to implement conventional mediation in
this matter in the future.

We hope you receive this in good order.

Best regards

Attorney Audrey SONNENBERG
Lawyer at the Court
Mediator Ifomene/ CNMA/ Court of
Appeal
Member of the AME and the IEAM
Mediation trainer, 49 rue
Saint-Roch
75001 PARIS

Mobile: 06 18 99 44 65

EXHIBIT 10 - PAGE 1 OF 2

**Subject:** RG : 23/16081 / Mme BROWN / M. PARIS / Médiation
**From:** Audrey SONNENBERG <audreysonnenberg@outlook.fr>
**Date:** 08/12/2025, 11:20
**To:** "heidimparis@gmail.com" <heidimparis@gmail.com>, Arnaud Paris
<arnaud@skyvr.com>, Sandrine FARRUGIA <farrugiaavocat@gmail.com>,
"terence.richoux@trx-legal.com" <terence.richoux@trx-legal.com>

Chère Madame, cher Monsieur, chers Maîtres,

Je reviens vers vous dans le cadre du dossier ci-dessus référencé.

Je vous confirme avoir organisé la réunion d'information à la médiation qui s'est tenue via
zoom, le jeudi 4 décembre, en présence de Monsieur PARIS qui a accepté de rentrer en
médiation avec moi.

Je demeure, malheureusement, sans nouvelle de Madame BROWN malgré mes courriers
électroniques.

Le délai de 15 jours imparti par la Cour d'Appel ayant désormais expiré, je clôture donc ce
dossier et en enforme la Cour d'Appel.

Je demeure toutefois à la disposition de Madame BROWN et de Monsieur PARIS s'ils souhaitent
à l'avenir mettre en place une médiation conventionnelle dans ce dossier.

Vous souhaitant bonne réception de la présente

Bien cordialement

Maître Audrey SONNENBERG
Avocate à la Cour
Médiatrice Ifomene/ CNMA/ Cours
d'Appel
Membre de l'AME et de l'IEAM
Formatrice en médiation
49, rue Saint-Roch
75001 PARIS

Port : 06 18 99 44 65

EXHIBIT 10 - PAGE 2 OF 2

EXHIBIT 11



Neutral Citation Number: [2022] EWHC 655 (Fam)

Case No: FD21P00779

**IN THE HIGH COURT OF JUSTICE**
**FAMILY DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 22/03/2022

**Before**:

**MRS JUSTICE THEIS**

- - - - - - - - - - - - - - - - - - - -

Between:

|  |  |
|---|---|
| **R** | **Applicant** |
| - and - |  |
| **G** | **Respondent** |
| - and - |  |
| **Secretary of State for the Home Department** | **Interested Party** |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Ms Jennifer Perrins** (instructed by **Dawson Cornwell**) for the **Applicant**
**Ms Elizabeth Lanlehin** (instructed by **Crystal Chambers** for the **1st Respondent**)
**Ms Fiona Paterson** (instructed by) for the **Secretary of State for the Home Department**

Hearing date: 17th March 2022
Judgment: 22nd March 2022
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

.............................

MRS JUSTICE THEIS

This judgment was delivered in private.   The judge has given leave for this version of the judgment to be published. The anonymity of the children and members of their family must be strictly preserved.   All persons, including representatives of the media, must ensure that this condition is strictly complied with.   Failure to do so will be a contempt of court.

EXHIBIT 11- Page 1 of 10

**Mrs Justice Theis DBE:**

**Introduction**

1.   This matter concerns proceedings issued by the father relating to X, age 5, against the mother for X's summary return to Italy. The applicant father's application is made pursuant to the 1980 Hague Convention on the Civil Aspects of International Child Abduction ('the 1980 Hague Convention') and was opposed by the respondent mother.

