**Christopher J. Riley**, OSB No. 211614
christopher.riley@millernash.com
**Incainti Sofia McDonald**, OSB No. 233714
sofia.mcdonald@millernash.com
**Jakini Auset S. Ingram,** OSB No. 250302
jakini.ingram@millernash.com
**Thomas C. Sand**, OSB No. 773322
tom.sand@millernash.com
MILLER NASH LLP
1140 SW Washington St, Ste 700
Portland, OR 97205
Phone: 503.224.5858
Fax: 503.224.0155

*Of Attorneys for Petitioner Arnaud Paris*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| ARNAUD PARIS, <br><br> Petitioner, <br> v. <br><br> HEIDI MARIE BROWN, <br><br> Respondent. | Case No. 1:24-CV-00648-AA <br><br> PETITIONER'S TRIAL BRIEF |

**INTRODUCTION**

Mr. Arnaud Paris ("Petitioner" or "Mr. Paris"), the father of two 11 year-old children, E.P. and J.P. (the "Children") seeks the assistance of this court pursuant to The Convention on the Civil Aspects of International Child Abduction (the "Hague Convention") to: (1) enforce the previous

Page 1 –   Petitioner's Trial Brief

finding of Judge McShane that the Children's habitual residence is France; (2) to give effect to the French court order granting Mr. Paris custody of his Children in France; and (3) to remedy the unlawful abduction and retention of the Children by Respondent Heidi Marie Brown ("Respondent" or "Ms. Brown") in violation of both the French Court Order and the District Court's previous finding of habitual residence. Respondent's conduct in absconding with the Children and wrongfully retaining them in Oregon is in flagrant disregard of the Hague Convention and the rights of both Mr. Paris and the Children.

This action presents the precise circumstance the Convention was designed to address: the wrongful retention of children outside their country of habitual residence, followed by an attempt to litigate custody in a forum unilaterally selected by the removing parent. *See Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010) ("The Hague Convention seeks to deter parents from abducting their children across national borders by limiting the main incentive for international abduction—the forum shopping of custody disputes.").

Respondent Heidi Marie Brown ("Respondent" or "Ms. Brown") seeks to avoid return of the Children through assertions of grave risk of harm and the children's alleged objections to being returned. Each defense fails. The Convention does not permit a parent to transform a temporary travel arrangement into permanent relocation, nor to manufacture a new habitual residence through delay, retention, or coercive influence over the Children. For the reasons set forth below, the Court should order the Children's prompt return to France so that the courts of their habitual residence may adjudicate custody on the merits.

Petitioner estimates that the trial will last a total of four (4) days.

## FACTUAL BACKGROUND

Ms. Brown and Mr. Paris (collectively, the "Parties") met online in 2013 and soon began a relationship. Four months later, the Parties quickly moved in together in Mr. Paris's rental home in Topanga, California. They welcomed two Children in January 2015. The Parties had the Children in Ashland, Oregon due to the progressive nature of childbirth permitted in Ashland

allowing natural birth for twin pregnancies. Two months after the then-couple gave birth, the family went back to Topanga California, where they lived previously. Between October 2017 and May 2019, the family alternated between living in France and the United States—living in Paris for 11 months of that period. The Children began preschool in France in 2017. Recognizing the high cost of living in California with the added expense of childcare, the family ultimately decided to relocate to Paris, France two years later in August 2019. For the next three years, the family lived in France, occasionally traveling back to Ashland, Oregon to visit family there.

Unfortunately, Mr. Paris and Ms. Brown's relationship deteriorated to the point where Ms. Brown threatened to leave France with the Children. Mr. Paris intended to stay in France with the Children. As a result, Mr. Paris initiated a two-week administrative proceeding in France to prevent Ms. Brown from leaving with the Children until a French court could issue a custody determination. The Parties soon entered into an agreement (the "July Agreement"), providing that the Children's time in Oregon, including one school year, was a limited and temporary trial period, with the mutual understanding that the Children would promptly return to France for the 2023-2024 school year. Ten days after signing the July Agreement, Ms. Brown left France with the Children, with the understanding that Mr. Paris would come to the United States shortly thereafter.

