Katelyn D. Skinner, OSB No. 105055
Email: kds@buckley-law.com
Katrina Seipel, OSB No. 164793
Email: kas@buckley-law.com
Buckley Law, P.C.
5300 Meadows Road, Suite 200
Lake Oswego, OR  97035
Telephone:  503-620-8900
Fax:  503-620-4878
*Of Attorneys for Respondent Heidi Brown*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

Medford Division

In re the Matter of J.P. and E.P.:

ARNAUD PARIS,

        Petitioner,

   and

HEIDI MARIE BROWN,

        Respondent.

Case No.: 1:24-cv-00648-AA

RESPONDENT'S CLOSING ARGUMENT

The Convention on the Civil Aspects of International Child Abduction,
Done at the Hague on 25 Oct 1980
International Child Abduction Remedies Act, 22 USC § 9001 *et seq.*

COMES NOW, Respondent Heidi Brown ("Mother"), by and through her attorneys, Katelyn D. Skinner, Katrina Seipel, and Buckley Law, PC, and hereby submits the following closing argument for the court's consideration:

### RESPONDENT'S CLOSING ARGUMENT

We ask this court to dismiss Petitioner's ("Father's") petition. Had Mr. Paris obeyed the rulings of Oregon orders, we would not be here.  In the first Hague Convention case Father against Mother in 2022 ("Hague 1"), the Court found that Mother had not wrongfully removed or retained the children in the United States.  The Court directed the jurisdiction of

Oregon state courts to determine the custody of the children. Thereafter, if Mr. Paris had simply participated as any other parent does in state court custody matters, we would not be here. He had his opportunity for his day in court in Oregon, in fact, many days, most while he was represented by counsel. But, he didn't trust the Oregon court to make a decision in the best interest of the children, he didn't trust the Oregon court would do what he wanted. So, he took the kids. He violated the Oregon state court's Temporary Protective Order of Restraint (TPOR), and told border control that Ms. Brown agreed to the children's travel to France because of the completely debunked "July agreement." He caused this situation because he had wild beliefs about corruption, biased judges, and an overall desire to control Ms. Brown.

### Habitual Residence

Let's look at the history of this family, from facts, as they have been found:

1.  August 2019: the family moved from California to France, temporarily. Judge McShane, after hearing extensive evidence on this timeframe, found as follows:

    > "In August 2019, the family moved to Paris. I mean, there's some dispute as to whether the move was intended to be temporary. I think it was. I think, at the very least, at the time of the move, the parties intended to have the children attend preschool in France for at least a year. They told family and friends they intended to be gone for a year. They had plans to develop property in California. They kept their household goods and stored them in California. They rented a furnished apartment in Paris rather than purchasing a home or furnishings. But, all that said, is it happens with the best of intentions. The family remained in France well over a year. Certainly, I think the pandemic may have contributed to this, as well as other factors."
    >
    > Exhibit 217, Page 45

2.    July 29, 2022: Mother and children move from France to Oregon, permanently, and Father joins thereafter. Judge McShane made the finding in Hague 1 in December 2022:

> "Everything the family did up until the July 13th [2022] departure appears to be in anticipation of a permanent move to the United States. The girls are unenrolled from the French schools by the parents. The lease to the apartment is broken, and the landlord was told, "We are moving to the United States." And, again, these are one of the explanations, Mr. Paris, that you give, that you didn't really mean that. You've said that about a number of explanations you've given to various people. And, at some point, it starts ringing a little hollow. I think you broke the lease specifically because everything points to the fact you were, in fact, moving to the United States. All of the girls' belongings were packed -- everything, for the most part -- and any unnecessary items were disposed of."
>
> Exhibit 217, page 48

3.    Then, Mr. Paris changes his mind. Judge McShane finds:

> "Ms. Brown is left with the two girls, no passports, no home to go to. She moves the children into a hotel, and they're living out of their bags. Mr. Paris has apparently changed his mind about moving to Oregon. But he's also put Ms. Brown in a remarkably difficult position."
>
> Exhibit 217, pages 48-49

4.    Judge McShane, upon hearing all the evidence, and viewing the videos of the girls at that time, finds:

> "I do think Ms. Brown's attempt at impacting Mr. Paris through a very emotional video was -- she described "a bad parenting moment." But it was

a bad parenting moment. And it was a bad parenting moment primarily because of the actions of Mr. Paris at this time."

