IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

In re the Matter of J.P. and E.P.:

ARNAUD PARIS,

              Petitioner,

      v.

HEIDI MARIE BROWN,

              Respondent.

Civ. No. 1:24-cv-00648-AA

**FINDINGS OF FACT &
CONCLUSIONS OF LAW**

AIKEN, District Judge.

On April 16, 2024, Arnaud Paris filed a Verified Petition for Return of Child to Habitual Residence (the "Petition") under the 1980 Convention on the Civil Aspects of International Child Abduction (the "Hague Convention").  ECF No. 1.  Petitioner seeks the return of his twin eleven-year-old daughters, E.P. and J.P. to France. He asserts that the children's mother, Respondent Heidi Marie Brown, violated Petitioner's parental and custodial rights under the Hague Convention when she removed the children from France to the United States during the week of April 7, 2024.

The Court held a bench trial on this matter from February 26, 2026, through March 3, 2026.  The parties submitted written closing arguments on April 1, 2026. For the reasons set forth below, the Petition is DENIED.

Page 1 – **FINDINGS OF FACT & CONCLUSIONS OF LAW**

## FINDINGS OF FACT

The Court makes the following findings of fact by a preponderance of the evidence.  22 U.S.C. § 9003(e)(1).  The Court heard testimony and reviewed the received exhibits. The Court will consider only admissible evidence and has discounted evidence and testimony of only marginal or dubious weight.

### I.     Credibility Determinations

"Where based in whole or in part on a witness's testimony, the Court's findings reflect credibility determinations based on its assessment of, *inter alia*, the relevant witness's demeanor, bias, and the extent to which the testimony was inherently logical and consistent with the testimony of other witnesses and relevant documentary evidence."    *Berg v. Wondra¸* Case No. 3:25-cv-01914-SI, 2025 WL 3564735, at \*5 (D. Or. Dec. 12, 2025).

### A. Petitioner Arnaud Paris

The Court considered Petitioner's demeanor, the consistency of his testimony in relation to other evidence, and the manner of his testimony.  The Court finds Petitioner less than fully credible.  Petitioner was evasive about certain issues in his testimony, notably where it concerned his removal of the children from the United States.  Other aspects of Petitioner's testimony were inconsistent with the evidence. Some aspects of Petitioner's testimony reflect poorly on Petitioner's honestly and candor, such as the fact that Petitioner left his children in the care of an au pair for extended periods and lied to the au pair about his whereabouts during at least part of that time.

### B. Olivia Bourne

Ms. Bourne served as the children's short-term au pair in France for a period of weeks in 2023 after Petitioner removed the children from the United States. Ms. Bourne never met, spoke to, or interacted with Respondent. Tr. Vol. 2, 196:04-11. ECF No. 93. Nevertheless, Ms. Bourne testified that she had experienced an acrimonious custody dispute during her childhood and felt that Respondent "had done what my dad had done to me," and didn't "want that happening to the girls." Tr. Vol. 2, 202:12-22. The Court considered Ms. Bourne's testimony, her demeanor, and her manner of testifying and finds her only partially credible.

### C. Anne-Marie Champert

Ms. Champert was J.P.'s teacher in the Parisian school she attended from late August 2023 to April 2024. Ms. Champert testified in French via certified interpreter. The Court considered Ms. Champert's testimony, demeanor, and manner of testifying and finds Ms. Champert credible.

### D. David Fouet

Mr. Fouet is the Director of the Holiday Inn in Perpignan, France. Mr. Fouet testified in French via certified interpreter. The Court finds the limited testimony Mr. Fouet provided was generally credible, but not relevant to the questions before the Court.

### E. David Benamou

Mr. Benamou is the father of one of the children's friends from Paris. Mr. Benamou testified in French via certified interpreter. The Court considered Mr. Benamou's testimony, demeanor, and manner of testifying and finds him credible.

### F. Keira Sumner

Ms. Sumner was the children's au pair in Paris from November 2023 to April 2024. Ms. Sumner testified about the children's lives and her observations of the children during her time as their caregiver. The Court finds that Ms. Sumner's partiality to Petitioner as her friend and her former employer impaired her objectivity and candor. For instance, Ms. Sumner testified that she lied to process servers in Paris, telling them that Petitioner was not present when they arrived to serve him with papers from Respondent even though Petitioner was in fact present. Tr. Vol. 2, 270:15-272:03; 280:04-23. During cross-examination, several inconsistencies emerged between the testimony provided by Ms. Sumner and the information contained in communications between Ms. Sumner and Petitioner during the relevant period. The Court concludes that these factors weigh against Ms. Sumner's credibility. The Court considered Ms. Sumner's testimony, her demeanor, and her manner of testifying and finds that Ms. Sumner is only partially credible.

### G. Victoria Sofitel

Ms. Sofitel was the coach of an Oregon youth soccer team on which J.P. was a player during the spring of 2023. Ms. Sofitel later assisted Petitioner with filing federal court documents. Ms. Sofitel testified generally about conflicts between

Respondent and Petitioner during the soccer season and emails Petitioner sent to the coaches about taking the children to France. Other than some testimony about distress among J.P.'s teammates after Petitioner took the children to France in July 2023, Ms. Sofitel offered little in the way of relevant testimony. The Court considered Ms. Sofitel's testimony, her demeanor, and her manner of testifying and, to the extent that any of her testimony was relevant, the Court finds Ms. Sofitel generally credible.

### H. Katia Paris

Mrs. Paris is the children's paternal grandmother. She testified in French via a certified interpreter. Mrs. Paris testified about her impression of the children's time in France and of the children's personalities. The Court considered Mrs. Paris's testimony, her demeanor, and her manner of testifying and finds Mrs. Paris credible, although the Court gives greater weight to evidence more directly related to the day-to-day care of the children during their time in France.

### I. Eric Olson

Mr. Olson is Respondent's stepfather and the children's maternal step-grandfather. He testified about the children's time in Oregon during the summer of 2021, and their lives in Oregon in 2022-2023. Mr. Olson also testified about the children's return to Oregon and their reintegration into the community beginning in 2024. The Court considered Mr. Olson's testimony, demeanor, and manner of testifying and finds him fully credible.

### J. Respondent Heidi Brown

Respondent testified about the children's history, their lives in Oregon, their removal to France, what she observed of their lives in France, and their return to the United States. The Court considered Respondent's demeanor, the consistency of her testimony with the other evidence, and her manner of testifying and finds Respondent to be fully credible.

### K. Nicole Leonard

Ms. Leonard was J.P.'s Oregon soccer coach in 2025. Ms. Leonard's testimony was brief and generally concerned the children's recent history. The Court considered Ms. Leonard's testimony, her demeanor, and her manner of testifying and, to the extent that Ms. Leonard offered any relevant testimony, the Court finds her credible.

### L. Jessica Bereszczak

Ms. Bereszczak, who lives in Oregon, is the mother of a child who is a close friend and classmate of the children before they were taken to France and who remains a close friend after their return. She testified about the relationship between her daughter, the children, and their other friends. The Court considered Ms. Bereszczak's testimony, her demeanor, and her manner of testifying and finds Ms. Bereszczak fully credible.

### M. Megan Rea

Ms. Rea is Respondent's stepsister, and she is the mother of the children's cousins. Ms. Rea testified about the close relationship between E.P. and J.P. and their cousins, about the effect of E.P. and J.P.'s abrupt removal on their cousins, and

about the resumption of their close relationship upon E.P. and J.P.'s return to the United States. The Court considered Ms. Rea's testimony, her demeanor, and her manner of testifying and finds Ms. Rea fully credible.

### N. Ellen Gayton

Ms. Gayton was J.P.'s second grade teacher in the 2022-2023 school year. Ms. Gayton testified about her experiences as J.P.'s teacher, about the friendships and relationships J.P. formed while in Ms. Gayton's class, and about J.P.'s personality. The Court considered Ms. Gayton's testimony, her demeanor, and her manner of testifying and finds Ms. Gayton fully credible.

### O. Nicole Steidler

Dr. Steidler lives next door to Respondent and the children and is the mother of one of the children's close friends. Dr. Steidler testified about her daughter's relationship with the children going back to 2021 and continuing through the present day, the effect of the children's abrupt departure on her daughter, and on her observations of the children since returning to Oregon. The Court considered Dr. Steidler's testimony, her demeanor, and her manner of testifying and finds Dr. Steidler fully credible.

### P. Ashley Baugh

Ms. Baugh was J.P.'s soccer coach during the 2023 season in Oregon. She testified about her observations of J.P. as a player and team member during that period. The Court considered Ms. Baugh's testimony, her demeanor, and her manner of testifying and finds Ms. Baugh fully credible.

### Q. Sonya Smith

Ms. Smith runs an aerial arts program in Ashland, Oregon. The children were enrolled in Ms. Smith's program before they were removed to France and have since resumed aerial arts training following their return to the United States. The Court considered Ms. Smith's testimony, her demeanor, and her manner of testifying and finds Ms. Smith credible, although the Court notes that much of Ms. Smith's testimony concerns events occurring after the relevant period.