2.   Following a contested hearing, a return order was made by Arbuthnot J on 4 February 2022, requiring X to be returned to Italy by 13 February 2022. The mother made an application for asylum for herself and X on 10 February 2022. The issues the court has to determine are

     (i) the mother's application for a further stay of the return order in the light of judicial review proceedings she has just issued challenging a decision by the Secretary of State for the Home Department ('SSHD') on 15 March 2022 that the asylum applications are 'inadmissible' under paragraph 326E of the Immigration Rules, and

     (ii) the father's application for the return order to be effected with, if necessary, a collection order being made so he can take X back to Italy. In addition, the father seeks disclosure of the material submitted by the mother in the asylum applications.

3.   The SSHD has attended this hearing, represented by Ms Paterson, to assist the court. The court is very grateful to all counsel who have provided focussed written and oral submissions, which have been of great assistance to the court.

4.   The court announced its decision on 17 March 2022 with reasons to follow, which are set out below.

**Relevant background**

5.   Both parents and X are Italian nationals. The parties were in a relationship for a number of years, did not marry, and separated in August 2021 although remained living together. On 30 August 2021 the father was not able to contact the mother, he received a message from her stating that she and X were in England and would be returning on 7 September 2021. They did not return on that date and the father reported the matter to the police and sought legal assistance.

6.   On 23 September 2021 the father submitted his application to the Italian Central Authority and on 14 October 2021 these proceedings were commenced seeking X's summary return to Italy.

7.   Directions were made by this court on 22 October and 5 November 2021 and the matter listed for a 2 day hearing on 3 February 2022. In paragraph 20 of the 5 November 2021 order, provision was made for the father and X to have video contact on Tuesday, Thursday and Saturday. I was told at this hearing that had largely taken place, although each parent cites some difficulties caused by the other. The 5 November 2021 order also provided that if the father wished to pursue direct contact in England prior to the date of the final hearing he should issue an application on notice.

EXHIBIT 11- Page 2 of 10

8.      The final hearing concluded on 4 February 2022 when Arbuthnot J made a return order after hearing oral evidence from the parties and rejecting the mother's defences under Article 13 a and b of the 1980 Hague Convention. Arbuthnot J gave a detailed judgment. The mother was ordered to return X by no later than 13 February 2022, with detailed directions made regarding the practical arrangements for X's return. Within those proceedings there was no issue that the father was exercising his rights of custody for the child at the time X was removed and X was habitually resident in Italy at the time of her removal to England in August 2021. That order was not appealed.

9.      Just before the mother was due to return to Italy, pursuant to the terms of the return order, her solicitors confirmed on 10 February 2022 she had not purchased return tickets as provided for in the order and had made an asylum application on behalf of herself and X. According to the father, this was after he had made payments to the mother to secure the necessary flights in accordance with Arbuthnot J's order.

10.     At the time no further details about the asylum application were provided save for a witness statement from an immigration solicitor instructed by the mother confirming the applications had been made. In relation to the asylum applications Ms Lanlehin's position statement for the hearing on 17 March 2022 states '*[the mother] had provided the same information during the Hague proceedings and her asylum claim is not based on predominantly new facts, that would suggest any fabrication or intention to delay the proceedings. Mother had simply obtained further evidence to advance her asylum claim of which the Secretary of State has a different duty to further investigate. The particular facts of this case suggests the mother equally had a right of appeal against the return order [of] which she could have lodged when the documentary evidence became available to her.*'

11.     The matter was urgently restored to court by the father the day after being informed of the asylum applications through his application dated 11 February 2022. The mother also made an application on the same day stating '*the mother has not purchased tickets and is intending to apply for a stay of the order on the basis that the mother and child each made an application for asylum in their own rights...the mother makes an application for a stay of the return order*'.

12.     On 15 February 2022 the matter came before this court and the directions order included inviting the SSHD to intervene, to attend the next hearing and to provide a letter to the court and the parties by 21 February 2022 detailing whether the application for asylum had been made, the status of the application, the timeframe for any decision and whether the SSHD intends to apply to intervene in the proceedings. Cafcass were invited to consider whether X should be joined as a party. The matter was listed again on 1 March 2022. The return order was stayed until the next hearing.