Around that same time, Mr. Paris was diagnosed with Biermer's Disease. Shortly following his diagnosis, Mr. Paris learned that he could not leave France for more than 6 months within a year without losing his long-term health insurance. Mr. Paris relies on his care coverage for long-term treatment and routine monitoring. After arriving in Oregon, Mr. Paris discovered that Ms. Brown had no intention of complying with the July Agreement. She signed it only to induce Mr. Paris into consenting so that she could leave France with the Children.[1] Mr. Paris uncovered an email exchange, sent by Ms. Brown's French attorney to Ms. Brown's local counsel in Jackson County, Oregon. The email provided:

---

[1] The email exchanged was sent on July 20, 2022, but was discovered on September 4, 2022.

> "Arnaud made it clear that the only way he would accept moving the residence of the family to the USA is if Heidi commits to going back to France after one school year." … "He really left her no choice." …"Our strategy is the following, while accepting this clause, we added that, every year, the girl's residence will change: year 1 USA—year 2 France." … "The point of this clause is to make it seem totally irrelevant to the girls' interest so that an Oregon court would have no trouble accepting that Heidi does not comply with it in September when she will remain stateside." .. "Indeed, Heidi's plan is to remain in Oregon at the end of the upcoming school year and to tell Arnaud, once Oregon courts have acquired jurisdiction (within 6 months - by January 2023), that she does not plan to move back to France with the girls."

Based on these communications, it became clear to Mr. Paris that legal intervention would be required to determine custody for the Children. As a result, Mr. Paris filed a Hague Convention proceeding in France on September 16, 2022. The U.S. Central Authority accepted that Hague Convention application two weeks later.

Mr. Paris returned to France for medical treatment and on October 6, 2022, he filed custody of the Children in France. The very next day, on October 7, 2022, Ms. Brown filed for custody of the Children in Oregon. On December 7, 2022, the U.S. District Court for the District of Oregon determined that the Children's habitual residence was France but dismissed Mr. Paris's petition with the understanding that the Children would be returned according to the July Agreement: "So I'm finding that the children were fully assimilated to France and an intensive fact inquiry points to the only conclusion that when the children left France for Oregon in July this year, France was their habitual residence." Petitioner's Ex. 047. Tr. 53:17-20, Dec. 7, 2022. The Court's dismissal was expressly based on the assumption that Ms. Brown would comply with the July Agreement to return the Children to France for the 2023-2024 school year.[2]

Meanwhile, the case in France continued, and after determining the Children's habitual residence was France, the French Court granted Mr. Paris full custody. The French Court ordered

---

[2] "Obviously, if Ms. Brown chooses to keep the children in Oregon, she will be in violation of the French agreement. The Oregon courts may want to and I think they should, enforce the agreement you entered into. I think you should be stuck with it, even if you change your mind." Ex. 047. Tr. 53:17-20, Dec. 7, 2022.

Page 4 –   Petitioner's Trial Brief

that the Children should be returned to France to resume school there. In contravention of the Parties' agreement and the French Court's order, the Children remained in the United States with Ms. Brown while she prosecuted the Oregon case.

During a recess in the Oregon state proceedings, Mr. Paris, visiting Oregon at the time, returned to France with the Children in July 2023. He did so believing he was authorized to return to France with the Children, based on the orders entered in the French case and Judge McShane's December 2022 conclusion that the Children's habitual residence was France. The 2023-2024 school year was set to begin on August 27, 2023 for J.P. and September 4, 2023 for E.P. Shortly after arriving back in France, on August 25, 2023, the French Court issued an order, which prohibited the Children's removal from France. A "Fichier des personnes recherchées" (FPR) alert was put in place to not allow the Children to leave Europe without consent of both parents.

Although the Parties were at odds on the custody of the Children, Mr. Paris always maintained that he wanted the Children to maintain regular contact with Ms. Brown. While living in France under the care of Mr. Paris, Mr. Paris never once objected to the Children receiving voice or video calls with Ms. Brown, plus holiday and summer vacation visitation. Even in moments where the Children expressed objections or annoyance with Ms. Brown's absence, he persistently reminded them of the importance of maintaining a two-parent relationship. On April 3, 2024, Ms. Brown, visiting France to testify in the French custody appellate proceedings, asked Mr. Paris if she could take the Children on vacation in the South of France. During the week of April 7, 2024, Ms. Brown presumably and clandestinely traveled by boat to Morocco, where she and the Children boarded a flight, wrongfully removing them from their habitual residence. As a result, Mr. Paris timely filed this action on April 16, 2024.