Exhibit 217, page 49

5. Then, the family settles into Ashland, leasing a home, Mr. Paris moves items from storage in California up to Oregon. Ms. Brown attempts to secure health insurance for Mr. Paris. Judge McShane finds:

"I will say, I agree with the Respondent in this area; that it is unclear to the Court the seriousness of the [Mr. Paris' health] condition. The record is silent with regard to any medical opinion. I've heard some testimony about having to take B-12. I've heard some testimony that there may -- this particular disease may have aspects of cancer. But I certainly have not seen anything more than Mr. Paris' description of his medical condition.

Ms. Brown does complete all of the conditions required by the July 19th agreement to keep the children in Oregon for the school year. Mr. Paris refused to accept the insurance policy, that was purchased on his behalf, by revoking it on August 21st, allegedly due to his medical situation. Again, I'm not sure if I'm willing to find this completely credible, because, one, there is no medical record before me; two, Mr. Paris' explanation for his responses in other parts of the trial have been less than credible."

Exhibit 217, pages 51 – 52

6. Judge McShane went on to find that there had been no wrongful removal from France in 2022. While in this case, Petitioner is keen on making the claim that "Judge McShane enforced the July Agreement and ordered that the children shall only live in Oregon for 2022-23, and then they will be returned to France." However, we need to look at

the actual words of the Court. Here is what Judge McShane, actually said in his ruling in December 2022:

> **"The Oregon courts may want to, and I think they should, enforce the agreement you entered into. I think you should be stuck with it, even if you change your mind. There may be other reasons why the Oregon courts would find otherwise.** I do believe that if that comes -- if it comes to that, there's clear evidence before the Court today that the children are certainly creating a habitual residence in the United States without any great impediment." [Bold and underline added]
>
> Exhibit 217, pages 53-54

What is crystal clear is that Judge McShane, in denying the petition, and making that statement, clearly assigns the issue of custody and parenting time to the jurisdiction of Oregon state courts. Which is exactly what happened. Judge McShane, didn't say, okay, now it's time for Oregon state and French courts to battle it out over jurisdiction of these children. He said the Oregon courts will decide. And, the Oregon courts may decide that upholding the July Agreement is not in the children's best interest.

And decide it did. The Oregon state court issued a Temporary Protective Order of Restraint (TPOR), prohibiting the children from being removed from the state of Oregon until the final decision in the custody case was rendered. And, the Oregon court ultimately made a decision on custody and parenting time, in favor of Mother, after a full trial and evidentiary hearing on the merits. The judgment granting Mother sole custody was signed by Judge Orr on December 28, 2023. Exhibit 206.

Father, however, didn't like the fact that the Oregon state courts were refusing to accept and enforce the judgment he received in France ("the French Judgment") while the Oregon state court matter was proceeding (in March of 2023). Exhibit 208 is the Oregon state

Page 5 – RESPONDENT'S CLOSING ARGUMENT

court's decision regarding the denial of registration of the French judgment, and describes in extreme detail the Oregon Court's decision in refusing to accept or enforce the French Judgment.