### R. Landon Poppleton

Dr. Poppleton has a Ph.D. in clinical psychology and a J.D., although he is not a practicing attorney. He was retained by Respondent as an expert witness in connection with the mature child exception and the grave risk of harm exception to the Hague Convention's return mandate. With respect to the mature child exception, Dr. Poppleton's assessment of the children's degree of maturity was generally consistent with the Court's own observations during its in-chambers interviews with the children although the Court opts to rely on its own impressions formed during the interviews, rather than rely on Dr. Poppleton's observations. The Court considered Dr. Poppleton's testimony, demeanor, and manner of testifying and finds him credible.

### S. George Cox

Dr. Cox is a psychologist retained by Petitioner as an expert witness. Dr. Cox testified as to the issue of grave risk of harm. Dr. Cox interviewed Petitioner but did not speak to the children. Dr. Cox acknowledged that his opinion was heavily reliant

on information provided to him by Petitioner. As discussed above, the Court has found Petitioner to be less than credible. This necessarily undermines any confidence the Court might have in the reliability of the information provided by Petitioner to Dr. Cox and, by extension, reduces the Court's confidence in Dr. Cox's conclusions.

### T. E.P. and J.P.

The Court conducted interviews with each of the children separately and outside the presence of counsel or the parties. The Court's conclusions regarding those interviews are discussed in greater detail below, but the Court found the children to be well-adjusted, bright, and articulate. The Court detected no indication of coaching or undue influence on the children by Respondent, or anyone else, and finds that the children were fully credible.

## II.    The Children's Early Lives

Petitioner Arnaud Paris is a French citizen and national, who became a naturalized U.S. citizen in April 2017. Respondent Heidi Marie Brown is a U.S. citizen and national. Petitioner met Respondent in 2013, and they began living together in California shortly thereafter. Tr. Vol. 1, 31:05-32:12. ECF No. 92. Petitioner and Respondent have never been married to one another.[1]

The children in this case, E.P. and J.P., are twin girls born in January 2015. Pet. Exs. 6, 7. The children were born in Ashland, Oregon, but shortly after their births, the family moved to Topanga, California. The family continued to travel to

---

[1] Respondent testified that Petitioner was in a "green card marriage" to another person when they began their relationship. Tr. Vol. 3, 404:05-23. This marriage dissolved in either 2017 or 2018. *Id.*

Ashland regularly and the children's pediatrician was in Ashland until they were two years old. Tr. Vol. 3, 406:02-10. ECF No. 94.

When the children were born, they were initially given Respondent's last name, but when Petitioner became a naturalized citizen in 2017, they applied for a name change and the children took Petitioner's last name. Tr. Vol. 3, 405:14-24. The parties applied for French passports for the children in 2017 or 2018. Tr. Vol. 3, 405:14-24.

During the early years of the children's lives, the family lived in a rented home in Topanga, California and stayed with Respondent's mother and stepfather during their visits to Ashland, Oregon. Tr. Vol. 3, 406:17-407:01. During this period, the family also traveled to France for weeks at a time. During those visits, the children were enrolled in French preschool. Tr. Vol. 3, 407:15-408:04. The family resided continuously in the rented home in Topanga, California during the early years of the children's life, and they did not vacate it during the periods when the family traveled to France, which Respondent described as "true vacations." Tr. Vol. 3, 408:20-24. When the children were in the United States, they attended a preschool in Topanga, California. Tr. Vol. 3, 408:06-19.

The family purchased real property in California in 2018 with the expectation that they would build a house there. Tr. Vol. 3, 409:02-11. However, the process of permit approvals to build a house on the California property was expected to take a year, and so the family decided to move to France while the permitting process went forward. Tr. Vol. 3, 409:12-410:07.

The family placed their furniture and other property in storage in the United States and moved to France in August 2019 with the expectation that they would remain in France for between ten and twelve months. Tr. Vol. 3, 409:12-413:04. They planned to return to the United States in July 2020. Tr. Vol. 3, 413:06-12. The COVID-19 pandemic interfered with these plans, and the family was unable to return to the United States in 2020. Tr. Vol. 3, 413:14-414:08. The family still planned to return to the United States, and both Petitioner and Respondent continued to file and pay taxes as California residents and collected unemployment benefits from the United States. Tr. Vol. 3, 414:09-23.

In France, Petitioner owns a small apartment. Petitioner listed the apartment on the short-term rental service AirBnB, and the family rented a larger, furnished apartment where they lived. Tr. Vol. 3, 419:13-18; Tr. Vol. 1, 40:04-14.

Between 2019 and 2022, the children were enrolled in French schools and E.P. was enrolled in a musical conservatory program. Tr. Vol. 1, 45:13-46:25.

The family returned to the United States in the summer of 2021 and stayed in Ashland, Oregon, where the children became patients of an Oregon orthodontist. Tr. Vol. 3, 415:15-416:01. The family also took steps toward constructing a home in Ashland, Oregon. Tr. Vol. 3, 416:02-06.

The family returned to France at the end of the summer of 2021 with concrete plans to permanently return to the United States in 2022. Tr. Vol. 3, 416:07-10. The family took discrete steps to facilitate their return to the United States in 2022, including breaking the lease of their apartment in France; unenrolling the children

from their French school; selling off furniture and other property that they did not intend to bring with them; packing up their other property; and even holding a goodbye party with their friends and family in France at Petitioner's parents' home. Tr. Vol. 3, 416:13-417:09.

In April or May of 2022, the family purchased one-way plane tickets for Respondent and the children to depart from France for the United States on July 7, 2022, which was later rescheduled for July 13, 2022. Tr. Vol. 3, 417:19-418:09. The family planned for Respondent to travel ahead with the children with the expectation that Petitioner would follow a few weeks later. Tr. Vol. 3, 417:22-418:02.

Also in early 2022, Petitioner was diagnosed with Biermer's disease, or pernicious anemia, an autoimmune disorder that interferes with the absorption of vitamin B12. Tr. Vol. 1, 50:12-25. Petitioner received complete medical coverage for his condition in France but was informed that he would lose coverage if he was absent from France for more than six months at a time. Tr. Vol. 1, 62:13-63:02.

By July 2022, the relationship between Petitioner and Respondent had grown strained. Tr. Vol. 3, 418:10-12. On July 13, 2022, the day of the family's planned departure, Petitioner abruptly seized the passports of Respondent and the children and told them they could not leave France. Tr. Vol. 3, 420:14-21. Petitioner testified that he reported Respondent to the police and sought an administrative stay to prevent her from leaving France with the children for two weeks. Tr. Vol. 1, 55:10-14.

By this point, however, the parties had already ended their apartment lease, and Respondent and the children had already packed their belongings into suitcases for the trip to the United States. Tr. Vol. 3, 420:16-21. Respondent had also transferred her job to the United States. Tr. Vol. 3, 420:16-21. As the change in circumstances played out, Respondent stayed at a hotel with the children. Tr. Vol. 3, 420:22-25.

Petitioner eventually returned Respondent's passport but retained the children's passports. Tr. Vol. 3, 422:17-18.

Respondent and Petitioner engaged in negotiations through French attorneys and reached an agreement on July 19, 2022 (the "July 2022 Agreement"). Pet. Ex. 30; Tr. Vol. 3, 422:08-14; Tr. Vol. 1, 58:18-59:10. Under the July 2022 Agreement, the family would move to Ashland as planned. Respondent would seek health insurance that would cover Petitioner's Biemer's disease, and Respondent committed to locate and rent a house of a certain size for Petitioner's home office. Tr. Vol. 3, 422:22-423:19. If the conditions were met, the July 2022 Agreement contemplated that the children would be enrolled in school in Oregon for the 2022-2023 school year; they would return to France in September 2023 for the 2023-2024 school year; and then return to the United States in September 2024. Pet. Ex. 30; Tr. Vol. 1, 59:19-60:03. The parties would "continue this alternation of residency from one year to the next, provided that it is in the best interests of the children." Pet. Ex. 30.

Respondent was concerned that, under the July 2022 Agreement, she was obliged to incur considerable expenses and that Petitioner would renege on the

Agreement, so she sought advice from a lawyer in the United States.  Tr. Vol. 3, 424:09-4:25:05.

Petitioner has contended that Respondent entered into the July 2022 Agreement in bad faith with no intention of adhering to it.  Respondent denies this. Tr. Vol. 3, 496:11-13.  After hearing the testimony, the Court finds that, at least at first, both parties entered into the July 2022 Agreement with the intention of adhering to it, as evidenced by Respondent's efforts to comply with its more onerous and expensive stipulations.  However, as will be discussed in greater detail below, subsequent events would overtake the July 2022 Agreement, particularly the near-simultaneous filing of competing custody cases by Petitioner in France and by Respondent in the United States, as well as Petitioner's efforts to compel the return of the children to France in late 2022 by filing a Hague petition.[2]  Of note, during custody litigation, neither party advocated for the enforcement of the July 2022 Agreement.  Tr. Vol. 3, 499:10-16.  The Court finds that, by early 2023 at the latest, the July 2022 Agreement was effectively discarded and that neither party intended to comply with its terms or genuinely expected the other party to do so.

Following the negotiation of the July 2022 Agreement, Respondent and the children were allowed to depart from France after the expiration of the administrative stay, and they arrived in the United States at the end of July 2022. Tr. Vol. 3, 425:06-10; Tr. Vol. 1, 60:14-25.  Petitioner followed several weeks later. Tr. Vol. 3, 425:13-16.

---

[2] For her part, Respondent testified that she considered the July 2022 Agreement to be moot as a consequence of the commencement of custody litigation.  Tr. Vol. 3, 499:07-09.