13.     Cafcass considered the papers and informed the court and the parties that they did not consider X needed to be joined as a party.

14.     Prior to the hearing on 1 March 2022 the SSHD confirmed the mother's asylum claim was deemed 'inadmissible' by the SSHD on 28 February 2022 under paragraph 326E of the Immigration Rules on the basis that both the mother and X are EU nationals and there is no evidence to suggest that the test under paragraph 326F was met, namely '*that there are exceptional circumstances which require the application to be admitted for*

EXHIBIT 11- Page 3 of 10

*full consideration'.* The mother did not receive notice of that decision until 10 am on 1 March 2022.

15.    At the hearing on 1 March 2022 the court was informed the mother was given a notice under s120 Nationality, Asylum & Immigration Act 2002 ('2002 Act') after her asylum interview the previous week, the effect of which was to give the mother 14 days to provide any further material in support of the asylum application. Counsel for the SSHD informed the court that the decision by the SSHD as to the inadmissibility of the mother's claim superseded the s120 notice and therefore the mother's asylum application had been fully concluded with no right of appeal. The mother sought more time, due to the short notice she had been given of the SSHD's decision, indicating that consideration would be given to a claim for judicial review. The father stated that if the mother was not going to return X he would travel over here and collect X to return her to Italy, the order records the father to have been deemed to have made an application for a collection order. The matter was adjourned until 8 March 2022, the stay on the return order was continued until the next hearing.

16.    The 1 March 2022 order provided the hearing on 8 March 2022 was to consider whether (i) the stay on the order dated 4 February 2022 should continue; or (ii) X should be returned to Italy; and (iii) whether to make a collection order placing X in the care of the father to enable X to return to Italy in his care. Directions were made for the father's solicitors to lodge a bundle with position statements/skeleton arguments from the parties by 10 am 7 March 2022. The father filed a position statement on 7 March 2022, the mother did not file hers until just before the hearing on 8 March 2022.

17.    The SSHD filed a position statement by 4pm 7 March 2022, as directed. It confirmed no pre-action letter had been received nor had any further application for asylum been made. The SSHD had served a further copy of her decision letter, the substance of the decision is the same as that dated 28 February 2022, namely that the mother's application is still deemed to be 'inadmissible', the final part of the letter is different as it sets out that unless the mother has permission to remain here she is expected to make arrangements to leave. Although the SSHD did not express any views on the orders sought by the father the position statement notes *'there is no bar to the court making orders sought by the applicant'.*

18.    Just before the hearing started on 8 March 2022 the court and the parties received details of an application for judicial review in the Upper Tribunal (Immigration and Asylum Chamber) by the mother that had been issued that morning. The Upper Tribunal made directions the same day, 8 March 2022, requiring the SSHD to file an acknowledgement of service on 10 March 2022.

19.    At the hearing on 8 March 2022 Ms Lanlehin informed the court the basis of the judicial review proceedings was procedural irregularity, as the SSHD had made her decision without giving the mother the opportunity to make the representations provided for in the s120 notice.

20.    During the hearing on 8 March 2022 there were discussions between Ms Lanlehin and Ms Paterson which resulted in an agreement being reached that the mother would withdraw the judicial review proceedings on the basis that she would provide the SSHD with any further information relating to the asylum application by 9am 14 March 2022,

EXHIBIT 11- Page 4 of 10

which the SSHD would consider and review the inadmissibility decision by 5pm 15 March 2022.