## BRIEF SUMMARY OF THE LAW

The objective of the Hague Convention is twofold: first, "to secure the prompt return of Children wrongfully removed or retained in any Contracting State" and second, "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in

other Contracting States." Hague Convention, art. 1. Both the United States and France are signatories to the Convention. The United States implemented the Hague Convention through the International Child Abduction Remedies Act ("ICARA") in 1988.

Since the primary remedy under the Hague Convention and ICARA is the return of wrongfully removed children, the Court's role does not involve making affirmative custody determinations. *See Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) ("It is the Convention's core premise that the interests of children in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence."). In order to prevail on a petition, the petitioner must show that:

1. The Children are under the age of sixteen;
2. The Children had a "habitual residence" in a foreign country that is a signatory to the Convention;
3. The Children were removed or retained in breach of the Petitioner's custody rights under the law of the country of habitual residence; and
4. The Petitioner was exercising those rights at the time of the children's wrongful removal or retention.

Hague Convention art. 3-4, Oct. 25, 1950; 22 U.S.C. § 9003(e)(1) (establishing the burden of proof). If the petitioning party proves by a preponderance of the evidence that the Children have been wrongfully removed or retained, the Convention instructs contracting states to "use the most expeditious procedures available" to return the Children to their habitual residence. Art. 2, Treaty Doc., at 7; *see also* Art. 11, *id*, at 9 (prescribing six weeks as normal time for return-order decisions). *Monasky*, 589 U.S. at 72. The Convention does *not* extend to custody determinations, i.e., which parent should care for the child. *Gaudin v. Remis*, 282 F.3d 1178, 1183 (9th Cir. 2002) (emphasis added). Rather, the Convention is designed to decide which country should make the custody determination. *Id.*

# ARGUMENT

## A. The Children Are Habitual Residents of France.

Under the Hague Convention, the threshold inquiry is whether the Children were habitually residents of France at the time of their wrongful removal or retention. *Monasky*, 589 U.S. at 77. In *Monasky*, the Court resolved disagreement among the circuit courts and clarified that a child's habitual residence depends upon the totality of the circumstances. *Id.* at 71. The Court rejected categorical tests and rigid frameworks establishing habitual residence. Instead, it held:

> "[T]he place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence. Because locating a child's home is a fact-driven inquiry, courts must be sensitive to the unique circumstances of the case and informed by common sense."

*Id.* Habitual residence is determined at the time of removal or retention. *See* Hague Convention, art. 3. Applying that framework here, the totality of the circumstances compels the conclusion that France was the Children's habitual residence at the time of their removal. Based on the Parties' July Agreement, the Children were to spend a temporary school year in the United States and immediately after, the Children would return to their home in France.

First, France was the Children's settled home. They resided there in a stable environment, were integrated into school and daily life, received routine medical care, and were engaged in ordinary routines that foster a sense of permanence and belonging. These are some of the precise markers demonstrating the Children were "at home" under *Monasky*. Second, the shared parental understanding reflected that France was the locus of the Children's habitual residence. The Parties' temporary travel arrangement expressly contemplated the Children's return to France for the 2023-2024 academic year. There was no shared parental intent to completely abandon France as the Children's habitual residence. *See Murphy v. Sloan*, 764 F.3d 1144 (2014) ("The facts do not evince a shared, settled intent to abandon the United States as E.S.'s residence. Instead, they point to the opposite conclusion. Sloan never intended that the stay in Ireland be anything but a 'trial period.'") Third, the District Court previously determined that France constituted the Children's

habitual residence. Although a subsequent federal dismissal occurred, that ruling was premised on the expectation that the Children would be returned pursuant to the Parties' agreement. The dismissal did not alter the Children's established home; it assumed compliance with the agreed upon return. Respondent wrongfully removed the Children from France on or about April 5, 2024, with two months remaining in the 2023-2024 school year. Not only did Respondent violate the July Agreement by removing the Children before the completion of the school year, but Respondent has and still is wrongfully retaining the Children against the District Court's conclusion.