7.    What does Father do when he doesn't like the decision of the Oregon state court? He takes matters into his own hands.  He violated the TPOR by removing the children from the state of Oregon in July 2023. Oregon state court Judge Orr, finds:

> "A TPOR was entered on October 7, 2022 and remains in effect. Neither party is allowed to leave the state of Oregon with the minor children without the agreement of the other parent.  Father and the minor children are located in France at present, in violation of this court's orders. As the Court told Father on June 21 [2023], he violates this court's orders at his peril.  Father was aware of the TPOR and was told repeatedly by the Court that the [French] judgment had not yet been confirmed or validated."
>
> Exhibit 208, page 18

8.    Father removed the children from the United States by mispresenting facts to the governmental authorities when confronted at border control/customs:

> "After the first three days of hearing, Father wrongfully misrepresented the registration of the French judgment to lawful authorities, and, contrary to this court's prior, explicit, written, and repeated orders, removed the minor children from this state and took them to France."
>
> Exhibit 208, pages 17-18

How did he do it? He did it by misrepresenting that the July Agreement governed the parties' situation at that point in time.  He explained this to Keira Sumner in text messages to her on July 23, 2023:

[23/07/2023 06:30:31] Arno: We just took off cause this judge was totally biased.

[23/07/2023 06:35:52] Arno: I had to bring the SF French consul to the airport to argue with them

[23/07/2023 06:36:22] Arno: Because she had put in the system that the French judgement hadn't been approved in the system

[23/07/2023 06:36:44] Arno: And that her matter was still pending in Oregon

[23/07/2023 06:36:52] Arno: But we convinced them

[23/07/2023 06:37:22] Keira AuPair Wyoming: Since the consul was there, that makes it entirely different

[23/07/2023 06:37:50] Arno: Yeah but they wouldn't even budge to the French consul

[23/07/2023 06:38:22] Arno: I had to show her written commitment to come back to France at the end of the school year

[23/07/2023 06:38:49] Arno: And I said this is clearly a permission for me to fly to France with the girls.

Exhibit 220, page 5.

In fact, Ms. Brown testified that the July agreement became moot when she filed for sole custody in the Oregon state court. Tr. 499: 7-9. Neither party was advocating for the terms of the July agreement to be upheld; not in France, not in the US. Tr. 499:10-12. Thus, Mr. Paris' representations, what he used to "convince" the border authorities to leave with the children in July 2023, was a void and moot agreement the parties reached prior to Hague 1, and prior to US and French court proceedings.

There have been three moves of the children in this case from 2022 to present. The first, the subject of Hague 1, was conclusively determined to not be wrongful. The court found that Mother did not wrongfully remove the children from France to the United States in July 2022. The second, the subject of much litigation in Oregon state courts, was Father's wrongful removal of the children from Oregon to France. Judge Orr in Jackson County Circuit Court Case No. 22DR17285, and Judge Rowan in 24CV41829, found Mr. Paris had violated the court's TPOR. Judge Orr in previously recited findings contained in Exhibit 206 and 208; and Judge Rowan: Exhibit 216, page 14: "Mr. Paris was in a protracted parenting time and custody dispute with Ms. Brown, absconded to France with his children in violation of a court order, and then has ignored this court order on prior occasions to the extent that a warrant was issued for his arrest." The third, is the subject of the current court action, Ms. Brown's retrieval of the children from France pursuant to her lawful grant of sole physical and legal custody by the Oregon state court. The very court that Judge McShane instructed would be making the decision on custody in this case.

Mr. Paris does not get to snatch the children back to France and claim an advantage in this proceeding, contrary to the very finding by Judge Orr after Mr. Paris absconded with the children in Exhibit 206, page 75: "Father should not violate court orders and expect to thereby gain any advantage."

By "advantage" in this case, I mean that Father does not get to claim that the children created a habitual residence in France from July 2023 to April 2024. That time period must be viewed in the context as it was: a period in time in which Mr. Paris was attempting to gain the advantage of creating a habitual residence in France to support an otherwise entirely meritless Hague action. Here's what I mean:

Judge McShane found that the children were habitually resident in France as of July 29, 2022, which is the day they flew from France to Oregon. When he ruled in December 2022,

Page 8 – RESPONDENT'S CLOSING ARGUMENT

he said: "There's clear evidence before the Court today that the children are creating a habitual residence in the US without any great impediment." (Exhibit 217, page 53-54).