After arriving in the United States, consistent with the terms of the July 2022 Agreement, Respondent secured health insurance for Petitioner and rented a four-bedroom house with space for Petitioner's home office. Tr. Vol. 3, 425:23-25. Petitioner declined to be on the lease for the house. Tr. Vol. 1, 61:05-18.

Petitioner bought tickets for the family to return to France in August 2022, telling Respondent that they could return to Oregon the following year, but Respondent declined. Tr. Vol. 1, 67:06-23.

In late August 2022, Petitioner traveled to California to retrieve the family's furniture and other possessions from storage and brought them to the rented house in Ashland, Oregon. Tr. Vol. 3, 426:16-25; Tr. Vol. 1, 68:12-69:15. Petitioner moved in with Respondent and the children in the rented home in Ashland in August and September 2022. Tr. Vol. 1, 135:16-136:01.

Respondent testified that the July 2022 Agreement began to break down soon after Petitioner arrived and that Petitioner cancelled the health insurance she had secured for him. Tr. Vol. 3, 427:18-428:07.

In September 2022, Petitioner accessed Respondent's computer without her permission and used the computer to search and read Respondent's email, including privileged communications with her attorneys. Tr. Vol. 3, 428:18-430:13; Tr. Vol. 1, 70:19-71:06; Pet. Ex. 31. Petitioner testified that he discovered correspondence between Respondent and her attorney indicating that Respondent intended to seek the jurisdiction of the Oregon courts over the children and pursue custody of the children in Oregon. Tr. Vol. 1, 71:25-72:06.

After accessing Respondent's emails, Petitioner packed his bags and departed for France but returned a week later. Tr. Vol. 3, 431:02-24; Tr. Vol 1. 67:24-68:01.

As of September 2022, there were no court orders concerning custody of the children. Tr. Vol. 3, 431:12-14.

By late September 2022, Respondent believed that Petitioner was no longer interested in adhering to the July 2022 Agreement and became concerned that Petitioner would abduct the children and take them to France. Tr. Vol. 3, 431:25-432:09. In her testimony, Respondent described an incident in late September 2022 in which she believed Petitioner did attempt to take the children, but the children would not go with him. Respondent intervened and reported the incident to the police. Tr. Vol. 3, 432:02-09.

Petitioner filed for custody of the children in the French courts on October 6, 2022. Tr. Vol. 1, 73:24-75:01.

On October 7, 2022, Respondent filed for dissolution of her non-marital relationship with Petitioner and for custody of the children in the Oregon courts. A Temporary Protective Order of Restraint ("TPOR") forbidding the removal of the children from Oregon was issued by the Oregon courts. Tr. Vol. 3, 432:12-433:24.

On October 20, 2022, after being served with the TPOR, Petitioner filed a Hague petition in U.S. District Court for the District of Oregon seeking to compel the return of the children to France, *Paris v. Brown*, Case No. 1:22-cv-01593-MC. ("Hague I"). The filing of Hague I temporarily paused the progress of the custody case in the Oregon courts. Tr. Vol. 3, 434:03-15.

### III.    Hague I

In Hague I, Petitioner asserted that Respondent had wrongfully removed the children from France in July 2022.  Hague I was assigned to U.S. District Judge Michael McShane, and he held a three-day bench trial on the petition ending on December 7, 2022.  At the conclusion of the trial, Judge McShane issued his findings of fact and conclusions of law from the bench.  ECF No. 36 in Case No. 1:22-cv-01593-MC ("Hague I Tr.").

Judge McShane determined that the children's habitual residence, as of July 2022, when they were removed to the United States, was France.  Hague I Tr. 46:14-21.  However, Judge McShane found that the "much more difficult issue" was whether the removal of the children was wrongful or whether there was wrongful retention of the children in the United States.  Hague I Tr. 46:22-24.  As Judge McShane observed, the question in Hague I was "whether Ms. Brown unilaterally decided to remove the children to the United States without the consent of Mr. Paris."  Hague I Tr. 46:24-47:02.

Judge McShane found that it "seemed like everyone was on board in early 2022 that the family was going to move to the United States," but that Petitioner's unilateral actions—seizing the passports and reporting Respondent to the police—derailed those plans.  Hague I Tr. 47:14-49:14.

Judge McShane found that the July 2022 Agreement, which he described as "a remarkably unusual agreement," permitted the children to fly to the United States and to remain in the United States for the 2022-2023 school year, provided certain

conditions were met, such as securing housing and health insurance for Petitioner. Hague I Tr. 49:15-50:07. Judge McShane found that the children were able to depart from France on July 29, 2022, and that Respondent subsequently followed and joined the family in the United States. Hague I Tr. 50:11-18. With respect to the July 2022 Agreement, Judge McShane found the following:

> I think both sides entered the July 19th agreement with some doubts to how committed they were to it, in part, because it is completely unclear as to whether the relationship between Mr. Paris and Ms. Brown could maintain itself. I don't think either side knew whether they could make it work as a couple or as a family unit, and, in part, because Mr. Paris has created an untenable situation in which the children had no home, no passports, and no future options for where they would be staying.

Hague I Tr. 52:08-17.

However, Judge McShane found that Respondent did "complete all the conditions required by the July 19 agreement to keep the children in Oregon for the school year." Hague I Tr. 51:19-21.

Judge McShane found that there had been no wrongful removal or wrongful retention in Hague I because Petitioner had consented to the removal of the children from France and to their remaining in Oregon for the 2022-2023 school year. Hague I Tr. 53:02-11. Judge McShane noted that "[b]oth sides seem to think that it is possible to unilaterally change their mind under the French agreement, which, for better or worse, they both bound themselves to." Hague I Tr. 53:03-05. Judge McShane observed:

> I don't believe consent, in this case, can be so easily revoked, and that it results in the children being treated like a ping-pong ball. At this point, the agreement and the activities of the parties suggest that Mr. Paris consented to the family living in Oregon for the 2022-2023 school year.

Obviously, if Ms. Brown chooses to keep the children in Oregon, she will be in violation of the French agreement. The Oregon courts may want to, and I think they should, enforce the agreement you entered into. I think you should be stuck with it, even if you change your mind.

There may be other reasons why the Oregon courts would find otherwise. I do believe that if that comes—if it comes to that, *there's clear evidence before the Court today that the children are certainly creating a habitual residence in the United States without any great impediment.*

Hague I Tr. 53:12-54:01 (emphasis added).

Judge McShane denied the petition in Hague I, finding that there had been no wrongful removal. Hague I Tr. 54:02-03. Of note, Judge McShane found Petitioner's testimony during the Hague I trial to be "less than credible." Hague I Tr. 51:23-52:02.

## IV.    From the conclusion of Hague I to July 2023

After Hague I was resolved, active litigation of custody of the children resumed in the courts of both Oregon and France. Petitioner made multiple unsuccessful efforts to dismiss the Oregon state court case and to lift the TPOR. Tr. Vol. 3, 434:20-435:08.

During the pendency of the Oregon custody case, the parties engaged in week-on/week-off custody of the children in Ashland, Oregon, which lasted until Petitioner took the children to France in July 2023. Tr. Vol. 3, 445:01-13.

At the same time, Petitioner was pursuing custody of the children in the French courts. Tr. Vol. 3, 436:13-15. The French court held a hearing in April 2023, which Respondent's French attorney told her would be limited to the subject of jurisdiction and that her personal appearance was not necessary. Respondent did not

travel to France for the hearing and appeared through her attorney. Tr. Vol. 3, 436:16-437:16. However, the French court made a substantive custody determination at that hearing, despite Respondent's inability to present evidence or testimony. Tr. Vol. 3, 436:16-437:19.

The French court ruled in April 2023 that Petitioner's apartment would be the "main residence" of the children in France, meaning that they would live with him, and that Respondent would have visitation rights during vacations at the commencement of the 2023-2024 school year. Pet. Ex. 48, at 7; Tr. Vol. 1,77:24-78:04; 121:25-122:16. On cross-examination, Petitioner admitted that the French judgment did not give Petitioner "custody" of the children, but instead parental authority would be exercised jointly by Petitioner and Respondent. Tr. 48, at 6; Tr. Vol. 1, 122:03-124:21.

Petitioner unsuccessfully attempted to register the French judgment in multiple Oregon circuit courts, including Jackson County, which encompasses Ashland and where the issue of custody of the children was being actively litigated. Tr. Vol. 3, 437:20-439:21. Petitioner unsuccessfully appealed the denial of the registration of the French judgment. Tr. Vol. 3, 439:22-24. Petitioner also unsuccessfully attempted to register the French judgment in numerous other U.S. jurisdictions. Tr. Vol. 3, 440:22-441:21. In his testimony, Petitioner admitted that during his efforts to register the judgment in other U.S. states, he did not always inform the courts that the Oregon courts had already refused to register the judgment. Tr. Vol. 3, 518:11-519:01.

Page 20 – **FINDINGS OF FACT & CONCLUSIONS OF LAW**

## V.    The children's lives in the United States during 2022-2023

When the children arrived in the United States in July 2022, they were seven-and-a-half years old.  Tr. Vol. 3, 448:12-25.  Respondent enrolled the children in Bellview Elementary School in Ashland, Oregon for the 2022-2023 school year, where they would be in the second grade.  Tr. Vol. 3, 426:08-09; 448:12-25.  The children were placed in separate classes.  Tr. Vol. 3, 449:09-450:01.