21. On 8 March 2022 Ms Perrins sought the stay to be lifted, the return order to take effect and for the court to make a collection order to enable the father to take X back to Italy. The father had travelled to England for the hearing. That was opposed by the mother, who sought a further stay for the process agreed between the mother and SSHD to take place. The court granted a further adjournment until 17 March 2022. The reasons included that due to what had been agreed between the mother and SSHD it was open to the mother to say the asylum application had not been determined and as a consequence the court was arguably bound by *G v G (SSHD and others intervening) (2021) UKSC 9*.

22. What was agreed took place. The mother provided the information on 14 March 2022. The SSHD sent a letter on 15 March 2022 setting out the SSHD had concluded the mother and X's asylum applications are 'inadmissible'.

23. In the position statement filed for 17 March 2022 Ms Lanlehin stated at paragraph 3 that the mother *'is in the process of filing another application for Judicial Review today, challenging the lawfulness of the decision on admissibility and the failure to independently investigate and consider the evidence provided'.* During the hearing on 17 March 2022 it was confirmed those proceedings had been issued that morning in the Upper Tribunal who had made a direction requiring the SSHD to respond to the application by 21 March 2022, and the permission application to be listed on the *'earliest available hearing date'* after that.

24. On 17 March 2022 the court heard oral submissions from the parties and the SSHD and announced the decision that the application for a stay was refused, the return order would take effect on 23 March 2022 and a collection order would be made to take effect on 22 March 2022. The parties had informed the court they would agree arrangements for X to see her father over the coming weekend.

**Submissions**

25. In her written and oral submissions on behalf of the father Ms Perrins refers to the case of *G v G* when the Supreme Court considered the potential conflict between the principle of non-refoulement and the obligations that arise under the 1980 Hague Convention. The Supreme Court acknowledged the tensions between the objectives of the 1980 Hague Convention and the principle that refugees should not be refouled, namely expelled or returned to a country where they may be persecuted.

26. The main issue considered by the Supreme Court in *G v G* was whether where a parent had made a claim for asylum and named a child as their dependent, this should result in the child also being treated as an asylum claimant in their own right. In *G v G* the mother had not made a separate claim by or on behalf of the child. The Supreme Court held that [117] *'generally speaking, an application which named a child as a dependent could (and indeed should) be understood as an application by the child [for asylum]'.* Counsel for the father in *G v G* had conceded below that the principle of non-refoulement would operate so as to prevent the implementation of a return of a child in circumstances where the child was an applicant or subject to non-refoulement and that

EXHIBIT 11- Page 5 of 10

issue appeared to be accepted in both the Court of Appeal [17] and in the Supreme Court [8] and [14].

27.    The Supreme Court's judgment in *G v G* was that the principle of non-refoulement, where it applies, always operates as an absolute bar on the implementation of the return of the child under an order made under the 1980 Hague Convention. Ms Perrins drew attention to what is set out in *G v G* about pending claims and appeals [135 – 153], in particular at [152] that an *'in country appeal acts as a bar to the implementation of a return order in 1980 Hague Convention proceedings.'* In that paragraph Lord Stephens continued *'Due to the time taken by the in-country appeal process this bar is likely to have a devastating impact on the 1980 Hague Convention proceedings. I would suggest that this impact should urgently be addressed by consideration being given as to a legislative solution.'*

28.    Ms Perrins continues in her written submissions to state '*the bar on removal/protection from expulsion is said to arise at various stages from a combination of our obligations under the 1951 Geneva Convention and the relevant framework, including EU law which has been transposed or otherwise incorporated into our domestic asylum and immigration law. See in particular Articles 7 & 39 of the procedures Directive and s77 & 78 of the Nationality, Asylum & Immigration Act 2002'*.

29.    In her oral submissions at this hearing, Ms Perrins focussed on the point that it was accepted by Ms Lanlehin there was no appeal from the determination by the SSHD that the asylum claim was 'inadmissible'. As a consequence, Ms Perrins submits, there is no bar to the return order taking effect as there is no 'in country' appeal (per Lord Stephens in *G v G* [152]). She relies on the analysis in *G v G* between [135 - 153] where the Supreme Court makes it clear the 'in-country' appeals are those that come within the 2002 Act, which does not apply in the circumstances of this case.