This case mirrors the analysis in *Murphy*, 764 F.3d at 1152, where the Ninth Circuit examined whether a move abroad was intended as a "trial period" rather than a permanent relocation. The court emphasized that habitual residence cannot be inferred where parents lack a "settled mutual intent that [the] stay … last indefinitely." The Court concluded that there was never a discussion, let alone an agreement, that the stay abroad be indefinite—instead, it was considered a trial period, not permanent relocation. *Id.* Similarly, the nature of the July Agreement was nothing more than a trial period, which contemplated their return to France. Nothing in the Parties' conduct reflects a settled mutual intent to relocate the Children permanently to the United States. At most, the arrangement constituted a defined and limited trial period—precisely the type of temporary arrangement the *Murphy* Court cautions against converting into habitual residence.

Under *Monasky*, 589 U.S. at 77, habitual residence is assessed at the time of removal or retention—not after a period of unilateral delay. A removing parent cannot manufacture a new habitual residence through prolonged retention or forum shopping. To hold otherwise would permit the precise forum shopping that the Convention seeks to prevent. The Children were deeply rooted in their lives in France—actively engaged in dance, soccer, musical conservatory, singing, and violin, and surrounded by lifelong friends they had known since preschool, as well as extended family, and a close-knit community that consistently supported, nurtured, and ensured they were seen and cared for. Common sense confirms what the legal standard requires: at the time

Respondent wrongfully removed the Children and later refused to return, their home—the place where they were rooted, integrated, and expected to resume school—was France.

**B.      The Children Were Removed When Petitioner Was Exercising His Custodial Rights and Are Being Retained in Breach of Those Custody Rights.**

Article 3 of the Hague Convention provides that a removal or retention is wrongful if it (1) it breaches rights of custody attributed under the law of the child's habitual residence, and (2) those rights were being exercised at that time. *See* 22 U.S.C. § 9003(e)(1). The Convention defines "rights of custody" as those rights relating to the care of the person of the child, particularly the right to determine the child's place of residence. Hague Convention, art. 5(a).

A child's removal or retention is wrongful if, at the time, custody rights were being exercised or would have been but for the removal or retention. Hague Convention, art. 3(b). The petitioner's burden here is minimal. *Asvesta v. Petroutsas*, 580 F.3d 1000, 1018 (9th Cir. 2009). Although the Convention does not define "exercise," the Ninth Circuit, referencing the Sixth Circuit, interprets it broadly. A parent with de jure custody rights exercises them by maintaining any regular contact with the child. *Friedrich v. Friedrich*, 78 F.3d 1060, 1065 (6th Cir. 1996); *see also Asvesta*, 580 F.3d at 1018. The Court further held that failing to exercise custody rights requires clear abandonment. *Friedrich*, 78 F.3d at 1066; *Asvesta*, 580 F.3d at 1018.

The Ninth Circuit emphasizes a practical, fact-specific inquiry into custody rights, protecting custodial authority. In *Flores Castro v. Hernandez Renteria*, 971 F.3d 882, 887 (9th Cir. 2020), the court distinguished wrongful removal from wrongful retention, citing the U.S. State Department:

> "Generally speaking, "wrongful removal" refers to the taking of a child from the person who was actually exercising custody of the child. "Wrongful retention" refers to the act of keeping the child without the consent of the person who was actually exercising custody. The archetype of this conduct is the refusal by the noncustodial parent to return a child at the end of an authorized visitation period."

Page 9 –   Petitioner's Trial Brief

*Id.* Both concepts are implicated here. At Respondent's wrongful removal, the Children resided in France. Respondent, on vacation, requested limited visitation from April 2-5, 2024, providing hotel and travel details. Petitioner agreed, intending not to deprive the Children of a relationship with Respondent and relying on Respondent's representations.