As such, the children, who were clearly on their way as of December 7, 2022 to creating a habitual residence in Oregon, were firmly rooted in their habitual residence in the United States on July 22, 2023 when abducted by their Father. They had resided in Oregon for one full year: July 29 2022 to July 22, 2023.

This court heard extensive testimony and received significant evidence to support this finding: testimony from Ms. Brown, the children's maternal grandfather, family friends, soccer coaches, arial arts instructor, teacher, and so on. This court received into evidence countless examples of the children's activities in Oregon (Exhibit 201); of their social life (Exhibit 202); their medical care and dental care (Exhibit 203); their school life (Exhibit 204); and their expansive and close group of friends (Exhibit 205).

Thereafter, during the time period of July 22, 2023 to April 8, 2024 (8 months), the United States remained the children's habitual residence because Father cannot violate court orders and expect to thereby gain an advantage. The children's habitual residence did not switch to France due to their temporary, transient and wrongful presence in France during that time. As such, as of April 8, 2024, the United States was and remained the children's habitual residence.

Imagine the precedent it would set if this court were to decide otherwise: That a parent can have their Hague petition denied, that the Hague judge discusses that the Oregon state court will decide custody and parenting time thereafter, that the Oregon state court indeed decides custody and parenting time, that the parent doesn't like the decision in the Oregon state court (blames "biased judge" and "corrupt local judges"), that the parent can take the children from Oregon by making a misrepresentation to border officials and in violation of a state court order prohibiting their removal, and that the parent can then create a habitual

residence in the country the children have been abducted to. Such a decision would be completely contrary to the aim of the Convention: "The States signatory to the present Convention, Firmly convinced that the interests of children are of paramount importance in matters relating to their custody, Desiring to protect children internationally from the harmful effects of their wrongful removal or retention…" Convention of 25 October 1980 on the Civil Aspects of International Child Abduction, Preamble. The children's best interests are not served by a parent who disregards a lawful Oregon state order, thereby ripping the children from their school, friends, family, and stable life in Oregon.

Finally, the court heard evidence of the time period between April 2024 and the present, not as a time period in which to argue that the children created a habitual residence in the United States during this time, but to bolster and support the fact that the children's habitual residence from July 2022 to April 2024 was indeed the US and stayed the US the entire time. Meaning, the children, after their temporary stay in France for 8 months in that period, returned to the US, returned to their home. Returned to their habitual country of residence. They did not come to a new place. They returned home.

*Monasky* brings further clarity to this analysis: it says "a child's residence in a particular country can be deemed "habitual" however, only when her residence there is more than transitory." *Monasky vs. Taglieri*, 140 S. Ct. 719 (2020) at 726. Consider the testimony by Petitioner's witnesses regarding the children's residence in France: they lived in a 400 square foot, one-bedroom apartment. They had two different au pairs. Their father not only traveled for work, but Keira Sumner testified that she slept at the Paris residence "half the time" and the other half at the friend's sublet. Both Mr. Partis and Ms. Sumner testified that when Ms. Sumner stayed at the apartment, Mr. Paris stayed elsewhere because there was no other room or bed at the apartment. Both also testified that there was no set or consistent schedule as to

when Ms. Sumner would stay the night, or Mr. Paris. This is a high degree of uncertainty, instability, and transitory situation for the girls. Their father was in and out of the home.

On the contrary, the girls had one stable caregiver for the entirety of their time in Oregon: Mother. One school, same friends, same family members, same community, same activities.

That's habitual residence.

**Breach of Rights of Custody**

The next analysis is whether Respondent took the children from France "in breach of Petitioner's rights of custody."