E.P. had a very positive relationship with her second-grade teacher, who noted E.P.'s strong academic proficiency and described her as "kind, respectful, and a joy to have in class."  Resp. Ex. 204, at 2.  E.P.'s teacher noted that E.P. had many friends at school and that she loved being E.P.'s teacher.  *Id.*

J.P. also had a very positive relationship with her teacher, Ellen Gayton, and Respondent testified that that the positive relationship continues to the present day.  Tr. Vol. 3, 452:03-10.  In her report, J.P.'s teacher described J.P. as "enthusiastic, fun, and social," and noted good academic progress.  Resp. Ex. 204, at 4.  J.P.'s teacher noted that J.P. was "well-liked and has many friends in the classroom," and stated that J.P. was "happy to be here and ready to learn."  *Id.*

As in her written reports, J.P.'s second grade teacher, Ms. Gayton, testified that J.P. was a "social butterfly" who "really blossomed academically."  Tr. Vol. 3, 545:01-12.  During the 2022-2023 academic year, J.P. more than doubled her reading speed.  Tr. Vol. 3, 546:05-10.  Ms. Gayton testified that J.P. was "empathetic and cared about all the classmates."  J.P. liked her classmates and "they felt the same

way about her." Tr. Vol. 3, 548:07-11. Ms. Gayton testified that J.P. made friends in her class who remain close friends with J.P. to the present day. Tr. Vol. 3, 549:05-22.

Consistent with the terms of the July 2022 Agreement, the parties sought and eventually hired a French au pair to look after the children in Oregon. Tr. Vol. 3, 427:01-17. Respondent also found a tutor for the children to maintain their French language proficiency. The daughter of the tutor became a classmate and close friend of E.P. Tr. Vol. 3, 426:01-05.

Respondent testified that J.P. "made tons of friends very organically," and was able to name several of J.P. and E.P.'s close friends, noting that those friendships continue to the present day. Tr. Vol. 3, 455:08-556:14. The children were also close with their maternal cousins. Tr. Vol. 3, 456:04-07. Eric Olson, the children's step-grandfather, testified that the children did "very well" making friends in Ashland in 2022-2023. Eight other girls attended their birthday party in 2023, including two cousins who lived nearby. Tr. Vol. 2 372:19-24.

The Court heard testimony from Megan Rea, Respondent's stepsister and the mother of the children's cousins, who testified that she saw that children regularly at family gatherings beginning during the family's extended visit to Oregon in 2021. Tr. Vol. 3, 538:12-15. Ms. Rea testified that her children are also twins and close in age to E.P. and J.P. and that there is a close relationship between the two sets of siblings. Tr. Vol. 3, 540:04-541:01.

The children had a full social calendar in 2022-2023, with numerous birthday parties, playdates, and sleepovers. Resp. Ex. 205; Tr. Vol. 3, 456:17-457:04. The

Page 22 – **FINDINGS OF FACT & CONCLUSIONS OF LAW**

children were also heavily involved in organized recreation and summer camps during 2022-2023, including dance classes, "Gym and Swim," soccer, skiing, volleyball camp, creative dance, and "Ninja Challenge." Resp. Ex. 201; Tr. Vol. 3, 457:05-24, 458:18-23. The children also became involved in aerial arts, which they continue to the present day. Tr. Vol. 3, 457:25-458:17; Tr. Vol. 4, 575:05-17.

J.P. was enrolled in soccer in 2022-2023. One of J.P.'s soccer coaches from 2023, Ashley Baugh, testified that J.P. attended every practice and game and was "very committed" and "did really well and enjoyed" playing soccer. Tr. Vol. 4, 572:13-23. Ms. Baugh testified that J.P. was friendly with the other players, "had a great attitude, had fun," and "was a good soccer player." Tr. Vol. 4, 573:07-24.

Eric Olson, the children's maternal step-grandfather, described the children as "fully integrating" into the school and community, with sports and extracurriculars. Tr. Vol. 2, 371:01-05. Mr. Olson was involved in numerous activities with the children including as a volunteer chaperone on school outings, basketball games, exploring downtown Ashland, and as a chaperone for their school's field day. Tr. Vol. 2, 371:08-14. Mr. Olson described the children's other activities from the 2022-2023 period, including camping, traveling to the Oregon coast, sleepovers with friends, visiting cousins, and going horseback riding. Tr. Vol. 2, 373:07-16. Mr. Olson observed the girls participating in soccer and aerial arts. He attended their games and performances. Tr. Vol. 2, 371:17-22. Mr. Olson testified that the children enjoyed these activities and resumed their participation when they returned to the United States in 2024. Tr. Vol. 2, 371:23-372:04.

The children formed close friendships during their participation in organized recreational activities, at least some of which extended beyond the activities themselves. Tr. Vol. 3, 458:24-459:06; Tr. Vol. 4, 576:24-577:04. Mr. Olson testified that the children also had friends from school and from the local swimming pool. Tr. Vol. 2, 372:25-373:03.

The Court heard testimony from Jessica Bereszczak, the mother of a classmate and close friend of the children from the 2022-2023 school year. Tr. Vol. 3, 527:15-528:22. Ms. Bereszczak's daughter befriended the children in 2022, and the children met and played together regularly. Tr. Vol. 3, 527:22-528:22. Ms. Bereszczak's daughter is part of a "very tight group of friends," with E.P., J.P., and two other children. Tr. Vol. 3, 531:11-20.

The Court also heard testimony from Dr. Nichole Steidler, Respondent's neighbor and the mother of one of the children's close friends. Tr. Vol. 4, 566:01-18. Dr. Steidler testified that her daughter first met the children in 2021 when the children were visiting their maternal grandparents. Tr. Vol. 4, 566:05-09.

In terms of medical care in 2022-2023, the children resumed their relationship with their previous pediatrician and orthodontist when they moved to Oregon in 2022. Tr. Vol. 3, 459:07-10, 15-16. The children were also enrolled with a regular dentist in Oregon in 2022-2023. Tr. Vol. 3, 459:11-15.

A typical day for the children while in Respondent's care in 2022-2023 involved Respondent getting the children ready for school, attending school, then going to activities, playdates, and bedtime. On the weekends, they would participate in soccer

games, playdates, and family time. Tr. Vol. 3, 460:15-23. In the evenings, the children would be finished with activities by 5:30 p.m. at the latest, they would eat dinner as a family, then Respondent would read them stories, and then they would go to bed by 8:00 or 8:15 p.m. Tr. Vol. 3, 460:24-461:10. On holidays, there were large family gatherings where the children would play with their cousins who lived nearby. Tr. Vol. 3, 461:11-462:02.

The children's sudden removal to France in July 2023 was distressing to their friends and family in the United States. Mr. Olson described the community's reaction as "devastated" and "incredulous" when the children were abruptly removed to France. Tr. Vol. 3, 389:11-20. Mr. Olson had limited contact with the children's friends and their friends' parents, but the children's maternal family, and especially the children's maternal cousins were distressed. Tr. Vol. 3, 389:21-390:10. J.P.'s soccer coach Victoria Sofitel testified that the children's cousin and teammate referred to their removal as a "kidnapping." Tr. Vol. 2, 339:18-341:10.

Ms. Bereszczak testified that her daughter was saddened and disappointed when the children were taken to France. Tr. Vol. 3, 529:15-23. Ms. Beresczak testified that her daughter missed the children and did not have contact with them while they were in France. Tr. Vol. 3, 529:15-530:01. Dr. Steidler similarly testified that her daughter was surprised and confused when the children were abruptly taken to France in 2023. Tr. Vol. 4, 567:03-07.

Ms. Rea testified that her children had been making summer plans with E.P. and J.P. in 2023. Tr. Vol. 3, 541:07-11. Ms. Rea testified that her children were

frightened and traumatized by their cousins being abruptly taken to France in 2023. She noted that the children had been taken without their cousins having an opportunity to say goodbye. Tr. Vol. 3, 541:02-20.

## VI.    Removal of the children to France

Petitioner removed the children and took them to France on July 22, 2023, contrary to the TPOR issued by the Oregon courts. Tr. Vol. 3, 443:02-13. Petitioner took the children to California and attempted to fly to France with them, but he was stopped by U.S. immigration authorities. Petitioner sought assistance from French consular authorities and presented the French judgment and the July 2022 Agreement as evidence of both his right to remove the children from the United States and, supposedly, Respondent's affirmative permission for him to do so. Resp. Ex. 220, at 5.

The Court finds that, at the time Petitioner removed the children from the United States, the July 2022 Agreement was superseded by contrary judicial custody decisions in both the United States and in France and was unenforceable. Tr. Vol. 3, 500:25-501:09. The Court finds that Petitioner was aware of this fact and that Petitioner affirmatively deceived the authorities by presenting them with the July 2022 Agreement as if it were still a valid and enforceable agreement between the parties when he knew that it was not.

Additionally, even if the July 2022 Agreement were valid and enforceable, which it was not, the Agreement provided that the children were not to return to

France until September 2023, while Petitioner removed them from the United States in July 2023.  Pet. Ex. 30.