30.    Ms Perrins submits the circumstances of this case fall within those categories of cases highlighted by Moylan LJ *Re R [2022] EWCA Civ 188* when he stated

       [9] *'...in my view, the timing of an asylum claim is, potentially, of considerable importance to the application of the principles set out in G v G. If this was ignored as a relevant factor, it would open the door to manipulative applications used to seek to subvert the expedited process that is required in the determination of applications under the 1980 Convention.'* and

       [92] '*Before dealing with the merits of this appeal, I sound the following note of caution. If greater experience demonstrates or suggests that the respective processes are being manipulated by one party, it may well be that the court will have to revisit the guidance given in G v G and determine whether it requires adjustment to seek to prevent such manipulation. I do not propose, at present, to suggest where that might lead but I would draw attention again to the different standards of proof applied in the determination of an asylum claim and an application under the 1980 Convention and to the other observations made, in particular by the Court of Appeal in G v G and by the Inner House in Re (A Child).'*

31.    Ms Perrins submits this case is an egregious example. The mother arrived in August 2021, made no application for asylum then or soon thereafter, fully engaged in the 1980

EXHIBIT 11- Page 6 of 10

Hague Convention proceedings with the benefit of legal advice and representation. No reference was made in those proceedings of any asylum application which was only made on the eve of the implementation of the date for the child to be returned under Arbuthnot J's order. In *Re R* at [68] Moylan LJ highlighted the expectation in *G v G* that both claims would be running in parallel. He recognised that there might be circumstances which explained why an asylum claim was not made until later, such as changed circumstances in the home State. He continued *'However, absent such as explanation, the court is entitled to expect, and there is an obligation on, a parent to advance their full case in the 1980 Convention proceedings.'*

32.   Whilst Ms Perrins made some more ambitious submissions about *G v G,* including the extent to what part of that decision is obiter, she accepted that if the court was with her in relation to the 'in-country' appeal point the court did not need to consider her wider submissions and the return order could, and should, be effected, thereby complying with the obligations under Article 12 of the 1980 Hague Convention.

33.   Ms Lanlehin, on behalf of the mother, whilst accepting there is no appeal from the SSHD's decisions that the application is 'inadmissible', does not accept Ms Perrin's analysis in relation to 'in-country' appeals regarding the mother's situation. Whilst she acknowledges the mother's position does not fit in with the routes of appeal in the 2002 Act she submits the Inadmissibility; safe third country cases guidance published for Home Office staff on 31 December 2020 ('the Guidance') refers to judicial review proceedings issued in circumstances such as in this case is likely to have *'suspensive effect'*. However, she recognised that this is different and distinctive to the situation when there is an 'in country' appeal under the 2002 Act. Ms Lanlehin submits that the court should treat it as the same, as judicial review is the only effective remedy for the mother and should be regarded as the same as an 'in country' appeal. She submits in these circumstances the issue of refoulement is still *'ingrained'* in this situation.

34.   Ms Lanlehin did not accept the judicial review proceedings were a further delaying tactic. She outlined that the mother had contacted the police soon after her arrival, hoped she would find redress in the 1980 Hague Convention proceedings where her fears were referred to in those proceedings. When her defence was rejected she was entitled to take the asylum route due to these fears. She submitted the asylum claim was not tactical as the mother sought redress in the 1980 Hague Convention proceedings first. Ms Lanlehin invited the court to exercise its discretion to grant a further stay of the return order until the judicial review proceedings are concluded.

35.   Ms Lanlehin was able to take instructions from the mother about whether the father could spend time with X if he was in this jurisdiction, as he had been for the hearings on 8 and 17 March 2022. Ms Lanlehin confirmed the mother did not object in principle to the father spending time with X, subject to agreement between the parties.