Respondent did not seek permanent relocation or permission for indefinite removal. Instead, she carefully crafted a plan to abscond with the Children, constituting wrongful removal by taking the Children from Petitioner, then seeking relief in U.S. custody courts. *See Cuellar*, 596 F.3d at 512 ("The Hague Convention does not allow abducting parents to resort to courts in their home country in order to thwart return of the child to its habitual residence. District courts considering Hague Convention cases are cautioned not to allow abducting parents to manipulate judicial process…")

Respondent's refusal to return the Children transformed a holiday visit into wrongful retention. On April 13, 2024, with two months left in the school year, Respondent informed Petitioner of her decision to return to the U.S. with the Children, citing the fact that they were missing their American family. This extinguished any temporary visitation permission, marking wrongful retention based on the *Flores* court's definition. The Ninth Circuit's decision in *Murphy* underscores Respondent's breach of custody rights. The court analyzed evidence like school communications and preservation of ties to the original residence. The inquiry requires examining the entire course of conduct—not isolated incidents such as a single trial period.

Here, no shared intent to relocate to the United States existed. The Children were enrolled and in the middle of the 2023-2024 French school year. Respondent's request to visit the Children was for a defined period of time, confirmed by hotel and travel details. Nothing in the Parties' conduct supports abandoning France as the Children's habitual residence. Respondent's unilateral decision to abscond during the mid-school year in April 2024, after securing short-term visit permission, breached Petitioner's custodial rights.

Page 10 – Petitioner's Trial Brief

4903-5287-4382.2

Petitioner actively cared for the Children in France, overseeing their schooling and extracurricular activities, maintaining the residence, and ensuring they had a community wherein they thrived. There is no evidence of abandonment; substantial evidence of active parenting exists. Respondent's actions—whether wrongful removal or retention—breached Petitioner's custody rights under French law and the Hague Convention. Transforming a short visit into unilateral relocation is precisely what the Convention seeks to remedy. A return remedy preserves pre-abduction custody rights, leaving decisions to the habitual residence's courts. Art. 19, id., at 11. *Abbott v. Abbott*, 560 U.S. 1, 9 (2010). We respectfully request the Court return the Children to their habitual residence in France.

C.  **Respondent Cannot Carry Her Heavy Burden on the Article 13(b) "Grave Risk" Defense.**

Respondent bears the burden to prove the Article 13(b) exception by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A). That is the highest evidentiary burden applicable to any Hague defense, and it reflects the Convention's core premise: the return remedy is the rule, and exceptions are "to be construed narrowly" so they do not "swallow[] the rule." *Gomez v. Fuenmayor*, 812 F.3d 1005, 1011 (11th Cir. 2016). Article 13(b) requires proof of a grave risk—not merely a serious risk—that return would expose the Children to physical or psychological harm or place them in an intolerable situation. *Id.*; *see also Velozny on behalf of R.V. v. Velozny*, 550 F. Supp. 3d 4, 18 (S.D.N.Y. 2021) (describing the demanding showing required).

Federal courts generally recognize grave risk in two categories: (1) return to a "zone of war, famine, or disease," or (2) cases involving serious abuse or neglect (or extraordinary emotional dependence) where the courts of the habitual residence are incapable or unwilling to protect the child. *Velozny*, 550 F. Supp. 3d at 4. The inquiry is forward-looking—whether return would expose the child to grave risk going forward—not whether the parties can litigate custody allegations in the return forum. *Gomez*, 812 F.3d 1005. And critically, Article 13(b) is not a vehicle to relitigate custody, credibility disputes, or "best interests" issues. *Monasky v. Taglieri*, 589 U.S.

68, 72 (2020) (Convention's "core premise" is custody decisions are best made in the habitual-residence country).

Respondent's anticipated grave-risk narrative falls far short of these standards.

1.  **Respondent's allegations are unsubstantiated and do not establish prospective grave risk to the Children.**

Respondent has made serious accusations about Mr. Paris in other proceedings and in litigation filings. But grave risk requires specific, substantial proof—not rhetoric.[3] *Gomez*, 812 F.3d at 1012. Where respondents claim harm based on domestic violence or abuse, Respondent must show evidence of violence in the presence of the child and a sustained pattern or propensity for violent abuse that creates an intolerably grave risk; "sporadic or isolated incidents" are not enough. *Velozny*, 550 F. Supp. 3d at 19. Here, Respondent has not produced objective corroboration—such as police reports, medical records, third-party findings, or other credible evidence—demonstrating that return to France would expose the Children to imminent, intolerable harm. Nor has Respondent tied her allegations to any concrete risk the Children would face if they were returned to their habitual residence and custody is litigated there.