First, as of April 2024, Father had no rights of custody under the Oregon state custody Judgment issued in December 2023. Ex 206. He was awarded two weekly telephone calls, and zero custodial rights. Second, even if the court did determine that Father had rights of custody, and analyzed the same under the French judgment, those were not breached on April 8, 2024 (the date on which Petitioner pled the children were wrongfully removed) because Ms. Brown had visitation with the children for their spring vacation, which lasted until April 13, 2024. As such, there could be no wrongful removal or retention on April 8th. Courts in Hague matters have held that the date of wrongful removal/retention is a "singular and not a continuing act." *Marks ex rel SM v Hochhauser*, 876 F3d 416 (2nd Cir 2017). As such, Mr. Paris fixed the alleged date of wrongful removal as April 8, 2024, but Ms. Brown cannot not be found to have breached his rights of custody as of that date because (a) under the Oregon state judgment she had sole legal and physical custody of the children, and (b) under the French judgment, she had rightful physical custody of the children through April 13, 2024.

Father had no rights of custody on April 8, 2024 because of the valid Oregon state custody order granting Mother sole custody. Importantly, Article 16 of the Convention states:

"After receiving notice of a wrongful removal or retention of a child in the sense of Article 3, the judicial or administrative authorities of the Contracting State to which the child has been removed or in which it has been retained shall not decide on the merits of rights of custody until it has been determined that the child is not to be returned under this Convention or unless an application under this Convention is not lodged within a reasonable time following receipt of the notice."

This means that while the Hague 1 case was pending, the state of Oregon could not make custody and parenting time decisions *until* the Hague 1 court determined that the children were not to be returned.  And then, when Judge McShane determined that the children were not be returned to France, the state of Oregon could, and did, make a proper custody determination.

While not controlling authority, the Court of Appeals of the State of Kansas, *In re SL*, when analyzing this very issue under the Hague Convention, stated:

"To give effect to Article 16, an abducted-to contracting state must have the authority to decide on the merits of rights of custody after it has been determined that the child is not to be returned. Simply put, if the new country cannot ever take jurisdiction, then Article 16 is a nullity. The text of Article 16 has no effect and no meaning unless the abducted-to country can decide custody after properly invoking an exception to the 1980 Hague Convention. Congress has implemented the 1980 Hague Convention through ICARA. 22 U.S.C. §§ 9001 et seq. "Congress presumably does not enact useless laws." United States v. Castleman, 572 U.S. 157, 178, 134 S. Ct. 1405, 188 L. Ed. 2d 426 (2014) (Scalia, J., concurring). Presumably, the United States does not participate in drafting, and does not sign and ratify, useless treaties.*" In the Interest of S.L.*,  61 Kan. App. 2d 276, at 305-306 (2021).

As such, this Court cannot find that Father had rights of custody, much less that any rights of custody were breached in April 2024 when Mother returned the children from France to Oregon pursuant to her lawful grant of sole custody.

### **Grave Risk / Intolerable Situation – Legal Abuse / Psychological Harm**

Psychologist Dr. Landon Poppleton talked about the framework and analysis that the court may undertake when determining the facts to support a grave risk of exposure to psychological harm or intolerable situation if returned to the country. This defense is set forth in Article 13b of the Convention: "Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that - … b)    there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."

Dr. Poppleton discussed coercive control and the impact it can have on the family system, specifically to the children.

Father's legal abuse against Mother is evident across dozens of jurisdictions against the United States, and multiple cases within Oregon state and appellate courts. The court received evidence as follows:

Exhibit 206, page 75: "Father should not violate court orders and expect to thereby gain an advantage." (Judge Orr)  He's doing just that here

Exhibit 206, page 81: Father has acted in bad faith in this proceeding.