Further, as Petitioner admitted on cross-examination, the French judgment said that the residence of the children would be with Petitioner in France beginning in the 2023-2024 school year.  However, the school year began for J.P. on August 26, 2023, and for E.P. on September 4, 2023, and Petitioner removed the children from the United States on July 22, 2023.  Tr. Vol. 1, 126:01-23; Pet. Ex. 48, at 7.  In addition, Petitioner admitted on cross-examination that the terms of the French judgment provided that the children were to be with Respondent in the second half of the summer in 2023, which would have encompassed the month of August 2023.  Tr. Vol. 1, 127:02-129:23; Pet. Ex. 48, at 8.

Respondent subsequently filed a contempt action against Petitioner for the violation of the TPOR.  Tr. Vol. 3, 448:04-11.  Respondent did not, however, file a Hague petition in France seeking the return of the children to the United States.

After returning to France in July 2023, Petitioner and the children traveled around the country before returning to Paris for the beginning of the school year at the end of August 2023.  Tr. Vol. 1, 83:25-84:10.

Petitioner sought to hire English-speaking au pairs for the children and, in particular, searched for an American au pair.  Tr. Vol. 1, 95:19-23.  Petitioner hired Keira Sumner, an American citizen, as an au pair for the children, but she could not start work until November 2023.  Tr. Vol. 1, 95:24-96:10.  In the period before Ms.

Sumner could begin work, Petitioner hired Olivia Bourne, a British citizen, to serve as a short-term au pair for the children. Tr. Vol. 1, 96:07-13.

Once she began serving as the children's au pair, Ms. Sumner testified that she had a positive working relationship with Respondent and communicated with both her and Petitioner regularly. Tr. Vol. 2, 258:07-13.

Between July 2023 and April 2024, Petitioner traveled internationally on a number of occasions, going to Germany, Belgium, Norway, and the United States. Tr. Vol. 1, 142:01-21. Petitioner did not bring the children with him on these trips but instead left them full time in the care of Ms. Sumner, including during a ten-day trip to California in December 2023. Tr. Vol. 1, 142:22-142:05, 145:21-25.[3] Although Ms. Bourne only briefly served as the children's au pair, she testified that on one occasion she also had to stay at the apartment with the children because Petitioner was traveling. Tr. Vol. 2, 185:03-06.

Petitioner again left his children in Ms. Sumner's sole care when he left for Norway for a multi-day trip in February 2024. Tr. Vol. 1, 148:17-149:11. When these trips occurred, Ms. Sumner protested that she had not been told that the children would be left in her care for such extended periods. Tr. Vol. 1, 147:12-24; Resp. Ex. 220, at 9. Ms. Sumner complained to Petitioner and to Respondent that she had been placed in a position where she felt like more of a parent than a nanny. Tr. Vol. 2, 314:01-08; Resp. Ex. 221, at 4.

---

[3] Ms. Sumner testified that she was left to care for the children alone during this period, except for a single day when the children's paternal grandparents came to assist her. Tr. Vol. 2, 313:19-25.

Despite leaving his children in her care for extended periods of time, Petitioner did not tell Ms. Sumner that he was in California because he thought Ms. Sumner might tell Respondent that he was in the United States. Tr. Vol. 1, 143:06-144:06. Instead, Petitioner lied to Ms. Sumner and told her that he was in Belgium. Tr. Vol. 1, 143:11-144:06; 147:03-11. Petitioner only told Ms. Sumner that he had lied to her about his whereabouts shortly before the trial in this case. Tr. Vol. 2, 298:02-299:12.

There were occasions during Ms. Sumner's time as the children's au pair when people Ms. Sumner identified as private investigators hired by Respondent came to the apartment looking for Petitioner, but Ms. Sumner lied to them and told them Petitioner was not there. Tr. Vol. 2, 270:15-272:03. On cross-examination, Ms. Sumner revealed that the private investigators were, in fact, process servers attempting to serve Petitioner on behalf of Respondent. Tr. Vol. 2, 280:04-23. Ms. Sumner testified that Petitioner did not ask her to lie to the process servers and that it "was entirely on my own that I lied." Tr. Vol. 2, 323: 04-07.

Meanwhile, back in the United States, the Oregon custody case resulted in a limited judgment issued on December 28, 2023, awarding Respondent sole custody of the children, with Petitioner awarded limited phone contact and supervised visitation, with a pathway for expanded contact and parenting time. Tr. Vol. 3, 441:22-442:14. A general judgment was issued in the Oregon case on April 17, 2024. Tr. Vol. 3, 442:15-443:01.

## VII.    The children's lives in France from July 2023 to April 2024

In France, Petitioner and the children lived in the Parisian apartment owned by Petitioner.  The apartment is approximately 39 square meters, which is roughly 420 square feet.  Tr. Vol. 1, 117:06-09.  Petitioner's Paris apartment has a single bedroom and a pull-out couch in the living room.  Tr. Vol. 1, 149:15-150:10.

When Ms. Bourne was working as the children's au pair, she had separate lodgings paid for by Petitioner.  Tr. Vol. 1, 150:14-18.  However, when Ms. Sumner was the au pair, Petitioner could not secure stable lodging for her between November 2023 and February 2024, and Ms. Sumner was frequently obliged to sleep at Petitioner's apartment.  Tr. Vol. 1, 150:19-151:24.

In the apartment, the children shared a bed in the bedroom and either Petitioner or Ms. Sumner would sleep on the pullout bed in the living room.  Tr. Vol. 1, 153:15-23.  Petitioner testified that on perhaps one occasion, Ms. Sumner shared the children's bed with E.P. and J.P. and he slept in the living room.  Tr. Vol. 1, 158:08-17.

Ms. Sumner testified that, on a typical weekday between November 2023 and April 2024, she would wake the children up at 7:00 a.m. and prepare breakfast for them.  J.P. would leave for school with David Benamou, the father of one of J.P.'s friends, and then Ms. Sumner would walk E.P. to school.  Ms. Sumner would then pick them up from school, provide them with a snack, and take them to their afternoon activities.  After the activities were over, Ms. Sumner would bring them home, prepare dinner for them, and then help them do homework before reading with

Page 30 – **FINDINGS OF FACT & CONCLUSIONS OF LAW**

them and putting them to bed. Tr. Vol. 2, 259:23-261:02. The children would go to bed between 8:30 p.m. and 9:00 p.m.  Tr. Vol. 1, 85:21-86:11. Both children were enrolled in the conservatory, E.P. for music and J.P. for dance.  Tr. Vol. 1, 85:16-20.

The children did not have school on Wednesday afternoons, which would "be a very active afternoon of extracurricular activities."  Tr. Vol. 1, 86:12-15.  E.P. was enrolled in judo classes while J.P. was enrolled in soccer.  Tr. Vol. 1, 86:12-23.

Petitioner testified that he tried to be with the children for dinner and to put them to bed on weekdays and testified that he traveled extensively with the children on the weekends.  Tr. Vol. 1, 86:20-87:03.  Ms. Sumner testified that, on the weekends, the children had planned activities, like sleepovers or trips to the water park or time with friends or grandparents.  Tr. Vol. 2, 261:08-14.

Petitioner testified that J.P. was behind in school and was initially in danger of not advancing to the next grade, although Petitioner testified that she caught up over the course of the year with help from Petitioner, the au pairs, and her paternal grandparents. Tr. Vol. 1, 87:07-14.  Ms. Champert was J.P.'s teacher during the 2023-2024 school year and testified that J.P. had difficulty with math and grammar at the beginning of the school year. Tr. Vol. 2, 224:14-15.  However, Ms. Champert testified that, by February 2024, J.P.'s performance had improved to the point where Ms. Champert felt that J.P. would be able to advance to the next grade. Tr. Vol. 2, 224:18-225:18.

Petitioner testified that E.P. also had to do some catching up in school but that she did not have the same difficulties as J.P. Tr. Vol. 1, 87:15-19.  However, Petitioner

testified that E.P. had to do significant and "more challenging" catching up with her musical training and that he hired a private teacher for her for four months. Tr. Vol. 1, 87:20-88:03.

While in France, the children were regularly seen by a pediatrician and by a dentist, and the children also visited an orthodontist. Tr. Vol. 1, 89:08-14. Petitioner admitted on cross-examination that he misrepresented to the children's French medical providers that he had "full custody" of the children under the French judgment. Tr. Vol. 1, 125:03-18.

Petitioner engaged a therapist for the children after they arrived in France, but the children were only seen three times by the therapist, between November and December of 2023. Tr. Vol. 3, 512:15-22. Petitioner discontinued therapy for the children in December 2023. Tr. Vol. 3, 512:23-513:03. Petitioner testified that the psychologist told him the children "were great and that they were not showing any sign of trauma and that they didn't need to have that level of support." Tr. Vol. 1, 89:15-24. Testimony presented during the hearing indicated, however, that E.P. refused to speak with the therapist during those sessions. Tr. Vol. 3, 513:04-515:19; Tr. Vol. 2, 312:03-12. Text messages between Petitioner and Ms. Sumner from December 2023 also show that E.P. refused to speak to the therapist. Resp. Ex. 220, at 8, 11.

In March 2024, Petitioner felt that it was urgent that the children be seen by a psychologist because E.P. was exhibiting "overwhelming" bursts of anger. Tr. Vol. 3, 516:04-517:13. Likewise, Ms. Champert asked Petitioner to have J.P. evaluated

by a psychologist because J.P. "had some issues." Tr. Vol. 2, 234:09-13. Ms. Champert testified that J.P. was "very intelligent," but needed additional help "because of stress. She was under stress." Tr. Vol. 2, 236:15-18.