36.   Ms Paterson made clear the SSHD remained neutral in relation to the outcome of the hearing. She agreed with the analysis by Ms Perrins in relation to 'in country' appeals as set out in *G v G*. She referred to further contact the mother had made with the SSHD on 16 March 2022 requesting a screening interview, which the SSHD had understood to be a further asylum application made by the mother. Ms Lanlehin was able to take instructions and stated her instructions are the mother has not made any further asylum application.

EXHIBIT 11- Page 7 of 10

37.     Ms Patterson drew the court's attention to the point that the guidance in *G v G* was grounded in a wholly different factual matrix than that before the Court of Appeal in *Re R* and that in the present application. In *G v G* the mother applied for asylum on arrival at the airport '*on the basis of the fear of persecution from her family as a result of her sexual orientation, from which the South African authorities were unwilling or unable to protect her*'. The father applied for the child's return through the South African Central Authority 9 days after the mother's arrival here. The two applications ran concurrently; the asylum application having preceded the 1980 Convention proceedings.

38.     In *Re R* there was a clear basis for the court to be concerned. The mother did not apply for asylum until 20 October 2020, the court having made a return order on 17 July 2020, in respect of which permission to appeal was refused on 3 August 2020 and stays were refused on 4 August 2020, 22 September 2020 and 16 October 2020.

39.     Ms Paterson submits this factual matrix needs to be considered against the factual and legal contexts outlined by Lord Stephens in *G v G,* which she effectively and succinctly summarised as follows:

> (i) The relationship between the child and the left behind parent may be harmed beyond repair if there are delays in the resolution of the 1980 Convention and asylum proceedings (*G v G [3])*.

> (ii) The purpose of the 1980 Convention is to deter people from wrongfully abducting children as it is to serve the best interests of the children who have been abducted (*G v G* [4]).

> (iii) The prompt return of children wrongfully removed or retained is one of the objects of Article 1 of the Hague Convention, which requires an application to be determined within 6 weeks (*G v G* [68]).

> (iv) Any delay in either the 1980 Hague Convention proceedings and in any related asylum application is inimical to the obligations imposed on the United Kingdom to determine applications under the 1980 Hague Convention promptly *G v G* [69].

> (v) Section 78 of the 2002 Act provides protection from refoulement only during an in country appeal but not an out of country appeal. A judicial review challenge does not fall within s78 of the 2002 Act (*G v G* [103]).

40.     When considering these matters Ms Paterson submits it is arguable that *Re R* is not a departure from *G v G,* but rather an extension of the same principles to a wholly different set of facts, namely where it may appear the asylum system is being manipulated to thwart a return order under the 1980 Hague Convention.

**Discussion and decision**

41.     The circumstances in this case are an illustration of how the tension referred to by Lord Stephens in *G v G* as between the 1980 Hague Convention and an asylum claim can operate on the ground and the impact that can have on decisions taken under the 1980 Hague Convention.

EXHIBIT 11- Page 8 of 10

42.  The factual matrix in *G v* G, as outlined by Ms Paterson, is arguably very different from that which existed in *Re R* and in this case where the asylum application is made after the 1980 Hague Convention proceedings have been concluded, following a contested hearing.

43.  What this court needs to determine in this case is whether there is any bar, in accordance with the principles set out in *G v G,* that prevents the return order taking effect. I am satisfied there is no bar for the following reasons:

> (i) There is no right of appeal against the decision by the SSHD that the asylum claim is 'inadmissible'. That is agreed by both Ms Perrins and Ms Lanlehin.

> (ii) As a consequence, there is no 'in country' appeal in accordance with the 2002 Act and consequently the protection afforded for such a situation by s78 2002 Act does not apply.