This case therefore looks like what Article 13(b) forbids: a return proceeding being reframed as a custody case based on unverified allegations. The Convention does not authorize that. *Monasky*, 589 U.S. at 72; *Gaudin*, 282 F.3d at 1183 ("The Convention does not extend to custody determinations, *i.e.,* which parent should care for the child. Rather, the Convention is designed to decide *which country* should make the custody determination.") (internal citation omitted; emphasis original).

---

[3] For the avoidance of doubt, Respondent cannot present any credible, admissible evidence of any domestic violence or sexual misconduct because there is none. To the contrary, Mr. Paris will present testimony from independent third-party witnesses that he never evidenced any such tendencies or exhibited inappropriate overtures toward them or the Children. Petitioner denies that he has engaged in any of the inappropriate behavior of which Respondent accuses him. Petitioner denies that he has engaged in *any* domestic or sexual violence, against Respondent, the Children, or any other family members or partners.

Page 12 – Petitioner's Trial Brief

4903-5287-4382.2

## 2. Respondent's own conduct is inconsistent with any claim that the Children face grave risk from return to Mr. Paris's care in France.

Courts evaluate whether a respondent's actions align with the asserted fear. In *Velozny*, for example, the court found grave-risk claims undermined by undisputed facts showing the respondent continued to allow the Children to be alone with the petitioner and did not report the alleged conduct to authorities. 550 F. Supp. 3d at 4.

Here, the record reflects comparable inconsistencies. Respondent exercised visitation rights in France in April 2024 under the French custody order, and shortly thereafter removed the Children from France. If Respondent genuinely believed the Children faced an imminent and intolerable risk from being returned to France and to Mr. Paris's care pending custody proceedings, it is difficult to square that belief with her course of conduct—including her participation in French proceedings, visitation arrangements, and evening agreeing to long-term medical treatment for the Children in France. The evidence instead shows disagreement about custody and forum, not clear and convincing proof of a grave risk that French courts cannot manage.

## 3. France is fully capable of addressing safety concerns and implementing protective measures; return restores the proper forum without prejudging custody.

Even if Respondent had articulated concrete safety concerns—which she has not—the Article 13(b) inquiry asks whether the Children would face a grave risk upon return and whether the courts of the habitual residence are incapable or unwilling to provide adequate protection. *Velozny*, 550 F. Supp. 3d at 4. This case involves France—a mature legal system that has already exercised jurisdiction, issued custody and travel orders, and is well-positioned to adjudicate any custody and safety allegations on the merits. Return under the Convention does not award custody to either parent; it restores the status quo ante and leaves custody to the proper forum. Hague Convention Art. 19; *Gaudin*, 282 F.3d at 1183.

Petitioner has consistently emphasized that he is not seeking to sever the Children's relationship with Ms. Brown. To the contrary, he has supported continued contact and visitation

and remains willing to work toward practical arrangements that stabilize the Children's routine and preserve their relationship with Respondent while France adjudicates custody.[4] Those child-centered commitments further underscore why Article 13(b) does not apply here: Respondent's allegations do not establish—much less clearly and convincingly—that return to France would expose the Children to an intolerable, grave risk of harm.

**D.  Respondent Cannot Establish the "Children's Objections" Defense, and Any Stated Preferences Should Be Accorded Little Weight Given Undue Influence and Wrongful Retention.**

Respondent also invokes the "children's objections" defense. The governing standard is settled: Respondent must prove by a preponderance of the evidence (1) that the child has "attained an age and degree of maturity at which it is appropriate to take account of its views," and (2) that the child objects to being returned. 22 U.S.C. § 9003(e)(2)(B); *Custodio v. Samillan*, 842 F.3d 1084, 1090–91 (8th Cir. 2016). Even if both elements are satisfied, the Court retains discretion whether to deny return. Hague Convention Art. 13 ("may" refuse return).