Exhibit 209, page 1: Father violated the court's November 20, 2023 order by failing to appear. (Judge Henry)

Exhibit 210, page 3: Father's pleadings were stricken as sham, frivolous and duplicative. (Judge Rowan)

Exhibit 210, page 12: The court found "it is improper to continually litigate the same issue over and over before the same court without a finding of error by the Court of Appeals." (Judge Rowan)

Exhibit 216: "He is, in essence, using the Oregon judicial system to lob bombs of civil claims against Ms. Brown." (Judge Rowan in defamation case)

Exhibit 216, pages 16-17: "The court is considering Mr. Paris's general disregard for the Oregon judicial system and flouting court orders." (Judge Rowan)

Mr. Paris' current attorney tries to explain away the bad behavior by saying he had no attorney and shouldn't be held to a standard when he doesn't know the law. That argument falls flat. Whether Mr. Paris is a lawyer or not, he is fluent in English and he understands the orders of the court when they instruct him to do or refrain from doing things, and yet he chooses not to obey. All to the detriment of Mother. It's as if he is "lobbing bombs of civil claims against Ms. Brown."

And, Mr. Paris is represented by Oregon state counsel: attorney Daniel Margolin; he was represented before by attorney Bradley Lechman-Su. And also Thomas Bittner. All experienced Oregon state family law lawyers.

Also, curiously, if Father still relies on some type of ignorance of this sometimes pro se actions, it should be questioned: If he can hire and go to multiple expert witnesses for help and advice: Dr. Kathy Marshack, Dr. Greg Cox, Dr. Jorge Gonzalez, and there is probably more. He can certainly divert those funds to a lawyer if he claims to be unaware of the legal implications in the dozens of cases he has filed.

Ms. Brown testified that Father's attacks on her within the multitude of the legal systems involved, were non-stop and daily. They inevitably take away from her ability to focus her attention on her children, despite her best efforts to shield her children from the attacks. Father's actions create for the children, and in turn, if they were to return to France, grave risk

of exposure to psychological harm or an intolerable situation. Mother's testimony was that Father's onslaught of legal "bombs" did not stop even when he had abducted the children to France and the children were in his care. He is not likely to stop even if the children are returned to France, and that is what creates a grave risk of exposure to psychological harm to the children. For that reason, even if this Court were to find that the children were habitually resident in France at the time of their removal, and that Father's rights of custody were breached by the removal, this Court should exercise its discretion and refuse to return the children to France.

### Mature Child Objection

Article 13 of the Convention states: "The judicial authority may refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and maturity at which it is appropriate to account of its views."

Here, we heard the psychological-based description of maturity from Dr. Poppleton's testimony. The court heard testimony from every single one of Respondent's witnesses about the girl's maturity, beginning with impressions from them as young as age 8 to their present age of 11. We heard from numerous of Petitioner's own witnesses about the children's maturity. In Mr. Paris' own testimony, he agreed with the description of the girls' temperament and personality, as self-assured and outspoken, but appropriately so.

The analysis is three fold:

(1) "Attained an age…": Courts in Hague matters have found children as young as age 8 as mature, (See *Blondin* 238 F3d 153, 2d Cir. 2001; *Anderson v. Acree*, 250 F Supp 2d 876 (2002)). There should be no question that age 11 is sufficient.

(2) "Attained …maturity": The court must find the child sufficiently "mature" in order to determine it is appropriate to take into account the child's view in this instance.

(3) "Child objects to being returned…": Finally, the court must find that the child objects to being returned.

The Court, having directly spoken with the children, is in the best position to analyze their impressions of the children as against the backdrop of the law, and the goals of the Convention.   We argue that the children have attained an age and maturity, have objected to being returned to France, and therefore the court should exercise its discretion and refuse to return the children to France.

## CONCLUSION

We ask the court to uphold the directive from Judge McShane, that custody and parenting time shall be decided under the jurisdiction of the Oregon state courts. Hague 1 fixed the jurisdiction question.  There is no need to go further.  Hague 1 already answered the question.  We ask that the court uphold the findings, rulings, and judgments issued by Judge Orr, and Judge Bloom, and Judge Rowan, all determining that the children's home is Oregon. Finding that Mother is the appropriate custodial parent.  Finding that Father poses a risk to his children. Finding that Father flouts court orders and attempts to gain advantage by doing so.