Although it is clear from her testimony that Ms. Sumner was very fond of the children, the evidence is that the children had some highly fraught interactions with Ms. Sumner. In her testimony, Ms. Sumner initially denied that the children struggled behaviorally or psychologically, other than missing their mother. Tr. Vol. 2, 304:22-305:02. However, when pressed on this issue, Ms. Sumner admitted that one of the children had told her that "they hate life," and Ms. Sumner had communicated this to Petitioner via a messaging app. Tr. Vol. 2, 305:03-306:24; Resp. Ex. 220, at 7. Although Ms. Sumner initially testified that the children did not have behavioral issues, she admitted that E.P. had an explosive tantrum in which she struck Ms. Sumner multiple times and attempted to run away. Tr. Vol. 2, 308:08-309:24; Resp. Ex. 220, at 12-13.

Ms. Sumner was also in communication with Respondent and informed Respondent that the children were distressed during their father's long absences because they did not have either of their parents with them. Tr. Vol. 2, 312:18-312:02; Resp. Ex. 221, at 2. Ms. Sumner testified that J.P. would take out pictures of Respondent and cry during the periods when Petitioner was traveling for work. Tr. Vol. 2, 313:03-07; Resp. Ex. 221, at 1. Ms. Bourne also testified that the children, and particularly J.P., were upset because their mother was not there and that they did not know when they would see her. Tr. Vol. 2, 187:11-15.

Petitioner testified that J.P. had "explosive" interactions with Ms. Sumner on multiple occasions and confirmed that there was an incident in which E.P. struck Ms. Sumner multiple times. Tr. Vol. 1, 163:01-164:22. E.P. also made more than one attempt to run away while in Ms. Sumner's care. Tr. Vol. 1, 164:01-20. Ms. Sumner informed Petitioner that the children's behavior improved when Petitioner was not in town and that their behavior became worse when Petitioner returned from his work trips. Tr. Vol. 1, 165:03-166:14; Tr. Vol. 2, 309:25-311:16; Resp. Ex. 220, at 13-14. The evidence of the children's violent or explosive outbursts and attempts to run away contradicts Petitioner's testimony that the children were so well adjusted that they did not require therapy. Tr. Vol. 1, 166:15-24.

Ms. Bourne, the children's short-term au pair, testified that the children had many friends at their French school. Tr. Vol. 2, 186:10-13. Ms. Bourne also testified that the children were very attached to their housecat. Tr. Vol. 2, 204:10-13. The Court heard testimony from David Benamou, who is the father of a classmate and close friend of J.P. from the children's time in France in 2023-2024. Tr. Vol. 2, 245:07-09, 246:01-25. Ms. Sumner testified that the children had friends in France and connected with them daily through their after-school activities and, on weekends, through sleepovers, and on playdates. Tr. Vol. 2, 266:24-267:14.

J.P.'s teacher Ms. Champert testified that the children's classmates were "shocked" and "asked many questions" when the children were removed to the United States in April 2024. Tr. Vol. 2, 230:02-04. Mr. Benamou testified that his daughter

was saddened by the children's sudden departure from France in April 2024.  Tr. Vol. 2, 251:13-15.

Respondent communicated regularly with the children while they were in France.  Tr. Vol. 3, 475:20-22; Tr. Vol. 1, 93:17-94:15.  Respondent also visited the children in France in August 2023, October 2023, December 2023, and February 2024 during the children's school vacations.  Tr. Vol. 1, 99:02-20.

Respondent testified that the children "were so homesick and so freaked out" during their time in France in 2023-2024.  Tr. Vol. 3, 475:24-25.  Respondent testified that the children were exhausted from how many activities they had been signed up for and that, in order to have a break from the pressure, E.P. would intentionally put her violin out of tune in order to escape from playing for the first forty-five minutes of class.  Tr. Vol. 3, 475:25-476:06. Respondent testified that the children were "confused" and "very unsettled" about their return to France and "it sounded like they were just getting run ragged."  Tr. Vol. 3, 476:08-17.  Respondent also testified that E.P. was "super scared of her teachers" in France.  Tr. Vol. 3, 476:07.

While in France, Respondent testified that the children "felt abandoned" because they were "pawned off on other people when au pairs weren't around."  Tr. Vol. 3, 476: 16-23.  During the Court's interviews with the children, they expressed a similar sentiment, telling the Court that they felt it was unfair that Ms. Sumner was obliged to care for them full time during Petitioner's long absences.

Respondent testified that the children's time in France was "very hard" for them and that they "desperately wanted to come home."  Tr. Vol. 3, 476:24-477:01.

This is consistent with what the children themselves told the Court during their interviews. When Respondent would visit the children in France, they asked her to bring "anything and everything [she] could" from the United States, including books, toys, other "things they wanted from home." Tr. Vol. 3, 477:01-06. When the children were in France, they missed their friends, their cat, their bedrooms, their maternal grandparents, and their cousins. Tr. Vol. 3, 484:04-11.

During video calls with Respondent, the children would ask her to walk around their house in the United States and show them their bedrooms. Tr. Vol. 3, 484:06-07. When Respondent would visit them in France, the children would ask her to bring them notes and photos from their friends in the United States. Tr. Vol. 3, 484:09-11.

## VIII.  Removal to the United States

Respondent traveled to France in April 2024 for the children's school vacation and took the children on a trip to Perpignan in southeastern France on April 5, 2024. Tr. Vol. 1, 101:02-09. At the time, there was an order by the French courts forbidding the removal of the children from France. Tr. Vol. 1, 103:13-24. Contrary to that order, Respondent took the children by boat to Morocco and from Morocco to the United States. Tr. Vol. 3, 498:08-499:04.

On April 12, 2024, Respondent notified Petitioner by email that she had taken the children to Oregon. Tr. Vol. 1, 105:17-18; Pet. Ex. 65. Petitioner filed the present case shortly thereafter.

The Court heard a significant amount of testimony and evidence concerning the children's lives in Ashland since their return from France and after the filing of

the Petition. Because this evidence falls outside of the relevant period, the Court has considered it only for the very limited purpose of assessing the children's acclimatization to Oregon in the relevant period. *See, e.g., Kalff v. Fennell*, Civil No. 26-00112 MWJS-KJM, 2026 WL 1047809, *2 n.1 (D. Hawaii April 17, 2026) (allowing respondent to submit photographs of the child from after the relevant period "solely to advance his argument that they accurately captured how well acclimatized LKKF was in Hawai'i even in the period predating the alleged wrongful retention."). The Court assigns little, if any, weight to evidence from outside the relevant period in determining the children's habitual residence.

Since returning from France in April 2024, the children have lived with Respondent at Respondent's parents' home. Tr. Vol. 3, 462:03-08. The children resumed attending Bellview Elementary School for the balance of their third-grade year. Tr. Vol. 3, 462:11-463:04. The children's classmates were "super excited" to have the children back and "just picked up where they left off." Tr. Vol. 3, 470:14-16.

The children did not have difficulty reintegrating into the Oregon schools and easily adapted to the expectations of the Oregon schools. Tr. Vol. 3, 392:07-393:02.

The children were also "very excited" to reconnect with a core group of friends at their school, and they continued to be friends with that same "core group" the following year. Tr. Vol. 3, 391:04-08, 392:02-06. Ms. Bereszczak testified that her daughter was part of this "very tight group of friends," with E.P., J.P., and two other children, Tr. Vol. 3, 531:11-20, and that when the children returned to Oregon, Ms. Bereszczak's daughter quickly resumed her friendship with the children. They

"reconnected as if they never left," and they remain close friends to the present day. Tr. Vol. 3, 530:02-531:10.

Dr. Steidler testified that when the children returned to the United States in April 2024, they resumed their close friendship with Dr. Steidler's daughter "nearly immediately." Tr. Vol. 4, 567:11-13. The children spend time with Dr. Steidler's daughter "nearly every day." Tr. Vol. 4, 568:09-11.

Ms. Rea testified that when the children returned to the United States, the children were "ecstatic, excited, joyful to be with their cousins, their family again." Tr. Vol. 3, 542:18-21. E.P. and J.P. resumed their close relationship with their cousins "virtually straight away." Tr. Vol. 3, 542:13-17.

Respondent testified that the children are strongly attached to Ashland, Oregon, Tr. Vol. 3, 491:05-17, which is consistent with statements the children made to the Court during their interviews. Respondent testified that the children are strongly opposed to returning to France and would have to be "physically restrained" to get them on an airplane to France. Tr. Vol. 3, 495:01-09. Petitioner acknowledged that the children had also expressed objections to returning to France to him during a telephone call. Tr. Vol. 3, 503:03-505:12. As discussed below both children expressed strong and consistent objections to returning to France during their interviews with the Court.

## CONCLUSIONS OF LAW

### A. General Standards

The Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention") was adopted in 1980 "[t]o address the problem of international child abductions during domestic disputes." *Monasky v. Taglieri*, 589 U.S. 68, 71 (2020) (internal quotation marks and citations omitted). The United States has ratified the treaty and enacted implementing legislation, the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001-9011. ICARA authorizes federal district courts and state courts to hear Hague Convention petitions. 22 U.S.C. § 9003(a). Courts must decide cases "in accordance with the Convention." 22 U.S.C. § 9003(d). France has also ratified the treaty.