> (iii) I reject Ms Lanlehin's submission that this court should treat the mother's application for judicial review as having the same effect as an 'in country' appeal on the basis that it is the only route by which the admissibility decision can be challenged. That decision and distinction was made by Parliament when it had the opportunity to do so and it chose not to include the situation this mother is in as having such protection under the 2002 Act. Ms Lanlehin realistically acknowledged the reliance by her on the Guidance to Home Office staff did not give the mother the same protection as an appeal under the 2002 Act.

> (iv) Consequently, there is no bar in accordance with the principles set out in *G v G* that prevent the return order being implemented.

44.  Ms Lanlehin sought to suggest the court retained a general discretion to stay the return order in the circumstances of this case until the mother's claim for judicial review was determined. I reject that for the following reasons:

> (i) Whilst the court does retain a general power to order a stay of an order under rule 4.1 (3) (g) Family Procedure Rules 2010 ('FPR 2010'), in this context that is generally exercised either in circumstances where the principles in *G v G*  apply or in other specified circumstances, such as a time limited stay pending the filing of a notice of appeal.

> (ii) Rule 12.52A FPR 2010 provides a procedure whereby return orders can be set aside where no error of the court is alleged. That is not an application made in this case and there has been no appeal of the return order.

> (iii) Having determined that there is no bar on the return order being effective under *G v G* the court has to consider Article 12 of the 1980 Hague Convention which requires this court to return the child unless one of the defences under the 1980 Hague Convention has been established.

> (iv) The considerations summarised in paragraph 38 above are relevant and underpin the obligation under Article 12 of the 1980 Hague Convention.

EXHIBIT 11- Page 9 of 10

45. Having considered the position the court is now in with no bar under *G v G* to the return order taking effect, the acceptance by the mother that arrangements can be made for the father to spend time with X over the next few days I am satisfied an order should be made for X to be returned to Italy by 23.59 on 23 March 2022 and for this court to make a collection order in favour of the father to take effect on 22 March 2022. This will give an opportunity for the father to see X, if the parties can agree the arrangements, and for the mother to consider her position as to whether she is going to return with X before the collection order takes effect. If she does not, X will be returned to Italy in the care of the father. The undertakings given by the father on 4 February 2022 remain in place (subject to adjustments to reflect that X is returning in his care) which include not '[using or threatening] *violence against the mother nor to harass or pester her, directly or indirectly'* or *'to attend the property where [she] resides, nor come within 100 metre radius of the same, without prior written permission from the mother or with permission of the court'.*

46. Finally, the father included in his application a direction for the mother to disclose her asylum application(s) as they are likely to be relevant to the issues between the parties in the Italian courts. That issue will need to be restored for determination if the parties are unable to reach agreement and the court will need to consider the relevance of the documents to the Italian proceedings and how the respective Article 8 and 6 rights of the parties should be balanced.

EXHIBIT 11- Page 10 of 10

EXHIBIT 12

**Kathy J. Marshack, Ph.D.**
**5930 Pacific Overlook Drive**
**Neskowin OR 97149**

**January 30, 2025**

**Inter-American Commission on Human Rights (IACHR)**
Organization of American States
1889 F Street NW
Washington, D.C. 20006
USA

## Re: Urgent Request for Temporary Relocation of Juliette and Eva Paris and Reunification Efforts

Dear Commissioners of the Inter-American Commission on Human Rights,

I am writing to express my grave concerns for the emotional and psychological well-being of **Juliette and Eva Paris**, the daughters of **Mr. Arnaud Paris**, and to support his urgent request for their temporary relocation to **San Francisco, California**. As a licensed psychologist in Oregon and Washington, I have reviewed significant evidence provided by Mr. Paris, including court orders, emails, videos, and audio recordings, which strongly suggest that the children are at serious risk of **parental alienation**, a form of psychological abuse with long-term consequences.