Respondent cannot carry her burden here for three independent reasons.

**1.  The Convention requires a true "objection," not a generalized preference or custody choice.**

Courts distinguish between a child's *objection* to return—required by Article 13—and a child's generalized preference about where (or with whom) they would rather live. The former is "stronger and more restrictive" than the latter. *Hirst v. Tiberghien*, 947 F. Supp. 2d 578, 597 (D.S.C. 2013). A "generalized preference to remain in one country, without more particularized objections to being returned," is generally insufficient. *Guerrero v. Oliveros*, 119 F. Supp. 3d 894, 915 (N.D. Ill. 2015). Courts look for objections that are "born of rational comparison" between life in the habitual-residence country and life in the new forum—not expressions rooted in loyalty

---

[4] Respondent, on the contrary, has limited Petitioner's ability to speak with the Children, including by limiting his ability to see them via video.

conflicts, transient discomfort, or a custody dispute. *Hirst*, 947 F. Supp. 2d at 597.

Here, Respondent's framing—focused on where the Children "want to live," and on alleged fears premised on unsubstantiated allegations—is still nothing more than custody preference. That is precisely what the Convention seeks to avoid. *Cuellar v. Joyce*, 596 F.3d at 508 (Hague Convention deters forum shopping by removing incentives to litigate custody in the abducting parent's chosen forum).

**2. Any stated objections should be accorded little weight because the record shows undue influence and alienation by the abducting parent.**

Even when children are old enough to articulate views, federal courts recognize that those views may be accorded "little if any weight" if they are the product of the abducting parent's undue influence. *Dietz v. Dietz*, 349 F. App'x 930, 935 (5th Cir. 2009). That influence need not be malicious; it can be "the inevitable product of an ongoing custody battle." *Hirst*, 947 F. Supp. 2d at 598. Allowing the abducting parent to "taint the child's preference … would frustrate the Convention's overarching purpose of preventing the abducting parent from obtaining custody by means of a wrongful removal." *Id.*

That doctrine applies with full force on this record. Petitioner will present evidence that, since the wrongful removal/retention, Respondent has engaged in a sustained pattern of conduct that predictably shapes the Children's expressed preferences:

- restricting the Children's video and in-person contact with Mr. Paris, fostering the perception that he does not care about them;
- restricting contact with Petitioner's extended family while permitting and facilitating Respondent's family access;
- intercepting and/or forging correspondence from the Children's friends and classmates;
- conveying inaccurate and frightening information—such as that if the Children return to France they will not see Respondent again until they are 18; and

- suggesting that not living with Respondent would jeopardize her employment, affect their living conditions, and leave the Children "poor" or "homeless."

These are mechanisms by which an abducting parent can (intentionally or not) create a loyalty conflict and reshape a child's stated views. Neutral indicators—such as whether a child repeats adult narratives, uses legal concepts, or appears to be channeling a parent's arguments—may evidence this undue influence. *See Dietz*, 349 F. App'x at 935 (citing *In re Robinson*, 983 F. Supp. 1339, 1344 (D. Colo. 1997) (noting that a child's use of legal terms in response to court questions evidenced undue influence)). And where third-party observations contradict the claimed "objections," courts treat those contradictions as circumstantial evidence of influence and decline to give dispositive weight to the child's stated preferences. *Hirst*, 947 F. Supp. 2d at 600.

**3. Respondent has not shown that the Children possess sufficient age and maturity for their views to control a return decision—particularly where the dispute is saturated with adult conflict and misinformation.**

Whether a child is of sufficient age and maturity is a case-specific factual inquiry; no particular age automatically confers maturity. *Swett v. Bowe*, 733 F. Supp. 3d 225, 264 (S.D.N.Y. 2024). Courts have found children in the 8–13 range either mature or not depending on circumstances. *Guerrero*, 119 F. Supp. 3d at 914–15. Here, the Children are 11. The Court may, in its discretion, consider their views through appropriate procedures, including an in camera interview—but the Court is not required to do so, and it may weigh those views cautiously where they appear intertwined with adult litigation narratives. *Velozny*, 550 F. Supp. 3d at 23 n.8.