The Hague convention opens by declaring: "The States signatory to the present Convention, Firmly convinced that the interests of the children are of paramount importance in matters relating to their custody…"  The interests of the children are to have two parents who follow court orders.  Court orders are entered for the benefit of the family, for the benefit of the children.  Court orders provide rules that parents can and should rely on.  The Court order in this case says: Mother is the sole custodial parent. The children reside with Mother, in Oregon.

Furthermore, the objects of the Convention are "to ensure that rights of custody and of access under the law of one contracting state are effectively respected in the other contracting state." Hague Convention, Article 1(b).

Mr. Paris has no respect for the custody order issued here, after the direction given by Judge McShane.

This court must dismiss the Petition upon a finding that:

As of the date of the alleged removal, the children's habitual residence from July 2022 to April 2024, and continuing to present, under a totality of the circumstances is Oregon. That never changed. Their time in France was temporary, unstable, and was the result of blatant child abduction by Mr. Paris. The analysis can end there. That is the only finding the court needs to make to dismiss this petition.

If the Court makes additional rulings, the Court should find that Mr. Paris's rights of custody were not breached when the children returned from France to Oregon in April 2024. Ms. Brown had sole legal custody and sole parenting time with the children subject to Father's phone call access. Those rights were not breached upon the children returning to their home in Oregon.

The analysis can end there.

If the court makes additional rulings, we ask the Court to find that the children are at grave risk of exposure to psychological harm or to be placed in an intolerable situation if returned to France. The harm relates to the coercive/control abuse and legal abuse of Mother at the hands of Father and its effects on the children. The court should also find that a return to France would place the children in an intolerable situation. Note that "intolerable situation" is a separate classification under Article 13b. Professor Merle Weiner, a scholar on Article 13, argues that the "intolerable situation" phrase constitutes a separate and distinct element within Article 13b (separate and distinct from grave risk of harm), that it is meant to be a flexible

concept that could address many of the hard cases. *See* Merle H. Weiner, *Intolerable Situations and Counsel for Children: Following Switzerland's Example in Hague Abduction Cases*, 58 AM. U. L. REV. 335, 345 (2008).

If there were any case to find that returning the children to France at this point is an intolerable situation, this is the one. It is intolerable that the children should be made to leave their friends, community, and family that they've worked so hard to build.  As 11-year-olds who value friendships and goals for themselves, all built in Oregon, being made to move to France after nearly two years of continuous life in Oregon at this point (and nearly four years of life in Oregon with a 8 month stay in France in the middle), would undoubtedly place the children in an intolerable situation. The analysis can end there.

Finally, although the court's analysis can stop at the very beginning with habitual residence, the court should find that the children have attained an age and degree of maturity, and have rationally asserted their objection to returning to France, and should therefore decline to order a return.

Respondent respectfully submits this Closing Argument for the Court's consideration and requests the Petition be denied and dismissed.

DATED: April 1, 2026

Katelyn D. Skinner, OSB No. 105055
Email: kds@buckley-law.com
Katrina Seipel, OSB No. 164793
Email: kas@buckley-law.com
Buckley Law, PC
5300 Meadows Road, Ste. 200
Lake Oswego, OR  97035
Tel: 503-620-8900
*Of Attorneys for Respondent*

CERTIFICATE OF SERVICE

    I certify that this document was served by electronic service  through the CM/ECF system and by e-mail, upon Christopher J. Riley at christopher.riley@millernash.com, Incainti Sofia McDonald at sofia.mcdonald@millernash.com, and Jakini Auset S. Ingram at Jakini.ingram@millernash.com on this 1st day of April, 2026.

Katelyn D. Skinner, OSB No. 105055
Of Attorneys for Respondent
kds@buckley-law.com