"It is the Convention's core premise that the 'interests of the children in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'" *Monasky¸* 589 U.S. at 72 (internal quotation marks and citation omitted, alterations normalized). The Hague Convention "ordinarily requires the prompt return of a child wrongfully removed to retained away from the country in which she habitually resides." *Id.* "When a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must 'order the return of the child forthwith,' unless certain exceptions apply." *Abbott v. Abbott*, 560 U.S. 1, 9 (2010).

Among the exceptions, as relevant to this case, are (1) the "grave risk of harm" exception; and (2) an exception alternately referred to as the as the "age and maturity defense" or the "wishes of the child" exception.

To establish a prima facie case under the Hague Convention, the petitioner must prove by a preponderance of the evidence that: (1) the child was "habitually resident" in a foreign county that is a signatory to the Hague Convention; (2) the removal of the child breached the petitioner's custody rights under the foreign country's law; and (3) the petitioner was exercising custodial rights at the time of the removal. 22 U.S.C. § 9003; Hague Convention, arts. 3, 4.

## B. Habitual Residence

The Hague Convention does not define "habitual residence," and courts have applied the standard that "[t]he place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Monasky*, 589 U.S. at 77. "[A] child's habitual residence depends on the totality of the circumstances specific to the case" and is a "fact-driven inquiry." *Id.* at 71, 78. "[A] child's 'mere physical presence' in a country 'is not a dispositive indicator of' his habitual residence." *Nisbet v. Bridger*, 124 F.4th 577, 588 (9th Cir. 2024) (quoting *Monasky*, 589 U.S. at 81). A child's "residence in a particular country can be deemed 'habitual,' however, only when her residence there is more than transitory" and "habitual" implies "customary, usual, of the nature of a habit." *Monasky*, 589 U.S. 76 (internal quotation marks and citation omitted, alterations normalized). "In general, a child's habitual residence is 'the place where he or she has been physically present for an amount of time sufficient

for acclimatization and which has a 'degree of settled purpose' from the child's perspective.'" *Nisbet*, 124 F.4th at 584 (quoting *Karkkainen v. Kovalchuk*, 445 F.3d 280, 291-92 (3d Cir. 2006)). "This approach considers a child's experience in and contacts with her surroundings, focusing on whether she developed a certain routine and acquired a sense of environmental normalcy by forming meaningful connections with the people and places she encountered." *Nisbet*, 124 F.4th at 584 (internal quotation marks and citation omitted).

"For older children capable of acclimatizing to their surroundings, courts have long recognized facts indicating acclimatization will be highly relevant." *Monasky*, 589 U.S. at 78. Such facts include (1) geography combined with the passage of an appreciable period of time; (2) age of the child; (3) immigration status of child and parent; (4) academic activities; (5) social engagements; (6) participation in sports programs and excursions; (7) meaningful connections with the people and places; (8) language proficiency; and (9) location of personal belongings. *Nisbet*, 124 F.4th at 584; *see also Berg*, 2025 WL 3564735, at *7 ("Facts that courts considered for determining habitual residence or acclimatization include: length of stay, social engagements and excursions, meaningful connections to the community, language proficiency, academic activities, parental employment, location of personal belongings, participation in religious activities, location of the child's medical care, previous limited stays in other countries, and parental intent." (collecting cases)).

As noted, a child's habitual residence "depends on the totality of the circumstances specific to the case." *Monasky*, 589 U.S. at 71. This is a "fact-driven

inquiry," in which courts must be "sensitive to the unique circumstances of the case and informed by common sense." *Id.* at 78 (internal quotation marks and citation omitted). "No single fact, however, is dispositive across all cases." *Id.* "The bottom line: There are no categorical requirements for establishing a child's habitual residence[.]" *Id.* at 80-81. As a result, a child's habitual residence "presents what U.S. law types a 'mixed question' of law and face—albeit barely so." *Monasky*, 589 U.S. at 84. "The inquiry begins with a legal question: What is the appropriate standard for habitual residence?" and, once that standard has been identified, the court undertakes a factual analysis: "Was the child at home in the particular country at issue?" *Monasky*, 589 U.S. at 84.

As discussed above, Judge McShane determined in Hague I that, in July 2022, the children's habitual residence was France, but noted that, as of December 2022, there was "clear evidence" that "the children are certainly creating a habitual residence in the United States without any great impediment." Hague I. Tr., 53:24-54:01.

The Court concurs with Judge McShane's observation. Between their arrival in Oregon in July 2022 and their removal to France in July 2023, the children established strong and durable ties to their community in Ashland, Oregon. The children became highly acclimatized to life in the United States.

The evidence shows that the children were enrolled in an Oregon elementary school, where they appear to have flourished. The children performed well academically and befriended their classmates.

The children were engaged in a robust schedule of social activities during the 2022-2023 period. The Court heard evidence from several witnesses about J.P.'s enthusiasm for participating in youth soccer. The Court also heard evidence concerning the children's participation in an aerial arts program in 2023, an activity which the children remain passionate about.

J.P. and E.P. formed lasting friendships with other Oregon children and the evidence is that many of those friendships survived their removal to France and subsequent return to the United States. It is particularly notable to the Court that when Respondent would visit the children in France between August 2023 and April 2024, the children would ask her to bring them notes and photographs from their friends in Oregon. The children also formed close relationships with their maternal family in Oregon and particularly with their maternal cousins. The evidence at trial showed that the sudden removal of the children to France in July 2023 shocked and distressed their friends and family in Oregon.

Respondent testified that when she would call the children during their time in France, they would ask her to show them videos of their home and their bedrooms in Oregon and they would ask her to bring them toys, favorite treats, and other mementos of Oregon during her visits with them in France. This strongly suggests that the children were deeply attached to Oregon and viewed Ashland, rather than Paris, as their home.

The children were enrolled with pediatricians, dentists, and orthodontists in both Oregon and France. While the provision of medical care merits some

consideration in the totality of the circumstances, "they speak to the decisions of a parent providing for her child's needs, not to whether [the child] became integrated into a social and family environment such that [a particular country] became her home." *Kalff*, 2026 WL 1047809, at *18.

The Court concludes that the children's habitual residence was the United States and that their removal to France between late July 2023 and early April 2024 was a transitory interruption of their habitual residence in the United States.

To be sure, there is contrary evidence. During their time in Paris, the children lived continuously at Petitioner's apartment and, as discussed below, were enrolled in school and in extracurricular activities. The children also have family in France, notably their paternal grandparents, and they seem to enjoy a warm relationship with them. "But acclimatization—measured by the depth and stability of a child's integration into a social environment—is something categorically different from temporary comfort." *Kalff*, 2026 WL 1047809, at *17.

The children were enrolled in a French school during most of the 2023-2024 school year, although the evidence and testimony is that they struggled to adapt to the demands of the French education system. Both children required remedial "catching up" and, for a time, there was concern that J.P. would not be able to advance to the next grade. Respondent testified that E.P. was afraid of her teachers in France. This evidence stands in marked contrast to the positive and meaningful relationships the children formed in their Oregon elementary school.

Petitioner enrolled the children in multiple extracurricular activities in France. The children were kept very busy, but there is limited evidence of the children's enthusiasm for or connection to those activities or the people they met through them. *See Nisbet,* 124 F.4th at 588 ("The ultimate object for evaluating a child's social engagement is to assess acclimatization."). E.P. is a gifted musician and Petitioner enrolled her in a music conservatory, but Petitioner testified that she had a challenging time catching up to her classmates and that he hired a private tutor for her. Respondent credibly testified that E.P. was afraid of her teachers in France and would deliberately take her violin out of tune to temporarily escape the pressure of performance. Given this evidence, it is difficult to credit the children's enrollment in those activities as evidence of meaningful connections in France.

Petitioner and the children's au pairs testified that the children had friends in France, and Mr. Benamou testified about his daughter's friendship with J.P. However, Respondent was able to testify in detail about the children's friends in Ashland and to present the Court with photographs and other evidence documenting the children's rich social life in Oregon in 2022-2023. Resp. Ex. 202. The Court also heard testimony from Mr. Olson and from the parents of several of the children's American friends describing the children's relationships with their friends and about the effect of their sudden departure on those friends. The Court concludes that the children's most significant relationships were with their maternal family and their friends in the United States, rather than in France.

Page 45 – **FINDINGS OF FACT & CONCLUSIONS OF LAW**

As the district court in *Kalff* observed, "[t]here is a difference—and a legally significant one—between a child who has adapted to her surroundings during a temporary stay and a child who has become firmly rooted in them." *Kalff*, 2026 WL 1047809, at *18 (internal quotation marks and citation omitted). Here, after hearing the testimony and reviewing the evidence, the Court is convinced that the children, at best, adapted to their stay in France between late July 2023 and early April 2024, but did not become firmly rooted there as they had in the United States between July 2022 to July 2023.[4]

In sum, the Court concludes that, at the time of their removal from France in April 2024, the children's habitual residence was the United States. The Petition will therefore be denied without needing to reach the issue of whether the children were wrongfully removed from France or wrongfully retained in the United States. However, the Court will address the additional defenses raised by Respondent because one of them, the "mature child exception," provides an additional, independent basis for denying the Petition.