## Key Findings and Concerns

1. **Parental Alienation as Emotional Abuse:**
   o  The evidence indicates a growing effort to alienate the children from their father. For example, video recordings show the mother prompting one of the daughters to accuse her father of causing harm, causing significant distress. This coercion is a hallmark of parental alienation and places the children under severe emotional stress.
   o  In audio recordings, the children state they cannot disclose their location and imply they can only see their father if he "pays," while also assuring him he "won't be arrested." Such statements strongly suggest they have been exposed to adult conflicts and misinformation, which is inappropriate and harmful.
2. **Community Involvement in Alienation:**
   o  School officials in the children's current community have reportedly engaged in spreading malicious and defamatory gossip about Mr. Paris. This dynamic fosters a hostile environment for the children, compounding the alienation and emotional harm.
3. **Psychological Consequences of Alienation:**
   o  Research shows that parental alienation can lead to lifelong emotional issues, including depression, low self-esteem, and difficulty forming healthy

EXHIBIT 12 - PAGE 1 OF 3

relationships. The involvement of community members further entrenches this alienation, isolating the targeted parent and confusing the children.

## Contact with Judge Bloom

I have communicated with **Judge Benjamin Matthew Bloom** regarding my concerns for Juliette and Eva Paris. In my letter to Judge Bloom, I emphasized the following points:

- **Delays and Access Issues:**
  The requirement for Mr. Paris to appear in person at court hearings in Oregon is an unreasonable burden given his residence in France. Remote appearances were eventually permitted, but the delays in addressing the situation have been harmful to the children.
- **Evidence of Alienation:**
  I outlined examples of parental alienation, including a video where the mother prompts one of the daughters to accuse her father and reports that the children have been instructed to keep their location secret.
- **Community Involvement:**
  I highlighted the troubling reports of defamatory gossip about Mr. Paris within the children's school community, which further alienates them from their father and compounds the emotional harm.
- **"Witch Hunt" Mentality:**
  I noted the dangerous dynamics in parental alienation cases where community members align with the alienating parent, isolating the targeted parent and creating lasting psychological harm for the children.

## Proposed Temporary Relocation to San Francisco and Reunification Efforts

To protect the welfare of Juliette and Eva, I support Mr. Paris' request to temporarily relocate his daughters to San Francisco while further legal and psychological evaluations take place. In addition, I respectfully request the Commission to consider granting Mr. Paris **extended supervised visitation** with his daughters to rebuild their relationship in a supportive, therapeutic setting.

This approach prioritizes the children's emotional well-being and ensures a child-focused resolution:

1. **Prioritize the Children's Emotional Well-Being:**
   - Consistent, safe, and structured time with their father will help the children rebuild trust and emotional connection, reducing the negative effects of alienation.
2. **Ensure Therapeutic Support:**
   - Supervised visits can include family therapy sessions to address the emotional impact of the separation and foster open communication between the children and both parents.
3. **Maintain Balance in Parental Relationships:**
   - While the children's mother has been their primary caregiver in recent months, it is critical that they are given the opportunity to re-establish a bond with their

EXHIBIT 12 - PAGE 2 OF 3

father without undermining their relationship with their mother. Structured visitation for both parents can help maintain balance and prevent further harm.

This recommendation is not punitive but rather a proactive step to restore a sense of security and stability for the children, ensuring they are not burdened by the emotional strain of choosing sides.

## Urgency of Action

The evidence I have reviewed underscores the **urgent need for intervention**. Without immediate action, the children face the risk of permanent estrangement from their father and lasting emotional harm. The longer this alienation persists, the more difficult it will be to repair the parent-child relationship.

I respectfully urge the **Inter-American Commission on Human Rights** to take swift action to support this temporary relocation and structured reunification plan, ensuring that Juliette and Eva are protected from further harm while this matter is resolved.

Please do not hesitate to contact me if further information is required. I remain available to assist in any capacity necessary to safeguard the welfare of these children.

Sincerely,

Kathy J. Marshack, Ph.D.

**Licensed Psychologist**
drkathymarshack@gmail.com
**503-222-6678**

EXHIBIT 12 - PAGE 3 OF 3