This is especially true where the alleged "objections" arise in the context of prolonged wrongful retention and restricted access to the left-behind parent. The Convention's purpose would be undermined if a respondent could create the very conditions that generate a child's resistance to return (distance, delay, misinformation, and restricted contact), and then invoke that resistance to defeat the return remedy. *Hirst*, 947 F. Supp. 2d at 600.

**4. Petitioner's position remains child-centered: return to France restores the proper forum and preserves both parental relationships.**

Finally, Petitioner does not minimize the reality that this litigation is difficult for the Children. He recognizes that the Children have been placed in an adult conflict they did not choose. But that is precisely why the Convention directs courts to return children promptly to their habitual residence so that custody can be decided on the merits by the appropriate court. *Monasky*, 589 U.S. at 72; Hague Convention Art. 1. Petitioner has consistently supported continued contact between Respondent and the Children and has pursued mediated solutions and workable international parenting arrangements. Return does not foreclose Respondent's ability to be heard on custody or safety, although Petitioner, of course, believes that the Children will be safest and best off in his custody. Rather, it ensures those issues are decided by the French courts that have jurisdiction and familiarity with the Children's established home.

For all these reasons, Respondent cannot meet her burden on the "children's objections" defense, and the Court should decline to deny return based on preferences that are, at minimum, materially shaped by wrongful retention and undue influence.

## CONCLUSION

The record and facts before this Court reflect precisely the type of wrongful retention the Hague Convention was enacted to deter. The Children are habitual residents of France. At the time of removal, Petitioner possessed and was exercising his custodial rights under French law. Respondent's refusal to return the Children, as ordered by the French Court in April 2023 and November 2025, in conformance with the District Court's findings, constituted both wrongful removal and retention within the meaning of the Hague Convention and ICARA.

Respondent's anticipated defenses fail as a matter of law. Temporary permission to travel is not consent to permanent relocation, and allegations unsupported by clear and convincing evidence cannot establish grave risk of harm. Nor may a removing parent rely upon their children's

objections that arise after wrongful removal. As the Court held in *McManus v. McManus*, it is the abduction that causes the pangs of subsequent return. 354 F.Supp.2d 62 (2005).

For these reasons, Petitioner respectfully requests that the Court order the immediate return of the Children to France pursuant to the Hague Convention and the ICARA, together with such further relief as this Court deems just and proper.

DATED this 18th day of February 2026.

        MILLER NASH LLP

        */s/ Jakini Auset S. Ingram*
        Jakini Auset S. Ingram, OSB No. 250302
        jakini.ingram@millernash.com
        Christopher J. Riley, OSB No. 211614
        christopher.riley@millernash.com
        Incainti Sofia McDonald, OSB No. 233714
        sofia.mcdonald@millernash.com
        Thomas C. Sand, OSB 773322
        tom.sand@millernash.com
        1140 SW Washington St, Ste 700
        Portland, OR 97205
        Phone: 503.224.5858
        Fax: 503.224.0155

        *Of Attorneys for Petitioner Arnaud Paris*

# CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **Petitioner's Trial Brief** on the attorney or party listed below on the date set forth below by the method(s) indicated:

| | |
|---|---|
| Katrina Anne Seipel, OSB No. 164793<br>Gregory Wallace, OSB No. 240347<br>Katelyn D. Skinner, OSB No. 105055<br>Buckley Law PC<br>5300 Meadows Rd, Ste 200<br>Lake Oswego, OR 97035<br>E-mail: kas@buckley-law.com<br>gmw@buckley-law.com<br>kds@buckley-law.com | ☐ First-class mail, postage prepaid<br>☐ Hand-delivery<br>☒ CM/ECF Transmission<br>☒ Email<br>☐ Other: _____ |

DATED this 18th day of February 2026.

MILLER NASH LLP

*s/ Jakini Auset S. Ingram*
Jakini Auset S. Ingram, OSB No. 250302
Jakini.ingram@millernash.com

*Attorneys for Petitioner Arnaud Paris*

Page 1 –   Certificate of Service

4903-5287-4382.2