---

[4] Even the children's adaptation to France appears to have been incomplete. It is not the role of a federal district court in a Hauge case to determine the best interests of the children or to speculate on where the children would be happiest and this Court will not embark on such a dubious undertaking. *See Asvesta v. Petroutsas*, 580 F.3d 1000, 1020 (9th Cir. 2009) (finding that a Greek court "stepped outside of its role as a Hague Convention tribunal by inquiring into the best interests of the child."). However, there was considerable evidence that the children were deeply unhappy in France and that they acted out in explosive ways. There are aspects of this evidence, such as E.P.'s attempts to run away or the children asking Respondent to show them their bedrooms in the United States or to bring them notes and photographs from their Oregon friends, that are, to some extent, probative of the question of habitual residence, and the Court has considered the evidence for that limited purpose.

## C. Respondent's Objections

### 1. Age and Maturity Defense

Courts "may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [the child's] views." Hague Convention, art 13. Respondent has the burden to establish, by a preponderance of the evidence, that this exception applies. 22 U.S.C. § 9003(e)(2)(B); *Berg*, 2025 WL 3564735, at *9 (citing *Rodriguez v. Yanez*, 817 F.3d 466, 473-74 (5th Cir. 2016)). "The standard for evaluating a child's objections under the Convention is more restrictive than the standard for evaluating a child's wishes in a custody case." *Berg*, 2025 WL 3564735, at *9 (citing *Kovačić c v. Harris*, 328 F. Supp.3d 508, 523 (D. Md. 2018)); *see also Hirst v. Tiberghian*, 947 F. Supp.2d 578, 597 (D.S.C. 2013) ("Additionally, the court must distinguish between a child's objections, as defined in the Hague Convention and the child's wishes as in a typical child custody case, the former being a stronger and more restrictive standard than the latter." (internal quotation marks and citation omitted); *see also Nelson v. Petterle*, 782 F. Supp.2d 1081, 1094 (E.D. Cal. 2011) (holding same).

The exception is construed narrowly "so its application does not undermine the express purposes of the Convention," and "proving that the defense applies is not dispositive; courts retain discretion to order repatriation despite that showing." *Swett v. Bowe*, 733 F. Supp.3d 225, 264 (S.D.N.Y. 2024). "Expression of a preference to remain in the respondent's country is not enough to disregard the narrowness of the age and maturity exception to the Convention's rule of mandatory return."

*Nelson*, 782 F. Supp.2d at 1094 (internal quotation marks and citations omitted, alterations normalized).

The district court in *Berg* observed that the Ninth Circuit has not provided definitive standards on how to evaluate whether a child has objected to return, but that other Circuits "have differentiated between a child's generalized preference for remaining in the United States and their particularized objection to returning to another country," and that these objections "may be inferred even if the child does not state them directly." *Berg*, 2025 WL 3564735, at *9-10 (citing *Tann v. Bennett*, 648 Fed. App'x 146, 149 n.3 (2d Cir. 2016); *Rodriguez*, 817 F.3d at 476)).

"The Convention does not establish a minimum age to trigger this provision, and if a court determines that a child's views are 'the product of undue influence,' they should not be taken into account." *Nelson*, 782 F. Supp.2d at 1094 (quoting *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 279 (3rd Cir. 2007)); *see also* 51 F.R. 10494-01, *available at* 1986 WL 133056, at *10510 (Mar. 26, 1986) ("A child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child.").

Here, the children are eleven years old. The Court interviewed each child separately in chambers, in the presence of court staff and the court reporter but without the presence of either the parties or their counsels. The Court questioned them about their school, their friends, their extracurricular activities, and their lives

in both the United States and in France. Both children expressed considerable enthusiasm for skiing.

The Court found the children to be bright, intelligent, and articulate. They denied being coached in what to say and the Court found this denial, and the rest of the children's statements, to be highly credible. The Court was alert to any possibility of coaching during the interviews and detected none. The Court finds that the children's statements were not the result of coaching or undue influence.

Both children expressed strong and specific objections to returning to France. Both E.P. and J.P. told the Court that they had struggled in the French schools and that they did not want to find themselves academically behind their peers. The children both expressed a strong attachment to their maternal grandparents, their friends, and their pets, and an aversion to being separated from their friends and maternal family. Both children spoke fondly about their lives in Ashland.

J.P. stated that she did not like living in Paris, citing the small size of their father's apartment and the necessity of sharing a bed with her sister. E.P. also expressed dissatisfaction with their living situation in France, noting the small size of the apartment and the shared bed. When the Court suggested that their father might find a larger living space, J.P. told the Court that she would still object to returning because she found Paris to be loud and overwhelming, contrasting it unfavorably with Ashland.

E.P. told the Court that everything about her life in the United States was better than her life in France, except that she misses her paternal grandparents and

the cat that they had in Paris.  Both children expressed warm sentiments about their paternal grandparents.

J.P. told the Court that, when the children were in France in 2023-2024, their father was frequently absent and they were left for long periods in the care of their au pairs and that, even when their father was in town, they would only see him for a limited amount of time each day.  This is consistent with other evidence and testimony the Court heard during the trial.

E.P. stated that she did not wish to even visit France because she was afraid that, if she did, her father would prevent her from returning to the United States.

The children expressed a desire for a relationship with their father, but both described their unhappiness and anger with his efforts to make them return to France.  Both children told the Court that their father did not understand that they did not want to live in France.  The children cited Petitioner's lack of understanding and his insistence that they live in France as impediments to their relationship with him.

Both children separately related that, during their time in France in 2023-2024, E.P. tried to run away while they were in the care of their au pair, Ms. Sumner. E.P., who was eight years old at the time, went into her father's wallet for a credit card, with the goal of purchasing plane tickets to return to the United States, but the attempt was foiled by Ms. Sumner.  E.P. told the Court that Ms. Sumner had understood her desire to return to the United States, but that her father had not.  The

children, who each separately described E.P. attempting to run away, meant for the story to convey the depth of their unhappiness in France.

The Court finds that E.P. and J.P. have attained a sufficient age and degree of maturity that it is appropriate for the Court to take their views into account in resolving the Petition. Both children expressed specific and concrete objections to returning to France which go beyond a mere preference for remaining in the United States. Although the mature child exception is not necessarily dispositive, the Court finds that E.P. and J.P.'s objections to returning to France provide an independent basis for denying the Petition, even if the Court had not already determined that their habitual residence was the United States.

### 2. Grave Risk of Harm

Under Article 13(b) of the Convention, "a court is not bound to order the return of the child if the court finds that the party opposing return has established that return would expose the child to a grave risk of physical or psychological harm." *Golan v. Saada*, 596 U.S. 666, 676 (2022). "Under Article 13(b), a court in its discretion need not order a child returned if there is a grave risk that return would expose the child to physical harm and otherwise place the child in an intolerable situation." 51 F.R. 10494-01, *available at* 1986 WL 133056, at *10510. "So as not to impair the Convention's general policy, this exception is narrowly drawn" and must be based on clear and convincing evidence. *Cuellar v. Joyce*, 596 F.3d 505, 509 (9th Cir. 2010). Even if the standards of grave risk of harm are met, the court retains the discretion to grant or deny return. *Golan*, 596 U.S. at 676.

This provision is "not intended to be used by defendants to litigate (or relitigate) the child's best interest" and only evidence "directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination." 51 F.R. 10494-01, *available at* 1986 WL 133056, at \*10510 (Mar. 26, 1986). The exception is also "not a license for the court in an abducted-to country to speculate on where the child would be happiest." *Cuellar*, 596 F.3d at 509.

The respondent must show that the risk to the child is "grave, not merely serious." 51 F.R. 10494-01, *available at* 1986 WL 133056, at \*10510. A lower standard of living in the country of return is not a grave risk of harm. *Cuellar*, 596 F.3d at 509. Likewise, "[t]he fact that a child has grown accustomed to her new home is never a valid concern under the grave risk exception." *Cuellar*, 596 F.3d at 511. "A respondent parent can establish a grave risk of harm from abuse where the petitioning parent had actually abused, threatened to abuse, or inspired fear in the children in question." *Ciampa v. Nichols*, Case No. 8:24-cv-02556-DOC-ADS, 2025 WL 521009, at \*13 (C.D. Cal. Feb. 18, 2025) (internal quotation marks and citations omitted). "Spousal violence may also establish a grave risk of harm, particularly when it occurs in the presence of the child." *Id.* (internal quotation marks and citation omitted).

Here, Respondent's arguments under the grave risk of harm exception are largely directed at Petitioner's treatment of Respondent and his abusive litigation strategies. While there is no doubt that Petitioner's behavior has been detrimental

to Respondent and has forced her to spend large sums of money that might otherwise have been put toward the benefit of the children, the grave risk of harm exception is fundamentally concerned with threats to the *children themselves* rather than to their mother.  The Court is not satisfied that Petitioner's arguments concerning coercive control by Petitioner meet the standard for a grave risk of harm to the children.

The Court heard considerable testimony and received voluminous exhibits and concludes that Respondent has not carried her burden on this exception.

**CONCLUSION**

For the reasons set forth above, the Petition is DENIED.  Final judgment shall be issued accordingly.

It is so ORDERED and DATED this _____3rd_____ day of June 2026.


 /s/Ann Aiken
ANN AIKEN
United States District Judge

Page 53 – **FINDINGS OF FACT & CONCLUSIONS OF LAW**